```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA        :
                                     :
 4   vs.                             : No. SA:18-CR-00603
                                     : San Antonio, Texas
 5   BRADLEY LANE CROFT(1),          : October 8, 2019
     Defendant.                      :
 6   ********************************************************

 7          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS (Volume 1)
                   BEFORE THE HONORABLE DAVID A. EZRA
 8              SENIOR UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:
     FOR THE GOVERNMENT:
10     Gregory J. Surovic, Esquire
       Fidel Esparza, III, Esquire
11     United States Attorney's Office
       601 N.W. Loop 410, Suite 600
12     San Antonio, Texas  78216
       (210)384-7020; greg.surovic@usdoj.gov
13

14   FOR THE DEFENDANT:
       Thomas Joseph McHugh, Esquire
15     William A. Brooks, Esquire
       Law Offices of Thomas J. McHugh
16     130 E. Travis Street, Suite 425
       San Antonio, Texas  78205
17     (210)227-4662; thomasjmchughlaw@gmail.com

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

# I N D E X

**OPENING STATEMENT**                                    **PAGE**

By Mr. Surovic                                      11


**GOVERNMENT WITNESS:**

**RUFUS THEODORE COBURN, III**

By Mr. Surovic                          16, 103

By Mr. McHugh                           61, 109

1    *(October 8, 2019, 10:53 a.m., open court.)*

2                              \*   \*   \*

3             COURT SECURITY OFFICER:  All rise.

4             COURTROOM DEPUTY CLERK:  SA:18-CR-00603, United States

5    of America versus Bradley Lane Croft.

6             THE COURT:  Appearances please.

7             MR. SUROVIC:  Greg Surovic for the United States with

8    Mr. Fidel Esparza.  We're present and ready.  The third

9    individual -- actually there are four individuals at our table.

10   The third individual is Mr. Jeff Breen, he's our case agent

11   from Veterans Administration OIG and we also have Mr. Joe Cantu

12   who is our litigation support individual.

13            THE COURT:  All right.  Counsel.

14            MR. MCHUGH:  Good morning, Your Honor, Tom McHugh and

15   William Brooks, we represent the defendant.  The defendant is

16   in the courtroom today, he is ready to proceed.  Also at

17   defense table with us is Mr. Fred Olivares, a retired, but not

18   retired FBI agent.

19            THE COURT:  It's good to have all of you here.  I need

20   to do a very brief colloquy with the defendant and counsel.

21            Counsel, my understanding is that your client has

22   determined that he wishes to proceed to trial before this Court

23   without benefit of a jury and that he has appeared before

24   Magistrate Judge Henry Bemporad and has gone through a full

25   colloquy where Judge Bemporad recited to him his constitutional

BENCH TRIAL PROCEEDINGS                    4

1    right to a jury trial and all of the attendant questions with

2    of course you present with him and that he did indicate in the

3    final analysis that he did wish to go forward and waive his

4    right to a jury trial, is that correct?

5                MR. MCHUGH:  That is correct, Your Honor.  He wants

6    issues of fact and law to be presented to his Court.  He feels

7    comfortable with that.  He is aware of his waiver, he knows

8    what his rights are and he's ready to proceed.

9                THE COURT:  All right.  I have a waiver of right to a

10   jury trial and I'm going to have that handed down to your

11   client.  I know he's already signed it, but I want to have him

12   identify his signature on the document as well as yours,

13   counsel.  Mr. Surovic, did you sign that as well?

14               MR. SUROVIC:  Yes, Your Honor.

15               THE COURT:  You need to identify your signature also.

16               MR. SUROVIC:  Yes, sir.

17               THE COURT:  And that is your signature, sir?

18               THE DEFENDANT:  Yes, sir.

19               THE COURT:  You heard what your counsel said and do

20   you agree with all of that?

21               THE DEFENDANT:  Yes, sir.

22               THE COURT:  And you do understand that you can change

23   your mind even now and go forward with the jury?

24               THE DEFENDANT:  Yes, sir, I do.

25               THE COURT:  And you do not wish to do that?

1            THE DEFENDANT:  No, sir.

2            THE COURT:  All right.  Okay.  And that is your

3    signature on the document?

4            THE DEFENDANT:  Yes, sir, it is.

5            THE COURT:  And that's yours, counsel?

6            MR. MCHUGH:  It is, Your Honor.

7            THE COURT:  And that is yours, counsel?

8            MR. SUROVIC:  Yes, sir, it is.

9            THE COURT:  If you'll present that to Ms. Springs, I

10   will approve it.  I am satisfied that given his full

11   explanation of his rights and that he has made a knowing and

12   voluntary waiver of a right to a jury trial and the Court

13   hereby approves that waiver and I'm signifying it by my

14   signature on the waiver document just mentioned and I'm going

15   to direct that that be filed.

16            Now, I do need to disclose, I think both counsel are

17   well aware of this.  I am a United States Marine Corps and

18   United States Army veteran and it's no different than my

19   getting a paycheck from the United States government I don't

20   think.  I haven't been either on active or reserve duty for

21   many decades and I don't receive any VA benefits.  I am

22   medically retired from the military due to an injury I received

23   in the military, but I chose not to pursue benefits, so I'm not

24   getting any VA benefits at all.  So is that something that

25   bothers you?

1          MR. MCHUGH:  I don't believe so, Your Honor, at all,

2    but let me just confer with my client.

3          THE COURT:  All right.

4          *(Pause.)*

5          MR. MCHUGH:  The defendant has no objection to this

6    Court proceeding in this case.

7          MR. SUROVIC:  And Your Honor, certainly the government

8    has no objection.

9          THE COURT:  All right.  Okay.  Well, counsel, I think

10   given the fact that we're going without a jury, this should

11   shorten the case somewhat because there's one way of presenting

12   a case if you have to present it to a jury of individuals who

13   don't understand the process and don't understand what the

14   charges are all about and quite another thing if you present it

15   to a judge who, particularly one who has many years at the

16   bench as I have, who certainly understands what the charges are

17   all about.  In many cases such as this, and I'm not suggesting

18   the government do this, but in many cases such as this where

19   the defendant has waived a jury, the government has chosen to

20   go forward on just a specific number of their counts reserving

21   the other counts.  And then if there is a conviction, they

22   frequently will not pursue those additional counts.  I don't

23   know whether this is something the government has considered or

24   not.

25         MR. SUROVIC:  Your Honor, I don't believe that this

1    case would be appropriate for that at this time, so we're going

2    to go forward on all of our counts.

3                THE COURT:  All right.  Okay.

4                MR. SUROVIC:  I guess we can advise the Court exactly,

5    one of the things we discussed when it was decided that we were

6    going to go this route, Your Honor, was that we were going to

7    try to work out stipulations of testimony so we can expedite.

8                THE COURT:  That will be fine.

9                MR. SUROVIC:  We probably will not be calling all of

10   the witnesses that we had originally intended.

11               THE COURT:  Were there some witnesses who had

12   preserved their testimony by deposition?

13               MR. SUROVIC:  No, Your Honor.  There is already one

14   stipulation of testimony concerning the Federal Reserve person,

15   pretty straightforward stuff.  But now with the jury not here,

16   there's no reason to have them see a live person when it can be

17   done on a piece of paper.

18               THE COURT:  Sure, of course.  I'm not going to compel

19   anybody to do anything.  I let the lawyers try their lawsuit as

20   you both know because you've both been in front of me many

21   times.  The other thing is that in a criminal jury trial before

22   a judge without a jury, there are two ways that the Court can

23   proceed.  I can simply reach a verdict at the end of the trial

24   the same as a jury would.  You hand the jury a verdict form and

25   the jury says guilty or not guilty and I can simply reach a

1   verdict or if the parties want to go through the trouble to do

2   so and prepare proposed findings of fact and conclusions of

3   law, the Court can decide the case issuing findings.  The

4   findings are of not a lot of value actually because if there's

5   an appeal, the Appellate Court will go to the briefs and to the

6   record.  And the judge's findings, I don't know what value they

7   are because when you appeal from a jury verdict, you don't have

8   findings, you have the record and you have the argument.  But I

9   wanted to get that out of the way because you obviously -- had

10  we known this beforehand, you would have already submitted

11  those if you wanted to, so you're going to have to do it now.

12  So how would you prefer the Court to proceed, just to issue a

13  verdict?

14        MR. SUROVIC:  That would be the government's

15  preference, Your Honor.  We'll present the full case as far as

16  the facts in the case and we'll let the judge decide and the

17  defense can have the record on appeal.

18        THE COURT:  What would you like, counsel?

19        MR. MCHUGH:  First of all, Your Honor, the defense

20  believes there will be no appeal, but we will -- what was the

21  question?

22        THE COURT:  Whether you wish me to when rendering a

23  verdict, instead of rendering an oral verdict from the bench,

24  whether you want the Court to prepare findings of fact along

25  with its verdict which will take some time and then you would

BENCH TRIAL PROCEEDINGS                    9

1    have to submit proposed findings.

2          MR. MCHUGH:  That's right.  The defendant would prefer

3    to go that route.

4          THE COURT:  You want me to do proposed findings?

5          MR. MCHUGH:  Yes.

6          THE COURT:  All right.  I will do that.  So you need

7    to submit, both parties need to submit proposed findings to the

8    Court and you need to start working on them now.

9          MR. MCHUGH:  May we approach the bench?

10                            *   *   *

11         (Sidebar.)

12         MR. MCHUGH:  First of all, thank you for both

13   Mr. Surovic and I believe this is in the government's and the

14   defendant's long-term best interest and we believe that we can

15   greatly consolidate the presentation and the defense in this

16   case.  It's my understanding that we were all prepared to begin

17   the trial today and there are witnesses here.  And so

18   Mr. Surovic has informed us who the witnesses are and

19   everything, but just for this Court's accommodation, you know,

20   after today or after tomorrow, you know, the Court doesn't have

21   to try it from beginning to end.  You know, it just needs to

22   accommodate the Court's schedule because I believe we have Sean

23   is out of town.

24         MR. SUROVIC:  Your Honor, actually we have a number of

25   witnesses that are flying in.  Of course, we had flown them in

1  based on the theory that we were going to be trying this with a
2  jury.  One key witness is an IRS agent who was reassigned to
3  the Virgin Islands.  He's flying back, but he won't be here
4  until I think it's Thursday night, so we'll need him.  We may
5  very well run out of witnesses -- I'm presenting it to the
6  Court to cut out a lot of stuff.
7            THE COURT:  We could always take a break and come
8  back.
9            MR. SUROVIC:  We may need to do that or one of those
10  things where we knock out five or six witnesses.
11            THE COURT:  The problem is my schedule stinks, quite
12  frankly, but with a criminal trial I certainly don't want to be
13  pushing this off for weeks.
14            MR. MCHUGH:  No, no, no.
15            MR. SUROVIC:  I anticipate, Your Honor, under the
16  current situation we can probably finish by Friday.  There are
17  certain witnesses we have to call that won't even be here until
18  Thursday night and there may be gaps Wednesday afternoon,
19  Thursday afternoon where witnesses have not come into town and,
20  therefore, we'd need to move them to Friday.
21            THE COURT:  Okay.  I wasn't sure what you meant by not
22  trying it beginning to end.
23            MR. MCHUGH:  I mean if there's an accommodation which
24  has to be made for somebody who is out of town, you know, the
25  defendant isn't going to object to that.

```
1              THE COURT:  That's fine.

2              MR. SUROVIC:  Thank you, Your Honor.

3              THE COURT:  Okay.  All right, very good.

4          (Sidebar concluded.)

5                             *   *   *

6              THE COURT:  All right.  Counsel, I am more than happy

7    to allow you an opportunity to make a brief opening statement

8    if you'd like to make one to the Court.  Shouldn't be more

9    than -- we don't have a jury, so it shouldn't be more than ten

10   minutes, but if you'd like to make a brief opening statement,

11   I'm happy to listen to it.

12             MR. SUROVIC:  Your Honor, we'll keep our opening

13   statement extremely brief, we'll just give you a thumbnail

14   sketch of where we're going in this case.

