1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3   UNITED STATES OF AMERICA        :
                                    :
4   vs.                             : No. SA:18-CR-00603
                                    : San Antonio, Texas
5   BRADLEY LANE CROFT(1),          : October 9, 2019
    Defendant.                      :
6   *********************************************************

7        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS (Volume 2)
              BEFORE THE HONORABLE DAVID A. EZRA
8             SENIOR UNITED STATES DISTRICT JUDGE

9   APPEARANCES:
    FOR THE GOVERNMENT:
10    Gregory J. Surovic, Esquire
      Fidel Esparza, III, Esquire
11    United States Attorney's Office
      601 N.W. Loop 410, Suite 600
12    San Antonio, Texas  78216
      (210)384-7020; greg.surovic@usdoj.gov
13

14  FOR THE DEFENDANT:
      Thomas Joseph McHugh, Esquire
15    William A. Brooks, Esquire
      Law Offices of Thomas J. McHugh
16    130 E. Travis Street, Suite 425
      San Antonio, Texas  78205
17    (210)227-4662; thomasjmchughlaw@gmail.com

18

19

20  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
21  Official Court Reporter, U.S.D.C.
    655 East Cesar E. Chavez Blvd., Third Floor
22  San Antonio, Texas  78206
    Phone(210)244-5048
23  angela_hailey@txwd.uscourts.gov

24  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.
25

I N D E X

| GOVERNMENT WITNESSES: | PAGE |
|---|---|
| PATRICK DWORAKOWSKI | |
| By Mr. Surovic | 5, 43 |
| By Mr. McHugh | 19 |
| | |
| STEPHEN PEEK | |
| By Mr. Surovic | 47, 78 |
| By Mr. Brooks | 62 |
| | |
| JESSE STANLEY | |
| By Mr. Surovic | 81, 134 |
| By Mr. McHugh | 111, 136 |
| | |
| ANTHONY WARD | |
| By Mr. Esparza | 142, 153 |
| By Mr. Brooks | 151 |

1    *(Wednesday, October 9, 2019, 9:21 a.m.)*

2                              *   *   *

3            COURT SECURITY OFFICER:  All rise.

4            THE COURT:  Please be seated.

5            COURTROOM DEPUTY CLERK:  SA:18-CR-00603, United States

6    of America versus Bradley Croft.

7            THE COURT:  Are we ready to proceed?

8            MR. SUROVIC:  We are, Your Honor.  Greg Surovic for

9    the United States with Fidel Esparza.  We're present and ready.

10           MR. MCHUGH:  Tom McHugh and William Brooks for the

11   defendant, Bradley Croft.  We are ready.

12           THE COURT:  And I understand you have a stipulation

13   you'd like to present to the Court.

14           MR. SUROVIC:  Correct, Your Honor.  Yesterday the

15   defense and the United States sat down and we were able to

16   enter into a stipulation of fact concerning much of the

17   testimony of the next witness.  Essentially the first eight

18   paragraphs of the superseding indictment have been stipulated

19   to.  I can read the stipulation to the Court, we can provide

20   the stipulation to the Court.

21           THE COURT:  Well, if we had a jury, Mr. Surovic, I

22   would certainly have you do that, but we don't.

23           MR. SUROVIC:  That's why I understand I was just going

24   to ask the Court how you wanted to handle it.

25           THE COURT:  Unless defense counsel would like to have

1    it read to me, I will read it myself.

2            MR. MCHUGH:  No, Your Honor.

3            THE COURT:  Why don't you just file the stipulation.

4    Why don't you outline generally -- what are the salient points?

5            MR. SUROVIC:  Essentially, Your Honor, it outlines the

6    Veterans Administration program and how it operates and it

7    defines the G.I. Bill benefits and it goes into how they're

8    distributed and all.  It talks about the statutes that control

9    the program.  And most importantly for the government, it talks

10   about how payments through to satisfy G.I. Bill claims are

11   processed through a system that requires the transaction to go

12   across state lines.

13           THE COURT:  Okay.  Very good.  Thank you.  Does it

14   have an exhibit number?

15           MR. SUROVIC:  Your Honor, it was filed as a document,

16   although I had Ms. Springs file it, so I don't know what the

17   document number is.

18           THE COURT:  Let's give it a document number so we can

19   easily reference it later if you need to.

20           COURTROOM DEPUTY CLERK:  It hasn't been docketed yet.

21           THE COURT:  Let's just give it an exhibit number.  It

22   hasn't been docketed, so let's give it an exhibit number.

23           MR. SUROVIC:  Your Honor, our next exhibit number

24   would be --

25           COURTROOM DEPUTY CLERK:  Forty-five.

1          MR. SUROVIC:  Forty-five.

2          THE COURT:  That's what we'll refer to it as for

3     purposes of this trial, Exhibit 45, the Court has accepted the

4     stipulation as facts proven beyond a reasonable doubt.

5          MR. SUROVIC:  Thank you, Your Honor.

6          MR. MCHUGH:  Thank you, Your Honor.

7          MR. SUROVIC:  With that, Your Honor, we're ready to

8     call our next witness.

9          THE COURT:  Okay.

10          MR. SUROVIC:  At this time, Your Honor, we call

11     Mr. Patrick Dworakowski.

12          COURTROOM DEPUTY CLERK:  Raise your right hand.

13                          *   *   *

14          *(PATRICK DWORAKOWSKI, Government Witness, Sworn.)*

15                          *   *   *

16                      DIRECT EXAMINATION

17     BY MR. SUROVIC:

18     Q.  Good morning, sir.  Would you please state your full name?

19     A.  Patrick Allen Dworakowski.

20     Q.  Spell last name?

21     A.  D-W-O-R-A-K-O-W-S-K-I.

22     Q.  And how are you employed?

23     A.  I work for the Department of Veterans Affairs.

24     Q.  What do you do for the Department of Veterans Affairs?

25     A.  I serve as the assistant director of the Oversight and

1  Accountability Division under the Education Service.

2  Q.  Does that mean that you are familiar with the V.A.

3  Education Benefits Program?

4  A.  Yes.

5  Q.  Have you been called on before to testify about those

6  benefits?

7  A.  Yes.

8  Q.  You've also been able to review the file in this case

9  concerning claims filed by and paid to the Universal K-9

10  school, is that correct?

11  A.  Yes.

12  Q.  Before we go into the specifics of the Universal K-9, can

13  you tell us what is a school certifying official?

14  A.  A school certifying official is an individual identified by

15  the school who is approved to receive G.I. Bill education

16  benefits.  That person serves on behalf of the school to file

17  claims for tuition and fee payments for students that are

18  enrolled.

19  Q.  And what form do they use in order to do that?

20  A.  Form 22-1999.

21  Q.  And who completes that form?

22  A.  The school certifying official or the SCO.

23  Q.  Where is that form sent to?

24  A.  That SCO sends the forms usually through the V.A. once

25  electronic system and that goes to a processing office.  In

Patrick Dworakowski - Examination          7

1   this part of the country, that would be the Muskogee Regional

2   Processing Office.

3   Q.  When the school certifying official fills out a 22-1999,

4   what are they certifying?

5   A.  They're certifying the pursuit of education, so whether

6   that's part-time, full-time, etc., the amount of money it costs

7   to pursue that education, tuition and fees, the amount of hours

8   or credits and the time periods, start to finish.

9   Q.  And in order to get to certify a 22-1999, does one have to

10  be approved by the Veterans Administration or some subagency of

11  the Veterans Administration?

12  A.  So the SCO as identified by the approval program sends in

13  another form stating who that individual will be.  At that

14  point the V.A. has that individual go through a number of

15  things, training as an example, one.  From that point they're

16  entered into the V.A. systems and then the V.A. system

17  identifies that individual as a file, those 1999 forms.

18  Q.  So would there be one process to certify the school and

19  then another process to certify the certifying official?

20  A.  I wouldn't identify them as a process, but yes, there's two

21  distinct pathways here.  You have to be an SCO and accepted by

22  the V.A. before you can file the 1999s.

23  Q.  And once the 22-1999s are reviewed for completeness, what

24  happens to them then?

25  A.  Upon receipt, the Regional Processing Office reviews them

1   and then enters information into the V.A. system which then

2   triggers the payment to the institution.

3   Q.  And where do the payments normally come from?

4   A.  Once they leave Muskogee, I'm going to say Chicago or

5   Jersey, there's a couple different locations.

6   Q.  When the payments are made, they're made from federal

7   funds, allocated funds, is that correct?

8   A.  Yes, taxpayer dollars.

9   Q.  Do you recall in this instance where Universal K-9's bank

10  accounts were located?

11  A.  I believe in Virginia.

12  Q.  So they would have been transferred from one of those

13  places that you talked about to the bank in Virginia?

14  A.  That's correct, sir, that's why I made the reference

15  earlier, depending on where you are in the country, different

16  offices.

17  Q.  I'm going to show you a series of documents, we're going to

18  move through them fairly quickly, but first I want to show you

19  Government Exhibit Number 12a.  This relates to count one of

20  the indictment.  Can you tell me what this is?

21  A.  I see 12a on the screen.  First and last name of the

22  individual is C.P., is that correct?

23  Q.  Correct.  And this is an information sheet, is that

24  correct?

25  A.  That's correct.  This is a payment release document, it's

1  basically saying for this file for this individual student

2  payment was made to the institution.

3  Q.  And it indicates the date -- what is date faxed to V.A.

4  mean?

5  A.  In this case V.A. wants was it used, which is what I made

6  reference earlier, then a fax machine because of the time

7  period here of January 2018, it appears that this document was

8  faxed into the V.A. and at that point it was then received and

9  then processed for payment.

10 Q.  And the payment released, amount paid to school is what?

11 A.  $12,500.

12 Q.  And date payment released to school is?

13 A.  January 12, 2018.

14 Q.  This would be an individual by the name of -- first name

15 begins with a C, last name begins with a P and there's a file

16 number attached to that, is that correct?

17 A.  Yes, sir.

18 Q.  What would this file number relate to?

19 A.  More than likely his or her Social Security number.

20 Q.  And if we go to the second page of this, I apologize, it's

21 a little hard to see, can you tell us what this is?

22 A.  Just based on the structure of the document and there's a

23 payment amount, it's going to be a 1999.  Can we scroll down a

24 little bit?  On the bottom left there would be an identifier

25 there, it would be a 22-1999.

1  Q.  Okay.  So this is what you were talking about before, the
2  22-1999 claim form?
3  A.  Yes, sir.
4  Q.  And this is, in fact, the claim form for the individual we
5  just talked about, the first name begins with a C, last name
6  begins with a P?
7  A.  Yes.
8  Q.  And can you tell which institution filed this form?
9  A.  Can we reset the one I have in front of me?  Right now it's
10  about this big.
11      (Pause.)
12  Q.  I can provide you a hard copy.
13  A.  That's probably better.
14          MR. SUROVIC:  Your Honor, may I approach the witness?
15          THE COURT:  Sure.
16  BY MR. SUROVIC:
17  Q.  This is Government Exhibit 12a and that's the second page.
18  A.  Because it says canine master training course and the time
19  frame, I'm looking for a facility code number as well, that's
20  an important part of how processed payments happen.
21          MR. MCHUGH:  Your Honor, may I approach?
22          THE COURT:  Sure, of course.
23          (Pause.)
24  A.  Based on my review of the file and the total amount of
25  payments, this individual was a student at Universal K-9.  Even

1    though I can't clearly identify the words here, I know that

2    that training course was at the Universal K-9.  And the

3    facility code here which is -- can we go all the way to the

4    bottom please?  Here 3-5, those are the codings that are in

5    line with Universal K-9.

6    Q.  This would be for the individual that we talked about on

7    the first page?

8    A.  C.P.  We usually identify students that way, that's why I'm

9    using first initial, last initial.

10   Q.  Sir, what was the amount of this claim?

11   A.  $12,500.

12   Q.  Was that claim, in fact, paid?

13   A.  It was.

14   Q.  When was it paid?

15   A.  On the date of the front cover there of the exhibit.

16   Q.  That would be?

17   A.  January 12, 2018.

18   Q.  Very good.  Let's go on to a matter related in count two of

19   the indictment.  I'm going to show you Exhibit 12b.  And again

20   can you tell us what this is?

21   A.  This is acknowledgment of payment for a veteran D.M.A. is

22   the initials and the payment was made in $12,500 on

23   January 22nd, 2018.

24   Q.  Again it has a unique file number?

25   A.  Yes.

1    Q.  Relating to that particular --

2    A.  Relating to the individual, yes.

3    Q.  And if we go to page two, this one is a little easier to

4    read?

5    A.  So at the bottom left, the facility code is listed and here

6    you can clearly see the Universal K-9, same facility code that

7    I made out in the other document.

8    Q.  And that would be this number right here?

9    A.  Yes, sir, bottom left right above the phone number.

10   Q.  If you look at the bottom box over here, you can see that

11   that is the facility code and then right next to it on that

12   same line, it says Universal K-9, in fact.

13       So this 22-1999 would relate to the individual that's on

14   the first page of this document, is that correct?

15   A.  Yes.

16   Q.  And again what institution filed the form?

17   A.  Universal K-9.

18   Q.  Okay.  And what was the amount of the claim?

19   A.  $12,500.

20   Q.  When was it paid or was it paid?

21   A.  Yes, it was paid January 22nd, 2018.

22   Q.  Let's move to the document that relates to count three of

23   the indictment, Government Exhibit Number 12c.  If I could ask

24   you to go through and identify the information on this again?

25   A.  Here we have a student J.P.M., file number, the amount paid

1    to the school is $12,500, was paid on January 22nd, 2018.

2    Q.   And then if we open this up to page two, again to the

3    bottom, what institution was filing this claim?

4    A.   I see Universal K-9, same facility, code number.

5    Q.   Facility number again is the same?

6    A.   Yes, bottom left, right above the phone number.

7    Q.   So that tells you that Universal K-9 is the institution

8    that filed the form?

9    A.   Yes.

10   Q.   What amount was the claim?

11   A.   $12,500.

12   Q.   Was this claim paid?

13   A.   Yes.

14   Q.   And when was it paid?

15   A.   On January 22nd, 2018.

16   Q.   Let's go to count four of the indictment, Exhibit 12d.

17   Again can you tell us what this is?

18   A.   Name S.M.R., on January 23 -- sorry.

19   Q.   Has a unique file number once again?

20   A.   Unique file number.

21   Q.   The reason I ask you that, sir, is because that's how we

22   identify it in the indictment.

23   A.   Understood.  In our system we have to have those file

24   numbers, so that's in line.  The amount paid, $12,500,

25   January 23rd, 2018.

Patrick Dworakowski - Examination          14

1   Q.  And once again if we go to page two, this is the 22-1999 --

2   well, scroll up so he can verify the name.  This is for the

3   individual we just talked about, is that correct?

4   A.  Yes.

5   Q.  This is the 22-1999 and the bottom, what institution is it

6   in?

7   A.  Universal K-9.

8   Q.  There it's very easy to read, is that correct?

9   A.  Yes.

10  Q.  Was this claim actually paid?

11  A.  Based on the front cover of this exhibit, yes.

12  Q.  And then you indicated it was paid on January 23rd, 2018?

13  A.  Yes.

14  Q.  Let's go to count five of the indictment, Government

15  Exhibit Number 12e.  Again can you tell us what this is?

16  A.  Student W.J.H., payment on January 30, 2018, with the

17  unique file number in the amount of $12,500.

18  Q.  And if we flip to the second page, this is the 22-1999 that

19  relates to that payment, is that correct?

20  A.  Same name, yes.

21  Q.  And if we go to the bottom, what institution filed the

22  claim?

23  A.  Based on the facility code, Universal K-9.  It's the same

24  course as the prior, that's legible.

25  Q.  Was that claim paid?

1  A.  Yes, January 30th, 2018.

2  Q.  Let's go to count six of the indictment, Government Exhibit

3  12f.  Can you tell us what this is?

4  A.  Individual D.A.L., unique file number, payment of $12,500

5  on February 12, 2018.

6  Q.  And if we go to the second page of this, is this the

7  22-1999 that applies to that student?

8  A.  It is.

9  Q.  And at the bottom can you tell us what institution filed

10  this claim?

11  A.  Universal K-9.

12  Q.  And was this claim paid?

13  A.  Yes, on February 12, 2018.

14  Q.  I show you what relates to count seven of the indictment

15  which is Government Exhibit Number 12g.  Can we go through

16  this?

17  A.  The name is T.K.E., unique file number, payment of $12,500

18  on February 19, 2018.

19  Q.  And if we go to page two, once again is this the 22-1999

20  that applies to that payment we just talked about?

21  A.  Yes.

22  Q.  And if we go to the bottom of that, what institution

23  submitted this claim?

24  A.  Universal K-9.

25  Q.  And was that claim paid?

Patrick Dworakowski - Examination                16

1  A.  Yes, on February 19, 2018.

2  Q.  Next we have count eight of the indictment and that is

3  Government Exhibit 12h.  Can you go through this again for us?

4  A.  The name is N.H., unique file number, payment made $6,500,

5  February 27, 2018.

6  Q.  By the way, that date payment release to school, that's

7  actually when it was transmitted from the --

8  A.  From the V.A., yes, sir.

9  Q.  To the institution's banking account, is that correct?

10 A.  That's correct.

11 Q.  We go to the second page here.  Is this the 22-1999

12 relating to that payment?

13 A.  Yes.

14 Q.  And if we go down to the bottom, what institution submitted

15 it?

16 A.  Universal K-9.

17 Q.  And was this claim actually paid?

18 A.  Yes, on February 27th, 2018.

19 Q.  Now, these are not the only claims that were filed by

20 Universal K-9 for G.I. Bill funds, is that correct?

21 A.  That's correct.

22 Q.  You reviewed all of the records concerning all of the

23 payments made by the Veterans Administration to Universal K-9,

24 is that fair to say?

25 A.  That's fair to say.

1  Q.  I'm going to show you Government Exhibit Number 13 and it

2  is a multi-page exhibit.  Government Exhibit 13 you've examined

3  before, is that correct?

4  A.  Yes.

5  Q.  Does this list all of the payments made to Universal K-9

6  from the Veterans Administration?

7  A.  It does.

8  Q.  And it indicates name, the last four of the Social

9  Security, the other numbers of the Social Security has been

10  blacked out, is that correct?

11  A.  Correct.

12  Q.  And then the payment amount and payment date?

13  A.  Yes.

14  Q.  There are two other columns, but I don't think they come

15  into play in the first few pages.  Let's just click through the

16  pages, shall we?

17     Go to the next to the last page, there are two students

18  here, there are a series of students that have nothing in the

19  payment -- or the date payment block.  Some of them are zeroed

20  out and then there are some dates next to two of the students,

21  can you tell us what's going on there?

22  A.  For student A.S.N., in the amount of $6,500, one of a

23  couple things could have happened, the February date and the

24  March date there may have been two of the same submittals and

25  the V.A. would have only accepted one because once they review

1    the time periods, meaning the term start date, term end date,

2    they make that determination of what the payment is, whether

3    it's as submitted or variation thereof.  For the next student,

4    A.D.S., July date and then July date again, so that could have

5    been one option.  Another could have been that there was a

6    revision submitted by the SCO, so they submit one document and

7    then turn around and submit a second document that has

8    revisions.  It might be a change of a date, might be the

9    spelling of a name, could be a course type, but in this case, I

10   would say because it's not a regular occurrence, it could have

11   been one of a couple things, but either way it was initiated by

12   the SCO.  The V.A. wouldn't have initiated anything.  The SCO

13   has to submit that 1999 to be paid.

14   Q.  And then the last six students listed on the sheet, their

15   claims were not processed, is that correct?

16   A.  That's correct.

17   Q.  Now, if we go to the last page, there's a number on this

18   last page.  Can you tell us what that number is and what it

19   means?

20   A.  The $1,506,758.31 is the total amount of money paid to this

21   institution in tuition and fees from the V.A.

22   Q.  So the V.A. paid Universal K-9 $1,506,758.31?

23   A.  Yes.

24        MR. SUROVIC:  No further questions, Your Honor.

25        THE COURT:  All right.  Counsel.

Patrick Dworakowski - Examination                    19

```
 1                      CROSS-EXAMINATION
 2   BY MR. MCHUGH:
 3   Q.  Mr. Dworakowski?
 4   A.  Yes.
 5   Q.  You and I have never visited before, have we?
 6   A.  No.
 7   Q.  My name is Tom McHugh.  I represent the defendant here in
 8   the courtroom, Bradley Croft, have you ever met him?
 9   A.  No.
10   Q.  And it is your testimony that you have testified before in
11   federal trials, is that correct?
12   A.  Yes.
13   Q.  In regard to this particular case, I'm referring to
14   Universal K-9 related 1999s, in regard to those, how many times
15   have you met with the government?  How many times have you met
16   with the team here to discuss your testimony?
17   A.  One time on the telephone.
18   Q.  I'm sorry?
19   A.  One time via telephone.
20   Q.  One time by telephone?
21   A.  Yes.
22   Q.  Did you go through the same records that you're referring
23   to today?
24   A.  The exhibits?
25   Q.  Yes.
```

Patrick Dworakowski - Examination                    20

1    A.   Yes.

2    Q.   And did you have a copy and did they have a copy at the

3    time?

4    A.   They have a copy.

5    Q.   Do you know whether or not they had a copy when you were

6    engaged in your telephone conversation?

7    A.   Yes, we established that there's going to be exhibits for

8    the hearing, we talked about 1999s.

9    Q.   When did this meeting occur?

10   A.   Four-ish weeks ago, I'd have to look at my calendar

11   specifically, but about a month ago.

12   Q.   At or before the time of the indictment, let's say more

13   than a year ago you had not yet been contacted in this case,

14   correct, your office?

15   A.   Not my office.

16   Q.   And just for the record, if you could -- I believe you're

17   referring to a 1999 and is it a 22-99?

