1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3   UNITED STATES OF AMERICA        :
                                     :
4   vs.                             : No. SA:18-CR-00603
                                     : San Antonio, Texas
5   BRADLEY LANE CROFT(1),          : October 10, 2019
    Defendant.                      :
6   *********************************************************

7        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS (Volume 3)
             BEFORE THE HONORABLE DAVID A. EZRA
8           SENIOR UNITED STATES DISTRICT JUDGE

9   APPEARANCES:
    FOR THE GOVERNMENT:
10    Gregory J. Surovic, Esquire
      Fidel Esparza, III, Esquire
11    United States Attorney's Office
      601 N.W. Loop 410, Suite 600
12    San Antonio, Texas  78216
      (210)384-7020; greg.surovic@usdoj.gov
13

14  FOR THE DEFENDANT:
      Thomas Joseph McHugh, Esquire
15    William A. Brooks, Esquire
      Law Offices of Thomas J. McHugh
16    130 E. Travis Street, Suite 425
      San Antonio, Texas  78205
17    (210)227-4662; thomasjmchughlaw@gmail.com

18

19

20  COURT REPORTER:
    Angela M. Hailey, CSR, CRR, RPR, RMR
21  Official Court Reporter, U.S.D.C.
    655 East Cesar E. Chavez Blvd., Third Floor
22  San Antonio, Texas  78206
    Phone(210)244-5048
23  angela_hailey@txwd.uscourts.gov

24  Proceedings reported by stenotype, transcript produced by
    computer-aided transcription.
25

**I N D E X**

**GOVERNMENT WITNESSES:**                                    **PAGE**

**DUSTIN BRAGG**

By Mr. Surovic                              12, 59, 67

By Mr. McHugh                                  28, 63




**RAYMUNDO NUNEZ**

By Mr. Surovic                                 69, 103

By Mr. Brooks                                       88




**WESLEY KEELING**

By Mr. Surovic                          105, 181, 186

By Mr. McHugh                              132, 184

BENCH TRIAL PROCEEDINGS                    3

1   *(Thursday, October 10, 2019, 9:16 a.m.)*

2                          *   *   *

3            COURT SECURITY OFFICER:  All rise.

4            THE COURT:  Please be seated.

5            COURTROOM DEPUTY CLERK:  SA:18-CR-00603, United States

6   of America versus Bradley Lane Croft.

7            MR. SUROVIC:  Greg Surovic for the United States,

8   Fidel Esparza.  We're present and ready.

9            THE COURT:  All right.

10           MR. SUROVIC:  Just want to advise the Court that last

11  night I was e-mailed actually turned out to be 45 e-mails from

12  Mr. Stanley.  It looks like a huge amount, but I've already

13  pointed out to counsel that 200-some odd pages of this is an

14  Air Force regulation that was an attachment.  I printed out the

15  attachments that went with each e-mail as well.  There were two

16  contracts that are about 80 pages long, so it's not this huge,

17  but they have been printed out and I have provided them to the

18  defense.

19           THE COURT:  All right.

20           MR. MCHUGH:  Good morning, Your Honor.  Tom McHugh and

21  Will Brooks.  We represent the defendant, he is in the

22  courtroom.  We're ready to proceed.  I have a procedural matter

23  to address with the Court and on the record.

24           THE COURT:  All right.

25           MR. MCHUGH:  Thank you, Your Honor.  Your Honor, both

BENCH TRIAL PROCEEDINGS                    4

1   sides in this case waived a jury.

2          THE COURT:  Right.

3          MR. MCHUGH:  And both the government and the defendant

4   and his representatives are well aware and have great respect

5   for the history of this Court.  I want to say that as a matter

6   of record and I know that you've been a jurist for many years.

7   I know that you've sat, you've participated on the Ninth Court.

8          THE COURT:  Ninth Circuit Court of Appeals.  Actually

9   I hold the all-time record for the number of designations.

10  They've asked me back that many times.  The Chief Judge called

11  me one time and said he had just gotten some statistics and he

12  said, "I want you to know that you hold the all-time record for

13  the most times anybody has ever been invited to sit with us

14  from the history of the court from 1800 something."  I said, "I

15  don't know if that's a great thing."

16         MR. MCHUGH:  I think it is and it speaks to the

17  respect that that Court has for Your Honor.  In addition to

18  that, Your Honor, the government brings with it vast experience

19  into the courtroom today of which I can only compliment and I

20  only respect.  Representing the defendant, I've been around the

21  block a couple of times.

22         THE COURT:  You're a very experienced lawyer for whom,

23  by the way, I have the greatest personal regard and great

24  respect.

25         MR. MCHUGH:  The statement -- and I shared this with

1   Mr. Surovic this morning that I would like to make to the

2   Court, it's my statement to the Court, not a joint statement to

3   the Court, but recognizing the experience of the jurist of Your

4   Honor, the attorneys in the courtroom and the fact that it's

5   being tried to the Court and not a jury and I have discussed

6   this with my client, Bradley Croft, that there were

7   opportunities during the evidence of objections that could have

8   been made by both sides.

9           THE COURT:  Sure.

10          MR. MCHUGH:  And those objections relate to relevance,

11  to foundation, to uncharged conduct to beyond the scope of

12  redirect, a lot of that.  And for the most part, there have

13  been no objections.  I know that this Court -- I believe

14  there's been one objection from each side, I think that --

15          THE COURT:  There have not been many and I would

16  absolutely agree with you that there were many opportunities

17  for counsel to have made like hearsay objections or leading

18  objections.  There wasn't really anything critically

19  substantive.  I mean like somebody trying to get in a critical

20  piece of evidence which would have damaged their position and

21  they didn't stand up and object.  That kind of thing didn't

22  happen.  But these were more the kinds of objections that one

23  would want to make in front of a jury to make sure that they

24  don't get misled, but which I understand and I will not be

25  misled.

1           MR. MCHUGH:  And the defendant understands through my

2    consultation with him that this Court surely has the ability to

3    sort out what is relevant to the charged conduct and what is

4    not relevant.

5           THE COURT:  That is true.

6           MR. MCHUGH:  And for that reason, and the defendant is

7    also attempting to accommodate the Court by not going to the

8    jury by entering into these stipulations.  And additional

9    stipulations will be entered into.

10          THE COURT:  Although I have to say I never suggested

11   to anybody that they waive a jury.

12          MR. MCHUGH:  That's fully understood, Your Honor,

13   fully understood.  This was presented to Your Honor.

14          THE COURT:  The crazy thing is that one of my very

15   best friends is now Chief Judge Michael Seabright, J. Michael

16   Seabright in Hawaii, and he was an AUSA for many years before

17   he was appointed to the bench, tried many cases in front of me.

18   He is now the Chief Judge there.  And he just had a white

19   collar defendant waive jury.  And so I wrote him, I said, "I

20   don't know, Mike, I think we live in parallel universes here."

21   And he's been a federal judge for maybe 12 years, maybe 15

22   years.  He said this is the first time it's ever happened to

23   him.  And it isn't the first time it's happened to me, I've had

24   it done many times, but there aren't many.

25          MR. MCHUGH:  I've had relatively few in my career.

 1   Mr. Olivares shared with me this morning that this is his
 2   first, so but part of that is that --
 3               THE COURT:  I'm waiting for the other shoe to drop.
 4               MR. MCHUGH:  No, there is no other shoe to drop, Your
 5   Honor.  And now I've lost my most important point.
 6               THE COURT:  Think about it.  You have plenty of time.
 7   By the way, the reason that I was going to say something was I
 8   wanted to apologize to counsel for being a bit late this
 9   morning.  I try never to do that, but I did get a call that I
10   needed to respond to.  And because I have sat on the Judicial
11   Conference and been on a number of committees and I have a
12   background that some of the other judges here do not have and I
13   know a lot of the people up there, it's not uncommon for me to
14   get calls from relatively new Chief Judges or even our own
15   Chief Judge to ask me questions, just ask me questions about
16   things that they know that I am aware of because that's the way
17   we work.  When I was a new Chief Judge, I was calling people
18   who were seasoned Chief Judges and as you know I had been Chief
19   Judge in Hawaii for seven years.  But rather than my Chief
20   Judge experience, they're more interested in my familiarity
21   with the workings of the Judicial Conference and other things
22   because I was there.  So go ahead, I was giving you some time
23   to try to recapture your memory.
24               MR. MCHUGH:  It's gone.  There is no other shoe to
25   drop.  Thank you, Your Honor.

BENCH TRIAL PROCEEDINGS                    8

1          THE COURT:  You just wanted to tell me --

2          MR. MCHUGH:  I just wanted to make a record.

3          THE COURT:  Make a record that you had not made --

4          MR. MCHUGH:  That I had conferred with client, there

5    were opportunities for objections to be made, I did not make it

6    because I understood because this Court can sort it out, this

7    Court knows what is relevant, what is leading and what the

8    proper objections may have been.

9          THE COURT:  Let me query your client so that there's

10   no mistake about it.

11         You agree with what he has said, he's talked to you

12   about all of this?

13         THE DEFENDANT:  Yes, sir, yes, sir.

14         THE COURT:  Yeah, we don't -- you can be seated, thank

15   you.

16         THE DEFENDANT:  Okay.

17         THE COURT:  In what we call non-jury or jury waived,

18   sometimes there's cases where you can't get a jury.  I had a

19   very big case in Austin and it was a serious case.  I mean this

20   is a serious case obviously, but this was also a serious case.

21   That was a civil case where a soldier had kind of gone off the

22   rails and shot and killed his wife, a neighbor, another woman

23   that he killed, yeah, he killed another woman and then killed

24   himself.  So it was a case against the United States.  It was a

25   terrible case, but when you sue the United States, you don't

1  get a jury.  There's no jury.  So with that much at stake, you

2  think people -- and if there had been a jury, they would have

3  been objecting to everything under the sun, but we had very few

4  objections in that case because they recognize that an

5  experienced District Judge is going to focus in on the facts

6  that have been proven or not proven and I'm going to hold the

7  government to a standard beyond a reasonable doubt.  I have

8  absolutely no inclinations in this case one way or the other.

9  I don't know the defendant and the government doesn't get any

10  breaks in my court.  As a District Judge, anybody who

11  researches my history will see that I have granted motions to

12  suppress in cases where granting the motion to suppress clearly

13  extinguished the government's case.  I've also granted

14  judgments of acquittal.  I'm not saying I'm going to do that in

15  this case, I don't know, I haven't heard all the evidence, but

16  I'm keeping an absolutely open mind here and I am not going to

17  be swayed by prejudice or sympathy.  I am not going to be

18  swayed by questions.  See, oftentimes lawyers will take

19  shortcuts, and this is even in front of the jury, where they

20  will lead a witness on non-controversial matters, matters that

21  don't have anything to do with anything, like an expert's

22  background or something of that kind or somebody else's

23  background or where they were the day before or, you know,

24  those kinds of things.  And oftentimes lawyers feel compelled

25  to object and I treat those objections and rule on them.  But

1    in a non-jury trial, the general rule is that lawyers don't get

2    up and object because it doesn't mean anything.  And the Court

3    of Appeals judges understand this.  I know from my own

4    experience.  And I have great respect for the Fifth Circuit

5    Court of Appeals.  I've never had the pleasure of sitting with

6    them, I don't know that I ever will, but I certainly respect

7    the judges there.  I know many of them.  I'm personal friends

8    with many of them.  And I knew many of them before I ever came

9    here because of my -- I was Vice President of the Federal

10   Judges Association and several of those judges were involved

11   with that.  I was chair of the Benefits Committee.  I've

12   answered probably 10,000 questions in my career about judges'

13   benefits, you know, in calls and e-mails.  And so I know a lot

14   of judges around the country that maybe others might not.  And

15   we have fine judges on the Fifth Circuit, so they don't always

16   agree with me, they sometimes don't.  I on many occasion -- in

17   fact, I just got reversed in a case, it was a civil case where

18   I -- great judges on that panel and I wrote a note to them

19   saying that in going back, I recognized my error after I had

20   filed -- my mistake after I filed my order and subsequently had

21   changed my course in that area.  It was a case involving Title

22   Seven.  And I told them I thoroughly agree with them and

23   appreciated the way that they had treated me on appeal.

24   Because sometimes, you know, judges don't -- the Court of

25   Appeals don't treat District Judges in a very cordial manner

1    for mistakes that they may have made that were not so nice.

2            I once got reversed in a case where I was treated

3    really nastily and it was terrible.  It was just not a good

4    thing and I thought that the panel was wrong on the law and

5    wrong on the facts and they didn't treat me well.  They didn't

6    say anything nasty about me, but very dismissive, it was like I

7    had been flippant.  And then the Court of Appeals was reversed

8    9/0 by the Supreme Court.  So you never know, right?

9            So I appreciate that, I appreciate the placing that on

10   the record and I thought -- and we've talked about this, we

11   talk about this, we talk about procedure behind closed doors

12   and I've said to my colleagues that I thought the lawyers in

13   this case were doing a great job on both sides.  You know, this

14   is not a situation where I go back there and I'm worried.

15   Sometimes I'm worry -- and you know this, both of you have been

16   prosecutors -- where I really worry about whether the defendant

17   is getting good representation.  Sometimes I worry about

18   whether the United States is getting good representation, but

19   not this case, but I worry about whether -- I'm more concerned

20   about the defendant because that's my main job is to make sure

21   the defendant gets a fair trial here.  And first of all, I

22   would never have any concern about Mr. McHugh.  I've never met

23   the co-counsel here, but he did a great job on the witness that

24   he took.  And I have no concerns at all about the defendant

25   getting great representation here or the government presenting

1    the case in an appropriate and fair manner, which is what their

2    job is, so there we go.  So who's the next witness?

3          MR. SUROVIC:  Government will call Mr. Dustin Bragg

4    next, Your Honor.

5          THE COURT:  This is despite the fact, I might add,

6    that I am in a state of great depression today over the fact

7    that my Dodgers blew a 3-0 lead and gave up a grand slam and

8    lost and are now out in spite of an incredible season, very

9    depressing.  And I've been following the L.A. Dodgers since I

10   was probably seven years old.  So this is a case where you

11   might have not had a judge.  I might have had to go to the

12   culvert and jump in.  Maybe that would have been good, I don't

13   know.

14         MR. SUROVIC:  I understand the feeling.  My father

15   feels that way about the Yankees.

16         THE COURT:  Sir, come on up.

17         COURTROOM DEPUTY CLERK:  Raise your right hand.

18                    *   *   *

19         (DUSTIN CONNER BRAGG, Government Witness, Sworn.)

20                    *   *   *

21         THE WITNESS:  Yes, ma'am.

22         COURTROOM DEPUTY CLERK:  Have a seat, sir.

23                    DIRECT EXAMINATION

24   BY MR. SUROVIC:

25   Q.  Sir, would you state your full name please?

1    A.   Dustin Conner Bragg.

2    Q.   Can I get you to spell your last name for the record?

3    A.   B-R-A-G-G.

4    Q.   And how are you currently employed?

5    A.   With the Red Oak Police Department.

6    Q.   Where is Red Oak?

7    A.   Just south of Dallas on 35.

8    Q.   And what do you do for the Red Oak Police Department?

9    A.   Currently assigned to patrol as an officer in charge for

10   the Patrol Division.

11   Q.   You indicated that Red Oak is just south of Dallas.  Is it

12   close to a town by the name of Midlothian?

13   A.   It is.

14   Q.   About how far between Red Oak and Midlothian?

15   A.   It's just east of Midlothian, maybe seven or 8 miles.

16   Q.   And how long have you worked as a police officer?

17   A.   Since August of 2006.

18   Q.   Do you know an individual by the name of Brad Croft?

19   A.   I do.

20   Q.   Is he present in court today?

21   A.   He is.

22   Q.   Could you point him out and describe an article of clothing

23   he's wearing or something like that?

24   A.   Bald, jacket, black shirt.

25        MR. SUROVIC:  Your Honor, request the record reflect

1   that the witness has identified the defendant, Mr. Brad Croft.

2           THE COURT:  Yes, right, the record will so reflect.

3   BY MR. SUROVIC:

4   Q.  When did you first hear about a -- let me ask you this way.

5   Have you heard of a place called Universal K-9?

6   A.  Yes, sir, I did.

7   Q.  When did you first hear about Universal K-9?

8   A.  Actually from my chief.  We were looking to start a K-9

9   program and that's the person that we decided to go with, the

10  company that we decided to go with.

11  Q.  Approximately when was that?

12  A.  Been a handler for little over five years, so not exactly

13  sure the month and the year that we were actually down there.

14  Q.  It was five years -- this is 2019, so we're talking

15  possibly 2014.  Does that sound about right?

16  A.  Approximately, yes, sir.

17  Q.  Why did you and your chief select Universal K-9?

18  A.  Because the Midlothian office or Wes Keeling was actually

19  either had just gone through or was fixing to go through the

20  Universal and he kind of -- him and my chief used to work

21  together, so it was kind of a, hey, this is a company to go

22  with and this is who we chose.

23  Q.  Had you known Wes Keeling prior to that?

24  A.  No.

25  Q.  Do you recall when you first met Mr. Brad Croft?

1  A.  I don't recall the actual date or when, but I was sent from
2  my department to San Antonio to go through the handler's
3  course.
4  Q.  And that would have been five years or more ago?
5  A.  Yes, sir.
6  Q.  What were the circumstances behind your first meeting?
7  A.  I was at a hotel, he met me at the hotel.  I was given my
8  dog and then I stayed at the hotel and then I met him for
9  training during the day.
10 Q.  At that time, where was Universal K-9 operating out of?
11 Did you actually go to the Universal K-9 school?
12 A.  I did not.
13 Q.  Facility?
14 A.  It was out of his residence.
15 Q.  Could you describe for the Court the training that you
16 received?
17 A.  I was given instructions on a little bit of classroom, the
18 instructions on behavioral changes as far as buildings for
19 narcotics searches, narcotics searches on vehicles and then
20 tracking.
21 Q.  Had you received dog handler training prior to coming to
22 this course?
23 A.  I had.
24 Q.  What type of training did you receive then?
25 A.  It was another training course that I believe it was U.S.

1    K-9 tactical and it was in Abilene.

2    Q.  Why did you need to get this second dog handler training?

3    A.  New dog, new course and it had been several years since I

4    had been through a handler's course.  In law enforcement,

5    you're continuously going through updates, different classes to

6    bring you up to speed on the current trends and things that are

7    happening.

8    Q.  Who are the trainers at Mr. Croft's school when you were

9    going through getting your training?

10   A.  Just Mr. Croft.

11   Q.  Did you ever meet anyone else that actually provided you

12   training while you were down there?

13   A.  No, not at that time, no.

14   Q.  Did you stay in contact with Mr. Croft after you completed

15   his school?

16   A.  I did for the first couple years into handling.

17   Q.  Why?

18   A.  Because he was the guy to go to for recertifications for

19   the dog once a year and then he was the trainer.  That's who we

20   had for a trainer.

21   Q.  At some point, did you come to any agreements with

22   Mr. Croft about doing extra things for him?

23   A.  I didn't with him.  Wes Keeling I did.  He had an

24   interdiction class that he was teaching.  I was very skilled

25   and knowledgeable in the interdiction portion because that's

1    what I did for my department, so I helped Keeling teach that

2    class.  I believe it wasn't any more than three times.

3    Q.  Wes Keeling, can you tell us a little bit about him?

4    A.  Wes Keeling, I met him at the time he was employed with

5    Midlothian Police Department.  He had actually had a dog,

6    Remmie, that had gone through Universal K-9's training as well.

7    Q.  Did he go through training the same time you did?

8    A.  No, he had actually gone through before and I don't know if

9    it was a month or two before or couple weeks before or even a

10   year before.  I don't recall when that actually took place.

11   Q.  Okay, but he had gone through Universal K-9 for training?

12   A.  Yes, sir.

13   Q.  What exactly did -- by the way, Wes Keeling is a police

14   officer in Midlothian, is that correct?

15   A.  He was at the time, yes, sir.

16   Q.  At that time?

17   A.  Yes.

18   Q.  What did Mr. Keeling have you do for him.  What was the

19   purpose of the interdiction course?

20   A.  I handled -- I had some videos and things of traffic stops

21   and things of narcotics loads, money seizures and weapons

22   seizures that I made on the streets.  I had also during the

23   portion of the class taught the evidence collection and

24   evidence processing because at the time I was also over our

25   property room, so it's kind of things to do to keep as little

1  chain of custody as possible without having a bunch of people's

2  hands in the property and as the evidence for when it goes to

3  courts, so how to process and those types of things for court.

4  Q.  Did this course have a particular student that it was

5  trying to focus on?

6  A.  It was --

7  Q.  Population at least?

8  A.  No, it was geared for officers that had dogs, the

9  interdiction for K-9 handlers.

10  Q.  Would it be a type of course that was tailored for police

11  officers or for anybody in off the street?

12  A.  Strictly police officers.  I hold a certificate through

13  TCOLE for instructor and it's for police officers only.

14  Q.  In fact, was that one of your requirements for people that

15  were registered for the course?

16  A.  Right, they had to be law enforcement.

17  Q.  Was that because you were using law enforcement sensitive

18  information when you were conducting the course?

19  A.  Correct.

20  Q.  Did Mr. Croft ever discuss with you his idea to get the

21  Universal K-9 approved for V.A. G.I. Bill funding so the

22  students could pay for the course through the G.I. Bill?

23  A.  It was mentioned when I was down there going through that,

24  I think that he had applied for it a couple times before and

25  was denied, but from the time when he actually got approved, I

1  wasn't down there and hadn't been there since.  That was
2  actually approved.
3  Q.  What period of time are we talking about that you were
4  helping Wes Keeling do these interdiction courses?
5  A.  It was probably a good two years after I got my first dog
6  through universal, around about -- I don't know in exactly what
7  month or what class.  I only taught the class -- I think the
8  maximum I taught the class was three times.
9  Q.  What type compensation did you get for teaching the class?
10 A.  Wes Keeling, he paid me I believe a hundred dollars to
11 teach a class.  A hundred dollars to teach a class is peanuts.
12 I normally make anywhere from 45 to $50 an hour, so it's more
13 me giving back to other officers so that whenever they do go to
14 court, they're able to keep their finds and things they have,
15 it's just a preparation.
16 Q.  Did Mr. Croft ever talk to you?  We're talking about
17 Mr. Croft, nobody else, but Mr. Croft.  Did he ever talk to you
18 about training veterans for him?
19 A.  No, sir.
20 Q.  Did he ever talk to you about joining his staff to be a dog
21 trainer?
22 A.  No, sir.
23 Q.  Did you ever conduct a K-9 handler or K-9 trainer class for
24 Mr. Croft?
25 A.  No, I did not.

1  Q.  What else did you do for Mr. Croft?

2  A.  That's it.  I was down there for the re-cert. of my dog and

3  that was it.

4  Q.  Did you ever train a dog for Mr. Croft?

5  A.  I did.

6  Q.  Tell us about that.

7  A.  I was given a Lab that was actually -- it was my first dog

8  actually to do to imprint and things in narcotics.  Wes Keeling

9  was the one that actually helped me do that.  I was going over

10  his house and he was coming to my house.  I was told that I

11  would be given $500 a dog to just do the imprinting and whatnot

12  and that would actually finish the dog off and certify the dog

13  as far as narcotics and narcotics only.  The process was only

14  supposed to take about a month.  I ended up and had the dog

15  more than three months.  And then I was asking where is

16  payment, those types of things.  And then it never came through

17  and I think I was given like $150 for that.  I was told that

18  the dog wouldn't certify narcotics and that the dog had worms.

19  I know that that was a lie because we were able to do that

20  here.  And then when Wes actually took the dog back to San

21  Antonio, he didn't meet standards, so that was pretty much it.

22  And I was paid through Keeling, I wasn't actually paid through

23  Mr. Croft.

24  Q.  So you only got 150 for training that dog?

25  A.  Yes.

1  Q.  Did you do any other work for Mr. Croft?

2  A.  No, I did not.

3  Q.  You indicated you were always paid through Wes Keeling.

4  How much money total did you get through Wes Keeling for work

5  that you did for Universal K-9?

6  A.  It was just the dog through him.  Wes had actually paid I

7  believe it was a hundred dollars a class, an interdiction class

8  that I taught him.  Wes being the instructor and the creator of

9  that class I guess is why I was paid through Keeling versus

10 Mr. Croft.

11 Q.  So total you said two or three classes?

12 A.  Yes, sir, I believe it was more like two than it was three,

13 but it was right at a hundred dollars a class.

14 Q.  So you got maybe 350 to $450?

15 A.  At most, yes, sir.

16 Q.  When did you stop working for Universal K-9 or for Wes

17 Keeling?

18 A.  When I received my -- I had only been to San Antonio a

19 handful of times during those couple of years and it was just

20 for the re-cert., so I really wasn't working for Mr. Croft at

21 any point in time with the exception of the one dog that I

22 tried to do and they said that I failed at.  And then to help

23 Mr. Keeling teach those interdiction courses, so maybe two

24 years.

25 Q.  Why did you stop working for Universal K-9?

1   A.  Well, we switched.  When my dog that I had, it was a

2   Belgian Malinois.

3            THE COURT:  How do you spell that?

4            THE WITNESS:  Actually I'd have to Google it.  I

5   believe it's M-A-I-L-O-U-S or something of that effect.

6   A.  The dog that I was given I was told that he was

7   approximately four years old, not a completely young dog, but

8   not an old dog at all.  Come to find out he was seven or eight

9   years old at the time.  And then I worked him on the streets

10  for approximately two years, two or three years and then he

11  passed away.  I was very devastated that the dog was actually

12  older than what was implied and told.

13           THE COURT:  And who told you that?

14           THE WITNESS:  The vet.

15           THE COURT:  The vet told you -- no, no.  Who told you

16  that it was younger?

