UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA          :
                                  :
vs.                               : No. SA:18-CR-00603
                                  : San Antonio, Texas
BRADLEY LANE CROFT(1),            : October 11, 2019
Defendant.                        :
*********************************************************

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS (Volume 4)
BEFORE THE HONORABLE DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE GOVERNMENT:
  Gregory J. Surovic, Esquire
  Fidel Esparza, III, Esquire
  United States Attorney's Office
  601 N.W. Loop 410, Suite 600
  San Antonio, Texas  78216
  (210)384-7020; greg.surovic@usdoj.gov


FOR THE DEFENDANT:
  Thomas Joseph McHugh, Esquire
  William A. Brooks, Esquire
  Law Offices of Thomas J. McHugh
  130 E. Travis Street, Suite 425
  San Antonio, Texas  78205
  (210)227-4662; thomasjmchughlaw@gmail.com




COURT REPORTER:
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter, U.S.D.C.
655 East Cesar E. Chavez Blvd., Third Floor
San Antonio, Texas  78206
Phone(210)244-5048
angela_hailey@txwd.uscourts.gov

Proceedings reported by stenotype, transcript produced by
computer-aided transcription.

1                      **I N D E X**

2    **GOVERNMENT WITNESSES:**                    **PAGE**

3    **CHAD HILLIER**

4    By Mr. Esparza                              7

5    By Mr. Brooks                              11

6

7

8    **RICHARD COOK**

9    By Mr. Surovic                      15, 124

10   By Mr. McHugh                       79, 126

11

12

13   **LILLIAN SOCORRO COOK**

14   By Mr. Surovic                          127

15   By Mr. Brooks                           135

16

17

18

19

20

21

22

23

24

25

1    *(Friday, October 11th, 2019, 9:09 a.m.)*

2                         *  *  *

3           COURT SECURITY OFFICER:  All rise.

4           THE COURT:  Please be seated.

5           COURTROOM DEPUTY CLERK:  SA:18-CR-00603, United States

6    of America versus Bradley Lane Croft.

7           MR. SUROVIC:  Greg Surovic and Fidel Esparza for the

8    United States.  We're ready.

9           MR. MCHUGH:  Tom McHugh and Will Brooks for the

10   defendant.  We are ready to proceed.  We have some matters to

11   address with the Court.  It can be done in executive session or

12   from the bench.

13          THE COURT:  Well, we don't have a jury, so it's kind

14   of all an executive session.  That's an interesting pocket

15   square.

16          MR. MCHUGH:  Is the Court aware of the history behind

17   this coat?

18          THE COURT:  It's not the coat.

19          MR. MCHUGH:  I have to complete the story for the

20   Court.

21          THE COURT:  All right.

22                         *  *  *

23                *(Discussion off the record.)*

24                         *  *  *

25          THE COURT:  What is it that you need to address?

1          MR. MCHUGH:  Thank you, Your Honor, and I can speak

2     for both sides, thank you for the kindnesses from the bench

3     this week.

4          THE COURT:  We're all officers of the Court, we all

5     work together to try to get the trial done in an appropriate

6     way.

7          MR. MCHUGH:  Thank you, Your Honor.  And so

8     Mr. Surovic and I were visiting this morning and he can

9     represent his interest, but we were talking about scheduling.

10    And we know this is important to the client, of course, to the

11    Court and all those present.  And so we were trying to look at

12    it, evaluate it, guesstimate where we are, where we're going to

13    be today and when the defense case may begin, so I'll allow

14    Mr. Surovic to take us up to that point.

15         MR. SUROVIC:  Your Honor, I'm anticipating based on

16    how the case has been progressing, we are actually nearing the

17    end of the federal government's presentation.

18         THE COURT:  All right.

19         MR. SUROVIC:  I anticipate we will at most get through

20    three witnesses today.  One of the reasons for that is one of

21    the witnesses is Mr. Richard Cook and obviously he will take a

22    little longer than most of the other witnesses.

23         THE COURT:  I'm sure he will.

24         MR. SUROVIC:  So I'm anticipating we'll get through

25    three witnesses at most today.  That will leave the government

1   with five witnesses for Tuesday.  Some of them are very short

2   witnesses, but we also have the FBI analyst to go through the

3   money trail for the Court, so that may take a little while.  So

4   I am still anticipating that the government will rest on

5   Tuesday, hopefully before the end of the day on Tuesday.

6           THE COURT:  And then you have how many days,

7   Mr. McHugh?

8           MR. MCHUGH:  I would say we have at most two days.

9           THE COURT:  Well, I have the whole week next week set

10   aside.

11           MR. MCHUGH:  And when we earlier went into executive

12   session earlier in the week, a conflict was communicated to the

13   Court regarding Thursday and Friday.

14           THE COURT:  Right.

15           MR. MCHUGH:  I work at the --

16           THE COURT:  If we're done Tuesday, we're done Tuesday.

17   We'll be fine.  And if it flows over until Wednesday at the

18   latest, that's okay.  If we get to Thursday, then we will

19   recess the trial until we can come back and finish it which

20   shouldn't take too long.

21           MR. MCHUGH:  Thank you, Your Honor.

22           THE COURT:  Don't worry about that.  Today we will end

23   a little early.  As I think counsel probably knows, getting out

24   of town on a Friday from downtown here is nasty at best and

25   worse than nasty at worst.  This isn't quite Austin, but it's

 1   bad and it's going to be a little worse because this is

 2   National Hispanic month, I believe, and there's something going

 3   on here.  And I am more than supportive of that, I think that's

 4   a great thing that we have that -- San Antonio in particular

 5   because the Latino culture is such a great part of our city and

 6   integral part of our city and so very important to it.  But

 7   nonetheless, it causes us traffic problems and it's no

 8   different than when the darn Spurs on occasion play over here

 9   or some other team, UTSA, and that really bollocks us up too so

10   we'll probably end around 3:30 or so today.

11          MR. SUROVIC:  Yes, sir, we'll try to get as much as we

12   can done.

13          THE COURT:  Between 3:00 and 3:30.  Okay.  Are you

14   ready to proceed?

15          MR. SUROVIC:  Yes, sir.

16          MR. ESPARZA:  The United States would call Chad

17   Hillier to the stand.

18          COURTROOM DEPUTY CLERK:  Please raise your right hand.

19                          *   *   *

20          *(CHAD HILLIER, Government Witness, Sworn.)*

21                          *   *   *

22          THE WITNESS:  I do.

23          COURTROOM DEPUTY CLERK:  Thank you.  You can have a

24   seat.

25                     DIRECT EXAMINATION

1   BY MR. ESPARZA:

2   Q.   Good morning, Mr. Hillier, could you state your name for

3   the record?

4   A.   Chad Hillier.

5   Q.   Could you spell your last name?

6   A.   H-I-L-L-I-E-R.

7   Q.   Where are you currently employed?

8   A.   Woodhull Police Department in Illinois.

9   Q.   And what's your position at Woodhull?

10   A.   Chief of Police and K-9 officer.

11   Q.   And how long have you been in that position?

12   A.   Five years.

13   Q.   How long have you been a police officer?

14   A.   Twenty years.

15   Q.   All with Woodhull?

16   A.   No, with other various agencies.

17   Q.   When did you first learn about Universal K-9?

18   A.   Been a couple years ago, 2017, I believe.

19   Q.   And how did you learn about it?

20   A.   Over the Internet.  I was looking at ways to get a K-9 for

21   my agency.  It's a very small agency with limited funds, so I

22   was researching different avenues to go about that and happened

23   to run across Universal K-9 with a way to use my V.A. benefits.

24   Q.   And so you're a vet. yourself?

25   A.   I am.

1   Q.   Thank you for your service.  Which course did you attend at

2   Universal K-9?

3   A.   The dual purpose handlers course.

4   Q.   Do you remember approximately when that was?

5   A.   It would have been December 2017, I believe.

6   Q.   And the first day of class, where was that held?

7   A.   First day of class we met at the hotel in a spare

8   conference room.

9   Q.   And who was present for Universal K-9 at that first day?

10  A.   The owner and two trainers, Brad Croft, Raul and Paco were

11  the names of the head trainers.

12  Q.   And who was the owner when you mentioned the owner?

13  A.   Brad Croft.

14  Q.   And did the whole course take place there at the hotel?

15  A.   No, that was the only time we were there at the hotel was

16  the very first I'd say half hour.  And then after that we were

17  on satellite locations, so to speak, not at the hotel.  We'd

18  meet -- arrange a place to meet one day for the next day.

19  Q.   Okay.  When you were at the satellite locations, was there

20  ever like a mobile training center present?

21  A.   Mobile training center?

22  Q.   Was there ever a big bus present for Universal K-9 when you

23  were at the satellite locations?

24  A.   No, sir.

25  Q.   I'm going to show you Government's Exhibit 33b.  It's

1  already been admitted into evidence.

2     Do you recognize that bus at all?

3  A.  I do not.

4  Q.  Was it ever present at any of the satellite training sites?

5  A.  Not that I recall ever seeing.

6  Q.  Did you ever attend or visit the main facility, the campus

7  for lack of better word of Universal K-9?

8  A.  The first day I had to -- I hadn't brought a kennel to

9  house my K-9 in, so after the first couple hours, after we were

10  issued our dogs and such, I had to meet Paco and Raul back at

11  the facility to get my K-9 back after I went and picked up a

12  kennel.

13  Q.  I'm going to show you Government's Exhibit 32a.  What is

14  that?

15  A.  That's the front of the building.  We went around the left

16  side of the picture there, the left side of the building and

17  there I believe like a chain link fence or some type of fencing

18  area and then that's where I pulled back to retrieve my K-9.

19  Q.  I'm going to show you Exhibit 32i, Government's Exhibit

20  32i.  Is that where you went to --

21  A.  Yes.

22  Q.  And can you identify where that is?

23  A.  That is behind the building in the previous picture.

24  Q.  So in your personal opinion from attending this course, who

25  owned Universal K-9?

1    A.  Brad Croft.

2    Q.  Did you ever have any interaction with a Richard Cook?

3    A.  I did over the phone and via e-mail.

4    Q.  And what was the nature of that interaction?

5    A.  He claimed -- I believe he handled all my veteran specific

6    related stuff, processing and any documentation needed from or

7    for the V.A. portion of it.

8    Q.  And who were the two trainers again that were present that

9    first day with Mr. Croft?

10   A.  Raul and Paco.  I don't -- Cortez I think may be Paco's

11   last name and Raul Cabrera.

12   Q.  Did either one of them ever tell you who their boss was?

13   A.  Brad Croft.

14   Q.  Throughout your time taking the course, were you ever

15   instructed by a Steve Peek?

16   A.  No.

17   Q.  A Wes Keeling?

18   A.  No.

19   Q.  A Jesse Stanley?

20   A.  No.

21   Q.  Or a Art Underwood?

22   A.  No.

23        MR. ESPARZA:  Pass the witness, Your Honor.

24        THE COURT:  Okay.

25                    CROSS-EXAMINATION

1    BY MR. BROOKS:

2    Q.  Good morning, Mr. Hillier.  My name is Will Brooks.  I'm

3    here representing Mr. Croft this morning.  Got just a few

4    questions for you.  If you don't understand something, just ask

5    me to clarify.  If I start talking too fast, just tell me to

6    slow down.  Did I hear you're from Illinois?

7    A.  I am.

8    Q.  So this must be like shorts weather for you, right?

9    A.  Definitely.

10   Q.  How did you find out about the Universal K-9 program?

11   A.  On the Internet.

12   Q.  And how did you come to be here in court today, by the way?

13   A.  I was provided a flight down here.

14   Q.  So were you under Subpoena?

15   A.  Yes.

16   Q.  And have you talked to representatives of the government

17   prior to today?

18   A.  Yes.

19   Q.  Did you do an interview with them?

20   A.  I did.

21   Q.  When was that?

22   A.  I don't recall a date.

23   Q.  Was it a year, recently, not recently?

24   A.  Sometime earlier this year, I believe.

25   Q.  Okay.  Couple months ago?

1    A.  Yes, a few anyway.

2    Q.  Is that the first time you've spoken about this particular

3    case to the government?

4    A.  Yes.

5    Q.  Where did that interview take place?

6    A.  At my house, it was over the phone.

7    Q.  How long did that last?

8    A.  I don't recall.

9    Q.  And you went through the U K-9 course, correct?

10   A.  Yes.

11   Q.  How long was that program?

12   A.  It was two weeks.

13   Q.  And you attended every day?

14   A.  Yes.

15   Q.  Roughly what type of hours are we talking about a day?

16   A.  It varied day to day.  Some days we'd get there early

17   morning, be out by 11:00.  Other days seemed to be it would go

18   past noon a little bit, maybe eight to 1:00ish.

19   Q.  And you said that you received a dog, is that correct?

20   A.  I did.

21   Q.  What was that dog's name?

22   A.  The dog at the time's name was Casey.

23   Q.  Casey, okay.  I believe your testimony was that you got

24   Casey on the first day when you went to the hotel?

25   A.  Yes, sir.

Chad Hillier - Examination                    13

1    Q.  And did you do any training with Casey?

2    A.  Yes, sir.

3    Q.  And that was with Paco and Raul?

4    A.  The training on the first day was basically

5    familiarization.  There was no training, so to speak, it was we

6    were issued our dogs and given time to familiarize with them.

7    Q.  Okay.  Did Casey end up being a working dog for you?

8    A.  Yes.

9    Q.  For how long?

10   A.  Currently.

11   Q.  Okay.  I'm curious, how long have you been a K-9 handler

12   officer?

13   A.  Going on two years now.

14   Q.  What is the length of service normally for a K-9, just

15   curiosity?

16   A.  That, I couldn't tell you.  I think it varies dog to dog.

17   Q.  Would it be somewhere longer than a year?

18   A.  Oh, yes, definitely.

19   Q.  Less than --

20   A.  Ten.

21   Q.  Do you know what sort of factors play into that, does it

22   just depend on the animal?

23   A.  Diet, the animal itself, a lot of different factors I

24   suppose as far as how the dog is treated, health issues mainly

25   are what's going to determine how long the dog is able to work.

1    Q.   Do you know whether Casey is a shelter dog?

2    A.   Was a rescue.

3    Q.   Okay.  And has he been a successful dog in the sense has he

4    facilitated some arrests?

5    A.   She has, yes.

6    Q.   She, I'm sorry.  Several, few?

7    A.   Several.

8    Q.   And in your interview with the government, you mentioned

9    that Casey was recertified by the State of Illinois, is that

10   correct?

11   A.   Yes, sir.

12   Q.   What does that process involve?

13   A.   That process basically just go through the annual narcotics

14   certification and if you pass, then your dog is good.

15   Basically it's a reverification of any training that was just

16   had since it's out of state.  They just want to make sure that

17   she can find her odors.

18   Q.   Is she completing that process successfully as far as the

19   past two years you've had her?

20   A.   Yes.

21           MR. BROOKS:  I'll pass the witness at this time,

22   Judge.

23           THE COURT:  Okay.

24           MR. ESPARZA:  No further questions, Your Honor.  We

25   ask that the witness be permanently excused.

```
 1              THE COURT:  You may be excused, sir, and go back to --
 2    what is it Indiana?
 3              THE WITNESS:  Illinois.
 4              THE COURT:  Sorry.
 5              MR. SUROVIC:  Your Honor, our next witness will be
 6    Mr. Richard Cook.
 7              (9:26 a.m.)
 8              COURTROOM DEPUTY CLERK:  Please raise your right hand.
 9                            *   *   *
10              (RICHARD COOK, Government Witness, Sworn.)
11                            *   *   *
12              THE WITNESS:  Yes.
13              COURTROOM DEPUTY CLERK:  Thank you.  You can have a
14    seat.
15                        DIRECT EXAMINATION
16    BY MR. SUROVIC:
17    Q.  Sir, would you state your full name please?
18    A.  My full name is Richard Cook.
19    Q.  And can I get you to spell your last name for the record?
20    A.  C-O-O-K.
21    Q.  What state do you live in?
22    A.  I live in Virginia.
23    Q.  Are you currently employed?
24    A.  No, sir.
25    Q.  Are you a disabled veteran?
```

1    A.   Yes, sir.

2    Q.   Tell us about your military service please?

3    A.   I was a pharmacy tech. in the military, eight years.

4    Q.   And you were actually assigned here in San Antonio?

5    A.   Yes, I was assigned here in San Antonio, sir.

6    Q.   At Brook Army, correct?

7    A.   Yes, sir.

8    Q.   What's the nature of your disability?

9    A.   I have a head injury, speech impediment, loss of left eye,

10   cognitive head injury, memory loss.  What else?  Multiple

11   facial fractures.

12   Q.   Could you tell the Court how you came by that disability,

13   that injury?

14   A.   I was driving right off Brook Army Medical Center, I guess

15   a random act of violence, somebody shot me in my car and head.

16   Q.   You were actually shot in the head, you were wounded in the

17   head, is that correct?

18   A.   Yeah, yes, sir, just shot in the head, went through the

19   car, shot with a shotgun.  That's how I received this injury.

20            THE COURT:  Was that just a random shooting?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  They just felt like shooting somebody.

23            THE WITNESS:  Yes, and that's why they closed that

24   post at Fort Sam.

25   BY MR. SUROVIC:

1    Q.   Closed that gate?

2    A.   Yes, sir.

3    Q.   You indicated it affected your cognitive ability and your

4    speaking ability?

5    A.   Yeah, I just have memory loss.  I stutter and I got, you

6    know, and then short-term memory loss, sometimes I make a lot

7    of mistakes and things like that.

8    Q.   Has that disability affected your ability to find

9    employment?

10   A.   Yeah, I tried to go to school for when I got to VCU, but

11   what happened was when I was taking these tests, it just was --

12   I couldn't focus, so I wasn't able to finish.  And I tried my

13   best, but what I did is after instead of doing that, I just

14   started doing personal training.

15   Q.   You said VCU, what is VCU?

16   A.   Virginia Commonwealth University.

17   Q.   And that's in Virginia, obviously?

18   A.   Yes, sir.

19   Q.   How long have you had this disability?

20   A.   I'm not sure the date of the injury.  I think maybe --

21   Q.   I think you said earlier seven or eight years?

22   A.   My injury was since before my daughter was born.

23   Q.   And she is how old now?

24   A.   She's 20 years old.

25   Q.   So it is 20 years ago?

1   A.  Yes, sir.

2   Q.  You are rated a hundred percent disabled by the Veterans

3   Administration?

4   A.  Yes, sir, I am rated a hundred percent.

5   Q.  Do you get regular benefits from the Veterans

6   Administration as a result of your disability?

7   A.  Yes, sir, I get a disability check, a V.A. compensation

8   check every month for $3,500, maybe more, I'm not sure the

9   exact amount.

10          THE COURT:  So you were on active duty when this

11   happened to you.

12          THE WITNESS:  Yes, Your Honor, I was just coming out

13   the -- getting off work, I believe, and I was driving off post

14   and somebody just randomly just shot me.

15   BY MR. SUROVIC:

16   Q.  And sir, you were, in fact, medically discharged, medically

17   retired from the military as a result of this injury?

18   A.  Yes, I still served another year because I had multiple

19   surgeries.  They let me work at different areas and I just --

20   they discharged me.

21   Q.  Do you know a person by the name of Brad Croft?

22   A.  Yes, I see him right here.

23   Q.  Could you point him out and identify some piece of clothing

24   or something he's wearing?

25   A.  Mr. Croft has a black jacket on.

1          MR. SUROVIC:  Your Honor --

2          THE COURT:  The Court would note the identification of

3    the defendant.

4          MR. SUROVIC:  Thank you, Your Honor.

5    BY MR. SUROVIC:

6    Q.  When did you first meet Mr. Croft?

7    A.  I met Mr. Croft through a friend that was working in the

8    pharmacy with me about 25 years ago.