15             THE COURT:  All right.

16             MR. SUROVIC:  It's a scheme to defraud case.  Wire

17   fraud and everything flows out of that scheme to defraud.  The

18   scheme to defraud in this case all involves the defendant and a

19   company that he created called the Universal K-9.  Universal

20   K-9 is a company that he created to train working dogs, dogs

21   that were to be used by law enforcement or security agencies

22   and things like that to detect drugs.  They're also called

23   fight dogs, things like that.  The problem that he ran into and

24   where the scheme to defraud arises is that he decided that he

25   wanted to be able to tap into GI Bill funds in order to pay for
```

1    the classes that the students were taking.  He came up with

2    this plan where he would rescue dogs from the pound, train them

3    to do this stuff and he would give them freely to the officers

4    that would come to actually do his course.  The problem he ran

5    into is he didn't have instructors that were qualified that

6    would get him the certifications that he needed from the

7    Veterans Administration so that he could actually qualify to

8    receive G.I. Bill funds.  And so when he applied to the -- in

9    Texas it's the Texas Veterans Commission.  Each state has their

10   own little commission that the V.A. works through on things

11   like education.  When he applied to them, one of their key

12   questions is who are your instructors and what are their

13   qualifications.

14          You can't get approved unless you identify who your

15   instructors are and what their qualifications are.  He gave

16   them four names.  You're going to hear three of those people.

17   Two of them are police officers from North Texas.  They're

18   going to come down and they're going to talk about how they had

19   actually taken Mr. Croft's course earlier and had gotten their

20   dog and they were trying to learn some more, but one of the

21   things that they noticed when they were taking his course was

22   it really -- for law enforcement there was something missing.

23   You really have to understand how to do an effective search and

24   probable cause and things like that.  So one of these

25   individuals, Wes Keeling, offered to set up a course like that

1  for Mr. Croft, and actually, in fact, taught a couple of those

2  courses.  He had a friend who also helped him with the course

3  once.  Magically those two individuals appear as instructors on

4  Mr. Croft's application to the TVC to get approval for this

5  course.  They're listed as a variety of different things that

6  they never agreed to teach as far as being instructors.  In

7  fact, they're listed to teach courses that they hadn't even

8  taken and had no idea how to do that, the kennel master course,

9  for example.  They never agreed to do this for Mr. Croft.  One

10  of them, Dustin Bragg, only had a very, very distant

11  relationship with Mr. Croft in the first place, didn't even

12  realize he was going in the V.A. process.  You're also going to

13  hear from a third individual, Jesse Stanley, who is a retired

14  military, long-time dog handler for the military.  In fact, he

15  trains dogs right now for HSI out at Lackland.  He had met with

16  Mr. Croft and he had actually trained some dogs for Mr. Croft,

17  but he had never agreed to teach people for Mr. Croft and

18  certainly they had never discussed anything about him doing

19  that for the V.A.

20        The fourth individual that you will not hear from is

21  the most interesting individual of the four that he submitted

22  saying they were going to be instructors because that is an

23  individual by the name of Art Underwood.  He also, like

24  Mr. Stanley, was a long-term dog handler for the military, had

25  been through a lot of courses.  But the problem with

1  Mr. Underwood and the reason you're not going to hear from Mr.

2  Underwood is because at the time that the defendant made the

3  submission to the V.A. and to the TVC saying this guy was going

4  to be an instructor, he had been dead for a year and a half.

5  He wasn't available to be an instructor.  So that is the heart

6  of the scheme to defraud.  Mr. Croft needed to get this TVC

7  approval and the V.A. approval so that he could draw funds from

8  the V.A. for these courses.  He used false names in order to do

9  it and in the course of the period, he was able to bill

10  $1.2 million to the V.A. for courses that he was giving

11  fraudulently because he didn't have the instructors that he

12  said he was going to have.  And without those, he would not

13  have been approved for the course.

14         The use of those four identities, Your Honor, is the

15  basis for the four aggravated identity theft counts.  There's

16  also money laundering involved here and false tax filings.

17  That comes out of the way that Mr. Croft operated his business.

18  You see, Mr. Croft didn't want his name on any of the paperwork

19  for the business, so he created Universal K-9 and he created a

20  number of different forms that say Universal K-9 with the

21  number nine, there's Universal K-9 that spells out nine, but

22  his name is not on any of that paperwork.  He got these other

23  individuals, some of them didn't even know that they were being

24  used for that and he listed them as officers of the

25  incorporation.  He recruited this other individual, Richard

1    Cook, to be the president.

2             One of the things you will see, you will get a chance

3    to talk to Mr. Cook, he was also former military.  He was in a

4    very unfortunate incident on the east side of town.  He was

5    shot in the head, so he has some brain damage.  He is a hundred

6    percent disabled.  Mr. Cook *(sic)* brought him in, listed him as

7    president, had him do a lot of things, for example, create all

8    the bank accounts for the company.  And then Mr. Croft would

9    keep the checkbook, would keep the ATM card and would direct

10   Mr. Cook to make withdrawals and things like that for him in

11   order to fund Mr. Croft's life-style.  One of the things he

12   bought was a nearly half million-dollar motor home that he

13   lived in with his daughter at the place where the business was

14   being run.  And these are all funds that came from the Veterans

15   Administration.  You'll see the evidence that traces it from

16   the Veterans Administration to the accounts to the purchases.

17   He also did -- he was in the process of buying the property

18   that the classes were being given on.  He didn't do it in his

19   name.  He did it in the name of Universal K-9 and of course he

20   doesn't appear on it, but he is the one that's benefiting from

21   all this.  And there are a number of purchases that he made for

22   his own personal benefit, had nothing to do with the business.

23   For example, jet skis, elective surgery, things like that.  He

24   was using the funds that he was obtaining through Universal K-9

25   for his own personal benefit.  And that is where the last two

1    counts, the income tax fraud counts come in because during this

2    period he was filling out personal income tax return forms

3    claiming that he only made $2,000 a year when in fact he was

4    spending grossly in excess of $2,000 on personal items for

5    himself.  Your Honor, after you've heard the evidence, there

6    will be no doubt in your mind that there was a scheme to

7    defraud and all the charged acts are in fact true.

8          THE COURT:  Thank you.  Counsel, do you want to make

9    your opening statement now or do you want to reserve?

10         MR. MCHUGH:  I'm going to reserve, Your Honor.

11         THE COURT:  All right.  You can call your first

12   witness.

13         MR. SUROVIC:  Your Honor, at this time, the government

14   will call Mr. Rufus Coburn.

15         COURTROOM DEPUTY CLERK:  Please raise your right hand.

16                         *   *   *

17      *(RUFUS THEODORE COBURN, III, Government Witness, Sworn.)*

18                         *   *   *

19         THE WITNESS:  I do.

20         COURTROOM DEPUTY CLERK:  Have a seat, sir.

21                    DIRECT EXAMINATION

22   BY MR. SUROVIC:

23   Q.  Sir, would you state your full name please?

24   A.  Yes, Rufus Theodore Coburn, III.

25   Q.  And how do you spell Coburn?

1    A.   C-O-B-U-R-N.

2    Q.   And how are you currently employed, sir?

3    A.   I'm really retired, but I'm volunteering to serve on the

4    Travis County Appraisal Review Board.

5    Q.   Could you give the Court an idea of what your career has

6    been up to today?

7    A.   Twenty-seven years in the United States Air Force,

8    commissioned officer retired with the rank of Colonel, flew

9    fighters, commanded large flying organizations, mobile tactical

10   communication units, four-year tour at headquarters Air Force

11   at the Pentagon.  After that career, 17 years with the Texas

12   Veterans Commission, over the last ten years of which I

13   functioned as the assistant director and director for the

14   veterans education programs.

15   Q.   Let's talk a little bit about your time with Texas Veterans

16   Commission.  What is the TVC, Texas Veterans Commission?

17   A.   That's a State commission that provides and oversees

18   services to veterans, eligible veterans and their dependents

19   and that really covers most of the veterans throughout the

20   state.

21   Q.   What type of programs does it administer?

22   A.   Oh, my goodness, quite a large -- probably the largest is

23   the Medical Division, which medical disability complaints and

24   as of about -- I can't tell you the exact figures today, but

25   that was 350, 400-odd people stationed throughout the state

1    providing those services to veterans.  Also had while I was

2    there, we started the fund for veterans assistance which was

3    partially funded through the Texas Lottery which provided

4    assistance to all kinds of veterans programs throughout the

5    state, the Veterans Education Program which I managed for a

6    while which oversaw the administration of the Federal G.I. Bill

7    as well as the State veterans programs such as the Hazelwood

8    extension.  Also had claims -- the other real important federal

9    program was the employment and unemployment programs for

10   veterans, primarily employment dealing with providing services,

11   employment services to veterans throughout the state with a lot

12   of emphasis on the disabled veterans.

13   Q.   So there were a variety of different programs that are

14   administered through the TVC?

15   A.   Yes, sir.

16   Q.   Some of them are State, some of them are Federal?

17   A.   They were a combination of the two.  Both the employment

18   program was a State program that ran right along a Federal

19   program.  The same thing with medical program and also with the

20   education program.

21   Q.   What's the relationship between the TVC and the Veterans

22   Administration, the V.A.?

23   A.   The TVC basically works hand in glove with the V.A. and the

24   programs that we just -- that I just enumerated.  And in the

25   case of the education program, TVC and -- this is for all the

1    states.   The states basically are the administrators of the

2    federal education program.   In other words, we head the

3    approval authority for the various institutions, everything

4    from flagship university programs down to mom and pop

5    on-the-job training programs.   The program was essentially

6    based on the Federal program providing the benefits to the

7    eligible veterans and those benefits were used at the approved

8    institutions.

9    Q.   And you indicated that you performed some of those jobs as

10   far as education benefits.   Could you describe for the Court

11   what duties you performed for the TVC while you were working

12   there?

13   A.   Well, the duties I performed basically as the assistant

14   director and director, I managed those programs for the State

15   which in many cases was with the Federal program liaison to the

16   schools, there are specific criteria for approval of even the

17   flagship university system schools set out in Title 38 Code of

18   Federal Regulations which has to do with the programs which can

19   be approved, the veteran eligibility is addressed, the types of

20   programs, for instance, degree programs, certificate programs.

21   And there's different criteria for each.   There's also criteria

22   as regards whether the program was accredited or not so that

23   they could, in fact, have nonaccredited programs approved.

24   Q.   Let's talk a little bit about that.   What different

25   categories of schools are actually eligible to receive G.I.

1  Bill benefits?

2  A.  Just about any school.

3  Q.  You mentioned flagship schools, that's our State

4  universities, right?

5  A.  That's correct.  And it can go down to, as I said, mom and

6  pop on-the-job training programs or formal on-the-job training

7  programs such as federally approved apprenticeship programs.

8  Nonaccredited schools which in many cases are schools that are

9  not accredited by a State accrediting agency, but which met the

10 criteria for training outlined in the Code of Federal

11 Regulations.  So we had some schools that, for instance, the

12 school like a beauty and barber school, cosmetology school

13 regulated by the State Cosmetology Commission, but we had other

14 schools that didn't have a particular -- fall under a

15 particular State approving agency or an ancillary agency, a

16 sister agency to the Veterans Commission that approved those

17 and they basically enumerated the requirements for the school.

18 Q.  When you say they basically enumerated the requirements,

19 who are we talking about as far as "they"?

20 A.  In the case of something like the Cosmetology Commission,

21 the State Cosmetology Commission has rules for schools.  For

22 those schools that are not regulated by a particular State

23 agency, if they applied for approval, they had to meet the

24 criteria outlined in Title 38, Code of Federal Regulations and

25 State law.

Rufus Coburn - Examination                    21

1            THE COURT:  So let me ask you a quick question,

2    Colonel.  Would these programs, putting aside the university

3    programs where somebody is going to get an accredited degree

4    and so forth, would these training schools, if I may use that

5    term, have to be schools that would lead to some sort of

6    potential gainful occupation or career?  Or were they just like

7    somebody might take -- can somebody use their G.I. benefits to

8    go to an art appreciation program just because they wanted to?

9            THE WITNESS:  One of the criteria for approval, sir,

10   is they had to lead to a vocational objective.

11           THE COURT:  They had to lead to a vocational

12   objective.  Thank you, Colonel.

13   BY MR. SUROVIC:

14   Q.  Sir, we talked about these different types of schools.

15   What is the process for the approval of a noncollege degree,

16   non-accrediting institution?

17   A.  First thing to have to happen would be the school would

18   have to contact the TVC and office there, Veterans Education,

19   and request an application.  We had general applications based

20   on, of non-accredited schools, based on the criteria outlined

21   in the Title 38, Code of Federal Regulations.  A couple of

22   other things that enter into that, it had to be licensed by a

23   particular State agency normally associated with the type of

24   vocation that the school was dealing with.

25           Trying to think of a real good example of that other

1    than something we had several -- well, I'm thinking about

2    non-accredited apprenticeships which is not really the same

3    thing, but the criteria basically was laid out the same way.

4    So if you had a school, it had to have a structured program.

5    Code of Federal Regulations outlines attendance criteria,

6    outlines academic progress, that has to be defined, so the

7    school has to have structure.  And the outlines that we sent,

8    they request for school approval, basically was a

9    fill-in-the-blank form where the school would state what their

10   vocational objective was, explain their physical plan they had,

11   the curriculum that they were offering, and so forth and

12   finally vocational objective which that led to.

13   Q.  And if they filled out this form and they met all the

14   requirements, would TVC be the agency that would actually

15   approve them?

16   A.  That form would be sent back to TVC Veterans Education.

17   Normally this was an iterative process.  I don't recall in my

18   tenure that we had any school complete the form absolutely

19   100 percent complete and correct the first time out.  I like to

20   use the term "iterative process".  Our staff tried to work

21   directly with the school officials to ensure that the

22   criteria -- if it was a question on it, it could be discussed,

23   it could be sorted out and if we could figure out a way that

24   within the parameters of the Code of Federal Regulations that

25   we could approve the school, we would.  So it was an iterative

1    process that ultimately led to the approval.  Once the school

2    was approved, we did staff assistance visits to the school.

3    Normally we try to go to all the schools at least once a year.

4    Because of the size of our staff and the number of schools we

5    had, that was virtually impossible.  But we did try to get to

6    most of them over a period of two or three-year period.  And

7    when we would visit the school, we would do a staff assistance

8    visit, it wasn't really an audit.  We took a look at the

9    catalog which we had approved.  We compared that catalog with

10   what the school was actually doing to assure that they were

11   providing the training that they allege they were providing in

12   the manner they said they would provide and that those criteria

13   still met the approval criteria and the Code of Federal

14   Regulations.  We also looked at the enrollment process for the

15   veterans because the enrollment and the time that the veteran

16   student spent hour-wise at the school was a direct impact on

17   what the veteran would get paid and what the school would get

18   paid from the V.A.  So we looked at that part, the financial

19   part of it as well and there was a formal report prepared on

20   that and that went back into the end of the school files.  If

21   we identified deficiencies, we tried to work with the school to

22   ameliorate those deficiencies.  And the overall thrust was to

23   have as broad and wide diverse opportunity for education

24   experiences for veterans in the State of Texas as we could, so

25   we worked really hard to -- we work with schools that were --

1   if they were having problems meeting some of the criteria, we

2   would try to work with them to help them be able to achieve the

3   approval standard.

4   Q.   I'm going to show you Government Exhibit Number Five.  And

5   you should be able to see it on the screen in front of you?

6   A.   Yes, sir.

7   Q.   Is this the letter that you would send out, the form to

8   provide people who had requested information with the

9   application so they could start the process?

10  A.   Yes, sir, this is part of the cover letter.

11  Q.   And if we go to page two, this is the beginning, this is

12  for non-accredited institutions, correct?

13  A.   Yes, that is the cover sheet for the approval packet for

14  non-accredited schools.

15          MR. SUROVIC:  And if we go to page five, if you can

16  zoom in on Exhibit Two.

17  A.   And this is a list of what we call exhibits, but this is a

18  list of the subtitles and the information that the school would

19  be requested to submit.

20  Q.   And they were told up front these are the things that you

21  have to provide us?

22  A.   That's correct.

23  Q.   Now, if we go down to section 2j, can you read what J says?

24  A.   J says, quote, Roster of administrative and instructional

25  staff with credentials or license numbers.

1   Q.  How important a section was that section?  I assume all the

2   sections are important?

3   A.  All the sections are important, but that was particularly

4   important because we had no other way of verifying the

5   qualifications of the instructors at the various schools.  In a

6   case like a cosmetology school, there's State licensing

7   requirements.  For other types of schools, for instance, flight

8   school, there are Federal licensing requirements as a flight

9   instructor.  If there were other types of local or State or

10  Federal level license, then we would require that.

11  Q.  And you would not -- if you didn't give this information,

12  you would not get approval, is that fair to say?

13  A.  That's correct.

14  Q.  In the course of your work for TVC, did you become aware of

15  a business by the name of Universal K-9?

16  A.  Yes, we did.

17  Q.  How did you become aware of Universal K-9?

18  A.  Universal K-9 applied and I'm not exactly sure the year, I

19  want to say around 2014 maybe, but anyway they applied

20  initially as many schools apply.  Their initial application was

21  deficient in many ways and we tried to work with them.  And as

22  I recall, that went on over a matter of several months, even as

23  much as a year, maybe little over a year.  It was an iterative

24  process, it was not as smooth as some might be, but we after I

25  would say after fairly extensive interaction, we did get them

1   approved and I think in part that is due to the fact the Texas

2   Workforce Commission worked very closely with Universal K-9 to

3   help them craft a catalog that fit the requirements that we had

4   for Veterans Education.

5   Q.  Okay.  In the course of working on the approval for

6   Universal K-9, did you meet an individual by the name of Brad

7   Croft?

8   A.  Personally, no.  I talked to him on the phone many times.