18   A.   For?

19   Q.   Well, the school certifying official?

20   A.   Correct.

21   Q.   What form is that?

22   A.   I don't recall the number.  We have so many different ones.

23   I want to say it's like an 8693.  I apologize, I don't recall.

24   Q.   You referred to form 22-1999, is that the form the

25   certifying official fills out?

1   A.   That's correct, that's the most important one for an

2   institution to be paid.

3   Q.   So give us a little -- in a little more detail describe the

4   form 22-1999?

5   A.   Sure.  The 22-99 is what's used by an institution who is

6   requesting tuition and fee payments from the V.A. Education

7   Benefits Service in order to educate education training

8   programs for veterans that are enrolled or beneficiaries

9   enrolled to use their G.I. Bill.  Without a 1999 submitted,

10  they cannot be paid.

11  Q.   And in regard to the -- what is a 2259?

12  A.   I'd have to look it up.  With all due respect, sir, there's

13  so many different forms that I don't keep a full catalog of

14  all, but I know the 1999 is the main document that an

15  institution submits through our processing.

16  Q.   For the record, there is no "got you" here.

17  A.   Fair enough.

18  Q.   In regard to the school certifying official, you offered

19  some testimony on that as to who he is and how he achieves that

20  status.  Could you do that one more time?

21  A.   Sure.  So the institution who is approved for education

22  training benefits to use the G.I. Bill must identify a school

23  certifying official.  In some cases they identify more than

24  one.  That individual has to sign a federal form, that's the

25  number I'm not recalling, that attests that they will follow

Patrick Dworakowski - Examination          22

1    all the statutes, regulations, etc.  That is submitted to the
2    V.A., we then enter that person's information into the V.A.
3    system.  Without that person in the system, the institution
4    cannot use the 1999 to submit for payments.  Part of the
5    requirement as an SCO is you have to go through a version of
6    training so you know how to use the forms and go through the
7    submittals.
8    Q.  Exactly and that is my next question.  The training, where
9    and how does that occur?
10   A.  It occurs at a couple different ways.  There's online
11   versions.  Depending on what the institution is, where it's
12   located, etc., some institutions request in-person type of
13   support.  There's State conferences that happen annually,
14   sometimes more than once and new school certifying officials
15   are able to at that point go line by line through different
16   questions that they have, so they actually have an in-person or
17   small group opportunity to learn how to use the processing for
18   the payments.
19   Q.  And this is a person, an individual that the V.A. relies
20   upon in terms of information submitted by him as being truthful
21   and accurate, the certifying official?
22   A.  That's what that individual signs up for, yes.
23   Q.  That's what that is all about, correct?  That's one
24   component to what a certifying official does?
25   A.  It's one component.

1  Q.  And in regard to the certifying official referred to

2  herein, what is his name?  Do you know the certifying official

3  for Universal K-9?

4  A.  I don't know names of certifying officials on a regular

5  basis, no.

6  Q.  I'm not asking that.  Can you tell by looking at the

7  exhibits that the government just went through with you,

8  Government Exhibit 12a I believe through 12h, the certifying

9  official on those, the certifying official is identified, is he

10  not?

11  A.  He would have to be.

12  Q.  Is he identified by a number and by a name?

13  A.  So not by the number, the number is a facility code that

14  identifies the institution.

15  Q.  That's right.

16  A.  The name would be -- can we pull one of the exhibits back

17  up?  Is it possible?

18          MR. MCHUGH:  Let's go to 12a please.

19          MR. SUROVIC:  Your Honor, in order to expedite things,

20  I think the government is willing to stipulate that the

21  certifying official for Universal K-9 was an individual by the

22  name of Richard Cook.  I think that's where the defense is

23  going.

24          MR. MCHUGH:  That is where we are going.

25          THE COURT:  I'll accept the stipulation.

1    BY MR. MCHUGH:

2    Q.  In regard to Mr. Cook, then the Department of Veterans

3    Affairs had confidence in him because it gave him this status

4    as a school certifying official, is that correct?

5    A.  I would say that the government receives attestations by

6    individuals appointed by the institution who is going to submit

7    for tuition and fees.  We don't then challenge that school

8    certifying official whether he or she is the most qualified

9    person.

10   Q.  I am not ranking that.  So in regard to this person, he is

11   identified as a Richard Cook.  I take it you have never met

12   this school certifying official?

13   A.  No, sir.

14   Q.  What is his status today?  As a school certifying official,

15   can you go from school to school or is it school specific?

16   A.  School specific identified by the institution to the V.A.

17   Q.  In regard to this school certifying official, do you know

18   whether or not he had been certified earlier for other

19   programs?

20   A.  I don't know.

21   Q.  Do you know whether or not he remains certified today?

22   A.  If he would, he would have to be in an approved program and

23   he could be one of many school certifying officials.  That

24   would be up to the institution that he now works for, if he

25   works for an institution.

1   Q.  And in regard to -- I'm referring to counts one through

2   eight, so that's also Government's Exhibits 12a through 12h.

3   In reference to that information, was there any information

4   that as you went through the file and as you met with the

5   government that would suggest to you or cause concern to you

6   that any of those claims were bogus, undeserved?

7   A.  This all begins with an approval.  This institution was an

8   approved program, however --

9   Q.  When did it become approved?

10  A.  Prior to the dates of the submittals of the 1999s.  I'm

11  sure there's a full timeline here that everyone is aware of,

12  sir.  My point is the 1999 is just another federal form unless

13  you're an approved program.  And we all know that that starts

14  with the State approving agency and then once submitted --

15  Q.  And the State approving agency is who?

16  A.  Texas, TVC.

17  Q.  The Texas Veterans Commission?

18  A.  Yes, in this case and in the State of Texas, so the fact

19  that this institution was approved allowed them to identify a

20  school certifying official which allowed them to submit 1999s

21  to request payment under the G.I. Bill.

22  Q.  Okay.  And you are the assistant director Department of

23  Veterans Affairs as it relates to education services?

24  A.  Education Service, that's where all the G.I. Bill matters

25  come from.

Patrick Dworakowski - Examination                26

1    Q.  And so all the G.I. Bills, so in addition to this

2    opportunity that is offered to V.A. -- to the vets, what are

3    some of the others?  So this is for a dog program, do you

4    oversee all the other programs?

5    A.  Excellent question.  Thank you for the question.  So across

6    the country we have institutions of higher learning, we have

7    non-college degree programs, OJT and apprenticeships, we have

8    some accredited programs, some non-accredited programs.

9    Q.  And your responsibility is over all of that?

10   A.  Oversight and accountability of all of those programs as it

11   relates to --

12   Q.  To education?

13   A.  -- to education.

14   Q.  And you have been doing that for how long?

15   A.  Since fall of 2016.

16   Q.  Have you had in regard to any claim submitted by Universal

17   K-9 and by the certifying official, Richard Cook, do you know

18   how many, other than what you referred to at the bottom where

19   they were not paid, were there others that were kicked back or

20   fell into some algorithm that caused -- because they looked

21   suspicious in any way?

22   A.  There's a term that's used with systems and it's called

23   offload.

24   Q.  Yes.

25   A.  In these cases these were faxed documents, so they may have

1   not even made it into the system for an offload.  The offload

2   would show me a record from the system, but those that were

3   never entered would not have.

4   Q.   The indictment identifies the claim file number and so it

5   is your testimony that that may or may not relate to a Social

6   Security number?

7   A.   Yes.

8   Q.   Or does it relate to a Social Security number?

9   A.   More than likely it does.

10  Q.   Okay.  And that is the Social Security of the applicant of

11  the V.A.?

12  A.   Of the veteran or the beneficiary.

13  Q.   And that is one way of tracking the veterans through your

14  system, by name and by Social Security number?

15  A.   And date of birth and a few other personal identifiers,

16  yes, sir.

17  Q.   And in regard to 12a, if we could bring that up again, I

18  believe that you had on 12a a payment date of January 12, 2018,

19  is that correct?

20  A.   Yes.

21  Q.   And so in the indictment, not a "got you", but in the

22  indictment there is a date January 17, 2018.  Do you have any

23  idea what that date would represent?

24  A.   It could be a difference in business days or weekends based

25  on when accounts receive funds versus the date that the fund

1   transfer begins.  This date is specific to the government

2   system saying --

3   Q.  We cut the check?

4   A.  We cut the check, we transferred the funds.

5   Q.  Do you have an explanation why the indictment --

6           MR. SUROVIC:  Your Honor, I'm going to object.  He's

7   asking a witness to testify about what's going on in my mind.

8           THE COURT:  I don't know that counsel knows what's

9   going on in his mind.  I don't think he can testify about it.

10  The objection is sustained.

11          MR. MCHUGH:  That was a good objection, Your Honor.

12  BY MR. MCHUGH:

13  Q.  Do you see anywhere on Exhibit 12a the date January 17,

14  2018?

15  A.  Not on this exhibit, I did not.

16  Q.  And so this date, the date the check is cut is your

17  testimony is January 12th --

18  A.  Yes.

19  Q.  Of 2018?  So that is the check is cut before that date.

20  Let's, for instance, go to Government Exhibit 12d.  And 12d has

21  a date of January 30th of 2018, is that correct?

22  A.  The date payment release was January 23rd, 2018 if we're

23  looking at D.

24  Q.  You're looking at file number 375 and you're looking at

25  12d?

1    A.   Yes, sir.

2    Q.   So the date on that is what?

3    A.   The date payment released to school is January 23rd, 2018.

4    Q.   And so that would be the date the check is cut.  Now, go on

5    to Government Exhibit 12e.  And what date do you see there?

6    A.   The date payment released is January 30th, 2018.

7    Q.   And go to Government Exhibit 12g.  And is that a date of

8    February 19, 2018?

9    A.   Yes.

10   Q.   And that would be the date the check is cut.  So as you

11   look at Government Exhibit 12g, would you have an explanation

12   for under that claim what event, if any, occurred earlier than

13   the date the check was cut, in particular February 16, 2018?

14   A.   I'm not understanding.  Are you asking me to --

15   Q.   If Government Exhibit 12g --

16   A.   Yes, sir.

17   Q.   -- you have a payment date through your testimony of

18   February 19, 2018, correct?

19   A.   Yes.

20   Q.   Okay.  By referring to Exhibit 12g, before that date,

21   February 16, 2018, do you see any event occurring that relates

22   to that payment?

23   A.   For this individual?

24   Q.   Yes.

25   A.   Considering the date it was received by the V.A. was

Patrick Dworakowski - Examination                30

1    February 3rd, anything from the period of the 3rd on through
2    the 19th could have been processing, it could have been
3    reviews, and that's on the V.A. side, that's all I can speak
4    to.  What would happen on the 16th, I don't know, I don't have
5    a calendar in front of me, I don't know if that was even a
6    Federal holiday or anything else.
7    Q.  Do you have any information with you regarding the school
8    certifying official, Richard Cook, did you bring those records
9    that relate to his form, is it 22-99 as certifying official,
10   his history or his training or anything?
11   A.  I don't have any records with me.
12   Q.  And how is the government and the taxpayers protected
13   against a person if they use, let's say, just a pseudo name,
14   they don't use their real name?  Let's say it's somebody else
15   using Richard Cook's name, what does the government do?
16   A.  We would go directly to the institution and hold them
17   accountable because they're the ones who submitted the
18   information.  And the individual on behalf of the institution
19   signed a document forwarding their identifier as the school
20   certifying official.
21   Q.  And your review of Universal K-9, were you asked to review
22   it for whether or not it was ever a subject?  Did you ever
23   become aware that any of the listed veterans by their Social
24   Security number were not, in fact, that person in taking that
25   course?

1   A.  I wasn't aware of that specifically, but I will say that

2   over the course of a fiscal year, we conduct over 4,000

3   compliance surveys across the nation.

4   Q.  But in your compliance surveys, if it touched upon

5   Universal K-9, all the Social Security numbers came back to

6   veterans, did it not?

7   A.  I can't answer that question because I don't know sitting

8   here --

9   Q.  Because -- I cut you off.

10  A.  I don't know sitting here which files, how many, at what

11  time, what interval were reviewed.  We do review student files

12  and when we review the student files on site and/or through the

13  systems, there's obviously a cross check of that type of

14  information.

15  Q.  A school facility may have its license suspended, may it

16  not?

17  A.  Sir, a license is a different matter --

18  Q.  Not a license.

19  A.  Their approval?

20  Q.  Their approval suspended.

21  A.  They could have their approval suspended, yes, by the State

22  approving agency.

23  Q.  And what are the grounds for suspension?

24  A.  They're not in line with the statute or regulation.

25  Q.  Okay.  Please give an example?

1   A.  An institution may have submitted an approval for a type of

2   modality.  Case in point, an institution says we're going to

3   teach in residence, beneficiaries are going to come in, they're

4   going to be in these tables, chairs, etc., this is where

5   they're going to learn.  However, the institution allows

6   students to work remotely, which is one example.  Another could

7   be that they provide an address of one location and they turn

8   around and go somewhere else to perform the services.

9   Q.  And in those instances, if they are real vets, but it does

10  not fit within the modality, is the institution paid?

11  A.  Well, the institution --

12  Q.  That the institution is aware?

13  A.  The institution could be paid up to a point and that point

14  comes when there's a compliance survey or a targeted risk base

15  review done or another version of the V.A. officials sometimes

16  with, sometimes without the State approving agency going on

17  site doing our audits, our compliance surveys.  And then

18  through findings, there's administrative actions that occur.

19  Q.  What are the administrative actions?

20  A.  Anything from referrals to the Office of Inspector General.

21  Q.  Which happened in this case?

22  A.  It happened in this case, yes, sir.

23  Q.  Okay.

24  A.  A collection of overpayments.  One of the things the V.A.

25  does see is when an institution is receiving a regular tuition

1    and fee payment because think of an institution of higher

2    learning, they constantly have beneficiaries attending semester

3    courses.  If there's an overpayment that's caught, we then

4    assess that institution for what they shouldn't have been paid

5    and it comes out of their next payment.  It's similar also with

6    non-college degree programs that have reoccurring semesters, so

7    in that case it's a collection of overpayments.  Another action

8    is called school liability and that deals with not just the

9    institution, but the veteran.  An institution may have

10   submitted a 1999, made a claim that a veteran is attending

11   full-time, but in turn they're only attending part-time and

12   because the submittal then triggers the system that states this

13   veteran should receive their housing allowance at a certain

14   rate.  Well, that's an overpayment, but the 1999 is what drove

15   that overpayment, so the V.A. would go back to the institution

16   again and hold them accountable for that liability.

17   Q.  And that was a remedy and it was an option available to

18   Universal K-9, to go back and hold accountable, is that

19   correct?

20   A.  I don't know that that's correct.  In some cases like this

21   one, there are not options for just overpayments and school

22   liability opportunities.  We go directly -- once we make that

23   referral to the Office of Inspector General, we don't then look

24   to work with the institution to try to recapture those

25   overpayments.  We don't specifically -- we don't specifically

1    have a threshold that says if it's over ten dollars, if it's

2    over a hundred dollars, we don't take it that route.  We look

3    at the seriousness of the matter and in this case there was a

4    referral made to the OIG.

5    Q.  And that referral was based upon what?

6    A.  That referral was based on a couple things.  One, the

7    institution was approved and we questioned the approval mainly.

8    Two --

9    Q.  And why would you question the approval?

10   A.  We question every approval.  As part of their V.A. -- as

11   part of our role, especially a new approval because I didn't

12   make a reference earlier, but for an institution to be approved

13   and identified in the system for payment, they have to have a

14   facility code.  The V.A. provides that facility code.

15   Congress's intent was to have the State approve them and then

16   submit that paperwork to the government.  The government then

17   issues basically their key so they can then submit for

18   payments.

19   Q.  What other options -- in reference to this particular case

20   and the referral to OIG, which is the Office of the Inspector

21   General, is that correct?

22   A.  That's correct, sir.

23   Q.  And that happens from time to time, I take it?

24   A.  It does.

25   Q.  I take it not commenting on this case, but fraud does exist

1   out there?

2   A.   That's correct.

3   Q.   And a determination is made within the V.A. as to when and

4   under what conditions a referral is made?

5   A.   That's correct.

6   Q.   And in this case, the referral was made again, you said it

7   was subject, but they all are subject to an examination?

8   A.   An examination.

9   Q.   But beyond that, what tickled the system in regard to

10  Universal K-9?

11  A.   So we have what's called a complaint system.  It's a

12  feedback system that we use, it's available public facing.

13  That's one of the various components.  At times we also in

14  conversation with our OIG partners, they also have systems that

15  they receive complaints that might be relevant to an education

16  case.  We receive inquiries from as far up as the White House

17  regarding veterans.  Compliance surveys, as referenced earlier,

18  I'd have to go back to my notes about the last compliance

19  survey that was conducted.  We may leave a compliance survey

20  and then keep them on our radar for the next year because of a

21  finding or concern.  Quick example, a concern could be a

22  turnover of a school certifying official, it could be

23  relocation --

24  Q.   In this case, you do not know?

25  A.   I'd have to go back to my notes.

1    Q.  Do you have your notes with you?

2    A.  I do not.  I didn't bring them.

3    Q.  Are they outside the courtroom?

4    A.  No, I didn't bring anything into the courthouse.

5    Q.  Are they available to you?

6    A.  Yes.

7    Q.  In regard to Universal K-9, you made some reference

8    regarding complaints.  Did any complaints come in to your

9    office or across your desk as it relates to Universal K-9?

10   Would that be in your file?

11   A.  It would be and that wouldn't -- to my office, yes.

12   Q.  And it's my understanding, but you correct me, reading

13   government reports that there were no complaints that came in

14   to the V.A. from vets in particular, do you disagree with that?

15   A.  Again I'd have to go back.  The reason I'm on this point is

16   because that's one of the avenues that is pretty regular for

17   us.  I'll stay on that point, sir, that more than likely

18   there's at least a complaint that came in.  And there's a

19   difference in how they're looked at by different entities

20   because of --

21   Q.  And could the complaint that came in or do you know whether

22   or not the complaint that came in was sourced from a veteran

23   or, say, from another government office or government agency?

24   A.  I don't recall.

25   Q.  And that can happen, can it not?

1  A.  It can, yes, we have inter-agency relationships with

2  Department of Education, Department of Labor, Department of

3  Defense.

4        MR. SUROVIC:  Your Honor, in order to save time, we're

5  willing to stipulate that this investigation actually got it

6  started by a complaint that was filed by Ms. Bebe Glasgow who

7  we've already heard some testimony about who was concerned

8  about the processes that Universal K-9 were using.  I believe

9  it was filed through the OIG's office.  Spoke to one of the

10 agents in another area in Dallas.

11       MR. MCHUGH:  Well, that's very helpful.

12       THE COURT:  All right.  I'll accept the stipulation.

13 BY MR. MCHUGH:

14 Q.  Were you aware of that?  Do you know who Bebe Glasgow is?

15 A.  I work with the agents, I don't work with all of their

16 staff and colleagues and things of that nature, I work directly

17 with an agent.

18 Q.  So the answer is no?

19 A.  I don't know --

20 Q.  Do you know who the project analyst from the Texas Veterans

21 Commission assigned to Universal K-9, was one of those project

22 analysts a Bebe Glasgow?

23 A.  I've got to guess that's a staff member of TVC which

24 they've had about a dozen and they've had their own turn-overs

25 over time.

1    Q.  But personally you do not know that person?

2    A.  No, I do not personally.

3    Q.  To your knowledge, that person did not complain to you?

4    A.  It wouldn't have come in to me directly.  It would have

5    came into my office through various sources.

6    Q.  And you're not able to testify today that you have any

7    recollection whether or not that ever came across your desk?

8        It's not a "got you".

9    A.  No.

10           MR. MCHUGH:  May I have one moment, Your Honor?

11           THE COURT:  Sure.

12           *(Pause.)*

13           Counsel, is this a good time to take our short morning

14   recess?

15           MR. MCHUGH:  Yes.

16           THE COURT:  Let's do that instead of you guys trying

17   to chat.

18           COURT SECURITY OFFICER:  All rise.

19           *(10:19 a.m.)*

20                              *   *   *

21           *(10:44 a.m.)*

22           COURT SECURITY OFFICER:  All rise.

23           THE COURT:  Please be seated.  All right, counsel, you

24   can proceed.

25           MR. MCHUGH:  I'm just about finished.

1   BY MR. MCHUGH:

2   Q.  Sir, is there a centralized databank that you would have

3   access to at the time where you can -- matters of fraud or

4   complaints would -- that you'd be able to access that?

5   A.  Yes.

6   Q.  And in regard to Universal K-9, other than the one referral

7   from TVC, I believe you said there was a complaint?

8   A.  Yes.

9   Q.  Okay.  And just so it's your words and not my words, you

10  did a bit of homework here during the break, did you not?

11  A.  Yes, sir.

12  Q.  And what did you learn?

13  A.  So as a background, I made a reference earlier about the

14  relationships we have across the federal government.  Federal

15  Trade Commission I didn't make a reference earlier, but they're

16  one of the main ones.  There's a database called the sentinel

17  database, they own it, however, we're a contributor along with

18  some other federal entities.  We have what's called the PECS

19  system.  Now it's called the feedback system.  Either way, we

20  have over 11,000 plus complaints in that system since 2014.

21  And our staff reviews each of those as they come in on a

22  regular basis.  There's file numbers attached to them, etc.