17           THE WITNESS:  Mr. Croft.

18  BY MR. SUROVIC:

19  Q.  How did that affect your relationship with all the classes

20  going on at Universal K-9?

21  A.  It's very disheartening.  Spent -- that dog almost cost me

22  a divorce a couple of times as far as being on call 24/7 for

23  the Department all the time and effort put into that dog.  I

24  spent more time with that dog than I did with my wife and my

25  kids.

1   Q.   That's not uncommon for an animal --

2   A.   It's not uncommon whenever you're in a specialized unit,

3   but needless to say, there's a lot of time that goes into the

4   training and whatnot and to keep those records and things up,

5   so it's very disheartening to -- hard to come to an end like

6   that.

7   Q.   Let me ask you, the times that you were going down to do

8   training, both for yourself and then for the interdiction

9   course and working the dog, who was the owner of Universal K-9?

10  A.   Brad Croft.

11  Q.   Who was in charge of making all the decisions at Universal

12  K-9?

13  A.   Brad Croft.

14  Q.   Did you ever meet an individual by the name of Richard

15  Cook?

16  A.   I did not.

17  Q.   At any time during the period when you had a relationship

18  with Universal K-9 from the time of your training onward, did

19  you ever give Mr. Croft permission to use your name and your

20  TCOLE certificate to obtain approval for the V.A. and Texas

21  Veterans Commission for certifying forces for the G.I. Bill?

22  A.   No, sir.

23  Q.   I'm going to show you Government Exhibit 6f.  And sir, if

24  you'll take a look at this, there should be a screen up there.

25  First of all, we'll zoom into the top so you can see this is an

1    e-mail from Brad Croft, dated October 4, 2015.  You're not in

2    the distributional line for this, is that correct?

3    A.  Correct.

4    Q.  And it's got a number of attachments to it.  We'll go into

5    those in a second.  If we could scroll down, do you see

6    paragraph seven?

7    A.  Yes, sir.

8    Q.  Talks about roster of administrative and instructional

9    staff.  Do you see that?

10   A.  Yes, sir.

11   Q.  And it also talks here about in part B of that paragraph,

12   "Instructor certifications are enclosed herein. (See Texas

13   Commission On Law Enforcement certification, TCOLE, for

14   Universal K-9 Academy's curriculum supervisor Corporal Wesley

15   Keeling and instructor Dustin Bragg."

16       Did you ever agree to be an instructor for Universal K-9?

17   A.  No, sir, I did not.

18   Q.  Did you authorize them to send in your TCOLE certificate as

19   part of your application?

20   A.  No, sir, I didn't.  Those records that we have are like

21   gold to us.  Those are very hard to obtain as far as the

22   classes and things that you attain and we don't send those out

23   to just anybody.

24   Q.  And if we scroll down a little bit more, we actually see

25   your name here, is that correct, Dustin Bragg?

Dustin Bragg - Examination                    25

1   A.  Correct.

2   Q.  And it's got a little bit of a description of what you're

3   trained for?

4   A.  Correct.

5   Q.  Let's go to page 69.  This is one of the attachments to

6   that e-mail.  And Mr. Bragg, it's referred to as Exhibit J and

7   again roster of administrative instructional staff.  Your name

8   is not on this list, is that correct?

9   A.  Correct.

10  Q.  But Mr. Keeling's is listed twice, is that fair to say?

11  A.  Yes, sir.

12  Q.  And then we go in, I believe it's going to be page 81.  As

13  part of that Exhibit J, there is a certificate attached here.

14  Can you tell us what this certificate is?

15  A.  That is my showing my instructor certification through

16  TCOLE at the time.

17  Q.  Did you give Mr. Croft permission to attach this instructor

18  exhibit and send it in to the Texas Veterans Commission?

19  A.  No, sir, I did not.

20  Q.  Did you know that he had done that?

21  A.  No, sir, I did not.

22  Q.  Did Mr. Croft ever approach you either before or after

23  October of 2015 to talk to you about the possibility that you

24  might be an instructor for him?

25  A.  No, sir, he did not.

Dustin Bragg - Examination                    26

1   Q.  If we can go to Government Exhibit 6g.  Sir, this is an

2   application, if we can go to the second page.

3       This is an application again to the Texas Veterans

4   Commission, dated March 4th, 2016.  So we're talking about

5   March of 2016 right now.  If we could go to page 15, this is

6   that Exhibit J again.  Do you see your name on this exhibit?

7   A.  I do.

8   Q.  It's the second name down, is that correct?

9   A.  Yes, sir.

10  Q.  This indicates that you were going to be teaching a certain

11  number of courses.  Could you read that list of courses you

12  were going to be teaching?

13  A.  Police K-9 handlers course, police K-9 trainers course, K-9

14  interdiction course, behavioral modification, kennel master

15  course.

16  Q.  Did at any time you agree with Mr. Croft that you were

17  going to teach those courses for him?

18  A.  No, sir, I don't hold those certifications with the

19  exception of just a few of them.

20  Q.  And specifically as to the K-9 handlers course and the K-9

21  trainers course, did you agree to do those type of classes for

22  him?

23  A.  No, sir.

24  Q.  Did you ever actually do any training in those classes?

25  A.  No, sir, I did not.

Dustin Bragg - Examination                    27

1    Q.  Then if we can go to page 27.  Again this is a series of

2    certificates, sir, attached to Exhibit J, is that your TCOLE

3    certificate?

4    A.  Yes, sir, it is.

5    Q.  Did you give Mr. Croft permission to submit your TCOLE

6    certificate for this application in March of 2016?

7    A.  No, sir, I did not.

8    Q.  Did he ever talk to you either before, immediately before

9    March of 2016 or after March of 2016 about teaching those

10   courses at Universal K-9?

11   A.  No, sir, I'm not certified to teach those courses.

12   Q.  At any time, did you give Mr. Croft a general authority to

13   use your name and your TCOLE certificate for any purpose that

14   Universal K-9 needed it to be used for?

15   A.  No, sir.

16   Q.  When did you first become aware that your name and

17   certificate had been used in the course of the application for

18   the V.A. training?

19   A.  At the time that I was contacted by the investigators

20   whenever the investigation into these allegations took place.

21   Q.  And during the course of your relationship with Universal

22   K-9, did you ever actually train veterans or were you only

23   involved in the interdiction course training police officers?

24   A.  Police officers only.

25   Q.  And that was exclusively for police officers?

1    A.   Correct.

2              MR. SUROVIC:  No further questions, Your Honor.

3              THE COURT:  All right.  Cross-examination.

4                        CROSS-EXAMINATION

5    BY MR. MCHUGH:

6    Q.   Mr. Bragg, my name is Tom McHugh, I represent the

7    defendant, Bradley Croft.  We have never visited before, have

8    we?

9    A.   No, sir.

10   Q.   In regard to your history, give me your employment history.

11   So you're talking about law enforcement, did you out of high

12   school or college did you start with law enforcement?  Take us

13   back to your early years?

14   A.   I went to funeral director and embalming school, it was a

15   family business back in high school, so would have been like

16   2002, something like that.  Volunteer Fire Department for Red

17   Oak, worked for the Sheriff's Department in the jail for three

18   years prior to being a certified police officer.  I worked for

19   Talty Police Department for about a month before I was brought

20   on with Red Oak Police Department.  And I've been currently

21   employed with the Red Oak Police Department since 2006.  As far

22   as any other employment as far as off-duty jobs and things

23   related to law enforcement, there's quite a few of them, but

24   still being employed with the City of Red Oak at the same time.

25   Q.   After high school, did you go to college?

1    A.   I went through some college, yes.

2    Q.   Some college?

3    A.   Correct.

4    Q.   And then your family had a business and you thought that

5    that would be part of your future?

6    A.   Correct.

7    Q.   You met with the agents.  I see, you can correct me, I'm

8    looking at a memorandum of interview and it's dated June 1st,

9    2018.  Do you believe that's approximately when you met with

10   the government?

11   A.   Approximately without looking at the document with my

12   signature on it, that seems about right.

13   Q.   Is there a document with your signature on it?

14   A.   I believe that there possibly is.  Normally whenever they

15   do interviews and things, there's a signature saying that they

16   met with us or something like that.  I don't recall for sure,

17   but that sounds about the right date.

18           MR. MCHUGH:  May I have one moment, Your Honor?

19           THE COURT:  Sure.

20           (Pause.)

21   BY MR. MCHUGH:

22   Q.   I need to correct myself.  The date June 1st, 2018 is

23   actually the date the report was written.  And it appears that

24   according to this memorandum that you -- that this interview

25   took place a few days earlier on May 24th of 2018 at the Live

Dustin Bragg - Examination                              30

1   Oak -- 101 Live Oak Street, correct?

2   A.  Yes, sir, that sounds right.

3   Q.  What is located 101 Live Oak Street?

4   A.  That's our City courts buildings, Explore buildings for the

5   Police Department, it's actually owned by the Red Oak ISD,

6   Independent School District building.

7   Q.  Did you know beforehand, were you given a call that you

8   would have a visit on that day?

9   A.  Yes.

10  Q.  When did you learn that you would have a visit?

11  A.  It was a couple of days prior, they asked if I had a

12  location that we -- that they could meet with me and then also

13  meet with Wes Keeling.  And I was able to get with my

14  lieutenant and other people that I needed to in order to

15  arrange for that meeting to take place at the building.

16  Q.  You needed to arrange it through Wes Keeling?

17  A.  No.  They wanted to meet with me and they also wanted to

18  meet with Wes Keeling, they asked if I had a building or

19  someplace that we could meet, so I went through my chain of

20  command with my lieutenants in order to secure that location

21  for us to have a conversation.

22  Q.  And when you met with them, were you in the presence of Wes

23  Keeling?

24  A.  No, sir.

25  Q.  And how many agents or officers were present during this

1  interview?

2  A.  I believe that there was two for sure, possibly three.

3  Q.  Did you ask any questions like what is this about?

4  A.  I didn't.  They kind of explained what was going on and

5  they asked some questions as to my dealings and whatnot.

6  Q.  And this was on the telephone before that interview?

7  A.  No, this was at the actual interview itself.

8  Q.  So when you were first contacted, what are you told?

9  A.  That they were doing an investigation into Universal K-9

10 and they had some questions for me in regards to my dog and

11 some things that had taken place and they asked if there was a

12 date and time and a place that we could meet.

13 Q.  Fair enough.  And did they ask you whether or not you knew

14 a Bradley Croft?

15 A.  They did.

16 Q.  And you said yes you did?

17 A.  Correct.

18 Q.  What else did they ask you during that telephone interview?

19 A.  There wasn't -- the telephone conversation was very brief.

20 It didn't go into details and things.  It was simply were you

21 involved in Universal K-9.  It was very broad and asked if I

22 knew Mr. Croft.  I told them of course that I did.  And then

23 they asked to set up an interview for them to actually come

24 down to Red Oak to interview me.

25 Q.  So you did talk with Wes Keeling because you helped arrange

1  for he to be present for his interview?

2  A.  I didn't actually make contact with him to tell him, okay,

3  this date and time you're going to do that.  The agents did

4  that.

5  Q.  Because you confirmed that that would be available on that

6  date, that location?

7  A.  Right.

8  Q.  And in regard to Wes Keeling, what conversation did you

9  have with him before you went into that interview?  Did you

10  call him and say what's this all about?

11  A.  I don't remember at the time we had -- we have a training

12  group that met on Tuesdays that we would meet with any

13  Universal dogs that had been through the program that were up

14  in the area.  It was kind of left open for anybody that had

15  dogs to come up and train with us.  In training, Texas doesn't

16  require the number of training hours per month, but with the

17  associations and things that we were involved in, they require

18  16 hours.  So we were training every Tuesday.

19  Q.  So you would see him more or less every Tuesday?

20  A.  Correct.

21  Q.  And when you say that the Universal dog -- you're referring

22  to Universal K-9?

23  A.  Correct.

24  Q.  So you're meeting with other law enforcement officers who

25  also in addition -- you received what, Rambo, from Universal

1   K-9?

2   A.  Correct.

3   Q.  And in this group that would meet, what was the purpose of

4   it?

5   A.  It was a reconditioning, training on narcotics, vehicles,

6   buildings, tracking, those skill sets.

7   Q.  And it's interfacing with other law enforcement officers

8   who had dogs that are doing the same thing you do?

9   A.  Correct.

10   Q.  And you're, I take it, learning from one another?

11   A.  Correct.

12   Q.  And so did Mr. Keeling attend that meeting before he came

13   to the 101 Live Oak for his interview?

14   A.  Like I said, I don't remember that.  We trained once a week

15   and we were there, so sure we saw each other before the

16   interview, but I don't remember what the actual question that

17   you're asking.

18   Q.  One, whether or not you met with him.  I believe your

19   answer is yeah we must have before.

20   A.  Sure.

21   Q.  And I would find it hard to believe, you can correct me,

22   that if law enforcement is coming up and this includes FBI-type

23   people?

24   A.  Sure.

25   Q.  That you would -- that you and Wes Keeling would visit with

1   one another about this and what's going on?

2   A.   Sure.  That's any normal, prudent person would do that,

3   trying to figure out what's on the table, what's going on.

4   Q.   Okay.

5   A.   But there's no specifics that were given at the time.

6   Q.   And you learned through him that he had been interviewed a

7   year earlier, did you not?

8   A.   A year earlier?  Which time frame are we talking about?

9   Q.   If this meeting occurred on or about May 24, 2018, that Wes

10  Keeling had been interviewed some time before that, did he tell

11  you that?

12  A.   I don't recall that, no, sir.

13  Q.   So was it your understanding going into this meeting that

14  this would be his first meeting with these FBI people?

15  A.   Yes, sir.  I believe that I spoke to him first before they

16  did.

17  Q.   But are you aware of whether or not or did he share with

18  you whether or not he had visited with them before?

19  A.   No, sir.

20  Q.   Did you know whether or not he engaged in a recorded

21  interview with those agents?

22  A.   No, sir, I'm not aware.

23        MR. SUROVIC:  Your Honor, I believe that counsel may

24  have just misread something.  I think that there's a mistaken

25  impression that there was a meeting with Mr. Keeling a year

1    before and actually it was the same day, just for

2    clarification, Your Honor.

3              MR. MCHUGH:  I stand corrected.

4              THE COURT:  But he said he didn't know, so that would

5    be consistent.

6    BY MR. MCHUGH:

7    Q.  In regard to your meeting, how long did that meeting take?

8    A.  To be honest with you, sir, I've slept since then.  I don't

9    remember.  Maybe an hour, hour and a half, something like that.

10   Q.  And you did not feel like -- did you take notes at that

11   meeting?

12   A.  No, sir, I did not.

13   Q.  Were you given a copy of the memorandum of interview after

14   that meeting?

15   A.  I don't remember.

16   Q.  Have you looked at it, a memorandum of interview in

17   preparation of your testimony today?

18   A.  No, sir.

19   Q.  But you've met with the agents or you've met with the

20   government before your testimony today, have you not?

21   A.  Correct.

22   Q.  And you went over with them, did you not, your original

23   interview?

24   A.  Correct.

25   Q.  And so were they reading from a piece of paper?

1    A.   Whenever we met, after that meeting it was done through I

2    believe it was a telephone conference.   I wasn't given any

3    papers or anything like that.

4    Q.   But when you came to San Antonio, have you met again with

5    them or have you had any face to face interaction with the

6    government since May 24th of 2018?

7    A.   No, sir, not until the time I got here.

8    Q.   Fair enough.   And in regard to your interview, were you

9    concerned or did you ask do I need representation?

10   A.   No, sir.

11   Q.   You were comfortable in the representation that you

12   received from the government regarding the subject of the

13   interview?

14   A.   Absolutely.

15   Q.   And you have no concerns for anything you may have done or

16   your conduct?

17   A.   No, sir.

18   Q.   Fair enough.   And in regard to that, do you know whether or

19   not your interview on May 24th of 2018 was recorded?

20   A.   I don't know.   I don't remember if it was recorded or not.

21   I'm sure if it's recorded, that it's published, but --

22   Q.   You are a trained law enforcement officer, are you not?

23   A.   Correct.

24   Q.   And your current assignment or responsibilities include

25   what?

1    A.  I'm a supervisor for patrol officers.

2    Q.  At Red Oak?

3    A.  Correct.

4    Q.  And the size of the Department?

5    A.  Roughly 30 officers.

6    Q.  And the size of the community which it serves?

7    A.  Roughly 15 to 18,000 people.

8    Q.  And you have been there for since 2000 and --

9    A.  2006.

10   Q.  -- 2006.  You are a supervisor.  Are you a supervisor in

11   patrol or is there a Detective Division?

12   A.  There was.  I've been assigned to several different.  I was

13   assigned to traffic, K-9 interdiction, Criminal Investigation

14   Division, I'm currently assigned to patrol as an officer in

15   charge, so it's like a corporal.  We don't have corporal based,

16   but when the sergeant is not there or unavailable, then I am

17   the supervisor for the Department.

18   Q.  And you have been -- your experience dates back to 2006?

19   A.  Correct.

20   Q.  And you've pretty much during your career there have done

21   everything that there is to do within the Department?

22   A.  Correct.

23   Q.  And have you served or have you done detective-type work?

24   A.  Yes, I have.

25   Q.  Give us a little background on that?

Dustin Bragg - Examination                    38

1   A.  Originally I was assigned to street crimes, so low-level

2   narcotics, controlled buys, working confidential informants.

3   From there I went to traffic, accident investigator, accident

4   reconstructionist.  From there I went to Criminal

5   Investigations Division is where I worked anything from petty

6   theft cases to capers crimes to crimes against persons,

7   homicides, robberies.

8   Q.  Sounds like a rich experience in a small department?

9   A.  Correct, correct.

10  Q.  From time to time and on occasion would you collaborate or

11  associate with other law enforcement in that area?

12  A.  Absolutely.

13  Q.  And you would support them and they would support you?

14  A.  Correct.

15  Q.  In regard to your detective work when you bring in a fact

16  witness or a target of an investigation for an interview, are

17  they advised of their rights?

18  A.  On a State level?  Yes.

19  Q.  On a State level.

20  A.  On a Federal level, no.

21  Q.  They're not advised of their rights on a Federal?

22  A.  No, sir.

23  Q.  You participated as a law enforcement officer on that side

24  of the -- on that side of the table?

25  A.  Correct, both State and Federal.

1   Q.  Both State and Federal.  And on the State side, what is

2   your practice or what are the regulations or policy of your

3   department regarding recording those interviews?

4   A.  Our interviews are recorded.

5   Q.  They're all recorded?

6   A.  Yes, sir.

7   Q.  And you have a recording system?

8   A.  Yes, sir.

9   Q.  And how is that set up?

10  A.  Roadside if on traffic stops and things --

11  Q.  I'm sorry.

12  A.  Those are interviews.

13  Q.  I'm referring to when they come into your department as a

14  detective.

15  A.  Then those are set up in a interview room that are visually

16  and audio recorded.

17  Q.  And is the subject or person involved in that interview

18  informed that it's recorded?

19  A.  Yes.  It's posted.

20  Q.  Why is it on that occasion as a law enforcement officer --

21  do you do it as a matter of course on every occasion to record?

22  A.  Except at a Federal level.

23  Q.  And at the Federal level, what happens at the Federal level

24  from your history and background?

25  A.  Their interviews are not recorded.

1    Q.  And it's your belief that your interview is not recorded?

2    A.  Correct.

3    Q.  And you have no idea today whether or not Wes Keeling who

4    was interviewed on the same day whether or not his was recorded

5    or not?

6    A.  I can't speak to that, I wasn't there.

7    Q.  But you believe it to be not recorded?

8    A.  Whether it was or whether it wasn't, I don't know.

9    Q.  You do not have that information?

10   A.  No, sir.

11   Q.  These meetings that you would attend with other Universal

12   law enforcement dog people on, what, Tuesday nights?

13   A.  Either Tuesday or Thursdays.  We changed.

14   Q.  How many would participate in these meetings?

15   A.  We'd have anywhere from just Wes and I to seven, eight, ten

16   other dogs, just depends.

17   Q.  And would it be the handlers only or would the dogs be

18   there?

19   A.  The handlers and the dogs.

20   Q.  Handlers and the dogs, okay.  And are you sitting around

21   the table or is somebody running the meeting?

22   A.  No, none of it was done in a classroom setting.  It was all

23   roadside, fields, buildings, it's all hands on.  There's no

24   sitting or downtime.

25   Q.  And these meetings went on for over how many years?

1   A.   Every week from the time that I was a K-9 handler.

2   Q.   And so you received your dog, Rambo, through Universal K-9?

3   A.   Correct.

4   Q.   And you ended up at Universal K-9 because your chief who

5   had a relationship with Keeling and that's how Universal K-9

6   was identified to you?

7   A.   Correct.

8   Q.   And so was it your chief that thought it was a good idea to

9   bring in this program into the Department?

10  A.   He did.  He worked for Cedar Hill Police Department as a

11  K-9 handler over there for numerous years and he brought the

12  K-9 Division to the City of Red Oak.

13  Q.   And so before you went down and interfaced with Mr. Croft,

14  were there other handlers at your department?

15  A.   No.

16  Q.   So you were the genesis or the beginning of the dog program

17  at your department?

18  A.   Prior to my employment in '06, there was a dog, I want to

19  say early 2000s, I know absolutely nothing about certifications

20  and who they went through and those types of things, that

21  officer retired and the program wasn't picked up after that.

22  So we had gone through several chiefs since the employment and

23  then when Chief Wolf came over, that's when he implemented the

24  K-9 program.

25  Q.   So you received a dog named Rambo?

1    A.   Correct.

2    Q.   And Rambo worked for you before he expired for a number of

3    years?

4    A.   Correct.

5    Q.   Was he imprinted?

6    A.   Yes, sir.

7    Q.   And what was he imprinted to do?

8    A.   Narcotics and tracking.

9    Q.   So it was basically traffic or exclusively traffic with

10   him?

11   A.   Correct.  No patrol issues.

12   Q.   When you would participate in Search Warrants, would you

13   bring Rambo?

14   A.   Yes.

15   Q.   And in regard to Wes Keeling and your relationship with

16   him, is it accurate that you were introduced to him through

17   your chief?

18   A.   Yes, sir.

19   Q.   And did you and he ever team up together as law enforcement

20   officers on any cases?

21   A.   Our two programs kind of coincided with each other.  With

22   our agencies being so close, if he was out of pocket, then I

23   would go to his city and work his calls.  And if I was out of

24   pocket, he would come and work my calls in the city.

25   Q.   And his department was I believe you said, what, seven to

1   8 miles away?

2   A.  Something relatively -- the cities almost butt up, but

3   there's a small city in between, it's either Ovilla or

4   Waxahachie that kind of buffers those.

5   Q.  So it's typical within law enforcement for law enforcement

6   to assist law enforcement?

7   A.  Yes, sir, I've gone anywhere from inside Ellis County to

8   Terrant County to Garland, I've gone everywhere with K-9.

9   Q.  So your first trip to San Antonio when you met Mr. Brad

10  Croft, I take it that went well?

11  A.  Sure.

12  Q.  I take it you felt comfortable with him?

13  A.  Sure.  Didn't know any better.

14  Q.  And your history with dogs at that time was not that rich?

15  A.  Right.

16  Q.  Since then, you've had considerable training?

17  A.  Correct.

18  Q.  The information that you reviewed with the government on

19  your direct examination regarding your certificates and

20  everything, you're not saying any of that information is not

21  accurate?

22  A.  Right.  The certificates, the TCOLE instructor certificate

23  that was posted, that is mine.  The other certifications as far

24  as kennel master and all those, I'm not certified to do that, I

25  never attended classes.

1    Q.   I'm just referring to your certificate.   All those
2    certificates, they belong to you?
3    A.   Correct.
4    Q.   And if we go to Government Exhibit 6f and to -- so read
5    Dustin Bragg, if we can highlight that, Joe.
6         Following your name, Dustin Bragg, TCOLE instructor
7    certification.   Is that your certification number?
8    A.   No, sir, it's not.
9    Q.   And in the information that follows, is that accurate?
10   A.   Dual is not at the time in 2014.   I was not dual certified,
11   had not been through a dual course at all.
12   Q.   And I believe it was your testimony that you jealously
13   protect your TCOLE and certificate information, do you not?
14   A.   Correct.
15   Q.   And for the record, why do you do that?
16   A.   Because they're so hard to obtain those.   You have to meet
17   so many requirements in order to obtain those, those classes
18   for the instructor certification.   It's not just a show up and
19   get a certificate for showing up.   You have to meet certain --
20   take certain tests.
21   Q.   So currently what are your certifications?
22   A.   Sir, I can't list all those.   There's over a thousand of
23   them.
24   Q.   A thousand certifications?
25   A.   Yes, sir.

Dustin Bragg - Examination                    45

1   Q.   That relate to?

2   A.   Law enforcement.

3   Q.   Law enforcement.   No, I'm referring to dog handler

4   specifically.

5   A.   I have an NNDDA, which is the National Drug Dog Detection

6   Association certification, Universal K-9 certification for

7   handler for narcotics and tracking, Sector K-9, just a

8   certification for tracking and narcotics and then American

9   Working Dog certification for narcotics tracking and patrol and

10  then I'm also a certifying official for American Working Dog.

11  Q.   And do you have to continue and stay current with these

12  certifications?

13  A.   You do.

14  Q.   And are you?

15  A.   My certifications I believe run out in -- they're either

16  fixing to expire or will expire pretty quick.

17  Q.   And in regard to the work that you did with Wes Keeling, I

18  believe it's your testimony that you were actually working for

19  Wes Keeling and not for Mr. Croft?

20  A.   Correct.

21  Q.   And how many training courses were there?

22  A.   I don't know how many training courses that there were, I

23  know that I only participated in approximately three at the

24  most.