9    Q.  Was that here in San Antonio?

10   A.  Yes, sir.

11   Q.  How long did your relationship with Mr. Croft last during

12   that period of time 25 years ago?

13   A.  I knew him for about a couple years and then when my

14   daughter was born, I actually left to Virginia and I hadn't

15   spoken to him for about 15 years -- no, I hadn't spoken to him

16   for a while prior to me moving and then I hadn't spoken to him.

17   Q.  So you departed from Texas after your injury, after your

18   recovery from your injury and then moved to Virginia, is that

19   correct?

20   A.  That is correct.

21   Q.  And that would have been about the time of your daughter's

22   birth or little after your daughter's birth?

23   A.  Yes, right after she was born.

24   Q.  When did you first hear about Universal K-9?

25   A.  When I first heard about it is when I was looking -- when I

Richard Cook - Examination                    20

1   was in Virginia and I was looking for a dog for my daughter

2   online, I believe.  And then I saw some pictures and I scrolled

3   through a website and I saw it.

4   Q.  Okay.  And how did you associate Universal K-9 with

5   Mr. Brad Croft?

6   A.  Well, as soon as -- somehow he contacted me or we got in

7   contact and then he told me about his company and that's when I

8   knew that he was, you know, he owned the company.

9   Q.  How do you know -- how did he know that you had looked at

10  his website?

11  A.  I don't know, I think he has like software, but I guess --

12  I don't know.  But I guess -- I don't know how he knew I looked

13  at his website.  I have no idea.

14  Q.  Did he reach out and contact you or did you contact him?

15  A.  I believe -- I think -- I'm not sure how that contact went.

16  I think he contacted me and then I reached out back, I called

17  back and then we just talked to each other because we hadn't

18  talked to each other in 15 years or 20 years.

19  Q.  When you first saw the Universal K-9 web page, where was

20  Universal K-9 operating out of?

21  A.  It was operating out of San Antonio, Texas, but it was out

22  of his house.

23  Q.  As a result of you making new -- approximately when was it

24  that you were looking at -- you found the Universal K-9

25  website, do you recall approximately what year that was?

1    A.  Maybe 2014 or '15, I'm trying to think.  Whatever grade my

2    daughter was in, I'm trying to think, not sure, sir.  '14, I

3    believe, '15, not sure.

4    Q.  What resulted from that new contact with Mr. Croft?

5    A.  We just had long conversations, we hadn't talked for a long

6    time, you know, he was telling me about the custody with his

7    daughter.  And it seemed like he went through a hard custody

8    battle.  And I was kind of, you know, I was proud of him

9    because he got custody.  I was like, okay, and he went through

10   the same custody battle like me, it was the same thing.  And I

11   was like, you know, we went through the same custody battle.

12   He was telling me about the company, he was training police

13   dogs and he was training law enforcement.  And I actually told

14   my father and he was happy, we was happy for him.

15   Q.  What happened as a result of that new contact?

16   A.  He just asked me what I was doing, I told him I was

17   personal training.  And he was like -- he asked me did I finish

18   school or anything.  I guess -- I told him I didn't.  And he

19   was just telling me about, you know, that he wanted -- what he

20   was going to do, he was going to make the school a bigger

21   school and he was -- I guess he was eventually he wanted to

22   offer me a job, he was just telling me and I was telling my

23   father and I was happy for him.

24   Q.  At some point did he suggest that you join his operation?

25   A.  Yes.  Actually he told me I should come down there because

1    I really didn't know anything about dogs or anything and, you

2    know, when I went down there I saw he had -- he was training

3    dogs and he was trying to -- and he showed me what he was

4    doing.

5    Q.  Had you ever been a trained dog handler?

6    A.  Never.

7    Q.  Had you ever worked with dogs extensively?

8    A.  No, sir.

9    Q.  What experience do you have working in the working dog

10   industry?

11   A.  I have zero experience.

12   Q.  When you came down to meet him, what did he talk to you

13   about?

14   A.  We talked about just how to make the school a better school

15   and he was trying to -- he talked to me about how to -- just

16   his dogs and we was just catching up basically, but he wanted

17   to try to make the school bigger and he was just sharing plans

18   trying to get the V.A. approval at that time.

19   Q.  Did he talk to you about getting a V.A. certification for

20   his school so that he could use the G.I. Bill to fund students,

21   potential students?

22   A.  Yeah, he said that was going to make the school bigger, you

23   know.

24   Q.  When did he talk to you or did he ever talk to you about

25   joining the business, becoming an employee for him?

1  A.  Yeah, yeah, because he knew -- I think he knew.  I didn't

2  know I was going to be a recruiter, that was my position.  I

3  was doing the paperwork, recruiting.

4  Q.  When did he do that?  Was that when you made the trip down

5  there or was that later?

6  A.  That was after.  I guess he got -- I'm not sure when it

7  came about, but that was just the job, I had to be a recruiter.

8  Q.  You said you made the trip down there in '14 or '15?

9  A.  Yes, sir.

10  Q.  Approximately when would it have been from that date that

11  he actually approached you about being a recruiter?

12  A.  I guess after he had obtained the V.A. approval.  He said

13  that was going to be my job.

14  Q.  Prior to that, had you talked to him about joining the

15  business, being part of the business?

16  A.  No, I never talked to him.  He offered me the job and I was

17  elated, I was happy that I had a job.

18  Q.  You said he offered you a job as a recruiter.  What exactly

19  did that mean?

20  A.  I think it was just because I was a veteran so I can talk

21  to other veterans and, you know, and like when you go, like,

22  bring students to the school, you know, and talk to them, talk

23  to the students on the phone to bring them to the school.

24  Q.  Okay.  When you talked to Mr. Croft, did he tell you about

25  how the business was structured and things like that?

1   A.  Yeah, I mean I didn't understand -- honestly, I didn't

2   understand, I don't understand anything about business or

3   anything like that, but I just knew that, you know, because he

4   took care of all the business stuff, I didn't do any of that.

5   I mean I don't know how to do all that stuff.

6   Q.  Who was in charge of the business when you first met?

7   A.  Mr. Croft was in charge of the business.

8   Q.  Do you recall any employees that were working for him at

9   that time?

10  A.  At that time I think Steve Peek was working for him I

11  think, yes, I think Steve Peek was working for him at that

12  time, sir.

13  Q.  What did Mr. Peek do for him?

14  A.  He was a dog trainer for him.

15  Q.  Was there anybody else that was working for him at that

16  time?

17  A.  I think Wes Keeling -- no, is this the time prior to the

18  approval or after the --

19  Q.  Prior to the approval, when you first went down to talk to

20  him.

21  A.  I think it was just Steve Peek.

22  Q.  And you indicated that he wanted you to be a recruiter for

23  him at some subsequent point?

24  A.  Yes, sir.

25  Q.  After he got approval for the V.A.?

1    A.  Yeah, he wanted me to be a recruiter.  I was happy that I

2    had a job.

3    Q.  Did he ever talk to you about being President of Universal

4    K-9?

5    A.  I saw my name after, you know, the approval came back, you

6    know, that I was the President, once I saw it, it was on the

7    book.

8    Q.  Did you ask him about it, why am I the President?

9    A.  I didn't ask him about it.

10   Q.  Did you operate as the President of Universal K-9?

11   A.  No, sir.

12   Q.  Did you have any authority over the funds, for example, of

13   Universal K-9?

14   A.  I don't have any authority -- Mr. Croft just directed me

15   what to do with the funds.  I do have the bank account for

16   Universal K-9 in my name, but I don't have any authority.

17   Q.  Did you hire anybody for Universal K-9?

18   A.  I never hired anyone.

19   Q.  Did you ever preside over a Board of Directors or anything

20   like that for Universal K-9?

21   A.  A Board of Directors, no, we never had a -- a Board of

22   Directors, no.

23   Q.  Or a meeting of the officers of the company, the secretary

24   and the treasurer?

25   A.  No, no, sir.

1  Q.  You said you were supposed to be a recruiter.  Could you

2  describe the jobs that Mr. Croft wanted you to do for the

3  business?

4  A.  What I did was I -- well, Mr. Croft would send me the

5  e-mails or, you know, the calls.  The students would call me.

6  I would actually also send out all the V.A. forms which is a

7  22-1999 to the V.A. and I would process their paperwork.  And

8  then I would just recruit more students.  And also like when I

9  was down here because I was down here, I would have to go and,

10  you know -- I'd get money orders for him to pay bills or get

11  cash to pay bills, I would get cash for him.

12  Q.  When you're saying you would get money orders or get cash,

13  did you decide on your own, okay, we need to pay this bill,

14  I'll get some cash, how did that work?

15  A.  No, everything was under his direction.  I never went to

16  the bank without his direction, he was the owner so --

17  Q.  I want to show you what is Government Exhibit 12h.

18  A.  Yes, sir.

19  Q.  There should be a screen in front of you?

20  A.  Yes.

21  Q.  And if we could turn to page two.  There we go.  Is this

22  what you were talking about as far as a form 22-1999?

23  A.  Yes, sir, this is a form which I faxed it in FaxZero to the

24  V.A. for the V.A. to pay for the school for the students.

25  Q.  Who would be responsible for filling in the information on

1   this?

2   A.  I would be responsible, that's my job.

3   Q.  Were you ever helped while you were doing this type stuff?

4   A.  I got help from my daughter and then later on I got help

5   from Cameron Croft.  She was helping me do this, just a couple

6   of V.A. forms like this.

7   Q.  How did you learn to fill in these V.A. forms?

8   A.  I had to call the V.A., it took a long time because I

9   didn't understand it and I was calling -- I had to call the

10  V.A. and learn how to do it.

11  Q.  Did the V.A. or the Texas Veterans Commission ever come

12  down to Universal K-9 to help you fill out these forms?

13  A.  They came down I guess after the approval and I don't

14  remember -- they showed us how to do it, but I forgot and then

15  I had to call one time.

16  Q.  Down at the bottom, I don't know if you can make it out or

17  not.

18         MR. SUROVIC:  Can we enlarge the signature?

19  BY MR. SUROVIC:

20  Q.  Can you see this?

21  A.  Yeah, I can't tell if that's my signature, but I think it

22  is.  I think it is because of the way I write, but I'm not

23  sure.

24  Q.  This would be your normal job to fill out these forms?

25  A.  Yes, that's what I was doing, that's my job.

Richard Cook - Examination                    28

1    Q.  Where did you get the information from to fill out the form

2    like the name of the student and where -- the address and the

3    dates that they attended?

4    A.  Okay, so the name -- they had an application and they put

5    the name on the application and I just take the name and

6    everything they needed was on this form as far as the program,

7    that was the program that had to be on the form.  The date for

8    the class was the date when they were supposed to attend and

9    the hours -- and the rest of this stuff, the rest of the things

10   that are on here, the dates, the hours, that was just filled in

11   by, you know -- the charges were how much the class cost.

12   Q.  How did you know the dates of the classes?

13   A.  When Mr. Croft -- I guess when he would tell us the dates

14   that the class was going to start.  And what I do is sometimes

15   the dates would change because they would tell me, you know,

16   they weren't ready or whatever, so I would have to put those

17   dates in when they were to come.

18   Q.  Who decided how much the class should cost?

19   A.  That was something in the catalog, the original catalog

20   that he made.

21   Q.  When you say "he", who is "he"?

22   A.  Mr. Croft, I'm sorry.

23   Q.  So Mr. Croft set the dates for the courses and he set the

24   price for the courses?

25   A.  Yes, sir.

1   Q.   Sir, I'm also going to show you what's been marked as

2   Government Exhibit 35c which is already in evidence.  Can you

3   see that?

4   A.   Yes, sir.

5   Q.   What is it?

6   A.   It's my cards.

7   Q.   And it's located in a cup holder somewhere?

8   A.   Yes, sir.

9   Q.   Is that your truck or somebody else's?

10  A.   I'm not sure.  It might be the -- one of the trucks that

11  were down here that I was using.

12  Q.   And if we could go to 35d, it will be a little easier to

13  read here.  Can you tell us what that is?

14  A.   Those are the cards that Mr. Croft made for me for being a

15  V.A. specialist.  That was my job.

16  Q.   And it actually has your title as V.A. specialist, is that

17  correct?

18  A.   Yes, sir.

19  Q.   Now, when you started working for Universal K-9, that would

20  have been after the V.A. approval?

21  A.   Yes, I mean like that's when I really officially started

22  being a V.A. specialist, started working for Universal K-9

23  right after we got the V.A. approval.

24  Q.   And there's already evidence in that that was in

25  March/April timeframe of 2016?

1    A.   Yes.

2    Q.   Who else worked for Universal K-9 when you started working

3    as the V.A. specialist?

4    A.   When I started working we had a trainer, his name was Paco

5    Cortez.   And then we had another trainer, Raul Cabrera, I

6    remember, and those are the two trainers that were working.

7    Q.   Anybody else who was working for them?

8    A.   Oh, I'm sorry, it was Wes Keeling also.   Sorry.   Wes

9    Keeling.

10   Q.   Anybody beyond Wes Keeling and those two?

11   A.   When I started or all -- the whole time?   It was those

12   three I believe, just those three.

13   Q.   What was Mr. Keeling doing?

14   A.   He was training K-9's also and he was doing a class.

15   Q.   And that was the interdiction class?

16   A.   Yes, he was doing the interdiction class.

17   Q.   Who did the training for the dog handler's course?

18   A.   The training for the dog handler's course was done -- that

19   was done by Paco.

20   Q.   Who did the hiring, who hired Paco?

21   A.   Mr. Croft hired Paco.

22   Q.   Who hired Raul?

23   A.   Brad hired -- Mr. Croft hired Raul.

24   Q.   Who hired Mr. Keeling?

25   A.   Brad hired Mr. Keeling.

1   Q.   Who hired you?

2   A.   Brad hired me.

3   Q.   Who handled all the money for the business, Universal K-9?

4   A.   I had the money in my account, but Brad handled all the

5   money.

6   Q.   Why was the money in your account?

7   A.   I was told that I guess it was part of my job, but I had

8   the bank account in my name.

9   Q.   Who told you that?

10  A.   Mr. Croft.

11  Q.   Say the business needed to buy a bag of dog food, how would

12  that bag of dog food be paid for?

13  A.   Mr. Croft had the credit card and something like that he

14  would buy it with the credit card, just use the credit card --

15  I mean the debit card and use it.

16  Q.   Okay.  For larger purchases, how would payments be handled?

17  A.   For larger purchases I would either get money orders or

18  maybe go get cash out the bank or sometimes I would have to I

19  guess wire transfer, whatever he told me to do I'd do, so --

20  Q.   Who made the decisions on what was going to be purchased?

21  A.   He did, he made all the decisions.

22  Q.   Did you and Mr. Croft ever discuss forming a nonprofit

23  corporation?

24  A.   I didn't discuss, I didn't know anything about a nonprofit.

25  I knew that the nonprofit was part of the school.

1    Q.  Did you have anything to do with the creation of that

2    nonprofit?

3    A.  I didn't know what a nonprofit was until he thought of it,

4    you know.

5    Q.  Whose suggestion was it that the business should be a

6    nonprofit?

7    A.  His suggestion.

8    Q.  I'm going to show you Government Exhibit Number Four.  This

9    is just the certification from the Secretary of State's Office.

10   If we could go to page two.  Do you recognize this?

11   A.  I don't recognize it, but I mean I see my name on it.

12   Q.  Prior to your discussions with the government, had you ever

13   seen the cover page of this document?

14   A.  Can you put it back -- is this the cover page?

15   Q.  No, this page.  Have you ever seen this page prior to

16   discussions with me and with the agents?

17   A.  No, I never seen that page.

18   Q.  This is a Certificate of Formation for a nonprofit

19   corporation and it was filed on May 29, 2015?

20   A.  Yes, sir.

21   Q.  The company that's involved in is what company?

22   A.  It's Universal K-9 company.

23   Q.  And you see you are listed here in part B as the registered

24   agent for that company, is that correct?

25   A.  Yes, the registered, yeah, I see it, yup, registered agent.

1   Q.  Did you and Mr. Croft have some discussion about being the

2   registered agent for this company?

3   A.  No, I don't even know what a registered agent is.

4   Q.  If we go down to article three, the management, you are

5   listed as a director, is that correct?

6   A.  Yes.

7   Q.  And then if we go to the next page of this document,

8   there's a second director, Anthony Ward, is that right?

9   A.  Yes.

10  Q.  Who is Mr. Anthony Ward?

11  A.  I don't remember meeting him.  I talked to him on the phone

12  because he was supposed to be a recruiter or supposed to help

13  me recruit, but I never met him personally, I don't think.

14  Q.  And the second individual, the third director is Mr. Steve

15  Peek.  Did you ever meet Steve Peek?

16  A.  Yes, I met Steve Peek.

17  Q.  You indicated that he had been a trainer at Universal K-9

18  when you first went down?

19  A.  Yes, sir.

20  Q.  Was he a trainer when you came back to work as the V.A.

21  recruiter?

22  A.  No, Brad had fired him.

23  Q.  Okay.  If we look at the top of this, there's some faxing

24  information and it says it's to an area code 512 number which

25  would be the Austin area code?

1   A.  Right.

2   Q.  From Richard Cook and then it's got a number here

3   (210)858-6830, do you know what that number is?

4   A.  That's not my number, but no, I don't know what number that

5   is.

6   Q.  That would be a number in San Antonio, is that correct?

7   A.  Yes.

8   Q.  If we go to the next page, and then the next page -- excuse

9   me.  On this page it says organizer was Richard Cook.  Were you

10  the person that organized the nonprofit?

11  A.  No, sir.

12  Q.  And then we go to the next page.  There's a signature at

13  the bottom, the execution block.  Do you recognize that

14  signature?

15  A.  I think that's my signature, I believe that's my signature.

16  Q.  Okay.  Did you sign this document?

17  A.  I probably did sign it, but I never looked at the document.

18  Q.  In fact, were you ever even given the entire document?

19  A.  Probably not, but no, I don't think so, but I think this is

20  my signature, not sure.

21  Q.  How are signatures done at Universal K-9 between you and

22  Mr. Croft?

23  A.  I trusted Brad, so whatever he gives me, I sign.  I just

24  signed.

25  Q.  Now, you were living in Virginia at this time, is that

1  correct?

2  A.  Yes, sir.

3  Q.  How would you get documents to sign?

4  A.  I think he just give me it just the bottom page, I didn't

5  read -- I never read any document, I just signed whatever he

6  gave me because I trusted him.

7  Q.  Would you have to exchange some back and forth between you

8  and him electronically or would you have to come here to San

9  Antonio to sign?

10 A.  I think most of the time it was here when I came here, he

11 gave me stuff to sign.

12 Q.  Did you ever try to read any of these documents?

13 A.  Never because I just trusted him, so I never read anything.

14 I might have read -- I never read anything, sorry, I just

15 signed it.

16 Q.  What would happen, what would he tell you when he'd put

17 something in front of you to sign?

18 A.  Just sign it.

19 Q.  Did you ever meet with Mr. Peek or Mr. Ward to discuss

20 Universal K-9 business?

21 A.  Mr. Who?

22 Q.  Mr. Peek or Mr. Ward?

23 A.  Never, no.  I talked to Mr. Ward on the phone, but it was,

24 you know, because he was supposed to be a recruiter like me.