9   I don't recall if we e-mailed back and forth, but we talked on

10  the phone quite a few times.

11  Q.  Did you ever deal with anyone other than Brad Croft

12  concerning the approval for Universal K-9?

13  A.  Not for the school approval.  Now, we did work with,

14  because the school was not approved as a school or formally

15  exempt, we had interaction with Texas Workforce Commission in

16  their capacity as the approval authority for non-accredited

17  schools, but we worked with them with many other schools as

18  well.

19  Q.  Did you ever deal with anyone other than Brad Croft that

20  actually was from Universal K-9 in order to get the approval?

21  A.  Not to my knowledge.

22  Q.  Why do you remember the process of Universal K-9 so well?

23  I'm sure you used to do a number of these every year.

24  A.  Well, it was a little turbulent.

25  Q.  What do you mean by that?

1    A.  Normally the process was that we would send the form out,

2    forms would be returned, our program staffer would work with

3    the school.  And as I said, it was an iterative process.  It's

4    not something -- it's fairly complex, it's fairly extensive.

5    Universal K-9 sent in, oh, for some of the exhibits that we

6    wanted particular information on, they kind of skirted the

7    edges of it, there were indirect answers and indirect

8    responses.  We worked back and forth with that with them and

9    also including working with the Texas Workforce Commission.  We

10   had I do recall one phone call where Universal K-9's owner

11   called the --

12   Q.  Who would Universal K-9's owner have been?

13   A.  Mr. Croft.  Called the Governor's Office and the result of

14   that was we had a conference, telephone conference call with

15   staffers from the Governor's Office.  And during that

16   conversation, Mr. Croft's inputs became quite heated and I

17   would say really to the point of totally getting out of hand.

18   But that happened.  The result of that call I think was pivotal

19   in the approval and that is we had representatives from the

20   Governor's Office, we had Mr. Steve Rye from Texas Workforce

21   Commission, myself and I don't remember the other party, maybe

22   another person from the Governor's Office.  But after that and

23   largely to Mr. Rye's concern and help, he and Mr. Croft sat

24   down and crafted a catalog which met the criteria that we

25   needed one for catalog approval and we did, in fact, approve

1    that.

2    Q.   Okay.  Now, in the process that you went through, you

3    indicated it took a period of time.  Notes were kept by members

4    of the staff at TVC in order to track the progress of this?

5    A.   Yes, sir.

6    Q.   And document the exchanges back and forth of that, correct?

7    A.   Yes, sir, it was.

8    Q.   By the way, have you ever heard the name -- other than in

9    conversation with me or with the agents, have you ever heard

10   the name of Richard Cook before?

11   A.   I can't say that I have, sir.

12   Q.   Could you explain for us who is Bebe Glasgow?

13   A.   Ms. Glasgow was one of my employees.  She was what we call

14   a program specialist and she was the program specialist

15   assigned to handle Universal K-9.

16   Q.   Could you tell us who Ms. Sue Jevning?

17   A.   Ms. Jevning was I believe about the second or third

18   replacement director for the Veterans Education Program after I

19   retired.

20   Q.   So she was one of your successors?

21   A.   Yes.

22   Q.   And what about Anita Chisholm?

23   A.   Anita Chisholm was another program specialist we had who,

24   as I recall, when Ms. Glasgow left, Ms. Chisholm picked up part

25   of the caseload that Ms. Glasgow had.

1   Q.   I'm going to show you what's been marked as Government
2   Exhibit Number 6i, sir.  Can you tell us what this is?
3   A.   Okay, this looks like a chronology of the -- well, it's a
4   complete timeline, yes, it's a chronology of the approval
5   application process between TVC Veterans Education and
6   Universal K-9.
7   Q.   And was this maintained as part of the actual file in the
8   case?  It came out of the TVC files?
9   A.   It came out of the TVC files, yes, sir.
10  Q.   This is dated -- there's a number on the top, 11/30/2015,
11  can you tell us what that indicates?  Would that be the date
12  that this was placed in the file?
13  A.   That could well have been, yes, sir.
14  Q.   I note that it talks about if you go down to the third
15  paragraph, first application January 18, 2013, is that correct?
16  A.   Best of my knowledge, I would say it is, coming out of the
17  files, because we kept extensive and accurate files.
18  Q.   Let's take a look at Government Exhibit 6a.  Is this that
19  first application from January 18th?
20  A.   Well, it's stamped received January 18th and with the State
21  approval agency stamp which was our office -- State approval
22  agency was the Federal function that we had, so all our stuff
23  was stamped in, so I would say yes, that's accurate.
24  Q.   Okay.  Can you tell me who is listed as the contact or the
25  owner for this business?  Who is listed as a contact first?

1    A.   The contact is Brad Croft.

2    Q.   And who is the owner?

3    A.   This lists the owner as Stan Schnitzer.

4    Q.   Did you ever have any contact with Mr. Stan Schnitzer?

5    A.   Never did.

6    Q.   If we go to page three of this document, can you tell me

7    who signed, if we go down to the very bottom, who signed the

8    application?

9    A.   This appears to be Brad Croft.

10   Q.   And it seems to be dated 12/12 since it was received

11   January 18th, would it be safe to say that this was originally

12   filed in December of 2012?

13   A.   I think that would be accurate, sir.

14   Q.   If we could go to page 27 of Government Exhibit 6a, can you

15   tell us what this page is?

16   A.   This is one of the exhibits we have at what we call the

17   school catalog, which the school catalog would be the document

18   that outlined the description of the school, the curriculum

19   involved and instructors as well.  So this is roster of

20   administrative and instructional staff that would be approved

21   or offered for approval with the school as part of the school

22   as instructors for the school.

23   Q.   So this would be Exhibit J, when we looked at Exhibit Five,

24   the basic application under section two, this would be Exhibit

25   J of that section two?

1   A.   That's correct, yes, sir.

2   Q.   What we were talking about as far as who was going to be

3   the instructors or the administrative staff?

4   A.   Yes, sir.

5   Q.   Who are the names listed here?

6   A.   Ray Nunez and Jesse Stanley.

7   Q.   And they are -- this indicates what courses they're going

8   to be teaching?

9   A.   Yes, it does.  It indicates their duties would be to teach

10  class, train dogs, courses would be police K-9 handlers course

11  and police K-9 trainers course for each one.

12  Q.   And again if we go to the bottom of the screen, who is this

13  signed by?

14  A.   That is Brad Croft, dated 12/12.

15  Q.   If we go back to Government Exhibit Number 6i, the

16  timeline, and if you look under the first application, what

17  reason was given for the first application not being accepted?

18  A.   First application 23 January 2013, TVC response after

19  evaluating program not approved primarily due to Universal K-9

20  having no permanent facility as well as participation of third

21  party contractor who is not approved for Veterans Education,

22  other deficiencies were not addressed.

23  Q.   Now, if we go to the next line down there, it talks about a

24  second application, is that correct?

25  A.   Yes, yes, sir.

1    Q.  Is this the process that an application would normally go

2    through that deficiencies would be identified and then a new

3    application would be generated?

4    A.  Yes, sir, as I mentioned, it was an iterative or is an --

5    I'm pretty sure it still is an iterative process, hopefully

6    culminating in school approval and with the school adhering to

7    the requirements for approval.

8    Q.  Let's take a look at Government Exhibit Number 6b real

9    quick.  We talked a little bit about what was on the timeline.

10   Can you tell us what 6b is?

11   A.  This appears to be a response --

12       (Pause.)

13       This is a response by an employee of Universal K-9 to get

14   more information or additional information to assist with the

15   approval, I believe.

16   Q.  And this was in response to the e-mail dated March 8, 2013?

17   A.  That would have been an e-mail outlining deficiencies to be

18   addressed.

19   Q.  Let's take a look now at Government Exhibit Number 6c.

20   Excuse me.  Before we move on, let's go back to 6b real quick.

21   You said this was an e-mail addressing some discrepancies?

22   A.  This would have been -- well, it appears to be -- that's

23   what it appears to be.  It seems that Ms. Santos says, "I

24   prepared a detailed letter of documentation --"

25       That would have been in response to what we would call a

1   deficiency letter which would be a letter outlining a

2   deficiency still that the school had not satisfied regarding

3   the approval process.

4   Q.  And if we jump to page 65 of that exhibit, 6b, can you tell

5   me what this is?

6   A.  This is roster of administrative and personnel staff,

7   similar to what we just reviewed on probably an earlier

8   rendition of this that only had Mr. Nunez and Mr. Stanley.

9   Q.  And so this now has an expanded list of instructors, is

10  that correct?

11  A.  That's correct.

12  Q.  And this was actually e-mailed with the e-mail that we

13  looked at the cover on 6b, is that correct?

14  A.  Well, if it had a date stamp on it, I could verify that,

15  but from what part of it we see, I would assume it is.

16  Q.  We can walk you through the entire exhibit if that would

17  help you?

18  A.  That's fine.  If it's got a date stamp on it, it would have

19  probably come in all at the same time or in response to a

20  certain date.

21      Yeah, that's fine.

22  Q.  And this again is signed by who at the bottom?

23  A.  Brad Croft.

24  Q.  Let's go to 6c.  Can you tell me what this is?

25  A.  This appears to be another later application.

Rufus Coburn - Examination                    34

1    Q.   Okay.  And --

2    A.   And that would be the first page of the application.

3    Q.   And if we go to the second page, you can actually see the

4    received stamp.  Can you tell me what the date is here?

5    A.   September 30, 2013.

6    Q.   So would this be the second application that is referred to

7    in the timeline?

8    A.   Appears to be.

9    Q.   Who is listed as the contact on this?

10   A.   Well, Brad Croft.

11   Q.   And who is listed as the owner again?

12   A.   Stan Schnitzer.

13   Q.   If we go to page three of the application, who signed the

14   application again?

15   A.   Brad Croft.

16   Q.   Now, let's go to page 46 of this application.  Can you tell

17   me what this is?

18   A.   This is a roster of administrative and instructional staff,

19   so these are going to be the folks who are teaching the

20   programs.

21   Q.   And it is essentially the same as the one we just looked at

22   on 6b, is that correct?

23   A.   Yes, sir.

24   Q.   And who signed this?

25   A.   Again Brad Croft.

1   Q.   And the individuals named here are who?

2   A.   Brad Croft, Ray Nunez, Jesse Stanley, Chris Tillman.

3   Q.   In this, normally where would you attach the certificates

4   of training and things like that?

5   A.   They would be behind this because we get the roster

6   personnel and then the qualifications of those personnel would

7   be attached behind that.

8   Q.   So if we open this up, we go to the next page, what is

9   this?

10  A.   This would be documentation of the credentials for the

11  individual instructor.

12  Q.   Now, this is just a resume for Bradley Croft, is that

13  correct?

14  A.   That's correct.

15  Q.   If we go to the next page, which is the second page of the

16  resume, that would not qualify as a certification, would it?

17  A.   No.

18  Q.   This is just a resume?

19  A.   It's just a resume.

20  Q.   We go to the next page, same thing, this is a resume for a

21  different individual, is that correct?

22  A.   It appears so.

23  Q.   And who is that individual involved here?

24  A.   That is Raymundo Nunez.

25  Q.   And then we can skip the next page, go on to page 51.  What

1    is this?

2    A.   Appears to be a similar outline for Jesse Stanley, Jr.

3    Q.   Again it's just a resume, there's no certificates attached?

4    A.   That's correct.

5    Q.   And if we go skip the next page, on page 53 we have another

6    resume, is that correct?

7    A.   That appears to be the same for Christopher Tillman.

8    Q.   Once again, there are no certificates, is that correct?

9    A.   That's correct.

10   Q.   Then if we skip the next page again, what is this?

11   A.   This appears to be a similar resume for Arthur L.

12   Underwood.

13   Q.   And this was received by your agency September 30, 2013, is

14   that correct?

15   A.   Yes, sir.

16   Q.   And he is listed as the K-9 lead trainer, is that correct?

17   A.   That's what it says, yes, sir.

18   Q.   Okay.   And if we show the next page, and show the next

19   page, there are no certificates attached to section J, is that

20   correct -- or Exhibit J?

21   A.   That's correct.

22   Q.   So had Mr. Croft met the requirements for submitting your

23   certifications for the potential instructors?

24   A.   We would have wanted a copy of certificates, at least maybe

25   not a copy of everyone that was listed, but at least a copy of

1  at least one certification of per person so that we would know

2  that they were certified in addition to the resume.

3  Q.  Would that have been communicated to Mr. Croft?

4  A.  I would imagine it would.  I can't imagine why it would not

5  have been.

6  Q.  If we go on back to Government Exhibit 6i, we'll see a

7  number of comments underneath the second application.  If you

8  could just take a look at those real quick.  Was it common to

9  go back and forth and back and forth as you described?

10  A.  Yes, sir.

11  Q.  That's what's going on with the second application, is that

12  correct?

13  A.  That's correct.

14  Q.  Then we go down to the heading, third application.  Before

15  we get there, let's show you Government Exhibit 6d.  Can you

16  tell me what this is?

17  A.  This looks like another application with -- I'm looking for

18  the date on this one.  Second submission 10/13.  So this looks

19  like another redone application to come in for additional

20  iteration with corrections.

21  Q.  And there are a number of notes actually attached to this,

22  is that correct?

23  A.  That's correct.

24  Q.  Is that normal that when people are reviewing these,

25  they'll make notes as far as the deficiencies they see?

1   A.  Yes, and it is -- generally it is formalized in the letter

2   back, but if it is -- in some situations where there is a

3   continuing conversation between the school official and the TVC

4   Veterans Ed. Office, a lot of things like that are discussed

5   and merely notes like this -- discussed over the phone and

6   notes like this go in the record as the memo.  So it could have

7   been either of those, but again the intent is to provide the

8   school an adequate amount of information so that they can

9   provide correct content back and so that the TVC could approve

10  them.  If they don't have it and we get to that point where the

11  or we would get to that point where the school just said, well,

12  you know, we can't do that for whatever reason, then you know,

13  we thank them for their efforts and that's it.  We are not able

14  to approve the school.

15  Q.  Okay.  Now, I notice that there's a sticky at the top of

16  the first page of 6d, says second submission 10/21/13?

17  A.  Yes, sir.

18  Q.  If we go back to Government Exhibit 6i, what does the

19  timeline indicate as far as October 21st, 2013?

20  A.  Okay, response to 10/3/13 letter received from Universal

21  K-9, Universal K-9 provided answers to part of the identified

22  deficiencies.  Universal K-9 submitted an exception from TWC

23  which allowed the company to train students under contract

24  basis only.  Exception does not -- well, you want me to read

25  the whole thing?

1  Q.  Yes, please.

2  A.  In parentheses it says, "Area police departments and

3  military units send their currently employed K-9

4  officers/service members for training at company/military

5  expense.  Exception does not allow for students admitted from

6  the general public, as required by 38 CFR, Code of Federal

7  Regulations."

8  Q.  That last part of that statement, what does that mean?

9  A.  Well, that means that the program is not open to the

10  public, that it cannot be approved for veterans training.

11  Q.  So anyone that applies has to be able to get in for it to

12  qualify for G.I. Bill funds?

13  A.  That's correct.

14  Q.  Let's go back to Government Exhibit 6d, let's look at page

15  101 -- first of all, 6d we just talked about the cover of this,

16  is that correct?

17  A.  Yes, sir.

18  Q.  Let's go to page 101 of this document, can you tell me what

19  this is?

20  A.  Okay, again this appears to be a later iteration of the

21  roster of administrative and instructional staff that would go

22  into the catalog approval and approval process for the school,

23  again it outlines to the left the name of the individual,

24  duties assigned, license number and it lists see attached

25  license.

1   Q.  Now, there are two notes attached there, is that correct?

2   A.  That's correct.

3   Q.  The first note is what?

4   A.  First note says, "All contract employees."

5   Q.  What does that mean?

6   A.  Which means they are not -- basically they're not assigned

7   as school staff.  That means they're not part of the school,

8   that they are external and the school has brought them in.

9   Then it says, "License is actually issued to school."

10       And I can't read -- there we go.

11  Q.  There's apparently some question there as far as what it

12  says?

13  A.  Something Ks and then yes.  And I'm not sure what that is.

14  Q.  Now, if we turn to the next page -- by the way, these are

15  the same individuals that Mr. Croft had been talking about for

16  the last couple applications, is that correct, himself and

17  three other individuals?

18  A.  That's correct.

19  Q.  Who has signed off on this?

20  A.  Brad Croft.

21  Q.  If we go to the next page, what is this?

22  A.  This appears to be a letter from the Texas Department of

23  Public Safety, Texas Private Security Bureau and it is to

24  Universal K-9.  "Dear manager, Find enclosed pocket card for

25  individuals listed below.  As licensed manager it is your

1    responsibility to check all the information on pocket card for

2    correctness --"

3              THE COURT:  You're reading too fast, sir.

4              THE WITNESS:  I apologize, I slipped back into that.

5    BY MR. SUROVIC:

6    Q.  Let me ask you this, sir.  Would this be a certificate, as

7    far as the TVC is concerned?

8    A.  No, I don't think so.

9    Q.  Can you tell us why not?

10   A.  Well, it says -- it talks about being a manager, a licensed

11   manager.  It doesn't talk anything about -- doesn't say school

12   at all.  It doesn't talk about instruction.

13   Q.  And if we go to the next page, it says the same thing

14   except for another individual, is that correct?

15   A.  That's correct.

16   Q.  This was for Chris Tillman?

17   A.  Yes, sir.

18   Q.  And there are two other exhibits in there if we go on to

19   the next two pages, same thing?

20   A.  Uh-huh.

21   Q.  They all talk about being managers, they don't talk about

22   dog handlers?

23   A.  That's correct.

24   Q.  If we could go back to Government Exhibit Number 6i, you

25   see there's an entry following this the October 21st entry,

1    November 12th entry.  Can you tell us what that says?

2    A.   Third application --

3    Q.   Right before that.

4    A.   "November 12th, TVC response, approval denied primarily due

5    to the fact that the TWC exception does not allow Universal K-9

6    to offer training to the general public.  In addition,

7    Universal K-9 has no permanent facility, Code of Federal

8    Regulations, CFR, does not allow for approval of a mobile or

9    itinerant program as Universal K-9 submits their program to

10   be."

11   Q.   So as far as November of 2013, they still did not have

12   approval, is that correct?

13   A.   That's correct.

14   Q.   Looking at the timeline, there seems to be a jump to June

15   of 2015 for the next application coming in?

16   A.   Yes, sir.

17   Q.   Is that correct?

18   A.   Yes, sir, to the best of my recollection.

19   Q.   Do you know what was going on during that period of time?

20   A.   Actually at that point, as far as the school was concerned,

21   I don't know that we had any interaction with them.  And that

22   might not be unusual, especially with somebody starting a

23   school.  Sometimes it takes longer to get the process lined up

24   and to address deficiencies.  Normally we ran on a 30-day

25   cycle, we would notify if we had had interactions with the

1    school, we would have notified them, but if we had not received

2    any response back after a couple tries, we probably would have

3    just let it drop and assume they would reapply when they became

4    compliant or just dropped the whole request.

5    Q.  Let's take a look at the application sent in on June 2015,

6    Government Exhibit 6e.  Is this that application or third

7    application?

8    A.  Yes, sir.  It appears so.

9    Q.  And if we go to page four, this would be the cover page

10   we've been looking at from the other applications, is that

11   correct?

12   A.  Yes, sir.

13   Q.  Who is listed as the contact point for the third