23  Q.  And none is ignored?

24  A.  None are ignored.

25  Q.  If a complaint comes in, whether or not it is a valid or

Patrick Dworakowski - Examination            40

1   worthwhile complaint, it's followed up on?
2   A.   That's correct, valid or invalid, we have to pursue it.
3   Q.   And that is done as a matter of practice for every
4   complaint that comes in?
5   A.   That's correct.
6   Q.   And what did you learn about -- during the break about
7   Universal K-9?
8   A.   So identifying one specific we have a complaint from a male
9   student or beneficiary more appropriately stated who came to
10  the V.A. through the complaint system and made the statement
11  that he inquired about programming, never attending classes,
12  yet Universal K-9 did submit for payment to the V.A. for
13  services.
14  Q.   Do you know the date of that complaint?
15  A.   2017, '18 period.
16  Q.   You have access to it?
17  A.   I have access, yes, we have an account number for that
18  complaint and everything else.
19  Q.   And did you consider that account -- that complaint
20  actionable?
21  A.   Yes, because the initial steps that we take which is to
22  contact the individual who files the complaint with their
23  contact information, it puts it into action at that point.
24  From that point, we do one of many things, so the answer is
25  yes.

1    Q.   And what happened in this case?

2    A.   This complaint led us to review anything from payment

3    documents with our Regional Processing Office as well as we

4    work out in the Muskogee office where we have staff, we did

5    make contact with OIG regarding this matter.

6    Q.   And would you call that a referral?

7    A.   I would call that a referral, yes.

8    Q.   And is there a record of that referral?

9    A.   We do not make the formal referral records that way.  We

10   have a working relationship with agents across the country.  I

11   speak with representatives in D.C. on a fairly regular basis

12   about concerns and cases.

13   Q.   And so if it gets legs, I take it that that office will

14   call back and you'll --

15   A.   Then we'll be notified, yes.

16   Q.   And did that happen?

17   A.   It did and then we are on standby to provide all documents

18   necessary.

19   Q.   And did that event affect the -- at all the status of the

20   approval?

21   A.   I'll say it may have.  I can tell you that that's one of

22   our areas of concern is working with approved, suspended or

23   withdrawn programs back to the SAA and we have a regular

24   discussions with them about certain programs.

25   Q.   And the certifying official, do you know who the school

1  certifying official would have been on that complaint?

2  A.  No, I don't even know if the school certifying official was

3  listed.  It was the beneficiary who was making the complaint.

4  Q.  But the school certifying official, there would be a

5  follow-up in terms of it being actionable and you not ignoring

6  it?

7  A.  I do not.

8  Q.  So you do not know?

9  A.  I do not know who the SCO was at that time.

10         MR. MCHUGH:  May I have one moment, Your Honor?

11         THE COURT:  You may, of course.

12         *(Pause.)*

13         MR. SUROVIC:  Your Honor, counsel wants me to clarify

14  to make sure that I've spoken correctly and that the Court

15  understands.  We had a stipulation earlier, the government

16  offered to the Court that the complaint that resulted in this

17  case arose from a complaint that was made by Ms. Bebe Glasgow.

18  I believe she was a former TVC employee at the time that she

19  made the complaint and it was directly to V.A. OIG, not through

20  Mr. Dworakowski's office.

21         THE COURT:  He might be talking about a different

22  complaint.

23         MR. SUROVIC:  He's just testified about a different

24  complaint, yes, Your Honor, that this complaint came through

25  the OIG office and was not the result of the one he just

1   testified about.

2          THE COURT:  You mean the criminal action.

3          MR. SUROVIC:  Correct, Your Honor.

4          THE COURT:  All right.

5          MR. SUROVIC:  That we are here on today.

6          THE COURT:  That's fine.  Thank you.

7          MR. MCHUGH:  I have no further questions.  Thank you

8   very much.

9          THE WITNESS:  Thank you, sir.

10                    REDIRECT EXAMINATION

11   BY MR. SUROVIC:

12   Q.  Sir, I have one question for you.  Counsel had asked you

13   about the veracity of the 22-1999s that were submitted for

14   Universal K-9 and asking you if there was anything fraudulent

15   in them, I believe.  And you made a reference to the

16   application -- the approval process through the State.  Could

17   you tell us what you meant when you said that?

18   A.  So when an approval application is submitted to the State

19   approving agency, all documents within have to be true and

20   accurate as submitted because if it's not, then the State

21   approving agency on behalf of the V.A. cannot make a decision

22   that's accurate.  The application upon review -- give me just

23   one second.

24       (Pause.)

25   Q.  Let me ask you this, sir, if there were false statements

Patrick Dworakowski - Examination          44

1   made in the course of the application, would that affect the
2   validity of the 22-1999s?
3   A.  Yes, it would impact it directly because if a program can't
4   be approved or if it's not approved you can't file a 1999,
5   process then doesn't exist.  So it all comes back to the basics
6   of an approval through the application of a program.  Once a
7   State approving agency approves a program, the V.A. reviews it,
8   provides the facility code, then the process for submission of
9   tuition and fees can occur.
10  Q.  Under the federal rules for non-degree, non-certificate
11  programs, there is a requirement, is there not, to submit and
12  identify who is going to be the instructors and what their
13  certifications are?
14  A.  Under section 3676, there is a specific identifier that
15  instructors, credentials, their education, their experience,
16  their names, of course, have to be submitted.  Those are the
17  ones who the institution is stating to the SAA will carry out
18  these services.
19  Q.  And if an individual is fraudulent in making his
20  application to the State agency on that in the original
21  application to get approval, then all of the 22-1999s that
22  follow as a result of that approval would also be fraudulent,
23  is that correct?
24  A.  That's correct.
25          MR. SUROVIC:  No further questions, Your Honor.

1          THE COURT:  Okay.

2          MR. MCHUGH:  I object to the conclusion of law there,

3    Your Honor.  I have no questions.

4          THE COURT:  What conclusion of law?

5          MR. MCHUGH:  As to what is a criminal fraud.  That's a

6    legal opinion.  He can talk about the acts, but his conclusion

7    I object to.

8          THE COURT:  I think he was talking about what he was

9    investigating.  And what he reached as his conclusion is not

10   going to drive me.

11         MR. SUROVIC:  No, Your Honor.  The Court is certainly

12   able to evaluate the evidence and figure out --

13         THE COURT:  It might be different if we had a jury.

14   Anything else for this witness?

15         MR. SUROVIC:  No, Your Honor.  We request that he be

16   permanently excused to go to Washington, D.C.

17         THE COURT:  Yes, he can be excused.

18         THE WITNESS:  Thank you, sir.

19                           *   *   *

20         MR. SUROVIC:  Your Honor, there is a stipulation of

21   testimony and it would be appropriate probably at this time to

22   read the stipulation of testimony.  It has also been filed, it

23   is document number 98, I don't know if you want me to read it

24   to you or not.

25         THE COURT:  You can.

1          MR. SUROVIC:  It's short.  It's a stipulation of

2    testimony concerning Ms. Kathleen Davis.

3          My name is Kathleen Davis, I am employed as the Retail

4    Payments Office of Business Application Delivery Director at

5    the Federal Reserve Bank of Atlanta.  Part of my duties is to

6    maintain records for the institution and act as records

7    custodian.  I also oversee payment related matters that include

8    automatic clearinghouse, ACH, transactions.  The electronic

9    fund transfers referenced in this indictment involving

10   Universal K-9 were initiated by an electronic approved message

11   sent from the United States Department of Treasury in Kansas

12   City, Missouri.  That transmission was sent to the Federal

13   Reserve Bank National ACH clearinghouse in New Jersey and then

14   to the Federal Reserve Bank in Atlanta, Georgia and processed

15   through the ACH electronic payment network located in

16   Winston-Salem, North Carolina.  That resulted in an electronic

17   transfer of funds from the Federal Reserve Bank in Atlanta,

18   Georgia to Wells Fargo Bank at their Electronic Routing Center

19   in Minneapolis, Minnesota.  Finally, Wells Fargo Bank credited

20   the Universal K-9 account in Virginia and made those funds

21   available.  Each electronic payment traveled in interstate

22   commerce.

23          THE COURT:  All right.  The Court will accept the

24   stipulation of the parties and you should give a copy to her.

25          MR. SUROVIC:  Yes, sir, will do.

```
 1            THE COURT:  We'll mark that as an exhibit, your next
 2   in order.
 3            MR. SUROVIC:  Okay, Your Honor, that would be --
 4            COURTROOM DEPUTY CLERK:  It's 46.
 5            MR. SUROVIC:  Exhibit Number 46.  And Your Honor, with
 6   that, our next witness will be Mr. Stephen Peek.
 7            THE COURT:  We're not going to get very far with him,
 8   but we might as well start because I have to break, as you
 9   know.
10            MR. SUROVIC:  Yes, sir.
11            COURTROOM DEPUTY CLERK:  Raise your right hand, sir.
12                          *   *   *
13            (STEPHEN PEEK, Government Witness, Sworn.)
14                          *   *   *
15                       DIRECT EXAMINATION
16   BY MR. SUROVIC:
17   Q.  Sir, would you please state your name?
18   A.  Henry Stephen Peek.
19   Q.  And how do you spell your last name?
20   A.  P-E-E-K.
21   Q.  Approximately -- what city do you live in?
22   A.  Canyon Lake, Texas.
23   Q.  And how are you employed?
24   A.  Right now I drive a truck.
25   Q.  Have you ever worked or been a dog trainer in a dog
```

1   training business?

2   A.   Yes, sir.

3   Q.   Could you describe for the Court your history as a dog

4   trainer?

5   A.   I started working with Global Training Academy, I went

6   through their handlers program.  I also went through their

7   trainer's program.  I worked overseas through them, training

8   mine dogs.

9   Q.   When you say mine dogs, that's dogs that can find

10  landmines?

11  A.   Yes, sir.

12  Q.   Okay.

13  A.   When I came back from there, I was going to try to get on

14  with a company called Ronco.  Unfortunately, that fell through

15  for mine dogs.  Then I got on with a company called AK-9I in

16  Virginia, training the IED dogs for the Marine Corps.  That

17  contract transferred to K2 solutions in North Carolina.  And I

18  went there and I worked there for about five years.  I came

19  back here, drove a truck for a while, got on with Brad.  And

20  after that, I worked for a company in Alabama for about a

21  month, just working with getting dogs ready for TSA and stuff

22  like that.

23  Q.   All tolled, how many years do you think you've worked in

24  the dog training and dog handling business?

25  A.   All tolled, probably about eight to nine years.

1   Q.  What type of things did you do with the dogs?  Were you

2   primarily training dogs or training people to work with dogs?

3   A.  Both.

4   Q.  What type of things would you train them to do?

5   A.  I trained straight detection dogs for finding both drugs

6   and explosives.  I trained mine dogs.  My specialty was

7   imprinting.

8   Q.  Can you tell the Court what imprinting means?

9   A.  Imprinting is basically teaching the dogs and owners what

10  they're supposed to find.

11  Q.  What other type of training did you find?

12  A.  We trained handlers as well.  I trained mine dog handlers

13  over in Sri Lanka.  When I came back and was working for the

14  IED program, I was training military handlers to handle their

15  dogs overseas.

16  Q.  How did you meet -- do you know Brad Croft?

17  A.  Yes, I do.

18  Q.  Is he present in court today?

19  A.  Yes, he is.

20  Q.  Could you point him out, identify him for the Court?

21  A.  Sitting right over there.

22          THE COURT:  The one with the leather jacket?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  I'll note the identification.

25          MR. SUROVIC:  Thank you, Your Honor.

1    BY MR. SUROVIC:

2    Q.  How did you meet him?

3    A.  Brad contacted me, started contacting me through Linked In

4    and things of that nature.  And then he called me while I was

5    still working on the contract in North Carolina.

6    Q.  Do you know how he found out your name?

7    A.  The best way I can say, sir, is he talked to someone at

8    Global Training Academy in San Antone.  That's the best way I

9    can know how he found me.

10   Q.  When he first reached out to you, what did he want?

11   A.  He started talking to me about he wanted -- he was doing

12   different things.  He was very interested in trying to get the

13   V.A. contract for training ex-military coming out of the Corps

14   and basically wanted me to help him teach his class.

15   Q.  Do you recall approximately when that was?

16   A.  Not exactly, sir.  The phone call that I can remember, it

17   was sometime in 2014.  We did have some correspondence before

18   that.  As his attorney showed me yesterday, because I had

19   forgotten about it basically through Linked In, but the actual

20   phone calls and stuff, to the best of my knowledge, started

21   around 2014, maybe toward the end of 2013.

22   Q.  What did Mr. Croft tell you about his business?

23   A.  Basically that he was a nonprofit, but that he was trying

24   to start the V.A. program.

25   Q.  Did he tell you how his business operated and who was the

1    owner?

2    A.   As far as I know --

3    Q.   Financial situation?

4    A.   -- he told me that he was the owner, the nonprofit part he

5    was telling me about he trained -- got dogs from the pound and

6    stuff like that, rescue dogs and was training them and giving

7    them to the police forces.

8    Q.   Did you have any concerns about him using dogs from the

9    pound?

10   A.   Some, yeah.  I have never really up until then never worked

11   with dogs from the pound.

12   Q.   What type of concerns would you have about getting dogs

13   from the pound?

14   A.   They just didn't have the drive or the desire or the

15   ability to do the job.

16   Q.   What type of things do you look for when you're looking for

17   a dog that can be trained to be a working dog, a service dog?

18   A.   I look for a dog that's willing to stay out and search for

19   things for extended periods of time.  I look for dogs that have

20   a strong drive as far as toward their toy or a reward.  That's

21   initially what I look for.  I look for dogs that have stamina,

22   that can stay with the course.

23   Q.   Did you express these concerns to Brad Croft?

24   A.   I told him I wasn't real sure about, you know, the rescue

25   dogs, that I never worked with them before.

1    Q.   Did you actually start working with Brad Croft?

2    A.   Yes, sir, I did.

3    Q.   When did that happen?

4    A.   That happened around February of 2016.

5    Q.   And what were you doing for him?

6    A.   Initially we were -- I was helping him train -- finish

7    training some of the dogs that he had there.  I did teach one

8    class there.  Once we got through with that, we started a new

9    group of dogs and that's when I kind of realized that no matter

10   what I did I wasn't going to be able to do it the right way, so

11   I left.

12   Q.   How much was Mr. Croft supposed to pay you for your work?

13   A.   Thousand dollars -- sorry?

14   Q.   Was it a regular payment or was it based on students or

15   based on the dogs?

16   A.   Initially he talked about a percentage off each student

17   that went through the class and I told him I couldn't do that.

18   And then he paid me a weekly pay.

19   Q.   What was your weekly pay?

20   A.   Thousand dollars a week.

21   Q.   And did you get anything extra for working the dogs as well

22   as teaching the class?

23   A.   No, it's straight base salary.

24   Q.   How many dogs did you work with while you were there?

25   A.   When I first got there I don't remember the exact amount of

1   dogs, he probably had ten or 12 dogs there.  We were getting

2   them ready for that class.  There was six dogs in the class

3   that I taught and then after that he acquired some more dogs.

4   And honestly, I can't tell you the exact amount, I don't

5   remember.

6   Q.   How many students were in the class that you taught?

7   A.   It was six.

8   Q.   Six dogs and six members of the class?

9   A.   Yes.

10  Q.   How long do you think you worked for Mr. Croft?

11  A.   About three to three and a half months.

12  Q.   While you were working for him, who was running the

13  business?

14  A.   Mr. Croft.

15  Q.   Did you meet any other employees there?

16  A.   I met someone that was introduced as basically his partner.

17  Q.   And who was that?

18  A.   Rick.  I'm sorry I don't remember his last name.  His first

19  name was Rick.

20  Q.   Okay.  Anybody else working there?

21  A.   When I first met Brad he had another gentleman that was

22  working with him when I met him at the Canyon Lake Animal

23  Shelter, but I think that gentleman left right after that and I

24  never worked with him while I was working with Brad.

25  Q.   Who was teaching the classes other than you?

Stephen Peek - Examination                    54

1    A.   Brad.

2    Q.   You and Brad.  You've ever heard the name Richard Cook,

3    would that be Rick?

4    A.   Yes, that's Rick, right.

5    Q.   And he was introduced to you as his partner?

6    A.   Yes, sir.

7    Q.   What did Mr. Cook do for the company?

8    A.   I think he just helped do a lot of the business side of it,

9    I guess would be the best way to put it.

10   Q.   When you were working there, were you training veterans at

11   that time?

12   A.   No, sir, I never trained one veteran for them.

13   Q.   So this was prior to him getting his certification for

14   teaching veterans?

15   A.   Yes.

16   Q.   You ever met an individual by the name of Anthony Ward?

17   A.   No, sir, not to the best of my knowledge.

18   Q.   When you were working for Mr. Croft, where was the school

19   being operated out of?

20   A.   Basically everything was out of his house at that point in

21   time.  I did help him put the kennel in there behind the

22   plumbing supply and then after that -- but the class itself we

23   were still operating basically out of his house when we had

24   class.

25   Q.   And where would the dogs be stored at his house?

1   A.   In his garage.

2   Q.   Was it --

3   A.   They were in air kennels.

4   Q.   Could you describe your working relationship with

5   Mr. Croft?

6   A.   It was actually pretty good up until we started training

7   the last group of dogs that I worked with him.  And I was

8   trying to show him the methods that we use for imprinting the

9   dogs and we went through one trial, one set of repetitions and

10  his explanation to me is it takes too long and we're not doing

11  it that way, so that's when I left.

12  Q.   Did you have any discussion with Mr. Croft concerning what

13  his qualifications were to be a dog trainer?

14  A.   As far as I know, he doesn't have any.

15  Q.   To your knowledge, was he ever in the military?

16  A.   No, sir, not that I know of.

17  Q.   To your knowledge, was he ever in law enforcement?

18  A.   Not that I know of.

19  Q.   He never told you that he had been through dog training

20  courses or anything like that.

21       In your discussions with him about how to imprint dogs, did

22  he seem to understand what you were talking about?

23  A.   To a point, yes.  I think he probably picked up little bits

24  here and little bits there from different people he worked

25  with.  I don't think he had the full concept of how to train a

1    dog, no.

2    Q.   And he felt that your method was taking too long and that

3    was where the relationship broke down?

4    A.   Right.  My understanding was he hired me for my knowledge

5    and experience.

6    Q.   But he wasn't taking your advice?

7    A.   Exactly.

8    Q.   Did you ever agree to be a director for Universal K-9?

9    A.   No, sir.

10   Q.   I'm going to show you Government Exhibit Number Four.  This

11   is the certified records from the Secretary of State's Office

12   for Universal K-9.

13   A.   Okay.

14   Q.   And this is Universal K and then nine is spelled out.  I

15   know sometimes it's different.

16   A.   Right.

17   Q.   And if we turn to the second page, this is a certificate of

18   formation for a nonprofit corporation.  Do you see that?

19   A.   Yes, sir.

20   Q.   This was filed May 29, 2015, is that correct?  Do you see

21   the stamp?

22   A.   Yes, sir, I see it.

23   Q.   Who is the registered owner of this or who is the

24   registered agent of this business?

25   A.   Richard Cook.

Stephen Peek - Examination                    57

```
 1   Q.  And then we go down to the bottom, Article Three Management
 2   and it talks about directors, is that correct?  The management
 3   of the affairs --
 4   A.  Right, right.
 5   Q.  First director there is who?
 6   A.  Richard Cook.
 7   Q.  And if we turn the page there, who is the second director?
 8   A.  Anthony Ward.
 9   Q.  And who is the third director?
10   A.  Me, Steve Peek.
11   Q.  Did you ever serve as a director for this nonprofit
12   corporation?
13   A.  No, sir.
14   Q.  Did you ever have any meetings with Mr. Cook or Mr. Ward in
15   order to conduct the business of this?
16   A.  No, sir.  The only thing we ever did basically was sit
17   around the kitchen table and talk about training the dogs.
18   Q.  Who made all of the management decisions for --
19   A.  Mr. Croft.
20   Q.  Who had control of the money for Universal K-9?
21   A.  Mr. Croft.
22   Q.  I want to show you Government Exhibit Number 6h.  Let's go
23   to page three of this.  This is an application that was made to
24   the Texas Veterans Commission?
25   A.  Yes, sir.
```

Stephen Peek - Examination                                    58

1    Q.  And if we look at page three, there is a box here?

2    A.  Yes, sir.

3    Q.  "List all partners or if a corporation all officers,

4    directors and trustees."  Do you see that box?

5    A.  Yes, sir.

6    Q.  Who is listed in that box?

7    A.  Richard Cook, president; Anthony Ward, secretary; myself,

8    Steve Peek, as treasurer.

9    Q.  You're listed as a treasurer there, is that correct?

10   A.  Yes, sir.

11   Q.  Were you ever the treasurer for Universal K-9?

12   A.  No, sir.

13   Q.  Let me ask you this.  We just looked at the document, the

14   registration that said you were a director, did you ever

15   discuss with Mr. Cook being a director or being a treasurer?

16   A.  No, sir.

17   Q.  Did you ever perform any functions --

18   A.  No, sir.

19   Q.  -- concerning Universal K-9?

20   A.  No, sir.

21   Q.  I notice you indicated there are three names there.  Is

22   Mr. Croft's name listed anywhere as officer or owner or

23   anything like that?

24   A.  No, sir.  No, sir.

25   Q.  Does this accurately reflect the management situation at

Stephen Peek - Examination                    59

1    Universal K-9?

2    A.  No, sir.

3    Q.  Let's take a look at Government Exhibit Number 23.  This is

4    an income tax return and if we can go to -- this is an income

5    tax return for Universal, income tax return for Universal K-9

6    for the tax year 2016.  Do you see that?

7    A.  Yes, sir.

8    Q.  And let's go to page ten.  Let's go back to the beginning.

9    You can see in part five, that first block there, can you read

10   the names, "List all officers, directors, trustees, foundation

11   managers and their compensation"?

12   A.  Richard Cook, president; Steve Peek, secretary, Anthony

13   Ward, treasurer.  And no compensation for any of them.

14   Q.  It indicates that you worked an average of ten hours per

15   week at that position?

16   A.  Yes, sir.

17   Q.  Here you're listed as a secretary, is that correct?

18   A.  That's what it says.

19   Q.  Did you ever talk to anybody, Mr. Cook or Mr. Ward or

20   Mr. Croft about being the secretary?

21   A.  No, sir.

22   Q.  How did your duties as secretary differ from your duties as

23   treasurer?