25  Q.   And where were those conducted?

1    A.   Yes.

2    Q.   Where did they occur?

3    A.   Those were at a hotel in San Antonio and I don't remember

4    the name of them.

5    Q.   But it was a Universal K-9 program and school?

6    A.   It was an interdiction course.

7    Q.   An interdiction course.  And did you co-teach it with Wes

8    Keeling?

9    A.   You could say that, sure.

10   Q.   What would you say?

11   A.   Well, I assisted with setting narcotics up, with the

12   evidence and processing portion of the class.  I kind of --

13   sure, I helped him teach that.

14   Q.   And when you would drive down to San Antonio on those

15   occasions, would you drive down alone or would you be with

16   Mr. Keeling?

17   A.   I'd ride with Keeling.

18   Q.   And I believe -- but the first time you went down was not

19   to teach an interdiction course, but it was for you to be

20   trained?

21   A.   Correct.

22   Q.   And you received a certificate through Universal K-9?

23   A.   Correct.

24   Q.   That is part of your testimony?

25   A.   True.

Dustin Bragg - Examination                    47

1  Q.  And you received a dog that has done good work, have you

2  not?

3  A.  He did, sure.

4  Q.  Give some examples of the good work that Rambo did?

5  A.  He's responsible for currency seizures, narcotics seizures,

6  locating suspects, locating lost children, he did well in his

7  career.

8  Q.  You were proud of Rambo?

9  A.  Sure.

10 Q.  You had a good relationship with Rambo?

11 A.  Absolutely.

12 Q.  In regard to your certifications, I believe it's your

13 testimony that you lent this information to Wes Keeling, is

14 that correct?

15 A.  For what?

16 Q.  Your certifications that we see here?

17 A.  Right.

18 Q.  You have acknowledged that they're yours?

19 A.  Correct.

20 Q.  And so I believe it's your testimony that you directly did

21 not give it to Mr. Croft?

22 A.  Correct.

23 Q.  That you, in fact, gave it to Mr. Keeling?

24 A.  That certification could have gone to Keeling for the

25 interdiction course, sure, it could have.

Dustin Bragg - Examination                    48

1    Q.   That you participated at Universal K-9 with Wes Keeling?

2    A.   Sure.

3    Q.   It's not a trick question.

4    A.   Well, I wasn't at Universal K-9.  I was there to teach an

5    interdiction course with Wes, so however you want to word that,

6    I'm not real sure, but that's what I did.

7    Q.   But Mr. Croft was present, was he not?

8    A.   Yes, he was.

9    Q.   And over how many hours or how many days was this course?

10   A.   They were normally a two-day course.

11   Q.   You would be down there how many nights?

12   A.   Just one.

13   Q.   And you were paid $100?

14   A.   Yes, sir.

15   Q.   For two days?

16   A.   Yes, sir.

17   Q.   And --

18   A.   It wasn't much more than a hundred dollars.  I know that it

19   was at least a hundred dollars.  Like I said, normally my time

20   is worth more than that, but giving back to guys that haven't

21   had the experience or the investigations in filing those cases.

22   Q.   You believed in the program, of course?

23   A.   For the interdiction, correct.

24   Q.   For the interdiction.  And you believed that you and Wes as

25   instructors put together a pretty good course?

Dustin Bragg - Examination                    49

1    A.   Absolutely.

2    Q.   And I believe it's your testimony that he drew it up, it

3    was -- he put the course together, designed the course?

4    A.   Correct, Keeling did.

5    Q.   And explain that, the different components to that course?

6    A.   There's -- whenever you put together a TCOLE course or any

7    course that is submitted to our State standards to TCOLE, it

8    has to have -- it's just like putting a class together for a

9    teacher, you have to have drafts, you have to have all the

10   viewpoints, you have to have material that you hand out.

11   Q.   Because it was a real school and a real program?

12   A.   Absolutely.

13   Q.   If it were anything other than that, would you have allowed

14   yourself to be associated with it?

15   A.   No.

16   Q.   I'm sorry?

17   A.   No, sir.

18   Q.   If it were anything other than that, your friend Wes

19   Keeling, do you believe that he would participate in it?

20   A.   No, sir.

21   Q.   Is it your testimony that it was a good program and had

22   good results?

23   A.   Yes, sir.

24   Q.   In regard to these TCOLE certificates and your testimony

25   that you jealously guard them, how did it leave your possession

1  then?  We're talking about you sharing it with Mr. Keeling

2  because even though you co-taught the course, I take it he was

3  the guy?

4  A.  Right.  Whenever you teach a course for the State, those

5  certificates have to go to the State.  That would be the only

6  way that Keeling would have gained possession of my

7  certificates would have been through that for him to submit to

8  the State.

9  Q.  And I believe it's your testimony on your -- was it your

10  first trip down there when you met Mr. Croft you actually went

11  to his house?

12  A.  Yes, sir.

13  Q.  And subsequent trips, isn't it accurate to say that you

14  would actually stay with him?

15  A.  Correct.

16  Q.  And how many times would you stay with Mr. Croft?

17  A.  I had only been down there a handful of times, maybe once a

18  year, once every six months, something like that.

19  Q.  When you were down there, you would stay with him?

20  A.  Correct.

21  Q.  And you felt comfortable with that?

22  A.  Sure.  It was a free place to stay and didn't have to come

23  out of pocket.  It wasn't paid by the City to be down there, it

24  was -- sure.

25  Q.  And you were down there because you believe when you would

1   leave you would do some good?

2   A.   Correct.

3   Q.   And you did do some good?

4   A.   Correct.

5   Q.   In regard to the first time you went down there, I believe

6   you met at his house, how many dogs, if any, were at the house?

7   A.   They were in crates inside the garage.  There was probably

8   anywhere from six to ten, something like that.

9   Q.   Do you know where those dogs were sourced from?

10  A.   Some were, to my understanding, were shelter dogs.  Some

11  were owner surrenders, some were vendor dogs, which is what I

12  was told.

13  Q.   What about Rambo?

14  A.   Rambo was actually an owner surrender, I believe it was a

15  friend of his that actually gave him the dog.

16  Q.   And these shelter dogs, do you have a bias for or against a

17  shelter dog as a working dog for a department?

18  A.   I don't because I have seen shelter dogs work and do good

19  for police departments and communities.

20  Q.   And that's the bottom line?

21  A.   Sure.

22  Q.   Are you familiar with an organization called Animal Farm?

23  A.   Very -- don't know a whole lot about them.  I've heard

24  their name, I've seen their banners.  Never really spent the

25  time to talk to them.

Dustin Bragg - Examination                    52

1   Q.  But you know they're out there?

2   A.  Correct.

3   Q.  And you know that your good friend Wes Keeling, he's a big

4   shelter guy, is he not?

5   A.  Sure.

6   Q.  Tell us about that?

7   A.  He's actually working for that company.  Like I said, I

8   don't know too much about them.  I know that they take shelter

9   dogs, pit bulls and things and they would be trained and then

10  given to police departments under grant programs and things

11  like that.

12  Q.  And these shelter dogs, do you know whether or not these

13  same shelter dogs were subject to destruction if they remained

14  in the shelters?

15  A.  I'm sure that they probably were.

16  Q.  And so there was a good element to that as well?

17  A.  Sure.

18  Q.  And in regard to the sheltered dogs, I take it it was

19  sometimes hit and miss whether or not they turned out to be a

20  good working dog?

21  A.  Correct.

22  Q.  Explain?

23  A.  Dogs, they have a drive.  If they don't have a hunt drive

24  or a ball drive and they're not playful with the ball or

25  possess a ball, then they're probably not going to do good for

1   narcotics.  Then they just -- they're pets or some other --

2   something to that nature.

3   Q.  Are you familiar with Sector K-9?

4   A.  Yes, I am.

5   Q.  What is Sector K-9?

6   A.  Sector K-9 is a company that's owned by Wes Keeling.

7   Q.  And where is that company located?

8   A.  It's in Midlothian.

9   Q.  Sorry?

10  A.  Midlothian.

11  Q.  In Midlothian.  And what is Sector K-9 in the business of

12  doing?

13  A.  They do training for civilians and law enforcement,

14  behavioral things, narcotics.  I believe he's doing some patrol

15  dogs and also tracking as well.

16  Q.  And have you been to Sector K-9?

17  A.  In the past, yes.

18  Q.  And your purpose for going there would be what, to meet

19  Keeling or to see the program?

20  A.  For the training of the dog that I had.

21  Q.  And so what is meant by the term a perishable skill in

22  terms of when it relates to dogs?

23  A.  It's related to -- the way that I see it, it's kind of like

24  for a person that's not bilingual, a person that doesn't speak

25  Spanish, but they go and attend a Spanish class.  In law

1    enforcement, that's one of our core classes that we have to

2    attend.  If we don't keep up that skill and use that Spanish,

3    we lose it.  It's the same thing with dogs and the handlers.

4    If the handlers aren't using those skills and they're not

5    introducing those dogs to the training aids and those types of

6    things, then those skills perish, they go away, we don't use

7    them.

8                THE COURT:  Excuse me, Mr. McHugh.  I understand you

9    need to sort something out with Magistrate Bemporad.

10               MR. MCHUGH:  Okay.

11               THE COURT:  I just got a note.  Somebody sent me a

12   note.

13               COURTROOM DEPUTY CLERK:  Judge Bemporad.

14               THE COURT:  Judge Bemporad said you need to sort it

15   out, but anyway you need to take a break.  You're not in

16   trouble, just tell him you're up here in trial.

17               COURT SECURITY OFFICER:  All rise.

18               *(10:34 a.m.)*

19                              *   *   *

20               *(11:10 a.m.)*

21               COURT SECURITY OFFICER:  All rise.

22               THE COURT:  Please be seated.  The Court would note

23   the presence of all counsel.  Let's go off the record.

24                              *   *   *

25               *(11:12 a.m.)*

Dustin Bragg - Examination                    55

1          THE COURT:  Mr. McHugh, are you ready to proceed?

2          MR. MCHUGH:  I am, Your Honor.  And for the record,

3    Mr. Olivares is out of the courtroom right now.  He is my

4    investigator, he is working with us and he is copying so we may

5    offer as Exhibits 56, 57, 57a and 58.  And I'll identify those

6    when he -- when and if I ever see him again.

7          THE COURT:  Okay.

8    BY MR. MCHUGH:

9    Q.  In regard to Rambo, just a little clean-up, was he a

10   working dog at the time he expired?

11   A.  He had just retired out.

12   Q.  So he had retired, so he was in dogie retirement?

13   A.  Yes, sir.

14   Q.  And was he with you at the time?

15   A.  Yes, sir, he was.

16   Q.  And he was with you 24/7?

17   A.  365, yes, sir.

18   Q.  And you received Rambo through Universal K-9 and that was

19   part of that introductory program that you were involved in,

20   correct?

21   A.  Correct.

22   Q.  And Rambo came as part of the class with no additional

23   charge unless it's computed within the class, correct?

24   A.  Best of my knowledge, yes, sir.

25   Q.  And after Rambo passed away, expired, did you get another

1  dog?

2  A.  I did.

3  Q.  And what is the name of that dog?

4  A.  Lintz, L-I-N-T-Z.

5  Q.  And did you go to Midlothian for that dog?

6  A.  I did.

7  Q.  And do you know whether or not that dog was a shelter dog?

8  A.  I believe she's a vendor dog.

9  Q.  What's a vendor dog?

10  A.  A vendor dog is somebody that's from overseas or out of the

11  country that they breed these dogs and then they're imported

12  into the U.S.

13  Q.  And so Midlothian would use some vendor dogs?

14  A.  Correct.

15  Q.  And they would also use shelter dogs?

16  A.  Correct.

17  Q.  And is there a reason or explanation why you went with the

18  one and not the other?  How do you connect with the dog when

19  you -- is it what Midlothian gave you?

20  A.  No, it's my chief had actually done -- since him having

21  previous experience of being a handler, that he actually went

22  out and evaluated some different dogs and this is the one that

23  they thought would best pair.  Sometimes when you pair a

24  handler with a dog they just don't jive and then you have to go

25  through another vetting process to get another dog.

Dustin Bragg - Examination                    57

1   Q.   Like the story with the first wife, right?

2   A.   Absolutely.

3   Q.   I'm still with my first wife.

4   A.   Me too.

5   Q.   Would you on occasion for training purposes go to and

6   connect with other trainers at conventions or shows?

7   A.   I did, I attended a convention in Las Vegas.

8   Q.   The one in Las Vegas.  And who were you there with?

9   A.   With Red Oak Police Department.  They're the ones that

10  actually paid for my -- everything that I had to go.

11  Q.   And did you meet anybody there?

12  A.   I did.  Croft was there, Wes Keeling was there.  Couple

13  other people were there, I don't remember their names.

14  Q.   Fair enough.  Government Exhibit 56.

15          MR. SUROVIC:  Defense Exhibit.

16  BY MR. MCHUGH:

17  Q.   Defendant Exhibit 56.  Are you able to see that?

18  A.   Yes, sir.

19  Q.   And are you in Venice, where is that picture taken?

20  A.   That's somewhere in Las Vegas.  I'm not exactly sure, maybe

21  the Bellagio.

22  Q.   All that water is in the middle of the desert out there?

23  A.   Yes.

24  Q.   Are you one of the three persons in that photo?

25  A.   I'm the one in the black Under Armor hat with the

Dustin Bragg - Examination                    58

1  sunglasses, gray T-shirt and black jacket.

2  Q.  So you're the hand someone?

3  A.  Whatever you call handsome, sir.

4  Q.  And who is to your right and who is to the right of him?

5  A.  On the end is Wes Keeling.  The gentleman in the middle,

6  that was the first time I met him and I don't recall his name.

7  Q.  If I offer you a name, the name is Richard Cook, does it

8  fit?

9  A.  Does he go by Rick?

10  Q.  Rick, yes.

11  A.  Then that was, yes, sir.

12  Q.  And you met him in Las Vegas?

13  A.  Correct.

14  Q.  And you believe that's the only time you've had any

15  interaction with him?

16  A.  Correct.

17  Q.  Do you know whether or not he had a relationship with

18  Mr. Croft?

19  A.  I assume that he had some type of relationship, but wasn't

20  exactly sure.  I mean he's wearing a Universal K-9 shirt, so I

21  would assume that there's some type of history there, not sure

22  what it is.

23  Q.  And you're not wearing your Universal K-9 shirt?

24  A.  I believe that I probably am.  It's one of Croft's

25  T-shirts.

1          MR. SUROVIC:  Your Honor, just for the record, we have

2    no objection to the admission of Defense Exhibit Number 56.

3          THE COURT:  It will be received.

4          MR. MCHUGH:  Your Honor, I have four exhibits to offer

5    to show the witness.  I have no further cross-examination at

6    this time.  I'm waiting for the physical copy of the exhibits

7    to come up.  That's where we are.

8          THE COURT:  What would you like to do?

9          MR. MCHUGH:  I would like Mr. Brooks to run down there

10   and be back here in three minutes and give us an answer.

11         THE COURT:  Okay.  As we used to say in the military,

12   let's stand at ease.

13         MR. SUROVIC:  I have a very short redirect.  I could

14   do that and just reserve for those --

15         THE COURT:  We'll do that out of order then.  Why

16   don't you go ahead and do your redirect.

17                    REDIRECT EXAMINATION

18   BY MR. SUROVIC:

19   Q.  Mr. Bragg, I'd just like to clarify a couple things.  You

20   talked about this Tuesday meeting with the Universal dogs?

21   A.  Yes, sir.

22   Q.  Was that something that you guys did on your own or was

23   that something that was sponsored by Universal K-9?

24   A.  No, it's something we did on our own.  Training is, like I

25   said, it's very important to us and if you don't maintain those

1    skills, then they dissipate.

2    Q.  Did Universal K-9 coordinate these meetings, did they have

3    any role in these meetings?

4    A.  No, none whatsoever.

5    Q.  You talked about it being for Universal dogs, I'm sure you

6    know other K-9 handlers that have dogs that came from places

7    other than Universal K-9?

8    A.  Correct.

9    Q.  Were they also allowed to come to the meetings?

10   A.  Yes, they were.  Dallas County Sheriff's Office, their dogs

11   would come down.  Our training group was very consistent with

12   our training, we trained every week.  The other guys throughout

13   the metroplex, not so much.  They wouldn't train as much as we

14   would and the dogs reflected it.

15   Q.  You indicated that one of the reasons you did this was

16   because you have to have a certain number of hours

17   certification in order to get certified for some of the

18   national certifications, is that correct?

19   A.  Correct.

20   Q.  Had nothing to do with Universal K-9?

21   A.  Correct.

22   Q.  The other thing I wanted to ask you about is TCOLE, that's

23   the Texas Commission On Law Enforcement, is that correct?

24   A.  Yes, sir.

25   Q.  Now, they're the ones that sort of certify law enforcement

1   education in the State of Texas, is that fair to say?

2   A.   Correct.

3   Q.   Is there a requirement for law enforcement officers in the

4   State of Texas to maintain a TCOLE certification?

5   A.   Yes, sir, there is.

6   Q.   In order to do that, you have to have continuing education,

7   is that fair to say?

8   A.   Correct.

9   Q.   What is the real value of being a TCOLE instructor?

10   A.   The TCOLE instructor allows me to take other classes for,

11   say, DWI or standardized field sobriety testing.  I'm an

12   instructor for that, so it allows me to teach that class,

13   standardized field sobriety to other officers to certify them

14   so that they actually can stand up in court to testify.

15   Q.   And the reason that the other officers want to get that

16   training from somebody that is TCOLE certified is because that

17   allows them to then claim those hours that are taught as part

18   of their continuing education, is that fair to say?

19   A.   Right.  And if you don't have I believe it's 40 hours every

20   two years, then they suspend your license or put your license

21   on a back burner until you have those certain hours.

22   Q.   Then you're not a certified law enforcement officer, you

23   may lose your job?

24   A.   Correct.

25   Q.   So when these officers in the context of the interdiction

1    classes that you taught with Wes Keeling, if they wanted to

2    submit those hours for the interdiction class as part of their

3    continuing education hours for their TCOLE certification, they

4    would need to have a copy of your TCOLE instructor

5    certification in order to get those?

6    A.  Right, they'd have to have a portion of our credits in

7    order to apply for that.

8    Q.  Would that be one of the reasons why you might have given

9    your TCOLE instructor certification to Wes Keeling so he could

10   have provided --

11   A.  That would have been the only reason.

12              MR. SUROVIC:  No further questions, Your Honor.

13              THE COURT:  The record should reflect that you now

14   have the documents that you were looking for.

15              MR. MCHUGH:  One moment, Your Honor.  I've handed to

16   the government.

17              *(Pause.)*

18              MR. SUROVIC:  Your Honor, the government has no

19   objection to Defense Exhibits Number 57 or 58.

20              THE COURT:  All right.  They'll be received.

21              MR. MCHUGH:  Or 57a.

22              MR. SUROVIC:  57, 57a or 58.

23              MR. MCHUGH:  May I approach the witness, Your Honor?

24              THE COURT:  You may.

25                        CROSS-EXAMINATION

1    BY MR. MCHUGH:

2    Q.   Sir, you've been handed three exhibits, 57, 57a and 58.  In

3    regard to -- let me ask you this because you have testified as

4    to the value and the propriety of your certifications?

5    A.   Correct.

6    Q.   I believe you testified that when you were teaching the

7    interdiction course at the hotel in San Antonio where the

8    defendant Brad Croft was present and it was a Universal K-9

9    sponsored program?

10   A.   Correct.

11   Q.   That on that occasion or within that, you shared with Wes

12   Keeling your TCOLE information, did you not?

13   A.   Correct.

14   Q.   And so you have before you Government Exhibit *(sic)* 57 and

15   so 57 is -- I'll make a representation to you that it's an

16   e-mail from Red Oak which would be, I take it, your department?

17   A.   Correct.

18   Q.   To who is it addressed to, Exhibit Number 57?

19   A.   Info@UniversalK-9Inc.com.

20   Q.   Would you on occasion send e-mails or exchange e-mails with

21   Universal K-9?

22   A.   I believe there was a couple e-mails, I'm not exactly sure

23   what they are.  This appears to be one of them.

24   Q.   Okay.  And in regard to the e-mails, it has been your

25   testimony that the defendant, Bradley Croft, is the functional

1   equivalent of Universal K-9, correct?

2   A.   Correct.

3   Q.   So when you're communicating with Universal K-9, it's your

4   understanding or your intent that you're communicating with the

5   defendant, correct?

6   A.   Correct.

7   Q.   And so what is Government Exhibit *(sic)* 57?

8   A.   It's my resume and my certificate --

9         THE COURT:   It's Defense Exhibit, counsel.

10  BY MR. MCHUGH:

11  Q.   Defense Exhibit 57, not 57a, just the top one, 57, it's the

12  e-mail, so describe the e-mail.  What is the e-mail, date and

13  from who to who, what information --

14  A.   The attached information or the e-mail itself?

15  Q.   Not the attached.  The cover e-mail, Defense Exhibit 57?

16  A.   It's from my city e-mail to the info@UniversalK-9Inc.com

17  and it's my resume to Brad Croft.

18  Q.   And what is Government Exhibit *(sic)* 57a?

19  A.   It's my resume.

20        MR. MCHUGH:   For the record, Your Honor, for the

21  record, "government" means "defense" in terms of exhibits.

22        THE COURT:   Don't worry, I do the same thing, counsel.

23  Don't worry.

24  BY MR. MCHUGH:

25  Q.   So what information is contained in Defendant Exhibit 57a?

Dustin Bragg - Examination                    65

1   A.  It's my resume with a copy of my certificates for the

2   interdiction class.

3   Q.  And is that truthful and accurate?

4   A.  Yes, sir.

5   Q.  Do you recall doing that?

6   A.  After looking at the e-mail and the documents and things,

7   yes.

8   Q.  In reference to Defendant Exhibit 58, what is Defendant

9   Exhibit 58?

10  A.  It's a letter.

11  Q.  And is it signed by you?

12  A.  Yes, sir, it is.

13  Q.  And who is it addressed to?

14  A.  Wes Keeling.

15  Q.  And what is the date on the letter?

16  A.  March 16, 2015.

17  Q.  And what is the letter in reference to?  It concerns a

18  Bradley Croft, does it not?

19  A.  It's to -- talking about Wes Keeling.  If you'll give me

20  just a second to scan over it.

21  Q.  Sorry, it's to Wes Keeling from Dustin Bragg, March 16,

22  2015, on the letterhead of Red Oak Police Department, correct?

23  A.  Correct.

24  Q.  And it is signed by Interdiction K-9 Officer Dustin Bragg,

25  correct?

1  A.  Correct.

2  Q.  And is that your signature?

3  A.  Yes, sir.

4  Q.  And is there a highlighted portion of Defendant Exhibit 58?

5  A.  Yes, sir.

6  Q.  And would you read that into the record?

7  A.  "I had the privilege of training with Mr. Croft for two

8  weeks.  During that time, Mr. Croft provided excellent hands-on

9  training."

10 Q.  And what was your purpose in writing this letter?

11 A.  Mr. Keeling needed a letter in order to send in -- I can't

12 remember exactly what it was for.  It was probably the

13 interdiction stuff, but I can't remember exactly why.  We write

14 letters as officers, we write letters of endorsements to other

15 officers that are trying to go to other departments or trying

16 to get an organization.

17 Q.  And this letter here, do you need a few minutes to read

18 through it right now just to see the other content within the

19 letter?

20 A.  Yes, sir, if you don't mind.

21 Q.  Okay.

22     (Pause.)

23 A.  Okay.

24 Q.  The other information contained on Defense Exhibit 58, when

25 written, you believed all that to be truthful and accurate?

1   A.   Yes, sir.

2   Q.   In reference to Defendant Exhibit 57, what is the date of

3   that e-mail?

4   A.   September 10, 2015.

5            MR. MCHUGH:   Your Honor, at this time, the defendant

6   would offer in the photograph 56, 57 which is the e-mail, 57a

7   which is the e-mail attachment which contains the resume, and

8   58 which is a recommendation letter to Keeling regarding the

9   defendant, Bradley Croft, and other information.

10           THE COURT:   Any objection?

11           MR. SUROVIC:   No objection, Your Honor.

12           THE COURT:   It will be received.

13           MR. MCHUGH:   I pass this witness at this time.   Thank

14  you, sir.

15           THE COURT:   All right.

16                     REDIRECT EXAMINATION

17  BY MR. SUROVIC:

18  Q.   Officer Bragg, just one or two quick questions.   Defense

19  Exhibit 57 and Defense Exhibit 57a, the e-mail and the resume,

20  could you tell us what the context was in which that was sent?

21  A.   That is my resume and it pretty much outlines my

22  capabilities and my certifications and things that I can do.

23  That would have been sent for strictly for interdiction

24  purposes, yet again whenever you send stuff into the State you

25  have to have those supporting documents in order to be

1    accredited and allowed to teach that.

2    Q.  Okay.  So you sent it in for purposes of the interdiction

3    courses that you were actively teaching then?

4    A.  Correct.

5    Q.  Were those courses again limited only to police officers?

6    A.  Yes, those are.

7    Q.  Was there any discussion or did you send in that resume or

8    those certificates in any way in order to obtain a job as a --

9    let me see exactly what that phrase is -- a K-9 handler,

10   trainer or a K-9 trainer course, to teach those two courses?

11   A.  I'm not certified to do that with the exception I am a

12   handler.

13   Q.  Did you ever have discussions with Mr. Croft about teaching

14   for him as a K-9 handler?

15   A.  No, sir, I didn't.

16          MR. SUROVIC:  No further questions, Your Honor.

17          MR. MCHUGH:  No questions.

18          THE COURT:  You may step down, sir.

19          MR. SUROVIC:  We request that he be permanently

20   excused so he can return to Red Oak.

21          MR. MCHUGH:  No objection.

22          THE COURT:  You can be permanently excused so you can

23   return to Red Oak.