25 Q.  Did you have any involvement in putting together the

```
1   application documents or any involvement in any part of the
2   approval application process for Universal K-9 to get the
3   certification from the Texas Veterans Commission?
4   A.  No, Brad did the book.  He was the one who did all the --
5   put the book together.
6   Q.  Did you have any involvement in providing information for
7   that?
8   A.  No, sir.
9   Q.  Did you send any of those documents to the Texas Veterans
10  Commission?
11  A.  No, I don't recall sending anything to the Texas Veterans,
12  no.
13  Q.  Do you know an attorney by the name of Ms. Lavinia D.
14  Santos?
15  A.  No, sir.
16  Q.  Have you ever heard that name before?
17  A.  Never heard it.
18  Q.  Did you hire an attorney for purposes of helping the
19  company?
20  A.  Never.
21  Q.  Universal K-9?
22  A.  Never, no.
23  Q.  I'm going to show you Government Document 6f.  This is an
24  e-mail.  Can you see who the e-mail is from?
25  A.  It's from Brad Croft.
```

1   Q.  And it was sent to -- have you ever heard of an individual

2   named Bebe Glasgow?

3   A.  I've heard that name, yes, I've heard it before.

4   Q.  Do you know where she worked?

5   A.  I think she worked at the --

6   Q.  Don't guess if you don't know.

7   A.  I don't know, I don't know.

8   Q.  What about Mr. Rufus Coburn?

9   A.  I've heard this name, sir.

10  Q.  Do you know where he worked?

11  A.  I know he works at the V.A.

12  Q.  And Daniel Paulino?

13  A.  Never heard of that name.

14  Q.  This is dated when?

15  A.  October 4, 2015.

16  Q.  And if we scroll down, you can see that this is an e-mail,

17  is that correct?

18  A.  Yes, sir.

19  Q.  Did you have anything to do with putting this e-mail

20  together?

21  A.  No, sir.

22  Q.  As far as the paragraph seven, roster of administrative and

23  instructional staff, did you provide any of this information

24  here to be included in any type of letter like this?

25  A.  No, sir.

1  Q.  Let me show you Government Exhibit 6g.  You recognize this

2  first page here?

3  A.  I recognize the letterhead sir.

4  Q.  You recognize Universal K-9 letterhead?

5  A.  Yes, sir.

6  Q.  This seems to be a letter addressed to Mr. Richard Coburn,

7  is that correct?

8  A.  That's Mr. Coburn, I see it.

9  Q.  And if we could look at the signature block here, is that

10  your signature?

11  A.  That's my signature, yes.

12  Q.  If we could go back to the full, did you write this letter?

13  A.  No, I never wrote that letter, no.

14  Q.  Is that your signature though?

15  A.  That is my signature.

16  Q.  How did you come to sign this?

17  A.  I think it's one of those letters where he just handed to

18  me and I signed it.  I didn't read it, I just signed.

19  Q.  If we could go to the next page, this is an application for

20  approval through the Texas Veterans Commission for the V.A.

21  benefits.  It indicates that it's for the school Universal K-9

22  and the name of the contact for Universal K-9 is Brad Croft, is

23  that correct?

24  A.  Yes, sir.

25  Q.  And if we move down to one sub paragraph three, it has the

1  name of owner is Richard Cook, is that correct?

2  A.  Yes, sir, I see it.

3  Q.  And it actually lists an address in Richmond, Virginia.

4  A.  Yes, sir, I see it.

5  Q.  Did you have any discussions with Mr. Croft as far as

6  filling out this form?

7  A.  I've never seen this form, but I didn't fill this out.  I

8  didn't fill this form out.

9  Q.  In fact, you've never even seen it before, before you were

10  shown it by the agents?

11  A.  Yes, I've never seen this form.

12  Q.  Down here it indicates that you are the President of

13  Universal K-9.

14  A.  I see that.

15  Q.  Did you have discussions with Mr. Croft about you being the

16  President of Universal K-9?

17  A.  I just knew once I saw that in the catalog I was listed as

18  the President, but I didn't fill this form out.

19  Q.  And if we go in, let's go to the next page --

20         THE COURT:  So you did not know you were President?

21         THE WITNESS:  No, I didn't, Your Honor, I didn't know

22  I was President until after I was -- after I saw the catalog.

23  BY MR. SUROVIC:

24  Q.  You're talking about the course catalog for the school?

25  A.  Yes, sir, after I saw the course catalog, I saw the catalog

1    and I was listed as the President.

2            MR. MCHUGH:  I believe the testimony is, Your Honor,

3    is that he was aware that he was President as he was working

4    there.

5            THE COURT:  Well, I asked him.  I was referring to

6    before.  I mean were you asked if you wanted to be President?

7            THE WITNESS:  No.

8    BY MR. SUROVIC:

9    Q.  Let's go to the next page.  And the next page.  Sir, there

10   is a signature on the bottom of this page here.  This is page

11   three of the application.  Is that your signature?

12   A.  Yes, that's my signature.

13   Q.  How did you come to sign this page?

14   A.  Probably a document that he probably gave me and I know

15   this is my signature because the date is written, not in

16   cursive, so that's me.

17   Q.  Let's go to the next page.  Sir, do you recognize this

18   document?

19   A.  I've never seen this document.

20   Q.  This is a letter from the Texas Workforce Commission

21   addressed to you, is that correct?

22   A.  Yes.

23   Q.  And the address there that it's addressed to you at is what

24   address?

25   A.  It's 1100 Loop 410, suite 700-125.

1    Q.  Do you know where that address is?

2    A.  It's in San Antonio, Texas, but it's somewhere on Loop 410.

3    I don't think it's near Tradesman.

4    Q.  Have you ever been to that address?

5    A.  I'm not sure if I been to this address.

6    Q.  Do you know what it is?

7    A.  It's a building, right?

8    Q.  You tell me.

9    A.  Mailbox, I'm not sure.

10   Q.  Do you know what it is?

11   A.  I don't know.

12   Q.  Did you establish that address for the business?

13   A.  I never established that address.

14   Q.  And you've never been to that address.

15        MR. MCHUGH:  That's not his testimony, Your Honor.

16   BY MR. SUROVIC:

17   Q.  Have you ever been to that address?

18   A.  I don't know where that address is at.  I don't know if

19   I've been there, but I didn't establish that address, Your

20   Honor.  I mean sir.

21   Q.  Did you receive this letter?

22   A.  I never received that letter.

23   Q.  Do you even know why the Texas Workforce Commission would

24   be involved in the application process for Universal K-9?

25   A.  I don't know why.  Sorry.

Richard Cook - Examination                    42

1   Q.  Let's go to the next page.  There's another signature on

2   this page.  Can you see that?

3   A.  Yeah, that's my signature because of the date.  That's my

4   signature, sir.

5   Q.  And if we go to the next page, there's another signature on

6   the bottom of that.  Is that your signature?

7   A.  That's my signature.

8   Q.  Did you read any of this while you were signing it?

9   A.  I'm sorry, I didn't read anything, I just signed.

10  Q.  Let's go to page 15.  This is what's referred to as Exhibit

11  J of the application.  There are a number of names listed here,

12  is that correct?

13  A.  Yes, sir.

14  Q.  Wes Keeling, Dustin Bragg, Jesse Stanley, Art Underwood.

15  Had you ever met Dustin Bragg?

16  A.  Yes, I met Dustin Bragg.

17  Q.  What about Jesse Stanley?

18  A.  I never met Jesse Stanley.

19  Q.  What about Art Underwood?

20  A.  I never met Art Underwood, sir.

21  Q.  Did you provide any of the information that was used to

22  fill in this document here, this particular page?

23  A.  I never provided any of this information.

24  Q.  Now, I note here that on this document Mr. Brad Croft is

25  listed as the operations director and you are listed as the

1  office manager, is that correct?

2  A.  Yes, sir.

3  Q.  Were you the office manager?

4  A.  I don't know what I was.  I guess -- I never seen this

5  application, but I don't think I -- I guess I was the office

6  manager.

7  Q.  If we look at the bottom, is that your signature?

8  A.  That's my signature, sir.

9  Q.  So you signed this page?

10 A.  Yes, sir.

11 Q.  Did you have any input into any of the items that are on

12 any of these pages that you signed?

13 A.  No, never, no input, just signed.

14 Q.  Why would you sign something like that?

15 A.  I trusted Brad and he just gave it to me to sign.  I

16 thought it was just part of helping the school, I trusted him.

17 Q.  By the way, Mr. Wesley Keeling, Mr. Dustin Bragg, Mr. Jesse

18 Stanley or Mr. Art Underwood, did you ever hire any of those

19 individuals?

20 A.  I never hired any of these people.

21 Q.  Do you know what their qualifications are to train dogs?

22 A.  I don't know what their qualifications are.

23 Q.  If we go on to the next page, there are a series of

24 certificates.  Have you ever seen this certification before?

25 A.  No, sir.

1    Q.  Or the one from the Air Force for Mr. Underwood below that,

2    have you ever seen that?

3    A.  Never seen this certification.

4    Q.  Did you ever see any certifications or training

5    certificates from any of the people who were working as

6    trainers for Universal K-9?

7    A.  The only person I've seen a trainer's certificate for is

8    the Raul Cabrera, that's the only one.

9    Q.  So you never saw any of these certificates?

10   A.  Never seen it.

11   Q.  You talked a little before when you were describing what

12   you did for the business, you talked about accounts and getting

13   money for Mr. Croft?

14   A.  Yes, sir.

15   Q.  Can you explain what you were talking about there?

16   A.  When I was getting money out the account I was doing the

17   money orders for to pay the bills or just -- that was one of my

18   jobs is when I come here to get money out and give it to

19   Mr. Croft or give him the money to pay a bill or get money

20   orders and things like that.  That's what he asked me to do.

21   Q.  Why did Mr. Croft want you to do that as opposed to doing

22   it himself?

23   A.  Because the accounts were in my name, sir.

24   Q.  Why were they in your name?

25           THE COURT:  Counsel, I know that counsel isn't

1  objecting, I'm going to disregard the last answer -- the last

2  question and answer and I'm going to disregard this one because

3  you're flat out asking him to put himself in Mr. Croft's head.

4          MR. SUROVIC:  Very well, Your Honor.

5          THE COURT:  You have no foundation for that.

6          MR. SUROVIC:  Let me ask it slightly a different way.

7          THE COURT:  If Mr. Croft said something to him,

8  there's no hearsay objection because he's the defendant, but

9  not why did you.  He's not a seer.

10          MR. SUROVIC:  I understand, Your Honor, I'll rephrase

11  the question.

12  BY MR. SUROVIC:

13  Q.  What did Mr. Croft tell you about why you were going to be

14  opening these accounts?

15  A.  He just told me to open the accounts for the school.

16  Q.  I'm going to show you what's in evidence as Government

17  Exhibit Number 16b.  This is a signature card for a Bank of

18  America account that ends in numbers 8171.  Do you see that?

19  A.  Yes, sir.

20  Q.  At the top?

21  A.  Yes, sir.

22  Q.  And the account title is what?

23  A.  The account title says Universal K-9.

24  Q.  Is this one of the accounts that you opened for Mr. Croft?

25  A.  Yes, sir.

1   Q.  And if we go down to the bottom here, is that your

2   signature?

3   A.  Yes, this is my signature.

4   Q.  Why did you open this account?

5   A.  For Mr. Croft because he asked me to for Universal K-9.

6   Q.  And what was the purpose of this account?

7   A.  This is for the school for -- this is for the school, for

8   the V.A. benefits, I believe.

9   Q.  And what was that account used for?

10  A.  That account was used for the direct deposits for the V.A.

11  benefits.

12  Q.  So would the V.A. benefits be deposited into that account

13  and distributed out?

14  A.  Yes, the V.A. benefits would be deposited.  When I'd fill

15  the form out, the 22-99, the money would come into one of --

16  this account, I believe.

17  Q.  Now, when you open an account, what type of items do you

18  get in order to allow you to have access to those accounts?

19  A.  When you open the account you get a checkbook and you get a

20  card, a debit card.

21  Q.  And you also get some sort of way to access the account

22  online?

23  A.  Yes, yes.

24  Q.  What do you get in order to do that?

25  A.  You have a password, online access, things to that nature.

1   Q.  Now, with a checkbook, the debit card and the online

2   password, what happened to those after you opened the account?

3   A.  As soon as I got those, I just sent it to Mr. Croft.

4   Q.  Did you have any ability to access the account?

5   A.  I could go with my ID into the account because I'm on this

6   account, so I can go to it with my ID and show them my ID to

7   access the account.

8   Q.  Did you have a checkbook?

9   A.  No, sir.

10  Q.  Did you have a debit card that you could draw money?

11  A.  No, sir.

12  Q.  Could you even access it, the account online to see what

13  the balance was?

14  A.  I didn't have the passwords.  Mr. Croft had the passwords

15  and he controlled the bank online account.

16  Q.  So again what did you have to do in order to get money out

17  of the account?

18  A.  I have to go in the account and show them my two IDs.

19  Q.  So you would have to personally appear at the bank?

20  A.  Yes, every time.

21  Q.  And again the money that went into these accounts all came

22  from where?

23  A.  All the money that went in there came from the V.A.

24  benefits or -- yeah, V.A. benefits.

25  Q.  And what you just described, did that apply to this

Richard Cook - Examination                    48

1  particular account here?

2  A.  Yes, sir.

3  Q.  The Bank of America account?

4  A.  Yes, sir.

5  Q.  I'm going to show you Government Exhibit 11e.  This is for

6  a Wells Fargo account for Universal K-9.  Do you recall opening

7  this account?

8  A.  Yes.  I do recall opening this account, yes.

9  Q.  And this is in -- it appears to be in November of 2017, is

10 that correct?

11 A.  Yes, sir.

12 Q.  What was the purpose of opening this account?

13 A.  The other account was closed, they closed the Bank of

14 America account.

15 Q.  So how did this account come to be opened?

16 A.  I had to go and open the account because the other account

17 was closed.

18 Q.  Did you do that on your own?

19 A.  Yes, under Mr. Croft's direction I had to open the account.

20 Q.  Who chose the Wells Fargo Bank?

21 A.  Mr. Croft because Wells Fargo was here in San Antonio.

22 Q.  Now, if we go to page three of this document, it indicates

23 the owner key individual is who?

24 A.  I'm the owner of this account.

25 Q.  Okay.  Did you actually have authority over this account?

Richard Cook - Examination                        49

1   A.  I didn't control this account.  Mr. Croft controlled this

2   account, but I'm the owner.

3   Q.  If we go to the next page, whose signatures are those?

4   A.  That's my signature, sir.

5   Q.  Now, you described before with the Bank of America account

6   about the checkbook, the debit card and the online password

7   access?

8   A.  Yes, sir.

9   Q.  What was the deal with the Wells Fargo account, was it

10  similar or was it different?

11  A.  Wells Fargo had a similar online access, but I didn't have

12  access to it.

13  Q.  Did you get to keep the checkbook from the Wells Fargo

14  account?

15  A.  No, I didn't keep the checkbook or the debit card.

16  Q.  Where did those go to?

17  A.  I sent those to Mr. Croft.

18  Q.  What about the online password so you could do online

19  banking?

20  A.  He has all the passwords or online account.

21  Q.  So what did you have to do in order to get into this

22  account?

23  A.  I had to go in the account -- I mean go into the bank, sir,

24  and show them IDs, same thing I had to do with Bank of America,

25  sir.

1   Q.  And you indicated that this bank account was started

2   because the Bank of America account was closed?

3   A.  Yes, sir.  The Bank of America account got closed.

4   Q.  Where did the deposits into this particular bank account

5   come from?

6   A.  The deposits came from the V.A., direct deposit from the

7   V.A.

8   Q.  Sir, next I'm going to show you Government Exhibit 11a.

9   And this is a document for the Wells Fargo Bank account.  And

10  I'll ask you, as far as this address here, can you tell me what

11  that address is?

12  A.  That's the address of the school, that's on Tradesman.

13  Q.  And if we take a look at this, this is for account number

14  1730 and we go to the second page, can you tell me what this

15  is?

16  A.  That's a bank statement.

17  Q.  That's a bank statement.  Do the bank statements for any of

18  these accounts ever come to you?

19  A.  No, sir.

20  Q.  Where do they go?

21  A.  To Mr. Croft on Tradesman or online.

22  Q.  Let's take a look at Government Exhibit Number 16c.  Now,

23  sir, can you tell me what bank account this is for?  This is

24  for account number what?

25  A.  This is account for me and my daughter.

1  Q.  And it's account number -- it's at Bank of America account

2  number 3782?

3  A.  Yes, sir.

4  Q.  What was this account for?

5  A.  This is an account for me and her, for her school because

6  she wasn't 18 at the time, so I had to sign I guess underneath

7  her.

8  Q.  Do you recall ever using this particular account to do

9  business for Universal K-9 and for Mr. Croft?

10  A.  I don't recall using this account for that purpose, I'm not

11  sure.

12  Q.  Do you recall making some deposits?

13  A.  Yes.

14  Q.  And making two large withdrawals out of it?

15  A.  I made a deposit, in fact, because Bank of America didn't

16  charge for a cashier's checks or something, so I think I

17  deposited something in here to make -- buy a cashier's check.

18  I'm not positive.

19  Q.  Do you remember what the cashier's check was for?

20  A.  No, sir.

21  Q.  Who is Lillian Socorro Cook?

22  A.  My daughter.

23  Q.  Why is she on this account?

24  A.  She was under 18 at this time.

25  Q.  You indicated something about a school or something like

1  that?

2  A.  A school account, yeah, she's at VCU too.

3  Q.  I show you Government Exhibit Number 16d.  This is another

4  Bank of America account, is that correct?

5  A.  Yes, sir.

6  Q.  This is an account number that ends 7217, is that correct?

7  A.  Yes, sir.

8  Q.  What's the account title?

9  A.  Account title --

10  Q.  If you can read it?

11  A.  Universal K-9, Inc.

12  Q.  And if we look down at the bottom, that signature, is that

13  yours?

14  A.  Yes, sir, this is my signature, Richard Cook, that's my

15  signature.

16  Q.  Here on this it's listed as the operations director.  Were

17  you also the operations director for Universal K-9, Inc.?

18  A.  I was just putting a title down.  I didn't know what my

19  title was, just veteran specialist.

20  Q.  Why did you open this bank account?

21  A.  This is another account for Universal K-9 that Brad asked

22  me to open.

23  Q.  Now, there is also an account at Union Bank and Trust, is

24  that correct?

25  A.  That's my personal account.

1  Q.  That's the account that ends in 8205?

2  A.  Yes, sir.

3  Q.  Was that the account that you got your disability check

4  deposited in?

5  A.  Yes, sir.

6         MR. MCHUGH:  Your Honor, may we approach the bench?

7         THE COURT:  Sure.

8                            *   *   *

9      (Sidebar.)

10        MR. MCHUGH:  Your Honor, I well appreciate the

11  challenges of the government.  I would like to communicate to

12  the Court that it's very uncomfortable and it becomes very

13  problematic, I don't want to embarrass the witness, he does

14  have cognitive challenges, I get that, and I want to allow a

15  leeway, but I have to object to excessive leading of this

16  witness because this witness --

17        MR. SUROVIC:  I understand, Your Honor, I haven't been

18  leading, I'm trying to move things faster.  I can do it the

19  slower way.

20        THE COURT:  I think he's right and I did step in once

21  where I thought you were asking him --

22        MR. SUROVIC:  I understand.

23        THE COURT:  Okay.

24      (Sidebar concluded.)

25                            *   *   *

1   BY MR. SUROVIC:

2   Q.  What type of instructions would you get from Mr. Croft

3   concerning the accounts that we've just discussed here?

4   A.  Just to open the account, sir.

5   Q.  What about did you ever receive any instructions from him

6   concerning what should be done with the money that was in those

7   accounts?

8   A.  I just opened the account and sent him the debit card and

9   anything -- and the checkbook as soon as I got it.