14   application?

15   A.  Brad Croft.

16   Q.  And who is listed as the owner for the third application?

17   A.  Stan Schnitzer.

18   Q.  Once again if we go to the next two pages, go to page six,

19   and at the bottom who signed this application?

20   A.  Brad Croft.

21   Q.  And it was submitted June 13th of 2015, is that correct?

22   A.  That is correct and the receipt date was the 16th,

23   June 16th.

24   Q.  Now, let's go to Exhibit 6e, page 33.  What is this again?

25   A.  This is again the roster of administrative and

1    instructional staff.

2    Q.  And it's pretty much the same as the one that was on the

3    2013 application?

4    A.  That is correct, yes, sir.

5    Q.  And if we go to the bottom, who is it signed by?

6    A.  Brad Croft.

7    Q.  Now, if we turn the page on this, go to page 34, this is

8    something a little different, this is not a certificate, is it?

9    A.  No, sir, it's not.

10   Q.  And if we go to the next page, this is a table of contents,

11   isn't that right?

12   A.  Table of contents for probably the catalog or information

13   that was submitted.

14   Q.  So in this application they jumped immediately from the

15   listing of names to the catalog.  Were they required to provide

16   you with a catalog of their school?

17   A.  The catalog, yes, and the catalog it generally can take --

18   for a non-accredited school, it can take a variety of forms, it

19   doesn't necessarily need to be, you know, published and bound,

20   it can be loose-leaf binder at least to describe the programs

21   and the courses that comprise those programs in detail.

22   Q.  Okay.  Let's take a look at Government Exhibit 6j.  Can you

23   tell us what this is?

24   A.  This looks like another deficiency letter or an excerpt

25   from a deficiency letter sent from Veterans Education back to

1    Universal K-9 to get additional information regarding the

2    information they provided.

3    Q.  And if we go to page four of that list of items, on page

4    four at the top there's an indication about an Exhibit J.  Can

5    you read that for us?

6    A.  Yes, sir.  Exhibit J.  "Positions referenced in catalog are

7    not listed on Exhibit J.  The request lists all administrative

8    as well as instructional staff.  The license number listed for

9    the instructors, listed on this exhibit is the number issued to

10   the company.  Please submit an Exhibit K for each instructor."

11   Q.  So would it be fair to say that this notified the company

12   specifically that they needed to provide certificates for the

13   individuals they were claiming as instructors?

14   A.  Explicitly, yes, sir.

15   Q.  Let's go to Government Exhibit 6f.  Now, this is also out

16   of the Texas Veterans Commission files, is that correct?

17   A.  It appears so, yes, sir.

18   Q.  Can you tell us what this is?

19   A.  This would be the response from Mr. Croft to Ms. Glasgow's

20   what we would call the deficiency letter, but the letter

21   identifying the issues yet to be resolved.

22   Q.  That was the thing we just talked about?

23   A.  Yes, sir.

24   Q.  This is an e-mail, is that correct?

25   A.  It appears so, yes, sir.

Rufus Coburn - Examination                    46

1   Q.  So it was sent electronically by Brad Croft to -- can you

2   read the names there that it was sent to?

3   A.  To Bebe Glasgow, Veterans Affairs, Rufus Coburn and Daniel

4   Paulino.

5   Q.  Who is Daniel Paulino?

6   A.  I have no idea, sir.

7   Q.  What is the date of this?

8   A.  October 4th, 2015.

9   Q.  Did this e-mail also contain a number of attachments?

10  A.  Well, it appears so.

11  Q.  Including a revised catalog and a number of other exhibits,

12  Exhibit F, Exhibit J, instructor, etc.?

13  A.  Yes, sir, it appears to most likely reference what was

14  listed in Ms. Glasgow's deficiency letter.

15  Q.  And if we scroll down, you'll see paragraph seven

16  specifically talks about Exhibits J and K, is that correct?

17  A.  That is correct, yes, sir.

18  Q.  And can you tell us this is essentially addressing some of

19  the discrepancies that were found, is that correct?

20  A.  Yes, sir, it appears so.

21  Q.  If we read 7b, could you read that for us?

22  A.  Yes, "7b, Instructor certifications are enclosed herein."

23  Q.  And then in parentheses?

24  A.  "See Texas Commission On Law Enforcement certification

25  (T-C-O-L-E) for Universal K-9 Academy's curriculum supervisor,

1    Corporal Wesley Keeling and instructor Dustin Bragg."

2    Q.   Then it goes on to say?

3    A.   "Below is a brief description of the credentials and

4    certifications of Universal K-9 Academy's four instructors."

5    Q.   Who is it -- when we go on, who does it identify as the

6    various instructors?

7    A.   It identifies Wes Keeling.  It identifies Dustin Bragg, Art

8    Underwood, Jesse Stanley.

9    Q.   I believe that's all?

10   A.   And that's all.

11   Q.   And it also goes into -- for example, why don't you read

12   Wes Keeling?

13   A.   "Wes Keeling, TCOLE instructor cert. 2014.  In the

14   following areas to give instructions, K-9 interdiction, dual

15   and single-purpose handlers course, K-9 trainer/instructor

16   course, behavioral modification course.

17   Q.   So that indicated that he was going to be teaching those

18   courses?

19   A.   That would indicate to me that he is qualified in those

20   courses to instruct.

21   Q.   And if we go down to Art Underwood, could you read that

22   please?

23   A.   Yes, sir.  "Art Underwood, military trainers cert. 1977

24   U.S. Air Force, military kennel master cert. 1981, Air Force

25   trained in the following areas to teach, dual and

 1  single-purpose handlers course, trainer/instructor course,

 2  behavioral modification course, kennel master course.

 3  Q.  Okay.  Sir, and again this letter or this e-mail is

 4  advising you that these four individuals will be teaching these

 5  courses or they're qualified for these courses?

 6  A.  Yes, sir.

 7  Q.  And in fact, it even goes so far as to identify Mr. Wes

 8  Keeling is going to be the Academy's curriculum supervisor?

 9  A.  Yes, sir.

10  Q.  Then if we go to 6f, page 69 I believe, can you tell us

11  what this is?

12  A.  This again is a roster of administrative and instructional

13  staff.

14  Q.  And who is listed as the -- on the roster as administrative

15  and instructional staff?

16  A.  Wes Keeling is listed twice, Jesse Stanley, Art Underwood,

17  Brad Croft and -- Brad Croft is listed as operations director,

18  Richard Cook as office manager.  Wes Keeling, Jesse Stanley,

19  Art Underwood as instructors.

20  Q.  And then if we turn the page, the next page, would this be

21  considered a certificate, the type of certificate that you were

22  looking for?

23  A.  Yes, sir, it would.

24  Q.  And if we keep going through here, that's a certificate for

25  Wesley Keeling, is that correct?

1   A.   That is correct.

2   Q.   Then the next one, who is this one for?

3   A.   This one is for Arthur Underwood.

4   Q.   Air Force certificate of training?

5   A.   Yes, sir, that looks like an Air Force certificate of

6   training.

7   Q.   And then if we go to the next page?

8   A.   That's same thing, yes, sir.

9   Q.   It's a different certificate, but also --

10  A.   Different certificate, but it also looks like a Air Force

11  certificate of training.

12  Q.   Okay.  And this also for Mr. Underwood?

13  A.   This is for Arthur Underwood, yes, sir.

14  Q.   And we go to the next page, another certificate of training

15  for Mr. Underwood?

16  A.   Yes, sir.

17  Q.   And we go to the next page, Federal Law Enforcement

18  Training Center, Glencoe, Georgia.  Certificate for

19  Mr. Underwood, is that correct?

20  A.   Yes, sir, that's correct.

21  Q.   So these are all Mr. Underwood's certificates?

22  A.   Yes, sir.

23  Q.   And we've got another page, what is this?

24  A.   This is another certificate for Mr. Underwood.

25  Q.   And then the next page?

1   A.   Is another certificate for Mr. Underwood.

2   Q.   There were a number of certificates that were submitted for

3   Mr. Underwood, is that correct?

4   A.   Yes, sir, apparently so.

5   Q.   Let's jump ahead about four pages.  What is this?

6   A.   This appears to be a Texas Commission On Law Enforcement,

7   officer standards and education award for instructor

8   proficiency for Dustin C. Bragg.

9   Q.   That was another of the individuals mentioned on the

10  original paper?

11  A.   Yes, sir.

12  Q.   And just go through a couple more pages here.  If we could

13  skip to four more pages, can you tell us what this is?

14  A.   This is Air Force certificate of training for Jesse

15  Stanley.

16  Q.   And the next page, can you tell us what that is?

17  A.   This is a military police school.  And I was looking to

18  see, Lackland Air Force Base, so another Air Force certificate

19  of achievement to Jesse Stanley.

20  Q.   And then there are other certificates contained in the

21  packet for Mr. Stanley, is that correct?

22  A.   Yes, sir, I believe there were.

23  Q.   All these things would have been e-mailed to the TVC?

24  A.   That's correct.

25  Q.   Are these type of certificates the type of certificates

1   that you're looking for in order to validate the instructors?

2   A.  Generally, yes.  In some cases, one would have to take a

3   look and see the applicability if there's a direct relationship

4   to the course being taught or the proficiency that is being

5   sought.  Some certificates just from -- in the military you can

6   get certificates for lots of different things and some things

7   really don't translate to instructional capability or being

8   able to teach something, so those which were for teaching

9   credentials and so forth would be acceptable, yes.  The others

10  just because they attended a school or a particular skill

11  training might not be applicable.

12  Q.  Would you have or would the program have been able to

13  approve Universal K-9 without providing some sort of

14  certification for the instructors?

15  A.  No, we would not because we would have no way of verifying

16  they were qualified to teach what they were supposed to be

17  teaching.

18          THE COURT:  Is this a good time to break for lunch?

19          MR. SUROVIC:  We can, Your Honor, certainly.

20          THE COURT:  Well, it's 20 minutes after noon.

21          MR. SUROVIC:  Yes, sir.

22          THE COURT:  We'll return at 1:30, about 1:40.

23          COURT SECURITY OFFICER:  All rise.

24          THE COURT:  Colonel, you can step down.  Be careful.

25          *(12:19 p.m.)*

1                              *   *   *

2          *(2:02 p.m.)*

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Please be seated.  The Court would note

5   the presence of all counsel.

6          I just wanted to get something cleared up, counsel.

7   We're going to have to break a little early tomorrow for lunch

8   and it may take a little longer because tomorrow is the Federal

9   Bar Luncheon.  What is it, every month?

10         MR. SUROVIC:  Yes, sir.  You're the speaker.

11         THE COURT:  Yes.  I mean I can't skip it.  Laura is

12  going to check and see what time it is and where it is and how

13  long it will take us to get there and I'm not going to be

14  hanging around afterward to hobnob.  I'm going to be getting

15  right back.

16         MR. SUROVIC:  If I remember the invitation correctly,

17  it was from 12 to 1:00.  You'll certainly leave here by 11:30.

18  I don't think we could expect you to be back before 1:30,

19  that's what was going on in my mind.

20         THE COURT:  I wanted to let you know ahead of time

21  because of witnesses.

22         MR. SUROVIC:  Okay.

23         MR. MCHUGH:  Your Honor, to bring to the Court's

24  attention, the defendant has supplemented his defendant exhibit

25  list, the Court has a binder.  Counsel only received the binder

 1    today.  The information which would be relevant to Mr. Coburn

 2    would be e-mails of which all were received from and through

 3    the government.  And we consider it -- it may be possible

 4    impeachment, but I think he'll agree to his own words.

 5                THE COURT:  Whatever it is, it is.

 6                MR. SUROVIC:  Yes, sir.  And I don't think it's going

 7    to be an issue as far as -- I've told Mr. McHugh if the

 8    document came from us, we certainly don't have an issue as far

 9    as authentication.  I just wanted to make sure that he let

10    Priscilla be aware of that because I don't think they're on

11    Jurors.  The last exhibit list that I have ends with Defense

12    Exhibit Number 10.  I'm now advised there are 44 defense

13    exhibits numbered one through --

14                COURTROOM DEPUTY CLERK:  I only have ten.

15                THE COURT:  Mr. McHugh, you need to get them to her so

16    she can mark them.

17                MR. MCHUGH:  We will, Your Honor.

18                MR. SUROVIC:  Of that 44, certainly some of them are

19    e-mails.  Just looking through the binder right now, there are

20    others that are not that we may have objections to, so we're

21    not agreeing to all of them.

22                THE COURT:  She's just marking them.  She's not

23    admitting them in evidence.  You can proceed.  Where is the

24    witness?

25                *(Pause.)*

 1   BY MR. SUROVIC:

 2   Q.  Sir, I need to remind you that you're still under oath.

 3   A.  Yes, sir, I understand.

 4   Q.  We had ended before lunch talking about the third

 5   application and some of the factors that got it kicked back and

 6   an e-mail that was sent.  I would like to have you look again

 7   at Government Exhibit Number 6i, the second page of that

 8   exhibit.  And this indicates a certain timeline as far as what

 9   went on after the third application, is that correct?

10   A.  Yes, sir.

11   Q.  Could you summarize for us what happened after the third

12   application?

13   A.  Okay, I think the cogent point here is the fact that the

14   involvement of the Governor's Office in the approval process

15   and that resulted in a rather extensive telephone conversation

16   between Texas Veterans Commission, Mr. Steve Rye, the

17   Governor's Office at that time, Craig Bean and I don't remember

18   the name of -- there was a lady who was on that call, I don't

19   remember her name and Mr. Croft and myself.  And the whole

20   purpose of that was to try to determine what it would take to

21   get Universal K-9 approved.  And the result of that was, to my

22   recollection, that Mr. Rye with TVC sat down with Mr. Croft and

23   they crafted a catalog which we ultimately approved.

24   Q.  Okay.  Now, you indicated Mr. Rye, you're talking about

25   Steven Rye?

1    A.   Yes, sir.

2    Q.   Who does he work for?

3    A.   Texas Workforce Commission.  I may have misspoke.  I may

4    have said Veterans Commission, but it's Workforce Commission.

5    Q.   How did the Texas Veterans Commission, Texas Workforce

6    Commission work together to finally get this resolved?

7    A.   Once the catalog was completed, then it was submitted to

8    us, Mr. Croft submitted it and we staffed it and the -- it met

9    the, as I recall, it met the requirements that we had for

10   approval.

11   Q.   So there was a fourth application that was filed, is that

12   correct?

13        *(Pause.)*

14        Let me show you Government Exhibit Number 6g.  And if we

15   turn to the second page, and if you go down, can you tell us

16   what 6g is?

17   A.   Yes, sir, that's application which was received on the 4th

18   of March, 2016.

19   Q.   This was the application that was received after you had

20   had the discussions with Texas Workforce Commission and after

21   Mr.Croft --

22   A.   That's correct, yes, sir.

23   Q.   Can you tell us if we look at this page who is the contact

24   point again for this application?

25   A.   The contact point on this is listed as Brad Croft.

1  Q.  And then if we move down, the name of the owner, who is the

2  owner?

3  A.  This says owner is Richard Cook.

4  Q.  And there's a box below that, it lists all partners or if a

5  corporation all officers, directors and trustees, is that

6  correct?

7  A.  Yes, that is correct, sir.

8  Q.  Can you tell us who is listed in that box?

9  A.  Richard Cook, president, Anthony Ward, secretary, Steve

10  Peek, treasurer.

11  Q.  Sir, I'm going to ask if we can go to page 15 of this

12  exhibit.  Can you tell me what this is?

13  A.  That is the -- it looks like the second page or maybe a

14  condensed page of the list of instructors and key personnel

15  where it lists Wes Keeling duties and then lists the license

16  number if applicable.  Dustin Bragg, Jesse Stanley, Art

17  Underwood, Brad Croft as operations director and Richard Cook

18  as office manager.

19  Q.  So again would this be identifying Wes Keeling, Dustin

20  Bragg, Jesse Stanley and Art Underwood as instructors for the

21  school?

22  A.  That is correct.  And also referring to a license number or

23  a license certification that would be included with further

24  evidence.

25  Q.  And then over at the far end, courses, subjects taught,

1    that would be the things they would be teaching, is that
2    correct?
3    A.  Yes, sir, that is correct.
4    Q.  If we go beyond this to the next page, this application
5    again has a number of different certificates that are attached,
6    is that correct?
7    A.  Yes, sir.
8    Q.  For Wes Keeling, for Art Underwood, these are the same
9    certificates that were attached in the earlier application, is
10   that right?
11   A.  I believe so, yes, sir.
12   Q.  Now, this was the application that was ultimately finally
13   approved?
14   A.  Yes, sir.
15   Q.  If we could go back to that application, let's go to page
16   one.  Page one of 6g is a letter, is that correct?
17   A.  Yes, sir.
18   Q.  Who signed that letter?
19   A.  Well, it appears -- I can't really determine the signature.
20   Q.  Who does it purport to be signed by?
21   A.  Richard Cook.
22   Q.  Had you had any dealings with Richard Cook?
23   A.  None.
24   Q.  At any time prior to this?
25   A.  None.

Rufus Coburn - Examination                58

1    Q.   Do you even know who Richard Cook is?

2    A.   Other than being listed on this, no, sir.

3    Q.   So that application finally got approved, is that correct?

4    A.   Yes, sir.

5    Q.   I'm going to show you Government Exhibit Number Seven.  Can

6    you tell me what this is?

7    A.   This is an attachment to the approval letter approving

8    Universal K-9, "Note enclosures, original approval notice with

9    attached program list and effective date of June 20 and the

10   associated supporting materials that would normally be

11   forwarded."

12        And it is sent to Ms. Michele Nelson who is the Federal

13   Veteran Education liaison rep. in Waco, so this would be

14   transmitting her copy of the approval materials.

15   Q.   And what is Ms. Michele Nelson's role in the approval

16   process?

17   A.   She is the Federal education liaison representative for the

18   State of Texas who is officed out of Federal offices in Waco.

19   Each state has a educational liaison representative for the

20   approval of programs, V.A. approval of programs for which G.I.

21   Bill benefits may be used.

22   Q.   And if we take a look at the second page of this exhibit,

23   can you tell me what this is?

24   A.   This is the first page of the approval notice, approval

25   letter sent to the school president.  And this letter would

1  also have been copied to Ms. Nelson in Waco.

2  Q.  What does original approval notice with attached program

3  list mean?

4  A.  Original approval is the first approval for a particular

5  school.

6  Q.  And if we go to page six, this is the same exhibit that was

7  Government Exhibit 6g, is that correct, the application?

8  A.  Yes, it is.

9  Q.  So that was the one that was finally approved?

10  A.  Finally approved, that's correct, sir.

11  Q.  Now, after the Veterans Commission, Texas Veterans

12  Commission does their work, then it's sent off to the V.A.?

13  A.  Yes, sir, it goes to the V.A., V.A. reviews it and if it's

14  approved, it goes into the V.A. database system and when the

15  individual veteran who is attending the school when their

16  enrollment in that school is certified by the school official,

17  it goes to V.A., then they get their V.A. educational benefits.

18  Q.  Okay.  I'm going to show you Government Exhibit Number

19  Eight and ask you if you know what this is.  This is an e-mail,

20  is that right?

21  A.  This is an e-mail, yes, sir.

22  Q.  With attachments?

23  A.  With attachments.

24  Q.  From who?

25  A.  Michele Nelson, V.A. Educational Liaison Office at Waco to

1  Universal K-9 with a copy to Anita Chisholm and Virgi Guerrero

2  who is the staff at Texas Veterans Commission for Veterans

3  Education.  Subject:  New NCD, non-college degree program, for

4  Universal K-9, effective 6/2016, date is 29th of June and it

5  also has two PDF attachments.

6  Q.  If we turn the page, can you tell us what this is?

7  A.  This would be the approval letter from Department of

8  Veterans Affairs to the school.

9  Q.  And so this is actually what gives them their authority to

10  bill against the G.I. Bill?

11  A.  That's correct.

12  Q.  Universal K-9?

13  A.  That's correct.

14  Q.  By the way, this is addressed to who?

15  A.  Mr. Richard Cook, president.

16  Q.  And what is the address?

17  A.  Universal K-9, 15329 Tradesman, San Antonio, Texas 78213.

18  Q.  Now, sir, we've talked about a number of different

19  applications in all.  As far as the list of instructors and the

20  certificates that were presented in the last two exhibits that

21  we talked about, Exhibit 6g and 6f, would the Texas Veterans

22  Commission or the Veterans Administration have approved

23  Universal K-9 as an institution that can bill for G.I. Bill

24  benefits if they had not provided the names of the instructors