24   A.  I don't know, I didn't have one.

25   Q.  And did you get compensated at all for being an officer of

1    the company?

2    A.  No, sir.

3    Q.  But you did receive a thousand dollars a week?

4    A.  Yes, sir.

5    Q.  And that's not reflected here, is it?

6    A.  No, sir.

7         THE COURT:  What was your thousand dollars a week for?

8         THE WITNESS:  Training dogs and handlers.

9         THE COURT:  And you specifically contracted to do that

10   for a thousand dollars a week?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  You didn't have any other duties?

13        THE WITNESS:  No, sir.

14        THE COURT:  Did you perform any other duties?

15        THE WITNESS:  Nothing other than the one time where we

16   went to Vegas to --

17        THE COURT:  Convention.

18        THE WITNESS:  Convention, right.  And then it was just

19   talking to people that came to the booth.

20        THE COURT:  For purposes of the dog handling.

21        THE WITNESS:  Right.

22   BY MR. SUROVIC:

23   Q.  I'm going to ask you to take a look at Government Exhibit

24   Number 24 now.  This is a tax return.  We'll go to the first

25   page.  Again for Universal K-9, this is for tax year 2017, is

1    that correct?

2    A.  Yes, sir.

3    Q.  And if we could flip through the pages here, same page --

4    go back.  Can you read this up there?

5    A.  Yes, sir.

6    Q.  Okay.  Now this is for the next tax year, 2017.  Were you

7    working for Universal K-9 in 2017?

8    A.  No, sir.

9    Q.  You only worked there for three months, is that correct?

10   A.  Yes, sir, about three, three and a half months.

11   Q.  Here is the same information as listed for the first year,

12   is that correct?

13   A.  It seems to be, yes, sir.

14   Q.  And again you've never had any discussion with him about

15   being a secretary?

16   A.  No, sir.

17   Q.  Since you left Universal K-9, since you completed that

18   course and you had the disagreement with Mr. Croft, have you

19   had any involvement with Universal K-9?

20   A.  No, sir.

21   Q.  Have you had any contact with Mr. Croft since then?

22   A.  No, sir.  Other than after I left I went back and took him

23   the T-shirts back and he gave me my last check.  Other than

24   that, I haven't spoken to Mr. Croft.

25   Q.  You indicated you were getting paid a thousand dollars a

1   week.  How much do you think you got paid during the entire

2   time that you were working for Mr. Croft?

3   A.  Approximately 14,000, 12 to $14,000.

4   Q.  Is there any doubt in your mind who was in charge of and

5   responsible for running Universal K-9?

6   A.  No, sir.

7   Q.  And who was that?

8   A.  Mr. Croft.

9          MR. SUROVIC:  No further questions, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. BROOKS:

12  Q.  Hi Mr. Peek.

13  A.  How you doing?

14  Q.  I'm Will Brooks.  We met briefly yesterday, correct?

15  A.  Yes, sir.

16  Q.  You prefer I refer to you as Steve or Mr. Peek?

17  A.  Steve is fine.

18  Q.  Okay, Steve, a couple of questions for you.  Mr. Surovic

19  started off into some of these, but I just wanted some

20  clarification on some of these, if I may.

21      You've trained at GTA, Global Training Academy, is that

22  correct?

23  A.  Yes, sir.

24  Q.  When did you do that training?

25  A.  That was back around 2000, 2001.

1    Q.  Are they still around?

2    A.  Yes, sir, they're still in business.  I don't know to what

3    capacity at this point though.

4    Q.  How long were they there?  Are they still there?

5    A.  They're still there.

6    Q.  And how long were you there?

7    A.  I was there approximately two and a half to three years.

8    Q.  And you talked about going to Africa and Sri Lanka as well?

9    A.  Yes, sir.

10   Q.  Were you ever in the military?  Did you ever serve?

11   A.  No, sir.

12   Q.  Was that part of a military contract?  I'm just curious.

13   A.  It was Department of State contract, I believe.

14   Q.  What time frame, when would that be?

15   A.  That would probably be around 2000, between 2002 and 2003.

16   Q.  And you had an interest in dogs at that point, correct?

17   A.  Yes.

18   Q.  What drew you to that profession?

19   A.  Actually my brother did.

20   Q.  He was interested in --

21   A.  Yes, he was.  My brother was EOD, he looked into -- he

22   worked with the dogs out in the field, he looked into doing

23   some of the training.  He decided he could make more money

24   doing EOD and he called me and told me and I've always liked

25   animals, been around animals most of my life and that's how I

1    got into it.

2    Q.  So was it more of an animals thing or a money thing for

3    you?

4    A.  Little bit of both.

5    Q.  You moved from GTA and from that contract onto Ronco, is

6    that correct?

7    A.  I applied at Ronco.  That contract fell through.

8    Q.  Describe Ronco for me, if you could?

9    A.  Ronco was a company that did EOD work and they used dogs as

10   well in the mine fields.

11   Q.  And what was the time frame there, when was that roughly?

12   A.  I honestly don't remember, sir.

13   Q.  Okay.  You went from there to AK-9I, is that right?

14   A.  I drove a truck for a while in between there.

15   Q.  So that's a business that owns trucks or trucking?

16   A.  AK-9I?

17   Q.  Yes.

18   A.  No, sir, AK-9I is a dog training company.

19   Q.  So in between Ronco and that contract, you drove a truck?

20   A.  Right.

21   Q.  And when was the AK-9I?

22   A.  I'm trying to think back.

23        (Pause.)

24   Q.  Sometime in between --

25   A.  2008, 2009, somewhere in there.

1   Q.   How long were you there with them?

2   A.   I was there for right at a year.

3   Q.   And you recall how many dogs you trained, maybe just a

4   general number for me?

5   A.   At that point in time, they probably had about a hundred

6   dogs.

7   Q.   So would you say your vocation as dog training as well as

8   driving trucks is kind of your interest?

9   A.   Right.

10  Q.   Okay.  And as far as Brad, we spoke briefly in the hall

11  yesterday, correct?

12  A.   Right.

13  Q.   And I pointed out to you that you had had an interview with

14  some officials from the government, correct?

15  A.   Correct.

16  Q.   And during that interview, you indicated to them that you

17  met Brad over an application called Facebook, is that correct?

18  A.   I'm thinking it was Facebook, but you showed me it was

19  Linked In.

20  Q.   And what was the year of those communications, if you

21  recall?

22  A.   The ones that you showed me was 2013.

23  Q.   So it wasn't actually 2014 as stated, correct?

24  A.   Yes.

25          THE COURT:  Before you go any further, we're going to

1    have to break.  It's just about 11:30.  So you can step down,

2    sir, but I need you back here at about 1:30 to 1:45.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  I need your proposed findings by Friday

5    afternoon.

6              MR. BROOKS:  Judge, actually we were going to withdraw

7    our request to have a proposed finding of fact.

8              THE COURT:  You are?

9              MR. BROOKS:  Yes, Your Honor, and we've shared that

10   with the government last night.

11             THE COURT:  I want to make it clear that the Court has

12   not pressured you or said anything in any way.

13             MR. MCHUGH:  Not at all.

14             THE COURT:  Very good.  That's taken care of.  All

15   right.  Thank you very much.

16             COURT SECURITY OFFICER:  All rise.

17             *(11:25 a.m.)*

18                              *   *   *

19             *(2:05 p.m.)*

20             COURT SECURITY OFFICER:  All rise.

21             THE COURT:  Off the record.

22                              *   *   *

23             *(Discussion off the record.)*

24                              *   *   *

25             THE COURT:  We can go back on the record.  Counsel,

1    your next witness.

2            MR. SUROVIC:  Mr. Peek.

3            THE COURT:  He's got to finish up, I'm sorry.  Go

4    ahead.

5            MR. BROOKS:  Thank you, Your Honor.

6    BY MR. BROOKS:

7    Q.  Steve, I know it's been a long lunch break, so we were

8    discussing your experience and a little bit about Brad.  In

9    respect to your experience, do you have any sort of specialized

10   certificates as far as dog training goes?

11   A.  Yes, sir, I do.

12   Q.  What would those certificates be?

13   A.  I hold a handler certificate for detection dogs.  I hold a

14   trainer certificate for detection dogs.  I hold a trainer

15   certificate for mine dogs.

16   Q.  Did you get those certificates through GTA?

17   A.  Yes, sir.

18   Q.  My understanding is -- is there a sort of industry

19   standard, is there any sort of governing agency as far as these

20   licensings go?

21   A.  From the individual company, no, not that I know of.

22   Q.  Do you have any sort of continued education or do you have

23   to update those certificates from time to time?

24   A.  I'm not required to update them, it's continuous on-the-job

25   training, learning, that sort of thing.

1   Q.  Fair enough.  So the training comes through experience, is
2   that correct?
3   A.  Yes, sir.
4   Q.  Is it something that you have to continually work at to do
5   or is it -- you know, do you have to polish those skills from
6   time to time?
7   A.  The knowledge is there, once you have the knowledge, the
8   knowledge is there, but the skills, yes, sometimes you need to
9   polish the skills up.
10  Q.  What about with respect to the animals themselves, do you
11  have to constantly reinforce things with them?
12  A.  That depends on the animal, sir.
13  Q.  So if I've got a mines detection was your specialty, if you
14  have a mine dog, do you have to work with that dog constantly?
15  A.  Yeah, we do continuous training all the time.  If that's
16  what you're asking, yes, we continue training all the time.
17  Q.  And in respect to Brad, we had a clarification.  You met
18  him or started conversation with him roughly 2013, correct?
19  A.  Yes.
20  Q.  And you guys discussed some training opportunities, is that
21  correct?
22  A.  Yes, sir.
23  Q.  Some mutual acquaintances in the industry and then you had
24  some friends that might have been interested in some positions?
25  A.  Yes, I recommended two guys, unfortunately both of them

Stephen Peek - Examination                    69

1   weren't available.

2   Q.  Got you.  When did you start working at K-9?

3   A.  Sorry?

4   Q.  When did you start at U K-9?

5   A.  Universal K-9?

6   Q.  Yes, sir.

7   A.  February of 2016.

8   Q.  And at the time you said it was mainly you and Brad,

9   correct?

10  A.  Yes, sir.

11  Q.  And you met Rick?

12  A.  Yes, sir.

13  Q.  And it was your testimony that Brad controlled the money,

14  Brad controlled the company, is that right?

15  A.  Yes, sir.

16  Q.  Now, do you remember giving an interview to a Agent Drake

17  as well as a Sean Scott with the IRS?

18  A.  Yes, sir.

19  Q.  And did you give a statement to them, anything written?

20  A.  Mostly verbal, they wrote it down.

21  Q.  Have you been able to review that statement?

22  A.  Yes.

23  Q.  In that statement, do you recall telling them that it was

24  your impression that Rick owned the majority of Universal K-9?

25  A.  Yes, that that was what my understanding was on paper.

1   Q.  Did you have the occasion to meet anyone else while working

2   there at U K-9 that worked for U K-9?

3   A.  Mr. Keeling and Dustin.  Sorry, I don't remember Dustin's

4   last name.

5   Q.  Would that be a Dustin Bragg?

6   A.  I think so, yes.

7   Q.  And what time frame are we talking about there?

8   A.  I actually met them before I even went to work for Brad.

9   Wes and Dustin were holding interdiction courses and they

10  needed some help as far as being able to do interdiction on

11  large vehicles.  I talked to my company, they agreed to allow

12  them to use our trucks to do the interdiction courses with.

13  Normally they used my truck when I was at home because I was

14  the only one that was an over-the-road driver.  All the rest of

15  the trucks were just day cabs and I would go out on the

16  weekends when I was home to help them with the interdiction

17  courses.

18  Q.  And if you could help enlighten the Court, I've been

19  looking at this stuff for a while and I'm familiar with

20  interdiction, but what is an interdiction course?

21  A.  It's like a roadside stop for the police where they do a

22  roadside interdiction.

23  Q.  And you had some familiarity with that type of training?

24  A.  I didn't really help with that part of it.  They did most

25  of that.  All I did was -- my biggest role was when they came

1    to the tractor-trailer, I showed them how to read and

2    understand log books.  I also showed them points on the trailer

3    that were valuable as far as hiding things and that sort of

4    thing.

5    Q.  And that tractor-trailer, was that when you were working at

6    Vocar, V-O-C-A-R?

7    A.  Yes.

8    Q.  So you were working at Vocar and Universal K-9 at the same

9    time?

10   A.  No.  At that point in time, I wasn't working for Universal

11   K-9.  I came out just because I liked being around the dogs and

12   helping them out when I could.

13   Q.  And they liked being around dogs as well?

14   A.  Exactly.

15   Q.  Would you say the same thing for Brad?

16   A.  Probably so, yes.

17   Q.  A common interest for you guys is dogs?

18   A.  Right.

19   Q.  And have you continued that relationship, meaning are you

20   still friends with Mr. Brag and Mr. Keeling at this point?

21   A.  I'm friends with Mr. Keeling.  I don't -- haven't spoken

22   with Dustin since then up until today.

23   Q.  And in respect to Mr. Keeling, do you know what his

24   business is today?

25   A.  He's training dogs.

1  Q.  Does he have his own business?

2  A.  As far as I know, it's his business.

3  Q.  Is he a police officer?

4  A.  He was.  I'm not sure if he still is or if he's on -- what

5  do they call that?  Like a standby or -- I don't know.  You

6  have to ask Mr. Keeling that, I don't know.

7  Q.  Fair enough.  So not sure, but he was a police officer as

8  far as you knew.  And when you say he's training dogs, do you

9  know where he's training dogs?

10  A.  No, sir, I don't.

11  Q.  And are there -- there are two parts to the dog business,

12  is it fair to say that.  You've got the animals and then the

13  courses themselves to train people?

14  A.  Yeah, I would say that.

15  Q.  And are you familiar with both of those types of trainings?

16  A.  Yes, sir.

17  Q.  And you've got the experience to be able to train both the

18  dogs as well as people?

19  A.  Yes, sir.

20  Q.  How did you acquire that experience?

21  A.  When I went through Global Training Academy, I went through

22  their training courses to train the dogs.  And when I went to

23  Africa, I went through the other training courses for the mine

24  dogs.  I also served an apprenticeship in Sri Lanka as far as

25  training the Sri Lanka military handlers.

1    Q.   So it's a hands-on type of a situation?

2    A.   Yes.

3    Q.   You talked a little bit about the falling out that you had

4    with Brad, correct?

5    A.   Yes, sir.

6    Q.   Now, you had trained some dogs for him, correct?  And you

7    taught a handlers course, is that right?

8    A.   Yes, sir.

9    Q.   Additionally, you helped build some cages out there at

10   the --

11   A.   I helped him put the kennel up out there.

12   Q.   And what was your thought process in doing that in helping

13   him out?

14   A.   Well, I pretty much told him when he did that that it

15   wasn't up to military standards.

16   Q.   Did you have any sort of goals or hopes or aspirations for

17   the company?

18   A.   I hoped to help him build the company, I hoped that it

19   would be something that would be mutually beneficial, but I saw

20   very quickly that it wouldn't be.

21   Q.   And your hopes were to see kind of a small business grow,

22   is that a correct characterization?

23   A.   Exactly.

24   Q.   And your hopes were to work and continue working in that

25   business?

1    A.   Exactly.

2    Q.   And you were aware that during that process of applying for

3    the ability to accept V.A. benefits, that Brad was using your

4    information, correct?

5    A.   That's an industry standard, yes.  If you're going for a

6    military-type contract, normally they do use their trainers'

7    credentials, yes.

8    Q.   And you had been working for Universal prior to that V.A.

9    approval, correct?

10   A.   Yes.

11   Q.   And according to you, shortly thereafter?

12   A.   Yes.

13   Q.   And outside of the things that we've discussed, I recall

14   you saying that you took a trip to Las Vegas?

15   A.   Yes, sir.

16   Q.   Who was that with?

17   A.   Myself, Brad, Rick Cook and Wes Keeling and another

18   gentleman met us there from -- his name is Justin.  I'm sorry I

19   don't know his last name.  I know the dog he had was Kia.

20   Q.   Did you ever meet a Jesse Stanley?

21   A.   No, sir, not that I recall.

22   Q.   When was that trip to Las Vegas, if you recall?

23   A.   Honestly don't remember the date, sir.

24   Q.   Fair enough.  Was it shortly before you left U K-9?

25   A.   I would say it was probably about mid way, two-thirds of

1    the way through.

2    Q.  So just to summarize for me, you and Brad met roughly

3    around 2013 on the Linked In app.

4    A.  Okay.

5    Q.  And describe the contact between 2013 and when you started

6    working there?

7    A.  Mostly it was like asking questions and wanted to know

8    what -- he asked a lot about my knowledge and things of that

9    nature and he told me a little bit about the things that he

10   wanted to do and where he wanted the company to try to go and

11   that sort of thing.

12   Q.  So it seemed to you that he was interested in growing that

13   business?

14   A.  Yes.

15   Q.  And in respect to the kennel dogs or shelter dogs, do you

16   have a preference for what you described I think as working

17   dogs?

18   A.  Yes, sir.

19   Q.  What is a working dog?

20   A.  A working dog is basically a breed or type of dog like a

21   Border Collie, a Belgian Malinois, German Shepherd, all of

22   these dogs were bred to fulfill certain purposes.  They were

23   bred to work like a cow dog or something like that.

24   Q.  So are these animals more or less expensive than the

25   shelter dogs generally?

1    A.  They're more.

2    Q.  Is there a preference in the industry for these types of

3    dogs?

4    A.  Majority, yes.  I would say most of them prefer the Belgian

5    Malinois, German Shepherd or Dutch Shepherd.

6    Q.  Is there a reason they have that preference outside of

7    just --

8    A.  Very high drive and mostly they're very focused animals,

9    they focus on their job really well.

10   Q.  And are shelter animals you think incapable of becoming

11   these types of animals?

12   A.  No, sir, I don't think they're incapable of it, but the big

13   part of it is most of those dogs are lap dogs, what I would

14   call a lap dog.

15   Q.  So a lower success rate potentially?

16   A.  Yes.

17         MR. BROOKS:  If I could have one second, Your Honor.

18         (Pause.)

19         At this time, I'm going to ask if Defense Exhibit 50

20   could be published.

21   BY MR. BROOKS:

22   Q.  Mr. Peek, I'm going to show you a photograph.

23         MR. SUROVIC:  We have no objection to Defense Exhibit

24   50, Your Honor.

25         THE COURT:  All right.

1    BY MR. BROOKS:

2    Q.  Mr. Peek, are you able to see that photograph there?

3    A.  Yes.

4    Q.  Do you recognize that photograph?

5    A.  Yes.

6    Q.  Roughly when was it taken?

7    A.  That, I can't tell you.  It was when I was helping them do

8    the interdiction courses.  That was taken at the car lot, I

9    believe.

10          THE COURT:  What car lot?

11          THE WITNESS:  There is a car lot right across the

12   street, an auction, where they do vehicle auctions right across

13   the street from the company I worked.

14          THE COURT:  I see.  It wasn't part of the business.

15          THE WITNESS:  Sir?

16          THE COURT:  It wasn't part of the business.

17          THE WITNESS:  No, sir.

18   BY MR. BROOKS:

19   Q.  Would it be fair to say 2016, 2015?

20   A.  2016 -- well, no, that was probably before I went to work

21   for him, so that was probably during late 2013, I would guess.

22   Q.  This photo was prior to that?

23   A.  To me going to work for him, yes.

24   Q.  And can you identify the individuals in that photo or any

25   of them that you can, if you would?  I see a gentleman in a

Stephen Peek - Examination                         78

1    green shirt.  Do you know that gentleman?

2    A.  I'm sorry, I can't make those out.  I can't make out their

3    faces.

4    Q.  Fair enough.  So none of those individuals you're able to

5    identify?

6    A.  No, sir.

7    Q.  Okay.

8    A.  Well, I take that back.  Wes is the second from the left,

9    right next to the green guy is Wes.

10   Q.  When you say Wes, would that be Wes Keeling?

11   A.  Yes, sir.  And the one on the next to the end on the other

12   end I believe is Dustin, the one standing next to me.

13   Q.  We haven't mentioned, it goes without saying, next to you,

14   so you've got the cowboy hat on in this photo?

15   A.  Yes, sir.

16   Q.  Looking sharp, sir.

17   A.  Thank you.

18          MR. BROOKS:  No further questions.

19                       REDIRECT EXAMINATION

20   BY MR. SUROVIC:

21   Q.  Mr. Peek, you indicated you had never heard of Mr. Jesse

22   Stanley, is that correct?

23   A.  Yes, sir.

24   Q.  Had you ever heard of an individual by the name of Art

25   Underwood?

1    A.   No, sir.

2    Q.   Did you ever see them around the property or anything

3    like --

4    A.   Not to my knowledge, no, sir.

5    Q.   You also indicated that it was you and Mr. Croft that were

6    doing the training at the time that you worked there, is that

7    correct?

8    A.   Yes.

9    Q.   But you were not involved in veterans training?

10   A.   No, sir.

11   Q.   Do you know -- if you know, do you know why when Mr. Croft

12   was putting together his paperwork in order to get approval

13   from the V.A. to teach, why he did not include your name as an

14   instructor?

15   A.   I couldn't answer that, sir, I don't know.

16          MR. SUROVIC:  No further questions, Your Honor.

17          MR. BROOKS:  Nothing further of this witness, Judge.

18          THE COURT:  All right.  You can step down, sir.  Wait

19   a minute.  I have one question for you.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  You mentioned that you're now driving a

22   truck which is just fine, but I wonder why did you make the

23   career change?

24          THE WITNESS:  Honestly, sir, I got tired of dealing

25   with the prima donnas.

1            THE COURT:  Are you talking about the dogs or the

2    people?