24          THE WITNESS:  Thank you, sir.

25          MR. SUROVIC:  Your Honor, next we call as a witness

1    Mr. Raymundo Nunez.

2              COURTROOM DEPUTY CLERK:  Please raise your right hand.

3                          *   *   *

4         *(RAYMUNDO NUNEZ, Government Witness, Sworn.)*

5                          *   *   *

6              THE WITNESS:  I do.

7              COURTROOM DEPUTY CLERK:  Have a seat.

8                       DIRECT EXAMINATION

9    BY MR. SUROVIC:

10   Q.  Would you please state your full name, sir?

11   A.  Raymundo Nunez.

12   Q.  Could I get you to spell your last name for the record?

13   A.  N-U-N-E-Z.

14   Q.  And what city do you live in?

15   A.  San Antonio, Texas.

16   Q.  How are you employed?

17   A.  I'm self-employed and I'm also employed through another

18   company.

19   Q.  You say you're self-employed, what do you do for

20   self-employment?

21   A.  I train police dogs.

22   Q.  And work you do for the other company, what is that other

23   company?

24   A.  What's that?

25   Q.  What is that other company?

1   A.   Global Training Academy.

2   Q.   What do you do for them?

3   A.   Same thing.

4   Q.   So you train dogs, that's what you do for a living?

5   A.   Yes.

6   Q.   How long you been in the dog training business?

7   A.   Roughly going on about 20 years now.

8   Q.   Could you explain for the Court what your experience is in

9   the dog training area, what jobs you've had and what training

10  you've had?

11  A.   I've helped many people with a lot of their companies as

12  far as I've worked with surrounding companies in San Antonio

13  and outside of San Antonio as far as just pretty much training

14  police dogs, military dogs and so on.

15  Q.   How many different companies have you worked for?

16  A.   Probably a good five.

17  Q.   And has that primarily been your employment for the last 20

18  years?

19  A.   Yes, sir.

20  Q.   Did you ever meet an individual by the name of Brad Croft?

21  A.   I did.

22  Q.   Do you know Brad Croft?

23  A.   I do.

24  Q.   Is he here in the courtroom today?

25  A.   Yes.

1   Q.  Could I get you to point to him, describe something he's

2   wearing?

3   A.  Gentleman in the black jacket.

4           THE COURT:  The Court would note the identification of

5   the defendant.

6           MR. SUROVIC:  Thank you, Your Honor.

7   BY MR. SUROVIC:

8   Q.  How did you first meet Brad Croft?

9   A.  I trained -- I was working for a company called Worldwide

10  K-9 and I trained a personal protection dog for him.

11  Q.  Approximately when was that?

12  A.  It's been a good while.  I'm going to say probably -- it's

13  been several years, it's been about, I don't know, maybe eight

14  odd years maybe.

15  Q.  Now, did Mr. Croft work with you when you were working at

16  Worldwide?

17  A.  No, sir.

18  Q.  You just trained a dog for him?

19  A.  Yes.

20  Q.  How did your relationship develop after that?

21  A.  Pretty good.  As a normal client to -- I was the lead

22  instructor, so I dealt with a lot of the -- if he had any kind

23  of questions about his dog, I'm the one that dealt with him.

24  Q.  Did you train Mr. Croft?

25  A.  No.

1  Q.  After a while you left Worldwide, is that correct?

2  A.  Yes.

3  Q.  Where did you go?

4  A.  I went to a job in Missouri.

5  Q.  What did you do at a job in Missouri?

6  A.  I started a business called Lethal K-9 Academy.

7  Q.  Did you return from Missouri to Texas at some point?

8  A.  Yes, sir.

9  Q.  Approximately when was that?

10 A.  I was probably out in Missouri for a couple years maybe.

11 And then after that, I came back, so probably I've been back

12 for probably a good six years probably I been back since

13 Missouri.

14 Q.  So let's see, it's 2019 now, so if we subtract six, you're

15 talking about 2013 time period?

16 A.  Roughly, '12, '13.

17 Q.  When did Mr. Croft approach you about opening a dog

18 training business?

19 A.  I trained a secondary dog for him when I was in a job in

20 Missouri.  And he was very infatuated with just the business

21 itself, so he wanted to start something up here, he wanted to

22 move forward with it.

23 Q.  Is that one of the reasons why you came back to Texas from

24 Missouri?

25 A.  No, I had a couple issues out in Missouri, it wasn't going

1    as planned, so I came back down to -- my family is here and,

2    like I said, me and Brad, we never had no bad issues back then,

3    so he wanted to do a business, so we went ahead and --

4    Q.  So what happened when you moved back from Missouri as far

5    as Mr. Croft and you?

6    A.  He approached me about helping him start up a business as

7    far as, you know, the dog business goes and that I was going to

8    be the trainer, the one doing everything as far as training.

9    Q.  Prior to you getting the business with Mr. Croft, did

10   Mr. Croft ever have any experience training dogs?

11   A.  No, sir.

12   Q.  To your knowledge, was he ever in the military?

13   A.  No, sir.

14   Q.  To your knowledge, did he ever work for a law enforcement

15   department as far as a dog handler?

16   A.  No, sir.

17   Q.  What was your impression as far as why he wanted to go in

18   the dog training business?

19   A.  I think he just -- he enjoyed the dogs with his two

20   personal protective dogs, he had the drive where he wanted --

21   he enjoyed being around them.

22   Q.  Do you know if Mr. Croft possessed any certifications

23   regarding dog training?

24   A.  Not at all.

25   Q.  Or human training?

1    A.   No.

2    Q.   As far as getting the business started, what did the two of

3    you discuss?

4    A.   Pretty much he was going to run it, it was going to be his,

5    but I was going to be the one with the knowledge as far as

6    training goes.

7    Q.   Did you guys decide on what the name of the business was

8    going to be?

9    A.   He came up with the name as far as, you know, the Universal

10   K-9.

11   Q.   And you say he was going to run it and you were going to do

12   the training?

13   A.   Yes, sir.

14   Q.   Were you going to have any employees or anything like that

15   at that point?

16   A.   At that point, no, it was going to be just -- I was going

17   to do all the hands-on.

18   Q.   There are a lot of dog companies out there, did you guys

19   come up with anything creative to do as far as in order to get

20   a dog handler business?  What was your business model I guess

21   would be the way to phrase that?

22   A.   I been doing it for a while, so I had different connections

23   as far as, you know, people wanting to have my services, so I

24   mean we gained stuff that way, but we ended up starting a grant

25   program that was going to kind of be more appealing to police

Raymundo Nunez - Examination                    75

1   departments.

2   Q.  Tell us about the grant program?

3   A.  It was initially made to help dogs get a second chance, yet

4   at the same time help the departments by getting a lot more of

5   a discount than what the original price of dogs were going to

6   be.

7   Q.  You're saying department, you mean the Police Departments?

8   A.  Yes, sir Police Departments.

9   Q.  What was that going to be, how did that work out?

10  A.  If I remember correctly, it was like the grant program was

11  they -- we were going to get them a dog and they were going to

12  just pay for the course.

13  Q.  Now, if a Police Department wants to go out and buy their

14  own drug dog, is that a fairly cheap thing like picking up a

15  75-dollar dog or something like that?

16  A.  No, sir.  Police dogs, an average police dog goes anywhere

17  from 10,000 to 15,000.

18  Q.  How much were you thinking you would charge for the course?

19  A.  To my knowledge, we were supposed to be charging 2500 per

20  handler.

21  Q.  So the Police Departments as far as this grant goes, the

22  Police Department would get a trained officer?

23  A.  Yes.

24  Q.  Plus a dog for a fourth of the cost of just a dog?

25  A.  That's correct.

1  Q.  And again you said your role in the business was to do the

2  training and he was the -- how would you describe his role?

3  A.  To my knowledge and to all my officers was it was his

4  business, you know, I was just a worker, you know.

5  Q.  So would he have been the owner of the business?

6  A.  Yeah.

7  Q.  Who made the primary decisions as far as money, for

8  example, how much we're going to pay for things or how much

9  we're going to charge for a course?

10  A.  He did.

11  Q.  Did you get a salary or were you getting a split of the

12  revenue of the business?

13  A.  I got whatever he felt was right at the time, so I mean at

14  the time I didn't have no other work, so I appreciated whatever

15  I did.  Any kind of work, any kind of money came my way is what

16  I did.

17  Q.  Who decided what was right for you to get?

18  A.  He did.

19  Q.  Do you recall a corporation being formed?  Let me show you

20  Government Exhibit Number One.

21  A.  Okay.

22  Q.  This is a certification from the Secretary of State's

23  Office.  If we open up to the second page, can you read this on

24  the screen in front of you?

25  A.  Yeah, I can see it a little.

Raymundo Nunez - Examination                    77

1   Q.  Says at the top "Certificate Of Formation For-Profit

2   Corporation", right?

3   A.  Yes, sir.

4   Q.  And Universal K-9, Inc., that would be the name of the

5   business?

6   A.  Yes, sir.

7   Q.  And this is a for-profit corporation, is that correct,

8   meaning you're trying to make money?

9   A.  Oh, yes, sir.

10  Q.  And this is filed on what date?

11  A.  July 3rd, 2011.

12  Q.  Okay.  And who is listed as the registered agent here in

13  this block B?

14  A.  Myself.

15  Q.  And what is this address here, 14439 Northwest Military

16  Highway, suite 108-105?

17  A.  I'm not sure, sir.

18  Q.  And down here, it lists you as director, is that correct?

19  A.  Yes, that's what it says.

20  Q.  And if we go to the next page, you're the only director, is

21  that correct?

22  A.  Yes, sir.

23  Q.  Did you have any involvement in drafting these documents?

24  A.  No, sir.

25  Q.  If we go to the last page -- excuse me, go to page four.

1  Do you recognize the signature there?

2  A.  Yes, sir, that's my signature.

3  Q.  So you did sign this?

4  A.  You know, there's a lot of things that -- that is my

5  signature, but there's a lot of papers that I've seen that it

6  may look like my signature, but it definitely -- I don't recall

7  signing them.

8  Q.  Do you have any recollection of signing paperwork in order

9  to establish a corporation called Universal K-9, Inc.?

10  A.  No, sir.

11  Q.  And this indicates that it was established -- well, you

12  signed it in June of 2011, is that correct?

13  A.  Yeah, this is what it says.

14  Q.  Does that help you recall when you would have come back

15  from Missouri and started talking to Mr. Croft?

16  A.  Roughly around that time frame, but like I said, I don't

17  recall signing any of these papers or saying anything of that

18  sort.

19  Q.  How long did you work for Universal K-9?

20  A.  Maybe little bit over a year probably, around there.

21  Q.  Into 2012?

22  A.  Roughly around there.

23  Q.  What did you do for Universal K-9?

24  A.  I taught his classes, the police classes and I trained the

25  dogs.

1   Q.  How many classes do you think you taught?

2   A.  Maybe a good -- anywhere from six to eight maybe.

3   Q.  And how many students did that involve all total?

4   A.  It varied, but probably maybe a good 15, 20 students

5   probably.

6   Q.  Per class?

7   A.  No, no, total.

8   Q.  All total?

9   A.  Yes, sir.

10  Q.  Was that normally what you'd be involved in teaching when

11  you were running your own businesses?

12  A.  Right now I teach classes of anywhere from nine to ten at a

13  time.

14  Q.  And you're teaching the same type of classes now that you

15  would have been teaching when you were with Brad Croft?

16  A.  That's correct.

17  Q.  While you're teaching the classes, what did Brad Croft do?

18  A.  He would show up here and there, show up and kind of

19  introduce himself to the class.

20  Q.  Who is responsible for getting the dogs for the training?

21  A.  He was.

22  Q.  Where did those dogs come from?

23  A.  Different places.

24  Q.  Tell us a few of the places?

25  A.  Some of the places were the shelters for the most part, but

1   at one point we did get dogs in from Europe.

2   Q.  Did you go with him when he would select dogs from the

3   shelters?

4   A.  At the beginning I did, but after that, no.  He took it

5   upon himself to do that.

6   Q.  Why did you stop going?

7   A.  Again I didn't make that decision.  He decided he was going

8   to do it on his own.

9   Q.  Now, when you're choosing a dog to be trained to be a

10  working dog for law enforcement or whatever, there are certain

11  aspects of behavior that you look for, is that correct?

12  A.  That's correct.

13  Q.  What type of behavioral aspects do you look for?

14  A.  For one, we've got to make sure there's no aggression

15  involved.  That can be a liability to ourselves or to the new

16  handler.  Certain types of drive needs to be shown.  To be

17  honest, that's pretty much the basics.

18  Q.  Did you talk to Mr. Croft about those instincts that he

19  should be looking for when he's getting dogs?

20  A.  I mean he hung around me long enough to pick up things here

21  and there, you know, anything that I guess that he thought he

22  knew what he was doing was due to me as far as him just

23  observing.

24  Q.  He never taught any of the classes at the point that you

25  were there?

Raymundo Nunez - Examination                81

1   A.  No, sir.

2   Q.  Were there any other instructors other than you working for

3   Universal K-9 when you worked there?

4   A.  No.  I brought a couple friends over just to hang out every

5   once in a while, but you know, they were my friends and they

6   were instructors either for the military or just old friends of

7   mine, but never taught classes.

8   Q.  Was one of those individuals known as Arthur Underwood?

9   A.  At the time that I taught classes, he was never around.  He

10  came in later on in the picture.  He was one of my instructors,

11  but he never taught a class and never was involved in any

12  classes.

13  Q.  Tell us a little bit about Arthur Underwood, would you?

14  Who is he?

15  A.  He's a really important guy in my life actually.  He taught

16  me a lot.  He passed away, but you know, he just had his ups

17  and downs.  So at the time that I was with him -- that he came

18  to be around me, he was at a pretty low spot in his life

19  because he got let go from the military, so there was a lot of

20  things going on.

21  Q.  So he was a friend of yours?

22  A.  Oh, yes, sir.

23  Q.  As far as his relationship with -- well, let me ask you

24  this.  How would you describe his relationship with Brad Croft?

25  A.  There was no relationship.

1   Q.  What do you mean by that?

2   A.  Brad did not know him.  He knew him through me, maybe met

3   him I would say maybe a couple times, two at the most, but Art

4   was my friend, you know, one of my instructors.  So like I

5   said, he never -- during the time that I taught classes, he

6   was -- Art was never in the picture.  He came in later on.

7   Q.  Did Art Underwood ever teach any classes for Universal K-9?

8   A.  No, sir.

9   Q.  I'm going to show you what's been marked as Government

10  Exhibit Number Nine.  If we could zoom in on the top part here.

11  This is a certification of vital records, actually a death

12  certificate, is that correct?

13  A.  Yes, sir.

14  Q.  Arthur Lee Underwood, Jr., that's the person we're talking

15  about, is that correct?

16  A.  Correct.

17  Q.  And he died when?

18  A.  March 18, 2014.

19  Q.  Now, you indicated that Mr. Underwood would come to visit

20  you and that he may have met Mr. Croft one or two times while

21  he was there?

22  A.  Correct.

23  Q.  Would Mr. Underwood ever have worked for Universal K-9?

24  A.  No, sir.

25  Q.  Why is that?

1   A.  Art didn't have much, just like I did at that time, but he

2   stated to me it wasn't his cup of tea, he didn't really get

3   along with Brad, it was just his character.

4   Q.  When you say his character, are you talking about

5   Mr. Underwood's character or Mr. --

6   A.  No, Brad's character.  He didn't get along with him the two

7   times he met him, just didn't rub him right.  And the only

8   reason he was there was, like I said, he was family to me.

9   Q.  Going back to Universal K-9, what type of customers was

10  Universal K-9 targeting at the point where you were actually

11  teaching?

12  A.  Strictly law enforcement.

13  Q.  Did you have any problems dealing with Mr. Croft regarding

14  the business?

15  A.  I mean the pay could have been better, you know, there were

16  certain decisions that I felt that as my experience for the

17  trainer part of it would have been different as far as products

18  or anything like that, but again I didn't have that say.

19  Q.  Now, you say from your experience it might have been

20  different, you're comparing your experience to Mr. Croft's

21  experience?

22  A.  Well, there's no comparison, the experience wasn't there.

23  He had no experience compared to me.

24  Q.  And yet he was not taking your guidance as far as what

25  should be done as far as training of the dogs?

1    A.   That's correct.

2    Q.   Why did you leave Universal K-9?

3    A.   The last project that me and Mr. Croft had was a very big

4    project.  It took me a good while, it was a contract for a

5    private sector for two dogs.  And I did a lot of work on them.

6    I did a whole lot of work on them and expecting to get paid

7    after I was done.  I delivered the dogs out of Austin and when

8    I delivered the dogs, as I was led to believe that I was going

9    to get the payment upon delivery from Brad, so I was pushing on

10   it, I spent months and months on these dogs.  And when I

11   arrived to Austin, the guy shook my hand, said thank you.  I

12   showed him everything that needed to be done and he was happy

13   with his product.  I expected the payment and he told me, "I

14   paid your -- I paid Brad.  I wired the transfer months ago."

15   And I -- my heart dropped because I expected that money for my

16   family.  I called him back and he wanted -- he says, "I think

17   we need to go our separate ways."

18   Q.   When you say, "I called him back", who are you talking

19   about?

20   A.   I called Brad.  I told him, "Hey, what's going on?  What's

21   happening?"  Because it caught me by surprise.  He says, "Well,

22   we need to go our separate ways."

23   Q.   And is that when you left Universal K-9?

24   A.   Yes, sir.

25   Q.   Did you ever get paid for those two dogs that you trained?

1    A.  No, sir.

2    Q.  Anything at all?

3    A.  No.

4    Q.  I show you Government Exhibit 6f.  And in particular I want

5    to go to page -- let's start with page one here.  At the top

6    you can see this is an e-mail, correct?

7    A.  Yes, sir.

8    Q.  From Brad Croft to -- do you know a Bebe Glasgow or any of

9    these individuals listed here?

10   A.  No, sir.

11   Q.  Now, this is October 4th of 2015, is that correct?

12   A.  Yes, sir.

13   Q.  Were you working for Universal K-9 at that time?

14   A.  No, sir.

15   Q.  If we scroll down, you'll see listed here under Exhibit J

16   and K, roster of administrative and instructional staff, it

17   lists Art Underwood.

18   A.  Yes, sir.

19   Q.  Was Art Underwood working for Universal K-9 at this time?

20   A.  No, sir, he never did.

21   Q.  In fact, he had died almost two years before this, is that

22   correct?

23   A.  Yes, sir.

24   Q.  If we go to page 69, is this Mr. Underwood's name on this

25   again?

1  A.  Yeah, it is.

2  Q.  Did he ever agree to teach the K-9 handlers course or the

3  K-9 trainers course for Mr. Croft?

4  A.  No, sir.

5  Q.  Let's turn the page and turn the page again.  There's a

6  series of certificates here.  These are for who?

7  A.  For Art Underwood.

8  Q.  That's the individual you're talking about, right?

9  A.  Yes, sir.

10  Q.  He was in the Air Force?

11  A.  Yes, sir.

12  Q.  And he had been through a variety of different courses.

13  This one is for the patrol dog explosive detection course?

14  A.  Yes, sir, he was well known in the dog business.

15  Q.  Had you seen these certificates before?

16  A.  Yes, sir.

17  Q.  Do you know how Mr. Croft obtained these certificates?

18  A.  There was a time where again Art didn't have much to him,

19  the only thing he had was his knowledge on dogs and, you know,

20  in the military we got badges for -- we got coins and we got

21  certificates for accomplishments.  And Art, of course, had a

22  lot of accomplishments, so he shared them with everyone, anyone

23  that asked, he was proud of them because he didn't have much,

24  but he had that to show.  That's the only way that I can think

25  that he could have gotten them, just by showing them and maybe

 1  he took pictures of them or whatever because there's no other

 2  way that he would have allowed anyone to take those off his

 3  hands.

 4  Q.  Now, this is very important.  To your knowledge, at any

 5  time did Mr. Underwood ever agree to teach courses for

 6  Universal K-9?

 7  A.  No, sir.  From the day to the day -- last day that he

 8  passed away, I was in contact with him.

 9  Q.  "With him"?

10  A.  With Art Underwood.  And there was no way that he would

11  have ever done it.

12  Q.  In fact, he didn't have a good relationship with Croft?

13  A.  No, sir.

14          MR. SUROVIC:  No further questions, Your Honor.

15          THE COURT:  All right.  Well, it's lunchtime.  It's

16  12:00, we'll take a recess and then you can cross-examine him

17  after lunch, 1:30.

18          COURT SECURITY OFFICER:  All rise.

19          THE COURT:  You can be excused.  Thank you.

20          (11:59 a.m.)

21                          *   *   *

22          (1:41 p.m.)

23          COURT SECURITY OFFICER:  All rise.

24          THE COURT:  Please be seated.

25          MR. MCHUGH:  Your Honor, Tom McHugh representing the

 1   defendant.

 2            THE COURT:  I know who you are.

 3            MR. MCHUGH:  I'm a little chilled.  I know I'm out of

 4   uniform, I ask the Court's permission.

 5            THE COURT:  Yes, that's fine.

 6            MR. BROOKS:  May I proceed, Your Honor?

 7            THE COURT:  You may.

 8                        CROSS-EXAMINATION

 9   BY MR. BROOKS:

10   Q.  Hi, Mr. Nunez.

11   A.  How you doing.

12   Q.  Doing all right.  My name is Will Brooks.  I'm one of the

13   attorneys representing Brad here today.  I've got just a couple

14   questions.  If something is unclear, ask me to clarify.  How

15   would you prefer I refer to you?

16   A.  Mr. Nunez is fine.

17   Q.  Mr. Nunez.  Mr. Nunez, you discussed a little bit about

18   your background with dogs and it's roughly a 20-year time

19   frame, would that be correct?

20   A.  Roughly, yes.

21   Q.  You started off at Global, was that your first chance

22   training dogs?

23   A.  That was where I got some of the certifications, that's

24   correct.

25   Q.  Was there any sort of employment or experience before that?

1   A.   Yeah, I still did the dogs before doing that, yeah.

2   Q.   Life-long interest, have you always been interested in

3   dogs?

4   A.   Yeah, the majority of the family is law enforcement, so I

5   went to the closest thing to it.

6   Q.   Do you enjoy that work?

7   A.   Yeah, I love it.

8   Q.   So it's almost not like work in that sense, would you say

9   that?

10  A.   It's work.

11  Q.   Tough to train those animals?

12  A.   Without a doubt.

13  Q.   Is it almost a 24-hour type of job, would you say?

14  A.   Yeah, it's -- you got your hands full.

15  Q.   If you're training a dog or imprinting a dog, are you on

16  the clock in a sense with that animal?

17  A.   It depends on what I'm doing with the animal, yeah.

18  Q.   It's not something where you can walk away for, you know, a

19  day or something like that, you've got to be around and

20  responsible, correct?

21  A.   No, not really.  It just depends on what I'm going to be

22  doing with the dog.

23  Q.   Sure, sure.  And that's part of the training?

24  A.   Yes, again different dogs, different training, it all

25  varies.

Raymundo Nunez - Examination                    90

1   Q.  So before Global, who taught you about dog training before

2   that?

3   A.  Just different handlers, different K-9 handlers as far as

4   what they did with narcotics and detection work.

5   Q.  Did you have any certificates at that time?

6   A.  No, I got my first certificates off Global.

7   Q.  Would you characterize the industry -- is it fair to say

8   it's an experience-based industry?

9   A.  Yeah.

10  Q.  Is that how you acquire knowledge is through practice and

11  exploring some of these interests and imprinting and things

12  like that?

13  A.  Takes more than that, but yeah, takes a lot more than that.

14  Q.  Tell me about that, tell me about the more?

15  A.  Well, you got to have the right hands-on, you got to have

16  the heart for it and you got to pretty much like I said, know

17  what you're doing, have an open mind.

18  Q.  You have to have, is it fair to say, a passion for it?

19  A.  That's a small part of it, yeah.

20  Q.  How long were you at Global?

21  A.  Several years.

22  Q.  Is it fair to say you continued your training there and got

23  some certificates?

24  A.  Yes.

25  Q.  What did those certificates signify, if I may ask?

1   A.   Just an accomplishment of whatever kind of -- where you
2   were at, the level of your training.
3   Q.   Is there any sort of State agency that regulates those
4   certificates that are given out by Global?
5   A.   They do have to be licensed through DPS and depending on
6   what other kind of training they're doing.
7   Q.   And after Global, is that when you went up to Joplin for a
8   little while?
9   A.   No, sir.  I did several other things, I trained for the
10  Department of Defense for a while.
11  Q.   And how did you get into that?
12  A.   Same thing, just the knowledge of the dogs --
13            THE COURT:  Can we stop for just a second.
14  Mr. McHugh, I had them bring the heater in from the office.  Is
15  it working?
16            MR. MCHUGH:  It's going to fill with warm air, I'm
17  positive.
18            THE COURT:  Is it working now?
19            MR. MCHUGH:  It's on.
20            THE COURT:  Good.  You can continue.
21  BY MR. BROOKS:
22  Q.   With respect to that experience that led you to Department
23  of Defense you said and doing that kind of work, is this a
24  large network of folks that are in this industry here locally?
25  A.   Yeah, I would say so.

1   Q.   Is it a community of sorts?

2   A.   I wouldn't know if it's a community, but yeah, it's a large

3   field.

4   Q.   Fair enough.   Example would be I saw you at lunch, correct,

5   was that with Mr. Bragg or Keeling?

6   A.   With who?

7   Q.   With Mr. Bragg or Mr. Keeling.   I didn't see who the other

8   person was?