10  Q.  Were you ever asked to withdraw money from those accounts?

11  A.  Yes, sir.

12  Q.  Were you told why you were withdrawing the money from the

13  accounts?

14  A.  No, very vague, just sometimes he would give me

15  instructions to pay, like, get a money order for certain

16  things, but otherwise, just the same amount of money.

17  Q.  How would you know what amount to get a money order for?

18  A.  He would send me a picture or tell me -- send me a text to

19  pay a certain amount of things.

20  Q.  And how would you know where to send the money to or send

21  the money order to?

22  A.  He would tell me the address, he would direct me the

23  address.

24  Q.  Were you ever asked to make payments from these accounts

25  for certain things?

1   A.   Yes, sir.

2   Q.   What type of payments were you asked to make out of these

3   accounts?

4   A.   Payments for a bus, payments for -- money orders for Raul

5   and payments for multiple things.

6   Q.   When you say multiple things -- you indicated earlier that

7   Mr. Croft had a credit card?

8   A.   Yes, sir.

9   Q.   That he would buy things like dog food and things for --

10  A.   Yes.

11  Q.   How was that credit card paid off?

12  A.   I had to pay his credit card off with a money order, yes.

13  Q.   How would that work?

14  A.   He sent me -- he just said get a money order for this

15  amount and send it and get the money out the bank, pay this

16  amount on this credit card and put the card number down.

17  Q.   And were there other items that you would have to take care

18  of?

19  A.   Yes.

20  Q.   Like his credit card?

21  A.   Yes.

22  Q.   Like what?

23  A.   His credit card, his bus, bus payment, the money order for

24  penile implant.

25  Q.   Do you recall ever making a purchase of a 2017 American

1   Eagle 45T mobile home?

2   A.  Yes, sir.

3   Q.  I'm going to show you Government Exhibit Number 33b.  Is

4   that what we're talking about?

5   A.  Yes, sir.

6   Q.  Whose idea was it to purchase this mobile home?

7   A.  Brad's.  Mr. Croft's, sorry.

8   Q.  What did Mr. Croft tell you the reason for the purchase

9   was?

10  A.  The vehicle -- this was supposed to be used for advertising

11  for the school.

12  Q.  Now, I'm going to show you Government Exhibit Number 15.

13  And could you tell me do you know who Motor Home Specialist is?

14  A.  Yes, sir, I know who Motor Home Specialist is.

15  Q.  Who are they?

16  A.  That's where we bought this bus from.

17  Q.  Can you tell me how the purchase of this bus went down?

18  A.  I was in Virginia and he called me and he flew me down that

19  day and he just told me he was going to buy a bus.  And I flew

20  into Dallas and I just signed some papers and then I had to I

21  guess -- I had to wire the money from some -- he told me to

22  wire some money from this account to --

23  Q.  From what account?

24  A.  From this account, from the account that me and my daughter

25  have to the Motor Home Specialist.

1   Q.   Did you have enough money in your daughter's account?

2   A.   No, sir.

3   Q.   Where did you get the money to get into your daughter's

4   account?

5   A.   This money came from the school's account.

6   Q.   Okay.  And how did it get into your daughter's account from

7   the school's account?

8   A.   I had to go and take money out, I had to go to the bank

9   every day multiple times and take money out.

10   Q.   Why didn't you just go once to take money out?

11   A.   Brad, Mr. Croft told me don't go and take more than $9,000

12   at a time.

13   Q.   Why did he tell you you shouldn't take more than $9,000?

14   A.   I'm not sure, but just don't.

15   Q.   You don't remember what he told you?

16   A.   He just told me don't take more than 9,000 at a time.

17   Q.   If we go through this document, were you the purchaser of

18   the mobile home?

19   A.   Yes, I purchased the mobile home.

20   Q.   Did you ever get to use the mobile home?

21   A.   No, sir.

22   Q.   Have you ever been inside the mobile home?

23   A.   Yes, sir.

24   Q.   How did you get inside the mobile home?

25   A.   I just walked up the front step, but I try not to -- I

Richard Cook - Examination                              58

1   mean.

2   Q.   Did Brad want you inside the mobile home?

3   A.   No, no, sir.

4   Q.   If we go through some of the documents here, next page,

5   this is a 60,000-dollar deposit.  Do you recall providing them

6   with $60,000?

7   A.   No, no, I wasn't there when that money was given, I don't

8   think so.

9   Q.   And did you actually negotiate, by the way, for the

10  purchase of this motor home?

11  A.   No, sir.

12  Q.   Do you know how they came about the price?

13  A.   Everything was -- the negotiation process was done way

14  before I got there.  I just flew in and signed.

15  Q.   Let's flip through the pages here.  This is a credit union

16  application.  Were you required to obtain credit for

17  purchasing?

18  A.   Yes.

19  Q.   Do you recall how much was put down on this motor home?

20  A.   I don't recall the exact amount, sorry.

21  Q.   Do you recall what the monthly payments were?

22  A.   I don't recall what the -- I don't know, no, I don't.

23  Q.   How were the monthly payments made?

24  A.   Brad would tell me just to pay a certain amount and I'd

25  mail them in, take the money out and mail them in.

1  Q.  Go to the next page.

2  A.  That's me.

3  Q.  That's your driver's license?

4  A.  Yes, sir.

5  Q.  And if we go to the next page, at the bottom here there are

6  some initials.  Can you tell me who those initials belong to?

7  A.  That's my signature.

8  Q.  Okay.  Your signature?

9  A.  Yes, my signature initial, yes, sir.

10  Q.  And this is the actual contract for the sale, is that

11  correct?

12  A.  Yes.

13  Q.  The total value, the total payments for this was how much?

14  A.  Total payments is $425,431.20.

15  Q.  And you actually had --

16       MR. MCHUGH:  Your Honor, respectfully, I would like

17  the record to reflect that the witness is reading from the

18  document.

19       THE COURT:  Are you reading from the document?

20       THE WITNESS:  Yes.

21       THE COURT:  That's not permitted.

22       MR. SUROVIC:  Very well, Your Honor.

23       THE COURT:  I'm going to strike the answer.

24       MR. SUROVIC:  Yes, sir.

25       THE COURT:  Don't read from the document, sir.  Do not

1    read from the document unless you're specifically drawn to it.

2    BY MR. SUROVIC:

3    Q.  Let's go to the fourth page from the end, sir.  Did you

4    have to go through a credit check in order to take out this

5    loan?

6    A.  Yes, sir.

7    Q.  And there's certain information here on this form, is this

8    information concerning you?

9           MR. MCHUGH:  Same objection, Your Honor.

10          MR. SUROVIC:  I'm just having him look at the

11   information, Your Honor.

12          THE COURT:  That objection is overruled.

13   BY MR. SUROVIC:

14   Q.  Is this information involving you?

15   A.  Yes, sir.

16   Q.  What about this -- it says the e-mail is

17   Info@UniversalK-9Inc.?

18   A.  That's not my e-mail, sir.

19   Q.  Did you have access to that e-mail?

20   A.  No, I have no access to that e-mail.

21   Q.  Whose e-mail is that?

22   A.  That's Mr. Croft's e-mail.

23   Q.  If we go to the next page, and at the top it indicates some

24   more personal information.  Is this your personal information?

25          *(Pause.)*

1      Let me ask you, it says, "Position held, President".  Would

2  you have been listed as the President of Universal K-9?

3  A.  At that time I was listed as the President, yes.

4  Q.  It indicates you have a salary.  This document says you

5  have a salary of $30,000 a month?

6  A.  That's not true.

7  Q.  Did you give that information to the credit reporting

8  agency?

9  A.  I don't -- no, I think the person who did the paperwork

10  prior to that did it, the sales guy did that.

11  Q.  Had you been approved for a loan before you even showed up

12  in Dallas?

13  A.  I think I was approved -- I think I was approved before I

14  got there because all I had to do was sign papers as soon as I

15  got there.

16  Q.  Now, this down here, other sources of income, military

17  retirement, 3,500 a month, that is correct, is that correct?

18  A.  That's correct, that's correct.

19  Q.  What type of salary did you get from Universal K-9?

20  A.  For every student I was supposed -- for every student I

21  recruited, I was supposed to get a thousand dollars for every

22  student.  I was supposed to get it, but it depends if the

23  student dropped out or they didn't show up, it was my supposed

24  to be salary.

25  Q.  You just said that was supposed to be your salary?

```
 1   A.   Yes.
 2   Q.   How much did you actually get paid by Universal K-9?
 3   A.   I can't recall because I never got any -- he never told me
 4   when I was going to be paid or the dates, you know, I didn't
 5   have a date.
 6   Q.   Why did you sign all this paperwork for the purchase of the
 7   motor home?
 8   A.   This is Brad told me it was for the school and he did it
 9   for the school to advertise and go to different bases and
10   recruit more students and it was going to help with the school.
11   Q.   Why was your name on the paperwork?
12   A.   Because he asked me to do it.
13   Q.   To your knowledge, was that motor home ever used to go
14   recruit students?
15   A.   Not to my knowledge.
16   Q.   You said you purchased things.  Did you take delivery of
17   the motor home?
18   A.   Delivery, I left that day.
19   Q.   So did you actually get to get in the motor home, drive it
20   off?
21   A.   I don't know how to drive, no, sir.
22             THE COURT:  You don't know how to drive?
23             THE WITNESS:  Not that motor home, no, sir.
24   BY MR. SUROVIC:
25   Q.   Who did take delivery of the motor home?
```

1    A.   Mr. Croft.

2    Q.   Did you ever have to travel down to Universal K-9 to do

3    business in San Antonio?

4    A.   Yes, I used to come to every class, for every class --

5    well, I came for the majority of the classes.

6    Q.   How often would that mean you came to San Antonio?

7    A.   I came to San Antonio every three months, two months.

8    Q.   And who paid for you to travel down here?

9    A.   The first time Mr. Croft bought me a ticket and he bought

10   me a ticket to Dallas.  The rest of the times I bought my own

11   ticket.

12   Q.   And would you drive down or fly down or what?

13   A.   I would fly down every time, fly.

14   Q.   Where would you stay when you came down?

15   A.   I stayed in the -- there was a travel trailer, I stayed in

16   the travel trailer right there on the Tradesman address.

17   Q.   Did you stay in the motor home we just looked at?

18   A.   No, I didn't stay in the motor home.

19            MR. SUROVIC:  Just a moment, Your Honor.

20            (Pause.)

21            Could we take a look at Defendant's Exhibit 3e?

22   BY MR. SUROVIC:

23   Q.   You see that trailer in the back there?  Let's take a look

24   at Defendant's Exhibit 3g.  Is that where you stayed?

25   A.   Yes, sir, that's where I stayed.

1    Q.  Was it connected to power or water when you stayed there?

2    A.  No.  He had lights in there, but no water.

3              MR. MCHUGH:  Your Honor --

4              THE COURT:  He just changed his answer.

5              THE WITNESS:  Sorry.

6    BY MR. SUROVIC:

7    Q.  What were the living conditions like in this trailer?

8    A.  No bathroom, no running water.  I had to go to the fitness

9    center that was about 3 miles down the street to use the

10   bathroom and shower every day every time I needed the bathroom,

11   any time I wanted to go to the bathroom, just drive down the

12   street or get a ride.

13   Q.  When you were doing business in San Antonio for Universal

14   K-9, were you ever allowed to use the motor home that we looked

15   at in 33b, go in there and use the bathroom there or stay

16   there?

17   A.  No.

18   Q.  Do you recall a purchase of the actual property at

19   Tradesman that the school was on?

20   A.  I remember going to a building, yes, sir.

21   Q.  Can you tell us how that purchase of the Tradesman property

22   came about?

23   A.  I was just told -- I was just directed to go get a money

24   order from the bank.

25   Q.  Who directed you to get a money order?

1    A.  Mr. Croft.

2    Q.  Okay.  And then what happened?

3    A.  I went with Mr. Croft and Mr. Dominick to go to a building.

4    Q.  Who is Mr. Dominick?

5    A.  He's the person who owned that building.

6    Q.  Okay.  And what were you told to do?

7    A.  Go to a building and sign some papers.

8    Q.  Whose idea was it to purchase that property?

9    A.  Mr. Croft.

10   Q.  Who negotiated the sales price?

11   A.  Mr. Croft, I guess, I wasn't around when he negotiated

12   this.

13   Q.  So what was your involvement in the purchase?

14   A.  Just signing, signing what he asked me to sign.

15   Q.  I'm going to show you Government Exhibit Number 18.  Do you

16   recognize these papers?

17   A.  I don't recall, but I know that Alamo Title Company is

18   where I went to sign the papers, yes.

19   Q.  And the buyer, if we look at the very top, can you tell us

20   who the buyer is?

21   A.  The buyer is Universal K-9.

22   Q.  And who is the seller?

23   A.  Dominick Alongi.

24   Q.  Where is the property located?

25   A.  15329 Tradesman Avenue, San Antonio, Texas 78249.

1    Q.  What went on at that address?

2    A.  This is where the dogs were at, the K-9s.

3    Q.  If we go to the second page, there are a couple signatures.

4    Is that your signature?

5    A.  Yes, sir.

6    Q.  Is this what you signed while you were there?

7    A.  Yes, sir.

8    Q.  Now, if we go to the third page, there is a picture of a

9    cashier's check, is that correct?

10   A.  Yes, sir.

11   Q.  Tell us about this cashier's check.  Where did it come

12   from?

13   A.  The cashier's check came from Wells Fargo and I just went

14   in the bank with Dominick and he told me the amount and Brad

15   told me the amount and I just went and got it.

16   Q.  Where did the money to make up this cashier's check come

17   present?

18   A.  Cashier's check came from the V.A. account.  The V.A.

19   Universal K-9 account.

20   Q.  And who told you to get that cashier's check?

21   A.  Mr. Croft.

22   Q.  You indicated that Mr. Croft would ask you to make other

23   payments for him.  I'm going to show you Government Exhibit

24   Number 31.

25          MR. MCHUGH:  Your Honor.

1      THE COURT:  Yes, sir.

2      MR. MCHUGH:  Respectfully I think it would be better

3  to say what other payments did you make rather than get up

4  there and did you make this payment, did you make this payment.

5  It has a leading nature to it.

6      MR. SUROVIC:  Your Honor, this is an exhibit that is

7  already admitted into evidence.

8      THE COURT:  Then why do you need to ask him at all?

9      MR. SUROVIC:  Because he's going to explain the

10  transaction.

11      THE COURT:  Ask him transaction by transaction.

12  BY MR. SUROVIC:

13  Q.  Sir, you mentioned making some payments for a penile

14  implant for Mr. Croft?

15  A.  Yes, sir.

16  Q.  Can you tell us how that transaction went down?

17  A.  I just went and got -- sir, I just went and got money out

18  the Wells Fargo account and in increments of $9,000 and got and

19  purchased a money order.

20  Q.  And what did you do with the money order?

21  A.  I gave it to Mr. Croft or mailed it, I'm not sure.

22  Q.  And do you know where he got this surgery at?

23  A.  Yes, he got it in Maryland, in University of Maryland.

24  Q.  I'm showing you Government Exhibit Number 31, is that a

25  breakdown of the cost of that transaction?

1    A.   Yes, sir.

2    Q.   You said you got some cashier's checks.  Where did that

3    money come from?

4    A.   This money came from the Universal K-9 account.

5    Q.   And who told you to get those cashier's checks?

6    A.   Mr. Croft directed me to get the money.

7    Q.   What other purchases did you assist Mr. Croft in?

8    A.   To pay for the bus.

9    Q.   Other than the ones we've already talked about, the bus,

10   the property and this one, what other type of payments?

11   A.   Mr. Croft, he actually -- Mr. Croft put $10,000 down on the

12   truck that he bought me.

13   Q.   Tell us about that transaction.  What was that about?

14   A.   Mr. Croft bought me a truck to use for -- to have and he

15   put $10,000 down.  He told me go to the bank, get a

16   10,000-dollar money order and he put $10,000 on a truck for me.

17   Q.   Why did you need a truck?

18   A.   My truck wasn't working and also what he said it was going

19   to be used to drive around to recruit veterans in my state.

20   Q.   Did you ever purchase a set of jet skis?

21   A.   No, sir.

22   Q.   Do you know anything about a transaction that Mr. Croft

23   might have conducted concerning some jet skis?

24   A.   No, sir.

25   Q.   Did you ever authorize jet skis to be purchased for

Richard Cook - Examination                  69

1  Universal K-9?

2  A.  No, sir.

3  Q.  Were you involved at all in the preparation of tax returns

4  for Universal K-9?

5  A.  No, sir, I just signed whatever he asked me to sign.

6  Q.  Who did the tax filing for Universal K-9?

7  A.  I don't know, sir.

8  Q.  Were you responsible for preparing the actual returns?

9  A.  No, sir.

10 Q.  Have you ever used a tax filing system called Tax File?

11 A.  No, sir.

12 Q.  I'm going to show you what's been marked as Government

13 Exhibit Number 22.  And if we go to the second page, this is a

14 letter telling you that the IRS has determined that you have a

15 tax exempt status.  If we flip to page four, can you tell me

16 what form this is?

17 A.  No, sir.

18 Q.  Have you ever seen this form before?

19 A.  No, sir.

20 Q.  This is a form from the IRS indicating what -- what's the

21 organization here?

22 A.  Universal K-9, sir.

23 Q.  And it is a 1023-EZ, is that correct?

24 A.  Yes, sir.

25 Q.  Application for recognition of exemption under section

1    501(c)3.  If we scroll down, it says that the -- list the

2    names, titles and mailing addresses of your officers, directors

3    and trustees, is that correct?

4    A.  Yes, sir.

5    Q.  Whose names are listed there?

6    A.  Richard Cook, my name, Anthony Ward, Steve Peek.

7    Q.  What job did you have on this form?

8    A.  On this form it says my title is Treasurer.

9    Q.  Did you ever serve as the Treasurer for Universal K-9?

10   A.  I'm not sure.

11   Q.  Let's look at the next one down.  What's the next name

12   there?

13   A.  Anthony Ward.

14   Q.  And what's his title?

15   A.  His title says the President.

16   Q.  Were you ever told you're no longer the President, Mr. Ward

17   is the President?

18   A.  No, sir.

19   Q.  Let's look at the third name, who is that?

20   A.  This is Steve Peek.

21   Q.  And what is his title?

22   A.  His title is the Secretary.

23   Q.  Did you ever work with Mr. Steve Peek as far as performing

24   the functions of either the Treasurer or the President for

25   Universal K-9?

1  A.  No, sir.

2  Q.  If we go down a little bit further, there is some

3  indications there about the organization's e-mail, do you see

4  that?

5  A.  Yes, sir.

6  Q.  Whose e-mail was that?

7  A.  That's Mr. Croft's e-mail.

8  Q.  And if we look up at the names of the officers, directors

9  and trustees, is Mr. Croft's name there?

10 A.  No, sir.

11            THE COURT:  I understand counsel would like a break.

12            MR. SUROVIC:  I have no objection, Your Honor.

13 Actually I don't have very much farther to go, but I have no

14 objection to a break.

15            THE COURT:  We'll take our morning recess at this

16 point.

17            COURT SECURITY OFFICER:  All rise.

18            *(10:48 a.m.)*

19                              *   *   *

20            *(11:12 a.m.)*

21            COURT SECURITY OFFICER:  All rise.

22            THE COURT:  You can be seated.  You can continue.

23            MR. SUROVIC:  Thank you, Your Honor.

24 BY MR. SUROVIC:

25 Q.  Mr. Cook, do you know what an IRS form 990 is?

1   A.   No, sir.

2   Q.   I'm going to show you Government Exhibit Number 23.  Go to

3   the second page.  You can see this is a -- it's an IRS form

4   990-PF.  Can you tell us what the name of the foundation is

5   that this form relates to?