25  and what they were going to teach?

Rufus Coburn - Examination                    61

1   A.  No, they would not.

2   Q.  And would they have been approved if they had provided

3   names of instructors but not provided certifications?

4   A.  No, they would not, there would be no way to validate the

5   instructors' qualifications.

6           MR. SUROVIC:  No further questions, Your Honor.  We

7   pass the witness.

8                     CROSS-EXAMINATION

9   BY MR. MCHUGH:

10  Q.  Mr. Coburn, my name is Tom McHugh and I represent

11  Mr. Bradley Croft.  I believe you and I just exchanged

12  greetings outside earlier today, did we not?

13  A.  Yes, sir, we did.

14  Q.  And other than that, you and I have never visited, have we?

15  A.  We have never met.

16  Q.  I don't recall us ever visiting, so let me ask you, you

17  were interviewed back in May of this year by Agent Breen who is

18  here, correct?

19  A.  Yes, sir.

20  Q.  And who else was at that meeting?

21  A.  You know, honestly I don't remember the names.  There were

22  a couple of other agents, but I don't recall the names.

23  Q.  And was Mr. Surovic there?

24  A.  Sorry?

25  Q.  Was Mr. Surovic present?

1    A.  Not the entire time, I don't believe.  I do recall meeting

2    him.

3    Q.  Do you recall the name Sean Scott, was he present?  He's

4    with IRS.

5    A.  Honestly, I don't recall the name.

6    Q.  Okay.  What was the purpose of that meeting?

7    A.  My understanding of the purpose was they wanted information

8    about the approval process and general information about how --

9    what interaction there had been with Universal K-9's owners and

10   how the process worked and that's what we talked about.

11   Q.  Kind of your knowledge and your background as it relates to

12   Universal K-9?

13   A.  Yes, sir.

14   Q.  And is that the first time that you met with any of these

15   persons, had you met with Mr. Surovic before or Mr. Breen

16   before?

17   A.  No, not that I recall, not that I recall.

18   Q.  I don't see evidence that you visited with them before.

19   A.  I don't recall it, so --

20   Q.  And let's go back to your TVC time.  You took us through

21   your military career and everything.  And what years were you

22   associated with TVC?

23   A.  Well, TVC -- actually the Veterans Education Program was in

24   Texas Workforce Commission when I entered into that program in

25   2000 and I don't remember the exact month.  So I worked for

1    the -- that approval process, that sub agency, if you will, was

2    in the Workforce Commission.  We stayed in the Workforce

3    Commission until approximately 2006 and then in reorganization

4    we moved over to --

5    Q.  Sorry, could you pull the mike in?

6    A.  Sorry.  Is that better?

7    Q.  It's fine for me.  Okay.

8    A.  So to repeat what I said, we were in Texas Workforce

9    Commission from when I originally started there in 2000, about

10   2000, and then I think it's approximately 2006 the Veterans

11   Education Program moved over to the Texas Veterans Commission

12   and we were in the Texas Veterans Commission where it still

13   resides today.

14   Q.  So when you were at the Texas Workforce Commission, what

15   was your title and what were your responsibilities?

16   A.  I started out as a program specialist and my

17   responsibilities were school approvals, school compliance

18   visits with much the same process that we have talked about

19   today.  I was at the worker bee level.  I continued that until

20   seems like about 2006 when we changed over, we re-organized and

21   I became the assistant director and then a couple years as

22   assistant director and then director until 2016 when I retired.

23   Q.  When did you move from the Texas Workforce Commission to

24   TVC?

25   A.  I think it was about 2006.

1  Q.  2006.  And so you were with TVC from approximately 2006

2  through the time of your retirement?

3  A.  Yes, sir.

4  Q.  And you retired in what year?

5  A.  About 2016, as I recall.

6  Q.  2016.  And when you retired in 2016, what was your title?

7  A.  I was the program director.

8  Q.  And what were your responsibilities?

9  A.  Administration of the Federal G.I. Bill for the entire

10 state as well as administration of the Texas Hazelwood Act and

11 some other minor kind of cats and dogs, veterans educational

12 programs that are not terribly significant, but generally the

13 veterans education business and the state.

14 Q.  And how big was your office?

15 A.  I think it was -- when I retired it was right around 20 and

16 we had probably authorization for two or three others.

17 Q.  What is an action officer?

18 A.  An action officer is -- I would call them the worker bee.

19 That's the individual who is responsible for staffing the

20 particular issues, doing the approvals and so forth.

21 Q.  How many of those worker bees did you have?

22 A.  Well, I'd say of the 20 working the approval programs,

23 about six or eight.  And the way we were organized then I had

24 field staff who were doing compliance visits and they were home

25 officed throughout the state.  I had four, five of those.  And

1  then at that time we had also instituted a program of liaison

2  representatives, two with major universities and throughout the

3  state, so I had four of those throughout the state.

4  Q.  Let's talk about a Bebe Glasgow.  I believe you mentioned

5  her during your direct examination.  Who is Bebe Glasgow?

6  A.  Well, she was a lady who had -- my first association with

7  her, she was the V.A. certifying official at Midland College.

8  And her husband was in the oil business, he moved from Midland

9  back to the Austin area and we were -- at that time, we were

10  advertising for a position and she applied and we hired her.

11  Q.  Approximately when did she come on board?

12  A.  Oh, gee, I'm not real sure about that.  I would say she was

13  there -- she retired or left in about '16, so she was there

14  four, five years, so 2010, 2011 maybe.

15  Q.  And when she came on board, her training or education to

16  perform her duties?

17  A.  She had been really kind of on the other end of what we

18  were doing.  The schools submit their catalogs, their approval

19  materials to TVC Veterans Education for approval.  She was that

20  person at Midland College who performed that task and also who

21  certified the veterans at her school for their G.I. Bill

22  benefits.

23  Q.  So she had enough work experience coming in?

24  A.  Yes, sir, she did.

25  Q.  And she was a program specialist?

1   A.  Program specialist.  That was the term we used, sir.

2   Q.  And how many program specialists were there?

3   A.  Well, let's see, had about 20.  Six or eight.

4   Q.  And did they all carry a similar workload in terms of cases

5   and in terms of variety?

6   A.  Yes, sir.

7   Q.  And in terms of -- and they were all overworked, I take it?

8   A.  Well, if you ask them, they were.  If you ask me, I might

9   not have shared that opinion.

10  Q.  Okay.  And you were their supervisor and they worked at

11  your direction, did they not?

12  A.  Yes, sir, that's correct.

13  Q.  And in reference to Bebe Glasgow, program specialist, give

14  the Court and for the record an idea of what kind of matters

15  she handled?

16  A.  Well, I'm not real sure exactly.  I can tell you what her

17  duties were.

18  Q.  Okay.

19  A.  Responsible for -- and I don't remember the exact numbers,

20  but we had them divided up, but responsible for keeping

21  approvals updated for the schools assigned to her as well as

22  staffing new approvals.  And we normally just would rotate the

23  new approvals among the program specialists to try to keep the

24  workload fairly even.

25  Q.  And she was assigned the Universal K-9 file, was she not?

1    A.    That's correct.

2    Q.    How did it come to land on her desk?

3    A.    Act of God.  Seriously, we rotated and so it was her turn

4    when that one came about.

5    Q.    So was there anything about that particular program that

6    she carried an expertise in and that's why she ended up with

7    that?

8    A.    Oh, no.  It was strictly a rotation of -- as new approvals

9    come in, they were staffed to the various program specialists

10   and if it were something particularly difficult or something we

11   had not seen similarities with before, generally the program

12   specialist would surface that and bring it up to my assistant

13   or either to me.  And if they weren't suited or if they had

14   some particular other reason that it wasn't -- that we didn't

15   think it could be, you know, a fair evaluation, then we would

16   shift it then.  They would just take the next one in line.

17   Q.    And so the assignment of the Universal K-9 program to

18   Ms. Glasgow, in your vernacular, how do you describe that?  Dog

19   school?

20   A.    Well, I think we call it a dog training school or dog

21   handler school.

22   Q.    Dog handler school.  Do you know whether or not she had

23   managed those before?

24   A.    Well, we only had one other one that had come through and

25   that was not exactly analogous to this, but I think it was an

1   on-the-job training program that the DPS had.

2   Q.  So a lot of this was first impression going through it with

3   the dog handler school?

4   A.  Well, it was the first exposure, yes, sir.

5   Q.  First exposure, okay.  In your testimony, you indicate how

6   many applications was Mr. Croft identified with or associated

7   with?  Did you say four?

8   A.  I think there were six different applications was the

9   numbers as we went down through the chronology.

10  Q.  And Mr. Croft had a relationship to all those, did he not?

11  A.  Apparently so, yes, sir.

12  Q.  Well, I'm referring to his name was on --

13  A.  His name was on them, yes, sir.

14  Q.  On all those.  And in regard to him, the case was

15  initially, the file was initially assigned to Bebe Glasgow and

16  then your testimony is that it was reviewed, it was considered

17  and it was denied, is that correct?

18  A.  That's correct.

19  Q.  And I believe it's also your testimony that a file can be

20  supplemented, it can be updated so it remains alive.  I think

21  you said there's a 30-day window or something?

22  A.  Well, we normally requested a response within 30 days.

23  Seldom did we -- if there was an ongoing conversation with the

24  school, if it ran over a little bit, it didn't matter, I mean

25  we would continue to work the program -- or the application if,

1   in fact, there was interaction with the school.  If we had
2   reason to believe the school wanted to continue.
3   Q.  So it was denied on that application, that first
4   application for the reasons stated and also because there was
5   not a whole lot of interaction with the school?
6   A.  Oh, I think that would be better characterized by saying
7   that the responses from the school were incomplete and we
8   continued to try to get responses and when they did not
9   respond, then it waited until there was further action, further
10  input from the school.  And then finally a denial letter was
11  sent.
12  Q.  And do you know whether or not you had any involvement or
13  what your involvement was in this first application?
14  A.  I really don't recall any particular significant
15  involvement one way or the other on the initial one.  It's not
16  to say there wasn't, but it was not unusual for schools to have
17  issues with an initial application for the iterative process to
18  go back and forth and sometimes there were long spaces between,
19  but as I said earlier, our impetus in this whole thing was to
20  provide as many and as broad an educational spectrum to our
21  Texas veterans as possible, so we were working with the school
22  to try -- we wanted schools to get approved, we wanted to
23  approval schools.
24  Q.  Would it be correct in saying that your goal was to
25  facilitate and not to frustrate?

1    A.   I think that's true, yes.

2    Q.   Because there were many deserving vets out there who could

3    take the benefit or use the benefit of this program?

4    A.   Seemingly so, yes, sir.

5    Q.   And it was just a matter of eligibility on the part of the

6    applicant school and that's what your role in it is, correct?

7    A.   That is correct.

8    Q.   So that's the first application.  And the second

9    application comes along not long thereafter, correct?

10   A.   Yes, sir, I think that's correct.

11   Q.   And I believe that when you visited with the agents back in

12   May, is this an accurate statement that you would try and take

13   the application at face value?

14   A.   I think that's accurate.

15   Q.   Is it accurate to say if there is a certificate attached to

16   the application, TVC would take that certification at face

17   value?

18   A.   Yes, sir, I think that's correct.

19   Q.   And is it also correct that unless there was cause to

20   believe there's a problem with the instructors, TVC would not

21   even review instructors or conduct additional checks?

22   A.   I'm not sure what you mean by review instructors.  The

23   application that we sent out asked for instructor

24   qualifications and certifications.  When we receive that, if it

25   appeared to be valid, we at that point we had no reason to

1   question the validity.  We had what we called a true and

2   correct statement on the application wherein the applicant and

3   in this case the owner had signed that verifying that all the

4   information tendered was true and correct to the best of their

5   knowledge, so we would accept that.

6   Q.  And this application, is it assigned a unique file number?

7   A.  Yes, it is.

8   Q.  And then if there is a new application, say, a second

9   application if the first one, say, were denied, does it go

10  under that same unique file number?

11  A.  You know, I'm not sure.  I don't recall how we did that.  I

12  know for -- it was a point at which we did and I'm not sure if

13  that changed.

14  Q.  And in regard to Ms. Glasgow, she all the way up until just

15  short of the last one, not including the last one, she was the

16  program specialist, was she not?

17  A.  That's correct.

18  Q.  And are you able to say whether or not she received those

19  subsequent applications randomly or were they assigned because

20  she had a history with that school?

21  A.  Well, they were assigned because she had a history with

22  that school.  And as I recall, I think the last letter was or

23  some of the last correspondence was with Anita Chisholm and

24  that was because Ms. Glasgow had terminated her employ with us

25  and moved to College Station where her husband was.

1   Q.  She retired?

2   A.  She didn't retire.  She wasn't retirement eligible from the

3   State, but she changed jobs.

4   Q.  And in regard to the applications for Universal K-9 that

5   she was involved with, when did that particular school begin to

6   creep onto your radar?

7   A.  Fairly early in the process.  Seems like I remember a

8   couple phone calls from Mr. Croft.  I know there were during

9   this whole process there was a series of Freedom Of Information

10  Act inquiries, it came to the Commission and got --

11  Q.  That was more later on, correct?

12  A.  That was probably after maybe the first two, but I'm not

13  quite sure and numerically which application that came into.

14  Q.  In the open records or Freedom Of Information Act, the

15  defendant was seeking what information?

16  A.  Information on similar schools that he had -- well, schools

17  that he asked for.  We didn't have any other dog handling

18  schools approved at that time, but he had a list of schools

19  that he wanted and basically he worked that with our legal

20  office and I was out of the picture on exactly what he got

21  other than I made our files totally open.

22  Q.  And do you know his purpose in doing that?

23  A.  No, sir, I don't.

24  Q.  Do you know his purpose today of doing that?

25  A.  No, sir, I don't.

1   Q.  Do you have a belief what his purpose may have been in

2   doing that?

3   A.  Well, you know, initially I thought that he felt he was not

4   being treated the same way as other schools were and he wanted

5   to see what their application process and files looked like.

6   Other than that, I really don't have any idea why.

7   Q.  And if you're correct in that assessment, there's nothing

8   wrong with that, is there?

9   A.  Not to my knowledge.  That's why we made the files

10  available.  That's what this all says we should do, so we do

11  it.

12  Q.  And who makes the determination whether or not to make

13  those files available?

14  A.  Our legal staff.  The TVC legal staff.

15  Q.  And in regard to the defendant here in the courtroom, would

16  it be fair to say that his relationship became a little rocky

17  with the TVC?

18  A.  I think -- perhaps so, yes.  Now, having said that, I think

19  he felt more ill at ease talking to me, and I'm not sure why,

20  than with other staff members.  I'm not aware he had any

21  problem at all with the legal staff with getting the materials

22  that he had asked for.

23  Q.  With regard to the TVC through his application process, he

24  would interface and deal directly or more directly with Bebe

25  Glasgow?

1  A.  That's correct.

2  Q.  And there were several e-mail exchanges between Ms. Glasgow

3  and Mr. Croft and some of which you were copied on, correct?

4  A.  I think that's correct, yes, sir.

5  Q.  And there's no "got you" questions.

6  A.  Honestly, I don't know if she had other correspondence with

7  him.  If it wasn't put in the file, all I know is what was put

8  in the file.

9  Q.  Fair enough.  What communications or records are documented

10  and maintained and kept in the file?

11  A.  Well, it's supposed to be a memo for all the correspondence

12  and all the interaction with the school.  And to my knowledge,

13  that was generally the case with most of the program, probably

14  all of the program specialists and with all the schools.

15  Q.  When you say a memo of a communication, would a copy of the

16  communication itself be included in the file?

17  A.  If it were a hard copy communication, I would think it

18  should have been.

19  Q.  And if it were, say, for instance Mr. Croft reaching out to

20  Bebe Glasgow for some clarification, should that have been

21  included in the file?

22  A.  I think it probably would have depended on the extent of

23  the request.  If it were a fairly simple straightforward

24  request and answer, it may or may not have been.  It might have

25  been a sticky note put in the packet or it might not have been

1   anything if it was something that she could have handled on the

2   phone or immediately faxed him something, it might not have

3   been.

4   Q.  And is there only one file as it relates to each applicant

5   school?

6   A.  Each -- until they were automated, which occurred right

7   after -- that was my final act was to get the files automated.

8   We had these monster green boxes with they were like

9   old-fashioned library boxes that had the paper copy files in it

10  and that kept the originals.  And we had a room probably about

11  14 by 16 or so was the file room.  And all of that was manually

12  kept.

13  Q.  So Ms. Glasgow's file as it relates to Universal K-9 would

14  be kept in this room, not in her office?

15  A.  It would have been kept in that file room for her to -- if

16  she were working that file, she would bring that box and set it

17  or take what she needed out of it and set it at her desk and

18  work and then put it back when she was finished.

19  Q.  And who had access to that file?

20  A.  All of our program specialists and our administrative

21  staff.

22  Q.  So you also had access to it?

23  A.  Everyone in the office had access to those files, yes.

24  Q.  And you said it's your job to help expand the base to work

25  with the veterans, so in that regard with Ms. Glasgow, she is

1  assigned to Universal K-9, so when it comes in it's on her

2  desk.  Do you review it, the new application, before it comes

3  in before you give it to her or does somehow it find its way to

4  her?

5  A.  Well, it didn't just find its way.  Normally we had a

6  rotation and our admin assistant person basically just because

7  we had program specialists we did not have -- with the

8  exception of flight schools, most everybody worked every type

9  of school that we dealt with.

10 Q.  So did you, during the course of your tenure there, did you

11 have the occasion from time to time to go and review one of

12 those files?

13 A.  Well, I had occasion fairly often to review files if we had

14 complaints from schools, if we had a particular issue that the

15 program specialist might have difficulty with that they would

16 bring in and ask for clarification or guidance on, I would see

17 the files from time to time, yes.

18 Q.  And so do you recall or do you know the e-mail

19 correspondence between the defendant and Ms. Glasgow.  Have you

20 had an opportunity to look at that e-mail correspondence?

21 A.  I've seen parts of it and I've probably gone through the

22 whole file, but not recently.

23 Q.  And in regard to that correspondence, initially Mr. Croft

24 was communicating directly with Ms. Glasgow, correct?

25 A.  As far as I know, yes, sir.

1  Q.  And at some point he retained an attorney, Ms. Santos?

2  A.  Perhaps.  We did get some correspondence with Ms. Santos

3  name on it, but you know, how and what he did with that, she

4  was someone else helping him.  Yeah, I do recall that she was

5  an attorney, but I don't remember a whole lot that transpired

6  much beyond that as far as her involvement.

7  Q.  It was your testimony that Mr. Rye from Texas Workforce

8  Commission ended up working with Mr. Croft --

9  A.  That's correct.

10  Q.  -- on the application that was approved?

11  A.  That is correct.

12  Q.  And his name was on that application, was it not?

13  A.  You know, I'm not sure if it was or not.  It may well have