3            THE WITNESS:  No, the people.  And that and my

4    shoulder was wearing out, so that was the other part of it.

5            THE COURT:  All right.  Thank you.

6            MR. SUROVIC:  Your Honor, request that he be

7    permanently excused so he can go back to his trucking duties.

8            THE COURT:  All right, he can.

9            MR. BROOKS:  We wouldn't anticipate it, we would just

10   ask that he be subject to recall.

11           THE COURT:  I doubt you'll be subject -- I don't think

12   you'll be called back.

13           THE WITNESS:  Thank you, sir.  The only thing is, sir,

14   once I get on the road --

15           THE COURT:  There is nothing to prevent him from

16   getting on the road.

17           THE WITNESS:  Thank you, sir.

18           THE COURT:  I'm not going to make the man go broke

19   when we don't know that he's going to have to be called.  I

20   have a dog that's a prima donna, that's why I asked him.  It's

21   actually my wife's dog.  Go ahead, counsel.

22           MR. SUROVIC:  Your Honor, next witness is going to be

23   Mr. Jesse Stanley.

24           *(Pause.)*

25           COURTROOM DEPUTY CLERK:  Please raise your right hand,

 1    sir.
 2                           *   *   *
 3              *(JESSE STANLEY, Government Witness, Sworn.)*
 4                           *   *   *
 5              THE WITNESS:  Yes, I do.
 6              COURTROOM DEPUTY CLERK:  You can have a seat.
 7                      DIRECT EXAMINATION
 8    BY MR. SUROVIC:
 9    Q.   Sir, would you state your full name for the record?
10    A.   Jesse Walden Stanley, Jr.
11    Q.   And could I get you to spell your last name?
12    A.   S-T-A-N-L-E-Y.
13    Q.   What city do you live in, sir?
14    A.   Canyon Lake, here in Texas.
15    Q.   How are you currently employed?
16    A.   Through Department of Homeland Security TSA.
17    Q.   Where do you work?
18    A.   On Lackland Air Force Base.
19    Q.   What type of job do you have for Homeland Security?
20    A.   I'm a K-9 trainer, instructor and evaluator.
21    Q.   How long have you been a trainer, instructor and handler
22    for Homeland Security?
23    A.   Four years this month.
24    Q.   How long have you been handling dogs throughout your entire
25    career?

1    A.   Since 1996.

2    Q.   Could you describe for the Court what your career has been,

3    where did you get your start, what you've done?

4    A.   Yes, I got my start in the military.  I was in the Army for

5    25 years.  In 1996 I went through dog school, that's where it

6    started, I spent my last 16 years in the military as a dog

7    handler, moved up to a trainer here at Lackland Air Force Base

8    training dogs for the DOD.  I was also a kennel master and a

9    program manager prior to retirement.

10   Q.   And when you retired from the military, did you make the

11   change directly over to HSI immediately?  What happened after

12   retirement?

13   A.   Right after the military, actually while I was on terminal

14   leave which is the extra leave I had left over when I retired,

15   for the first 90 days I worked for Worldwide K-9 in Spring

16   Branch.  I went directly to them.  I retired in late July, I

17   actually started for them beginning of May.  I had a falling

18   out with the owner of that company, started looking elsewhere.

19   That's when I started talking to Mr. Croft and never came upon

20   an agreement for employment, so I went to Afghanistan for a

21   year, once again working for Department of Defense, did a

22   one-year contract over in Afghanistan.  Coming back from

23   Afghanistan, I reengaged with Mr. Croft in reference to

24   employment.  Didn't work out.  I worked at a small shelter out

25   at Canyon Lake waiting for a job opportunity with DHS and when

1    I was hired from DHS in October of '15.

2    Q.  You indicated that you had explored employment possibility

3    with Mr. Croft.  How did you first meet Mr. Croft?

4    A.  It was by work through Worldwide K-9.  They were actually

5    competitors.  When I left Worldwide K-9, I physically called

6    Mr. Croft and talked to him, looking for employment.

7    Q.  So you had heard about his company when you were working at

8    Worldwide K-9?

9    A.  Absolutely.

10   Q.  Approximately when was that, do you recall?

11   A.  When I spoke to Mr. Croft?

12   Q.  Yes.

13   A.  It would have been probably December of 2012 because I left

14   in November of 2012 from Worldwide K-9.

15   Q.  Of course, you met Mr. Brad Croft, is that correct?

16   A.  Yes.

17   Q.  Is he present in the courtroom today?

18   A.  Yes, he is, sir.

19   Q.  Could you describe where he's sitting, what apparel of

20   clothing?

21   A.  He's behind the computer screen, but he's second from the

22   left over here in the leather jacket.

23          THE COURT:  The Court would note the defendant.

24          MR. SUROVIC:  Thank you, Your Honor.

25   BY MR. SUROVIC:

1   Q.  So again what were the circumstances of meeting Mr. Croft?

2   You reached out to him based on the fact that you knew his

3   company?

4   A.  There's only four or five major players in the K-9 game in

5   this area other than the Department of Defense.  And I called

6   him just basically asking if there was an opportunity for

7   employment because I still had to put food on the table for my

8   family.

9   Q.  What did he tell you?

10  A.  He said he was working on some projects.  I've got notes,

11  if I can use those, because I actually have those as far as

12  timeline.

13          MR. SUROVIC:  Your Honor, apparently the witness

14  brought in a -- he created a timeline to refresh his

15  recollection.  I became aware of it just during the lunch hour.

16  We have electronically provided a copy to the defense, but I

17  know that Mr. McHugh would prefer to have a hard copy.  He's

18  old-fashioned like I am.  I don't know if there's any way we

19  can make a copy of the timeline.

20          MR. MCHUGH:  I'm not that old-fashioned, Your Honor.

21          THE COURT:  Send it to Ms. Springs and she'll print it

22  out.  Just do it right now.

23          MR. SUROVIC:  I think you've got a hard copy.  I guess

24  it would be easier to print it?

25          THE COURT:  Yes.  Priscilla_springs@txwd.uscourts.gov.

1          MR. SUROVIC:  With that I don't believe there's going

2    to be an objection to you referring to those notes.

3          THE WITNESS:  When you guys do have it, there's a typo

4    on the very first, it says December 13th, it should be

5    December 12th for timeline purposes.

6          *(Pause.)*

7          MR. SUROVIC:  Thank you.

8    BY MR. SUROVIC:

9    Q.  Okay.  Go ahead.  You were talking about how -- I think we

10   were talking about discussions you had with Mr. Croft as far as

11   employment?

12   A.  Yes, like I said, December of 2012 I made the initial call

13   asking if he had employment at that time.  He was, according to

14   Mr. Croft, was in a transitional period between some older

15   employees and trying to find new work, whether it be through

16   contracting or trying to find a way to bring in more money

17   where he could afford -- he said he wanted me as an employee,

18   but he didn't have the finances to pay me.  Part of that was to

19   get set up as an actual course that was more structured.  I

20   stated to Mr. Croft that I had course material that I used in

21   the past that I was capable, very capable of teaching through

22   my military career and through my civilian career after the

23   military.  He had told me that if he could get that, that would

24   give him a good start as far as setting up a good course for

25   all the classes.  And because of the fact that I could teach

1  all those, it was a better chance of me being one of his

2  employees to teach them.  Part of that was he had given me $300

3  to provide him that information and those classes.

4  Q.  So he paid you for the information you were providing.  Did

5  he hire you?

6  A.  No, he did not.

7  Q.  So what happened after this meeting with him in

8  December 2012?

9  A.  That initial talk was in December of '12, the discussion

10  about the K-9 courses was actually in January of '13.  In

11  February, we sat down quite a few times at his home over

12  breakfast discussing possibilities of contracts.  We were

13  looking at some Navy Special Warfare contracts, an Air Force

14  contract for pre-deployment training in Fort Bullis, Texas.

15  Q.  You're talking about his contract, what type of contracts

16  are we talking about here?  Are we talking about actual doing

17  training for these entities or are we talking about providing

18  dog handlers or what?

19  A.  It was more for training.  The Navy Special Warfare already

20  had dogs on the ground.  If at some point we had to replace

21  dogs out of attrition, then yes, we would be liable for

22  bringing more dogs into the system, but they had dogs in their

23  system already through another contractor.  With the Air Force,

24  that was a pre-deployment training, these handlers and dogs

25  were already paired up, they were already trained together, it

Stephen Peek - Examination                    87

1    was more to train them up to go to Afghanistan and Iraq prior
2    to leaving.
3    Q.   Okay.  So you had this discussion with him in February of
4    2013 about trying to get these contracts, is that correct?
5    A.   That's correct.
6    Q.   And how did that go?
7    A.   At the time it sounded very promising.  He had a couple
8    different directions he was going.  He wanted to use me as a
9    program manager instructor.  The only issue was is he couldn't
10   pay me until he had actually was awarded one of those
11   contracts.  He couldn't afford it.  At that point that's when I
12   gave him my initial resume, so he could use my resume to
13   become -- so I could become the program manager showing that I
14   was capable of doing that job in accordance with the statement
15   of work that was on the contracts.
16   Q.   Okay.  And this was in February of 2013?
17   A.   Uh-huh.
18   Q.   What happened?
19   A.   Basically I really didn't hear back from him until March.
20   We did discuss -- in February we did discuss that to get these
21   contracts we needed to bring a lot more instructors and capable
22   people to work with him because it wasn't going to be just me.
23   At that point he had stated that it was me and Mr. Underwood,
24   Mr. Art Underwood that were his two instructors and that we
25   needed to bring more of them in.

1   Q.  Did you know Mr. Underwood?

2   A.  I was aware of who he was.  I never knew him on a personal

3   level.  He was working for the Department of Defense when I was

4   actually training dogs back in the early 2000s, but I never

5   knew him on a personal level.

6   Q.  Did you ever meet him when you were at Universal K-9?

7   A.  No, I did not.

8   Q.  Did you ever see him teach any classes while you were at

9   Universal K-9?

10  A.  No, I did not.

11  Q.  So you're talking about bringing in more people.  How did

12  this develop?  Did you finally get a contract where you were

13  hired?

14  A.  No, I did not.

15  Q.  What happened?

16  A.  We went through February with no resolve to any of the

17  contracts.  I understand that is a process.  Contracts don't

18  happen overnight.  There's a lot of give and take, paperwork,

19  e-mails going back and forth trying to settle everything and

20  you're also being competitive, so there's no guarantees.  At

21  that point I was in a position that I hadn't really worked for

22  income since November of the year prior, so bank accounts are

23  starting to get empty.  I took a contract with another company

24  over in Afghanistan for one year.

25  Q.  What did that contract involve?

1    A.  It involved training IED dogs in the desert for the United

2    States Army.  I was over there as an instructor trainer for the

3    dogs and for the handlers.

4    Q.  What period was that?

5    A.  That was from March of '13 through February of '14.

6    Q.  Did that have anything to do with Universal K-9?

7    A.  Absolutely not.

8    Q.  And what happened when you finished with that contract?

9    A.  During that contract, we also continued talking.  I had to

10   have an out once the contract was over, I was still trying to

11   work with Mr. Croft to try to get some type of employment.  I

12   went over there in March.  In April I started receiving e-mails

13   from Mr. Croft, just some comments between him and Mr. Hawkins

14   of Worldwide K-9, which is the owner/operator of Worldwide K-9.

15   There was some pretty derogatory stuff in the e-mails.  I was

16   not personally involved in it, that was just stuff that he had

17   forwarded to me.  And he also in April of '13 sent me a copy of

18   his DPS license showing that he was accepted as a guard dog

19   company, which entails basically that we can -- him as a

20   company at Universal K-9 can sell police dogs, protection dogs,

21   that type of thing.

22   Q.  So you were in Afghanistan all this time.  This is when you

23   first went over to Afghanistan you were having these things?

24   A.  Uh-huh.

25   Q.  Did the contact continue while you were in Afghanistan?

Stephen Peek - Examination                    90

1    A.   It did, it was sporadic.  He sent me another e-mail between

2    himself and Mr. Hawkins, Worldwide K-9, in May of '13.

3    Q.   What is the nature of these communications between him and

4    Mr. Hawkins?

5    A.   It was more of a legal battle between the two companies

6    about who was going to be authorized to use the V.A. benefits.

7    There was some comments made about from Mr. Croft to

8    Mr. Hawkins that he was going to have an investigation done on

9    Worldwide K-9 in reference to him getting V.A. benefits, using

10   the G.I. Bill on an illegal basis.

11   Q.   So it was essentially threats by Mr. Croft against

12   Worldwide K-9?

13   A.   Yes, sir, but they did go both directions.

14   Q.   Both ways?

15   A.   Yes, sir.

16   Q.   Somehow it included you as well and Mr. Hawkins making

17   comments about you?

18   A.   It really didn't include me, the conversations between the

19   two of them, it was just e-mails being forwarded to me, I guess

20   to let me know what was going on.  It was my prior employer and

21   I personally didn't like the guy, so I mean he sent that to me

22   as I guess as to let me know how things were going between him

23   and the other company.

24   Q.   You indicated that Mr. Croft had threatened to sue

25   Mr. Hawkins because Worldwide had V.A. and he did not?

Stephen Peek - Examination                    91

1   A.   I don't believe it was actually the word "sue", I think it

2   was to have it investigated to see if it was legal, if he had

3   legally gone through the right process.

4   Q.   Was Mr. Croft authorized to bill against the G.I. Bill at

5   that point?

6   A.   Not that I know of, no.

7   Q.   Did these types of conversations continue during the period

8   when you were in Afghanistan?

9   A.   That was the last real thing I had between him and

10  Mr. Hawkins at Worldwide.  He did state in May that the V.A.

11  stuff should be done by the time I returned home in February

12  for his company.  And when I returned he would have my back and

13  saying that I would work with him, not for him.  So it sounded

14  to me and the way I read it as he wanted me to be a business

15  partner.  And I didn't talk to him again until September of

16  2013 and he had sent me an e-mail stating that he was starting

17  to work on Special Warfare Navy contract.  He requested my

18  resume and the required format for that contract because it was

19  a completely different format, which I sent him.  I was still

20  not an employee of his.  This was all based off of me trying to

21  get into the company as far as contracting goes and to be a

22  lead of the contracts.  So yeah, that was the basis of the

23  contracting stuff is if he received or was awarded one of the

24  contracts, that I would be hired as one of the leads to run

25  those contracts, teaching, training and evaluating.

1   Q.   What happened when you got back from Afghanistan?

2   A.   When I returned from Afghanistan, once again I went

3   directly back to Mr. Croft and discussed with him employment

4   opportunities.  We also once again sat down at his home over

5   lunch and breakfast, stuff like that and discussed training.

6   He said he was still waiting for the V.A. approval before he

7   could afford to pay me.  I was already a private investigator

8   through DPS, but it was through Worldwide K-9.  That had to be

9   restarted to fall under Universal K-9.  He did that for me.

10  That was one of the steps that I would have to have done to

11  become an employee and to help him out through what we were

12  trying to do as far as selling police dogs, protection dogs,

13  that type of thing.  So that was just a basically a formality

14  as a step to be going the right direction.  Because if he was

15  awarded that stuff and I didn't have that, I wouldn't have been

16  authorized to be doing some of the stuff that I was doing.  So

17  that was a preemptive step prior to any of the contracting or

18  any of the other selling of dogs.  So it was transferred from

19  Worldwide K-9 and it was approved.  It's since expired, but it

20  was approved then.  That was when I returned in February.  In

21  May of 2014 --

22  Q.   Did he hire you when you returned in February?

23  A.   No, he did not.

24  Q.   What happened next?

25  A.   May of 2014, Mr. Croft contacted me to go to San Juan,

1   Texas Police Department.  I guess they had a dog that had
2   previously come from Worldwide K-9 that was having some issues.
3   He wanted me to go out and take a look at the dog and see what
4   the issues were.  We went out and took a look at the dog.  It
5   really wasn't a dog issue at that point, it was a handler
6   issue.  We discussed that with the handler, told him what he
7   needed to do to fix the issues.  It was maybe a one or two-hour
8   session with the handler discussing proper ways of working the
9   dog as opposed to the way he was doing it.  As far as I know,
10  everything was fixed because I never heard anything back from
11  him.  It was a fairly simple training mission.
12  Q.  Did you get paid for that?
13  A.  If I remember right, I think Mr. Croft gave me $150 for
14  that, to go out for that one day.
15  Q.  At this point, were you teaching classes for Mr. Croft or
16  training dogs?
17  A.  Not at that point.
18  Q.  So this is in I think you said --
19  A.  This was in May of 2014.
20  Q.  May of 2014?
21  A.  Yes.
22  Q.  Did you ever actually come on and start working for
23  Mr. Croft?
24  A.  The only work that I did for pay other than that was
25  considered piece work.  He was getting onesies and twosies in.

1   I don't know that he felt bad because he couldn't hire me for

2   the lack of funds or what the reason was, but he told me he

3   would give me a one or two dogs at a time to imprint on an

4   odor.  He would pay me $500 a dog to imprint them and prepare

5   them for training.  Basically like pre-training to make sure

6   the dogs are capable.  He had given me -- I have to get all the

7   way into August.  Probably late June, early August he gave me a

8   K-9 named Clyde, it was a young black Labrador, I took it home

9   with me.  I took the pseudo narcotic aid that he had provided

10  because I wasn't licensed to have the real stuff anyway, I

11  couldn't have it at my house and I imprinted the dog on the one

12  odor.

13       During that time, I also met up with Mr. Croft in some of

14  his training areas while he was training in San Antonio to show

15  him the progress of the dog, take a look at some of the other

16  dogs that he was working and give my humble opinion of what I

17  thought of them.  He asked me what I thought.  I told him

18  exactly what I thought, whether they were good, bad or

19  indifferent.  As far as the dog training, he asked me what I

20  thought about his dogs, the ones that he was training and as

21  far as what I thought about where they stood in their training

22  and how well they were working.

23  Q.  And what did you tell him?

24  A.  It was dog dependent.  He had some dogs that were very

25  capable and other ones that -- one I remember in particular was

1   a Rottweiler, I wasn't impressed with and I told him that.  I

2   said that's probably not a dog I would send out.

3   Q.  What did he tell you when you said that?

4   A.  It was a conversation, it wasn't an argument.  Later on

5   when I get into my timeline I did see the dog again.  It was

6   being sent off to a Police Department.

7   Q.  You mentioned a dog by the name of Clyde.  Can you tell us

8   the story of Clyde?

9   A.  Yes.  After I got done with my imprinting, Mr. Croft asked

10  me if I would come and actually work with the police officer

11  that was coming to pick him up which was -- the officer's name

12  was Jeremy Bost, B-O-S-T, out of McGregor, Texas Police

13  Department.  Mr. Bost contacted me directly so we could set up

14  a time where me and him could get together.  I offered one full

15  day of training with him and that was at a cost to Mr. Croft.

16  I believe that was another $500.  And I came out for one day

17  and I believe that the company name was Dodson, it was like old

18  buildings, moveable buildings.  I don't remember the exact name

19  of the company.  We went out there and did a training, venue

20  out there with him so I could explain to Officer Bost how to

21  properly work the dog, how to read his changes of behavior,

22  what his final response was and how I trained him so he could

23  continue working in the same direction that I trained so it

24  wasn't counter-productive to his work.

25  Q.  Were you able to resolve the problems?

1    A.  I had no problems with Clyde.  Phenomenal dog.

2    Q.  So what were you doing on this occasion out at Dodson

3    Homes?  Were you training Clyde?  Were you training Officer

4    Dodson*(sic)*?

5    A.  I was training Officer Dodson*(sic)*, that was what I was

6    asked to come there for.  I did have some other officers come

7    to me and ask me questions that were working with Mr. Croft and

8    asked me what I thought of the dog.  Of course, one of the ones

9    they brought up was the Rottweiler.  There was some

10   conversation that the dog wasn't finding odor the way he should

11   have.  I said, well, let me take a look at the dog.  At that

12   time, Mr. Croft actually grabbed the dog and worked the dog and

13   his problem.  And once again I didn't see what I thought was a

14   good working dog.  Lack of independent sniffing behavior, very

15   dependent on the handler's positioning.  The times that I did

16   see the dog sit on odor, it was because the handler was

17   stopping at odor as opposed to -- it was almost like he was

18   cuing the dog into, hey, here is where you need to sit because

19   the odor is here and not letting the dog figure it out himself.

20   Q.  Now, at this point, are you actually teaching courses or

21   are you just providing commentary?

22   A.  That was just commentary.  I was there to instruct Officer

23   Bost how to train that one individual dog.  The other officers

24   came to me once they seen me working with Officer Bost, asking

25   me questions.

1   Q.   Do you know where Mr. Croft was getting his dogs from?

2   A.   I know -- initially I know he did get some European

3   imports, but at that point, most of his dogs were coming from

4   shelters.

5   Q.   Did that give you any concern?

6   A.   Absolutely.

7   Q.   Why?

8   A.   As an experienced trainer, there's a lot of things you need

9   to look for in a dog to decide whether it's a good candidate

10  for detection training, since that's what Mr. Croft was dealing

11  with was just straight detector dogs.  There's more to it than

12  ball drive.  If I go out and throw a ball, most any dog will

13  chase that ball.  There's some that won't even do that.  I

14  think that was the basis of him selecting dogs is a dog with

15  real good ball drive.  There's more to it than that.  They also

16  have to have other drives.  They have to have motivations to

17  want to work.  Some dogs just -- they'll play with the ball all

18  day long on the floor, but you ask them to do work to get that

19  ball and they won't work.

20       There's a process, what we call principles of conditioning

21  where you have to use the dog's drive, you have to use what's

22  natural to the dog, his prey drive, wanting to chase, bite,

23  carry, that type of thing to get a dog out.  It also has to

24  have hunt drive.  If a dog won't hunt, it's not going to do

25  detection.  When I say hunt drive, if I take a ball in an open

1    field and I throw it out in the middle of the grass, I turn the

2    dog around one time and tell him to go find the ball, how long

3    does he go before he quits.  A good hunt drive, 20 to 30

4    minutes that dog will continue hunting because he wants the

5    ball that bad.  I've seen dogs that will run out there, they

6    don't see it, they'll run right back to the handler.  Not a

7    very capable dog because we have to have a dog that has that.