9   A.   Yeah, there was a gentleman out there, yeah.

10  Q.   Did you guys talk dogs?

11  A.   Yeah, we did.

12  Q.   Because that's kind of a commonality?

13  A.   Yes.

14  Q.   Did you know that gentleman before today?

15  A.   No.

16  Q.   After the DOD, where did you go after that?

17  A.   I went to Worldwide K-9.

18  Q.   And how long were you at Worldwide?

19  A.   Several years.

20  Q.   Five, ten?

21  A.   Less than five.

22  Q.   And was that a good experience, bad experience?

23  A.   Same thing, I was the lead instructor, lead trainer.

24  Q.   What qualified you for that position, was it the

25  experience?

1  A.  Yeah, my hands-on, my experience on it, what I can do with

2  the dogs.

3  Q.  Why did you decide to leave Worldwide?

4  A.  I got a better offer, it was going to be better for my

5  family.

6  Q.  Which offer was that?

7  A.  To go to Joplin.

8  Q.  And that opportunity didn't work out, correct?

9  A.  That's correct.

10  Q.  You had the occasion to meet Brad.  How did you guys meet?

11  A.  We met at Worldwide.  He was a client of Worldwide.

12  Q.  You trained a protection dog for him, is that correct?

13  A.  That's correct.

14  Q.  Did he show interest in dogs at that time?

15  A.  Yeah, he had to.  He got a personal protection dog.

16  Q.  With a personal protection dog, is that the sort of dog

17  that you had to stay on top of in training and reinforce

18  behaviors?

19  A.  We did require it, yes.

20  Q.  Did he show an interest in doing those reinforcement

21  behaviors?

22  A.  I had different occasions that I had a chance to talk to

23  him, but like I said, if he had questions, I would try to

24  answer them for him, but for the most part, he dealt with my

25  boss.

1   Q.  And you left Worldwide to then go work with Brad, is that

2   correct, or you left the Joplin opportunity, correct?

3   A.  No, I came back from Joplin, not to work with Mr. Croft, it

4   was just to come back because it didn't work out for me.  And

5   then that's when he approached me with that opportunity to

6   work.

7   Q.  You felt good about that opportunity at the time?

8   A.  Honestly it was an opportunity.

9   Q.  Sure.

10  A.  I don't know about feeling good or feeling bad about it.

11  It was an opportunity.

12  Q.  And you took that opportunity, correct?

13  A.  That's correct.

14  Q.  And you characterized your relationship as being good with

15  Brad at that time?

16  A.  Yeah, at that time it was good.

17  Q.  You've known him for roughly eight years now?

18  A.  No, I can't say that.  At the time, we were close.  I

19  haven't spoke to him or seen him in several years.

20  Q.  Fair enough.  And you started to train dogs, is that

21  correct?

22  A.  That's correct.

23  Q.  And the government produced a document that showed the

24  incorporation of a business to you, correct, do you remember

25  that?

1   A.  No, I don't.

2   Q.  So when they were asking you about your signature on some

3   documents?

4   A.  Oh, yes.

5   Q.  What was that document, if you remember?

6   A.  To be honest with you, I don't remember what it was about,

7   but I saw the document.

8   Q.  Was it the Universal K-9, was that the business?

9   A.  Yes, that's correct.

10   Q.  You were involved with Universal K-9 at that point?

11   A.  I was.

12   Q.  You had hoped to grow in that opportunity, correct?

13   A.  It was a job.

14   Q.  Did you feel or did you have hopes that you would grow in

15   that job beyond just training dogs?

16   A.  Actually I didn't have no expectation.  I was just trying

17   to work.

18   Q.  To get a paycheck?

19   A.  Somewhat, yeah.

20   Q.  And you did have some compensation, correct?

21   A.  What do you mean?

22   Q.  I mean you were paid, you discussed a little bit of that?

23   A.  Yes.

24   Q.  And I understand about the falling out over the two dogs,

25   but was there any other sort of compensation, did you ever get

1   a truck payment or anything like that?

2   A.   None.

3   Q.   How long was that, how long were you there?

4   A.   I'd say maybe little bit over a year, maybe two, if any.

5   Q.   And you had some philosophical differences with Brad, would

6   that be fair to say?  Meaning the way that you wanted to train

7   and the way you thought dogs should be trained was different?

8   A.   Yeah.

9   Q.   Okay.  You discussed the shelter dogs.  Tell me a little

10  bit more about that.  How did that come into play?

11  A.   We decided -- we started that grant program, that's the way

12  it came about.

13  Q.   And you thought that was a good thing, correct?

14  A.   Yes and no.  Depending on the breed.  I'm not a big fan of

15  certain mixed breeds because you can get different side-effects

16  with the mixed breeding and we don't know the backgrounds of

17  the dogs, so it can be a good thing, it can be a bad thing.

18  Q.   We've heard some testimony previously about the success

19  rate and how it's lower for those mixed-breed dogs as far as

20  success rate in becoming a trained K-9 officer, correct?

21  A.   Can you repeat that?

22  Q.   We've heard some testimony prior to you today whereby some

23  individuals discussed that these mixed-breed dogs are not as

24  successful in becoming a K-9 officer, is that right?

25  A.   A good dog is a good dog to me, just from my experience,

1    but what I did realize is some of the backgrounds were there

2    was a lot of stuff in the background of the shelter dogs that

3    we didn't know too much about, so it would come out later on in

4    the training and it was something that was causing a problem.

5    Q.  But it sounds to me like when you're talking about starting

6    this program, it's good in its concept and good in the idea,

7    meaning you're matching up the dog?

8    A.  It was a new idea and it was something to explore.

9    Q.  Would you say you were excited about it at that time?

10   A.  I think anything with dogs I get excited about.

11   Q.  Fair enough.  How long did that go on, if you recall?

12   A.  I don't recall, I wouldn't know what to tell you.  Like I

13   said, probably within that year, whatever I produced out there.

14   Q.  Did you ever do any sort of promotional work for Universal

15   K-9?

16   A.  Not promotional work, it was more Mr. Croft got different

17   newscasts to go out there and kind of promote it and I was just

18   there handling the dogs.  I wasn't there promoting the

19   anything, it was just in the background somewhat.

20   Q.  Fair enough.  So do you recall KSAT featuring a story about

21   you?

22   A.  Not about me, but about the dogs.

23   Q.  Do you remember the dog's name at that time?

24   A.  No, I don't.

25   Q.  Big Red, does that sound familiar?

1   A.  Yeah, that was one of the dogs that was out there.

2   Q.  Do you know where Big Red went?

3   A.  No, I don't.

4   Q.  Did you train Big Red?

5   A.  I did.

6   Q.  And when was that?

7   A.  I wouldn't know the dates, the exact dates on it.

8   Q.  Fair enough.

9   A.  Big Red was not a shelter dog.

10  Q.  Okay.  There was a mix of both shelter dogs and what we

11  would call I guess working dogs?

12  A.  No, he was a European dog.  He was from Europe.

13  Q.  Okay.  Is there a preference in the industry for trying to

14  train those types of dogs?

15  A.  Well, you have pure lines, so you have more working lines

16  so you have a better success rate.

17  Q.  Do you feel like your certificates affect your ability to

18  perform your job, in other words, to train either persons or

19  train the dogs themselves?

20  A.  I think it makes a difference because it's an

21  accomplishment, so without that, I mean I think any person off

22  the street can think they're doing the right thing and they may

23  not be because they don't have the education for it.

24  Q.  If I understand that correctly, to you that certificate

25  means it's someone has completed some training or they've had

1   experience, correct?

2   A.   Some kind of experience, correct.

3   Q.   So that experience is very important whether or not you

4   have certificates or not, if you've had the experience?

5   A.   Yeah, depending where you get it from.  I mean there's some

6   great places depending where they get their knowledge from.

7   Q.   And you would consider yourself to be an excellent

8   instructor or teacher, correct?

9   A.   I can hold my own.  I definitely don't want to put no one

10  else down.

11  Q.   And you've been doing it a long time?

12  A.   Yes, sir.

13  Q.   Trained a ton of dogs?

14  A.   Yeah.

15  Q.   And people?

16  A.   Yes, sir.

17  Q.   In respect to Mr. Underwood, when did he leave the Army?

18  A.   I'm not sure.

19  Q.   You would have been at Universal K-9 at the time?

20  A.   No, that was way before that.

21  Q.   Way before that, okay.

22  A.   Yes.

23          MR. BROOKS:  If I could -- may I have one second, Your

24  Honor?

25          THE COURT:  You may.

1          (Pause.)

2          MR. BROOKS:  If I could see Defense Exhibit Number

3    Eight please.

4    BY MR. BROOKS:

5    Q.  While that's being produced, Ray, you said that there's no

6    way that Art gave his information to Brad, correct?

7    A.  That's correct.

8    Q.  Certificates, resume, things of that nature?

9    A.  He didn't give him anything.  Like I said, when I brought

10   Art over just to introduce him because again I was trying to

11   help him out because he was going through a hard time, Brad

12   will ask the same questions anyone else has, just experiences,

13   kind of being nosey, you know, just wanted to understand what

14   each person's experience was.  So if at any time he showed it

15   to him, it wasn't out of applying it to something that he was

16   going to do for him.

17   Q.  And to kind of take a pause from that real quick if you

18   would take a glance at Defense Exhibit Eight, are you able to

19   see that?

20   A.  Yeah, I am.

21   Q.  Could you identify the two folks there for me?

22   A.  That's me and Art.

23   Q.  Okay.  And in respect to Art and what you're saying he did

24   not do -- you said he was pretty down when you started to

25   reconnect with him, right, when he left the service?

1   A.  What does that mean about being pretty down?

2   Q.  You said he was pretty low was your words, he had some ups

3   and downs and you said he was pretty down?

4   A.  He was prior military for a long time.  He went to the

5   civilian side and he was working with me at Global and then

6   went back to work at the military as civilian side of it.  And

7   then by the time -- years had passed by the time we got back to

8   when I was with Universal, he just got let go from the military

9   side of it.

10  Q.  Reasonable for someone to experience a low as a result of

11  that, correct?

12  A.  That's correct.

13          THE COURT:  Excuse me.  He had retired from the

14  military?

15          THE WITNESS:  No, he didn't get retired, he got --

16          THE COURT:  He just left.

17          THE WITNESS:  He left and then he went back as civil

18  service.

19          THE COURT:  And they let him go.

20          THE WITNESS:  It was end of his contract.

21          THE COURT:  His contract was ended and he left.

22          THE WITNESS:  Yes, sir, and he got let go.

23  BY MR. BROOKS:

24  Q.  That's understandable and reasonable leaving service and

25  going to civilian life, it's a transition that can be tough, I

Raymundo Nunez – Examination                    102

1  can imagine.
2      Are you saying that you were with him 24/7 from that point
3  on?
4  A.  We spoke a lot pretty much every day and it was just
5  personal stuff.
6  Q.  But you're not with him 24/7, he's not living with you,
7  you're not around him every day from that time until his death,
8  correct?
9  A.  No.
10  Q.  So is it possible that he did supply those documents to
11  Mr. Croft?
12  A.  No.
13  Q.  Is it an impossibility in your mind?
14  A.  Because of the fact that they didn't get along.  There was
15  no way.  He didn't trust him.  He trusted me because we were
16  friends.  He had a bad taste in his mouth about him from the
17  beginning.
18  Q.  Again he's on hard times at this point, correct?
19  A.  Yes.
20  Q.  And Mr. Nunez, I don't know if Mr. Surovic asked because it
21  was before lunch.  What kind of work are you doing now?
22  A.  Same thing I've always done, training police officers,
23  training military guys.
24  Q.  And you have your own business?
25  A.  I do, but I do more the business through Global Training

1   Academy.

2   Q.   Are you an employee or contractor?

3   A.   I'm an employee.

4   Q.   And they allow you to have your own business as well?

5   A.   Yes, sir, I work underneath their license, their

6   everything.

7   Q.   Is that common to have multiple disciplines or multiple --

8   A.   Through the State of Texas we have to have our guard dog

9   license, private investigators, and through DPS as well, so

10  yeah, I'm underneath their umbrella as well.

11  Q.   You're using Global's certificate?

12  A.   Yes.

13        MR. BROOKS:  No further questions at this time.  Thank

14  you, Mr. Nunez.

15                    REDIRECT EXAMINATION

16  BY MR. SUROVIC:

17  Q.   Mr. Nunez, very briefly.  If we could have Defense Exhibit

18  Eight back up.  Can you tell us where this picture was taken?

19  Do you recognize the background or anything there?

20  A.   No, I was trying to look at it earlier, but no, sir.

21  Q.   Do you know what the context of this picture is at all,

22  what was going on other than obviously you and he are eating?

23  A.   No, just us eating.

24  Q.   Or even who took the picture?

25  A.   I wouldn't even recall who took the picture.

1  Q.  Your relationship with Art Underwood earlier when I was

2  talking to you, it sounded like you had a very close

3  relationship, would that be fair to say?

4  A.  Yes, sir.

5  Q.  Would you describe your relationship?

6  A.  He was a father figure, he was a good friend, he was a

7  mentor.  He was a mentor, so for him to be involved in this

8  right now, it hurts, you know.

9  Q.  I think you mentioned that you were in almost daily contact

10 with him until the day he died?

11 A.  Yes, sir.

12 Q.  Because of your relationship with him, would you have known

13 if he had decided to work for Universal K-9?

14 A.  Yes, sir, without a doubt.

15 Q.  Did he ever indicate to you that he was even thinking of

16 working for Universal K-9?

17 A.  No, sir.

18 Q.  In fact, it was the opposite?

19 A.  Yes, sir.

20         MR. SUROVIC:  No further questions, Your Honor.

21         THE COURT:  Anything else?

22         MR. BROOKS:  Nothing further for this witness at this

23 time?

24         THE COURT:  All right.  You can step down, sir.  Thank

25 you.

1          MR. SUROVIC:  Your Honor, request that he be

2    permanently excused.

3          THE COURT:  Yes, he can be excused.

4          MR. SUROVIC:  Your Honor, our next witness will be

5    Mr. Wesley Keeling.

6          COURTROOM DEPUTY CLERK:  Please raise your right hand.

7                          *   *   *

8          *(WESLEY KEELING, Government Witness, Sworn.)*

9                          *   *   *

10         THE WITNESS:  I do.

11         COURTROOM DEPUTY CLERK:  Thank you.  You can have a

12   seat.

13                    DIRECT EXAMINATION

14   BY MR. SUROVIC:

15   Q.  Would you state your full name please, sir?

16   A.  Wesley Keeling.

17   Q.  Could I get you to spell your last name for the record?

18   A.  K-E-E-L-I-N-G.

19   Q.  And what city do you live in?

20   A.  Midlothian, Texas.

21   Q.  How long have you lived in Midlothian?

22   A.  About five years now.

23   Q.  How are you currently employed?

24   A.  I am a police officer and I own a police K-9 business.

25   Q.  Where are you a police officer?

1    A.   The City of Ferris ISD Police Department.

2    Q.   Where is Ferris located -- the City of ferries ISD?

3    A.   It's the Independent School District Police Department.

4    Q.   For Ferris?

5    A.   The school district, yes.

6    Q.   Where is Ferris located in relation to Midlothian?

7    A.   Just south, about 30 minutes, like 45, Highway 45.

8    Q.   You indicated that you're a police officer and you also did

9    something else?

10   A.   Yes, I own a police K-9 training business.

11   Q.   What is your K-9 training business called?

12   A.   Sector K-9.

13   Q.   How long have you been running Sector K-9?

14   A.   Since January of '18.

15   Q.   And how big is Sector K-9?

16   A.   Not very big, it's just --

17   Q.   Let's say in a normal month what do you normally do in

18   relation to Sector K-9?

19   A.   I have usually about six dogs in training, if that's what

20   you're asking, so I train dogs and then I still do part -- like

21   I said, I do part-time stuff with the Police Department.

22   Q.   So is Sector K-9 largely a dog training activity or do you

23   also train individuals to handle the dogs?

24   A.   I do both.

25   Q.   How long have you been a police officer?

1    A.   Almost 15 years.

2    Q.   Did you in the course of your career, did you meet an

3    individual by the name of Brad Croft?

4    A.   I did.

5    Q.   Is he in the courtroom today?

6    A.   Yes, sir.

7    Q.   Could I have you point him out and describe an article of

8    clothing he's wearing?

9    A.   Black leather jacket.

10             THE COURT:   The Court will note the identification of

11   the defendant.

12   BY MR. SUROVIC:

13   Q.   How did you first hear about Universal K-9?

14   A.   We were looking for a police dog.

15   Q.   Who is "we"?

16   A.   Midlothian Police Department.

17   Q.   Okay.

18   A.   We were looking for a police dog on the Internet and

19   Universal K-9 came up and I proceeded to show the chief his

20   programs and that's how we -- that's the contact that we made.

21   Q.   What particularly attracted you to Universal K-9?

22   A.   The cost, the cost of the dog.

23   Q.   What about the cost?

24   A.   It was very cheap, I think we paid $2,900.

25   Q.   And you were really paying for the course, you were getting

1   the dog for free?

2   A.  Right, come to find out.  We didn't know that at the time,

3   until we had more discussion about it.

4   Q.  How much does a police dog normally cost?

5   A.  Single purpose, probably nine to ten-ish.

6   Q.  Thousand?

7   A.  Yes, nine to ten thousand.

8   Q.  They're expensive animals?

9   A.  Extremely.

10  Q.  Did you meet Mr. Croft?

11  A.  I did.

12  Q.  How did that first meeting go?  How was that arranged?

13  A.  I was told to go to a hotel which we called and made -- I

14  was supposed to go down there for two weeks.

15  Q.  You were signed up for the course?

16  A.  Yes, we signed up for the course.  We sent Mr. Croft the

17  payment.

18  Q.  Where did the money from that payment come from?

19  A.  Midlothian.

20  Q.  You were not using your G.I. Bill or anything like that?

21  A.  No, sir, this is Midlothian Police Department.  Sent

22  payment and then we set up the course.  He told me what hotel

23  to go to, we went to the hotel or I did.  And then Mr. Croft

24  showed up in a white Dodge pickup the following morning around

25  nine, 9:30 with kennels in the bed of the truck.

1  Q.  And what did he tell you to do, what was the purpose of the
2  meeting when you first met him?
3  A.  He was going to give my dog to me and then we were going to
4  go to -- I think we went to -- I don't remember the first day
5  where we went.  We went to train at I believe Dodson homes, I
6  can't recall exactly where.
7  Q.  You first met him as a student in one of his courses?
8  A.  Yes, sir.
9  Q.  Where was Universal K-9 operating out of at the time that
10  you first met him?
11  A.  I didn't know.
12  Q.  You indicated that he met you in the parking lot of a
13  hotel?
14  A.  Yes, sir.
15  Q.  And he delivered you a dog and then you said something
16  about Dodson homes.  Can you describe what the course was like
17  that you attended?
18  A.  Well, I was the only one in the course, so we went to
19  lunch, you know, we would go train in the mornings, and then we
20  would go to lunch and we were pretty much done for the day.
21  Q.  When you say "we", who is "we"?
22  A.  Just Brad and I, Mr. Croft.
23  Q.  Did you run into -- did you meet anyone else during the
24  course of the course?
25  A.  No, sir.

Wesley Keeling - Examination                110

1    Q.   Who was instructing you?

2    A.   Mr. Croft.

3    Q.   Okay.  And how long did the course run?

4    A.   Two weeks.

5    Q.   And again would you describe -- you said you went to Dodson

6    homes, you would meet in the morning, do some training, then

7    you went to lunch?

8    A.   Yes, we would go to lunch wherever we decided to that day

9    and then most of the time we met later in the evening, but to

10   do some tracking because the dog was trained in narcotics and

11   tracking.

12   Q.   Where would you meet to do the tracking?

13   A.   Various places.  He would just tell me where to go.  A lot

14   of times he would come and I would follow him where we would go

15   do a track, a field or something, random places.

16   Q.   So these would be public places in various locations

17   throughout the city?

18   A.   Yes, sir.

19   Q.   Did you ever go to an actual school campus --

20   A.   No.

21   Q.   -- during this time period?

22   A.   No.

23   Q.   Were you able to complete the course?

24   A.   Yes.

25   Q.   Had you received dog handler training prior to going to

1   this course?

2   A.   No.

3   Q.   What was your interest in becoming a dog trainer?

4   A.   A dog trainer?

5   Q.   Excuse me.  A dog handler.

6   A.   A dog handler.  I've been in law enforcement for a while

7   and that was something that I always wanted to do and this was

8   a great opportunity to move forward with that.

9   Q.   After you graduated the course, you got your dog, did you

10  stay in touch with Mr. Croft?

11  A.   I did.  Initially it was because of all the issues I had

12  with my dog.

13  Q.   What were the problems with your dog?

14  A.   She didn't want to search cars, we didn't -- she didn't

15  want to do much, so I called Mr. Croft numerous times.  He said

16  it was me.  And I went back down there a couple times in a

17  police car.  Obviously the City allowed me to drive it down

18  there.  Went down and he would just put -- like he said, it's

19  my presentation, so a lot of times we would put hot dogs out.

20  I remember a ladder -- one of those times I think is when I

21  went to his house.  He put hot dogs along an aluminum ladder

22  and he said, "When you get to the hot dog, say check here."  We

23  did that and the dog seemed to do better at the time.

24  Q.   You used the phrase "presentation", what does that mean?

25  A.   Me basically showing the dog where I want her to sniff.

1  Q.  So he suggested you take the dog to hot dogs and show the

2  dog where you wanted her to sniff?

3  A.  Yes, sir, it was spaced out, hot dogs were probably

4  12 inches apart along the top of the ladder if the ladder was

5  upright.

6  Q.  Did that take care of the problem with your dog?

7  A.  I thought so at the time, but no, it didn't.

8  Q.  What did you end up doing?

9  A.  Work, work, work.  Went to a lot of different training

10  groups in my area who helped me out and we basically -- we

11  didn't start all over, we just kind of reintroduced odor to her

12  and she did pretty well after that.

13  Q.  You got that help from somebody other than Mr. Croft?

14  A.  Yes.

15  Q.  Did you continue to stay in touch with Mr. Croft?

16  A.  I did off and on for a little bit and then I don't really

17  remember how it went after that.  I know I mentioned that

18  because of what I did for the Police Department, which is

19  criminal interdiction, I told him that I thought that would be

20  a very beneficial class to add to his handler course because

21  it's information that they're not going to gain the way it was

22  currently set up.  And I just thought I could add something, I

23  was already teaching courses like that for my Police Department

24  and other Police Departments in the area, so I thought it would

25  be -- I was really into K-9, so I wanted to --

1    Q.  Do you know approximately when that was?

2    A.  I can't tell you.  I would say 2014, 2015 is when we first

3    started talking about it.

4    Q.  And what type of relationship did you have with Mr. Croft

5    at that time?

6    A.  We were starting to become friends, I felt like.  I felt

7    like we were getting to know each other on a personal level,

8    you know.  He knew I had kids, I knew he had Cameron, which is

9    his daughter and I just felt like we were becoming friends, so

10   it just kind of -- after the interdiction course was in play,

11   then we became pretty good friends, I felt like.

12   Q.  Were you the one that raised the idea of actually having an

13   interdiction course?

14   A.  Right.  Well, I think it was a mutual -- it was my class,

15   it's my material, I created it.  Mr. Croft is like -- he

16   thought, I guess he thought about it and we talked about it.

17   And I guess he thought it was a good idea, but I can't tell

18   you -- it's my class, so I would tell you that I brought it up

19   first, yes.

20   Q.  What type of agreements did you have with Mr. Croft

21   concerning that class, the interdiction class?

22   A.  Well, he wanted to charge 750 per student, $750 per

23   student.  I thought that was extremely high.  I thought 200 to

24   300 per student would be -- and you could help a lot of

25   officers out there.  But he stook with the 750 and he said

1  we'll split it.  And the first part of that was we had Dustin

2  Bragg involved, so we were going to -- basically whatever I

3  paid him, that's what Brad was going to pay him and we were

4  going to do it a three-way deal.

5  Q.  That was the original idea?

6  A.  Yes.

7  Q.  Did you have a particular target audience for this type of

8  course?

9  A.  I didn't do anything as far as targeting.

10  Q.  I'm not talking about sales or anything like that, but as

11  far as who were you anticipating would come to this course?

12  A.  Well, I was hoping that the handlers that -- because the

13  programs that he was doing was kind of targeting lower budget

14  Police Departments and I felt like this would give these guys,

15  since they're already there doing a course, that I thought they

16  could benefit from adding just some additional training there,

17  there with them and help them.

18  Q.  Did you actually sort of target police officers?

19  A.  Yes.

20  Q.  In the course of putting together your block of

21  instruction, did you use any materials that would have been

22  considered law enforcement sensitive?

23  A.  Everything.

24  Q.  Did that give you any concerns as far as who would be

25  attending that course?

1    A.  Not at the time.  Not at the time because we started out

2    with maybe two students and I knew they were police officers

3    because I talked to them, so as it grew it became a concern,

4    yes.

5    Q.  We'll talk about that in just a second.  How many courses

6    during the period of your association with Mr. Croft did you

7    teach?

8    A.  I don't know the exact answer to that.

9    Q.  More than five?

10   A.  Yes, more than five.

11   Q.  More than ten?

12   A.  Ten-ish, maybe a little bit more, maybe a few more.

13   Q.  Fifteen?

14   A.  I would say between ten and 15.  That would be a guess.

15   Q.  How often did you give the course?

16   A.  When he called and said he had students and then I would --

17   he would schedule with me so I could schedule it with work and

18   we would schedule it that way.  And I would try to go down on

19   the weekend in between the two weeks so the officers didn't

20   ever have to stay longer than what they were having to to

21   complete the two-week handler course.

22   Q.  So this would be a module that you would slip in on the

23   weekend between the two weeks of the normal handler's course?

24   A.  Yes, sir.

25   Q.  You said between ten and 15 courses, what period of time

1    are we talking about that you did this for him?