6   A.   Universal K-9.

7   Q.   And it's for the calendar year 2016, is that correct?

8   A.   Yes, sir.

9   Q.   It says underneath the foundation, Universal K-9 is in

10  whose name?

11  A.   Richard Cook.

12  Q.   And what address is listed?

13  A.   1100 Loop 410, suite 700-125.

14  Q.   Did you prepare this document?

15  A.   No, sir.

16  Q.   Have you ever seen it before talking to me a couple days

17  ago?

18  A.   No, sir.

19  Q.   Did you ever have any input as far as what numbers should

20  be placed on it or what information should be included?

21  A.   No, sir.

22  Q.   Did you direct somebody to prepare this?

23  A.   No, sir.

24  Q.   If we go to the next to last page of the document, it

25  indicates that the preparer was a Fola Damazio.  Do you know

1  who Fola Damazio is?

2  A.  No, sir.

3  Q.  Did you ever hire anyone to prepare an income tax return

4  for Universal K-9?

5  A.  No, sir.

6  Q.  Have you ever had any business with Tax Act, Inc.?

7  A.  No, sir.

8  Q.  How about Discovery Tax Solutions?

9  A.  No, sir.

10  Q.  Do you know an individual by the name of Ruth Williams?

11  A.  No, sir.

12  Q.  Did you ever provide anyone with any financial information

13  concerning Universal K-9 so the tax returns could be prepared?

14  A.  No, sir.

15  Q.  Whose job was that to take care of things like tax returns?

16  A.  Mr. Croft.

17  Q.  Going to show you Government Exhibit Number 24.  And we go

18  to the second page, this is another form 990 and again if we

19  could zoom in on the name of the foundation, who is this for?

20  A.  Name of the foundation is Universal K-9.

21  Q.  Again it's in care of Mr. Cook, is that correct?

22  A.  Yes, sir.

23  Q.  This is for calendar year 2017.  Did you direct anyone to

24  prepare taxes for the tax year 2017?

25  A.  No, sir.

Richard Cook - Examination                    74

1   Q.  Had you seen this document before I showed it to you a

2   couple days ago?

3   A.  No, sir.

4   Q.  Did you have anything to do with preparing that document?

5   A.  No, sir.

6   Q.  Did you direct anyone to prepare it for you?

7   A.  No, sir.

8   Q.  If we go to the next to the last page of this document, do

9   you know who Daniel Johnson is?

10  A.  No, sir.

11  Q.  Did you employ or direct somebody to employ an accountant

12  or tax firm in order to complete taxes for this company?

13  A.  No, sir.

14  Q.  Did you ever give anybody your name so that they could do

15  this, complete taxes?

16  A.  No, sir.

17  Q.  And if we could scroll down a little bit below Mr.

18  Johnson's signature, you ever dealt with Smart Money Tax

19  Services out of Newport Beach, California?

20  A.  No, sir.

21  Q.  And again whose job was it to take care of filing the taxes

22  in years 2016 and 2017?

23  A.  Mr. Croft.

24  Q.  Now, let's step back a little bit.  How long was your

25  association with Universal K-9, how long were you working as a

1   recruiter?

2   A.   I was working as a recruiter as soon as it got approved, as

3   soon as I came down, that was my job.

4   Q.   And how long did that last until?

5   A.   Three years, two years.

6   Q.   And in the course of the time that you were associated with

7   him, how much money did you receive from Mr. Croft for you

8   personally as compensation for your work?

9   A.   I can't recall the number, but I know I was supposed to get

10  paid like a thousand dollars for every student.

11  Q.   Can you give us a ball park figure?

12  A.   I don't even know because the compensation included my

13  truck and then there was another truck, he bought a truck for

14  me, another truck, I can't give you a ball, sorry.

15  Q.   How many trucks did he buy for you?

16  A.   He bought a smaller truck because another truck when I was

17  down here to drive around, but -- he bought two trucks for me,

18  one when I was here he bought a truck and another truck.

19  Q.   Did you ever give you any cash or anything like that?

20  A.   For the truck?

21  Q.   No, for compensation, beyond the two trucks?

22  A.   Yes.

23  Q.   How much money did he give you?

24  A.   I can't recall the exact number, but I know I was supposed

25  to get a thousand dollars for each student and if the student

1   didn't come or they'd go back and I'd owe him money for it.

2   Q.  You'd owe money for what?

3   A.  For the students not coming because I was working on a --

4   that was the compensation supposedly.  I was supposed to get

5   a -- that was my pay, a thousand dollars for each student

6   supposedly.

7   Q.  Did you actually get a thousand dollars for each student?

8   A.  No, because Brad was my friend, I trusted him and he didn't

9   have to pay me.  Actually you can do whatever you want.

10  Q.  As far as those trucks that you said that Mr. Croft bought

11  for you?

12  A.  Yes.

13  Q.  Did he actually buy them outright for you?

14  A.  He bought the -- there's a small truck he bought for me,

15  but the one that he bought --

16  Q.  By the way, where is the small truck located?

17  A.  It's here.

18  Q.  In San Antonio?

19  A.  Yes, sir.

20  Q.  Not where you live?

21  A.  No.

22  Q.  What about the other truck?

23  A.  The other truck he put $10,000 down for me on the truck.

24  Q.  Who had to pay for the rest of the truck?

25  A.  I'm still paying for that truck.

Richard Cook - Examination                     77

1  Q.  How about the travel expenses that you had when you would

2  fly down to San Antonio, who took care of those travel

3  expenses?

4  A.  I paid all the airline tickets when I came here.

5  Q.  What about when you had to travel to different military

6  bases and things like that to give presentations about

7  Universal K-9, who paid for that?

8  A.  I just paid for all the gas when I drove to the military

9  base or anywhere like to Fort Lee or something close to my

10  house or to Walter Reed or something, I would drive to give the

11  presentation or just set up a stand there or -- even when I was

12  here, I'd drive the small truck to set up a stand.

13  Q.  What about meals?

14  A.  When I was here I would pay for my meals, but usually we'd

15  go to dinner together in the evening, but you know because I

16  don't really try to eat too much when I was here, it would be

17  limited.

18  Q.  Who paid for your meal when you were here?

19  A.  We would split, I would pay for one meal, he would pay for

20  one meal.  We would split meal to meal because I didn't like

21  nobody to pay for my meal.  But he would pay one meal and I'd

22  pay one meal.

23  Q.  Other than the compensation you've already talked about,

24  did Mr. Croft do anything else for you?

25  A.  He gave me a job.  He did some -- he gave my daughter a

1    graduation present.

2    Q.  How much was the graduation present?

3    A.  I don't know.  I'm not sure.  She wouldn't tell me.  Maybe

4    thousand dollars or something, she wouldn't tell me exactly,

5    but he gave her a graduation present.  He took me to a Spurs

6    game, to an NBA game.  He took me to a magic show with Wes.  He

7    took me to a magic show with Wes twice and --

8    Q.  Did he ever take you to Las Vegas?

9    A.  Yeah, we had a show, we had a police convention there and

10   we drove with Steve.  And then we went with Wes, so he took me

11   to Las Vegas, yes.

12   Q.  Who paid for that?

13   A.  I paid for that.  We drove the first time.  And the second

14   time we -- did we drive?  We flew the second time.  I think I

15   paid for my ticket that time.  I'm not sure.

16   Q.  Why did you get -- you testified earlier you had no

17   experience in the dog business.  Why did you get involved with

18   Mr. Croft?

19   A.  Well, when me and my dad sat there and, you know, he saw

20   him on TV, I trusted Brad, I don't have too many friends except

21   for him, so I saw him and he had the change in character and I

22   felt like he was just like me because he went through the

23   custody battle like me.  And when he told me that he was going

24   to give me a job --

25   Q.  How did that make you feel?

Richard Cook - Examination                    79

1    A.  It made me feel good because I knew I couldn't do too much.

2    My dad liked him a lot and when we saw him on TV, you know, we

3    knew he was a different person and he was a good person.  When

4    we saw him, he's training police officers.  And when I told my

5    dad that he was going to give me a job and my mom, they were

6    proud of me.

7            MR. SUROVIC:  No further questions, Your Honor.  Pass

8    the witness.

9                          CROSS-EXAMINATION

10   BY MR. MCHUGH:

11   Q.  Mr. Cook, good morning.

12   A.  Good morning, sir.

13   Q.  My name is Tom McHugh.  I represent Bradley Croft.

14   A.  Nice to meet you.

15   Q.  You and I have never visited before, have we?

16   A.  No, sir.

17   Q.  We haven't even visited here this morning yet, have we?

18   A.  No.

19   Q.  And back when we first -- early on in this case I think on

20   a number of occasions we tried to reach out to you to visit

21   with you, was it your preference not to meet with us?

22   A.  Yes, sir.

23   Q.  And is there a reason that you felt uncomfortable meeting

24   with me?

25   A.  I just -- I don't know, I didn't know who you were.  I

1   didn't have no preference meeting with anybody.

2   Q.  Would you agree with me that you don't want -- you would

3   prefer not to be here today?

4   A.  Can you repeat that question?

5   Q.  Yes.  Would you agree with me that your preference is not

6   to be here today?

7   A.  No, I don't want to be here -- I mean it's fine.

8   Q.  Of course.  And is it unpleasant to you being here?

9   A.  Is it unpleasant, yes, I feel like it's unpleasant.

10  Q.  And for the record, why is it unpleasant?  What makes this

11  experience to you unpleasant?

12  A.  What makes this -- it's just because I guess -- I guess I

13  just -- it's unexpected, I don't know.

14  Q.  You still like Bradley Croft, do you not?

15  A.  I pray for him.  I don't have any problem with anybody in

16  this world at all.

17  Q.  And you don't have any problems with him today?

18  A.  Do I have any problems with him today?

19  Q.  Yes.

20  A.  I don't have hatred for anyone in this world.

21  Q.  That's admirable.  How long have you -- it's your testimony

22  that you've known Mr. Croft for what, 25 years?

23  A.  I've known him for 25 years.

24  Q.  And when is it that you had that terrible accident when you

25  were shot?

Richard Cook - Examination                    81

1   A.  This is -- I don't know the exact date, sir, but I'm not

2   sure.

3   Q.  But it was during the time that you knew Mr. Croft?

4   A.  Yes, yes.

5   Q.  So you knew Mr. Croft before that terrible --

6   A.  Yes, yes.

7   Q.  And how many times have you visited with the government

8   regarding Mr. Croft?

9   A.  With the government?

10  Q.  I'm sorry?

11  A.  Can you repeat that question?

12  Q.  How many times have you sat down and visited with the

13  government regarding their questions regarding Mr. Croft?

14  A.  Twice, three times, I'm not sure.  You talking about this

15  week?  I don't know.  I can't recall.  I'm sorry.

16  Q.  I don't know when you've met them.  I'm asking you.

17  A.  I don't know how many times, couple times.  I can't give a

18  number, sir.

19  Q.  When is it -- respectfully, and if I go too fast, slow me

20  down.

21  A.  Yes, sir.

22  Q.  When is it the first time that you visited with the

23  government?  I'm sure you remember that time.

24  A.  When the government came to my house, yes.

25  Q.  Your house was where?

1   A.   In Virginia.

2   Q.   So agents from Texas came up to visit you?

3   A.   Yes, sir.

4   Q.   Did they give you a telephone call and say, Rick, we're on

5   our way up or how did that happen?

6   A.   I was getting my military ID I lost at the base and they

7   called me and I didn't know who they were, but they just said,

8   hey, somebody is coming.  I think -- the only thing I remember

9   is IRS or something, it was just weird and they just came to my

10  house.

11  Q.   And who came to your house?

12  A.   The government.

13  Q.   How many composed the government, how many persons?

14  A.   Three, sir.

15  Q.   Sorry?

16  A.   Three people, sir.

17  Q.   And who would they be?

18  A.   The government, the IRS, the V.A. and the -- I'm not sure

19  who else.

20  Q.   Okay.

21  A.   DPS or FBI, I'm not sure.

22  Q.   Do you know any of their names?

23  A.   Do I know they names?  Yes, I do know.

24  Q.   What were the names of those that visited you?

25  A.   The person who visited me, I know Sharleigh and I know Sean

Richard Cook - Examination                    83

1    and I forgot the other agent's name.

2    Q.  And what time of day or night did you meet with them?

3    A.  The first time they came in the morning, morning time, sir.

4    Q.  The first time?

5    A.  Yes.

6    Q.  Did they come to your house another time?

7    A.  Yes, sir.

8    Q.  And did they come to your house a third time or only two

9    times?

10   A.  Just two times.

11   Q.  And the first time they came, were you nervous?

12   A.  Not really, no.

13   Q.  What did they tell you?

14   A.  When they just came, I just invited them in my house, I

15   actually thought they were people -- somebody from the church.

16   They came in the house and I thought they were from the church,

17   so I just let them in.

18   Q.  How did the meeting start off?

19   A.  I can't remember that, sorry, just how you doing.

20   Q.  You refer to the agents all by their first name.  I take it

21   you're comfortable with all of the agents, are you not?

22   A.  Yes.

23   Q.  And they made you feel comfortable on that occasion?

24   A.  Yes, I'm comfortable.

25   Q.  And you weren't afraid of them?

1    A.   The first time?

2    Q.   Yes.

3    A.   The first time, no, not really, I just didn't know who they

4    were.

5    Q.   While they were there, how long were they there?

6    A.   Couple hours, seven hours, six hours.

7    Q.   Six, seven hours, that first time.  And during that time,

8    did they -- did you eat, did they give you food or how did all

9    that work?

10   A.   I was drinking coffee, just talking.

11   Q.   And did this occur in your living room or your kitchen?

12   A.   Kitchen, it was in my kitchen.

13   Q.   And do you live alone?

14   A.   I live with my daughter.

15   Q.   And how long have you lived in that residence?

16   A.   Ten years.

17   Q.   And can you describe it?

18   A.   It's just a regular townhouse, upstairs and downstairs,

19   small.

20   Q.   You bought it ten years ago?

21   A.   I'm not sure how many years ago, eight years ago, not sure.

22   Q.   And are you making payments on it?

23   A.   Yes, I was making payments on it.

24   Q.   Did you have money down on it?

25   A.   Yes.

Richard Cook - Examination                    85

1   Q.   And so what is your equity in your house?

2   A.   Now?  My house is sold.  Sorry.

3   Q.   When you sold your house, what was your equity in it?

4   A.   Are you talking about percentage-wise or --

5   Q.   What did you take out of it?

6   A.   What did I take out of it?  I'm not sure, couple thousand

7   dollars, I'm not sure the exact amount.

8   Q.   And your sources of income --

9   A.   Yes, sir.

10  Q.   -- during the time that you worked for Universal K-9, other

11  than Universal K-9, where else were you receiving money from,

12  what other sources?

13  A.   That was it.  I didn't have -- I got a large check from

14  them because I was paying taxes for -- I paid taxes for ten

15  years and they gave me a refund for it.  That's the income I

16  had.

17  Q.   This is recently you did this?

18  A.   When I was -- before I sold -- like years ago, I'm not sure

19  when.  That's the only source of income I had.

20  Q.   At the time that you first met the agents when they came to

21  your house and visited with you for six or seven hours, I take

22  it they identified themselves to you, did they, yes, no?

23  A.   Yes, they identified themselves after.

24  Q.   And they told you the purpose for being there?

25  A.   After, yes.

1   Q.   Did you ask them whether or not you needed a lawyer?

2   A.   Did I ask them did I need a lawyer?  No.

3   Q.   Did they tell you that you don't need a lawyer?

4   A.   Nobody, no.

5   Q.   Did they read you your warning of your rights?

6   A.   I think it was informal more, I don't know when it came.

7   Q.   You don't recall ever having them read your rights?

8   A.   I don't remember that.

9   Q.   Did they tell you that you were an aider and abettor in the

10  activity of your good friend, Mr. Croft?

11  A.   I don't remember hearing that.

12  Q.   If they had told you that, would that have maybe changed

13  your willingness to visit with them?  Probably so?

14  A.   If they would have -- I think -- aider and abettor, can you

15  explain that, what that means?

16  Q.   I'll move on, respectfully.  And you have known the

17  defendant, Croft, for approximately 25 years?

18  A.   It was a break.  I knew him when we were real young and,

19  like I said, we had a 16-year break.

20  Q.   You had a 16-year break, but when you were with one

21  another, you had a good relationship with him?

22  A.   It was -- yeah, we were together, yes.

23  Q.   You would hang out together?

24  A.   Yes.

25  Q.   It was a positive, cordial relationship that you would have

1   with him?

2   A.  Yes, for the most part.

3   Q.  And then you moved back to Virginia?

4   A.  Yes.

5   Q.  And you don't hear from him for a number of years?

6   A.  Yes.

7   Q.  Had you had any communication with him?

8   A.  Didn't talk to him at all.

9   Q.  Did you think of him from time to time?

10  A.  My dad used to always ask about him because my dad came

11  down here when I got shot and we went to eat at a restaurant

12  and my dad, he always talks about this restaurant.

13  Q.  So he met Brad Croft at that time?

14  A.  Yes.

15  Q.  And the Brad Croft he met, he liked?

16  A.  Yes, he did.

17  Q.  And when you visited with the agents on every occasion, you

18  would tell them that you believed him to be a good and honest

19  man?

20  A.  Well, I didn't know, you know, because like I just --

21  because what they showed me was -- what I saw was --

22  Q.  I'm not talking about that.  You told them that he was a

23  good and honest man?

24  A.  I didn't know what I told them.  I was working until the

25  day they came, so from what I know, you know, Brad was just

1   a --

2   Q.  What you did know was that you were President of Universal

3   K-9?

4   A.  When I saw the book I knew when I was President, but only

5   by name.

6   Q.  Only by name.  Did you feel honored by that?

7   A.  No, I knew I was just a V.A. specialist.  I felt good to

8   have a job, though, I had a job.

9   Q.  It's always good to have a job.  Always good to have a job.

10  And so you had a job with him.

11      Now, when you met with the agents when they came to you on

12  that first time, did the matter of your tax issue come up?

13  A.  No, I don't remember that recall because it was like it's

14  just blur, but all I know is I was just doing work and I was

15  working and then when they came they just -- it's kind of a

16  blur, I'm sorry, that day.

17  Q.  You have memory issues, do you not?

18  A.  Slightly.

19  Q.  And that's why some of what happened is a blur, yes or no?

20  A.  Some of what?  What are you talking -- like what?

21  Q.  Your testimony that you sometimes have trouble remembering,

22  does that relate to your injury?

23  A.  I can't answer that question because I don't know.

24  Q.  Well, what did you mean on direct examination when you told

25  Mr. Surovic that you had cognitive issues, what are cognitive

1   issues?

2   A.   That's what my diagnosis was.

3   Q.   And did they go into you paying taxes, how long it had been

4   since you filed a tax return?

5   A.   I hadn't worked since I got out of the military except for

6   being a recruiter.

7   Q.   My question is when is the last time or the most recent

8   time when the agents came to visit you that you had filed a tax

9   return?

10  A.   When is the most recent time?  Can you repeat that?

11  Q.   Would you agree with me that you hadn't filed a tax return

12  in eight years?

13  A.   Yes, yes.

14  Q.   And that during that eight years, you had income, did you

15  not?

16  A.   Yes, I had income.

17  Q.   And did the agents tell you that they would help you work

18  that out?

19  A.   No, we didn't talk about that.

20  Q.   Well, they asked you about your income and how much money

21  you were making from Universal K-9, did they not?

22  A.   Yes.

23  Q.   And you said you really don't know how much money you were

24  making, correct?

25  A.   Correct.

1   Q.  And so you told them that maybe they could go into your

2   bank accounts and they can tell you how much money you were

3   making?