14  been.  I mean certainly the Veterans Commission, I knew he

15  worked with him on it, they had worked on the catalog, but I

16  don't recall if his name was on the application.

17  Q.  And on the first number of applications, he was the owner,

18  was he not, that's your understanding?

19  A.  Mr. Croft was the owner, yes, sir.

20  Q.  And then the one that was finally approved, though his name

21  was on the application, it was Mr. Cook's name on it, is that

22  correct?

23  A.  That's correct.

24  Q.  And Bebe Glasgow was gone at the time?

25  A.  By the final one, yes, sir, that's correct.

1    Q.  And so the fact that that approved application did not go

2    to Bebe, one explanation is she was no longer there, is that

3    correct?

4    A.  I believe that's correct.  And Ms. Chisholm would have

5    completed that, but the fact that it changed program

6    specialists is really not particularly significant because

7    we've got the same rules, it's the same format and so forth.

8    Q.  What is your recollection having at one time or another

9    having reviewed some of these e-mails as to the attitude or the

10   approach or the demeanor of the defendant, Mr. Croft, in his

11   e-mail communications with the TVC?

12   A.  Specifically the e-mail communications, I don't know that

13   there was any particular problem.

14   Q.  And it's your testimony that it was not unusual for an

15   applicant school to be turned down either?

16   A.  That's correct.

17   Q.  And nothing prohibits that applicant school from trying

18   again, correct?

19   A.  That is correct.

20   Q.  And Universal K-9 tried on several other occasions, did it

21   not?

22   A.  That is correct, sir.

23   Q.  Did you have many other applicant schools that were turned

24   down on that many occasions who wanted to remain in the fight?

25   A.  Not many, but some, yes, sir.

1  Q.  So would you agree that it began to develop a notoriety?

2  A.  Not really because notoriety kind of has a negative

3  implication.

4  Q.  Why don't you characterize it?

5  A.  It was another school that had difficulty complying and

6  that in itself was not unusual.

7  Q.  And TVC was open to, pursuant to a proper application, to

8  approving Universal K-9?

9  A.  That's correct and we ultimately did.

10  Q.  And you ultimately did?

11  A.  Yes, sir.

12  Q.  But Universal K-9 was turned down, denied how many times

13  would you guesstimate?  It is what it is.

14  A.  At least four, five.

15  Q.  And let me --

16        MR. MCHUGH:  If we can show 2a, Defendant's Exhibit

17  2a.

18  BY MR. MCHUGH:

19  Q.  Do you see it?

20  A.  No, my screen is blank.  I need some technical assistance.

21     (Pause.)

22  Q.  Are you familiar with that e-mail?  Do you recall having

23  seen it before?

24  A.  No, actually I don't, but --

25  Q.  But it's from Mr. Bradley Croft to Bebe Glasgow at Texas

1  Veterans Commission, correct?

2  A.  Yes, sir.

3  Q.  And on that one I don't believe you're copied, are you?

4  A.  No, sir.

5  Q.  And the date of this one is January of 2013, is that

6  correct?

7  A.  Yes, sir.

8  Q.  Okay.  And the tone of it, let me -- I'm referring to

9  "Pursuant to our telephone conversation" and then Mr. Croft

10 says, "Let me know your thoughts.  We stand ready to answer

11 anything you may need."

12     Do you see that?

13 A.  It rolled up.  Yes, sir.

14 Q.  So this was back in 2013 and this may be what you say --

15 would you say this is before you were more personally involved

16 in Universal K-9, these communications?

17 A.  Yes, sir, I would say so.

18 Q.  And would you describe the tone of that communication to be

19 appropriate?

20 A.  Well, it appears to me that that would be pretty much a

21 normal exchange, request for additional information.

22 Q.  That's right.  And now we don't have to pull it up, but

23 Government Exhibit 2b, you're copied on 2b and -- well, maybe

24 we should bring it up since you're copied on it.  In that

25 communication, Mr. Croft is acknowledging that you have his

1    permission or that your office has his permission to

2    communicate directly with Ms. Santos, an attorney that he

3    retained to represent him in the application process, is that

4    correct?

5    A.   Yes, sir.

6    Q.   The date of that, that was back in September 2013.  If we

7    go to October of 2013, Defendant Exhibit Number 2c, have you

8    read it?

9    A.   Yes.

10   Q.   And in regard to that, that is Mr. Croft just again

11   reaching out in October 2013 just touching base saying if

12   there's anything that he may do, any additional information

13   that TVC may need in the application process, is that correct?

14   A.   Yes, sir, that appears correct.

15   Q.   It's a characterization?

16   A.   That's fine.

17   Q.   And Ms. Glasgow, she acknowledges that e-mail actually the

18   following day.  And her response is that she was currently in

19   the process of reviewing the application, she acknowledges

20   that, "I know you're anxious" and then she says, "but it is a

21   tedious process."  Do you see that?

22   A.   I did just a minute ago.  Can you bring it back up please?

23   It went blank.  Okay.

24         MR. SUROVIC:  Your Honor, I think there may be an

25   issue as far as -- you want 2c, right?

1          MR. MCHUGH:   2c.

2          MR. SUROVIC:   I think you had 2b up on the screen.

3    A.   There we go.

4    Q.   So you have 2c before you, do you not?

5    A.   This is 2c, yes, sir.

6    Q.   That's a communication from Bradley Croft to Bebe Glasgow

7    and copied to yourself in October of 2013, correct?

8    A.   Yes, sir.

9    Q.   And he's just touching base, any additional information.

10   He's reaching out to TVC, is he not?

11   A.   Uh-huh, I understand.

12   Q.   And Ms. Glasgow timely responds to it I believe the

13   following morning where she basically says this is a tedious

14   process, but what she's saying is you're on our radar and we're

15   working on it, correct?

16   A.   That's correct.

17   Q.   And then was there a period of time that you know during

18   this application process that the defendant was informed that

19   you really need to be in operation for two years before we

20   could give you serious consideration?

21   A.   I think that was probably conveyed early on.

22   Q.   And do you know that in this process he actually stepped

23   away to cultivate that history?

24   A.   Well, in reviewing this, I don't recall that as such, but

25   in reviewing this, there is a gap and that would explain it.

1    Q.  And so there is a hiatus where he was not making

2    application, correct?

3    A.  That's correct.

4    Q.  And you learn the explanation for that to be that he had

5    to -- his understanding, he had to be in operation for two

6    years?

7    A.  Which is correct.

8    Q.  So that application is maybe a year and eight months later

9    because he had been in operation before that, you agree,

10   correct?

11   A.  I agree, yes, sir.

12   Q.  No got-yous.

13       In regard to that, at that point had you talked with

14   Mr. Croft in person on the telephone?

15   A.  You know, I do recall I think we talked on the phone

16   initially and I know we had -- there was a gap there and then

17   seems like the next -- and it may not have been the very next

18   sequential call, but we did have the call that's where he was

19   from the Governor's Office --

20   Q.  That's when he went from being a squeaky wheel to a thorn,

21   correct?

22   A.  I wouldn't call it a thorn.  And the reason I wouldn't call

23   it a thorn at all is the fact that I think he was sincere in

24   what he wanted to get done and we were sincere in trying to

25   help him.  If it goes to the Governor's Office, it goes to the

1   Governor's Office.

2   Q.  So he wasn't barred ever from participation in that

3   program, was he?

4   A.  To my knowledge, he wasn't, certainly not by me.

5   Q.  And you were not aware of it if he was?

6   A.  I was not aware of it at all as far as --

7   Q.  He was never told to go take a hike?

8   A.  No, not at all.

9   Q.  And I am familiar and I believe you're familiar, I know the

10  government is familiar here with the history of communications

11  between defendant Croft and your office.  And at some point,

12  you were then copied on all the e-mails, were you not?

13  A.  Quite a few.  I'm not sure it was all, but it was quite a

14  few.

15  Q.  If you're not copied, you wouldn't know, would you?

16  A.  It would be difficult.

17  Q.  And you told us about the, off your testimony, the

18  telephone conversation following the referral to the Governor's

19  Office or to Palladino, correct?

20  A.  Referral to the Governor's Office.

21  Q.  And he also wrote a letter, did he not, or an e-mail to

22  Palladino that he copied you on or you were copied on it at one

23  point.  Turn to Exhibit Number 44.

24          MR. SUROVIC:  Your Honor, this is one of those new

25  exhibits.  Because it is an e-mail communication that we

1    provided defense, we have no objection to it.

2         THE COURT:  All right.

3    BY MR. MCHUGH:

4    Q.  Are you familiar with that e-mail?

5    A.  I'm sure I saw it.  It doesn't ring a bell right now, but I

6    certainly saw it.

7    Q.  I'll just say this for the record, it was copied many times

8    and on some of those your name is on it?

9    A.  That's fine.

10   Q.  It was passed around and you would expect a letter of this

11   type to be passed around.

12        So what is Mr. Bradley Croft communicating to Palladino

13   where it's copied to Cook?  You're copied on this later on, but

14   what is the import?  What is he saying in this communication?

15        *(Pause.)*

16        In reference to Government Exhibit Number 44, the content

17   of this letter or this communication is it's very important and

18   your office was copied with this same communication later on.

19   And it's your testimony that you're familiar with it?

20   A.  Well, can we roll it on up, so I can see?  Okay.

21        *(Pause.)*

22        Okay.

23   Q.  Are you able to summarize or we can read it into the

24   record, it is an exhibit or will be an exhibit, Mr. Croft's

25   complaint to Palladino.  Who is Palladino?

1   A.   Tom Palladino was and still is the execute director for the

2   Texas Veterans Commission, so he was my immediate boss during

3   this time period.

4   Q.   And do you sense any frustration on the part of the author,

5   that defendant Brad Croft?

6   A.   Well, I think it comes across fairly clearly that he's

7   concerned about the time it has taken to get his program

8   approved.

9   Q.   Do you recall he -- and so you see his frustration, do you

10  not?

11  A.   Certainly.

12  Q.   And it's your testimony that you believed his efforts for a

13  school were sincere?

14  A.   Absolutely.

15  Q.   And in regard to the instructors that were identified, and

16  this is Government Exhibit 6f, if we could go to 6f.

17  Government 6f is the attachment to an e-mail which offers

18  information regarding the instructors, correct?

19  A.   Yes, sir.

20  Q.   And those instructors are named and identified as a --

21  maybe not this order, a Jesse Stanley, a Dustin Bragg, Wes

22  Keeling and an Art Underwood?

23  A.   That is correct.

24  Q.   And earlier today you have looked at that and you've also

25  looked at the attachment to it, have you not?

1    A.   That is correct, sir.

2    Q.   And this information was received by TVC through an e-mail,

3    correct?

4    A.   Yes, sir.

5    Q.   And a TVC application by rule, is it required to be mailed?

6    A.   Not by rule.

7    Q.   By practice, by policy?

8    A.   By practice it is normally mailed, but some have been

9    physically dropped off, hand delivered.

10        THE COURT:  Counsel, this is probably a good time to

11   take our afternoon recess.

12        COURT SECURITY OFFICER:  All rise.

13        *(3:10 p.m.)*

14                             *   *   *

15        *(3:37 p.m.)*

16        COURT SECURITY OFFICER:  All rise.

17        THE COURT:  Okay, the Court would note the presence of

18   counsel and the parties.  You may proceed, counsel.

19        MR. MCHUGH:  Thank you.

20   BY MR. MCHUGH:

21   Q.   I believe when we broke we had started going into the

22   Government Exhibit 6g which has the names of the four

23   instructors and their qualifications and everything.  Do you

24   see that?

25   A.   Yes, sir.

1        MR. SUROVIC:  6f.

2    BY MR. MCHUGH:

3    Q.  6f.  And in regard to 6f, your testimony today was not that

4    any of that information is untrue, correct?

5    A.  That is correct.

6    Q.  As a matter of fact, your understanding is that that

7    information -- you don't have any information that it's

8    incorrect, correct?

9    A.  That is correct.

10   Q.  Okay.  In regard to the government application and

11   that's -- oh, tell me this.  What month and year did you

12   retire?

13   A.  I think it was the 31st of August, 2016.

14   Q.  In regard to 6f, how is that information received by TVC?

15   A.  I'm sorry, I was looking at the wrong reference.  You're

16   talking about the entire page.

17   Q.  Yes.

18   A.  Well, it appears it was e-mailed and I can't really -- yes,

19   and I am an addressee, so it would have come to my e-mail.

20   Q.  And in regard to the application itself, the formal

21   application, what is the history, what are the rules that I

22   believe it's requiring to be mailed, the application itself,

23   the four-page application, is that correct or incorrect?

24   A.  It's normally mailed, yes.

25   Q.  Is it required to be mailed?

1  A.  You know that, I don't know.  I don't recall if we had that

2  requirement.  I also don't recall ever receiving a complete

3  application packet via e-mail, but that doesn't mean that we

4  had the rule.

5  Q.  And you are, of course, very familiar with the application

6  itself, are you not?  I'm just saying the blank application.

7  A.  I'm familiar with the application as it existed when I was

8  a director, yes, sir.

9  Q.  And the application that you showed us here earlier today?

10  A.  Is that one.

11  Q.  Was dated when?

12  A.  It was during the tenure that I was the director, so --

13  there were several applications, one from 2013 on to '16.

14  Q.  I'm referring to Government Exhibit Number Five.

15  A.  That appears to be essentially the same application,

16  obviously it is slightly different, it's got different people's

17  names in the positions and so forth, but essentially it looks

18  to be about the same.

19  Q.  You believe it to be the same?

20  A.  I would say it is reasonably so and I'm looking at the

21  bottom where it says, "SAA non-accredited revised 09/2018."

22  09/2018 was after I retired, so I retired.

23  Q.  So at the time you retired the application, was it similar

24  to this?

25  A.  It was very similar to that, yes.

1   Q.  If it's substantively different --

2   A.  Substantively similar.

3   Q.  But the list of the instructors, now going back to 6f, if

4   we may, that list was mailed or e-mailed?

5   A.  This appears to be e-mailed, but if you're referring to --

6   are you referring to this list, this piece of paper?  That

7   appeared to be e-mailed.

8   Q.  That's the October 4th, correct?

9   A.  I need some technical assistance up here.  My screen just

10  went blank.

11          MR. MCHUGH:  Your Honor, for the record, this part of

12  this examination relates to page four, paragraph eleven of the

13  government indictment.  And maybe for clarity sake, Your Honor,

14  I would like to read paragraph number four and then ask the

15  witness to comment on it.

16          THE COURT:  Well, he can only testify as to what he

17  knows personally.  He can't be commenting on the indictment.

18          MR. SUROVIC:  Exactly, Your Honor.

19  BY MR. MCHUGH:

20  Q.  Referring then to the application, we'll do it another way,

21  referring to the application that you're familiar with, Roman

22  numeral two J, where it is requested a roster of administrative

23  and instructional staff, okay, you're familiar with that on the

24  exhibit -- on the application?

25  A.  Yes, sir.

1   Q.  And are there any admonishments that follow the -- when

2   listing the roster of administrative and instructional staff,

3   any admonishments that go with that?

4   A.  Well, I don't think there is, but without the actual blank

5   up there, I'm not -- can we have that exhibit so I can see what

6   it looks like?

7           MR. MCHUGH:  Exhibit five, page five please.

8   BY MR. MCHUGH:

9   Q.  If you go to Roman numeral two, paragraph J, if you would

10  read that into the record?

11  A.  Yes.  Personal data form for -- sorry, J.  "Roster of

12  administrative and instructional staff with credentials or

13  license numbers."

14  Q.  Is anywhere in the application does it say, if you are

15  familiar, that this information has to be listed with either

16  the knowledge or the permission of those persons identified as

17  instructors?

18  A.  To my knowledge, it does not.

19  Q.  Going back to Government Exhibit 44, which is an early

20  generation -- the letter from Bradley Croft to Palladino.  And

21  you've got that before you, do you not, a copy of it?

22  A.  No.

23          MR. MCHUGH:  Forty-four.  I've got a hard copy, Your

24  Honor.

25          THE COURT:  You can give it to him or show it to him,

1   sure.

2   BY MR. MCHUGH:

3   Q.  Do you see it?

4   A.  Yes, sir.

5   Q.  And you are familiar with this communication, Defendant

6   Exhibit Number 44, are you not?

7   A.  Yes, sir.

8   Q.  And that rattled around the offices of TVC back in July of

9   2015 and after, correct?

10  A.  Yes, sir.

11  Q.  And it's a letter from Bradley Croft to Palladino.  And

12  again who is Palladino?

13  A.  He was the -- or is the executive director of the Texas

14  Veterans Commission.

15  Q.  And you knew him personally, did you not?

16  A.  Yes, sir.

17  Q.  As a matter of fact, he in some communications would refer

18  to you as Rufus, would he not?

19  A.  Yes, sir.

20  Q.  And is that an a.k.a.?

21  A.  No, it's a Christian name.

22  Q.  And in the letter, Mr. Croft complains that "I appreciate

23  your time and understanding."  He kind of starts off that way,

24  do you see it?

25  A.  Yes, sir.

1  Q.  And he refers to earlier communications between he and

2  Palladino, correct?

3  A.  Yes, sir.

4  Q.  And he is complaining to you in 2015 and he says he has hit

5  a stone wall and all efforts have met with -- and then he goes

6  on and says he believes discrimination.  Do you see where he

7  says that?

8  A.  Last sentence, first paragraph.

9  Q.  Do you see where he makes the reference to discrimination?

10  A.  Yes, sir.

11  Q.  Did any discrimination exist between --

12  A.  Not to my knowledge.

13  Q.  Not to your knowledge.  Do you know what he was referring

14  to either at the time or later when he was talking about

15  discrimination?

16  A.  The only thing I could imagine he's referring to or

17  referred to on that was just timeliness, that I don't think he

18  agreed with the fact that we had certain standards and certain

19  policies that had to be adhered to and that his school was

20  noncompliant and when they became compliant there was no

21  problem.  That's the only thing I can imagine.

22  Q.  Do you recall being copied on communications where he

23  described his program or his school as nontraditional?  In

24  other words, they would use shelter dogs, do you remember that?

25  A.  I don't recall that as being anything of significance, no.

1   Q.  Well, I'm not asking whether or not there was

2   discrimination on your part.  I'm asking --

3   A.  I don't recall the particular terminology.

4   Q.  And was there a bias or prejudice against shelter dogs?

5   A.  Being as I didn't know what a shelter dog was, I don't

6   think there could have been any.  I would say absolutely none.

7   Q.  In his letter, he talks about all the stone walls that he

8   has hit and that he has wasted years on this application

9   process.  Do you see that?  Just read paragraph number two,

10  read it into the record.

11  A.  "I have attached a current letter from Ms. Bebe Glasgow,

12  V.A. Texas letter 7/20/2015.pdf asking for a number of changes

13  and additional information.  I have also attached a letter from

14  Rufus Coburn, V.A. denial letter 11/12/2013.pdf.  As you see in

15  the V.A. denial letter from Mr. Coburn has specifically stated

16  two areas of noncompliance and please duly note the highlighted

17  portion where Mr. Coburn states Veterans Education has

18  thoroughly assessed your application for approval to train V.A.

19  eligible persons."

20       Should I continue?

21           THE COURT:  Yes, much slower though.

22  A.  "Universal K-9 submitted with our new application June 16,

23  2015 with no changes except the two noncompliance issues and

24  now instead of being approved there are all these new issues

25  that weren't there before after, quote, thoroughly reviewing

1   our application in 2013.  Universal K-9 is trying to comply

2   with every compliance issue.  However, we fix one list and then

3   another list comes after that.  We have reviewed over 30 other

4   V.A. approved application that have been approved with less

5   information than provided by us (and with numerous mistakes) as

6   we have become almost experts at applying and recognizing all

7   Federal and State regulations.  We have made copies of several

8   approved schools applications and can provide them to you to

9   review alongside ours and you will see what we are talking

10  about."

11  Q.  And did you -- after your office received a copy of this

12  communication, did you staff it, did you meet with, say,

13  Ms. Glasgow and discuss this complaint?

14  A.  I don't recall.  I'm certain that Mr. Palladino would have

15  questioned me on that and what I would have -- I honestly don't

16  recall that specifically.