8    Q.  So there are certain factors that you look for in finding a

9    dog that will be a good working dog, is that fair to say?

10   A.  Yes, sir.

11   Q.  Did you have discussions with Mr. Croft about looking for

12   dogs that had these behavior traits?

13   A.  We did.  At that point, I was kind of working part-time at

14   Canyon Lake Animal Shelter out at Canyon Lake which is one of

15   the places that he was getting dogs from.  One of the things

16   that we had talked about is I told him if I found a dog that

17   was capable of doing that, I would let him know.  I worked

18   there for over a year and had not seen one that was what I

19   would say would be a capable working dog.

20   Q.  Was Mr. Croft still getting dogs from Canyon Lake Shelter?

21   A.  Not while I worked there.

22   Q.  We were talking -- before we went down that path, we were

23   talking about your working in May of 2014.  Where was

24   Mr. Croft's school at that point?

25   A.  I never seen his school, sir.

1   Q.  Where did you go to meet him and work with him?

2   A.  At his home.  I never seen an actual schoolhouse, I never

3   seen kennels.  The dogs were actually being housed in his

4   garage in dog crates.

5   Q.  Is it normal to house a working dog in a dog crate?

6   A.  Not full-time, it's for travel purposes.

7   Q.  You're talking about one of those boxes that you carry your

8   dog on in an airplane, is that right?

9   A.  But larger, yes, because we're talking about larger dogs.

10  Q.  During that period of time, who were the trainers at

11  Mr. Croft's school?  You indicated you were not one, you were

12  doing piece work.

13  A.  When I met him, it was him and his daughter.  That was it.

14  Q.  Him and his daughter?

15  A.  Yes, sir.

16  Q.  Is his daughter present in the courtroom?

17  A.  Yes, she is.

18  Q.  Could you point out to her?

19  A.  Dark-haired girl in the first row.

20          THE COURT:  Court will identify the young woman

21  sitting right behind defense table.

22  BY MR. SUROVIC:

23  Q.  How old was Cameron, Mr. Croft's daughter, when she was

24  working training the dogs when you were down there in 2014?

25  A.  Sophomore in high school approximately.

1   Q.  Do you know if Mr. Croft or his daughter had any training

2   on -- had, like you, been to courses or anything like that to

3   train dogs?

4   A.  None that I know of.

5   Q.  Were they the only trainers that were there?

6   A.  When I was there, yes.

7   Q.  Did you ever see anybody by the name of Art Underwood?

8   A.  No, sir.

9   Q.  I think I've asked you that before.  Wes Keeling, do you

10  know Wes Keeling?

11  A.  I met him.

12  Q.  Was that during the period that you were down there?

13  A.  Maybe the last 30 days that I was dealing with him.  When I

14  was working that dog Clyde, I had met him.  Right after that --

15  I guess I can go to my timeline -- I picked up a second dog

16  that I never finished because the dog wasn't capable and that

17  was the one time that I seen Wes.

18  Q.  Okay.  And what about a Dustin Bragg?

19  A.  Never met the gentleman.

20  Q.  The only trainers that you actually saw were Mr. Croft and

21  his daughter?

22  A.  Yes.

23  Q.  What happened after you did this training with Clyde and

24  you started to do the imprinting on the second dog?

25  A.  The second dog just didn't have it.  And I say didn't have

1    it, didn't have the hunt drive, didn't have any type of drive.

2    The dog was a house pet that was brought in saying can you make

3    a working dog out of it.  The answer should have been no right

4    off the bat.  We made an honest attempt, I made an honest

5    attempt to see if the dog did have any capability.  Didn't see

6    it.  I let Mr. Croft know that.  He was kind of upset that I

7    didn't put forth more effort.  I told him it was wasted effort,

8    wasted money, wasted time, that if he got another dog, I would

9    start another one.  The issue was -- kind of came to a head for

10   us ending was Officer Bost had called me on the phone.  And

11   this is -- I want to venture to guess he was in his

12   mid-twenties when I met him, so maybe a month after he had

13   picked up Clyde and took him home.  One of the things that he

14   asked me prior to leaving Universal K-9 is how would

15   certification from Universal K-9 hold up in court.  I told him

16   that everybody that I've ever trained on the civilian side I

17   request that they go through one of the nationally recognized

18   certification authorities somewhere in the nation, whether it

19   be the National Working Dog Association, National Detector Dog

20   Association, International -- there's several different ones

21   that are nationally recognized.  So it would hold up better in

22   court if they had a bust as opposed to the company owner you

23   got your dog from testifying for you.  Because I thought it was

24   a conflict of interest.  He left Universal K-9, went directly

25   to Austin, Texas to a National Working Dog Association's

1  certification and had no issues, flew right through it.  Three

2  weeks after that, I got a phone call that the dog had died in

3  his backyard.

4  Q.  Did he tell you how or why the dog died?

5  A.  He said he was playing with the dog in the backyard, it

6  fell over.  He took the dog to the vet, it was already dead by

7  the time they got it to the vet.  They did an necropsy on the

8  dog, which is the equivalent to an autopsy for us.  And the vet

9  had told him that the dog had massive heart failure and that

10  the dog was only nine to ten months old.

11  Q.  Is there any issue with training a dog that's nine to ten

12  months old?

13  A.  There are some dogs that are very capable if they're a

14  little bit more mature.  This dog was a pretty good dog, but I

15  would have never guessed he was that young.  He was a tall,

16  linky Lab, so he looked a little bit older.

17  Q.  Any issues as far as your normal experience with training

18  working dogs as far as them having a heart attack?

19  A.  No, sir.  Normally the vendor -- and I say vendor, the

20  company that is giving, selling or whatever dog.  The normal

21  standard is one to two years of training on a guarantee and one

22  to two years of guarantee on the genetic health of a dog.

23  Q.  Did you discuss the death of Clyde with Mr. Croft?

24  A.  No, I think he had already talked to the officer prior to

25  the officer calling me.

1    Q.  You seem to indicate that that and the failure with the

2    second dog brought something to a head between you and

3    Mr. Croft.  Could you tell us what that was?

4    A.  Basically talked on the phone and I told him the dog wasn't

5    going to make it and with the issue with Clyde, if that's the

6    way he was going to run the business, I just didn't think we

7    should be working together.  He came to Canyon Lake Animal

8    Shelter when I wasn't there to pick up a dog.  I dropped it

9    off, I left it there.  He came to pick up the dog and that's

10   the last that we had talked.

11   Q.  Approximately when was that?

12   A.  That would have been late August, early September.  Yeah,

13   probably August, September time frame of 2014.

14   Q.  2014?

15   A.  Yes, sir.

16   Q.  Did you ever have any conversations subsequent to that

17   about the possibility that Mr. Croft could use your name and

18   your certifications in order to obtain V.A. certification so

19   that he could teach G.I. Bill authorized classes?

20   A.  We had discussed the V.A., the whole system and him trying

21   to get V.A. approved.  The initial reason that I gave him all

22   my information was for contracting purposes, right down to when

23   I went to dog school, my certificate in 1996, all of the

24   courses that I had gone through as far as the kennel master's

25   course, all the training I had ever done, he had copies of all

1    of that for the contracting purposes so I could become the

2    program manager or the lead for those contracts when they were

3    awarded.  He had discussed the V.A. stuff, but it was never

4    said that he was going to use me as his lead guy other than

5    just conversation, hey, if I get the contract, I'd like you to

6    come in and teach.  There was nothing said that he was going to

7    use my material that I had given him for the contracting stuff

8    to get approved for the V.A. or anything else.  That was a

9    process that had already been started prior to me leaving there

10   and then when I left, that was the last I had heard of it until

11   October of '16.

12   Q.  And how did you hear about it again in October of '16?

13   A.  I was actually called by a prior student that went through

14   dog school in the military.  I was his instructor.  I also was

15   his kennel master when I got to Korea.  He called me and said

16   he wanted to further his K-9 education and become a trainer so

17   he could get better jobs.  At that time he was living in

18   Chicago, it was Chicago Police Department, so I understand.  He

19   called me and said, hey, he says according to this paperwork,

20   you're an instructor over this Universal K-9, I'd like to go

21   there.

22          MR. MCHUGH:  Your Honor, I have resisted, but we're

23   getting into hearsay now.

24          THE COURT:  Objection sustained.

25   BY MR. SUROVIC:

1   Q.  Mr. Stanley, let me call your attention to Government

2   Exhibit Number 6f.  I believe your testimony was that you

3   pretty much broke off relations with Mr. Croft in August of

4   2014, is that correct?

5   A.  That's correct.

6   Q.  If we could zoom in to the top of this, this is an e-mail

7   from Brad Croft to a variety of people and there's already been

8   testimony that it was at the Texas Veterans Commission.

9   A.  Uh-huh.

10  Q.  This is dated October 4, 2015.  What was the status of your

11  relationship with Mr. Croft in October of 2015?

12  A.  We had none.

13  Q.  And if we can scroll down.  Now, this is an e-mail, it has

14  your name at the bottom, is that correct?

15  A.  Yes, it is.

16  Q.  This is part of a paragraph talking about roster of

17  administrative instructional staff.  And if you could read this

18  real quick, read it out loud if you want.  "Erroneous and/or

19  misleading references to positions, titles and offices of staff

20  members have been revised or omitted in the published catalog.

21  B, Instructor certifications are enclosed herein.  (See Texas

22  Commission On Law Enforcement certification, TCOLE, for

23  Universal K-9 Academy's curriculum supervisor Corporal Wesley

24  Keeling."

25      Were you ever aware that Wesley Keeling was the curriculum

1  supervisor for Universal K-9?

2  A.  No, I was not.

3  Q.  And "Instructor Justin Bragg.  Below is a brief description

4  of the credentials and certifications of Universal K-9

5  Academy's four instructors."

6      And your name is down here.  Could you read what it says

7  with your name?

8  A.  It says, "Military kennel master certification."

9  Q.  If we go to the next page?

10 A.  "Army 2005 trained in the following areas to teach dual and

11 single-purpose handlers course, trainer instructor course --"

12          THE COURT:  You're talking way too fast.

13          THE WITNESS:  Sorry.

14 BY MR. SUROVIC:

15 Q.  Why don't you start over from "Military kennel master

16 cert."?

17 A.  Okay.  "Military kennel master cert. Army 2005, trained in

18 the following areas to teach, dual and single-purpose handlers

19 course, trainer instructor course, behavioral modification

20 course, and kennel master course."

21 Q.  Had you agreed to teach those things for Mr. Croft in

22 October of 2015?

23 A.  No, sir.

24 Q.  Had you told him at any time in your relationship that he

25 could use your name and your certificate whenever and wherever

1    he wanted?

2    A.  No, sir.

3    Q.  Can we go to page 69 of that exhibit?  This is Exhibit J

4    that was an attachment to the e-mail that we just looked at.

5    And this indicates roster of administrative and instructional

6    staff, use additional pages if needed.  Is that your name here

7    on the third line down?

8    A.  Yes, it is.

9    Q.  It says teach class and train dogs, talks about license

10   number.  Well, that's not your license number is it?

11   A.  No, sir, I don't have one.

12   Q.  And then it talks about course subject taught.  Can you

13   read those two courses?

14   A.  "Police K-9 handlers course, police K-9 trainers course."

15   Q.  Did you ever teach any of these courses for Mr. Croft?

16   A.  No, sir.

17   Q.  Did you ever agree to teach any of those courses for

18   Mr. Croft?

19   A.  Only under contract if we were awarded the contract.

20   Q.  Were you ever awarded the contract?

21   A.  No, sir.

22   Q.  And in 2015, was your relationship such that you would have

23   been teaching for him?

24   A.  No, sir.  Within a week of that date, I was actually

25   working for Homeland Security.

1  Q.  And if we go to 6g, Government Exhibit 6g, page 15.  This

2  is an application that was submitted received by the Texas

3  Veterans Commission on March 4, 2016.  This is the same type of

4  page that we were looking at before.  Is your name also on this

5  list?

6  A.  Yes, sir.

7  Q.  And what courses does it indicate that you will be teaching

8  then?

9  A.  "Police K-9 handlers course, police K-9 trainers course,

10  K-9 interdiction course, behavioral modification and kennel

11  master course."

12  Q.  Now, in March of 2016, had you agreed to teach those

13  courses for Mr. Croft?

14  A.  No, sir.  I'm not even somebody that should be teaching a

15  K-9 interdiction course.  That's not something I teach.

16  Q.  Now, again this is very important, sir, at any time did you

17  give Mr. Croft permission to use -- well, let me go back a

18  second.  If we could go back to page 15.  And let's go to page

19  16 -- page 28.  Can you tell us what this is?

20  A.  That was my clearance to go over to Afghanistan and work

21  for K2 Solutions.

22  Q.  Did you authorize Mr. Croft to submit this paperwork to the

23  Texas Veterans Administration?

24  A.  No, sir.

25  Q.  Go to the next page.  This is what we refer to as a DD-214,

1    is that correct?

2    A.   Yes, sir.

3    Q.   Did you authorize Mr. Croft to submit this to Texas

4    Veterans Commission?

5    A.   No, sir.  This is another one that was given to him for

6    contract purposes.

7    Q.   And this was given to him long before the 2016 when this

8    was submitted, is that correct?

9    A.   Yes, sir.

10   Q.   And if we go to the next page, the back of it, go to the

11   next page, can you tell me what this is?

12   A.   The very first one is my military work in dog handlers

13   course, that shows when I first started as a dog handler.

14   Q.   The one below that?

15   A.   I was the honor grad for that course.

16   Q.   Did you ever give him authority to send these in?

17   A.   No, sir, not for other than contracting purposes.

18   Q.   Let's see the next certificate.  Can you tell us what this

19   is?

20   A.   That's when I joined the military the very first time, that

21   was my MP School for joining the Army.

22   Q.   Did you give him authority to use that certificate?

23   A.   No, sir.

24   Q.   Let's go back to Government Exhibit 6f.  I believe again if

25   we could start at page 69, go to page 82.  I'm going to flip

1    through a few pages.  These are the same certificates we just

2    talked about.  These were sent with the attachment in October

3    of 2015.  Did you give anybody authority to use these

4    certificates in October of 2015?

5    A.  No, sir.

6    Q.  Again this is your clearance?

7    A.  Yes, sir.

8    Q.  And if we flip through them, DD-214 again, and the

9    collection of your certificates, is that correct?

10   A.  Yes, sir.

11   Q.  Did you give him authority either in October of 2015 or

12   March of 2016 to use your certificates?

13   A.  No, sir.

14   Q.  Did you give him authority to use your name?

15   A.  No, sir.

16   Q.  Did you have any working relationship with him at that

17   point?

18   A.  No, sir.

19   Q.  What was the only thing that you agreed to do with

20   Mr. Croft?

21   A.  Basically we were working on contracting.  If he was

22   awarded one of these contracts through the military Department

23   of Defense, that he would bring me on as one of the leads to

24   run the program.

25   Q.  And did you even have that understanding with him after

1   August of 2014?

2   A.  I don't understand the question, sir.

3   Q.  Did you have an understanding where if he had gotten one of

4   those contracts, you would have come back after August of 2014

5   after you had the break with him?

6   A.  No, that was the end.  There was nothing after that.

7              MR. SUROVIC:  No further questions, Your Honor.

8                      CROSS-EXAMINATION

9   BY MR. MCHUGH:

10  Q.  Mr. Stanley, my name is Tom McHugh.  Good afternoon.

11  A.  Afternoon, sir.

12  Q.  You and I have not visited, have we?

13  A.  No, sir.

14  Q.  And I represent Mr. Bradley Croft.  Are you aware of that?

15  A.  Yes, sir.

16  Q.  Because you saw where I've been sitting, correct?

17  A.  Yes, sir.

18  Q.  And in regard to your notes that you brought with you into

19  the courtroom today, I'm not challenging the accuracy of these

20  notes, but how did you put together this three-page summary?

21  A.  This three-page summary is just based off e-mail traffic.

22  Q.  So there are e-mails that relate to this?

23  A.  Yes, sir.

24  Q.  And are there other sources of information that you used to

25  put this together?

1  A.   Just conversations between -- there was nothing in writing,

2  conversations between myself and Mr. Croft.

3  Q.   And did you put those conversations into a diary?

4  A.   No, sir, I did not.

5  Q.   How are you able to recall these dates and times?

6  A.   For me it was fairly simple.  It was based off around what

7  we were trying to work on at that time.  As far as when I left

8  there, it was pretty simple because I started another job.  The

9  dates and times and conversations were fairly simple to come up

10 with.  We didn't spend a lot of time together, a lot of it was

11 e-mail traffic because I was gone for one year.

12 Q.   And you were interviewed by agents including an agent at

13 the Federal Bureau of Investigation or assigned to that task

14 force back in May of 2018, were you not?

15 A.   Yes, sir.

16 Q.   And were they taking notes when you were interviewed, do

17 you know?

18 A.   I believe they were, yes.

19 Q.   Did they ask you whether or not they could record that

20 interview?

21 A.   I don't remember them recording it.  It's been a while, so

22 I was interviewed twice.

23 Q.   And one time was in May of 2018.  When was the other time?

24     (Pause.)

25     It's not a trick question.

1    A.   Two to three months prior.

2    Q.   So this is all back in the spring of 2018?

3    A.   Uh-huh, yes, sir.

4    Q.   And in regard to the interview, have you had the occasion

5    to look at the agent notes of your interview or to look at

6    their summary of your interview?

7    A.   No, sir.

8    Q.   And in regard to your interview being recorded, did the

9    matter of it being recorded ever come up?

10   A.   Not that I remember, sir.

11   Q.   And you know a Wesley Keeling, do you not?

12   A.   I know of him, I met him one time.

13   Q.   Only on one occasion?

14   A.   Yes, sir.

15   Q.   And when is the last time you may have visited with him?

16   A.   That would have been August of 2014 when I was actually

17   training Officer Bost with K-9 Clyde.

18   Q.   So y'all weren't outside together all day yesterday and

19   today?

20   A.   I wasn't here yesterday, sir.

21   Q.   Today?

22   A.   I met him briefly today, yes.

23   Q.   And you were sitting with him?

24   A.   Yes, sir.

25   Q.   Of course, you did not discuss or have the conversation

1    regarding the events or Mr. Croft, did you?

2    A.  No, sir.

3    Q.  In regard to these e-mails, how many e-mails were there

4    that you referred to that were used when you put together this

5    three-page summary of what your testimony has been this

6    afternoon?

7    A.  I couldn't give you an exact number.  I would venture to

8    guess between Universal K-9 and directly from Mr. Croft's

9    personal e-mail, 25 to 30.

10           MR. MCHUGH:  Your Honor, we would ask, not necessarily

11   at this time, but we would ask that these e-mails be produced,

12   they being the source product for his summary.

13           MR. SUROVIC:  First of all, Your Honor, the summary is

14   not in evidence.  It was merely a guide to help him keep

15   straight when things happened.  And the government is not in

16   possession of the e-mails.

17           THE COURT:  They don't -- I mean if you want to

18   subpoena them, you can subpoena them, but they don't have any

19   control over them.

20           MR. MCHUGH:  I'm not suggesting, Your Honor.  But the

21   Court, of course, has the authority since he used these

22   documents to prepare for his testimony to require that he copy

23   and produce notes, we would ask that.

24           THE COURT:  Well, how much difficulty would it be for

25   you to locate all these e-mails?

1          THE WITNESS:  Not difficult at all, sir.

2          THE COURT:  How many e-mails are there?

3          THE WITNESS:  Twenty-five to 30.  Some of those

4   e-mails thread to two or three different conversations.

5          THE COURT:  Can you do that?

6          THE WITNESS:  Yes, I can, sir.

7          MR. MCHUGH:  And Your Honor, I believe I can represent

8   to the Court that it is not my desire to prolong this or to

9   drag him back into the courtroom.  It's just if it's a source

10  document, I would just like --

11         THE COURT:  It's just a source document for him to

12  refresh his recollection, but that's okay.  I mean it isn't a

13  source document for anything that was entered into evidence.

14         MR. MCHUGH:  His testimony is in evidence though.

15         THE COURT:  I don't know that he used the e-mails in

16  his testimony other than --

17         MR. MCHUGH:  That is his testimony.

18         THE COURT:  Did you use your e-mails?

19         THE WITNESS:  As a timeline, yes.

20         THE COURT:  For the timeline.

21         THE WITNESS:  Yes.

22         THE COURT:  Did you recollect what had gone on

23  independent of the e-mails?

24         THE WITNESS:  Absolutely, I just needed a timeline of

25  when it happened.

 1            MR. MCHUGH:  Twenty-five e-mails, Your Honor,
 2   respectfully.
 3            THE COURT:  Counsel, I haven't turned you down.  I'm
 4   trying to figure out what we're doing here.  So --
 5            MR. MCHUGH:  Don't allow me to rush the Court, Your
 6   Honor.
 7            THE COURT:  Don't worry, you won't.  Well, what do you
 8   want to do with cross-examining him?
 9            MR. MCHUGH:  I will continue to cross-examine him.
10            THE COURT:  I don't want to replow the field here
11   tomorrow.
12            MR. MCHUGH:  It's my representation to the Court that
13   I would like these for my record for my file for me to review.
14   I am not challenging his words or his honesty before this
15   Court.  I'm not suggesting that these e-mails would be -- would
16   contradict his testimony here.  I'm doing my due-diligence.
17            THE COURT:  Can you do that and bring them back
18   tomorrow?
19            THE WITNESS:  Yes, sir.
20            THE COURT:  Thank you.
21            MR. MCHUGH:  May I proceed, Your Honor?
22            THE COURT:  Yes.
23   BY MR. MCHUGH:
24   Q.  Sir, take us back to -- it is your testimony, as I recall,
25   that the first time that you engaged with Mr. Croft, there were

1    four or five major players at the time, is that correct?