2    A.  I think we started the first one in '15, maybe early '16.

3    I just don't remember the exact dates.  And then it went to

4    '17.

5    Q.  So couple years?

6    A.  Yes, couple years.

7    Q.  You indicated first you didn't have a problem with the

8    first course because you only had two students and you knew

9    that they were both police officers?

10   A.  Sure.

11   Q.  How did the course evolve and what caused you to have

12   concerns?

13   A.  Well, after he obtained the V.A. approval, the classes got

14   huge.  And I knew that he had put -- he mentioned that he

15   wanted to do some V.A. stuff.  And I said, well, I can't teach

16   law enforcement sensitive class to civilians.  He didn't like

17   that.  He said -- how it kind of all ended was he said, "You'll

18   teach it to who I tell you to teach it to."

19   Q.  And did you continue to teach?

20   A.  No.

21   Q.  After he told you it's got to go to everybody?

22   A.  No.

23   Q.  So that would have been what, in 2017 when you stopped?

24   A.  Yes.

25   Q.  Did Mr. Croft ever discuss with you his idea of getting a

1    V.A. approval to allow G.I. Bill benefits to be used for his

2    courses?

3    A.   Yes.

4    Q.   What did he tell you about that?

5    A.   There was a lot of conversations.  Again I thought we were

6    friends, so I thought -- he would vent to me a lot and say

7    that, you know, I know -- when I first met Mr. Croft he told me

8    that the government -- I didn't understand it, I don't think he

9    used the words "G.I. Bill", but it was some type of military

10   contracts is the way to go to make a lot of money at K-9.

11        Again at the time I didn't, for lack of better words, I

12   didn't care, but as it went on, yes, he talked about getting

13   the V.A. and that it was an extensive application process and

14   that's pretty much all I knew.  And then he would just call

15   and, like I said, kind of vent is how I took it, that the V.A.

16   was not approving him because he was training shelter dogs and

17   that was -- they didn't think shelter dogs could do it and all

18   that.

19   Q.   Did you know when he actually finally did get approved,

20   V.A. approval?

21   A.   No.

22   Q.   Did he ever ask you to do K-9 handler courses or K-9

23   trainer courses for him?

24   A.   No.  I mean he talked about me -- he said that the veteran

25   side of everything would do the training of the dogs and then I

1   would do -- he wanted me to teach classes on the law

2   enforcement side.  So he wanted me to do separately what I had,

3   you know, kind of evolve a little bit and continue what I was

4   doing, but he was like, "I would like you to teach the law

5   enforcement side, you're a cop, I don't know what I'm doing on

6   that, so I want you to teach it."  So that's how it was

7   perceived to me.

8   Q.  So it was never a plan that you would be an instructor for

9   the school teaching K-9 handling or K-9 training?

10  A.  No.

11  Q.  Just the interdiction?

12  A.  Yes.

13  Q.  What else did you do for Mr. Croft other than teach the

14  interdiction course?

15  A.  Nothing.

16  Q.  Did you ever train dogs for him?

17  A.  Oh yes, I'm sorry, yes.  I did train a set of some dogs for

18  him and, yeah, it was every kind of dog you could think of.

19  Q.  Did you ever have any problems with the dogs he was asking

20  you to train?

21  A.  Uh-huh, yes.

22  Q.  What type of problems did you have?

23  A.  Dogs that wouldn't work.  I told Mr. Croft that.  I

24  misevaluated some of them, I thought they would work and it

25  turned out the dogs just didn't want to do it.  I called

1    Mr. Croft and he got upset with me and a lot of times cussed me

2    out.

3    Q.  What was Mr. Croft's normal reaction when you told him

4    something that he didn't want to hear?

5    A.  Get pretty mad, upset, very upset.

6    Q.  What effect did that have on you?

7    A.  Well, considering -- I mean no one likes to be yelled at

8    including myself, but considering I thought he was a friend, it

9    was pretty -- it affects you.

10   Q.  How much money did you get paid by Universal K-9?  You

11   indicated it was a split for the courses, did that continue?

12   A.  After?

13   Q.  While you're teaching the courses, did you continue to

14   split the money between him and you?

15   A.  Oh, yes, yes.

16   Q.  What about Dustin Bragg?

17   A.  He said that -- he basically told me he didn't want Dustin

18   to come.  So I -- yeah, he said he would have people come over

19   and help me with the set-up of the cars and how we conducted

20   the class, he would have people come and help me do the set-up.

21   Q.  How many classes do you think Dustin Bragg helped you with?

22   A.  I think one or two, not many.

23   Q.  And then he told you don't use Dustin Bragg?

24   A.  Right.  He said I'm not paying him, you don't need him.

25   Q.  Okay.  When did you stop working for Universal K-9?

1   A.   2017.

2   Q.   And why did you stop working for them?

3   A.   It was an argument that we had and I told --

4   Q.   What was the argument about?

5   A.   It was about interdiction and money.  And I told him that,

6   no, I'm not teaching interdiction for -- he wanted me to take a

7   less amount on the interdiction and basically fulfill all this

8   other stuff that we -- it was completely different from that.

9   And I told him no, that this is the price, this is what we'll

10  do, that's been the deal ever since.  And he got mad and cussed

11  me out and we split ways.

12  Q.   Was that about the same time that you told him that this

13  should only be for law enforcement officers and the conflict as

14  well?

15  A.   Yes.

16  Q.   While you were working for Universal K-9, who were the

17  instructors that he was using to teach the handler course and

18  the training course?

19  A.   Himself.

20  Q.   Just him?

21  A.   That's all I saw.

22  Q.   Was there anyone else available?

23  A.   At the end there was -- I forgot, Paco at the end.  I met

24  Paco and I don't really -- there was another man, but I don't

25  know what he did.  I don't know much about that.

1  Q.  Did you ever meet an individual by the name of Jesse

2  Stanley?

3  A.  I did, early on.  I met Jesse, I think I met him twice.

4  Q.  What was he doing for Universal K-9 when you met him?

5  A.  I don't know.  He just -- Brad said that he was going to

6  bring this guy on, he really knew a lot.  And when we met

7  him -- and that was one of the times I was down there with my

8  first dog I was having issues with.  He said you should listen

9  to this guy, this guy really knows what he's talking about.  I

10  said okay.  And Jesse, we talked for maybe five minutes and

11  that was it.

12  Q.  And you never had any more contact with him?

13  A.  One other time I think and it was again I brought my dog

14  back down because it was issues and he was doing something with

15  Jesse at a shelter and we met Jesse in a parking lot and that

16  was pretty much it.

17  Q.  You ever meet an individual by the name of Art Underwood?

18  A.  No.

19  Q.  How about Stephen Peek?

20  A.  I did meet Steve, yes, sir.

21  Q.  How did you meet Steve Peek?

22  A.  Through Mr. Croft.  I was doing the interdiction course and

23  again that was after -- so I met Steve after Jesse.  And Brad's

24  like, Oh, this guy really knows what he's doing and, you know,

25  okay.  And so I met Steve one weekend when he came in because

1    he works for a trucking company and he set up the 18-wheeler

2    searches that we wanted these guys to conduct with their dogs

3    and teach them how to search 18-wheelers.  He set that up and

4    he came out and, you know, helped me set up the mimic of the

5    hides and, you know, he pulled the truck around and that stuff,

6    so that's when I met him.

7    Q.  Did Steve Peek teach any courses while you were there?

8    A.  Not that -- I think maybe one at the end he was instructing

9    one, but I don't recall.  I don't recall.

10   Q.  You ever meet an individual by the name of Richard Cook?

11   A.  I did.

12   Q.  Who is Richard Cook?

13   A.  Richard was a friend of Brad's.  And I know that he said

14   that Rick was an ex-veteran and he was helping with the veteran

15   side of it.  I met Rick a couple times at a conference and a

16   couple times when I was at Brad's house.

17   Q.  You talked about Brad's house a couple times now.  Where is

18   Brad's house?

19   A.  It was in San Antonio off of I think Bute Hill *(ph)*.

20   Q.  Are we talking about a brick and mortar type house or a

21   mobile home?

22   A.  No, at the time it was a brick and mortar house.

23   Q.  Were you around -- were you involved with Universal K-9

24   when Mr. Croft purchased the big motor home?

25   A.  No.

1   Q.  Did you ever go into the big motor home?

2   A.  No.

3   Q.  What would you do at Mr. Croft's house?  I think you said

4   was Crest View?

5   A.  Bute Hill *(ph)*.  We would train.  There was a lot of times

6   that I would, you know, on the interdiction stuff if I didn't

7   get a hotel, I'd stay with Mr. Croft on the separate side of

8   the building -- building, it was like a building -- on the

9   separate side of the house.

10  Q.  Is that where the dogs were stored?

11  A.  Yes, at that time.

12  Q.  What was Mr. Cook's role in the school?

13  A.  I don't know.  I don't know much about that.

14  Q.  Who owned Universal K-9?

15  A.  After research after I left because I wanted to know what

16  all my name was on, I found out that Rick owned Universal K-9.

17  Q.  To your knowledge, who was it that made all the decisions

18  for Universal K-9?

19  A.  Oh, one hundred percent Brad Croft.

20  Q.  Did you ever deal with Mr. Cook on anything?

21  A.  No, just going out to eat or seeing him and saying hi.

22  Q.  Were you involved in any decisions, were you aware of who

23  the decision-maker was that involved Mr. Cook?

24  A.  I think Brad.  I mean Brad decisions no matter what

25  happened, no matter if we disagreed with it or not, Brad made

1   the decisions and he made sure that you knew he was in charge.

2   Q.  When you were discussing things with Mr. Croft, did you

3   ever discuss with him about the possibility of you being the

4   curriculum supervisor for Universal K-9?

5   A.  Absolutely not.

6   Q.  Did you supervise the curriculum for Universal K-9?

7   A.  No.

8   Q.  Other than your own one little course?

9   A.  No.

10  Q.  Did you ever give Mr. Croft permission to use your name

11  and -- first of all, you are TCOLE certified, is that right?

12  A.  Yes, sir, I am.

13  Q.  Can you tell us what that means?

14  A.  It's the Texas Commission On Law Enforcement standards.  So

15  we have that -- that's our commissioning -- that's what gives

16  us our license to become a police officer, to get hired at a

17  Police Department.  And so we have to have so many hours every

18  year, every two years.  And then I'm an instructor, so I can

19  create classes and based on their format and their standards

20  and be able to provide law enforcement hours for those classes.

21  Q.  Does law enforcement have to earn a certain number of

22  continuing education hours every year through TCOLE?

23  A.  Yes.

24  Q.  And because of your certification, were you able to provide

25  those hours?

1   A.   Yes.

2   Q.   Did you ever give Mr. Croft permission to use your name or

3   your TCOLE certification in order to obtain approval for V.A.

4   and TVC funding through the G.I. Bill for his school?

5   A.   Not for that, no, absolutely not.

6   Q.   Did he ever discuss with you that he wanted you as a

7   instructor specifically for V.A. candidates taking the handler

8   or trainer course?

9   A.   He told me he wanted me to teach the Power Point and he was

10  going to pay me $10,000 for three days to teach the Power

11  Point.

12  Q.   What do you mean by Power Point?

13  A.   The Power Point I guess for the V.A., that's what he told

14  me.

15  Q.   I'm going to show you Government Exhibit Number 6f.  When

16  you say the Power Point, that was a one-time thing, wasn't it?

17  Was that going to be a one-time thing or was that going to be

18  continuous employment?

19  A.   I didn't ask.

20  Q.   Let's look at 6f.  And you can see that this is an e-mail

21  from Brad Croft, dated October 4, 2015, correct?

22  A.   Yes, sir.

23  Q.   And it contains a number of attachments to it.  We'll go

24  into those in a second.  But let's scroll down here.  You can

25  see paragraph seven, Exhibits J and K, roster of administrative

1   and instructional staff.  Do you see that?

2   A.  Yes.

3   Q.  Paragraph B says, "Instructor certifications are enclosed

4   herein.  (See Texas Commission On Law Enforcement certification

5   TCOLE for Universal K-9 Academy's curriculum supervisor,

6   Corporal Wesley Keeling."  Is that your name, Wesley Keeling?

7   A.   Yes.

8   Q.  Was there ever any type of agreement between you and

9   Mr. Croft that you would be the curriculum supervisor?

10  A.  Absolutely not.

11  Q.  And then it also goes on to talk about instructor Dustin

12  Bragg.  This is in October of 2015, would that have been before

13  or after he told you you could no longer work with Dustin

14  Bragg?

15  A.  I don't recall.  I don't know the dates.

16  Q.  And if we keep going down here, you can see your name is

17  listed as one of the four instructors?

18  A.  Yes.

19  Q.  And it indicates some course certifications that you have.

20  Is this correct information here that you're certified in K-9

21  interdiction?  That's the course you taught?

22  A.  Uh-huh.

23  Q.  Dual and single-purpose handlers course, were you certified

24  in those?

25  A.  No.

Wesley Keeling - Examination                127

1   Q.  K-9 trainer instructor course, were you certified in that?

2   A.  No.

3   Q.  Behavior modification course?

4   A.  No.

5   Q.  Let's go to page I believe it's 69 of the same document.

6   This is Exhibit J, see your name on this?

7   A.  I do.

8   Q.  It's, in fact, listed twice, is it not?

9   A.  Yes.

10  Q.  Indicates that you have a TCOLE instructor certificate, is

11  that correct?

12  A.  Yes.

13  Q.  And it indicates, again this is a roster of administrative

14  and instructional staff, indicates that you would be teaching

15  police K-9 handlers course, police K-9 trainers course for both

16  of the times your names are listed, is that correct?

17  A.  That's what it says, yes.

18  Q.  Did you ever have an agreement with Mr. Croft around

19  October of 2015 or any other time that you would be teaching

20  these two courses?

21  A.  No.

22  Q.  Let's go to the next page.  Can you tell us what this is?

23  A.  The top one?

24  Q.  The certificate of completion?

25  A.  It says basic instructor course.

1    Q.   And it's for who?

2    A.   It's for me.

3    Q.   It spells your name K-E-E-L-Y-I-N-G?

4    A.   Sorry, I just see that, no, that's not correct.

5    Q.   Who issued this certificate?

6    A.   Midlothian, I would assume.

7    Q.   Is that a certificate that you actually have?

8    A.   It is, but that's the wrong spelling on this particular

9    document.

10   Q.   Did you give permission for Mr. Croft to submit this

11   certificate as part of his application to the Texas Veterans

12   Commission to get V.A. approval?

13   A.   No.

14   Q.   Is this what you would refer to about -- would that be your

15   TCOLE certification?

16   A.   Yes, sir.

17   Q.   As an instructor?

18   A.   Yes.

19   Q.   And by the way, you got this in 2014, is that correct?

20   A.   Yes, sir, through my Police Department.

21   Q.   Do you know how Mr. Croft got a copy of your certification?

22   A.   I don't, but after many months of rattling my brain, I

23   think the only way he would obtain that is through the

24   interdiction course.  We're trying to give hours to students

25   and there's a lot of times they need this, it's not required by

1    State of Texas if they're students in Texas and it's not

2    required by every state that recognizes Texas hours, but there

3    are states that do want that or, you know, the trainers at

4    their Police Department.  In order to log those hours, they do

5    want to see the instructor's certificate.

6    Q.   They want to make sure they actually got it from somebody

7    who is a certified instructor?

8    A.   Right, right, and we have to produce the outline and class

9    agenda and all that good stuff too.

10   Q.   Again did you give Mr. Croft permission to use your name or

11   this certificate in relation to his application in October?

12   A.   Not -- no.

13   Q.   Let's look at Government Exhibit Number 6g.  And if we go

14   to the second page of this, this is another application through

15   the Texas Veterans Commission you can see at the top.  This one

16   was received by the Texas Veteran Commission March 4, 2016.

17   A.   Yes.

18   Q.   Do you see that?

19   A.   Yes.

20   Q.   And then we go to page 15, I believe.  This is that Exhibit

21   J again and is your name on this list?

22   A.   It is.

23   Q.   And is Mr. Bragg's name on this list?

24   A.   It is.

25   Q.   Now, if we go across here, TCOLE instructor certificate and

1   then it has a list of courses that you're going to be teaching.

2   Police K-9 handlers course, did you ever agree to teach that?

3   A.  Not for the V.A., no.

4   Q.  And did you have any understanding with Mr. Croft in March

5   of 2016 that you would be willing to teach that course for him?

6   A.  No.

7   Q.  The police K-9 trainers course, did you have any

8   understanding with him about that course?

9   A.  No.

10  Q.  Now, you did teach the K-9 interdiction course?

11  A.  I did, yes.

12  Q.  Behavior modification course, did you ever teach that?

13  A.  No.

14  Q.  The kennel master course, did you have any understanding

15  with him about you being a -- teaching kennel master course?

16  A.  No.

17  Q.  Are you even a kennel master?

18  A.  No, at the time I was none of those things except for the

19  K-9 interdiction, that's what I did.  I didn't even have a

20  trainers course at that time.

21  Q.  Did you have any understanding with Mr. Croft that you

22  would be willing to teach anything he offered to you?

23  A.  No.

24  Q.  If we go to the next page, it's the same certificate we saw

25  before, correct?

1    A.  Yes, sir.

2    Q.  Did you give him permission in March or on or around March

3    for him to use the certificate for any application that he made

4    to the V.A.?

5    A.  No.

6    Q.  Did he ever tell you that he was going to do that?

7    A.  Use mine?

8    Q.  Yes.

9    A.  Not that I ever recall.  I mean I wouldn't agree to -- I

10   mean I wasn't any of those things that he listed me as, so --

11   Q.  When did you first become aware that your name and your

12   certificates were used for this purpose?

13   A.  For I guess when the first meeting I had with the V.A. and

14   FBI.

15   Q.  When the agents came and talked to you?

16   A.  Uh-huh.

17   Q.  When was that?

18   A.  I don't remember exactly.  I don't remember the exact date.

19   Q.  Between 2016 and the present, has Mr. Croft ever come to

20   you and asked you would you teach a handlers course for me?

21   A.  No.

22   Q.  Has he ever come and asked would you teach a trainers

23   course for me?

24   A.  No.

25   Q.  In fact, you terminated your relationship even on the

1    interdiction course, is that fair to say?

2    A.   Absolutely.

3            MR. SUROVIC:  I have no further questions, Your Honor.

4                         CROSS-EXAMINATION

5    BY MR. MCHUGH:

6    Q.   Mr. Keeling, good afternoon.

7    A.   Good afternoon, sir.

8    Q.   My name is Tom McHugh and I represent Bradley Croft.

9    A.   Nice to meet you, sir.

10   Q.   How many meetings have you had with the government to

11   discuss Bradley Croft and Universal K-9?

12   A.   Two.

13   Q.   And approximately when were those two meetings?

14   A.   Again I don't recall the dates.

15   Q.   Do you know when the first one was?

16   A.   I don't recall the dates.

17   Q.   Do you know where it took place?

18   A.   Yes.

19   Q.   Where did it take place?

20   A.   In Red Oak at the courthouse.  I think it's the courthouse.

21   Q.   And how did you know that meeting or interview was to take

22   place?

23   A.   They called me and asked me if I would be willing to talk

24   about it.

25   Q.   Talk about what?

1   A.   The V.A. and Mr. Croft.

2   Q.   And did you say what are you talking about?

3   A.   I knew that he had got the V.A. approval, so no, I didn't

4   ask that.

5   Q.   What did you ask?

6   A.   I said sure.

7   Q.   And what did you and Dustin Bragg talk about regarding that

8   meeting?

9   A.   After the meeting or prior to the meeting?

10  Q.   Prior to the meeting.

11  A.   Well, we assumed that he was in trouble considering it's

12  the Veteran Affairs and the FBI wanting to interview us about

13  Mr. Croft.

14  Q.   Why would you assume that and not that he's just a fact

15  witness?

16  A.   His demeanor.

17  Q.   That's gratuitous.  In regard to that meeting, who set up

18  the location for that meeting?

19  A.   Mr. Bragg.

20  Q.   And why was it Mr. Bragg and not you that set up the

21  location?

22  A.   I couldn't find a location that would be easy for them to

23  find.

24  Q.   And how many days or weeks before that meeting were you

25  first contacted?

1   A.   Oh, I don't know, probably a week maybe.

2   Q.   And did you and Mr. Bragg discuss or speculate what that

3   may be about, did you have a conversation?

4   A.   I don't recall having any.  It wasn't our main concern.

5   Q.   And do you know when Mr. Bragg's interview was?

6   A.   I think Mr. Bragg went -- I think he went before me, maybe

7   he went after me.  I don't remember the order.

8   Q.   But it was on the same day?

9   A.   Yes, sir.

10  Q.   And you were alone in that interview, in other words, he

11  was not present with you?

12  A.   Mr. Bragg was not in the room when I was being interviewed,

13  no.

14  Q.   And you were not present with him during his interview?

15  A.   That's correct.

16  Q.   And in regard to that interview, who all was there?

17  A.   V.A., I believe an IRS and the FBI, three people.

18  Q.   Did you know any of them before that day?

19  A.   No, sir.

20  Q.   Do you know whether or not they took notes of that meeting?

21  A.   I think they did, I would assume they did.

22  Q.   You were there.

23  A.   I understand that, but I didn't pay attention to everything

24  they were doing.

25  Q.   Did they ask your permission to record it?

Wesley Keeling - Examination                     135

1   A.   Yes.

2   Q.   And you gave them your permission?

3   A.   Yes.

4   Q.   And how long did this interview take?

5   A.   Three, four hours maybe, I don't remember the exact time.

6   I don't remember what time we started.

7   Q.   And when did the recording start, of the interview?

8   A.   I don't remember what time it started.

9   Q.   How long had you been meeting with them before the

10  recording began?

11  A.   Couple hours.

12  Q.   So you visited with them a couple of hours and then you

13  agreed to have it recorded?

14  A.   Yes, because they asked me, sure.

15  Q.   And so all together were you there four hours?

16  A.   Like I said, I do not recall the time frame that I was --

17  Q.   I'm not holding you to a time frame, but is it your

18  testimony that you visited with them for a couple of hours and

19  then at the end of that couple of hours they asked your

20  permission to go through one more time and to record it this

21  time?

22  A.   Yes.

23  Q.   And have you asked to see that recording?

24  A.   No.

25  Q.   Have you seen the recording?

1    A.  No.

2    Q.  Have you seen the notes of that meeting?

3    A.  No.

4    Q.  It's your testimony that you first met Mr. Croft back in

5    approximately what year?

6    A.  '14, 2014.

7    Q.  2014.  And who is it that put you in contact with

8    Mr. Croft?

9    A.  The Internet.

10   Q.  The Internet.  And had you had any -- who knew Mr. Croft

11   first, you or Mr. Bragg?

12   A.  Me.

13   Q.  And did Mr. Bragg ever send you a communication based on

14   the letterhead at Red Oak Police Department regarding or

15   concerning Brad Croft?

16   A.  I don't know.

17          MR. MCHUGH:  Defendant Exhibit 58.

18   BY MR. MCHUGH:

19   Q.  Would you like to take some time to read that?

20   A.  Sure.

21      (Pause.)

22      Okay.

23   Q.  What was the purpose of this communication?

24   A.  I don't remember getting this, so --

25   Q.  You know Justin Bragg, do you not?

1   A.   Yeah, he's bragging about the dog and what he got on the

2   street.

3   Q.   What does the highlighted portion of that letter say?

4   A.   It said, "I had the privilege of training with Mr. Croft

5   for two weeks.  During this time, Mr. Croft provided excellent

6   hands-on training."

7   Q.   And was this before or after you were first introduced to

8   Mr. Croft?

9   A.   This is after.

10  Q.   Because you knew him before Mr. Bragg did?

11  A.   Yes.

12  Q.   Why is it that Mr. Bragg had to write this letter to you

13  talking about somebody that you already knew?

14  A.   I don't know.  I don't remember --

15  Q.   Fair enough, thank you.  In regard to your interview, would

16  your memory be fresher today or on the day that you gave that

17  recorded interview?

18  A.   I would say the day I gave it.

19  Q.   In regard to Mr. Croft, would you agree that your initial

20  meeting and relationship with him was positive?

21  A.   Yes.

22  Q.   And what do you mean by positive?

23  A.   Wasn't negative.  I don't know.  I mean I felt like we

24  became friends, so it was positive.

25  Q.   And how was that friendship manifested?

1    A.   There is nothing, there's no contact.

2    Q.   How was at the time that friendship manifested?

3    A.   How was it manifested?

4    Q.   Yeah.

5    A.   We just started talking.

6    Q.   And you would talk -- you lived in different cities?

7    A.   Yes.

8    Q.   And but you would talk on the phone?

9    A.   Uh-huh.

10   Q.   You would talk about family?

11   A.   Sure.

12   Q.   You talked about dogs?

13   A.   Sure.

14   Q.   You even talked about the Dallas Cowboys?

15   A.   A lot.

16   Q.   You didn't talk about the Cowboys last week?

17   A.   We talked about when Romo was a quarterback when they were

18   a real team.

19   Q.   With regard to your relationship with him, your business

20   relationship with him --

21   A.   Yes.

22   Q.   -- it had a life of approximately two years?

23   A.   Yeah.

24   Q.   And then at the end, it crumbled?

25   A.   Sure.

1  Q.  And the last time you communicated with him or talked with

2  him was then?

3  A.  Well, he sent me some text messages after that, but I

4  didn't respond to.

5  Q.  Did you have his e-mail address?

6  A.  Well, there was like three of them, so I would have to

7  look -- I would have to literally ask him which e-mail he'd

8  want me to send it to and it was usually three different ones.