4   A.  I didn't tell them nothing, I was just listening, sir.

5   Q.  And did you tell them that the answer to their questions

6   were in your bank accounts?

7   A.  I don't remember saying that.  I don't remember that.

8   Q.  Do you remember them asking you how much money you were

9   paid and how much money you made?

10  A.  I remember that.

11  Q.  And in regard to -- you haven't paid taxes at that time in

12  eight years and this was back in 2018, correct?

13  A.  Yes, yes.

14  Q.  Have you made it right with the IRS since then?

15  A.  I got -- I have a State thing I had to fill out for the IRS

16  and that's all I had got.  Excuse me, a State -- something from

17  the State, but that was it.

18  Q.  Do you have an understanding -- in particular I'm asking

19  you about your Federal taxes.  Have you made it right with your

20  Federal taxes yet?

21  A.  I don't know.  I don't know.  I don't file taxes.

22  Q.  But you do have income, do you not?

23  A.  Yeah, but that's military income, sir, it's military V.A.

24  pension.

25  Q.  And in regard to your invitation by Mr. Croft to join his

1  business, I guess as a recruiter, that was attractive to you,

2  was it not?

3  A.  Yeah, because -- I guess yes, after I thought it was a good

4  job, yeah.

5  Q.  And so you talked on the telephone a number of times before

6  you actually came down to San Antonio?

7  A.  Yes, we did.

8  Q.  What were those conversations you had on the telephone

9  about a prospective employment?

10  A.  Just -- it was not like that.  It was just catching up on

11  that.  We were just catching up when we could talk on the phone

12  and he was telling me about the school he had and I would see

13  the pictures on the website.

14  Q.  Did it sound to you at the time that he believed in this

15  school?

16  A.  Yes, yes.

17  Q.  And did you believe in him believing in this school?

18  A.  Yes, we did.  My whole family, my dad, we looked at it and

19  we was happy for him.

20  Q.  So you come down there and you work for him for how long,

21  how many years?

22  A.  The first time I come down there?

23  Q.  No, no, no.  How long did you have this working

24  relationship with --

25  A.  Three years, I believe.

1   Q.   Three years.  And during that three years, you would do

2   some of your work from your home in Virginia?

3   A.   Yes, sir.

4   Q.   What would you do from your home in Virginia for Universal

5   K-9?

6   A.   I would take all the phone calls and do all the billing and

7   then when he would send me everything, all the e-mails to call

8   the students and do recruiting.

9   Q.   What is it about your history and your background that, if

10  you know, makes you attractive to Mr. Croft as a recruiter?

11  A.   I don't know.  I thought he was just -- I guess I was a

12  veteran, but I thought he was being nice to me.

13  Q.   Was he being nice to you?

14  A.   As a veteran, I don't know.  I mean as a friend, I thought

15  he was just --

16  Q.   He tried to help you out?

17  A.   That's what I was thinking.

18  Q.   Tried to help you out.  And that thinking hasn't changed,

19  has it?

20  A.   Like I said, I don't hate nobody in this world, I never

21  will, ever.

22  Q.   In regard to Mr. Croft, so the first time you come down, we

23  won't go into dates or anything, but the first time you went

24  down and visited with him, where did this meeting take place?

25  A.   We went to his house and then I think he was just showing

1    me his dogs.

2    Q.   And did he have dogs at the time?

3    A.   Yes.

4    Q.   And the dogs were at his house?

5    A.   Yes.

6    Q.   And it was your understanding that he had a dream, is this

7    correct?

8    A.   He was just telling me -- he had told me about this, he had

9    been working on stuff and -- yeah.

10   Q.   So it was a dream, was it not?

11   A.   I think he had already had the school going, because he was

12   training officers already.

13   Q.   And you felt honored to join him in this, did you not?

14   A.   I trusted Brad, yeah.

15   Q.   And you joined him because you believed that he was sincere

16   in wanting to grow this business?

17   A.   Yeah, I mean I know that he was doing the right thing and

18   my dad, everybody knew, we trusted him, yeah.

19   Q.   And so his business started in his garage, but then it

20   grew, did it not?

21   A.   Yes, yes.

22   Q.   And it grew during the time that you worked for him?

23   A.   I think so, yeah.

24   Q.   Describe that growth.

25   A.   He was -- I mean I didn't do anything, I just was -- I mean

1  he did everything, he was the business owner.  He did the V.A.

2  applications, everything.  I was just there, you know, and I

3  really didn't do anything to grow the business or anything, but

4  only thing I did is recruit the veterans and do the 22-99.

5  Q.  Well, you would agree that you allowed yourself to be one

6  of the faces of Universal K-9?

7  A.  No, because I just -- I just was a recruiter.

8  Q.  That's right.

9  A.  Just a recruiter.

10  Q.  So you as a recruiter would interface with prospective

11  students, would you not?

12  A.  Yeah, I would meet them every time I come down, yes, sir.

13  Q.  So you would talk with them on the phone and you would meet

14  them when you came down here?

15  A.  Yes, sir.

16  Q.  And I believe it's your testimony that you came down for

17  every class?

18  A.  Not every class, most of the classes I try to because -- I

19  tried to.

20  Q.  So you tried to come down for most classes?

21  A.  Uh-huh.

22  Q.  And you would meet the students?

23  A.  Yes, sir.

24  Q.  And you would help the students?

25  A.  Yeah, I tried to help them, yes.

1  Q.  And how would you try and help them?

2  A.  Like just help them with the V.A. paperwork because

3  sometimes the students weren't getting paid, so I would try to

4  get on the phone with the V.A. with them and try to help them

5  get paid, I was just wanting to make sure they get a

6  certificate so they can start working.

7  Q.  And the students believed in the school, did they not?

8  A.  Yes, sir.

9  Q.  You as a recruiter at the time believed in the school, did

10  you not?

11  A.  Oh, yes.

12  Q.  If you didn't believe in it, you'd have nothing to do with

13  it, right?

14  A.  Right.

15  Q.  And so then you -- the business grows.  What do you

16  attribute that growth to?

17  A.  I think it was just, I don't know, because -- I guess

18  because Brad, he was a good -- he knew how to run a business or

19  knew how to run the school.

20  Q.  He's a good promotor?

21  A.  I guess he knows how to do the school, yeah.

22  Q.  And you would go with him to different military

23  installations, would you not?

24  A.  We only went to Fort Sam.  We went to Fort Hood, but we

25  couldn't advertise at Fort Hood, but we went to Fort Sam and

1  that's the only one that he went with me.  The rest of the time

2  I went by myself.

3  Q.  Okay.  You went by yourself a number of times?

4  A.  To Fort Sam.

5  Q.  And when you would go to Fort Sam alone -- we saw your

6  business card, the government showed your business card -- you

7  would have your business card and you would meet with people at

8  Fort Sam?

9  A.  Yes.

10  Q.  And what was your goal or objective in meeting with the

11  people at Fort Sam?

12  A.  Just to get -- to recruit the people for the school, to

13  recruit the people for the school.

14  Q.  And that would be good for you, right?

15  A.  Yeah, and it would probably be good for them because they

16  could get a certificate and start working.  They could get a

17  certificate in two weeks and get a job or maybe ten weeks and

18  get a good job.  I knew once they finished, that they'd get a

19  job.

20  Q.  Right.  And so you were very supportive of their dreams

21  too, were you not?

22  A.  Yes.

23  Q.  They wanted to be employed and you wanted to help them get

24  employed?

25  A.  Yes, I was happy for the veterans.

1    Q.   So this seemed to be a good fit for you?

2    A.   I felt like it was a really good --

3    Q.   Everything you see is consistent with that good fit, right?

4    A.   Yeah.

5    Q.   Okay.  And then the government showed you all these

6    signatures of yours and you said, "Yes, that's my signature,

7    but I didn't read anything", correct?

8    A.   Yeah, I just signed.

9    Q.   How many signatures did you see that were not yours that

10   were Richard Cook?

11   A.   I don't know, I don't remember, but I know my signature.  I

12   know I signed a lot of stuff.

13   Q.   You identified your signature this morning, did you not?

14   A.   Yes, sir.

15   Q.   Did you object to Mr. Croft regarding your role for

16   Universal K-9?

17   A.   As the recruiter, no.  He gave me a job, so I didn't

18   object.  I think it was okay.

19   Q.   Did you believe yourself to be a good recruiter?

20   A.   No, I figured I stutter a lot and sometimes it's hard to

21   understand me, but I tried my best and it was more than a

22   recruiter because I had to file the paperwork.  I was just

23   trying to do my best, I was doing everything I could.

24   Q.   And Mr. Croft was kind and supportive of your efforts,

25   right?

1    A.   Yes.

2    Q.   I mean he didn't have to include you in this, did he?

3    A.   No.

4    Q.   And he did include you in it?

5    A.   Yeah.

6    Q.   And all the way through the time when the agents walked

7    into your kitchen there and visited with you, it was a good

8    thing for you, it kept you busy and gave you income, did it

9    not?

10   A.   Yes, it did.

11   Q.   And with Mr. Croft and Universal K-9, you would go places

12   with him and with them, would you not?

13   A.   Yes, yes.

14   Q.   So where all did you go?

15   A.   We went to Vegas -- like to recruit or just everywhere?

16   Q.   As it related to Universal K-9 business.

17   A.   Yeah, I'm not sure exactly where we went, but we went

18   places.

19   Q.   Who was all out there in Las Vegas with you?

20   A.   Me and Wes Keeling and Steve Peek and some other -- it was

21   some other officers, but I don't remember their names, sir.

22   Q.   And was Mr. Croft out there?

23   A.   Yes, sir.

24   Q.   You made reference to you went up to -- are you doing okay?

25   A.   Yes, sir.

1    Q.  You made reference that you made a trip up to Fort Hood?

2    A.  Yes.

3    Q.  But for some reason that particular trip was unsuccessful?

4    A.  Yes.

5    Q.  So what happened on that occasion?

6    A.  We were just trying to -- trying to recruit veterans, but

7    you have to be -- have permission, certain permission to get on

8    the base.

9            MR. MCHUGH:  Government Exhibit G33b -- 33b.

10   BY MR. MCHUGH:

11   Q.  Government Exhibit 33b, do you recognize that?

12   A.  Yes, yeah, I remember that.  That's the bus.  That's

13   Mr. Croft's bus.

14   Q.  And it's your testimony that this was purchased for

15   Universal K-9?

16   A.  Yeah, that's what it was supposed to be, yeah.

17   Q.  In Universal K-9's name?

18   A.  In Universal K-9's name, I think.

19   Q.  And did you ever take any trips in this bus?

20   A.  Hold on.

21       We went somewhere.  I'm trying to think.

22   Q.  Could it have been Fort Hood?

23   A.  Yes, we did go to Fort Hood.  Did we go to Fort Hood?  Yes,

24   because we had -- something we had Dominick Alongi with us.  It

25   might have been the pickup truck, I'm not sure.

Richard Cook - Examination                    100

1    Q.  It could have been this?

2    A.  I don't remember.

3            THE COURT:  He doesn't remember, counsel.

4            THE WITNESS:  I don't remember.

5            MR. MCHUGH:  Fair enough.

6    BY MR. MCHUGH:

7    Q.  How many times would you guesstimate that you traveled from

8    Virginia to San Antonio?

9            THE COURT:  I don't want him guesstimating anything.

10   BY MR. MCHUGH:

11   Q.  How many times did you travel from San Antonio?

12   A.  I don't know.

13   Q.  Are you able to give a range for the number of times that

14   you traveled?

15   A.  Sorry, I don't know.  I can't -- how many times?

16   Q.  Yes.

17   A.  I can't recall.

18   Q.  Do you know if it's more than ten times?

19   A.  I can't recall.

20           THE COURT:  Are you feeling okay?

21           THE WITNESS:  Yeah, I'm just trying to think.  Twelve?

22   I don't have the exact answer, I just don't know.  It's -- how

23   many times did I travel to --

24           THE COURT:  I don't want you guessing.  If you don't

25   know, you don't know.

1          THE WITNESS:  I don't know.

2     BY MR. MCHUGH:

3     Q.  If that's an honest answer, it's a fair answer.  Now, in

4     regard to the first couple of times you came down, I believe

5     it's your testimony that you would go to Brad Croft's house?

6     A.  Yes.

7     Q.  And would you stay at his house?

8     A.  Yes, I did stay at his house.  The first two or three

9     times, yes.

10    Q.  And then subsequent to that, you came down and as his

11    business grew, the business left the garage and went somewhere

12    else, did it not?

13    A.  Yes.

14    Q.  And where did it go?

15    A.  To this address, to the Tradesman address.

16          MR. MCHUGH:  Government Exhibit 32a please.

17    BY MR. MCHUGH:

18    Q.  Is that where the business moved to?

19    A.  Yes.

20    Q.  And do you know how many times you had visited that

21    location?

22    A.  I'm sorry, I don't recall.

23    Q.  But you have been there, have you not?

24    A.  Yes, sir.

25    Q.  What was the most recent time you were there before the

1    agents came and visited you?

2    A.   I don't recall the date, sorry.

3    Q.   I'm not asking for a date.  Had it been a year?

4    A.   Within a year, sir.

5    Q.   And when you were there, did you see work that was being

6    done on this building?

7    A.   I don't recall.  You said work when I was there?

8    Q.   Did you see any construction, did you see the building of

9    classrooms within it?

10   A.   No, I was not there.

11   Q.   What did you see?

12   A.   Hold on, let me try to think.

13       (Pause.)

14       I don't recall, sorry, when I was there.

15   Q.   Can you describe the property where the business is

16   located?

17   A.   The property is just a building and land.

18   Q.   Is it in a residential or a commercial neighborhood?

19   A.   It's a commercial neighborhood.

20   Q.   So when his business expanded to this address, did he also

21   move to this address?

22   A.   Yes.

23   Q.   And early on he lived in that smaller trailer, did he not?

24   A.   Yes, yes.

25   Q.   And did he live there alone?

1   A.   No.

2   Q.   Who did he live there with?

3   A.   He lived with his daughter, Cameron.

4   Q.   And she's in the courtroom today, is she not?

5   A.   Yes.

6   Q.   How long had he lived in that little trailer, do you know?

7   A.   I don't know exact, I don't know the time, I don't know how

8   long, but they lived there.

9   Q.   And kennels, there were kennels on the property, were there

10  not?

11  A.   Yes, sir.

12  Q.   And dogs were in those kennels, were they not?

13  A.   Yes, sir.

14  Q.   On those occasions when you would visit, how many dogs

15  would be present?

16  A.   It would vary, it would vary.

17  Q.   I'm sure it did because dogs come and go, do they not?

18  A.   Yes.

19  Q.   Where did the dogs come from?

20  A.   They came from -- I'm not sure.  I don't know the answer, I

21  don't know.

22  Q.   Do you know any sources for those dogs?

23  A.   S.P.C. -- pound, I mean the -- what's the name of it?  I

24  don't know how to say it.

25  Q.   Would you call them shelters?

1   A.   Shelters, sorry, shelters.

2   Q.   And so you even made trips out to the shelters, did you

3   not?

4   A.   Yes, I made trips to the shelter.

5   Q.   And the same shelter or more than one shelter?

6   A.   I remember driving to one shelter.

7   Q.   And did you drive alone or was Mr. Croft with you?

8   A.   I wasn't there when he went to the shelters.  I think I

9   just took a dog back one time to a shelter.

10  Q.   So you were going to retrieve a dog and bring it back to --

11  A.   No, excuse me.  Let me explain.  So the only thing I do

12  remember is taking a dog back to a shelter and that's -- he

13  just told me take the dog back to the shelter.  As far as going

14  to the shelter, I didn't go to the shelter to get the dog.

15  Q.   Did you visit with Mr. Croft, did you and he talk in terms

16  of a business plan regarding shelter dogs?

17  A.   No, that idea was way before, that was his -- I mean I

18  didn't have any business plan with him.  He was doing -- that

19  was his business, he was doing what he wanted.

20  Q.   You've opened a number of bank accounts for your benefit

21  and the benefit of Universal K-9, did you not?

22  A.   Not for my benefit, it's just what Mr. Croft instructed me

23  to do for the school.

24  Q.   And where did you open those accounts?

25  A.   I believe I opened those in Virginia when he asked me to,

1  yeah.

2  Q.   That would be Bank of America?

3  A.   Yes, Bank of America.

4  Q.   Wells Fargo?

5  A.   Yes, Wells Fargo too.

6  Q.   And another bank, do you recall?

7  A.   Just Bank of America and Wells Fargo and -- that was the

8  two banks that he asked me to open.

9  Q.   And the money that would be received by Universal K-9 for

10  training veterans would be deposited, wire deposited into those

11  accounts, would it not?

12  A.   Yes, sir.

13  Q.   And just for the record, there were real students and real

14  veterans, were they not?

15  A.   Yes.

16  Q.   There were no ghost veterans, were there?

17  A.   No.

18  Q.   If there were, you would not be involved, would you?

19  A.   Right.

20  Q.   And so for every submission that you made for payment under

21  that program, there was a real vet. and for the most part the

22  classes had been completed unless they don't show up?

23  A.   Yeah, they got a certificate.

24  Q.   And you would meet many of these students, would you not?

25  A.   Yes, I would meet them when I was here for the class, yes.

1   Q.  And you purposely came down here for that purpose, did you

2   not?

3   A.  Well, I came down here to do more recruiting, yes.

4   Q.  To do recruiting?

5   A.  Meet students.

6   Q.  You would meet the students?

7   A.  Yes.

8   Q.  And would you explain to them the V.A. process?

9   A.  I explained to them the V.A. process on the e-mail, the

10  e-mail sent to them when they first joined the school.

11  Q.  So in addition to telephone conversations, you would have

12  e-mail exchanges with students?

13  A.  Yeah, yes.

14  Q.  And you would do this while in Virginia?

15  A.  Yes.

16  Q.  And when you would come down here, you would supplement

17  that and you would perform other tasks at Universal K-9?

18  A.  Yes, sir.

19  Q.  What else would you do for Universal K-9?

20  A.  I would go -- when he instructed me to, Brad, whatever he

21  asked me to do, pay this bill, go and get this, just various

22  jobs, whatever he asked me to do.

23          THE COURT:  Counsel, just a minute.  Mr. McHugh, how

24  much more time do you have with this witness?

25          MR. MCHUGH:  I have one more hour.

```
 1              THE COURT:  An hour?  Then we'll take our lunch recess
 2    at this time.  It's after noon already.  Sir, I need you back
 3    here about 1:30.
 4              THE WITNESS:  Thank you, sir.
 5              COURT SECURITY OFFICER:  All rise.
 6         (12:07 p.m.)
 7                                   *   *   *
 8         (1:39 p.m.)
 9              THE COURT:  Please be seated.  The Court would note
10    the presence of counsel as well as the respective parties and
11    you may continue.  And, sir, I would remind you that you remain
12    under oath.
13              THE WITNESS:  Yes.
14              MR. MCHUGH:  Good news for the Court, Your Honor, and
15    all those present, I do not think it will be one hour.
16              THE COURT:  Okay.  Whatever it is, it is.
17    BY MR. MCHUGH:
18    Q.  Mr. Cook?
19    A.  Yes, sir.
20    Q.  Good afternoon.
21    A.  Good afternoon.
22    Q.  Let's talk about these bank accounts that you've opened in
23    Virginia and you were talking about the bank cards and the
24    passwords and all that.  Can you help me understand that a
25    little more?
```

1   A.   Mr. Croft asked me to open the accounts for Universal K-9

2   and I did it and mailed the bank cards to him and I think it

3   just comes with one checkbook and just mailed everything to

4   him.  That's what he asked me to do, so I did it.