17  Q.  Let me try and refresh your memory.  And you can correct me

18  if I'm mistaken, that you had asked Ms. Glasgow to write a

19  response which you adopted and then that was then adopted by

20  Mr. Palladino?

21  A.  That could be.

22  Q.  I mean that only makes sense?

23  A.  Well, that could be.  I just -- I didn't recall that, I

24  don't deny doing it at all.

25  Q.  And after this letter and the Palladino communication,

1   another application was submitted, was it not?

2   A.   Honestly I don't recall.  It could well have been.

3   Q.   You do recall that when the Cook application is approved,

4   the Universal K-9 application is finally approved, is it not?

5   A.   Yes.

6   Q.   And it is not approved by Bebe Glasgow, but it is approved

7   by is it Ms. Chisholm?

8   A.   Ms. Chisholm, yes.

9   Q.   Because she is the new project analyst, is she not?

10   A.   That is correct.

11   Q.   Because Bebe Glasgow no longer was employed by the Texas

12   Veterans Commission?

13   A.   That's correct.

14   Q.   But this time around, the first application that was

15   submitted after Bebe Glasgow leaves is approved, is it not?

16   A.   It is and that application --

17   Q.   And the defendant is not unidentified with that

18   application, is he?

19   A.   Sorry.  Not unidentified?

20   Q.   In other words, he knew that he was part of the application

21   process?

22   A.   Absolutely, absolutely.

23   Q.   As a matter of fact, do you recall when you visited with

24   the agents back in May that you were actually referred to this

25   as the Croft application?

1  A.  No, I don't recall that, but I certainly don't deny it.

2  Q.  And in regard to this application, is there anything wrong

3  or sinister about another person coming on board as, say, for

4  Mr. Cook to make the application?

5  A.  I'm not sure what you're asking there, but I think the

6  answer to that is no, I don't think --

7  Q.  This application was not submitted in the dark?

8  A.  No, it was not.

9  Q.  This application was related --

10  A.  It was a continuum of that process.

11  Q.  And it was continued and it was finally approved because he

12  was determined eligible at that time, is that correct?

13  A.  It was determined that the application was complete and

14  eligibility criteria were met, that is correct, sir.

15          MR. MCHUGH:  May I have one moment, Your Honor?

16          THE COURT:  Yes.

17          (Pause.)

18  BY MR. MCHUGH:

19  Q.  Would you describe the defendant as persistent?

20  A.  Yes, sir.

21  Q.  As determined?

22  A.  Certainly.

23  Q.  As undeterred?

24  A.  Of course.

25  Q.  He didn't give up, did he?

1    A.   No, he didn't give up.

2    Q.   There is a FOIA request and the product of that request was

3    looking into Worldwide.  Do you recall that?

4    A.   I'm not -- looking into Worldwide?  I'm not -- I don't

5    really understand what you're asking.

6    Q.   It was a school that Mr. Croft had learned of that through

7    the Freedom Of Information he looked at that application and

8    then he complained to your office and to you that, hey, I'm no

9    different than this, that's approved and I'm not.  Your office

10   then reviews Worldwide and suspends its authority.  Do you

11   recall that?

12   A.   No, I don't, but I don't deny it happened.  I mean I just

13   don't recall it.

14        MR. MCHUGH:  One moment, Your Honor.

15        THE COURT:  Sure.

16        *(Pause.)*

17        MR. MCHUGH:  Your Honor, if I may say for the record

18   as we attempt to bring it out, that it was not anticipated that

19   I would receive this response and so we're just trying to bring

20   up an e-mail so Mr. Coburn can maybe refresh his memory.

21        THE COURT:  All right.

22        *(Pause.)*

23   BY MR. MCHUGH:

24   Q.   Has it been brought up on your screen?

25   A.   Yes, sir.

1    Q.  So this is an e-mail communication from yourself to a Craig

2    Bean, correct?

3          MR. SUROVIC:  We have no objection to Defense Exhibit

4    46, Your Honor.

5          THE COURT:  It will be received.

6    BY MR. MCHUGH:

7    Q.  Have you had an opportunity, Mr. Coburn?

8    A.  Yes, I have reviewed it.

9    Q.  Does that refresh your memory?

10   A.  It does.

11   Q.  Okay.

12   A.  But not a whole lot more detail than what we've got here,

13   but yes, sir.  And Craig Bean was a staffer at the Governor's

14   Office.

15   Q.  So what are you communicating to he in this e-mail?

16   A.  Well, he obviously had had a question.  "Do you happen to

17   have a copy of the TWC letter notifying Universal K-9 that they

18   have received an exemption from TWC?"  And my response is down

19   below.  Would you like me to read that?

20   Q.  Yes, please.

21   A.  The response.  "I apologize for taking so long to respond.

22   Today has been a typical Monday.  We withdrew Worldwide

23   Canine's approval to train veterans when we determined that the

24   documents they submitted to verify approval by Texas Workforce

25   Commission as a school were erroneously accepted by our staff.

1    They did not have a TWC exemption at that time.  Worldwide

2    Canine's withdrawal was dated May 2013 and the TWC exemption

3    letter you attached is dated 2014.  Worldwide Canine did not

4    choose --" obviously I left out a word "--to apply for approval

5    to train veterans after their initial approval was withdrawn.

6    I have not heard from DPS today, but have resent the e-mail

7    request for information and also tried to contact them via

8    telephone.  So far no response."

9    Q.  Are you able to testify today how this came to your

10   attention?

11   A.  Honestly I do not recall having came to my attention other

12   than what's here.  I don't know what the catalyst for this

13   response was.

14   Q.  Are you aware that the defendant, Bradley Croft, made a

15   FOIA request of Worldwide and he then communicated that

16   information to TVC as a complaint, why him and not me?

17   A.  I don't recall that, but I don't deny it happened.

18   Q.  In any of defendant Croft's communications to you through

19   e-mails, letters, was he ever rude to you?

20   A.  The only comment -- not e-mails and letters.

21   Q.  You told us about the telephone?

22   A.  The telephone call is the only time that I recall what I

23   would call excessive.

24   Q.  And the telephone call occurred after or during this time

25   when this letter was floating around, correct?

 1   A.  I'm not sure.  It may be close, but I honestly don't

 2   recall.  The sequence of events is once the telephone call, the

 3   conference call to the Governor's Office, that catalyzed, if

 4   you will, the TWC involvement.  And this is just personal

 5   opinion, I think the personal intervention of Steve Rye and the

 6   help that he provided to Mr. Croft --

 7   Q.  To assist him?

 8   A.  -- to assist him was instrumental in the approval.

 9   Q.  And on the earlier applications there, Mr. Croft was pretty

10   much on his own?

11   A.  With the exception of the exchange back and forth with our

12   staff on what was required and --

13   Q.  Did you have a comment or characterization of when

14   Mr. Croft says, On my denial letter you said I needed to do

15   this, I did that and that it had been thoroughly reviewed and

16   he did that and then new grounds for denial came up?

17   A.  Well, I don't think there were new grounds for denial, I

18   think they were the same grounds for denial that he had had

19   originally and which were the program was not adequately

20   described, it was not adequately described, instructors were

21   not adequately qualified and so forth and this was a continuum.

22   And what happened on it when Steve Rye finally sat down with

23   him with this is what you need to do to get this thing approved

24   by TWC as a school, they went through the TWC school catalog

25   requirements.  The next submittal which reflected all of that

1    work was approval.

2    Q.  Going back to Bebe Glasgow for one moment.  What other

3    types of applicant schools did she manage or handle?

4    A.  From accredited State universities to on-the-job training

5    programs and everything in between, the whole panoply of

6    schools that we dealt with.  And each of the program

7    specialists, with the exception of flight schools, we did not

8    have a unique specialist for any particular type of school.

9    Q.  And in regard to the application itself, is there any

10   requirement in the application -- and I'm going back to what we

11   had mentioned before, referred to before as Roman numeral two

12   J, roster of administrative and instructional staff, is it set

13   out anywhere that a threshold amount of instructors that need

14   to be present, in other words, for an application to be

15   approved?

16   A.  No, there is not a specific number of instructors, but

17   there's got to be at least one with qualifications.

18   Q.  As a matter of fact, there have been applications approved

19   with one instructor?

20   A.  That would not surprise me.  I don't recall one right

21   offhand, but I'm sure there have been if the school is small

22   enough.

23           MR. MCHUGH:  Thank you.  Pass the witness, Your Honor.

24           THE COURT:  Okay.

25                       REDIRECT EXAMINATION

1   BY MR. SUROVIC:

2   Q.  I don't have too much for you, Mr. Coburn, but I do have a

3   few I'd like you to clarify for me.  And if we could get

4   Defense Exhibit 44 back up?  This is the e-mail between

5   Mr. Croft and Mr. Palladino.  Do you remember that?  I'd like

6   to scroll forward.  This is the original message and then, as

7   Mr. McHugh indicated, it was forwarded around.  So if we scroll

8   back up -- right here is good.  Can you tell us what is this?

9   This is part of Defense Exhibit 44 again, this is the follow-on

10  e-mail, is that correct?

11  A.  Yes, sir, I believe so.

12  Q.  This is where Mr. Palladino is forwarding the e-mail to

13  you?

14  A.  Yes.

15  Q.  What does he ask you to do?

16  A.  "Please coordinate with Shawn, Karen and Cruz."  Shawn was

17  the -- one of the -- what did we call him?  He was between

18  Mr. Palladino and myself, but at that time it had not been

19  formalized.  Karen was the legal counsel and Cruz was the

20  assistant TVC director, Cruz Matamayor.  So coordinate with

21  them.  "Brief me on the V.A. approval process for Universal K-9

22  current status."  And he basically wanted me to come in and

23  talk to him about the whole approval process and what the

24  chronology of events was and I'm sure that's what I provided.

25  Q.  That's for the purpose of for him to respond to Mr. Croft?

1   A.   Yes.

2   Q.   If we scroll up some more -- stop right there.  Who is

3   Ms. Karen Meisel?

4   A.   Karen Fastenau, she was our legal counsel.

5   Q.   What does this indicate?

6   A.   She wanted a short briefing on the Universal K-9 approval

7   process and where it was, status.

8   Q.   It seems to indicate that she's read the documents in the

9   file and she thinks she understands what happened?

10  A.   That's the way I interpret it, yes.

11  Q.   And that there was going to be a follow-on meeting with

12  Mr. Palladino, is that correct?

13  A.   That's correct.

14  Q.   So you all met together with Mr. Palladino in that meeting

15  formulated response?  It wasn't just Mr. Palladino sending out

16  whatever you said?

17  A.   No, no, I'm sure we sat down and had a roundtable

18  discussion on it.

19  Q.   I want you to take a look at Government Exhibit Number 6g

20  again.  Mr. McHugh asked you about it was signed off on by

21  Steve Rye.  This is 6g, this is the application that was

22  finally approved, is that correct?

23  A.   Just a second.

24       (Pause.)

25       Yes, sir.

1    Q.  The cover page is just the transmittal from Universal K-9.

2    If we open it to the second page, that might be more helpful to

3    you.  You can see the receive date, March 4, 2016?

4    A.  Yes, sir.

5    Q.  This is after all of the conversations with Mr. Palladino,

6    is that correct?

7    A.  That is correct.

8    Q.  We go to page five, this is what you mean when you say that

9    Mr. Steve Rye signed off on the application, is that correct?

10   A.  Yes, sir.

11   Q.  Can you tell us what this is?

12   A.  Well, this letter?

13   Q.  Yes, sir.  You don't have to go through the details.

14   A.  Essentially what that meant is that the Universal K-9 was

15   exempt from the requirements that normally applied to career

16   schools that were approved by Texas Workforce Commission.

17   Q.  And that's -- this is a critical letter, is it not, because

18   Texas Workforce Commission is the only person that has the

19   authority to do that?

20   A.  That's true.

21   Q.  In fact, this was a key letter that was missing from all

22   the other applications?

23   A.  Well, yes in part.  And in part because we get into the --

24   I would call it the segmentation of what agencies approve what

25   types of schools and so forth.  So for instance, cosmetology

1   school has to be approved by the Cosmetology Commission and so

2   forth.  So in this case, this is the proper route for this to

3   take.

4   Q.  It could not have been really approved until you had a

5   letter like that?

6   A.  That is true.

7   Q.  When you were talking about the Worldwide Canine situation,

8   they did not have this letter until after their application had

9   been denied, I think that's what your testimony was?

10  A.  I think that's correct, yes, sir.

11  Q.  Their application was denied in 2013 and the letter from

12  Texas Workforce wasn't dated until 2014?

13  A.  That's correct.

14  Q.  So this application couldn't really not have been approved

15  until you had a letter like this in the file?

16  A.  We had to have either a formal exemption or a license.

17  Q.  And that was one of the reasons why this packet took so

18  long is trying to get that letter, is that fair to say?

19  A.  I think that's a fair assessment, yes, sir.

20  Q.  Let me ask you about Government Exhibit 6f.  You talked

21  about how it was a back and forth activity with people who were

22  making applications that you would identify or your aids would

23  identify for them, things that needed to be corrected and that

24  they would correct them, is that fair to say?

25  A.  Yes, sir.

1    Q.  I can't remember the phrase exactly that you used?

2    A.  I said an iterative process.

3    Q.  Iterative process, perfect.  So it wasn't really that if

4    you identified something was wrong, they went back to square

5    zero and had to start over?

6    A.  No, they had merely to satisfy that requirement.

7    Q.  Was it unusual for people to after you identified a thing

8    that was wrong in an application to either mail or e-mail

9    somehow you a correction to their packet?

10   A.  It wasn't unusual.

11   Q.  And that was an acceptable --

12   A.  It was acceptable.

13   Q.  We're looking at 6f.  You'll see at the very top this is an

14   e-mail from Brad Croft and it's got a list of attachments, is

15   that correct?

16   A.  Yes, sir.

17   Q.  They're hard to read?

18   A.  Yes, sir.

19   Q.  And we looked at this previously.  If we could go to page

20   69, this was one of the attachments, was it not?

21   A.  Yes, sir, I believe so.

22   Q.  The Exhibit J that we've talked about listing the

23   individuals who would be teaching?

24   A.  Yes, sir.

25   Q.  And then on the next page as we went through, if you can

1    turn to page 70, the collection of certificates?

2    A.  Yes, sir.

3    Q.  That would have been the way that you supplement your

4    application, wouldn't it?

5    A.  That is correct.

6    Q.  And these items would have been absolutely necessary to

7    process that application?

8    A.  That is correct.

9    Q.  As far as defense asked you if there was anywhere in here

10   where it talks about, you know, that the information provided,

11   they had to get permission for the -- including the name of a

12   person that's not in the program is it?  I think it's -- sorry,

13   it's a very complicated question.

14       The defense asked you whether or not there was any warnings

15   in the thing saying you need to make sure that you talk to

16   these people before you include their names and I believe your

17   answer was no, there wasn't?

18   A.  No, there's not, there's not.

19   Q.  There is an obligation, though, and a warning to be true

20   and correct, is that not correct?

21   A.  Absolutely.  There is a true and correct statement which

22   the applicant signs.

23   Q.  And the people that are listed here, the purpose of this is

24   these are people who are actually going to be administrators

25   and actually going to be the teachers in the courses, is that

1   correct?

2   A.  That is correct.

3   Q.  In fact, if you go down to the bottom of that page, right

4   above the signature, it says very specifically what?

5   A.  That's the true and correct statement.  "I certify that the

6   information on this form and/or attachment is true and correct

7   to the best of my knowledge and belief."  And a blank for

8   signature and a date.

9            MR. SUROVIC:  No further questions, Your Honor.

10                    RECROSS-EXAMINATION

11   BY MR. MCHUGH:

12   Q.  An application is like a snapshot, is it not?  It may

13   change over time and it may be supplemented over time, correct?

14   A.  That is correct.

15   Q.  And that's even provided for in the application to update

16   it, so if your instructional staff changes, then when it's

17   approved at some point it should be updated, correct?

18   A.  That is correct.

19   Q.  But the fact that a teacher or an instructor may not be an

20   instructor on the day it was approved or the instructor may

21   have agreed if you get the V.A. program I'm going to come on

22   board, there's nothing sinister about that?

23   A.  I'm not real sure what you're asking.  If the instructor is

24   fully qualified for the position and the instructor is included

25   on the roster of instructors --

1  Q.  That's right.

2  A.  Then --

3  Q.  Because it is an understanding of the applicant that that

4  is going to be the team in place, but the team in place

5  changes, it can change, can it not?

6  A.  It can change and those changes should be --

7  Q.  And in regard to Universal K-9 --

8       MR. SUROVIC:  Your Honor, I object.  Counsel is not

9  letting the witness answer the question.

10      THE COURT:  Let him answer the question.

11 A.  I was going to say that list of instructors has to be valid

12 for the time of the approval and if they change during that

13 time, then that roster of instructors needs to be updated.  And

14 until the approval goes back approving said instructor, unique

15 instructor and they're not qualified, they are qualified to

16 teach at that school, however, a veteran student is not

17 qualified to get -- that student or that instructor, I'm sorry,

18 is not approved for veterans training.  You can have

19 instructors on that school totally valid that are not listed on

20 that roster that provide training.  The only thing is the

21 veteran will not be able to get the G.I. Bill benefits if that

22 unapproved instructor is one of their instructors.

23 Q.  Did you or any member of your staff make a site visit to

24 Universal K-9?

25 A.  A member of my staff did because we are required to do site

1    visits.  And I don't remember the staff member who made that.

2    There should be in the TVC records there should be a record of

3    that visit and that's called an original visit and they go --

4    normally they will sit down with the owner, the instructors and

5    talk about how to validate the forms so that the veteran

6    student can get paid and they go over the changes in the

7    approval process and so forth and so on.  Usually that visit

8    takes anywhere from an hour and a half to two hours.

9    Q.  And you believed and you don't have contrary information

10   today that Universal K-9 was a real school?

11   A.  They met the requirements we had at that time.

12   Q.  Okay.  And you haven't received information when the site

13   was visited that it was a bowling alley?

14   A.  The original visit verified the information on the

15   application, that instructors, people and so forth were there.

16   If not, it would not have been approved.

17   Q.  And this would be -- are you familiar with the address is

18   on Tradesman in San Antonio?

19   A.  I am not familiar, personally familiar with the address,

20   no, sir.

21   Q.  A site visit to Tradesman in San Antonio, was it reported

22   back to you how many dogs were present, how many animals they

23   had?

24   A.  I doubt that because probably the focus was more on the

25   facility and the fact that there were animals.  And whether or

1   not there were two or five I don't think would have been of

2   consequence to the person looking at the facility and that's

3   what it is, it's more a facility inspection.

4   Q.  And the facility inspection passed, did it not?

5   A.  To my knowledge, it did or they would not have been

6   approved.

7   Q.  And your knowledge or understanding of Universal K-9 is

8   that it started with a small footprint and attempted to expand,

9   correct?

10  A.  I'm not really sure about how small it was when it started,

11  but it was evidently because we did, you know, an inspection on

12  it, it did exist in the form and all that it was described.

13          MR. MCHUGH:  Thank you.

14          MR. SUROVIC:  We have no further questions, Your

15  Honor.

16          THE COURT:  Okay.

17          MR. SUROVIC:  We'd request this witness be permanently

18  excused.

19          THE COURT:  Yes, he may.  Do you live in the San

20  Antonio area, colonel?

21          THE WITNESS:  No, sir, Austin.

22          THE COURT:  That's close enough.

23          MR. MCHUGH:  We would ask that he would be subject to

24  recall in case.

25          THE COURT:  All right.  That's why I asked where he