2    A.  Within the company?

3    Q.  No, no.  You were looking for a -- it is your testimony

4    that when you met him, the question was from the government how

5    did you meet him.  And let me just ask you that.  How did you

6    meet Mr. Croft?

7    A.  Basically I called him and discussed employment

8    opportunities and then we set up a meeting.  I don't know

9    exactly when the meeting was.

10   Q.  And in regard to that call to him, why is it that you

11   reached out to him as opposed to -- as an employment

12   opportunity as opposed to other similar companies?

13   A.  Other similar companies weren't hiring.  Hill Country K-9

14   out of Somerset, Global K-9 Academy out of San Antonio, I had

15   just left Worldwide K-9.  There was a couple other upstarts,

16   Full Armor K-9 that was a one-man show, he was in the same

17   boat, couldn't afford to hire anyone else.

18   Q.  So when you called Mr. Croft, you knew that there were no

19   employment opportunities for you at some of these other

20   schools?

21   A.  Yes, sir.

22   Q.  Had you called them asking them also for employment?

23   A.  Yes, sir.

24   Q.  And Mr. Croft was down the chain in terms of who you

25   reached out to?

1    A.  Yes, sir.

2    Q.  And in regard to -- did you vet him, did you vet his school

3    before you placed that call?

4    A.  Other than looking at his website and talking to prior

5    employees of his, no, sir.

6    Q.  And the prior employee is -- what is his name?

7    A.  Mr. Ray Nunez and Mr. Chris Tillman.

8    Q.  Ray Nunez had at one time a relationship in the dog

9    business with the defendant, Bradley Croft?

10   A.  Yes, sir.

11   Q.  And you and he had a conversation.  And after that

12   conversation and after there being no employment opportunities

13   with other dog companies, as you worked your way down the list,

14   you called Mr. Croft?

15   A.  Yes, sir, I don't believe there was up or down the list.  I

16   had five major companies, him being the smallest and happened

17   to be the last one.

18   Q.  And so you weren't necessarily rating or ranking those

19   companies?

20   A.  Correct, sir.

21   Q.  You were familiar with his website at the time?

22   A.  Yes, sir.

23   Q.  And I take it Mr. Ray Nunez did not tell you don't go see

24   Bradley Croft?

25   A.  No, sir.  If he had, I probably wouldn't have called him.

1   Q.   And so somebody -- who is Ray Nunez to you?

2   A.   He actually worked for Worldwide K-9, left there to go to

3   Mr. Croft's company and I knew that he was running a company

4   called Full Armor K-9.

5   Q.   So you and he had worked together?

6   A.   No, sir.

7   Q.   Never at Worldwide?

8   A.   No, sir.

9   Q.   How did you know him?

10  A.   Basically word of mouth from Mr. Croft and Mr. Hawkins from

11  Worldwide K-9.

12  Q.   No, no.  I'm sorry.  Bad question.  How were you introduced

13  to Mr. Nunez?

14  A.   Same thing.  I made a phone call.

15  Q.   And receiving no negative information back regarding

16  Mr. Croft, you first reached out to him I believe in

17  approximately 2012 is your testimony?

18  A.   Either late November, early December, yes.

19  Q.   And your timeline says December 2013, so that would be an

20  error?

21  A.   Yes, I had stated that when we first started, sir.

22  Q.   So your relationship with him dates back to 2012?

23  A.   Yes, sir.

24  Q.   And your relationship was initially as were considering him

25  and hopefully he would consider you as an employment

1    opportunity?

2    A.  Yes, sir.

3    Q.  And you continued to remain in contact and in touch with

4    him?

5    A.  Yes, sir.

6    Q.  Had you yet met him in person or only talked with him on

7    the phone?

8    A.  We met in person fairly quickly after the December phone

9    call, maybe a couple weeks, to sit down and discuss stuff.  A

10   lot of times when he e-mailed me, sir, hey, we need to sit down

11   and talk.  So we did have some meetings.

12   Q.  Where would those meetings have taken place?

13   A.  Most of the time they were at his home.

14   Q.  And you had referred to, in your list of companies,

15   upstarts.  Would you refer to his company at the time as an

16   upstart?

17   A.  At that time, I didn't know how far in the business he was.

18   I know he had prior employees that no longer worked there,

19   Mr. Nunez and Mr. Tillman.  I didn't know how long he had been

20   in business.

21   Q.  Did you learn when you visited with him?

22   A.  When I visited with him, it was discussions about getting

23   contracts to make the big money contracts and that's what the

24   interest went towards.

25   Q.  For his business to grow, for him to generate income and

1   for you to be an employee?

2   A.  Yes, sir.

3   Q.  And when you visited with him, the position that y'all were

4   discussing was for you to be the program manager?

5   A.  Yes, sir, for a contract that was awarded.

6   Q.  What is the responsibility or -- the role or responsibility

7   of a program manager?

8   A.  Depends on the contract.  It's all in statements of work,

9   but for, like, the Navy Special Warfare contracts, they

10  actually have an east and west, they have schoolhouses on both

11  sides of the country.  The program manager will be in charge of

12  the entire program, east, west and everything.  It would have

13  leadership underneath him to physically run those individual

14  training courses.

15  Q.  Would it be fair to say that you were interested in a

16  relationship with him and he was interested in a relationship

17  with you?

18  A.  At that point, I believe so, yes, sir.

19  Q.  Did you believe he had respect for your background,

20  experience and training?

21  A.  Yes, sir.

22  Q.  Did you tell him what your background, experience and

23  training was?

24  A.  Absolutely.

25  Q.  What did you tell him about that?

1    A.   It would have been the same thing I opened this court with,

2    from my military career all the way through working for

3    Worldwide K-9.

4    Q.   And you have looked at -- the government showed you

5    Government's Exhibit 6f, I believe.  Do you recall that?

6    A.   You'd have to show me again what it is, sir.

7    Q.   6f is --

8         MR. MCHUGH:  If you can bring up 6f.  So if you scroll

9    down to Mr. Stanley.

10   BY MR. MCHUGH:

11   Q.   Is it a true statement that you were a military kennel

12   master and certified in that?

13   A.   I believe what is supposed to be on there, I was a kennel

14   master, I was also a program manager and a certifying official.

15   I was able to certify dogs and dog teams in the country.

16   Q.   So this information as you read it as it describes you, and

17   I'm not going into the permission aspect of it, adequately and

18   accurately describes your experience?

19   A.   Yes, sir, although brief, yes it does, sir.

20   Q.   Although brief.  And then I believe on page 82 of 6f, are

21   you able to see that?

22   A.   Yes, sir.

23   Q.   And if we scroll to the next page.  And to the next page,

24   and to the next page.  There is a certificate of training and

25   it has your name on it, does it not?

1    A.   Yes, sir.

2    Q.   And part of that -- part of it is redacted out, correct?

3    A.   That's correct.

4    Q.   And that's a personal identifier number for courtroom

5    purposes.

6    A.   Okay.

7    Q.   Is that an accurate --

8             MR. SUROVIC:  Your Honor, just for clarification, I

9    don't know if counsel understands, the redaction is actually a

10   redaction of the witness's Social Security number.

11            THE COURT:  That's what I understood.

12            MR. SUROVIC:  You said something about it being for

13   court purposes.

14            MR. MCHUGH:  That's what it was redacted for.

15            THE COURT:  When I went through Military Police

16   Officer Basis School at Fort Gordon, we got a similar

17   certificate, so I'm familiar with it.

18            MR. MCHUGH:  Okay.

19   BY MR. MCHUGH:

20   Q.   And the next certificate is a military police school.  And

21   that is a certificate that you earned or were awarded, correct?

22   A.   That is correct.

23   Q.   And so let's just kind of scroll through to the next one.

24   And are any of these here, as we continue to scroll through

25   because there are several, they all relate to you, do they not?

Stephen Peek - Examination                124

1   A.  Yes, sir.

2   Q.  And they were all in your possession at one time, were they

3   not?

4   A.  Yes, sir.

5   Q.  And they were all truthful and accurate as to the

6   information contained on that, were they not?

7   A.  Yes.

8   Q.  And it is your testimony that as you continued to -- I

9   believe you went to back in -- if you look at your timeline,

10  back in March 2013, you took employment with K2 Solutions,

11  correct?

12  A.  That is correct.

13  Q.  And that put you in Afghanistan?

14  A.  Yes, sir.

15  Q.  And so you were gone for a year?

16  A.  Yes, sir.

17  Q.  And but then you returned.  And did you continue visiting

18  or having communication with Mr. Croft?

19  A.  Yes, I did.

20  Q.  And it is your testimony that back in April of 2013 when

21  you returned, he was sending you e-mails and you were

22  continuing your relationship, were you not?

23  A.  You said that when I returned.  That's actually when I

24  departed.

25  Q.  Oh, that's when you departed.

1    A.  I left in March and didn't come back until February the

2    next year.

3    Q.  I'm sorry.  But when you returned in -- when do you return?

4    A.  February of 2014.

5    Q.  But in May of 2013 and in September of 2013 you continued

6    to communicate with Mr. Croft?

7    A.  Those were the e-mails that were sent to me basically just

8    discussions between Mr. Croft and Mr. Hawkins of Worldwide K-9.

9    Those aren't solicited or talking about work environment.  That

10   was just his sending copies of e-mails that he was dealing with

11   Mr. Croft.  That wasn't really soliciting anything as far as

12   employment.

13   Q.  September 2013, "This was the time I was attempting to get

14   hired."  Hired by whom?

15   A.  By Mr. Croft.  I knew my contract was going to run out and

16   at some point I was going to have to have a job when I

17   returned.

18   Q.  And there's nothing about your at that point your history

19   with him and your communications with him that soured you on

20   being a program manager for him at some point?

21   A.  Not under contract, no, sir.

22   Q.  And he was not able to hire you, it is your testimony you

23   did piecemeal work, piecemeal work, but he was not able to take

24   you on as a full-time employee, correct?

25   A.  That is correct.

1   Q.  That was your desire and your hope, was it not?

2   A.  It was my desire to have a full-time job training dogs,

3   yes, sir.

4   Q.  And at that time, you thought you and he would be a good

5   fit?

6   A.  At that point, yes, sir.

7   Q.  And he was well aware of your history and your background,

8   correct?

9   A.  Yes, sir.

10  Q.  And these documents that we just looked at here in

11  Government Exhibit 6f, when and how did you deliver those to

12  Mr. Croft?

13  A.  Those were -- I'd have to look back.  I want to say that I

14  sent them to him digitally through e-mail.  I don't know that I

15  was taking hard copies of them for him to copy, so I'm sure

16  they were sent digitally to him, but that was for the purpose

17  of the Navy contract, Special Warfare contract, so it showed my

18  capabilities to fill that position as a program manager.

19  Q.  So it was your hope or your desire that he with that

20  information could possibly get a government contract?

21  A.  Yes, sir.

22  Q.  Okay.  And with your background and experience and pursuant

23  to your conversations with Mr. Croft, that you would be the

24  program manager?

25  A.  Yes, sir.

Stephen Peek - Examination                    127

1   Q.  And had you yet discussed a salary or how you would be
2   paid?
3   A.  Basically the information that we discussed and it was very
4   loosely talked about as far as salary, he said if I was a
5   program manager, it would be well over six figures.
6   Q.  And then you return -- well over six figures?
7   A.  Yes, sir.
8   Q.  You did not object to that?
9   A.  Absolutely not.
10  Q.  There's nothing wrong with making money?
11  A.  Absolutely.
12  Q.  There's nothing wrong with defendant Croft sitting here
13  making money, is there?
14  A.  No, sir.
15  Q.  If you do it lawfully, legally?
16  A.  Yes, sir.
17  Q.  In regard to Universal K-9, when you went out to his home
18  before you left for Afghanistan and you had a number of visits
19  out there, when you returned from Afghanistan, did you again
20  see him?
21  A.  Yes, sir.
22  Q.  Where did you see him on this occasion?
23  A.  It would have been at his home.  Actually we were still
24  looking at Navy contracts.  I even brought colleagues in from
25  the military when we were working on the east and the west side

Stephen Peek - Examination                128

1    to try to fill those slots.  It was another company that we

2    were using, Olive Branch K-9.  We were basically setting

3    everything up to send in a copy of what we could do for that

4    contract.

5    Q.  So you and he were working together in concert to -- in

6    attempting to get those contracts?

7    A.  Yes, sir.

8    Q.  And if you had received those contracts -- and you had had

9    them before, had you not?

10   A.  Which contract are you speaking of?

11   Q.  Had you had government contracts before?

12   A.  The one in Afghanistan, yes.

13   Q.  And in regard to if you had been successful with Mr. Croft,

14   you had visited with him and you talked about what your salary

15   may be, correct?

16   A.  Yes, sir.

17   Q.  And you would be paid a six-figure salary and you would be

18   responsible for any cost or overhead of the operation of the

19   business?

20   A.  No, sir.

21   Q.  So you would be strictly an employee of the business?

22   A.  Yes, sir.

23   Q.  A titled employee of the business?

24   A.  Yes, sir.

25   Q.  And you were attracted to that, were you not?

1   A.   Yes, sir.

2   Q.   You thought that that would be in the future possibly a

3   good career move to have that on your resume?

4   A.   I don't think, sir, it had anything to do with my resume.

5   I have a family that I have to feed, I wanted to put money in

6   my bank and food on my table.

7   Q.   And that's a good motivation in itself, is it not?

8   A.   Yes, sir.

9   Q.   In regard to the defendant, Mr. Croft, did you and he ever

10  do any trips together?  Did you go to any conventions together?

11  A.   They were discussed, but we never went to anything

12  together, no, sir.

13  Q.   And the discussion was what, to expand your knowledge base

14  or your certification or what?

15  A.   No, sir, there was a couple -- and once we have the

16  e-mails, you'll be able to see this as far as the date and time

17  frame.  I believe one was in Oklahoma to go up there and it was

18  more of a collective bargaining of a lot of professionals in

19  the industry to get together and trade ideas, that type of

20  thing.  And we had discussed going up to that, but it never

21  came about.

22  Q.   Never came to fruition?

23  A.   No, sir.

24  Q.   But you continued to talk, did you not?

25  A.   Yes, sir.

Stephen Peek - Examination                    130

1   Q.  And he had your permission to use your resume and those

2   certificates as they may relate to prospective government

3   contracts?

4   A.  For two individual ones, for the Air Force and Fort Bullis

5   and for the Navy Special Warfare, yes.

6   Q.  That's right.  Let me visit with you for just a bit, the

7   government went into it.  If you could compare and contrast

8   what is maybe a working dog with a shelter dog.  I don't know

9   if those are words of art, but it's what we have heard in the

10  courtroom.

11  A.  Okay.

12  Q.  So what is a working dog?

13  A.  It's very vague, but a working dog is a dog that is trained

14  to do the mission you're requesting him to do.  It's got to

15  have all the proper drives, motivations, principles of

16  conditioning which is dog psychology, how a dog thinks, using

17  their natural behaviors that they want to do to use those to

18  your advantage to get them to find a specific odor.

19  Q.  And may a shelter dog actually on occasion become a

20  working -- valuable working dog?

21  A.  Sir, I'm not going to say it's not possible, but in the one

22  year that I worked at Canyon Lake Animal Shelter, I seen zero

23  that come through that shelter.  I'm saying it's not

24  impossible.

25  Q.  Have you heard success stories coming out of Universal K-9

1   regarding their shelter dogs?

2   A.  I've seen the news stories and nothing personal on a

3   personal level.

4   Q.  What did you learn or what did you understand from the news

5   stories?

6          MR. SUROVIC:  Your Honor, I'm going to object at this

7   time because we are going to hearsay again.

8          THE COURT:  Sustained.

9          MR. MCHUGH:  This is state of mind, Your Honor.

10         THE COURT:  No, I don't think it's state of mind.  No,

11  there's no imminent event.  I don't think it's state of mind.

12  BY MR. MCHUGH:

13  Q.  Through your association or relationship with Mr. Croft,

14  you were introduced to other trainers, were you not?

15  A.  As far as who worked for him?

16  Q.  Do you know a -- yes, as far as who worked for him.

17  A.  When I met him, there was nobody else working for him.

18  Q.  And in regard to -- if you can go to -- do you know a

19  Mr. Keeling?

20  A.  I said I met him one time out at a training area when I was

21  dropping off K-9 Clyde to Officer Bost.

22  Q.  And where did you meet him?

23  A.  At the Dodson homes, I don't remember the exact name of the

24  company.

25  Q.  And were other persons there?

1    A.   There were several police officers.

2    Q.   What was the occasion or purpose for you and they being

3    there on that occasion?

4    A.   For me being there, it was one hundred percent to teach

5    Officer Bost how I work that dog and how to work that dog

6    properly to succeed in the future.

7    Q.   Government Exhibit 50 please -- I mean Defendant Exhibit

8    Number 50.  Have you seen that photograph before?

9    A.   I do not remember, no, sir.

10   Q.   Do you recognize anybody in that photograph?  Let's start

11   from the left as you look at it in the green shirt?

12   A.   One face that's familiar and that's number five from the

13   left.

14   Q.   That would be Mr. Peek?

15   A.   In the white shirt and the cowboy hat.

16   Q.   What about third from the left?

17   A.   Kind of hard to see on this screen, sir.

18   Q.   Do you recognize that as the defendant, Bradley Croft?

19   A.   It looks like him.  Like I said, it's hard to see with the

20   shadows.  Normally I don't see him wearing a hat.

21   Q.   There you go.

22   A.   Yes, sir.

23   Q.   And do you see what he is wearing?  Are you familiar with

24   Universal K-9 shirts or their monograms?

25   A.   The logo, yes, sir.

1   Q.  And is that a Universal K-9 logo?

2   A.  I believe it is, sir, yes.

3   Q.  And if you moved to Mr. Croft's left, that person wearing

4   that shirt, though you may not know him, do you know him?

5   A.  No, I do not.

6   Q.  Is he also wearing a Universal K-9 shirt?

7   A.  Yes, he is.

8   Q.  Go back to the main photo and we go second from the right

9   or sixth in, that person there, do you recognize that person?

10  A.  No, sir.

11  Q.  What is he wearing?

12  A.  Universal K-9 logo.

13  Q.  And you did piecemeal work for Mr. Croft, did you not?

14  A.  Yes, I did.

15  Q.  And when you did that piecemeal work, did you wear a

16  Universal K-9 shirt?

17  A.  No, I did not.

18  Q.  Have you ever worn a Universal K-9 shirt?

19  A.  He sent me a couple T-shirts when we first started talking.

20  I never wore them.  Actually they were thrown in the trash

21  brand new.

22          MR. MCHUGH:  May I have one moment, Your Honor?

23          THE COURT:  Certainly can.

24          (Pause.)

25          MR. MCHUGH:  Thank you very much, sir.  I have no

1   additional questions at this time.

2           MR. SUROVIC:  If we could put up Defense Exhibit 50

3   again real quick.

4                   REDIRECT EXAMINATION

5   BY MR. SUROVIC:

6   Q.  Sir, do you know how one goes about getting a Universal K-9

7   logo equipment, hats, shirts, anything like that?

8   A.  They'd have to come from Mr. Croft, I believe.

9   Q.  Do you know if they're given out generally, if they're sold

10  to the public, given to students?

11  A.  That, I don't know.

12  Q.  You don't know how these guys got their shirts?

13  A.  No, sir.

14  Q.  You indicated that you had met Wes Keeling once in regards

15  to your training of another officer.  What was he doing out

16  there?

17  A.  I believe that was when he was very first started talking

18  to Mr. Croft.  He was basically watching me train K-9 Clyde.

19  Q.  So he wasn't training anybody else while he was out there?

20  A.  Not at that point, no, sir.

21  Q.  You talked a little bit about Government Exhibit 6f and

22  Government Exhibit 6g, those were the applications.  Concerning

23  that application in October of 2015, if we could go ahead and

24  go to 6f, I believe it is page 69 and if we could scroll to the

25  bottom here.  First of all, at the top it says, "Roster of

1   administrative and instructional staff."  And of course your

2   name, you've already identified your name is on this list?

3   A.  Yes, sir.

4   Q.  Scroll to the bottom, it says I certify that the

5   information on this form is true and correct.  Was it true and

6   correct that you were going to be an instructor for Universal

7   K-9 in October of 2015?

8   A.  No, sir.

9   Q.  Was it true that you were going to be an instructor for

10  Universal K-9 any time in the year of 2015?

11  A.  No, sir.

12  Q.  6g is a similar thing you testified about, it involves the

13  application that was made in March of 2016.  Is the statement

14  that you would be an instructor for Universal K-9 in March of

15  2016 true and correct?

16  A.  No, sir.

17  Q.  Or at any time in 2016?

18  A.  No, sir.

19  Q.  There's already been evidence that Mr. Croft actually got

20  V.A. approval in March -- later in 2016 to teach G.I. Bill

21  courses for the V.A.  Did he call you in the year 2016 saying,

22  hey, I finally got the contract with the Veterans

23  Administration, can you come on over and start teaching?

24  A.  No, sir.

25  Q.  When was the next time -- since 2014, August of 2014, how

1    many times have you had contact with Mr. Croft?

2    A.   Today.

3    Q.   And that's it?

4    A.   That's it, sir.

5    Q.   He never called you to tell you I want you as an

6    instructor?

7    A.   No, sir.

8         MR. SUROVIC:  No further questions, Your Honor.

9                    RECROSS-EXAMINATION

10   BY MR. MCHUGH:

11   Q.   Sir, do you have your outline before you?

12   A.   Yes, I do, sir.

13   Q.   And under October 2016, and I may be misreading it, but

14   when you say he immediately called me, and that's halfway

15   through the paragraph, who were you referring to?