9  Q.  What would you send to the e-mail address?

10  A.  Anything, I don't know.

11  Q.  Well, I'm asking you.  I mean you talked with him on the

12  telephone --

13  A.  Well, sir --

14          THE COURT:  Just a minute.

15  Q.  -- you're representing that you --

16          THE COURT:  If you don't remember, just say you don't

17  remember.

18          THE WITNESS:  I don't remember.

19          MR. MCHUGH:  Defendant Exhibit 52.  Please bring that

20  up.

21  BY MR. MCHUGH:

22  Q.  What is Government Exhibit *(sic)* 52, sir?

23  A.  Looks like an e-mail from my work e-mail to Brad Croft,

24  Universal K-9.

25  Q.  And does it indicate what it may be about?

1    A.   Says, "My stuff, Wes's resume two."

2    Q.   That would be from you to Mr. Croft?

3    A.   That's what it appears.

4    Q.   Do you have an independent recollection of that or are you

5    saying that never happened?  Do you believe it happened because

6    you're looking at it?

7    A.   I don't remember.  I don't know the authenticity of this.

8    Q.   I'm not asking you that.

9    A.   If you're saying it's real, then I'm going to believe you

10   saying it's real, then okay.

11   Q.   Sir, I wasn't involved in the communication between you and

12   Mr. Croft.

13   A.   I understand that.

14   Q.   You had a telephone relationship with him, you have an

15   in-person business relationship with him and according to your

16   testimony, you would also on occasion text him and e-mail him?

17   A.   That is correct.

18   Q.   In regard to Mr. Croft, was there any occasion that you

19   would need to send him information regarding your history, your

20   training, your background, any of that?  Would it relate to the

21   interdiction course?

22   A.   Yes.

23   Q.   And why would you -- if you gave him that information, why

24   would you give him that information?

25   A.   Well, I think it's a deal where -- I think he explained to

1   me that he wanted to have it on file just like any other

2   training coordinator does anywhere else that they teach

3   classes, so I didn't think that there was anything wrong with

4   that.

5   Q.  I refer you to Defendant Exhibit 53.

6           MR. MCHUGH:  And then if you would, Joe, if you would

7   scroll through that.

8   BY MR. MCHUGH:

9   Q.  And as he's scrolling through it, just look at it.  And as

10  you're looking at it, if I may address you, are you familiar

11  with this document?  Did you put this document together?  Have

12  you seen this document before?

13  A.  It appears to be my resume.

14  Q.  And would you have put that resume together or would your

15  department have put it together?  Who would have put that

16  resume together?

17  A.  Well, I have two different resumes.  One department and one

18  personal and they both look the same except little fine

19  wording, so without me reading this entire document, I can't

20  tell you who made it.  It was either me or collaboration.

21  Q.  Let's go back to the top and see if that gives you a hint.

22  Does this appear to be your resume?

23  A.  Yes, it appears to be.

24  Q.  Does it appear to be the resume that you put together?

25  A.  It appears to be.

1   Q.  And it appears to be the resume -- and it is your testimony

2   that you sent this to Brad Croft as it related to your

3   interdiction program?

4   A.  Yes, to my best recollection that's what it's for.

5   Q.  That's your best recollection?

6   A.  Uh-huh.

7   Q.  Not positive, but that's your recollection?

8   A.  That's what I'm telling you I sent it for.

9   Q.  Fair enough.  Fair enough.  In regard to that interdiction

10  course, you know a Dustin Bragg, do you not?

11  A.  I do.

12  Q.  How do you know him?

13  A.  Through work.

14  Q.  What does he do at work?  Is he a dispatcher or what?

15  A.  He's a patrol officer assigned to a K-9 Unit.

16  Q.  In your department?

17  A.  No, the city next to mine.

18  Q.  He's in what city?

19  A.  Red Oak.

20  Q.  And you're in what city?

21  A.  Midlothian at the time.

22  Q.  How far are the two apart?

23  A.  Miles, probably 5 miles maybe.

24  Q.  How often would you see, visit or converse with Mr. Bragg?

25  A.  We trained every Tuesday, so we definitely talked every

1  Tuesday.

2  Q.  You said you drank every Tuesday?

3  A.  Trained every Tuesday.

4  Q.  Trained, I'm sorry.

5  A.  It's okay.

6  Q.  I drink every Tuesday.

7  A.  Congrats.

8  Q.  In regard to when you first began or when you first took a

9  positive step toward being involved in a dog program, that is

10  what drew you together through the Internet to Bradley Croft?

11  A.  Yes, we had a dog at the time, but it became blind, so yes,

12  we researched and --

13  Q.  And so you conferred with him, you talked with him a couple

14  times on the phone and then you actually went down to San

15  Antonio physically and met him?

16  A.  Yes.

17  Q.  And that was your testimony on direct examination, as I

18  recall?

19  A.  Yes.

20  Q.  And it is your testimony today that you were alone, it was

21  just like a one-on-one class?

22  A.  Yes.

23  Q.  And when you first met him, what was the location where you

24  first met him?

25  A.  It was the hotel that he used off 610, I don't remember the

1   exact name of the hotel or the address.

2   Q.  And it may have been 410?

3   A.  Maybe 410.  Sorry, I'm not familiar.

4   Q.  And you took a one-on-one course from him?

5   A.  Yes, sir.

6   Q.  And after that one-on-one course, did you get a dog or

7   anything?

8   A.  I did.

9   Q.  And is Remmie the name of the dog?

10  A.  Yes.

11  Q.  What kind of dog is Remmie?

12  A.  She's a Lab mix, we don't know.

13  Q.  And was it a handler training interdiction course that you

14  had with him?

15  A.  No, just a handler course.

16  Q.  A handler course with him, that was the initial.  And they

17  have dog training and handler training, I believe is your

18  testimony, right?

19  A.  I didn't do any dog training at the time.

20  Q.  Universal K-9, was it your understanding?

21  A.  Yes, yes, sir.  I'm sorry.

22  Q.  And is it also your understanding -- well, let's talk about

23  Remmie.  Is Remmie still with us?

24  A.  She is, barely, but she's still there.

25  Q.  And do you know where Remmie came from?

1   A.  I believe Canyon Lake Animal Shelter.  I believe that's the

2   shelter.  Don't quote me on that, but --

3   Q.  Everything is quoted on the record.  In regard to Remmie,

4   how old was Remmie at the time when you first met Remmie?

5   A.  I think Mr. Croft estimated her to be three.

6   Q.  Did Remmie at the time appear to be a good fit for you?

7   A.  Sure, I didn't know any better.

8   Q.  If you had it to do all over again, would you walk away

9   from Remmie?

10  A.  Well, no, she's my dog.  I love her to death, no, I would

11  never walk away from her.

12  Q.  So Remmie turned out to be a good dog and a good companion

13  to you?

14  A.  Yes.

15  Q.  And your initial course down there with Remmie involved

16  what, what was it?

17  A.  It was a handler course for narcotics and tracking.

18  Q.  And what is meant by -- I'll come back to that.  And it was

19  how long was the course?

20  A.  Two weeks.

21  Q.  And how much was the course?

22  A.  I think it was 2,900, but there might have been an

23  additional charge for tracking.  I don't actually remember the

24  exact cost.

25  Q.  Because it was paid through the Department?

1    A.  Right.

2    Q.  And when it was over, did you believe -- at that time, did

3    you believe it to be a good value?

4    A.  I questioned it, I'm not going to lie.  I questioned the

5    dog's ability.

6    Q.  Really?

7    A.  Uh-huh.

8    Q.  And this is the first dog that you had been exposed to in

9    this relationship as a dog handler, correct?

10   A.  Yes.

11   Q.  I'm not asking you whether or not you may have had dogs in

12   the past?

13   A.  Okay.

14   Q.  Had you had dogs in the past?

15   A.  Yes.

16   Q.  And in regard to Remmie, so when you received Remmie and

17   you worked with Remmie for two weeks, at night would Remmie

18   stay with you or would Remmie stay with Mr. Croft?

19   A.  She would stay with me.

20   Q.  Sorry?

21   A.  She would stay with me.

22   Q.  And this was all part of the bonding experience, was it

23   not?

24   A.  Yes.

25   Q.  For the dog to feel comfortable with you and you to feel

1   comfortable with the dog?

2   A.   Yes.

3   Q.   On occasion, dogs and handlers just may not hit it off,

4   correct?

5   A.   Yes, sir.

6   Q.   But this one and on this occasion it turned out to be a

7   success?

8   A.   Yes, sir.

9   Q.   Not without its bumps in the road?

10  A.   That would be correct.

11  Q.   Short-term and long-term you would say it's positive?

12  A.   It turned out to be positive, yes.

13  Q.   Remmie was a shelter dog, it's your understanding?

14  A.   Yes.

15  Q.   And that shelter dog then became a working dog for you?

16  A.   Yes.

17  Q.   And though you had bumps in the road, I believe that's your

18  testimony, how long did Remmie remain a working dog?

19  A.   I think two years, maybe three.

20  Q.   And what were Remmie's responsibilities or what were your

21  responsibilities when you were on duty with Remmie, how would

22  Remmie be used?

23  A.   On narcotics searches, Search Warrants, anything involving

24  a narcotics search and any misdemeanors as far as tracking.

25  Q.   And what is meant by the term "perishable skill", as it

1   relates to dogs?

2   A.  I think that's something of your own, it's something very

3   valuable of your own.

4   Q.  Sorry?

5   A.  Something valuable of your own.

6   Q.  Something valuable of your own.  In terms of a perishable

7   skill, in terms of Remmie's skills, what were Remmie's skills?

8   A.  At what time?  What point in time are we talking about now?

9   Q.  We're talking when you first left, what did you believe to

10  be her skills?

11  A.  Narcotics detection dog and tracking dog.

12  Q.  And then that didn't work out that well in the beginning,

13  did it?

14  A.  No, sir, it didn't.

15  Q.  It was a rocky relationship, was it not?

16  A.  Yes, sir, it was.

17  Q.  And this was your first dog in this type relationship?

18  A.  It was my second dog in that type relationship.

19  Q.  And you would go back, you would complain to Mr. Croft

20  about it?

21  A.  Yes, sir.

22  Q.  And would he send you down the road or would he try and

23  help you?

24  A.  No, he tried to help me.

25  Q.  And did you believe him to be sincere?

1   A.   Yes.

2   Q.   If you didn't believe him to be sincere, you would not have

3   wasted your time with him?

4   A.   That's right.

5   Q.   And his school that you became familiar with, Universal

6   K-9, when you first went down there, it was classes would be

7   conducted at a hotel, is that correct?

8   A.   The interdiction course?

9   Q.   The interdiction course.  When you were down there and when

10  you co-partnered with Dustin Bragg?

11  A.   Yes, sir, we did it at a hotel.

12  Q.   And you two would get together and run an interdiction

13  class, would you not?

14  A.   We did.

15  Q.   And Mr. Croft would pay you?

16  A.   Yes.

17  Q.   And you would pay Mr. Bragg?

18  A.   Yes.

19  Q.   Right?

20  A.   Yes.  I believe that's the first -- I don't remember the

21  first -- how it was set up, the first payment.

22  Q.   And were you helping during this process Dustin Bragg to be

23  a teacher and a trainer?

24  A.   No.

25  Q.   Was he teaching you?

1   A.   No.

2   Q.   Well, you co-taught the interdiction course you said, I

3   believe it was your testimony, maybe ten to 15 times?

4   A.   Sure.

5   Q.   I believe it was your -- and it's no big deal, I believe it

6   was your recorded testimony that it may have been six to eight

7   times.  That's in the ball park, is it not?

8   A.   Yes.

9   Q.   And in regard to that, sir, respectfully how many times was

10  Dustin Bragg involved with you in this particular interdiction

11  class?

12  A.   Again I don't recall the exact number of classes he helped

13  me with.

14  Q.   It is your testimony that actually you put together a

15  program or a syllabus regarding your training regarding the

16  interdiction program?

17  A.   Okay.

18  Q.   Did you?

19  A.   A syllabus?  I think we're maybe talking about two

20  different things.

21  Q.   We very well may be.  What would you describe the course

22  materials to be?

23  A.   Well, I had to lay it out on paperwork, so I have a class

24  outline, I have a class -- basically an agenda that says

25  exactly what we're going to teach and then how we're going to

1    teach that.

2    Q.  And you drew that up?

3    A.  Yes.

4    Q.  That is your product, right?

5    A.  Yes.

6    Q.  Something you were proud of at the time and you're proud of

7    today?

8    A.  Yes.

9    Q.  I take it today it's evolved from even better than what it

10   was back then?

11   A.  I hope so, yes, that's the plan.

12   Q.  We all hope so.  In regard to Mr. Croft, was he aware of

13   these course papers that you put together?

14   A.  I told him that that's how we have to do a course if TCOLE

15   is going to recognize it.

16   Q.  And did he appreciate your effort and your good work?

17   A.  I would assume so.

18   Q.  The relationship at least at the time was good for you and

19   it was good for him?

20   A.  I believe --

21   Q.  Because it continued, correct?

22   A.  I would have believed so, yeah.

23   Q.  And I believe the first year may have been -- this

24   interdiction course may have been 2016.  I'm not representing

25   that it was, this is what I see in government reports.

1    A.   Okay.

2    Q.   And the second year 2017.  So you were involved in this

3    interdiction course for roughly two years where you were

4    working under the name of Universal K-9?

5    A.   I don't think I was ever working under the name of

6    Universal K-9.

7    Q.   Were they Universal K-9 sponsored programs?

8    A.   Yes, they were his students, yes.

9    Q.   And the second year I see or understand that you may have

10   been paid $14,000?

11   A.   Yes.

12   Q.   And how were you paid?  Were you paid per student, per

13   class, how did that work out?

14   A.   As the interdiction unit?

15   Q.   The interdiction.

16   A.   Per student.

17   Q.   Per student.  And what was your share with Mr. Croft, would

18   they pay you or would they pay him?

19   A.   They would pay Mr. Croft, then Mr. Croft would pay me.

20   Q.   And would you know how much they'd pay him?

21   A.   From my understanding, the class was $750.

22   Q.   And further when you say you did not work under the name,

23   but they were paying Universal K-9, Universal K-9 was paying

24   you?

25   A.   Okay.

1    Q.  And this was in San Antonio?

2    A.  Yes.

3    Q.  On somewhere between six to eight or ten to 15 occasions?

4    A.  Sure.

5    Q.  And Mr. Bragg was with you on some of those occasions,

6    though you don't recall how many?

7    A.  That's right.

8    Q.  And did you consider him to be a co-instructor with you or

9    would you kind of have him do things like as a teacher's aide?

10   A.  No, he was a co-instructor.  He just didn't do as much as I

11   wanted him to do.

12   Q.  That happens, doesn't it?

13   A.  Yes, it does.

14   Q.  And in regard to your present pursuit, your present

15   livelihood, one of them is Sector K-9?

16   A.  That's right.

17   Q.  And Sector K-9 I believe you said began in approximately

18   2018?

19   A.  January of 2018.

20   Q.  January of 2018 I believe was your testimony.  And so you

21   had a falling out with Mr. Croft and at the end of 2017?

22   A.  I think it was May, but I can't recall exactly what month.

23   Q.  And in regard to a business model, where would you obtain

24   your dogs for your school Sector K-9?

25   A.  At the time I didn't -- I created the business to mainly

Wesley Keeling - Examination                    154

1    train pets.

2    Q.  But then it evolved, did it not?

3    A.  It did.

4    Q.  And then it evolved into a similar business that was run by

5    Mr. Croft down in San Antonio?

6    A.  Okay.  Similar?  Okay.

7    Q.  And so who would your students be at Sector K-9?

8    A.  Police officers.

9    Q.  And what course or courses would you teach at Sector K-9?

10   A.  We teach handler courses, interdiction courses,

11   recertifications, all that.

12   Q.  And who is "we"?

13   A.  Myself.

14   Q.  So you were a school with one instructor?

15   A.  Well, no, I use different instructors.  I use TCOLE

16   instructors.

17   Q.  So you would bring them in to assist you?

18   A.  Yes, every class.

19   Q.  And can you name some of the other TCOLE instructors that

20   you would include as a teacher, as instructors at Sector K-9?

21   A.  Well, they're current police officers.  If you would like

22   me to name them, I can.  Is that what you're asking?

23   Q.  No, I'm not asking for current police officers.  Let's go

24   back to 2018.

25   A.  Okay.

1    Q.  Who were you using back then?

2    A.  To train pets, I didn't train any police dogs at that time.

3    Q.  Police dogs started when?

4    A.  Months later.  I don't remember, August-ish, I think.

5    Q.  And what was your arrangement with the Police Departments

6    and the officers regarding your training?  In other words, how

7    were you compensated, how were you paid?

8    A.  The Police Departments would pay the business or -- the

9    Police Departments would pay the business, yeah.

10   Q.  Which is use?

11   A.  Yeah.

12   Q.  You are Sector K-9?

13   A.  Sure, I own it.

14   Q.  And so what arrangement did you have with the individual

15   Police Departments, what would you charge them and what would

16   you get?

17   A.  It would depend on what kind of dog they wanted.

18   Q.  Help us out.

19   A.  If they want a dual-purpose dog, the standard price is

20   11,000.  If they want a single-purpose dog, depending on what

21   dog we have, then we price the dogs based on the availability.

22   Q.  And so what is the range?

23   A.  For single-purpose?

24   Q.  Yes.

25   A.  5,000 to seven.

1  Q.  Five to seven.  And is it your testimony that you thought

2  what Mr. Croft was charging may have been a little excessive?

3  A.  Excessive?

4  Q.  High.

5  A.  No, no, his price was lower.

6  Q.  I'm sorry?

7  A.  His prices were lower.

8  Q.  His prices were lower, but your comment was I believe you

9  commented on how you saw $2,900.  Did you see that as much, as

10 a little much for the training and the dog that was received

11 through Universal K-9?

12 A.  I didn't think at the time that that was too much money,

13 no.

14 Q.  You thought it at the time to be fair and appropriate?

15 A.  No.  We second-guessed even doing it because the price was

16 so low, but it turned out to be, at the end of the day, turned

17 out to be okay.

18 Q.  Turned out to be okay because you got the training and you

19 received a dog and though there may have been bumps in the

20 road, it turned out to be an excellent dog?

21 A.  Yes.

22 Q.  And it served you and the community for two years?

23 A.  Yes.

24 Q.  And was involved in many, many seizures of narcotics?

25 A.  Sure.

1   Q.  What would you guesstimate?

2   A.  She made some good pops.  She made some very decent alerts

3   and we arrested people out of it.  Many, many --

4   Q.  Is a pop a --

5   A.  It's an arrest.

6   Q.  -- a word of art?

7   A.  It's a law enforcement term maybe.

8   Q.  How many seizures would you believe that Remmie may have

9   been responsible for?

10  A.  I would have to go back and look.  I don't even want to

11  speculate, I don't know.

12  Q.  But it's more than ten?

13  A.  Yes.

14  Q.  It's probably less than 10,000?

15  A.  Yes, that's a good range, very good range.

16  Q.  And it is your testimony that you believe that Remmie came

17  from Canyon Lake Animal Shelter?

18  A.  Yes, sir.

19  Q.  And the dogs -- where did you source your dogs for Sector

20  K-9?

21  A.  All different vendors.  At the time I didn't take them from

22  shelters.

23  Q.  But you did in time, did you not?

24  A.  I do.

25  Q.  And though there may be a preference for another breed,

1   Remmie is proof to you that a shelter dog can be a very

2   successful working dog?

3   A.   Absolutely.

4   Q.   Sector K-9, would Sector K-9 include the dog as part of the

5   program?  Would the Department get the dog at the end of the

6   program?

7   A.   They would get it upon arrival.

8   Q.   Upon arrival.

9   A.   Yes.

10   Q.   Similar to Universal K-9?

11   A.   Similar to Universal and pretty much every other dog school

12   in that sense.

13   Q.   Would you physically go to the shelter or did you have a

14   relationship with the shelter?  How did you get together with

15   the dogs at the shelter?

16   A.   Currently?

17   Q.   No.  When you first started dealing with the animal

18   shelter.

19   A.   Me personally?  I don't understand your question.

20   Q.   Sector K-9.

21   A.   Yes, I would go to animal shelters or had contacts with

22   animal shelters.

23   Q.   And what information would you give to the shelter in

24   regard to what dogs you'd be interested in, what type dog?

25   A.   It's not breed specific.

1   Q.  But there had to have been some description that you gave

2   them.  You didn't want dogs that were 12 years old?

3   A.  Right, well, we wanted young, healthy dogs with a health

4   certificate and I'm not breed specific.

5   Q.  And you're not a breed snob, is that right?

6   A.  If you want to put it that way.

7   Q.  And in regard to these dogs, did these dogs that you

8   obtained, did they have their own successes?

9   A.  Sure, they do.

10  Q.  And their own successes in part were a product of what

11  Sector K-9 was able to do for the handler and the dog, correct?

12  A.  Yes.

13  Q.  In regard to, did you learn or did you on occasion get

14  calls regarding these shelter dogs to -- if a good one came in,

15  would they call you and say you need to look at this one?

16  A.  Yes.

17  Q.  And did you ever get the call where give the dog a chance

18  because after a while dogs at shelters are often destroyed?

19  A.  No.

20  Q.  Do you know whether or not the shelters that you dealt with

21  were no-kill shelters?

22  A.  Some are and some aren't, it just all depends.

23  Q.  So what is a kill shelter?

24  A.  They euthanize the dogs after so many days.

25  Q.  After so many days?

Wesley Keeling - Examination                    160

1    A.   Yes.

2    Q.   But that's not information that the shelter would

3    necessarily pass on to you?

4    A.   I don't know.

5    Q.   But you knew that existed and you knew that was a dynamic

6    of shelters?

7    A.   Sure.

8    Q.   Universal K-9 when you first came down, did you go to

9    Bradley Croft's house?

10   A.   No.

11   Q.   Have you ever been to his house?

12   A.   Yes.

13   Q.   I'm sorry?

14   A.   Yes.

15   Q.   And did he have -- at the time, did he have dogs at the

16   house?

17   A.   Yes.

18   Q.   And where did he maintain those dogs?

19   A.   In the garage.

20   Q.   And how many times would you guesstimate that you were at

21   his house at that garage?

22   A.   Many.  I'm not going to put a number on it, many.

23   Q.   Between two and ten thousand?

24   A.   Yes, there you go.

25   Q.   In regard to -- every time you would come down, if you had

1  six to eight or ten to 15 interdiction courses, that would be

2  with several students in each course, correct?

3  A.  Not really.

4  Q.  Would it be one on one?

5  A.  No, we had anywhere from two to maybe I think the last one

6  had nine or ten students in there.

7  Q.  That's again between two and ten thousand.  In regard to

8  that, let me also go to your relationship and your knowledge of

9  dogs.  Did you attend any training programs?

10  A.  I did.

11  Q.  And where would these training programs have taken place,

12  where would you go for these training programs?

13  A.  You mean like me becoming a dog trainer, is that what

14  you're asking?

15  Q.  Where would you go to further cultivate your understanding

16  and knowledge of dogs?

17  A.  At the time I went to Mr. Croft.

18  Q.  Would you ever take trips to like a convention or anything?

19  A.  Yes, we did.

20  Q.  And the Department would pay for that?

21  A.  Yes, they paid for some of it.

22  Q.  And how many such conventions or meetings did you go to?

23  A.  I think two, I think it was two.

24  Q.  And this is for personal enhancement, correct?

25  A.  We went to train --

1    Q.   If it makes you a better dog handler?

2    A.   Yes.

3    Q.   And you believe those to be good and effective programs?

4    A.   At the conferences, yes.

5    Q.   Defendant Exhibit 56 please.

6         Do you recognize this photograph?

7    A.   I do.

8    Q.   And it looks like you're in some European city.  Where are

9    you?

10   A.   We're in Las Vegas.

11   Q.   In Las Vegas.  And are you in that photo?

12   A.   I am.

13   Q.   Where would you be in the photo?

14   A.   Far left.

15   Q.   You would be far left.  Do you know the person in the

16   middle?

17   A.   I do.

18   Q.   And who is that?

19   A.   That is Rick.

20   Q.   And how do you know Rick?

21   A.   Through Mr. Croft.

22   Q.   As a matter of fact, you'd see him at Universal K-9, would

23   you not?

24   A.   No.

25   Q.   Where would you see him?

Wesley Keeling - Examination                    163

1   A.  I've never -- I didn't meet Rick.  I think this is actually

2   the first time I met him.

3   Q.  You met him subsequently, did you not?

4   A.  I don't think so.

5   Q.  Didn't you have an understanding at the time of what his

6   role was with Universal K-9?

7   A.  No, I thought he was Brad's friend.

8           MR. MCHUGH:  If I may have one moment, Your Honor.

9           THE COURT:  Sure.

10          (Pause.)

11  BY MR. MCHUGH:

12  Q.  Do you recall in your interview, you gave two interviews,

13  did you not, to the government regarding this?

14  A.  Yes, I guess if you want to call it that.

15  Q.  What would you call it?

16  A.  I would call it one that we got halfway through and they

17  wanted to record it after that.

18  Q.  And you were interviewed back in March of this year, 2019,

19  were you not?

20  A.  Sure.

21  Q.  And I may be reading this incorrectly, but it is my

22  understanding that you made a representation then that you knew

23  Richard Cook and he was a great guy?

24  A.  Okay.

25  Q.  Is that true or not?

1    A.  I'm sure I did.

2    Q.  How do you know he's a great guy if you don't know him?

3    A.  I trusted Mr. Croft, he said he was a great guy, he talked

4    about him all the time.

5    Q.  So your representation to the agents when they're

6    interviewing you and you know he's in trouble, you believe him

7    to be an honest man, do you not?