5   Q.   At the time you did that, did you believe it to be

6   nefarious, did you believe it to be wrongful on his part?

7   A.   No, because I trusted him.

8   Q.   Because you trusted him?

9   A.   Yes.

10  Q.   And if it weren't, you would have nothing to do with it?

11  A.   Right.

12  Q.   And you trusted him when you learned that you had been

13  promoted to President, right?

14  A.   When I saw the catalog I didn't know -- I mean just by name

15  I was President on the catalog, but I didn't know I was

16  promoted.

17  Q.   And --

18          THE COURT:  Did you get a promotion in money?  Did you

19  get any more money for being President?

20          THE WITNESS:  No promotion, just --

21          THE COURT:  Just a title.

22          THE WITNESS:  Yeah.

23          THE COURT:  But you didn't do anything.

24          THE WITNESS:  No.

25          THE COURT:  You didn't even know about it, I guess.

1        THE WITNESS:  No, I just saw it on the book.

2        THE COURT:  Okay.

3   BY MR. MCHUGH:

4   Q.  Well, you did know about it.

5        THE COURT:  I think he knew about it later.  He said

6   he knew about it when he saw it in the book.

7        THE WITNESS:  When I saw it in the book, yeah.

8   BY MR. MCHUGH:

9   Q.  And when you knew about it, you didn't demand that your

10  name come off that either?

11  A.  I was just doing my job.  I thought I'm just a recruiter,

12  so I know I'm not the President.  I don't know nothing about --

13  Q.  And you were just doing your job when you opened those bank

14  accounts?

15  A.  Yeah, that's what he asked me to do, yes, sir.

16  Q.  And it's your testimony that at Mr. Croft's direction you

17  would go to those banks and you would withdraw cash?

18  A.  Yeah, whatever he asked me to do, I'd do it, so as far as

19  doing that because that's what he asked me to do.

20  Q.  This would be up where you lived in Virginia?

21  A.  Yeah, sometimes, sometimes there, wherever we were at.

22  Q.  And so sometimes it would be in San Antonio?

23  A.  Yes, when I come here, yes, sir.

24  Q.  Sometimes it may be in other cities?

25  A.  Yes, one time I think it was somewhere, maybe D.C., I'm not

1    sure, I don't remember.

2    Q.   Because you went with Mr. Croft on a couple of trips, did

3    you not?

4    A.   Yes.

5    Q.   Where did you go?

6    A.   To Las Vegas.

7    Q.   You went to Reno?

8    A.   Just to the -- I didn't go to Reno.  I went to Las Vegas

9    for the police convention.  I don't remember going to Reno.

10   Q.   Don't remember?

11   A.   I don't recall, sorry.

12   Q.   Fair enough.  Did you go to D.C.?

13   A.   Yeah, that's where my daughter met Mr. Croft for the first

14   time.

15   Q.   What was going on in D.C.?

16   A.   Me and my daughter met him and Cameron up there.  I think

17   we were there for a police convention and we went there for the

18   first time and met him.  Excuse me, I'm sorry, I didn't mean to

19   cut you off, but that's where she met him and Cameron for the

20   first time.

21   Q.   In regard to these withdrawals that you would make?

22   A.   Yes, sir.

23   Q.   You did that many, many times, did you not?

24   A.   Yeah, I mean any time he asked me I just did it, didn't

25   matter when he asked me.

1   Q.  Did you keep a ledger or how did you keep track of your

2   withdrawals?

3   A.  I didn't keep track.  I just -- he just told me what to

4   withdraw and withdraw it because I didn't -- he had the

5   password to the bank and all the information, so I just --

6   whatever he asked me to get, I was just was there just to do --

7   Q.  Did he ever allow you to withdraw money for your benefit?

8   A.  Yes, when I would withdraw the money for my benefit he'd be

9   like Take this out, pay this and that.  And he'd say, I owe you

10  this.  And then I remember something like This is yours.

11  That's what I remember, so I don't know the exact amount, what

12  he told me at any time.

13  Q.  Sure, sure.  And you didn't make a record of that?

14  A.  I never made a record because I trusted him.

15  Q.  How did you keep track of your income?

16  A.  I just -- I just pay my bills.  I don't write anything

17  down.  I don't have a checkbook.

18  Q.  So you're more concerned about making sure that you were

19  current on all your bills and everything?

20  A.  Yeah, I don't have a checkbook, sir, I just pay my house

21  note and my electric bill.

22  Q.  How much was the house note back then?

23  A.  $800.

24  Q.  How much?

25  A.  $800.

1    Q.   $800.   And did you have a note on the car?

2    A.   When?   When was this?

3    Q.   Did you ever have a note on the car?

4    A.   On the truck that he bought me or before?

5    Q.   Yes.

6    A.   It was $401.

7    Q.   Would you pay on your house and the car at the same time?

8    A.   Yeah, it would just -- sometimes I would miss payments or

9    I'd just pay it online.   I have income, so -- on the 1st.

10   Q.   And your income was your disability income?

11   A.   $3,500 a month.

12   Q.   Was there any condition on your disability income that you

13   must report income?

14   A.   No.   My income is permanent.   Some people have something

15   called -- the type of retirement I have is permanent and it's

16   just a permanent disability.   A lot of people can work if they

17   can find jobs.

18   Q.   So there's no prohibition against you working?

19   A.   No, there's some people who have it, but I don't have it.

20   I pretty much can do anything.

21        Oh, the income that the people who retired from the V.A.

22   who can't work, it's called unemployability, but I have

23   retirement, so if you're retired with unemployability, you

24   can't work, but I just got regular retirement a hundred

25   percent.

1    Q.  So the point as to unemployability, if they did work,
2    they'd have to report it?
3    A.  Yes.
4    Q.  But yours was a lifetime and there was no requirement that
5    you report?
6    A.  No, no.
7    Q.  In addition to your house and your automobile, what other
8    expenses would you have?
9    A.  Credit cards.
10   Q.  Credit cards.  Okay.  And where would you spend your credit
11   card money?
12   A.  Credit cards, I just probably just spend it wherever, I
13   don't know.  I have a lot, so I spent it wherever, probably
14   sometimes to travel or --
15   Q.  Where would you travel to and how long?
16   A.  San Antonio, when I was overseas over everywhere and then I
17   would -- sometimes I buy just food, just different things, but
18   I had a lot of credit cards.
19   Q.  You have to pay off those credit cards too?
20   A.  Yeah, just pay the minimum, but I consolidated my debt.  I
21   had a whole bunch of credit cards.
22   Q.  Other than San Antonio, where would you travel to?
23   A.  I went to Costa Rica and that's it.  That's it.  Overseas
24   or here in the United States.  That's it, back and forth to San
25   Antonio.

1  Q.  And you would go to Costa Rica fairly often, would you not?

2  A.  Yeah, I went there a couple times.  Because I had air

3  rewards, so it wouldn't cost that much.

4  Q.  And you've got a friend in Costa Rica?

5  A.  I have a lot of friends there.

6  Q.  I mean you've got a girlfriend?

7  A.  I don't know if it's a girlfriend, it's a friend, yeah.

8  Q.  And would you on occasion help her out and send her money?

9  A.  Yeah, I just helped her.  I actually helped her family out,

10 but you know, as much as I could, whatever I could I can help.

11 Q.  And how would you do that?

12 A.  Just send her Western Union or whatever I could if she

13 needed -- same way I would help my uncle out or anybody out,

14 Paypal or something like that.

15 Q.  Have you had the -- back at the time when you first met the

16 government agents when they came and visited you, did they ask

17 you for your permission to image your laptop or computer or

18 phone or anything?

19 A.  Yes, yes.

20 Q.  Tell us about that.

21 A.  They just said because they wanted my laptop and I didn't

22 have anything to hide, so I just gave it to them.  Here, they

23 just wanted my laptop because they just were doing an

24 investigation, so I mean it was no big deal.  I gave them my

25 phone, I gave them my laptop and they took all the information

1    off.

2    Q.  What information would be found on your laptop and on your

3    phone?

4    A.  On my phone, just a lot of pictures and stuff like that.

5    And on my laptop, stuff for the, you know, the e-mails and

6    stuff I was doing for -- that I had for school and my job

7    stuff.

8    Q.  And so the defense, we did not have a defense by ambush, so

9    we gave your lawyer what may be exhibits that we may want to

10   show you and that is in Defendant's Exhibits 11 through 41, I

11   believe.

12           MR. SUROVIC:  Through 44.

13           MR. MCHUGH:  Forty-four, okay.

14   BY MR. MCHUGH:

15   Q.  And when did you get into town, here into San Antonio on

16   this trip?

17   A.  Today is Friday, right?  I got here Monday, I think.  No,

18   no, I got here Wednesday, sorry.

19           MR. SUROVIC:  We'll stipulate that he arrived on

20   Wednesday.

21           THE WITNESS:  Wednesday, sorry.

22   BY MR. MCHUGH:

23   Q.  Since you've been here, you've met with the government one

24   time or more than one time?

25   A.  Just twice.

1   Q.   Just twice.  Okay.  Did you meet with them on Wednesday,

2   the day you arrived?

3   A.   Yes.

4   Q.   And then you met with them again yesterday, correct?

5   A.   Yes.

6   Q.   And did you go over with them these exhibits that may or

7   may not relate to you?

8   A.   Yes, I did.  I did went over the pictures, yes.

9   Q.   And can you describe just generally what you looked at?

10  A.   Just a lot of pictures that I took on my phone, just

11  pictures, just mostly pictures I did on my phone, stuff like

12  that.

13  Q.   Did you see any picture in those exhibits that you did not

14  recognize?

15  A.   Did I see any pictures that I did not recognize?  No, I

16  think one or two, but -- are you just talking about pictures?

17  Q.   Yes.

18  A.   Yes, I remember taking a picture because I didn't have my

19  phone after that, so when I remember taking the pictures, but

20  when they showed me the pictures, I remembered the pictures,

21  yeah.

22  Q.   When you looked at it with the government yesterday, what

23  were the pictures?

24  A.   Just pictures I took when -- like just random stuff like

25  poker chips and sunglasses and stuff like that, money, stuff

1   that I would have on my phone, pictures and stuff like that.

2   Q.  Why would you take pictures of money and poker chips?

3   A.  For the poker chips when I was playing poker, my buddy

4   would send me when he was at the casino or something like that

5   or if I had went to the casino, then I would take a picture of

6   that too.

7   Q.  You would take a picture when you're at the casino of your

8   chips to send to your buddy?

9   A.  Or if he's at the casino, he might text me back and show me

10  when he ever goes.  That would be it, when we play poker or

11  something like that.

12  Q.  Are you playing poker at somebody's house or --

13  A.  No, no, this is when I went to the MGM Casino.

14  Q.  Was that out there on a dog convention?

15  A.  No, this was in D.C. near my house, this is not too far.

16  This is probably I think I went maybe one time for my birthday

17  and maybe one other time.  Casino is about 90 miles from my

18  house.

19  Q.  So this money or these stacks of money, there was one photo

20  with a stack of money, correct?

21  A.  Right.

22  Q.  Was that your money?

23  A.  No, the biggest one was when he won, he was showing me,

24  sent it to me and I think one time might have been $180 is when

25  I won, something like that.

1   Q.  So he was the big winner with the stack?

2   A.  Well, I'm thinking yeah because we play a poker game called

3   One-Two, so he sent it to me and I might have sent him that,

4   so --

5   Q.  And the sunglasses?

6   A.  The sunglasses, I wear a lot of sunglasses because I try to

7   protect my other eye, my good eye, so I have a lot of

8   sunglasses, so I take it and just collect them, but I usually

9   have a strong lens in it because I want to protect my eye

10  because I don't want to lose my eye.

11  Q.  So was there anything in any of those pictures that you

12  said that you would say no, that wasn't on my phone and I've

13  never seen that?

14  A.  No, everything that was on my phone, I mean everything that

15  all the pictures that were on my phone I guess was downloaded,

16  I guess.

17  Q.  And in addition to the photos, what else did you look at in

18  those exhibits?

19  A.  Pictures of money or pictures of -- I'm not sure, picture

20  of a car, my truck.

21  Q.  What else?

22  A.  Pictures of dogs.

23  Q.  Okay.

24  A.  Oh, pictures when me and Mr. Croft and Cameron went to a

25  concert, I think.  Picture of tickets that Brad bought us to go

1    to the game.

2    Q.   The Spurs?

3    A.   Yeah, when we went to the Spurs game.

4            THE COURT:  I'm having a hard time trying to figure

5    out how this has anything to do with this case.  Am I missing

6    something here?

7            MR. MCHUGH:  Your Honor --

8            MR. SUROVIC:  Do we need to approach the bench?

9            MR. MCHUGH:  Yes, let's approach.

10                            *   *   *

11       (Sidebar.)

12           MR. SUROVIC:  I'll let Mr. McHugh narrate.  He's

13   basically trying to establish the way they've got their

14   exhibits labeled that the -- I was joking with Mr. McHugh if he

15   wants to say this guy is a co-conspirator with his client, I

16   don't have a problem with that.  I suspect -- and the reason

17   why I suggested that maybe the bench, I know there's certain

18   pressures on Mr. McHugh to make certain points that his client

19   is insisting on and this may be one of those issues.

20           MR. MCHUGH:  So this would be, Your Honor, this would

21   be we're just showing just evidence of the presence of money.

22   I'm not saying wealth, but there seems to be a fascination with

23   money and for the most part, I think I'm wrapping up this part

24   of it.

25           THE COURT:  Okay.  I mean it certainly has nothing to

1   do directly with this.

2          MR. SUROVIC:  Not at all.  Like I said, I want to make

3   sure that Mr. McHugh is able to make a full record and I

4   understand there are issues as far as his client.

5          THE COURT:  All right.  Okay.

6          *(Sidebar concluded.)*

7                          *  *  *

8          MR. MCHUGH:  Your Honor, we would offer to publish two

9   exhibits, they being 38a and 38c.  These will be defendant

10  exhibits.

11         *(Pause.)*

12         Your Honor, the discussion is this evidence was

13  received from the phone of the witness and we have identified,

14  with a photo and a number, two short videos that are contained

15  therein, but though we received it from the government, I take

16  it now the government has not reviewed it, not reviewed it in

17  your own records?

18         MR. SUROVIC:  Correct.  And Your Honor, from my

19  understanding is it's a -- what we were provided was a photo of

20  a hand on top of a pile of money, that's 38a.  And 38c is a --

21  it's a video file.  And 38c is a video of a truck.  I'm not

22  objecting to authentication, but I'm objecting to relevance at

23  this point.

24         THE COURT:  I don't know whose hand is it?  Is it him

25  or is it his friend?

1              MR. MCHUGH:  His hand, Your Honor.  He can deny it

2      being his hand.

3              THE COURT:  I don't know whose hand it is.  Show him

4      the picture.

5              MR. MCHUGH:  Your Honor, in addition to the video,

6      part of the video there's an audio where we may hear the voice

7      of the witness.

8              THE WITNESS:  Yeah, that's my hand.

9              MR. SUROVIC:  That is your hand?

10             THE WITNESS:  Yes, sir.

11                          *  *  (38a.)  *  *

12             THE COURT:  Well, okay.  All right.

13             MR. MCHUGH:  We would ask to play this video.

14             THE COURT:  Why?  What does this have to do with

15     anything?  I have no understanding at all why somebody putting

16     their hand on some bills has anything to do with this case

17     because the defendant is charged, not him, first of all, but

18     the defendant is charged with tax counts and he's charged with

19     fraud on the U.S. Government as outlined in the indictment.

20     What does this man's hand on money have anything to do -- let's

21     assume somebody gave him $2 million.  So what?  I mean I don't

22     know.

23             MR. MCHUGH:  Your Honor, that's an excellent question.

24     May I answer it?

25             THE COURT:  Yes.  Please.  Because I don't know.

1          MR. MCHUGH:  As part of this indictment, there's an

2    allegation that includes forfeiture and everything.  And

3    there's an amount there.  And later on through government

4    witnesses, we're going to get into how much should the

5    defendant be tagged for or how much may go through the hands --

6          THE COURT:  I thought there was an agreement that

7    there was going to be no objection to the forfeiture.  Am I

8    wrong here?

9          MR. SUROVIC:  No, Your Honor, we're submitting the

10   forfeiture to the Court, I think.

11         THE COURT:  Is that what it was?  Oh, even if we had a

12   jury.  That's fine.

13         MR. MCHUGH:  May we play it, Your Honor.

14         THE COURT:  For what purpose?  How much money was his?

15         MR. MCHUGH:  How many minutes is it?  Less than a

16   minute.

17         THE COURT:  Is this really going to enlighten me?

18   Let's play the video.  Play the video.

19         We don't have the video.  You may have the video.

20                        *   *   *

21                    *(Video playing.)*

22                        *   *   *

23         MR. MCHUGH:  Thank you very much.

24   BY MR. MCHUGH:

25   Q.  Mr. Cook, do you recognize that?

1    A.  I think I remember.  That's one of the times where I got

2    money out for Mr. Croft.  I believe that was the time where I

3    was getting money to either pay for a payment on a bus or pay

4    for -- get the money to pay the penile implant and I had to get

5    the money out the bank.

6    Q.  So what you did was you did a video of it to show

7    Mr. Croft?

8    A.  No, I did a video probably to show a girl or something.

9    Q.  Would you agree with the following --

10              THE COURT:  Just a minute.  That wasn't your money?

11              THE WITNESS:  No, that's not mine.

12   BY MR. MCHUGH:

13   Q.  It was your hand?

14   A.  Yes, that was my hand, definitely my hand and that was

15   definitely me counting it, yes, sir.

16   Q.  And Universal K-9 it's your testimony was not your school?

17   A.  No, sir, that was not my school, I didn't start it.

18   Q.  But it was a school?

19   A.  Yes, it was a school.

20   Q.  And it was growing and expanding?

21   A.  Yes, that's what I was hoping for, yeah, I was hoping it

22   would grow.

23   Q.  Because what's good for Universal K-9 would be good for

24   Richard Cook?

25   A.  It would be good for the veterans, I'm just a veteran.

1  Q.  And the trainers that you met, they were training real

2  dogs?

3  A.  Yes, they were training real dogs.

4  Q.  And you were present and met real veterans?

5  A.  Yes, I met real veterans, yes.

6  Q.  And you never substituted in a non-veteran for a veteran to

7  be paid, did you?

8  A.  A non-veteran for a veteran?

9  Q.  There was no scheme going on?

10 A.  No, we was a legitimate school, we trained the K-9 -- I

11 mean they trained the dogs and the veterans went through the

12 school.

13 Q.  And overall it was a good program moving in the right

14 direction?

15 A.  I thought it was a good program, I thought it was a good

16 program.  I wore my shirt every day.

17 Q.  And you believed in it?

18 A.  I did believe in the school, sir.

19          MR. MCHUGH:  Thank you very much.

20                    REDIRECT EXAMINATION

21 BY MR. SUROVIC:

22 Q.  Mr. Cook, counsel has asked you about the first visit you

23 had with the federal agents when they came to your house?

24 A.  Yes.

25 Q.  You indicated that lasted for six or seven hours?

1    A.   Yes, sir.

2    Q.   Did you receive any calls or anything like that when you

3    were sitting with the agents?

4    A.   Yes, I did.

5    Q.   What was going on?

6    A.   Well, I think I called Mr. Croft and I said -- because like

7    I said, when they came to my house --

8    Q.   Did the agents ask you to call Mr. Croft?

9    A.   No, not the first time.

10   Q.   Okay.  What happened when you called Mr. Croft?

11   A.   When he called he said, "Record them."

12   Q.   Was this before you actually met with the agents?

13   A.   Before I met with them, he was like -- he was just like --

14   I said, "The IRS --" I think I said -- I'm not sure how it

15   transpired, but I said, "Hey, the IRS is here."  And he's like,

16   "Hey."