```
 1    lived, so at the moment, sir, you are excused.
 2               THE WITNESS:  Thank you, sir.
 3               THE COURT:  Well, who is your next witness?
 4               MR. SUROVIC:  Your Honor --
 5               THE COURT:  I hope we move a little faster from now
 6    on.  This is very slow.
 7               MR. SUROVIC:  We're trying, Your Honor.
 8               THE COURT:  Try a little harder.
 9               MR. SUROVIC:  Actually I believe that Mr. McHugh has a
10    special request.  We have a witness who came from Austin.  I am
11    trying to expedite things and so I no longer need her as a
12    witness, but he would like to ask her one or two questions from
13    what I understand and so we'd like to if possible and I'm doing
14    the talking, but this is really yours, Tom, we'd like to be
15    able to take her out of order.  Let Mr. McCrum call her as a
16    witness.
17               THE COURT:  This is definitely not McCrum.  You mean
18    you want to do that this afternoon?
19               MR. SUROVIC:  If we could, that way we could save her
20    having to come back tomorrow.  I understand she'll be a very
21    short witness.
22               THE COURT:  I've heard that before.  Is it going to be
23    a short witness?
24               MR. MCHUGH:  I can't make that representation.
25               THE COURT:  All right.  Well, we'll see her tomorrow
```

1    morning.

2          MR. SUROVIC:  Your Honor, if she's going to go home

3    tonight, we might as well just have her called when during the

4    defense case because I'm not calling her as a witness.  It's

5    Mr. McHugh and we're just trying to accommodate her.

6          THE COURT:  Let her go home and we'll see her at some

7    point down the road.  She's in Austin.

8          MR. SUROVIC:  She's in Austin.  Sue Jevning.  I had

9    her on my witness list because she was the actual education

10   director at the time that the thing was actually approved.  And

11   so, you know, I didn't know if I would be able to get in the

12   documents concerning the actual approval.  I got it through.

13         MR. MCHUGH:  Your Honor?

14         THE COURT:  Yes.

15         MR. MCHUGH:  We would like to attempt to be economical

16   with the witness and call her this afternoon.

17         THE COURT:  How economical?  Because you know they're

18   going to start closing the place up on us actually.

19         MR. SUROVIC:  If Mr. McHugh is going to limit himself

20   to the stuff he's going to ask, I don't think I'm going to have

21   any cross.

22         THE COURT:  Well --

23         MR. MCHUGH:  We'll call her back.  She'll still be

24   under your Subpoena.

25         MR. SUROVIC:  Right.

1          THE COURT:  Okay.  Very good.  We'll see you tomorrow

2    morning, regular time.

3          COURT SECURITY OFFICER:  All rise.

4          *(4:29 p.m.)*

5                              *   *   *

```
 1                      *   *   *   *   *

 2    UNITED STATES DISTRICT COURT

 3    WESTERN DISTRICT OF TEXAS

 4

 5         I certify that the foregoing is a correct transcript from

 6    the record of proceedings in the above-entitled matter.  I

 7    further certify that the transcript fees and format comply with

 8    those prescribed by the Court and the Judicial Conference of

 9    the United States.

10

11    Date signed:  October 20, 2019

12

13    /s/ Angela M. Hailey

14    Angela M. Hailey, CSR, CRR, RPR, RMR
      Official Court Reporter
15    655 East Cesar E. Chavez Blvd., Third Floor
      San Antonio, Texas  78206
16    (210)244-5048

17

18

19

20

21

22

23

24

25
```