16   A.   The colleague that actually was trying to get a trainer's

17   course and he contacted Universal K-9 and they sent him a

18   student catalog.

19   Q.   Who is this now?

20   A.   Michael Makowski *(ph)*.

21   Q.   So he called you.  At the time when the contract was

22   awarded, it is accurate to say that you were able to feed the

23   young mouths in your house?

24   A.   Which contract are you referring to, sir?

25   Q.   I believe the Homeland Security.

1    A.   That's a permanent job, it's not a contract.

2    Q.   Well, same as contract.  But at the time you received that

3    employment, and I take it it's very steady employment?

4    A.   Yes, sir, after the first year, of course, you've got to go

5    through a probationary period.

6    Q.   And you still work there?

7    A.   Yes, sir.

8    Q.   So you were not at all interested at that point because you

9    had a good government job to work for Mr. Croft?

10   A.   Absolutely not.

11   Q.   And are you able to say that if you had lost that position

12   whether or not you would consider working for him?

13   A.   No, after we departed in August of '14, I was done with his

14   company altogether.  Like I said, after K-9 Clyde and the

15   secondary dog that he was upset that I couldn't train, I was

16   done with his company one hundred percent.

17   Q.   And so your disagreement with him was related to that dog,

18   Clyde?

19   A.   That and the secondary dog that he wanted trained that was

20   not capable.

21            MR. MCHUGH:  Thank you very much.

22            MR. SUROVIC:  We have no further questions, Your

23   Honor.

24            THE COURT:  Okay.  You can be excused, sir.

25            THE WITNESS:  Thank you.

1          MR. SUROVIC:  We request that he be permanently

2     excused, but I understand --

3          THE COURT:  No, he's got to come back tomorrow.  Can

4     you be here 9:00 tomorrow morning?

5          THE WITNESS:  Yes, sir.  Do you want paper copies?

6          THE COURT:  If you just bring one paper copy, that

7     will be fine.

8          THE WITNESS:  Of each e-mail?

9          THE COURT:  You can run them together.

10          THE WITNESS:  That will be difficult.  As you open the

11    e-mail, it prints that one e-mail.

12          THE COURT:  Of each e-mail then, one copy of each

13    e-mail.  That will be fine.  Thank you.

14          THE WITNESS:  Okay.

15          THE COURT:  Let's take a very short bathroom break

16    here and we'll be back.

17          COURT SECURITY OFFICER:  All rise.

18          *(3:54 p.m.)*

19                            *  *  *

20          *(4:12 p.m.)*

21          COURT SECURITY OFFICER:  All rise.

22          MR. SUROVIC:  Your Honor, Mr. McHugh suggested to me

23    that in order to save Mr. Stanley a trip over to the courthouse

24    tomorrow morning, if I were to have Mr. Stanley e-mail the

25    documents to me, then I could print them out and bring them to

1    court, that that would be acceptable to him, that he doesn't

2    need Mr. Stanley tomorrow morning.

3              THE COURT:  Is that right?

4              MR. MCHUGH:  That is correct, Your Honor.

5              THE COURT:  So you don't want to examine him on

6    documents?

7              MR. MCHUGH:  I don't believe that I'm going to examine

8    him on the documents.

9              THE COURT:  That's all right with me.  I don't have a

10   problem with that if you need him.

11             MR. MCHUGH:  If I need him, I'll call him, but I'm

12   representing to the government now that I don't believe that

13   I'm going to find that e-mail that requires me to bring him

14   back.

15             THE COURT:  That's fine.

16             MR. SUROVIC:  I suspect he'll be subject to recall.

17             THE COURT:  That's fine.

18             MR. SUROVIC:  If that's okay with the Court.

19             THE COURT:  It's fine with me.  Look, you're running

20   your own cases.  I'm not running your case.

21             MR. SUROVIC:  You gave an order, Judge, and we're not

22   going to violate your order.

23             THE COURT:  That was because, you know, Mr. McHugh

24   wanted the documents and I determined that he should have them.

25   And so the only way I knew to get them is to have him bring

1    them back.  If you want to do it this way, that's fine.

2              MR. MCHUGH:  Yes, as an accommodation.

3              THE COURT:  Sure.  Where does he live?

4              MR. SUROVIC:  Canyon Lake.

5              THE COURT:  Which is a ways out.

6              MR. SUROVIC:  Yes, sir, it's outside of New Braunfels.

7              THE COURT:  I know where it is.

8              All right, Mr. Surovic your next witness.

9              MR. SUROVIC:  Your Honor, there's some clarification,

10   we had originally announced that Mr. Alongi was going to be a

11   witness for the United States, but we entered into a

12   stipulation of testimony with the defense and so Mr. Alongi has

13   come into the courtroom.  We have no objection to it.  I've

14   just consulted with defense counsel, they have no objection to

15   it.

16             THE COURT:  That's only the second time in my life

17   I've heard of Alongi as a last name.  The first time was when

18   my -- I married my niece to an Alongi.  Are you related to that

19   family?

20             MR. ALONGI:  Your Honor, it's A-lon-gee(ph) and I

21   don't know.  There are very few of us.

22             MR. MCHUGH:  But if it helps.

23             MR. ALONGI:  You know what, I think I remember.

24             THE COURT:  Well, I've got to know that, because I've

25   got to disclose it.

```
 1              MR. ALONGI:  It was a joke, Your Honor.  I don't know.
 2              THE COURT:  Because my niece is married to a Joe
 3    Alongi.  He's a mortgage broker.
 4              MR. ALONGI:  Is he from Chicago?
 5              THE COURT:  California.
 6              MR. ALONGI:  Probably not.
 7              THE COURT:  Not the same family.
 8              MR. ALONGI:  We came from a little town in Sicily, so
 9    it's named after that, it's a long story.
10              THE COURT:  You could go back to Adam and Eve, I
11    guess, but I'm talking about a reasonable trip back.
12              MR. ALONGI:  No, I can't.  We looked for each other
13    and it's rare when you find another Alongi.
14              THE COURT:  You're not the same family, I don't think.
15    Well, there's no relationship that I'm aware of.  That's fine.
16    I've got his testimony in stipulated form, I think.
17              MR. SUROVIC:  Correct, Your Honor.  I believe it's
18    even been filed already.
19              THE COURT:  So we're good.  Anybody intend to call him
20    back?
21              MR. SUROVIC:  No, Your Honor.
22              THE COURT:  Then he can stay in the courtroom then.
23              MR. SUROVIC:  Exactly, Your Honor.
24              THE COURT:  Next.
25              MR. ESPARZA:  The United States would call Anthony
```

```
 1   Ward.
 2            THE COURT:  We've got to get out of here by 4:45.
 3            MR. SUROVIC:  And Your Honor, that's one of the
 4   reasons why we picked him is we think he's going to be a short
 5   witness.
 6            THE COURT:  Come on up, sir.
 7            COURTROOM DEPUTY CLERK:  Please raise your right hand.
 8                             *   *   *
 9            (ANTHONY WARD, Government Witness, Sworn.)
10                             *   *   *
11            THE WITNESS:  Yes, ma'am.
12                        DIRECT EXAMINATION
13   BY MR. ESPARZA:
14   Q.  Good afternoon, Mr. Ward.
15   A.  Good afternoon.
16   Q.  Can you state your name for the record?
17   A.  Anthony Ward.
18   Q.  Could you please spell your last name?
19   A.  W-A-R-D.
20   Q.  Where are you currently employed right now?
21   A.  My Buddy's Pet Resort in San Marcos, Texas.
22   Q.  And this is in no way to embarrass you in any fashion
23   whatsoever, but do you have any criminal history?
24   A.  Yes, I do.
25   Q.  Just briefly what kind?
```

1  A.  Back in the late eighties I got in trouble for possession

2  and just a few other charges for theft, things like that.

3  Q.  But nothing recent?

4  A.  Nothing, nothing.

5  Q.  Did you do any time for what you did, any prison time?

6  A.  I did a few months in county jail, but that's as far -- I

7  didn't do anything else.

8  Q.  Do you know a Bradley Croft?

9  A.  Yes, I do.

10  Q.  Is he in the courtroom today?

11  A.  Yes, he is.

12  Q.  Can you identify him and point to him, name an article of

13  clothing that he's wearing?

14  A.  Black jacket, good-looking gentleman over there.

15         MR. ESPARZA:  I'd like the Court to note that witness

16  has identified Mr. Croft.

17         THE COURT:  The witness's identification is noted.

18  BY MR. ESPARZA:

19  Q.  Did you ever get involved in any sort of business with

20  Mr. Croft regarding Universal K-9?

21  A.  We spoke about it, but nothing official ever came of it.

22  Q.  Did you ever receive a salary?

23  A.  No, I did not.

24  Q.  Did you ever offer your name or likeness for Mr. Croft to

25  use to promote the business?

1   A.   I did at one point, yes, I did.

2   Q.   At approximately what time did you offer that?

3   A.   In the beginning when he was going through the application

4   process.  He's a life-long friend, so I offered whatever help

5   that I could.

6   Q.   Do you know what year that was?

7   A.   Probably around 2012, that's when I came back and I was at

8   Texas State University.

9   Q.   And did you ever retract that offer?

10  A.   In 2017 when we decided to go our separate ways, that was

11  the only time I said, hey, can you take my name off the trucks

12  and things like that, but that was it.

13  Q.   Do you know approximately when it was in 2017?

14  A.   Probably around May or April, somewhere around there.  I

15  can't remember exactly.

16        MR. ESPARZA:  Can you pull up Exhibit 24, page nine

17  please, second page.

18  BY MR. ESPARZA:

19  Q.   This is Exhibit 24, it's already been admitted.  This is a

20  return filed by Universal K-9 regarding the charity.  Can you

21  see it says part eight, box one, do you see your name anywhere

22  on there?

23  A.   Yes, I do.

24  Q.   And what does it have you listed as?

25  A.   The treasurer.

1  Q.  And if we can go back to page one.  So this was filed for

2  tax year 2017 which began in January 1st and ended in

3  December 31st of 2017.  You said 2017 was the year you had

4  asked him to retract your name, correct?

5  A.  Yeah, I had been telling him right after the ski season, so

6  it was April, so probably around May or June, April, May.

7  Q.  Throughout 2017 did you ever do any work as a treasurer for

8  Universal K-9?

9  A.  No, sir, I did not.

10 Q.  Moving on, were you ever involved in the purchase of

11 vehicles for Mr. Croft?

12 A.  Yes, I was.

13 Q.  The first vehicle, do you remember what it was?

14 A.  Dodge Ram 1500.

15       MR. ESPARZA:  Can you pull up Exhibit 29 please and

16 let's go to page -- page number five.  Try six.

17 BY MR. ESPARZA:

18 Q.  This is a purchase form for a white Dodge pickup at San

19 Marcos Dodge.  The year, can you see what's under box two?

20 A.  Yeah, I can see it.

21 Q.  What does it say?

22 A.  2014.

23 Q.  And if we'll zoom up the bottom where the signatures are

24 and under signature purchaser, whose name is listed there?

25 A.  My name and that is my signature.

Anthony Ward - Examination                   146

1   Q.   That is your signature?

2   A.   Yes, sir.

3   Q.   Why did you purchase this vehicle?

4   A.   Mr. Croft is a life-long friend and at that time we had

5   spoke, I think he was going through a divorce or just finishing

6   up his divorce and he had wrecked his Honda Odyssey and he

7   needed to get a new vehicle and he wanted to see if I could put

8   it in my name just because he was going through a divorce and

9   he felt -- that's what he asked me to do.

10  Q.   Why did you choose this dealership in particular?

11  A.   I had a friend that had worked there and because at the

12  time I was in school full-time, I didn't really have an income

13  and I had a friend that I knew that could possibly get us

14  financed.

15  Q.   So you didn't have a job at the time?

16  A.   No, I was in school full-time.

17  Q.   Okay.  Now, the vehicle, was it in your name only?

18  A.   Yeah, I mean as far as that's what it looks like right

19  here.

20  Q.   Did you make any payments on the vehicle?

21  A.   No, I did not.

22  Q.   Did you put any money down that day on the vehicle?

23  A.   No, I did not.

24  Q.   Let's show Exhibit 16, page 331.  I'm showing you what's

25  been marked as Exhibit 16, it's page 331.  There is a check

1    that's issued.  Can you read where it says payoff account

2    forward?

3    A.   Payoff account number 7443001, customer Anthony Ward.

4    Q.   And what's the check's total amount for?

5    A.   $9,703.42.

6    Q.   And go back.  And where it says remitter, can you read who?

7    A.   Remitter purchased by Universal K-9, Inc.

8    Q.   Now, the check says that it was for the account in your

9    name.  Did you issue or purchase that cashier's check for that

10   amount?

11   A.   No, I did not.

12   Q.   You said that you purchased this vehicle for Brad, correct?

13   A.   Yes, I helped him purchase it.

14   Q.   Did you ever transfer title into his name?

15   A.   No, I think the title was transferred out of my name, but I

16   never transferred it into his name.  No, I never did.

17   Q.   And did he ever pay you any money for the vehicle?

18   A.   No, just a favor for a friend.

19   Q.   Is this the only time you've done this sort of favor for

20   Mr. Croft?

21   A.   No, I've done it one other time, sir.

22   Q.   And that other time, what was it for?

23   A.   I wasn't living in town, I was living in Aspen, so I can't

24   tell you exactly what type of truck it was, but I believe it

25   was for the same type of truck.

1    Q.  So another Dodge Ram?

2    A.  Yes, sir.

3         MR. ESPARZA:  Can you pull up Exhibit 28, page three?

4    BY MR. ESPARZA:

5    Q.  This is the application for a Texas title.  Under

6    applicant, whose name is listed?

7    A.  Anthony Ward.

8    Q.  And where it says previous owner, can you say who is listed

9    there?

10   A.  Ancira Chrysler Jeep Dodge.

11   Q.  Under box two, what year was the vehicle?

12   A.  2016.

13   Q.  And the make?

14   A.  Ram.

15   Q.  And the color?

16   A.  White.

17   Q.  So was this the second vehicle?

18   A.  Yes, sir.

19   Q.  Again if we scroll to the bottom, under the

20   applicant/owner, whose name is listed?

21   A.  That's my name, but that's not my signature.

22   Q.  And did you authorize somebody to sign for you?

23   A.  I did.  He had sent me the paperwork and at that time me

24   and Mr. Croft were friends, so I told him that he had carte

25   blanch to signing my name for me.

1   Q.  Again this was because you were in Colorado, correct?

2   A.  Yes, sir.

3   Q.  This vehicle, did you make any payments on it?

4   A.  No, sir, I did not.

5   Q.  Did you put any cash down that day?

6   A.  No, sir, I did not.

7          MR. ESPARZA:  Let's go to Exhibit 16, page 340 and

8   339.  Can you put them upside by side?  Actually just do 340.

9   BY MR. ESPARZA:

10  Q.  So you're looking at another cashier's check from Bank of

11  America.  Who is it paid to, can you see?

12  A.  Pay to the order of Ancira.

13  Q.  And again who is the remitter under?

14  A.  It's Richard Cook and Universal K-9, Inc.

15  Q.  And again did you pay any money at all on this vehicle?

16  A.  No, no, sir.

17  Q.  So you didn't issue any cashier's check?

18  A.  No, sir, I did not.

19  Q.  Now, you said earlier you never received any salary from

20  Universal K-9, correct?

21  A.  Yes, sir.

22  Q.  Approximately how long did you work there for without a

23  salary?

24  A.  I don't think that I ever actually technically worked

25  there.  I was just more of a -- if I could use the term, like

1  consultant, calling me bouncing things off, but never at any

2  time was I employed by the company.

3  Q.  Okay.  So did you ever receive any money from Mr. Croft?

4  A.  He did loan me some money as a friend, but not anything

5  through Universal K-9 or anything like that.

6  Q.  So you said he loaned you some money, but that wasn't

7  related to --

8  A.  No, had nothing to do with it, just one buddy helping out

9  another.

10  Q.  Both of the trucks, the Dodge Rams, the 2014 and 2016, do

11  you know what happened to them afterwards?

12  A.  Just from what I've heard from the news and everything

13  else, that you guys confiscated them.

14  Q.  These trucks in particular or just you know that some

15  trucks were seized?

16  A.  Just some trucks were seized.

17  Q.  So you're not a hundred percent sure what happened to the

18  2014 or 2016?

19  A.  No, I don't know.  You would have to tell me exactly what

20  happened.

21          MR. ESPARZA:  No further questions, Your Honor.

22          THE COURT:  Cross.

23          MR. BROOKS:  Briefly, if I might, Your Honor.

24                      CROSS-EXAMINATION

25  BY MR. BROOKS:

1   Q.  Mr. Ward, my name is Will Brooks.  I'm here representing

2   Brad today.  How would you like me to refer to you, Anthony or

3   Mr. Ward?

4   A.  Anthony, Tony, I answer to any of those.

5   Q.  Tony, just a couple questions, if I might.

6   A.  Yes, sir.

7   Q.  You were shown a couple of documents, correct?

8   A.  Yes, sir.

9   Q.  Some being the sales of a Dodge Ram and title and things

10  like that?

11  A.  Yes, sir.

12  Q.  Others being formation documents for Universal K-9?

13  A.  When you say formation documents, can you --

14  Q.  Where you were asked if you were an officer or treasurer.

15  A.  Yes, sir, I saw those.

16  Q.  In respect to those vehicles, the Dodge Ram, do you know

17  how that vehicle was used from the time that it was purchased

18  in 2014?

19  A.  I do not know directly.  I would assume that it was used

20  for work.

21  Q.  And you were listed as the treasurer for that particular

22  business, correct?

23  A.  Yes, I was, sir.

24  Q.  So as far as you know, that truck was used for work,

25  correct?

1    A.  As far as I know.

2    Q.  And then in respect to the 2016 Dodge Ram, same question,

3    do you know how that truck was used?

4    A.  I do not know directly, but if I had to assume, yes, I

5    would say it probably was used for work.

6    Q.  Do you know what Universal K-9 is?

7    A.  Yes, sir, I do.

8    Q.  What was it in your understanding?

9    A.  It was a dog training school, dog training business that

10   ended up becoming a school.

11   Q.  And in your words, you allowed Universal K-9 to use your

12   likeness and your name to a point, correct?

13   A.  Yes, sir, I did.

14   Q.  And you didn't retract that permission until 2017, is that

15   correct?

16   A.  Yes, sir.

17   Q.  Have you yourself ever owned a small business?

18   A.  I've got an LLC called Big T Athletics, LLC.

19   Q.  Do you wear different hats for that business?

20   A.  Yeah, sometimes.

21   Q.  Can it be challenging to do different roles or different

22   tasks?

23   A.  Yes, sir, you can't -- you've got to be a good time

24   management person.

25   Q.  So it involves different sorts of skill sets, right?

1    A.   Yes, sir.

2    Q.   What are you doing now, if I might ask?

3    A.   I run a pet resort in San Marcos, Texas.

4    Q.   You said you got back here after the ski season?

5    A.   In April of '17 I got back here after the ski season.  And

6    then I've been gone -- I've been going to school in Santa

7    Monica College in -- I went back to Colorado after I left in

8    2017 and worked at a hotel.  And then I transferred from that

9    hotel to another hotel and then I was in school taking classes

10   at that time.  And I just moved back home probably about three,

11   maybe four months ago.  May 23rd was the day that I hit the

12   ground here.

13   Q.   So from about 2017 on, you're back and forth between

14   California and Colorado?

15   A.   Well, I pretty much been in Colorado, then I went to

16   California for 18 months, then I came here.

17   Q.   I'm hanging out with you later.

18          MR. BROOKS:  No further questions.

19          THE WITNESS:  It's not that glamorous, I promise you.

20          MR. ESPARZA:  Just a couple questions, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MR. ESPARZA:

23   Q.   As an officer, like you were listed as treasurer, did you

24   ever meet with a Stephen Peek or a Richard Cook to hold a

25   business meeting?

1    A.  No, sir, I did not.

2    Q.  And then just going back to those two Dodge Rams, did you

3    ever take possession and control of the vehicles?

4    A.  No, I did not.

5    Q.  Who took possession and control of the vehicles?

6    A.  I would assume it was Mr. Croft because I wasn't in town

7    when it happened.

8    Q.  For the second one, correct?  You were in town for the

9    first one, correct?

10   A.  Yeah, but I wasn't there when it actually got picked up

11   either.

12   Q.  And then in your brief time as a consultant, who in your

13   mind owned and operated Universal K-9?

14   A.  From what I knew that I can be absolute, Richard Cook and

15   Mr. Croft.

16   Q.  Do you know their positions?

17   A.  I couldn't tell you what their formal titles were.  I just

18   know that Mr. Cook was the one that actually was listed as the

19   president and that's just because what I read in the newspaper

20   and Mr. Croft was director.

21   Q.  What about your personal knowledge, not from the newspaper,

22   but from when you were trying to come on board?

23   A.  Oh, I would say both of them were running it.

24           MR. ESPARZA:  Okay.  No further questions.

25           MR. BROOKS:  No further questions at this time, Your

1    Honor.

2          THE COURT:  You can just tell me from over there.  You

3    don't have to walk all the way over to do it.

4          MR. ESPARZA:  Your Honor, we request that he be

5    permanently excused.

6          THE COURT:  He can be excused, he doesn't have

7    anything more to offer, I don't think.

8          MR. BROOKS:  No objection to that.

9          THE COURT:  You can be excused, sir.  All right.  We

10   will see you tomorrow morning at the usual time and the usual

11   place.

12         MR. SUROVIC:  Yes, sir.

13         COURT SECURITY OFFICER:  All rise.

14          *(4:36 p.m.)*

15                         *   *   *

16

17

18

19

20

21

22

23

24

25

BENCH TRIAL PROCEEDINGS                    156

1                          *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  October 21, 2019

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25