8    A.  I did at the time, sir, yes.

9         MR. MCHUGH:  If I may have one moment, Your Honor?

10        THE COURT:  Yes.

11        *(Pause.)*

12        MR. MCHUGH:  Defendant Exhibit 54.  And I would ask

13   you to go to --

14        *(Pause.)*

15        Excuse me, Your Honor.

16        THE COURT:  Sure.

17        MR. MCHUGH:  A good question is why don't I impeach

18   him first.  He is being impeached, Your Honor, respectfully.

19        THE COURT:  Well, we'll see.

20        MR. SUROVIC:  Your Honor, the Defendant's Exhibit that

21   he's talking about, Exhibit 54, our understanding is that it is

22   a transcript of the interview that the agents had with

23   Mr. Keeling back on May 24, 2018.  That's hearsay because it's

24   not a statement made in court.  If they want to use it, they

25   need to ask him the question and then if he doesn't answer the

1   same way, then he can impeach him, but it's improper to admit

2   this as an exhibit.

3           THE COURT:  There's another issue with it.  First of

4   all, unlike testimony taken under oath, this is something

5   written by someone else and it may not actually reflect

6   accurately a person's statement.  Counsel can certainly ask him

7   whether he made the statement and can show that to him and

8   attempt to refresh his recollection, but I have seen many, many

9   instances during my career where an FBI agent or somebody else

10  who is writing a 302 after an investigation -- an interrogation

11  of somebody and they just get it wrong.  And so the information

12  in the 302 is not entirely accurate.

13          MR. SUROVIC:  That's correct, Your Honor.  This is

14  actually a transcript.  There were two --

15          THE COURT:  It's a.

16          MR. MCHUGH:  This is a transcript of a recorded

17  conversation.

18          THE COURT:  I thought it was a 302.

19          MR. SUROVIC:  No, sir, but the same problems apply,

20  it's an out-of-court statement.  Defendant has never reviewed

21  the transcript for accuracy.

22          THE COURT:  The appropriate thing is to ask him the

23  question, then if he answers the question differently, then you

24  can attempt to refresh his recollection or attempt to impeach

25  him with the transcript.  That's the way it goes.  In any

1   event, it's our afternoon recess.

2           COURT SECURITY OFFICER:  All rise.

3           *(3:25 p.m.)*

4                               *   *   *

5           *(3:57 p.m.)*

6           COURT SECURITY OFFICER:  All rise.

7           THE COURT:  All right.  He can come back up.  You

8   remain under oath.

9           THE WITNESS:  Yes, sir.

10          MR. MCHUGH:  May I proceed, Your Honor?

11          THE COURT:  Yes.

12          MR. MCHUGH:  Your Honor, first a little bit of

13  housekeeping.  I want to make sure that I have offered into

14  evidence from an earlier witness Defendant's Exhibits 52 and 53

15  which would be the e-mail and the resume -- no -- yes, from

16  this case, 52 and 53.  And then I am not sure whether or not

17  the 57 and 57a has been admitted into evidence yet.

18          MR. SUROVIC:  My understanding 57 and 57a have been

19  admitted, 52 and 53 have not, but we have no objection.  Excuse

20  me, 52 and 53, right, but we have no objection.

21          THE COURT:  Are you offering those, counsel, 52 and 53

22  also?

23          MR. MCHUGH:  Yes, Your Honor.

24          THE COURT:  Then they'll be received.

25          MR. MCHUGH:  May I proceed?

1          THE COURT:  Yes, of course.

2    BY MR. MCHUGH:

3    Q.  Mr. Keeling, have you and if you have on how many occasions

4    have you been to the Tradesman location where that former I

5    believe you referred to it as a pest control lot?

6    A.  Yes, a handful of times.

7    Q.  And what would be the reason or the purpose for you being

8    there?

9    A.  Something related with Universal K-9, usually an

10   interdiction course.

11   Q.  And can you describe the facility that was there on

12   Tradesman?

13   A.  The dog facility?  The dog facility is what you're talking

14   about?

15   Q.  Yes.  What did you see?

16   A.  It's a building that's a pest control business that's

17   fenced chain link, six-foot.  And there was two -- three

18   containers, shipping containers that were shaped in a square.

19   Q.  You say shipping containers that you'll see on 18-wheelers

20   and then on boats, correct?

21   A.  Yes, sir.

22   Q.  They're huge?

23   A.  Absolutely huge.

24   Q.  Please continue?

25   A.  So there was three in a box formation.  And inside was an

1    opening.  And then the only -- I was only inside that maybe

2    once or twice.  And one had dogs like separate plastic airline

3    style kennels inside of it.  I don't know how many and then one

4    was storage and then the other one had bricks and I guess other

5    training tools inside of them.

6    Q.   And were there dogs present at that location?

7    A.   Yes.

8    Q.   And the containers, would they be or would one of them at

9    least be a kennel or something to cage or keep the dogs?

10   A.   There was kennels inside of the shipping containers lined

11   up on the floor.

12   Q.   And how many, between what, two and 10,000 dogs, how many

13   dogs would you estimate?

14   A.   I would estimate probably 15 to 20.

15   Q.   Fifteen to 20 dogs.  And you were there on how many

16   occasions?

17   A.   A handful of times.

18   Q.   Fair enough.  And in regard to that, sir, can you describe

19   the neighborhood?

20   A.   It's a business street, has nothing but businesses on it.

21   I didn't see any homes on that street.

22   Q.   In regard to the trailer, you visited Mr. Croft's trailer,

23   did you not?

24   A.   Yes.

25   Q.   And do you know whether or not he resided at that trailer?

1    A.   Yes, sir, I believe he did.

2    Q.   And do you know whether or not he resided there alone or

3    with anyone?

4    A.   With his daughter.

5    Q.   And she would be the young lady in the courtroom today?

6    A.   Yes, sir.

7    Q.   And in regard to that, was their trailer parked on this

8    commercial lot?

9    A.   It was actually behind the business, inside the fence

10   location and it was right behind the business and cords were

11   hooked up, electrical cords were hooked up to the building.

12   Q.   And would you describe it as park-like?

13   A.   Yes.

14   Q.   It had -- the trailer was on a caliche surface, was it not?

15   A.   Yes, some type of rock, yes.

16   Q.   Some type of rock and that's where the trailer was?

17   A.   Yes.

18   Q.   On the back of this commercial lot.  Can you describe the

19   trailer, how big or luxurious or small or modest was it?

20   A.   It was pretty nice, it was brown and black, bumper-pull

21   trailer approximately, I don't know, 25-foot or so-ish.

22   Q.   25-foot.  The length of an automobile?  How long is an

23   automobile?

24   A.   I don't know.

25   Q.   18 feet.  And so it was in your estimation maybe one and a

1    half automobiles in length?

2    A.   Approximately, yes, sir.

3    Q.   And it's all approximate?

4    A.   Yes.

5    Q.   And this is where he lived and this is where she lived?

6    A.   That was my understanding, yes, sir.

7    Q.   And would you see evidence of that?  Did they tell you or

8    why is that your belief that they lived there?

9    A.   Yes, yes, they lived there.  I mean they told me that.

10   Q.   And I'm going to hop around.  In regard to -- let me go

11   back to that lot one more time.  How far were the dogs that

12   were housed, were they at another location?

13   A.   No, sir, I -- roughly an acre lot-ish and the back -- I

14   would say 75 percent of the lot is fenced and the dogs --

15   compared to the trailer, I would estimate two to 300 feet,

16   something like that, maybe further.

17   Q.   And did you attend classes out there?

18   A.   I never attended classes there, no.

19   Q.   Did you ever observe classes there?

20   A.   No.

21   Q.   Did you know that this was the dream or the goal to expand

22   into classrooms at that location?

23   A.   Yes, Mr. Croft told me that he was -- the classroom was at

24   the pest control business.

25   Q.   It's on the same acre lot?

1   A.   Yes, sir.

2   Q.   And did you ever go inside there and look at it?

3   A.   Yes, sir.

4   Q.   Can you describe it?

5   A.   Initially it was in I guess what you would call a

6   boardroom.  Boxes everywhere, TVs, I think there was a couple

7   tarantulas in there in fish tanks.  And chair, like a business

8   table kind of like in the courtroom with chairs all around it

9   and a TV on one wall is the easiest way for me to explain.

10  Q.   When was the last time you visited that location?

11  A.   I don't recall.

12  Q.   Was it undergoing construction at that time?

13  A.   No.

14  Q.   So it was at that time when you were there, it was a new

15  location to Universal K-9?

16  A.   Yes.

17  Q.   And was it your understanding through your visits and

18  conversations with defendant Croft that this would be the

19  location of a formal dog training school?

20  A.   Yes.

21  Q.   In regard to -- so when you first visited him, I believe

22  it's your testimony that you would see dogs at his house and

23  you would meet at a hotel and would you also go out to Dodson

24  homes?

25  A.   Yes.

1    Q.   And the purpose of Dodson homes was what?

2    A.   To teach the handlers how to control the dog in a

3    controlled atmosphere, a room.

4    Q.   And was it your understanding at the time that it was the

5    goal of Universal K-9 to consolidate onto this new property?

6    A.   No, I didn't know anything about it.

7    Q.   You didn't --

8    A.   I don't recall knowing, no.

9    Q.   You saw the evidence of how many dogs being present?

10   A.   Okay, I thought you were saying going from Dodson to --

11   Q.   I'm sorry.  No, I'm referring to where the trailer home

12   was.

13   A.   Yes, my understanding is that's the new home, if you would,

14   yes.

15   Q.   And how far would you estimate would be the defendant's

16   pillow from the nearest dog?

17   A.   I don't know, same amount as the last, four, 500 feet.

18   Q.   So he literally lived in the back of the commercial lot

19   with the dogs?

20   A.   Yes.

21   Q.   In regard to -- we talked about your resume that was sent.

22   Do you know or do you recall whether or not you may have sent

23   other or additional resumes to defendant Croft?

24   A.   I don't recall.

25        MR. MCHUGH:  May I approach the witness, Your Honor?

1          THE COURT:  Sure.

2    BY MR. MCHUGH:

3    Q.  I hand you what has been marked for identification purposes

4    as Defendant's Exhibit A, B and C.  Do you have that before

5    you, 59a, b and c.

6    A.  Yes, sir.  I do.

7    Q.  And what would be Defendant Exhibit 59a?

8    A.  Appears to be an e-mail from my work e-mail to Mr. Croft.

9    Q.  What would be 59b?

10   A.  It's on Midlothian's letterhead.  Do you mind if I read it

11   real quick?

12   Q.  I do not mind if you read it.

13        (Pause.)

14   A.  I never wrote that.

15   Q.  Sorry?

16   A.  I never wrote that.  That's not even my signature.

17   Q.  Defendant Exhibit 59c.

18        (Pause.)

19   A.  I don't remember writing that either.

20   Q.  Defendant Exhibit 59a, what is the subject and content of

21   59a?

22   A.  It shows that there was an e-mail sent to

23   info@UniversalK-9Inc. from Midlothian, my e-mail address on

24   May 10, 2015 at 1:22 and to Brad Croft, Universal K-9.  And

25   then the subject is V.A. letter and certification and then some

Wesley Keeling - Examination                    174

1    attachments.

2    Q.  And you have denied the signature is yours, but the

3    attachments B and C, do they relate to you?

4    A.  They have my name on them.

5    Q.  Do they concern your certifications, your background, your

6    history?

7    A.  No.

8             THE COURT:  The answer was no?

9             THE WITNESS:  No, sir.

10   BY MR. MCHUGH:

11   Q.  Exhibit 59d, do you have Exhibit 59d?

12   A.  Yes, the certification?

13   Q.  What person or persons do they relate to?

14   A.  Myself.

15   Q.  Do you know these to be your certification?

16   A.  It appears to be that, yes, sir.

17   Q.  And how many are there?

18   A.  I have one.

19   Q.  You have one.  And in regard to Defendant Exhibit 59a,

20   which is the e-mail which has B, C and D as attachments, do you

21   believe that to be an e-mail from you to Bradley Croft?

22   A.  No, not after seeing the rest of the e-mail, absolutely

23   not.

24   Q.  And so you deny B, C and D or you deny B and C?

25   A.  I'm denying B and C right now.

1    Q.  And so Defendant Exhibit 59a --

2              MR. MCHUGH:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. MCHUGH:

5    Q.  -- is an e-mail from your e-mail address, is it not?

6    A.  It appears to be, yes, sir.

7    Q.  And it's addressed to Bradley Croft, Brad Croft at

8    Universal K-9, is it not?

9    A.  Yes.

10   Q.  And you have exchanged e-mails with him before, have you

11   not?

12   A.  Yes.

13   Q.  And what is the content or the narrative that is contained

14   on 59a?

15   A.  It says, "Let me know if I need to change anything or add

16   anything."

17   Q.  And --

18             MR. MCHUGH:  Your Honor, at this time, the defendant

19   would offer Defendant Exhibit A.  And B and C go to the weight,

20   so B and C as well as D, which the witness has identified.

21             MR. SUROVIC:  Your Honor, because this is a judge

22   alone trial, we will not object to the admission of these

23   exhibits.  We're not saying that they're true or anything like

24   that.

25             THE COURT:  Otherwise I wouldn't admit the ones that

1   he has said are not his.

2           MR. SUROVIC:  Correct, Your Honor.

3           THE COURT:  We don't know where they come from.

4           MR. SUROVIC:  I understand that and that's why we

5   don't have an objection to them coming in because you can

6   evaluate them as they are.

7           THE COURT:  I'll receive it.

8           MR. MCHUGH:  May I approach, Your Honor?

9           THE COURT:  Sure.

10  BY MR. MCHUGH:

11  Q.  Sir, I had asked you before the break about a Richard or a

12  Rick Cook.  Do you recall that?

13  A.  I do.

14  Q.  And I asked you whether or not you knew him and how

15  familiar you were with him, correct?

16  A.  Yes.

17  Q.  And you identified the photo of him, I believe Defendant

18  Exhibit Number 56, do you recall that?

19  A.  Yes, sir.

20  Q.  And that was a photo of yourself and who else?

21  A.  Mr. Cook and Dustin Bragg.

22  Q.  And let me ask you one more time, could you describe in

23  regard to Mr. Cook what kind of person is he the times you've

24  been around him?  Is he happy, is he sad, is he friendly?

25  A.  He seems to be happy and friendly.

1  Q.  And how many occasions would you have visited with him?

2  A.  I don't recall how many.

3  Q.  In reference to the defendant who is here in the courtroom,

4  I believe in your interview, your recorded interview of May 24,

5  2018, you made reference to a Rufus, who would be Rufus?

6  A.  My understanding of Rufus was the guy that was giving --

7  the government official that was giving Brad a hard time at the

8  V.A. for not getting approval.

9  Q.  Are you saying that he was giving Brad a hard time or are

10 you saying Brad was saying --

11 A.  That was my understanding from Mr. Croft.

12 Q.  That's right.  And what was your understanding through

13 Mr. Croft regarding his problems with Rufus?

14 A.  My understanding at that time was they weren't letting him

15 get the V.A. program because he recruited shelter dogs to do

16 this work.

17 Q.  And in your conversations with him, did he believe this was

18 a form of discrimination?

19 A.  I would say so.

20 Q.  And but you yourself are a believer in shelter dogs, are

21 you not?

22 A.  I am.

23 Q.  Did Mr. Croft make any statements to you about the Open

24 Records Act or Freedom Of Information Act, trying to get

25 records of other dog facilities?

1    A.  He mentioned it, but I don't remember the exact

2    conversations we had.

3    Q.  Do you recall, though, what you may have said in your

4    interview?

5    A.  I do not recall.

6    Q.  Would it help you if you looked at the transcript?

7    A.  Sure.

8    Q.  That would be page 66 of Exhibit 54.  Transcript page

9    number is 66.  Do you see that, sir?

10           MR. SUROVIC:  Should be 19.

11   BY MR. MCHUGH:

12   Q.  Does it refer to on page 66 his frustrations with the

13   government regarding his applications to participate in the

14   V.A. program?  You can take your time and read it.

15   A.  Okay.

16       (Pause.)

17   Q.  Does that refresh your memory?

18   A.  Yes, sir.

19   Q.  And so tell the Court and for the record what Mr. Croft --

20   what you said on that day was representing to you?

21   A.  That he would get e-mails back or some type of

22   conversations back that he was denied or whatever and he had to

23   reapply.  And then Mr. Croft would, I guess, look at this guy

24   and say this person or this K-9 company didn't have that, this

25   K-9 didn't have that, but they're requiring me to do that.

1  Q.  So he's fact checking other schools is what he's doing?

2  A.  Yes, that's what I was told.

3  Q.  And page 68, and what was his attitude regarding the

4  government and the V.A. toward his, if you can describe it,

5  toward his source of dogs?  Did he communicate to you --

6  A.  Basically they were discriminating against the shelter

7  dogs.

8  Q.  Did he use the phrase "picking on him"?

9  A.  I don't recall.

10  Q.  Okay.  On direct examination you made reference to being

11  paid -- in the subject of the conversation you being paid, you

12  would be paid $10,000 for three day's work, do you recall

13  saying that?

14  A.  Yes, sir.

15  Q.  If you could give more context to that please?

16  A.  That was literally it.  He said he wanted me to teach the

17  Power Point, approximately three days, and he was going to pay

18  me $10,000.

19  Q.  That was not brought up or mentioned in your recorded

20  interview.  Is it because it was never asked or you never

21  brought it up?

22  A.  Probably both.

23  Q.  Defendant Exhibit 50 please.  Do you recognize any of the

24  persons in Defendant Exhibit 50?

25  A.  Yes, sir.

1    Q.   Okay.  If you start from the far left and work to the

2    right, describe the individual and if you know that person what

3    his name is, if you know?

4    A.   Okay, I believe the guy -- the gentleman in the green, he

5    was there for a handler course.  The next person is me and then

6    Brad Croft.

7              THE COURT:  Could we start again?  Because I was way

8    over on the other side there and I want to take a look.  The

9    fellow in the green is who?

10             THE WITNESS:  He is a gentleman police officer that's

11   there for a police K-9 course.

12             THE COURT:  All right.

13             THE WITNESS:  And then that's me in the blue --

14             THE COURT:  What are you wearing?

15             THE WITNESS:  Universal K-9 shirt.

16             THE COURT:  And white pants?

17             THE WITNESS:  Yes, sir, BDUs.  And in the blue shorts

18   and the black Universal K-9 shirt is Mr. Croft.  The brown

19   sheriff officer is Todd.  I don't know how to pronounce his

20   last name.  And the in the white, the cowboy hat is Steve Peek.

21   The other BDUs and the black shirt and the hat is Dustin Bragg.

22   The last gentleman with the German Shepherd is Donny Dunn.

23   BY MR. MCHUGH:

24   Q.   What would be the occasion and the location of this photo,

25   if you recall?

1   A.  I believe it's in the interdiction course.  And it's at the

2   lot that he did his searches at, Mr. Croft.

3   Q.  A program sponsored by Universal K-9?

4   A.  Paid for, yes.

5        MR. MCHUGH:  Thank you very much, Mr. Keeling.  I pass

6   the witness at this time, Your Honor.

7                   REDIRECT EXAMINATION

8   BY MR. SUROVIC:

9   Q.  Mr. Keeling, you talked a little bit about Mr. Croft and

10  his dog were living in a trailer on the property.  Just for

11  clarification, I want to show you Government Exhibit Number

12  33b.  Now, this is a -- I refer to it as a motor home as

13  opposed to a trailer.  Is that what you're talking about?

14  A.  No, that's completely different.

15  Q.  Was that present on the property when you were there?

16  A.  No, sir.

17  Q.  You indicated in your testimony that you knew -- that Brad

18  Croft had a number of different e-mail addresses?

19  A.  Yes.

20  Q.  Do you know what those were?

21  A.  I believe he had a personal one and then he had one with

22  Universal K-9 info and that's the only two that are right off

23  the top of my head.

24        MR. SUROVIC:  If we could pull up Defense Exhibit

25  Number 2e, which is already in evidence, Your Honor.

1    THE COURT:  Yes.

2  BY MR. SUROVIC:

3  Q.  If we look at this, if we go out, it's in a slightly

4  different format, but same e-mail as you saw in Government's

5  Exhibit 6f, is that correct?

6  A.  Yes.

7  Q.  For example, you'll see it's to Ms. Glasgow and it talks

8  about seven exhibits, Exhibit J and K, roster of administrative

9  instructional staff and if we could pull down to the next page.

10     It's got the paragraph B we talked about and your name,

11  Dustin Bragg's name, etc., is that correct?

12  A.  Yes, sir.

13  Q.  If we go back to the first page, it's from Brad Croft and

14  then it's bradcroft@satx.rr.com.  Whose e-mail address is that?

15  A.  Mr. Croft.

16  Q.  Is that his personal e-mail address?

17  A.  I believe so, yes, sir.

18  Q.  Did you use that address sometimes?

19  A.  I'm sure I did.

20  Q.  Let's try Defense Exhibit Number 2b.  Let's go to Defense

21  Exhibit Number 52.

22     MR. SUROVIC:  Sorry, Your Honor.

23  BY MR. SUROVIC:

24  Q.  This is the info@UniversalK-9Inc.com.  Are you familiar

25  with that e-mail address?

```
 1   A.  Yes, sir.
 2   Q.  Who used that e-mail address?
 3   A.  Mr. Croft.
 4   Q.  Was he the only one that ever used that e-mail address?
 5   A.  To my understanding, yes, sir.
 6   Q.  And you talked a little bit about shelter dogs and the
 7   selection of shelter dogs and you indicated you really didn't
 8   care about breeds, is that right?
 9   A.  That's correct.
10   Q.  What do you look for when you're looking at a shelter dog?
11   A.  Proper drives within the dog.
12   Q.  How do you determine those drives?
13   A.  There's a lot of different tests.
14   Q.  When you go to an animal shelter, you actually give the
15   dogs a test before you take them?
16   A.  Yes.
17   Q.  So it's not like the shelter is just sending you dogs and
18   you decide, oh, well, these will --
19   A.  Absolutely not, no.
20           MR. SUROVIC:  No further questions, Your Honor.
21           THE COURT:  Okay.
22           MR. MCHUGH:  Maybe two.
23           THE COURT:  Sure.
24           MR. MCHUGH:  If you would please pull up Defendant's
25   Exhibit 3g.
```

1                        RECROSS-EXAMINATION

2    BY MR. MCHUGH:

3    Q.  You see Defendant Exhibit 3g?

4    A.  Yes, sir.

5    Q.  And can you describe is anything in that photo familiar to

6    you?

7    A.  The location and the trailer in front of the green

8    forklift.

9    Q.  And would that be the trailer that you were referring to?

10   A.  Earlier, yes, sir.

11   Q.  That would be the residence of the defendant and his

12   daughter?

13   A.  Yes, sir.

14   Q.  And that would be the caliche surface on the -- in the back

15   part of the lot, correct?

16   A.  Yes, sir.

17   Q.  Defendant's Exhibit 3i.  Is that another view of the back

18   of the lot?

19   A.  I don't recognize -- I remember the tree, but I don't

20   remember all the -- I guess more shipping containers going from

21   the right to the left.

22   Q.  But those are similar if not the same to the shipping

23   containers that you observed there?

24   A.  Yes, sir.

25   Q.  And because of the tree, you believe this to be the back of

1   that same lot?

2   A.  I would assume so, yes, sir.

3   Q.  Defendant Exhibit 3L.  That's just another -- the same view

4   from a different angle?

5   A.  That's what it appears to be, yes, sir.

6   Q.  The shipping containers that are present on this occasion,

7   can you say or do you have an opinion whether or not they're

8   the same shipping containers?

9   A.  They appear to be the same.

10  Q.  Defendant Exhibit 3M.  This bus you've never seen?

11  A.  No, sir, I've never seen that.

12  Q.  Defendant Exhibit 3N.  Is that another view of the same

13  trailer and residence of Mr. Croft and his daughter?

14  A.  It appears to be the same, yes, sir.

15  Q.  And Defendant Exhibit 3P.  What would Government

16  Exhibit *(sic)* 3P be?

17  A.  Behind the building of the pest control business and --

18  Q.  So as I point to 3P, would this be the building?

19  A.  Yes, sir.

20  Q.  And would this be the trailer?

21  A.  Yes, sir.

22          MR. MCHUGH:  Your Honor, at this time, the defendant

23  would offer Defendant Exhibits G, 3g, 3i --

24          MR. SUROVIC:  Those are all in evidence already.

25          THE COURT:  I think they're already in.

```
 1              MR. SUROVIC:  They are, Your Honor.

 2              MR. MCHUGH:  I just saved everybody some time, Your

 3   Honor.  I have no further questions.  Thank you very much.

 4              THE WITNESS:  You're welcome.  Thank you, sir.

 5              THE COURT:  Anything else, counsel?

 6              MR. SUROVIC:  One last question, Your Honor.

 7                     FURTHER REDIRECT EXAMINATION

 8   BY MR. SUROVIC:

 9   Q.  Officer, when was the last time you were actually at the

10   Tradesman location?

11   A.  Late '16 or early '17.

12              MR. SUROVIC:  No further questions, Your Honor.

13              THE COURT:  Anything else, counsel?

14              MR. MCHUGH:  No, Your Honor.

15              THE COURT:  All right.  You may step down.

16              MR. SUROVIC:  We request that he be permanently

17   excused, Your Honor.

18              THE COURT:  Yes.  Probably too late this afternoon to

19   put another witness on unless you've got somebody that's really

20   short.

21              MR. SUROVIC:  We may have somebody that's as short as

22   the person yesterday.  He's a local, so it's not an issue.

23              THE COURT:  We'll bring him in first thing tomorrow

24   morning.

25              MR. SUROVIC:  Yes, sir.
```

BENCH TRIAL PROCEEDINGS                    187

1          THE COURT:  You can be excused.  I've got to finish up

2    my notes here.

3                            *   *   *

4          *(4:33 p.m.)*

BENCH TRIAL PROCEEDINGS                    188

1                    *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  October 23, 2019

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25