17       And then all of a sudden I knew something was wrong because

18   he's like, "Well, it's not my school, it's your school."  And I

19   was like, "What?"

20   Q.   What did he tell you when you told him the IRS was at your

21   house?  Do you recall his exact words?

22   A.   "Record them."

23   Q.   And what did he tell you about Universal K-9?

24   A.   I said, "What's going on?"  He said, "I don't know, you're

25   the President."  I was like, "What?"  That's my exact words,

```
 1    "What?"
 2             MR. SUROVIC:  No further questions, Your Honor.
 3             THE COURT:  All right.
 4                         RECROSS-EXAMINATION
 5    BY MR. MCHUGH:
 6    Q.  When he told you to record them, he wasn't afraid of the
 7    truth, was he?  He wanted there to be a record of what
 8    happened?
 9    A.  When he said, "Record them", I guess.
10    Q.  Did you record them?
11    A.  No.
12             MR. MCHUGH:  Thank you.
13             MR. SUROVIC:  No further questions, Your Honor.
14             THE COURT:  Okay.  You can step down, sir.
15             THE WITNESS:  Thank you.
16             MR. SUROVIC:  Your Honor, we request that he be
17    permanently excused so he can return home.
18             THE COURT:  Yes.  He's living in D.C. now, is that
19    what it is?
20             MR. SUROVIC:  He's living in Virginia, Your Honor.  We
21    don't want to get too specific about that just because there's
22    some concerns on his part.
23             THE COURT:  All right.  Anyway he's living on the east
24    coast.
25             MR. SUROVIC:  He's living in the State of Virginia,
```

1    Your Honor.

2            THE COURT:  All right.

3            MR. SUROVIC:  Your Honor, our next witness will be

4    Ms. Lillian Cook.

5            COURTROOM DEPUTY CLERK:  Raise your right hand.

6                            *  *  *

7        *(LILLIAN SOCORRO COOK, Government Witness, Sworn.)*

8                            *  *  *

9            THE WITNESS:  I do.

10           COURTROOM DEPUTY CLERK:  Thank you.  You can sit down.

11                       DIRECT EXAMINATION

12   BY MR. SUROVIC:

13   Q.  Would you state your full name please?

14   A.  My name is Lillian Socorro Cook.

15   Q.  Could I get you to spell your last name?

16   A.  C-O-O-K.

17   Q.  And do you currently live in Virginia with your father?

18   A.  I do.

19   Q.  You know Richard Cook, is that correct?

20   A.  Yes.

21   Q.  How do you know him?

22   A.  He's my dad.

23   Q.  And your father is divorced from your mother, is that

24   correct?

25   A.  That's correct.

1   Q.   Who is the custodial parent?

2   A.   My dad.

3   Q.   How long have you lived with your father?

4   A.   My whole life, but -- yeah, my whole life.

5   Q.   How does your father make a living right now?

6   A.   He does not have a job currently, but he gets money from

7   his military stipend.

8   Q.   Have you known him to have been employed in the last five

9   years?

10  A.   He was employed under Universal K-9.

11  Q.   Does your father own his own home at this point?

12  A.   No.

13  Q.   Did he in the past?

14  A.   No, he was paying for it.

15  Q.   He was in the process of purchasing a home?

16  A.   Yes.

17  Q.   But he does not own one now, is that correct?

18  A.   No.

19  Q.   Without giving any details about the address or anything,

20  can you describe where your father lives right now?

21  A.   He lives in a small apartment with one other person.

22  Q.   Could you describe your father's disability?

23  A.   So my father was shot in his head, it makes him partially

24  blind and he also has metal in his face.  As a result of that,

25  he has some significant memory problems and some speech issues.

1   Q.  How does it affect his ability to perform what people would

2   consider normal simple tasks?

3   A.  He performs normally just as any other person would, just

4   occasionally he might have memory issues or speech issues that

5   may be a little bit difficult for people to understand.

6   Q.  I'll ask you in about two areas, for example, how does it

7   affect his speech?

8   A.  So he has a tendency to ramble, it's a little bit unfocused

9   sometimes and that's -- and he'll probably get off topic, but

10  then he'll try and come back.

11  Q.  What about his writing ability, how is that affected?

12  A.  His writing, I don't think he was ever a good writer in the

13  first place, but he has very -- he has difficulty writing I

14  guess comprehensive messages, like, it's kind of not very

15  grammatically correct sometimes.

16  Q.  Did you help him with his e-mails and things like that?

17  A.  I do.

18          THE COURT:  Can I ask you a question?  How old are

19  you?

20          THE WITNESS:  I'm 20.

21          THE COURT:  You're 20.  Are you in school now?

22          THE WITNESS:  I'm a junior in college, yes.

23          THE COURT:  Thank you.  Just trying to get a sense

24  of where --

25          MR. SUROVIC:  I understand, Your Honor.  I was going

1   there because that was going to be my next question.

2        THE COURT:  All right.

3   BY MR. SUROVIC:

4   Q.  Let me jump ahead.  Do you know Mr. Brad Croft?

5   A.  I do.

6   Q.  How did you meet him?

7   A.  He was a friend of my father's.

8   Q.  Were you aware of your father's involvement with Mr. Brad

9   Croft?

10  A.  Yes.

11  Q.  Were you aware of Universal K-9?

12  A.  Yes.

13  Q.  How would you describe your father's relationship with

14  Universal K-9?

15  A.  My father, he was the veteran specialist, so what he would

16  do is he would speak to the veterans and he would correspond

17  with them and help them with their paperwork.

18  Q.  Now, you indicated that you met Mr. Brad Croft, is that

19  correct?

20  A.  I did.

21  Q.  How many times did you meet Mr. Croft?

22  A.  To my memory, once in person.

23  Q.  Is Mr. Croft here in court today, do you recognize him?

24  A.  Yes.

25  Q.  Could you point to him and describe a piece of clothing

1    that he's wearing?

2    A.  He's over there and he's wearing a black leather jacket.

3            THE COURT:  The Court would note the identification of

4    the defendant.

5            MR. SUROVIC:  Thank you, Your Honor.

6    BY MR. SUROVIC:

7    Q.  Could you describe the circumstances that you met Mr. Croft

8    in?

9    A.  There was a convention in D.C., so me and my dad drove up

10   to D.C. and we were participating in the convention with Brad.

11   Q.  Was anybody else there along with Brad Croft?

12   A.  Cameron, his daughter.

13   Q.  So you got a chance to meet her as well?

14   A.  Yes.

15   Q.  How would you describe the relationship that you were able

16   to observe at that time between Mr. Croft and your father?

17   A.  I would say it was odd.

18   Q.  Describe what happened during that convention?

19   A.  Well, it was very clear that Brad was the person running

20   things in that situation and he would have kind of a very harsh

21   joking kind of repertoire with my dad.  And he would do things

22   like -- I guess they would joke with each other, but it was

23   mostly Brad who would call him the F slur.  I don't think

24   that's appropriate for court.

25           THE COURT:  Who would call him that?

1          THE WITNESS:  Brad would call my father the F slur.

2    BY MR. SUROVIC:

3    Q.  Was that the only person that Mr. Croft did that to?

4          MR. BROOKS:  Judge, I'm going to object at this point.

5    I don't see the relevance of this particular testimony as it

6    pertains to the indictment.

7          THE COURT:  It has to do with the relationship between

8    the two.

9          MR. SUROVIC:  Exactly, Your Honor.

10          MR. BROOKS:  I believe the question was about others.

11    The next question was whether he used this word in reference to

12    other people.

13          MR. SUROVIC:  That's not where I was going.  I'll

14    withdraw that question.

15          THE COURT:  All right.

16          MR. SUROVIC:  I've made my point.

17    BY MR. SUROVIC:

18    Q.  When your father was working for Universal K-9, you

19    indicated what things did he do?

20    A.  He would call the veterans, he would correspond with them

21    or actually I think it's correct to say the veterans would call

22    him with any questions that they had, any kind of interest or

23    any kind of, like, application things that they needed.

24    Q.  How much time a day do you think your dad spent handling

25    things like that?

1   A.   It was a 24-hour job.  From when he woke up to when he

2   would go to bed his phone was constantly ringing.

3   Q.   Would he also communicate with these same veterans by

4   e-mail?

5   A.   Yes.

6   Q.   Did you help him at all in the course of his work with

7   these veterans?

8   A.   So very often he would need me to write things for him, but

9   it was more in the sense that he would send me a message that

10  he would like me to format grammatically correct.  So what he

11  would do is he would send me maybe something that he wanted to

12  say and I would just rewrite it with the exact same message,

13  just grammatically correct, and then he would send that.

14  Q.   Would it be fairly -- did you work closely with your father

15  during this period on things like that?

16  A.   Occasionally, but not really.

17  Q.   To your knowledge, was your father ever responsible for

18  making any management decisions for Universal K-9?

19  A.   Absolutely not.

20  Q.   Was your father ever responsible for making any financial

21  decisions for Universal K-9?

22  A.   No.

23  Q.   Who made those decisions?

24  A.   That was Brad.

25  Q.   We've already seen and I'll show you Exhibit 16c.  This is

1  a bank account at Bank of America.  Do you recognize this

2  account?

3  A.  I do.

4  Q.  In fact, that first name on the account title, that's

5  yours, is that correct?

6  A.  Yes, that's correct.

7  Q.  And if we go to the bottom, is that your signature down

8  there as well?

9  A.  Yes, that's correct.

10  Q.  What was the purpose of this account?

11  A.  So this was my first savings account for me and my money

12  that I was getting from work.

13  Q.  In the course of operating your savings account, did you

14  ever take any money out of that savings account to buy a motor

15  home?

16  A.  No.

17  Q.  I'm going to show you Government Exhibit Number 15.  And

18  this is an e-mail concerning a deal with Motor Home Specialist,

19  L.P., do you see that?

20  A.  Yes.

21  Q.  It says originator info, Lillian Socorro Cook.  And it's

22  actually there's a transmission of a fund transfer for

23  $165,837.78 and it indicates that it was received from the Bank

24  of America by order of Lillian Socorro Cook.  Do you see that?

25  A.  Yes.

1   Q.  Did you order $165,837.78 to be sent to this Motor Home

2   Specialist?

3   A.  No, sir, I did not.

4           MR. SUROVIC:  No further questions, Your Honor.

5                       CROSS-EXAMINATION

6   BY MR. BROOKS:

7   Q.  Hi, Ms. Cook.  My name is Will.  Just a couple of questions

8   for you, if I may.  How would you like me to refer to you, Lily

9   or Ms. Cook?

10  A.  Either is fine.

11  Q.  Lily, I'm sorry for interrupting a little bit.  In respect

12  to your dad, you guys were living in Virginia?

13  A.  That's correct.

14  Q.  Still there is my understanding, correct?

15  A.  Uh-huh.

16  Q.  Your dad is not working at this time, right?

17  A.  No, sir.

18  Q.  Now, we've heard some testimony about when agents from the

19  government came out to the townhome where he was living at the

20  time, can you tell me a little bit about that townhome?

21  A.  The townhome?

22  Q.  Yes.

23  A.  It was in a suburb in Virginia.

24  Q.  The reason I ask is I want to give the Court a correct

25  impression of that place.  Would you say it's a nice townhome?

1   A.   It was moderate, you know, moderately nice.

2   Q.   Not something from the 1930s?

3   A.   It was from the eighties.

4   Q.   Would you say updated?

5   A.   Actually, no.  I mean it was fairly new, but the appliances

6   were all pretty old.

7   Q.   But it's not a broken-down shanty of sorts or anything like

8   that?

9   A.   No.

10  Q.   And I'm sorry to hear about his current circumstances, you

11  said he's sharing an apartment with somebody, is that right?

12  A.   Yes.

13  Q.   But at the time you were living with him in this particular

14  townhome, correct?

15  A.   That's correct.

16  Q.   And attending VCU as well?

17  A.   Yes.

18  Q.   Was Rick or was your dad taking care of your expenses while

19  you were there?

20  A.   While at VCU?

21  Q.   Yes, ma'am.

22  A.   No, not necessarily.

23  Q.   Were you using G.I. Bill or something like that for --

24  A.   Yes, and also loans.

25  Q.   What about just living expenses?

1   A.   As in dorms and food and everything?  I had a meal plan

2   from the school.

3   Q.   And we've got copies of your dad's text messages, would you

4   ask him for money from time to time to help you out?

5   A.   Yeah, I would.

6   Q.   And did you ever send money on his behalf to people?

7   A.   No.

8   Q.   So again, remember we have a copy of some of his messages,

9   did you ever assist him to send money to Costa Rica?

10  A.   No.

11  Q.   Did you ever ask him to send money by MoneyGram or any sort

12  of service like that, Western Union?

13  A.   Could you repeat the question?

14  Q.   Did you ever send any money for your dad through services

15  like Western Union or any of those types of companies?

16  A.   Occasionally he would ask me to Cash App. him a few dollars

17  for things that I would ask him to buy me.

18  Q.   Okay.  And did you ever -- you mentioned you'd help him out

19  with e-mails and letters and things for Universal K-9, correct?

20  A.   Yes, that's correct.

21  Q.   Did you ever get compensated for doing that?

22  A.   Not in really any way other than he would, like, you know,

23  give me a couple of money, like a couple of dollars for change

24  or anything.

25  Q.   Couple of dollars?

 1  A.  Yeah, I mean --

 2  Q.  What's a couple of dollars?

 3  A.  I would say like maybe $20.

 4  Q.  Okay.  And the things you would assist him with, and I've

 5  seen a couple of those things, would they be letters to

 6  students potentially?

 7  A.  It would be responses to e-mails.

 8  Q.  And did you ever assist him to draft a letter about the

 9  removal of a student?

10  A.  Yes.

11  Q.  Was that things that he would help take care of for the

12  school?

13  A.  I think he would do it under the direction of Brad.

14  Q.  But again, he's the person that's e-mailing and asking you

15  to help him out, correct?

16  A.  Yes.

17          MR. BROOKS:  If I may have just a moment to confer

18  with counsel, Your Honor?

19          THE COURT:  All right.

20          (Pause.)

21  BY MR. BROOKS:

22  Q.  Lily, I understand you're a good artist.  I saw some of

23  your characters.  Don't draw me.  Thank you, ma'am, I have no

24  further questions.

25          MR. SUROVIC:  We have no further questions of this

1   witness, Your Honor.

2          THE COURT:  All right.  You can step down, ma'am.

3   Thank you.

4          THE WITNESS:  Thank you.

5          MR. SUROVIC:  Your Honor, we request that she be

6   permanently excused so that she can return to Virginia as well

7   with her father.

8          THE COURT:  Yes.

9          MR. SUROVIC:  Thank you, Your Honor.

10          MR. MCHUGH:  Your Honor, may we approach the bench?

11                    *   *   *

12       (Sidebar.)

13          THE COURT:  Yes.

14          MR. MCHUGH:  Your Honor, when we were at the bench the

15   last time, there was a comment by the government which I

16   believe may be open to interpretation and lead to

17   misunderstanding.  I just want to say as a matter of record,

18   Your Honor, that the defendant is a full fledge member of the

19   defense team, he's a valued member, we have a mutual respect

20   for one another, there is a positive relationship and he's gone

21   through a very difficult and unpleasant time.  We're on the

22   same page, we communicate well, his team is united in its

23   defense and we believe in him and his innocence.

24          THE COURT:  All right.  Well, I didn't understand his

25   comment to suggest anything other than that.  I think he was

1    suggesting that your client had a very strong preference to

2    bring out certain issues, that's all, that's all I understood.

3            MR. SUROVIC:  And that's all I intended, Your Honor.

4            MR. MCHUGH:  Excellent.

5            THE COURT:  Okay.

6            *(Sidebar concluded.)*

7                           *   *   *

8            MR. SUROVIC:  Your Honor, at this time, there's a

9    stipulation of testimony concerning a Mr. Dominick Alongi

10   and --

11           THE COURT:  He was here, wasn't he?

12           MR. SUROVIC:  He was here after we entered into the

13   stipulation, so it wasn't an issue, but I was reminded that

14   that has not been officially entered as an exhibit in this

15   case, so I would like my co-counsel to read it and enter it as

16   an exhibit.  It will be Exhibit 47.

17           THE COURT:  That's fine.  Do you have any objection to

18   that?

19           MR. MCHUGH:  No objection, Your Honor.

20           MR. ESPARZA:  The stipulation is as follows, the

21   defendant, Bradley Lane Croft, and the owner of 15329

22   Tradesman, San Antonio, Texas 78249, Dominick Alongi initially

23   entered negotiations regarding the sale of 15329 Tradesman in

24   late 2017, early 2018.  Dominick Alongi did not negotiate the

25   sale of 15329 Tradesman with Richard Cook.  After the property

1    was appraised at $520,000, the defendant, Bradley Lane Croft,

2    and Dominick Alongi settled on a purchase price of $540,000.

3    The sale of 15329 Tradesman was an owner-financed transaction.

4    A cashier's check for $296,996.17, was provided to Alamo Title

5    at closing on April 16, 2018.  The remaining balance was to be

6    paid in payments of $20,000 per month increments until balance

7    is paid in full.  Dominick Alongi received two post closing

8    statements totaling $60,000.  The first payment was for two

9    months and was for $40,000.  The second payment was for one

10   month and was for $20,000.  So stipulated.

11          THE COURT:  Okay.  Very good.

12          MR. SUROVIC:  We would move that into evidence as

13   Government Exhibit Number 47, I believe, Your Honor.

14          Your Honor, defense counsel significantly reduced the

15   time that I thought he was going to spend with Mr. Cook.

16          THE COURT:  You've run out of witnesses.

17          MR. SUROVIC:  We have a local witness, but it's going

18   to take him about 30 minutes to get here.  I know you indicated

19   you wanted to stop at 3:00 or 3:30.

20          THE COURT:  You're going to want me to stop at 3:00

21   because over lunch I was reading -- because I take the

22   newspaper, I get the digital updates and so as I was eating my

23   lunch, I got a big pop-up about a whole bunch of construction

24   work going on and issues going on and plus there's a bunch

25   of -- they're getting ready for some festivities over the long

1    weekend.

2           MR. SUROVIC:  I know even at the best times traffic

3    around here is crazy, especially around five.

4           THE COURT:  It's not good.  Well, we'll recess then

5    for the afternoon and we'll commence on Tuesday morning as

6    normal.

7           MR. SUROVIC:  Thank you, Your Honor.  And I would

8    anticipate that we will rest, the government will rest on

9    Tuesday.

10          THE COURT:  All right.

11          MR. MCHUGH:  And we'll be prepared, we are prepared to

12   present witnesses on Wednesday, Your Honor.  Thank you very

13   much.

14          THE COURT:  47 is accepted into evidence, without

15   objection.

16          MR. SUROVIC:  Thank you, Your Honor.

17          COURT SECURITY OFFICER:  All rise.

18          *(2:32 p.m.)*

19                        *   *   *

20

21

22

23

24

25

1                          *   *   *   *   *

2     UNITED STATES DISTRICT COURT

3     WESTERN DISTRICT OF TEXAS

4

5          I certify that the foregoing is a correct transcript from

6     the record of proceedings in the above-entitled matter.   I

7     further certify that the transcript fees and format comply with

8     those prescribed by the Court and the Judicial Conference of

9     the United States.

10

11    Date signed:  October 25, 2019

12

13    /s/ Angela M. Hailey

14    Angela M. Hailey, CSR, CRR, RPR, RMR
      Official Court Reporter
15    655 East Cesar E. Chavez Blvd., Third Floor
      San Antonio, Texas  78206
16    (210)244-5048

17

18

19

20

21

22

23

24

25