1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                       SAN ANTONIO DIVISION

3    UNITED STATES OF AMERICA         :
                                      :
4    vs.                              : No. SA:18-CR-00603
                                      : San Antonio, Texas
5    BRADLEY LANE CROFT(1),           : October 15, 2019
     Defendant.                       :
6    ********************************************************

7         TRANSCRIPT OF BENCH TRIAL PROCEEDINGS (Volume 5)
                BEFORE THE HONORABLE DAVID A. EZRA
8             SENIOR UNITED STATES DISTRICT JUDGE

9    APPEARANCES:
     FOR THE GOVERNMENT:
10     Gregory J. Surovic, Esquire
       Fidel Esparza, III, Esquire
11     United States Attorney's Office
       601 N.W. Loop 410, Suite 600
12     San Antonio, Texas  78216
       (210)384-7020; greg.surovic@usdoj.gov
13

14   FOR THE DEFENDANT:
       Thomas Joseph McHugh, Esquire
15     William A. Brooks, Esquire
       Law Offices of Thomas J. McHugh
16     130 E. Travis Street, Suite 425
       San Antonio, Texas  78205
17     (210)227-4662; thomasjmchughlaw@gmail.com

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25

**I N D E X**

| **GOVERNMENT WITNESSES:** | **PAGE** |
|---|---|
| **DUSTIN KELLER** | |
| By Mr. Esparza | 4, 8 |
| By Mr. Brooks | 7 |
| | |
| | |
| **JOE VIGIL** | |
| By Mr. Esparza | 8, 83 |
| By Mr. McHugh | 51, 85 |
| | |
| | |
| **SEAN SCOTT** | |
| By Mr. Esparza | 86, 137 |
| By Mr. McHugh | 105 |

1    *(Tuesday, October 15, 2019, 9:22 a.m.)*

2                              *   *   *

3           COURT SECURITY OFFICER:  All rise.

4           COURTROOM DEPUTY CLERK:  SA:18-CR-00603, United States

5    of America versus Bradley Croft.

6           MR. SUROVIC:  Good morning, Your Honor.  Greg Surovic

7    and Fidel Esparza for the United States.  We're present and

8    ready.

9           THE COURT:  All right.

10          MR. MCHUGH:  Good morning, Your Honor.  Tom McHugh,

11   Will Brooks for the defendant.  He is present.  We are ready to

12   proceed.  We have one stipulation.

13          THE COURT:  All right.  What is it?

14          MR. MCHUGH:  Stipulation to a Sue Jevning e-mail dated

15   April 29, 2018.  It would be Defendant's Exhibit 45, it is one

16   paragraph, I'd like to read it into the record.

17          MR. SUROVIC:  Your Honor, I have no objection to the

18   admissibility of this.

19          THE COURT:  You can go ahead, counsel.

20          MR. MCHUGH:  "Hello, Jeff.  Thank you for the

21   attached.  I have requested a meeting with our senior

22   leadership for next week to discuss the next steps.  Normally

23   we move to suspension which does not allow K-9 to enroll

24   additional veteran students, but will allow those already

25   enrolled to complete the course so long as the business remains

1    open.  To suspend, we will have to cite reasons for the

2    suspension which in this -- which I this case is investigation

3    for fraud.  While we have the right to conduct a compliance

4    survey at will, I will need senior leadership approval to do so

5    given we have not received any veteran complaints, V.A.

6    complaints, nor have the scheduled survey at this time.  I will

7    let you know what we have discussed once the meeting is

8    complete.  I don't anticipate being able to get on the schedule

9    until midweek the week of April 30th."  Signed Sue Jevning.

10   This is to Jeffrey Breen.

11             THE COURT:  Very good.  Next witness.

12             MR. ESPARZA:  The United States would call Dustin

13   Keller.

14             COURTROOM DEPUTY CLERK:  Please raise your right hand.

15                          *   *   *

16        *(DUSTIN KELLER, Government Witness, Sworn.)*

17                          *   *   *

18             THE WITNESS:  I do.

19             COURTROOM DEPUTY CLERK:  You can have a seat.

20                       DIRECT EXAMINATION

21   BY MR. ESPARZA:

22   Q.  Good morning, Mr. Keller.

23   A.  Good morning.

24   Q.  Could you please state your name for the record?

25   A.  Dustin Keller.

Dustin Keller - Examination                    5

1    Q.  And can you spell your last name?

2    A.  K-E-L-L-E-R.

3    Q.  I'm going to talk to you today regarding a jet ski that you

4    once owned.  When did you post your jet ski for sale?

5    A.  March, 2017.

6    Q.  And on what website did you post it on?

7    A.  Craig's List.

8    Q.  Who responded to the postings?

9    A.  Few other people and then Brad Croft.

10   Q.  What was the nature of those discussions?

11   A.  We had a listed price, he asked if we could negotiate to I

12   believe it was 6,500, we agreed at 7,500.

13   Q.  What was your original posting?

14   A.  The amount?

15   Q.  The amount, yes, sir.

16   A.  8,500.

17   Q.  And did you end up selling it to Mr. Croft?

18   A.  I did.

19   Q.  Can you repeat the amount again?

20   A.  7,500.

21   Q.  Who came to pick it up?

22   A.  It was Brad and then another individual and his daughter.

23   Q.  Is one of those men in the courtroom today?

24   A.  I don't believe so.

25   Q.  Is Mr. Croft?

1    A.  Yes.

2    Q.  In the courtroom?

3    A.  Yes.

4    Q.  Could you identify him by an article of clothing?

5    A.  Leather jacket.

6          THE COURT:  Yes, the Court will note the

7    identification of the defendant.

8          MR. ESPARZA:  Can you pull up Government Exhibit 36b?

9    BY MR. ESPARZA:

10   Q.  Is that the jet ski that you sold?

11   A.  That is.

12   Q.  Did you handle any of the title paperwork at the juncture

13   of the sale?

14   A.  I handed him my title, yes.

15         MR. ESPARZA:  Can you pull up Defendant's Exhibit 9a.

16   BY MR. ESPARZA:

17   Q.  I'm showing you Defendant's Exhibit 9a, it's a Texas

18   Certificate of Title for the Yamaha jet ski.  You didn't have

19   any hand in handing over title or filling out paperwork at DPS,

20   did you?

21   A.  No, so all I handed him was the parks and wildlife

22   certificate on how -- for him to fill it out and get title in

23   his name.

24         MR. ESPARZA:  No further questions, Your Honor.  Pass

25   the witness.

```
 1                    CROSS-EXAMINATION
 2   BY MR. BROOKS:
 3   Q.  Hi, Mr. Keller.  My name is Will Brooks.  I'm here
 4   representing Mr. Croft.  Just a couple questions for you, if I
 5   might.  You posted that jet ski on Craig's List, correct?
 6   A.  Yes.
 7   Q.  Were there multiple or was it just that one?
 8   A.  That was just it.
 9   Q.  And you settled on a price of 7,500, correct?
10   A.  Yes.
11   Q.  You said that there were two gentlemen and a young lady
12   with him, is that correct?
13   A.  Yes.
14   Q.  Do you know who the other gentleman was?
15   A.  I don't, I did not talk with the other one.
16        MR. BROOKS:  If we could see Defense Exhibit 56.
17   BY MR. BROOKS:
18   Q.  So Mr. Keller, are you able to identify anyone in that
19   particular photo?
20   A.  No.
21   Q.  Anyone look familiar as possibly the other gentleman?
22   A.  Like I said, I didn't talk with the other individual, I
23   didn't have close communications with him.
24        MR. BROOKS:  Thank you, Mr. Keller.  No further
25   questions at this time.
```

```
1                    REDIRECT EXAMINATION
2   BY MR. ESPARZA:
3   Q.  One question.  You said you talked during the pickup?
4   A.  Yes.
5   Q.  What did Mr. Croft tell you about the nature of why he
6   bought the jet ski?
7   A.  He said it was for his daughter, for his daughter to enjoy.
8           MR. ESPARZA:  No further questions, Your Honor.
9           THE COURT:  Anything else?
10          MR. BROOKS:  Nothing further.
11          THE COURT:  You can step down, sir.
12          MR. ESPARZA:  We ask that the witness be permanently
13  excused.
14          THE COURT:  Yes, he can be excused.
15          MR. ESPARZA:  The United States now calls Joe Vigil to
16  the stand.
17          COURTROOM DEPUTY CLERK:  Please raise your right hand.
18                         *   *   *
19          (JOE VIGIL, Government Witness, Sworn.)
20                         *   *   *
21          THE WITNESS:  Yes, I do.
22          COURTROOM DEPUTY CLERK:  Have a seat.
23                    DIRECT EXAMINATION
24  BY MR. ESPARZA:
25  Q.  Good morning, Mr. Vigil.
```

Joe Vigil – Examination                    9

1   A.   Good morning.

2   Q.   Can you please state your name for the record?

3   A.   Joseph Vigil.

4   Q.   Can you spell your last name?

5   A.   V-I-G-I-L.

6   Q.   And where are you currently employed?

7   A.   I'm currently not employed.

8   Q.   Are you retired?

9   A.   Yes.

10  Q.   Lucky you.  Where were you employed in the past?

11  A.   Most recently I was a contractor at a FBI office for the

12  last approximately ten years until last year when I retired

13  from that.

14  Q.   As a contractor what were your duties?

15  A.   My duties were basically to assist the agents in their

16  cases by conducting financial analysis of bank records and

17  other records and to assist in the identification of assets for

18  seizure.

19  Q.   And prior to your time as a contractor, where were you

20  employed?

21  A.   I worked as a special agent with IRS for the previous 26,

22  27 years.

23  Q.   So your career you've been involved in financial

24  investigations?

25  A.   Yes.

1   Q.  What was your involvement in this case?

2   A.  Well, my involvement was basically analyzing financial

3   records and other records, what my duty entailed and I was

4   basically to look for assets that would have been purchased

5   from illegal proceeds.

6   Q.  Now, let's start with the discussion of the assets.  This

7   is going to be Exhibit 19, page 12.

8           MR. ESPARZA:  Your Honor, we have it in both blown up

9   demonstrative.  If that's too hard for you to read I also gave

10  Ms. Springs static printout.

11          THE COURT:  I've got it right here.  I'm taking notes

12  both places.

13          MR. ESPARZA:  It will be the last page of that packet

14  so again this is Government's Exhibit 19, page 12.

15  BY MR. ESPARZA:

16  Q.  Mr. Vigil, can you see that or do you need a hand copy

17  also?

18  A.  Yes, could I have a hand copy?

19  Q.  Is that better?

20  A.  Yes.

21  Q.  I'm showing you Government's Exhibit 19, page 12.  Do you

22  recognize it?

23  A.  Yes, I believe it would have been -- there might have been

24  a small change or two, but basically this was one of the

25  spreadsheets that I prepared.

1   Q.  And what did you review to create that summary?

2   A.  I would review the bank records, purchase records for the

3   different assets that are listed in there.  There may have been

4   some reports, but primarily it would have been the purchase

5   records and bank records and other financial records.

6   Q.  Okay.  Let's focus on the column that says 2017 Eagle.  Do

7   you see that?

8   A.  Yes.

9   Q.  I'd like to go down this column.  This is the RV, correct?

10  A.  Yes.

11  Q.  Let's discuss the purchase of the RV.

12          MR. ESPARZA:  Let's show Exhibit 33a please,

13  Government --

14          THE COURT:  Where does it say 2007 Eagle -- I see

15  you're looking at the --

16          MR. ESPARZA:  The big chart at the back, Your Honor,

17  and it should be about toward the middle, right under amount.

18          THE COURT:  Okay, 2017 Eagle.

19          MR. ESPARZA:  Yes, Your Honor.

20          THE COURT:  I thought you said 2007 Eagle.

21          MR. ESPARZA:  Sorry, Your Honor.

22  BY MR. ESPARZA:

23  Q.  I'm showing you Government's Exhibit 33.  Do you recognize

24  that, Mr. Vigil?

25  A.  Yes, I believe so.

1  Q.  And let's show 33b, Government's Exhibit 33b.  Is that the

2  2017 Eagle?

3  A.  It looks to be, yes.

4  Q.  Now, let's go to Government's Exhibit 15.  And let's go to

5  page five.  I'm showing you the sales records for the RV in

6  question.  Are these records that you reviewed?

7  A.  Yes.

8  Q.  When was it purchased, the RV?

9  A.  I believe it would have been approximately May 25th of

10  2017.

11  Q.  And how was it purchased?

12  A.  Well, according to this record or just in general?

13  Q.  In general.  Was it one lump sum, was it multiple payments?

14  A.  There were various payments, the initial purchase there had

15  been a number of payments I believe before it was actually

16  picked up and then there was a large sum that was financed.

17  Q.  And those initial payments, that's going to be the four

18  transactions on the summary, correct, starting with 5,000,

19  ending in 60,000?

20  A.  That's correct.

21  Q.  Regarding those payments, do you remember the source of the

22  funds for the purchase?

23  A.  The payments I believe were cash and some amounts from a

24  Bank of America account.

25  Q.  Let's do Government Exhibit 16a, page six.  Might be a

1   little hard to see there.  Can you see on that screen?

2   A.   Yes.  The 5,000-dollar?

3   Q.   Yes.  Do you see the transaction?

4   A.   Yes.

5   Q.   I believe it's the second one down, correct?

6   A.   Correct.

7   Q.   What transaction is that?

8   A.   That's the 5,000-dollar payment that was basically the

9   initial payment on the RV.

10  Q.   And that's the first payment you recorded on your summary,

11  correct?

12  A.   Yes.

13  Q.   Let's go to Exhibit 15, page three.  And I'm showing you

14  back on Government's Exhibit 15, this is again from the

15  purchase records that you reviewed?

16  A.   Yes.  This would have been from the purchase records from

17  the RV dealership.

18  Q.   What do you see before you?

19  A.   This one is a deposit item that indicates that there was --

20  that this particular deposit included $45,000 in cash and this

21  would have been one of the items that went towards the deposit

22  on the RV.

23  Q.   And again this is the second payment you recorded in your

24  summary, correct?

25  A.   Yes.

1   Q.  Now, let's go to Government's Exhibit 16a, page eight.  And

2   I want to focus your attention to the bottom last transaction

3   dated 5/24/2017.  Is that the third purchase or the third

4   transaction that you recorded?

5   A.  Yes, it is.  That would have been a wire transfer from the

6   same bank account that the 5,000-dollar payment was made from.

7   Q.  And how much is that wire transfer for?

8   A.  $165,837.78.

9   Q.  Now, on that record that I'm showing you, it looks like it

10  is merely a simple single wire.  What were the source of the

11  funds for that large wire?

12  A.  Well, I believe that there were a number of transfers that

13  came out of one account -- not transfer rather, but cash

14  withdrawals.  And then as a result of that withdrawal, then

15  that cash is deposited into this account.  And over a period of

16  time, the money was accumulated enough to be able to make that

17  wire transfer of 165.

18  Q.  And did you make a summary of those wire transfers?

19  A.  I did.

20  Q.  Okay.  Would it help you to review the summary if we put it

21  up for you?

22  A.  Yes, it would.

23          MR. ESPARZA:  Can we put Government's Exhibit 19?  I

24  believe it's page nine.  And this will be the first one in the

25  packet, Your Honor.

1            THE COURT:  Yes, I've got it.  Got it on the screen

2    also.

3    BY MR. ESPARZA:

4    Q.  And you have a packet, correct, Mr. Vigil?

5    A.  Yes, I do.

6    Q.  I want to go through this summary which I know there's a

7    lot of numbers to go through, so we'll try to go through as

8    smoothly as possible.

9            MR. ESPARZA:  And if I go too fast, Ms. Reporter,

10   please let me know.

11   BY MR. ESPARZA:

12   Q.  Let's discuss the movement of the funds.  First off on the

13   summary there's two bank accounts, correct?

14   A.  That's correct.  The Bank of America 8171 which is

15   Universal K-9, the number, the word nine.  And the Bank of

16   America 3782 in the name of Richard Cook.

17   Q.  The two columns, one has parentheses, one doesn't.  What do

18   those represent?

19   A.  The ones with parentheses would represent withdrawals and

20   the ones without parentheses would be deposits.

21   Q.  Did you review bank account records to establish the

22   summary?

23   A.  Yes.

24           MR. ESPARZA:  Let's pull up Government's Exhibit 10a,

25   page four and Government's Exhibit 16a, page three.

Joe Vigil - Examination                          16

1    BY MR. ESPARZA:

2    Q.  Mr. Vigil on the screen you'll see the two bank accounts in

3    question.  At the top will be the withdrawals that you

4    referenced for the May 8 transactions.  Do you see those?

5    A.  Yes, I do.

6    Q.  Are those correctly reflected, from your summary?

7    A.  Yes, they are.

8    Q.  And on the bottom, what do you see?

9    A.  Those would be the what I consider the corresponding

10   deposits to the withdrawals.

11   Q.  Okay.  And the top for the withdrawals, can you list the

12   amounts please?

13   A.  Yes, there's -- actually it's three withdrawals on the same

14   day May 8, 2017, each for $9,000.  And the V.A. would indicate

15   that it was in Virginia and it shows it's cash withdrawal.

16   Q.  And then the deposits on the bottom, list the amounts

17   please?

18   A.  The deposits, one on May 8th, '17 for $9,000, another one

19   on May 8th, '17 for $8,615, third one also May 18th for 5,000

20   and the fourth one on May 8th for $3,950.

21   Q.  And what is the significance of these transactions being

22   under $10,000?

23   A.  It means that the bank would not be required to file a

24   currency transaction report which would be filed if it was over

25   $10,000.

1   Q.  And that report, what would the report discuss had they

2   been over 10,000?

3   A.  If it had been over $10,000, the bank would have filed a

4   report including all the information on the amount and the date

5   and the person making the withdrawal.

6   Q.  Let's go to the next set of transactions for May 9th.

7   That's going to be Government's Exhibit 10a, page four and

8   Government's Exhibit 16a, page three, side by side.  Can you

9   see on the screen?

10  A.  Yes.

11  Q.  What do you see?

12  A.  Well, we have again two withdrawals on May 9, 2017 each for

13  $9,000 from the Universal K-9 account.  And then also on

14  May 9th we have a 9,000 and 8,800-dollar withdrawal, each of

15  them on the 9th as well.

16  Q.  And again where were these made?

17  A.  This would have been in Virginia.

18  Q.  And the two accounts, who is listed on the first account,

19  the 8171?

20  A.  The Universal K-9 account would have had listed Richard

21  Cook as the -- you mean as the signer?

22  Q.  Let's pull up 10a, page one.  You should be able to see on

23  the left who the account --

24  A.  Yes, it's registered to Universal K-9, nine as the word

25  nine.

1    Q.   Was this a business account?

2    A.   Yes.

3    Q.   And the other account where the deposits are going in, the

4    3782?

5    A.   That was a personal account for Richard Cook.

6    Q.   I'm going to the next set of transactions that happened on

7    May 10, that would be Government Exhibit 10a, page four again

8    and Government Exhibit 16a, page three again.  Do you see the

9    transactions on the screen?

10   A.   Yes, I do.

11   Q.   Again can you list the transactions, the withdrawals and

12   deposits?

13   A.   On May 10th, there are two withdrawals from the Universal

14   K-9 account, each for $9,000.  And then on May 10th, there is a

15   deposit, there's a counter credit for $18,032.61.

16   Q.   Let's go to the next set on your summary, May 11, again

17   this will be Government's Exhibit 10a, page four, Government's

18   Exhibit 16a, page three, same pages, but different

19   transactions.  Can you read those?

20   A.   Yes, so again it's two 9,000-dollar withdrawals from the

21   Universal K-9 account on May 11, 2017.  And on the same date,

22   May 11th, a counter credit deposit of $18,308 on Richard Cook's

23   account.

24   Q.   What does counter credit mean, do you know?

25   A.   I'd probably butcher it.  I think it's just at the counter.

1   Q.  Does that mean the teller or --

2   A.  I don't really know.

3   Q.  No problem.  Same Exhibit 10a, page four, 16a page three,

4   we'll discuss the next dates and transactions.

5   A.  May 12th, one withdrawal for $9,000 from the Universal K-9

6   account.  And then on May 12th, a deposit of $8,660 on Richard

7   Cook's account.

8   Q.  Okay.  And we'll move on to the next date which would be

9   May 15, so same Exhibit 10a, page four and Exhibit 16a, page

10  three.

11  A.  Yes, on May 15th, there were three withdrawals each for

12  $9,000 from the Universal K-9 account and then on the same date

13  there's a deposit for $17,961 on Richard Cook's account and

14  then another one on Richard Cook's account for $9,000.

15  Q.  And on your summary you also list branch and locations,

16  correct?

17  A.  Yes.

18  Q.  For this date, May 15th, were the deposits made at the same

19  location, on your summary?

20  A.  On May 15th?

21  Q.  Yes.

22  A.  No, they were different locations.

23  Q.  Okay.  Moving on to May 16th, same Exhibit 10a, page four

24  and Government's Exhibit 16a, page three, which transactions

25  took place on that day?

1   A.  On May 16th, there's a 9,000-dollar withdrawal and a

2   4,000-dollar withdrawal from the Universal K-9 account.  And

3   then on May 16th, there is a deposit of $12,942 and a 20-dollar

4   deposit on May 17th.

5   Q.  And we're almost done with this chart.  Going on to May 19,

6   same Exhibit 10a, page four and Exhibit 16a, page three.  Which

7   transactions took place on this date?

8   A.  On May 19th there were two 9,000-dollar withdrawals from

9   the Universal K-9 account.  And then on the same date, there's

10  three withdrawals of three deposits to Richard Cook's account,

11  one for 9,000, one for 8,390 and a third one for $610.

12  Q.  And moving on to May 22nd, same exhibit, Exhibit 10a, page

13  four and Exhibit 16a, page four this time.  Which transactions

14  took place on this date?

15  A.  On May 22, 2017 there were two 9,000-dollar withdrawals

16  from Universal K-9 account.  And on the same date, an

17  18,000-dollar deposit to the Richard Cook account.

18  Q.  And last set of transactions for this summary would be

19  May 24th, Exhibit 10a, page four and Exhibit 16a, page four.

20  A.  On May 24th, a withdrawal of $957 from the Universal K-9

21  account and a 925-dollar deposit on the same date to Richard

22  Cook's account.

23  Q.  All these cash withdrawals and deposits took place prior to

24  the large wire of $165,000, correct?

25  A.  Yes, sir.

1    Q.   I'm going to show you Exhibit 10a, page four, Exhibit 16a

2    page eight, so those are all the withdrawals that were made

3    from the Universal K-9 account, correct, for that month?

4    A.   For that month, yes, so it includes I believe all of these

5    and maybe looks like there may be one more that happened after

6    the 165,000-dollar.

7    Q.   And the majority of these withdrawals, are they all over

8    10,000, under 10,000?

9    A.   All of the withdrawals are under $10,000.

10   Q.   And in your opinion, in your analysis, is that what funded

11   the 165,000-dollar wire transfer to the motor home?

12   A.   Yes, sir, you mean the wire transfer amount?

13   Q.   Yes.

14   A.   Yes.

15   Q.   Now, for these bank accounts, what were the source of all

16   the funds in the Universal K-9 account?

17   A.   Let me see.  If I'm not mistaken, the Bank of America

18   account was the first Universal K-9, the word nine, account.

19   And then later on, that account was closed and a new one was

20   open and so what came into that account primarily would have

21   been monies from the V.A. and donations.  There were a few

22   miscellaneous others, but the majority of them were those two

23   items.

24   Q.   The two Universal K-9 accounts, the Bank of America 8171

25   and the Wells Fargo that ended in 1730, did you do an analysis

1   of those accounts in terms of the funds that came in and the
2   percentage of where they came from?
3   A.   Yes.
4   Q.   Do you remember roughly how much of the accounts were
5   funded by V.A. or government deposits?
6   A.   Okay.  After you take into account the trans -- when Bank
7   of America account was closed, then that money was transferred
8   over to the second account.  And if you take away that
9   particular deposit into the opening account, then all of the
10  other deposits, all of those deposits, there would have been
11  about 97 percent of those deposits were comprised of the V.A.
12  payments and the donations.
13  Q.   Now that we've discussed the 165,000-dollar wire, the
14  source of those funds, I'm going to direct your attention back
15  to your large summary which would be again Exhibit 19, page 12.
16  And we'll continue to move down this column discussing the
17  purchase.  The next amount that's listed is $60,000, correct?
18  A.   Yes.
19  Q.   I'm going to show you now Government's Exhibit I believe
20  it's 15, page two.  These are the RV records.  Can you see
21  that, sir?
22  A.   Yes.
23  Q.   Is that what you reviewed for the source of the funds for
24  that 60,000-dollar transaction?
25  A.   That's correct.

Joe Vigil - Examination                    23

1   Q.  And what kind of transaction was that?  Was it a cash,
2   check?
3   A.  It's a 60,000-dollar cash deposit by the dealership.
4   Q.  And up until this point, we've discussed the 5,000, the
5   45,000, the 165,000, the 60,000.  Was that the down payment,
6   for lack of better terms, on the RV, those transactions?
7   A.  Yes.
8   Q.  And the other half, is that the amount that was financed?
9   A.  Yes.
10  Q.  What company financed that latter half of the purchase?
11  A.  It was financed by a company named Alliant.
12  Q.  Could you spell that?
13  A.  A-L-L-I-A-N-T.
14  Q.  So now let's go down through these transactions.  On your
15  big chart you have payments going from 5,000 down to 58,000.
16  What were the source of the funds for these?
17  A.  These accounts all came from an account Union Bank and
18  Trust, 8205 is the account number.
19  Q.  And were they sourced with one lump sum or were there
20  multiple wires like the 165?
21  A.  I believe that these funds were -- there were deposits into
22  that account just like the previous one that we went over.  And
23  then periodically there would be withdrawal and the purchase of
24  a cashier's check and these represent those cashier's check
25  payments.

1    Q.  Did you make a summary of those transactions as well?

2    A.  I did.

3    Q.  Would it help you to see the summary?

4    A.  Yes, it would.

5    Q.  It's Government's Exhibit 19, page ten.

6            MR. ESPARZA:  This would be the second page of the

7    packet, Your Honor.

8            THE COURT:  All right.

9    BY MR. ESPARZA:

10   Q.  Second page of the packet, Mr. Vigil, is before you as

11   well.  Is this the summary that you created for the Alliant

12   payments?

13   A.  Yes, it is.

14   Q.  Could you describe what the columns represent for the

15   Court?

16   A.  Well, the first column again is the bank of the Universal

17   K-9, Bank of America account.  And then the next two columns

18   with numbers is the Union Bank account that is also in the name

19   of Richard Cook.  And then I have another column called other

20   cash because sometimes the monies from the Union account would

21   be combined with additional cash for the cashier's check and

22   then the comment section is a description that gives a little

23   clarity to the transaction.

24   Q.  I want to go through the first two columns first.  So let's

25   discuss the movement of the funds before we get to what it

1   actually purchased.  Starting with the July 2017 transactions,

2   let's bring up Government's Exhibit 10b, page four and

3   Government's Exhibit 17a, page four.

4       Now, the bank account on the left, which bank account would

5   that be?

6   A.   That would be the Universal K-9 Bank of America account.

7   Q.   Ending in 8171?

8   A.    8171, correct.

9   Q.   On the right, what account would that be?

10  A.   The account on the right would have been -- would be the

11  Union Bank and Trust account number 8205 in the name of Richard

12  Cook.

13  Q.   And we're kind of going to do the same song and dance that

14  we did earlier, most unentertaining song and dance ever, but

15  we're going to do it.  Let's go through these transactions and

16  these wires.  Starting at the beginning, that first at the top,

17  what withdrawal do you see?

18  A.   That again is a withdrawal, cash withdrawal $9,000 from the

19  Universal K-9 account on 7/24 and then at the bottom you have

20  the corresponding deposit of $9,000 on Richard Cook's Union

21  account.

22  Q.   Again these not only are they two separate accounts, but

23  two completely separate banks, correct?

24  A.   Yes.

25  Q.   Let's go to the next set of transactions.  It's going to be

1    the same exhibit just 10b, page four and 17a, page five.  What

2    withdrawals do you see at the top?

3    A.  On July 25th, there's a 1,500-dollar withdrawal and on

4    July 27 there's a 9,000-dollar withdrawal, both of them from

5    the Universal K-9 account.

6    Q.  And then on the bottom is that the corresponding deposit

7    under your analysis?

8    A.  There is -- yes, a corresponding deposit for $3,000 on

9    July 27th into the Union account in the name of Richard Cook.

10   Q.  Let's go on to the next transaction which would be 10b,

11   page four and 17a, page five, staying in the month of July.

12   What is at the top?

13   A.  The 9,000-dollar withdrawal on July 28th from the Universal

14   K-9 account and then there's two deposits on the same date, one

15   for 4,800 and one for 4,200 to Richard Cook's Union account.

16   Q.  And finishing off the month of July, let's go same exhibit

17   10b, page four and 17a, page five.  What transactions do you

18   see?

19   A.  July 31st, 2,000-dollar withdrawal from Universal K-9

20   account.  And on the same date, a deposit of $1,850 on Richard

21   Cook's Union account.

22   Q.  Okay.  Let's move on to the month of August.  So I'm going

23   to show you Government's Exhibit 10c, page four and

24   Government's Exhibit 17b, page two.

25       What transactions do you see?

1    A.  August 31st, 2017, a cash withdrawal from the Universal K-9

2    account of $9,000 and then on August 31st, a deposit of $9,000

3    in Richard Cook's Union account.

4    Q.  I'm going to show you some more regarding August.  Now,

5    what month is reflected at the top and from which account?

6    A.  On the top part is withdrawals on Universal K-9's account

7    in August, 2017.  Read them out?

8    Q.  Yes.

9    A.  On August 8th, withdrawal of $9,000; August 11, withdrawal

10   9,000; August 14, 9000-dollar withdrawal; August 15,

11   5,000-dollar withdrawal; August 28th, 3,500-dollar withdrawal;

12   August 29th, 9,000-dollar withdrawal.

13   Q.  Okay.  And we kind of got ahead of ourselves earlier due to

14   my mistake, but we already discussed the August 31st

15   withdrawals, correct?

16   A.  Yes.

17   Q.  So that gets us done with the month of August.

18   A.  And then there's that one deposit on August 29th for $9,000

19   to Richard Cook's Union account.

20   Q.  Let's move on to September now.  The is going to be

21   Government's Exhibit 10d and Government's Exhibit 17c.  10d,

22   page four, 17c, page two.  What transactions are reflected at

23   the top?

24   A.  On September from the Universal K-9 account, there are four

25   withdrawals reflected here, one on September 1st for $9,000,

1   one on September 11th for 3,500, September 18th, 9,000 and

2   September 19th for 9,000.

3   Q.   And then what are their corresponding deposits?

4   A.   There's two deposits to the Union Richard Cook account on

5   9/18 for 8,900 and 9/19 for $9,000.

6   Q.   Continuing with the month of September, we're going to be

7   in still the same Exhibit 10d, page four and Exhibit 17c.

8   A.   From the Universal K-9 account, withdrawal of $9,000 on

9   9/20 and then on 9/21, a 3,000-dollar withdrawal and then you

10  have a deposit to Richard Cook's Union account on 9/21 for

11  $1,400.

12  Q.   Again moving on, same exhibits, 10d, page four and 17c,

13  page four, next set of transactions?

14  A.   September 27th, you have a 9,000-dollar withdrawal from the

15  Universal K-9 account and then on the same date a deposit of

16  $9,000 to Richard Cook's Union account.

17  Q.   Same exhibits, next set of transactions.

18  A.   September 28th, a 9,000-dollar withdrawal from the

19  Universal K-9 account and on the same date a deposit of $9,000

20  to Richard Cook's Union account.

21  Q.   Next set of transactions, same exhibit?

22  A.   September 29th, 9,000-dollar withdrawal from Universal K-9

23  account and a deposit on the same date for $9,000 to the Union

24  account.

25  Q.   That gets us through September, so now we're going to go

1    through October.  Looks like we've only got another month to

2    go, so we'll keep doing this song and dance.  Let's go to

3    October, so it's going to be Government Exhibit 10e, page four

4    and Government Exhibit 17c, page five.

5    A.  On October 2nd, there's a 7,000-dollar withdrawal from

6    Universal K-9 account and a 5,330-dollar deposit to the Union

7    account.

8    Q.  Next set of transactions on the same exhibits, except this

9    time will be page four and page seven?

10   A.  Can I make a notation on that last one?

11   Q.  Sure.  Let's go back.

12   A.  Okay.  There might be a little discrepancy.  I notice it

13   says 5,330 and on my summary I have 5,300, just wanted to make

14   that note.

15   Q.  Would that have been a typo on your end?

16   A.  Probably.

17   Q.  I understand there's plenty of numbers to have to crunch

18   through.  So now let's go to the next set which I believe is

19   October 4th.  And which transactions do you see on the screen?

20   A.  Yes, on October 4th, a 9,000-dollar withdrawal from

21   Universal K-9 and a 8,850-dollar deposit to the Union account.

22   Q.  Let's go to the next set, same exhibits, 10e and 17c, 17c

23   would be page eight at this time?

24   A.  On October 5th, a 9,000-dollar withdrawal from Universal

25   K-9, and 8,960-dollar deposit to the Union account.

1   Q.  And we'll move on to the next set of transactions, same
2   exhibits again.
3   A.  On October 6th, 9,000-dollar withdrawal from Universal K-9
4   and 9,000-dollar deposit to the Union account.
5   Q.  And correction, this is Exhibit 10e, page four on one side
6   and 17d, not 17c on the right side.
7       So that was October 6th.  Let's go to the next transaction.
8   And this will be the same exhibits, 10e and 17d.
9   A.  Okay, this one has six withdrawals from the Universal K-9
10  account on 10/18 for $9,000, on 10/19 for $9,000, on 10/23 for
11  9,000, 10/23 for 9,000, 10/25 for 5,000 and 10/27 for 9,000.
12  And also a deposit on October 27th for $9,000 on Richard Cook's
13  Union account.
14  Q.  And we'll go to the next set of transactions which will be
15  the same exhibit, 10e.
16  A.  Yes, on --
17  Q.  10e, page four and 17d, page six.
18  A.  October 30th, two withdrawals from Universal K-9 account,
19  one for 9,000 and one for 6,000.  And there are two deposits to
20  the Union account on October 30, one for 8,940 and the second
21  one for 6,000.
22  Q.  Now, finally at the end of these transactions, moving on to
23  the month of November, let's begin with Government's Exhibit
24  10f, page four and 17e, page one.  And this should be up on the
25  screen for you.  Should be the first set of November

1    transactions?

2    A.  Yes, on November 6th, a withdrawal from Universal K-9 for

3    $6,000 and a deposit on the same date to the Union account for

4    $2,927.

5    Q.  And let's go to the next set of transactions, same exhibit,

6    10f, page four and Government's Exhibit 17e, page two this

7    time.

8    A.  Yes, on the 7th of November there's two withdrawals from

9    Universal K-9, each for $9,000.  And on the same day the

10   deposit to the Union account for $18,000.

11   Q.  And what day was that again?

12   A.  That is on November 7th, 2017.

13   Q.  And let's move on to the next transaction.  The same

14   exhibits.

15   A.  Yes, on November 8th, two withdrawals from Universal K-9,

16   each for $9,000 and two deposits on the same date to the Union

17   account, one for $8,880 and a second for 8,600.

18   Q.  And next set of transactions, same exhibits, 10f and 17e.

19   A.  Yes, on November 9th, there are three withdrawals from the

20   Universal K-9 account, one for 9,000, one for 9,000 and the

21   third one for 4,700.  And then there are three deposits to

22   Richard Cook Union account, one for 9,250, second for $9,000

23   and then the third one for 4,700.

24   Q.  Now that we've discussed all the movement of the funds,

25   let's discuss what it actually purchased.  These were the

1   financed payments, correct, on the RV?

2   A.   Yes.

3   Q.   I believe you stated earlier that the funds were taken in

4   the form of cashier's checks from the deposit account, correct?

5   A.   From the Union account, those were in the form of cashier's

6   checks that went to Alliant.

7   Q.   Now let's discuss those.  Let's put Government's Exhibit

8   43a on one side and Exhibit 41, page seven, on the other.  On

9   the left is Government's Exhibit 43a.  Do you recognize that?

10  A.   Yes.

11  Q.   What is that?

12  A.   That is a record for Alliant's account for this loan for

13  the RV.

14  Q.   And on the right, what is that?

15  A.   That is the -- that first cashier's check for $5,943.

16  Q.   And when was that check issued?

17  A.   That check was issued on July 27, 2017.

18  Q.   And is that the check that corresponds to your summary for

19  the $5,943?

20  A.   Yes, it is.

21  Q.   Let's move on to the next set of cashier's checks.

22  Governments Exhibit 43b on one side and Government's Exhibit

23  17k on the other side.

24  A.   That first cashier's check for 5,943, that did not actually

25  physically, as far as I can recall, come from that account,

1   that would have been a cashier's check purchase with cash.

2   Q.  And that's reflected on your summary, correct?

3   A.  Yes.

4           MR. ESPARZA:  43b and Government's Exhibit 17k.

5   BY MR. ESPARZA:

6   Q.  You're looking at Government's Exhibit 43b on the left and

7   Government's Exhibit 17k on the right.  What are they?

8   A.  It's the same as before, the Alliant statement that shows

9   the receipt of the 17,000-dollar payment and on the right is

10  the cashier's checks that was purchased for $17,000 from the

11  Union account.

12  Q.  Okay.  And is this cashier's check what you reference on

13  your summary for 7/28 for $17,000?

14  A.  Yes, it is.

15  Q.  Let's move on to the next set of payments.  It's going to

16  be Government's Exhibit 43c, as in cat, and Exhibit 17i.  Again

17  you're looking at both Government's Exhibits before you, what

18  are they?

19  A.  This on the right is the cashier's check for $9,000 is

20  dated August 29th, 2017.  And on the left it reflects the

21  receipt of the payment.

22  Q.  And I'm going to direct your attention to 17i.

23      Now, 17i is that cashier's check we just discussed.  What's

24  the bottom half where the exhibit sticker is, what is that?

25  A.  That shows where it was negotiated, in this case deposited.

1  You mean where it shows Alliant Credit Union?

2  Q.  Yes.

3  A.  Yes.

4  Q.  What's the deposit date listed there?

5  A.  The deposit date is listed as 9/1, September 1, 2017.

6  Q.  Let's put 43c on the other side again.  Does that deposit

7  date correspond with the loan payment listed there towards the

8  bottom?

9  A.  Yes, the 9000-dollar?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Okay.  And again these are records that you reviewed as you

13  were drafting this summary, correct?

14  A.  Correct.

15  Q.  Doing an amazing job because I can barely keep track of all

16  this.  Let's go now to Government's Exhibit 43c on the left and

17  Government's Exhibit 17j on the right.  Again what are the

18  exhibits before you?

19  A.  Okay.  The exhibit on the right is a cashier's check dated

20  September 1st, 2017 for $16,000.  And then on the left it shows

21  the payment being received on 9/5, $16,000.

22  Q.  And again on the bottom of 17j, what's the transaction

23  date?

24  A.  September 5th, 2017.

25  Q.  And is that reflected on the payment statement?

1    A.   Yes, on the statement of account for Alliant.

2    Q.   Again these are all coming from which account?

3    A.   These are all coming from the Union account in the name of

4    Richard Cook.

5    Q.   Let's move on to the next check.  There's light at the end

6    of the tunnel, we're almost there.  Hope everybody is still

7    awake.  Let's view Government's Exhibit 43c on the left and

8    17L.  Do you see the exhibit before you, what are they?

9    A.   Yes, you have the cashier's check for $27,000, dated

10   September 20th, 2017 and it does have at the bottom portion as

11   the deposit date of September 25, 2017.  And on the left you

12   have Alliant statement of account.  And in this particular

13   case, a $27,000 went into what Alliant has as a savings account

14   that was deposited into.

15   Q.   And in your opinion, why did it go to that top account

16   first rather than the bottom?

17   A.   Honestly, I don't recall.  I can only guess that it was

18   early and they just -- I don't know why they had a savings

19   account.

20         MR. MCHUGH:  Object to speculation.

21         THE COURT:  Sustained.

22   BY MR. ESPARZA:

23   Q.   Let's move on to the next transaction, Government's Exhibit

24   43d on one side and Exhibit 17m on the other.

25   A.   On the right you have a cashier's check for $27,000 to

1   Alliant, dated September 29, 2017.  And the back of the check

2   shows that it was deposited on October 5th.  And then on the

3   left you have the Alliant statement of account that shows an

4   October 5th deposit for $27,000 into that savings account.

5   Q.  Okay.  But it's still going to Alliant, correct?

6   A.  Yes.

7   Q.  Let's go to the next set of transactions, again 43d on the

8   left and Exhibit 17n, as in Nancy, on the right.

9   A.  On the right, cashier's check for $27,000, dated October 6,

10  of 2017.  And it shows on the back of the check that it was

11  deposited on October 11th.  And on the left you have the

12  statement of account for Alliant that shows the deposit on the

13  11th for $27,000 into that savings account.

14  Q.  Now, the last few sets of checks that were dated $27,000,

15  you said they all went into that top account, correct?

16  A.  Correct.

17  Q.  And what did they total?

18          MR. ESPARZA:  If you could highlight the top account

19  where it says posting date in the box?

20  A.  The three 27,000-dollar checks?

21  Q.  Yes.

22  A.  They would have been $81,000.

23  Q.  Does the statement reflect that that 81,000 was then

24  credited as a payment?

25  A.  Yes, on the bottom portion of the statement it shows

1   basically the transfer from the savings into the loan account

2   on October 31st of 2017 for $81,004.90, which would have

3   included the interest on the savings account.

4   Q.  Just to be clear because again you're the numbers guy, I

5   went to law school so I would never have to do math, yet here I

6   am, all those 27 that came from the Union bank were first

7   deposited up top, but they did eventually credit towards the RV

8   payment?

9   A.  That's correct.

10  Q.  And last transaction for this asset, Exhibit 43e on the

11  left on Exhibit 17o.

12  A.  The cashier's check dated November 10, 2017 for $58,701.39.

13  And on the left you have the Alliant statement of account that

14  shows it deposited on November the 13th of 2017.

15  Q.  And was that the final pay-off payment?

16  A.  Yes, it was.  It shows the ending balance of zero.

17  Q.  And again referencing your big summary, that would cover

18  all the payments that you reviewed and all the transactions

19  which would be Exhibit 19, page 12, the big chart, what we just

20  went through was that all the payments?

21  A.  Yes, I believe so.

22  Q.  And the original source of each of the funds for those

23  payment was from which account?

24  A.  Universal K-9 account and Bank of America.

25  Q.  That account was funded through what kind of funds?

 1   A.   Monies from the V.A. and primarily the V.A. and donations.

 2   Q.   Okay.  Now let's move on to -- now that the bulk of our

 3   work is done.  Let's move back to Exhibit 19, page 12, we're

 4   going to go to that column that says 15329 Tradesman.

 5        We already had some stipulation regarding this, but let's

 6   discuss briefly this transaction.  Now, did you ever visit

 7   15329 Tradesman?

 8   A.   Yes, I did.

 9   Q.   When did you visit it?

10   A.   I was there during the execution of the Search Warrant.

11   Q.   Okay.  I'm going to show you Government's Exhibit 32a.

12   What is that?

13   A.   That's the front of the building at Tradesman.

14   Q.   Now, again you reviewed the purchase records for this asset

15   as well, the real property, correct?  In order to make your

16   summary?

17   A.   I did.  I'm trying to recall what purchase record, but I

18   did review some purchase records, yes.

19   Q.   I'm going to show you Exhibit 18.  These are the title

20   records from the date of the purchase, were these records you

21   would have reviewed?

22   A.   That's correct.

23   Q.   At the top it has the buyer and the seller, could you tell

24   me who the buyer is?

25   A.   The buyer is Universal K-9, the word nine.

1  Q.  And the seller?

2  A.  The seller is Dominick Alongi.

3  Q.  Let's go to the page three.  What was the date of the

4  purchase?

5  A.  I believe that is April 16th of 2018.

6  Q.  And in your review of the records that you used to make

7  your summary, was it one lump sum transaction or was it

8  multiple payments?

9  A.  I think that the records that I reviewed reflected just one

10  payment initially at the closing and then the remainder being

11  financed.

12  Q.  In that one payment, I'm going to show you Government's

13  Exhibit 11d, page three on one side and 11i on the other.

14      On the left is the Wells Fargo account.  Is that the one

15  large transaction that you discussed that you reviewed in your

16  records?

17  A.  Yes, yes, and so by this time, Universal K-9 has switched

18  from Bank of America to this account and it's a withdrawal for

19  that purchase of the building.

20  Q.  Okay.  And the source of this account, source of the funds

21  for the Wells Fargo account, what was the source of them?

22  A.  It's just like the Bank of America.  If you put them all

23  together, like I stated earlier, about 97 percent of the money

24  that went into the Bank of America and the Wells Fargo account

25  came from either the V.A. or donations.

Joe Vigil - Examination                    40

1   Q.  Okay.  That's it for the -- wait, sorry, there's one more.

2   On your summary you reflect that there was a 20,000-dollar

3   payment which matches up with --

4           MR. ESPARZA:  Sorry, give me one second, Your Honor.

5           (Pause.)

6   BY MR. ESPARZA:

7   Q.  So let's go to Exhibit 18, I believe it's page five.  At

8   the top there should be a number four with a section that

9   discusses financing.  Can you see that?

10  A.  Yes.

11  Q.  The financing agreement was to be the large lump sum with a

12  20,000-dollar per month until the balance is paid in full,

13  correct?

14  A.  Right.  There was a seller finance 240,000-dollar note that

15  called for 20,000-dollar monthly payments.

16  Q.  And you did review and see one note payment on your

17  summary, correct?

18  A.  Yes.

19  Q.  That's going to be Government's Exhibit 11g on one side

20  with 11h on the other side?

21  A.  Yes.

22  Q.  Do you see the records before you?

23  A.  Yes.

24  Q.  So on the left, what's on the left?

25  A.  On the left is a withdrawal slip.

1  Q.  From which bank?

2  A.  From Wells Fargo, from the Wells Fargo account of Richard

3  Cook for $26,500 and there's some notes on it that break out

4  what the 26,500-dollar is for and that included a $20,000 for

5  Dominick Alongi.

6  Q.  And on the other side, what do you see?

7  A.  And this is the payment for the purchase of a cashier's

8  check at Wells Fargo for $20,000.

9  Q.  Who is it paying to the order of?

10  A.  Pay to the order of Dominick Alongi.

11  Q.  Let's go back to Exhibit 19, page 12, the big chart again

12  to help us keep on track.

13       MR. ESPARZA:  I want to discuss a couple of more

14  purchases briefly, unless Your Honor wants our mid-morning

15  break.

16       THE COURT:  Are you ready?  How much longer do you

17  have?

18       MR. ESPARZA:  I can keep going.  If that's fine with

19  you, I can keep going.

20       THE COURT:  We can take a break.  I see somebody needs

21  a break.  We'll recess at this point.

22       COURT SECURITY OFFICER:  All rise.

23       *(10:30 a.m.)*

24                    *  *  *

25       *(10:59 a.m.)*

```
 1              COURT SECURITY OFFICER:  All rise.
 2              THE COURT:  The Court would note the presence of all
 3    counsel.  You may proceed, as well as the parties.
 4              MR. ESPARZA:  Referencing back to Exhibit 19, page 12,
 5    the first column regarding an asset, let's discuss the purchase
 6    of the 2018 Ford F-150.  Pull up Government's Exhibit 34a.
 7    BY MR. ESPARZA:
 8    Q.  Do you recognize that?
 9    A.  Well, I'm sure that's the Ford F-150 we're talking about, I
10    guess.
11    Q.  You were present at the Search Warrant, correct?
12    A.  Yes.
13    Q.  Let's go to Government's Exhibit 27, page eight.  I'm
14    showing you the purchase records for the 2018 Ford.  And what's
15    on the screen is the document from Ford Motor Company regarding
16    the description and the details of the vehicle.  Now, let's put
17    that side by side with Government's Exhibit 34e.  Does the VIN
18    on the sales record match the VIN on the picture from the
19    vehicle?
20    A.  Yes, it does.
21    Q.  And these purchase records, did you review them prior to
22    making the summary regarding the Ford?
23    A.  Yes, I did.
24    Q.  Let's go back to Exhibit 27 and it should be page four.
25    Page six, sorry.  You're looking at the application for title
```

1   again from the same purchase records.  Down at the bottom it
2   has the date.  When was this purchased?
3   A.   February 6th, 2018.
4   Q.   And who is listed as the signature applicant?
5   A.   Cameron Nicole Croft.
6   Q.   Who is Cameron Nicole Croft?
7   A.   That is Brad Croft's daughter.
8   Q.   And let's go to page nine.  Where was the vehicle
9   purchased, the dealer?
10  A.   Red McCombs Ford.
11  Q.   And again referencing your summary, how was it purchased,
12  was it multiple payments, one payment?
13  A.   The car was purchased with 40,000 in cash, two credit card
14  payments and the value of a trade-in vehicle.
15  Q.   And let's go to Exhibit 27, page 25.  Are those the
16  receipts for the payments that were made that day at the
17  dealer?
18  A.   Yes, those are the two credit card payments from Brad
19  Croft's credit card.
20  Q.   And you said there was a vehicle traded in, correct?
21  A.   That's correct.
22  Q.   Let's go to same exhibit, page 23.  What vehicle was traded
23  in for this vehicle?
24  A.   A 2014 Dodge Ram 1500.
25        MR. ESPARZA:  And let's pull up Exhibit 29, page 17.

1    BY MR. ESPARZA:

2    Q.  Does the VIN number match on the traded information on the

3    left to the purchased records on the right?

4    A.  Yes, they do.

5    Q.  And on the right, those would have been purchase records

6    for the 2014 Dodge Ram, correct?

7    A.  Yes, I believe so, yes.

8    Q.  Did you review those records as well?

9    A.  I did.

10          MR. ESPARZA:  One second, Your Honor.

11          THE COURT:  Sure.  I can see it.

12   BY MR. ESPARZA:

13   Q.  And let's move on to the next vehicle on your Exhibit 19,

14   page 12, the next column, which is going to be the 2017 Dodge

15   Ram.  Do you remember seeing the Dodge Ram when you conducted

16   the Search Warrant?

17   A.  Yes.

18   Q.  Could you identify it if I showed you a picture?  Would it

19   refresh your memory if you saw a picture?

20   A.  If I saw a picture, I'd have to look at the tags to see if

21   it's the same one, but it was there.

22   Q.  So you need to see the VINs, correct, is that what you're

23   saying?

24   A.  Either the VINs or the tags, yes.

25   Q.  We can certainly do that.  Let's pull up Exhibit 26, page

1    five.  I'm going to show you the purchase records for the 2017

2    Dodge Ram.

3        Are these the purchase records that you reviewed regarding

4    the purchase and sale of the 2017 Dodge Ram?

5    A.  Yes, it is.

6    Q.  And who is listed as the purchaser on the agreement?

7    A.  Cameron Nicole Croft.

8    Q.  And what was the date of the sale?

9    A.  The date is July 7, 2017.

10   Q.  And what dealership -- where did the sale take place?

11   A.  From Ingram Park Chrysler Jeep, Inc.

12   Q.  Now, you said earlier that you would have to match up VINs

13   to verify the vehicle in question, correct?

14   A.  Right -- well, yes.

15   Q.  Let's pull up side by side Government's Exhibit 37d.  This

16   is a picture taken from the Search Warrant from the VIN.  Does

17   that VIN match the VIN in the sales records?

18   A.  Yes, it does.

19   Q.  Now, let's pull Government's Exhibit 37a and 37b side by

20   side please.

21   A.  That looks like the one.

22   Q.  And the VINs do verify the records you reviewed, correct?

23   A.  Yes.

24   Q.  Now, again same with this one, was it one cash lump sum

25   that was paid, was it financed, multiple payments?

1    A.   In this particular one, there was a trade-in vehicle and

2    then there were basically three payments made by debit card

3    from the -- from Richard Cook's Union account.

4    Q.   And I note on your main summary on Exhibit 19, page 12,

5    those three payments by debit card.  On the far right in the

6    comment section it says Union B&T, 8206.  Is that a typo, the

7    last four?

8    A.   Yes, it should be 8205.

9    Q.   Did you ever review a Union Bank 8206?

10   A.   No.

11   Q.   What number did you review?

12   A.   The 8205.

13   Q.   Now, you said those were three debit card payments?

14   A.   Correct.

15   Q.   Let's pull Exhibit 26, page 17.  Again this is from the

16   purchase records and I believe that's for 7,800.  Is that one

17   of the debit card transactions that you reviewed?

18   A.   Yes.

19   Q.   And next one should be page 18, same exhibit.  And what

20   transaction is that?

21   A.   Yeah, that's the 3,000-dollar debit transaction.

22   Q.   And lastly will be page 19.

23   A.   And that's the 2,500 transaction.

24   Q.   And again who is listed as the purchaser of the vehicle?

25   A.   Cameron Croft.

1    Q.  And you said this took place at Ingram Park Chrysler,

2    correct?

3    A.  Correct.

4    Q.  Where is that located?

5    A.  I believe that's located on 410.

6    Q.  Is it here in San Antonio?

7    A.  Yes, in San Antonio.

8    Q.  Now, you said the account that it comes from, that debit

9    card you said is Richard Cook's, correct, or the account

10   that --

11   A.  Right, it's associated with Richard Cook's Union Bank and

12   Trust account.

13   Q.  Again let's do this side by side since I clearly get lost.

14   Exhibit 26, page 17 on one side and Exhibit 17a, page two on

15   the other.  And should be 26, sorry, page 17.  Next page,

16   sorry.

17   A.  It's there at the bottom, the 3,000-dollar one, it's --

18   Q.  Do you see it, corresponding charge in the bank statement?

19   A.  Right, so it's got the date of July 7 and then on the

20   statement on the right it shows July 10, but in the description

21   it does have that it was actually took place on July 7 at the

22   very bottom part of it.  It just apparently didn't get

23   processed until July 10th.

24   Q.  Scroll down on the bank side.  Do you see the July -- the

25   next transaction for Ingram Park on the right-hand side?

1   A.   That's the 2,500-dollar one, correct.

2   Q.   Does that correspond with the receipt that we showed prior?

3   A.   Yes, it has a July 8th date which matches the July 8th and

4   it shows Ingram Park.

5   Q.   Okay.  And last one on the right side, scroll down to

6   July 11th.  And is that the corresponding transaction for the

7   7,800?

8   A.   Yes, it is.

9   Q.   Okay.  Now, another question.  You reviewed looks like

10  multiple different bank accounts.  The accounts that we just

11  referenced, whether it was for the motor home, the Ford or the

12  Dodge, was Mr. Croft's name on any of those accounts?

13  A.   I don't believe so.

14  Q.   Now, did you actually see his name on any bank account that

15  you reviewed?

16  A.   Not any of these accounts.

17  Q.   Out of all the accounts that you reviewed, was there any

18  other bank account that he would have been a signature on?

19  A.   Yes, there was an account in the name of Willawall Trust.

20  I forget which bank it is, but there was a Willawall Trust

21  account and I believe during this time period, he had the

22  account and he was a signer on that account.

23  Q.   And was that account used for any of these purchases?

24  A.   No.

25  Q.   Now, I want to go through some of the accounts in the

1   indictment really quick regarding the wire fraud.  You reviewed

2   all the bank accounts discussing all the wires, correct?

3   A.   Yes.

4   Q.   Now, in count one of the indictment, it lists that there

5   was a claim file number 642161775 for an amount of 12,500 and

6   the date of that claim that's listed as January 17, 2008.  What

7   date is that?  Do you remember?

8   A.   I'm sorry.  You have to ask that again.

9   Q.   Sorry.  That's my fault.  Let's pull up Exhibit 11a.  Page

10  three.

11      Now, you're seeing Exhibit 11a, which is the Wells Fargo

12  account.  Where it says file number, what number does that say?

13  A.   642161775.

14  Q.   And what's the amount for?

15  A.   $12,500.

16  Q.   And what date is it?

17  A.   That is January 17.  Sorry, I don't have the year there.

18  Oh, yes, 2018.

19  Q.   Let's move on to the next claim.  Same page, January 25th.

20  Again these were bank records.  What's the file number?  What

21  does that state?

22  A.   File number 608502940 and it's dated January 25th, 2018.

23  Q.   And that matches with count two.  Let's move on to the next

24  count which is going to be same date and should be the next one

25  right below it.  Could you read the file number?

1    A.   635050120 and that's dated January 25th, 2018.

2    Q.   Move on to count four and that's going to be January 29th.

3    Could you read the file number there?

4    A.   File number 375961984, dated January 29, 2018.

5    Q.   Move on to count five.  At this time it's going to be

6    Government's Exhibit 11b, page two.  Could you read that file

7    number please?

8    A.   File number 635347422, dated February 6, 2018.

9    Q.   Next would be same exhibit, page three.

10   A.   That file number 171684140, dated February 15, 2018.

11   Q.   Okay.  And now moving on to count six, it's going to be

12   11b, page four.  Can you read that file number please?

13   A.   That file number is 631054077, February 23, 2018 for

14   12,500.

15   Q.   And last one is going to be Government's Exhibit 11c, page

16   two.  Can you read that file number please?

17   A.   Yes, that's file number 429816546, dated March 6, 2018 for

18   6,500.

19   Q.   Now, when you reviewed all the bank accounts, did you

20   notice a lot of purchases in San Antonio?

21   A.   Well, you're talking about for the -- for Universal K-9

22   account?

23   Q.   Yes.

24   A.   Yes.

25   Q.   What were the nature of some of the purchases?

1    A.  Well, they mostly I guess like you would have it in any

2    account where you're purchasing personal stuff from the store

3    or a variety of things, there were some business related

4    purchases, but there were a lot of -- and there were a lot of

5    purchases of, like, money orders from H.E.B. and Wal-Mart

6    and --

7    Q.  When you say personal purchases, do you mean like

8    restaurant purchases?

9    A.  Yes.

10   Q.  And the majority of that activity, did that take place in

11   Texas, in San Antonio?

12   A.  Definitely the majority of the expenditures from the

13   Universal K-9 account were in San Antonio.

14   Q.  And is that in the Western District of Texas?

15   A.  Yes, it is.

16             MR. ESPARZA:  Pass the witness, Your Honor.

17                        CROSS-EXAMINATION

18   BY MR. MCHUGH:

19   Q.  Mr. Vigil, good morning.

20   A.  Good morning.

21   Q.  You and I know one another?

22   A.  Yes, we do.

23   Q.  We have worked together, have we not?

24   A.  Yes, we have.

25   Q.  And on this case, you and I have yet to visit, talk or

1    discuss it, is that correct?

2    A.  Correct.

3    Q.  So you are retired now, when did you retire?

4    A.  I retired last year I believe the end of August.  You're

5    talking about from FBI?  Yes.

6    Q.  And the work that you performed on this case, was it in

7    your retirement or while you were still employed?

8    A.  While I was still employed.

9    Q.  And you were a -- you did 25 or roughly 26 years with the

10   IRS?

11   A.  Correct.

12   Q.  All here in San Antonio?

13   A.  No.

14   Q.  Where else?

15   A.  I started in Atlanta, Georgia.  I worked there for a number

16   of years.  I went to Puerto Rico, I worked there for two years.

17   And then I moved here and have been here since then.

18   Q.  And are you a CPA?

19   A.  I'm not.

20   Q.  In regard to your assignment as a contract employee at the

21   FBI, what were your duties, what were your responsibilities,

22   what were you asked to do?

23   A.  My duties were to assist the agents in their cases, to

24   identify assets for seizure and forfeiture and that naturally

25   included the examination of financial asset records to trace

1    the funds from an illegal activity to the purchase of assets.

2    Q.  And when you were with CID and IRS, you carried a gun, did

3    you not?

4    A.  I did, sometimes.

5    Q.  As a contract analyst, are you on the street, do you carry

6    a gun or are you more reactive?

7    A.  No, it's not a law enforcement.  It's purely a support

8    position for the agents, so I did not have -- I didn't carry a

9    gun or nor could I.

10   Q.  In regard to the Universal K-9/Bradley Croft case, when did

11   you first become involved in that?

12   A.  I don't recall.

13   Q.  Prior to your retirement, do you believe you were with the

14   case for several years, one year?  Were you with the case

15   before the Search Warrant, for instance?

16   A.  Yes, yes.  Well, I've been involved in the case pretty much

17   since the beginning.

18   Q.  When is the beginning?

19   A.  I don't know.  I haven't a date or time, I don't know.

20          THE COURT:  You don't remember.

21          THE WITNESS:  I don't remember.

22   BY MR. MCHUGH:

23   Q.  Fair enough.  Did you work with an IRS agent in this case?

24   A.  Yes.

25   Q.  And would that be Sean Scott?

Joe Vigil - Examination                    54

1    A.   Yes.

2    Q.   Were your functions and duties responsive to him or to all

3    the investigators in the case?

4    A.   Mostly responsive to FBI.  I certainly -- at some point

5    there may have been discussions that would have involved Agent

6    Scott and so I would have done whatever I needed to related to

7    that.

8    Q.   And who were the agents assigned -- who are the FBI agents

9    working under the --

10   A.   There's a Task Force officer Sharleigh Drake who works at

11   FBI and she was assigned the case and so she was the person

12   that I worked with at FBI.

13   Q.   And would she give assignments to you?

14   A.   Yes.

15   Q.   Would you give assignments to her?

16   A.   No.

17   Q.   In regard to the records that you reviewed, it's your

18   testimony you were present during the execution of the Search

19   Warrant?

20   A.   Yes.

21   Q.   And did you participate in the drafting of that Search

22   Warrant?

23   A.   I don't believe I did.

24   Q.   Do you know who the affiant was on that Search Warrant?

25   A.   I'm not sure, no.

1   Q.   In regard to the Search Warrant, you were present out there
2   on the morning of the search, were you not?
3   A.   Yes, I was.
4   Q.   And in regard to that, what was your role, what was your
5   responsibility out there?
6   A.   I don't think I had a specific responsibility.
7   Q.   What were you doing out there?
8   A.   I was just there to -- I knew a lot about the case and so
9   as the -- there are many agents who were involved in the search
10  and so if there were any questions came up about some items, I
11  could say whether or not that's something we ought to seize or
12  not and so I was kind of there sort of for that purpose.
13  Q.   Did you read the Warrant, the Affidavit which included the
14  scope of the search before you went out?
15  A.   Yes, I did.
16  Q.   And would you and the other agents meet and discuss the
17  scope of the Warrant?
18  A.   I don't recall doing that.
19  Q.   Did you have a pre-op meeting?
20  A.   Yes.
21  Q.   What is a pre-op meeting?
22  A.   A pre-op meeting is basically where you meet with the case
23  agents that will generally make a presentation to everybody who
24  is going to be participating in the Warrant to let them know
25  this is what we're going to do, you know, some logistics about

1   how it's going to be done.  And that's pretty much it.
2   Q.  And one of the reasons for that is officer safety?
3   A.  Yes, it is.
4   Q.  Another reason for that is so you know what you have the
5   authority to seize and what you don't have the authority to
6   seize?
7   A.  Correct.
8   Q.  And so when you're at this pre-op meeting, do you sign
9   anything, acknowledging that you have read and know what the
10  scope of the Warrant is?
11  A.  I don't recall signing anything.
12  Q.  Do you recall reading it?
13  A.  Reading the Warrant?
14  Q.  Reading the Warrant.
15  A.  Yes.  I may have read it before the briefing.
16  Q.  And are you able to say today in regard to that Warrant who
17  the sources of information were for that Warrant?
18  A.  Well, I guess the sources of information, financial -- I'm
19  trying to think whether or not it would have included financial
20  records, I'm sure.  I'm sure it would have been some witness
21  interviews.
22  Q.  Do you know whether or not you participated in any of those
23  witness interviews?
24  A.  I don't think I did.
25  Q.  And do you know a Bebe Glasgow?

1   A.  A what now?

2   Q.  Bebe Glasgow.  Do you know her?

3   A.  No.

4   Q.  Do you know whether or not she was mentioned in the Warrant

5   as a source?

6   A.  I don't recall.  I was there up until the Search Warrant

7   and I don't remember that name, so I wouldn't -- source or not,

8   I don't know.

9   Q.  Do you remember seeing a name, Bebe, in the Affidavit?

10  A.  No.

11  Q.  Do you recall there being a statement in the Affidavit

12  where it said that the source of the -- one of the sources of

13  the information was an employee at TVC, Texas Veterans

14  Commission.  Do you remember that?

15  A.  I don't, but that wouldn't surprise me.

16  Q.  Do you recall whether or not there was a statement in the

17  Affidavit that gave attribution to a TVC source?

18  A.  I don't recall.

19          MR. ESPARZA:  I object, Your Honor, it's been asked

20  and answered three different times, three different ways.  He

21  doesn't remember.

22          THE COURT:  I agree.  Let's move on, counsel.

23  BY MR. MCHUGH:

24  Q.  Do you know whether or not there was a statement in the

25  Affidavit that said that Bradley Croft was receiving a lot of

1  money, a suspiciously large amount of money through the V.A.?

2  A.  I don't recall seeing that in the Affidavit, but I mean

3  that's what the case was about, so it probably was in there.

4  Q.  And when is the last time you looked at that Affidavit?

5  A.  A year or -- well, whenever I was working there.

6  Q.  In regard to these bank accounts that we have gone through,

7  you were talking about a Bank of America account, Universal K-9

8  ending in 8171, is that correct?

9  A.  Yes.

10  Q.  And where was that account opened?

11  A.  I don't recall.

12  Q.  Was it in Texas or was it in Virginia?

13  A.  I don't recall.  I mean I think the opening documents would

14  probably say that, I just don't recall.

15          MR. MCHUGH:  Do we have the signature card?

16          MR. SUROVIC:  Government 16b.

17          MR. MCHUGH:  16b please.

18  BY MR. MCHUGH:

19  Q.  And if you scroll down, whose name do you see on the bottom

20  of this document?

21  A.  Richard J. Cook.

22  Q.  And what is this document?

23  A.  This is like I guess what's called signature card when you

24  open up an account.

25  Q.  Do you see any other names contained on this?

```
 1   A.  No.
 2           MR. MCHUGH:  Would 16a identify the account?  Let's go
 3   to 16a.
 4   BY MR. MCHUGH:
 5   Q.  Do you have 16a before you?
 6   A.  Yes, I do.
 7   Q.  Do you see a location of the bank?
 8   A.  This is a different account.
 9   Q.  Yes.  Exhibit Number 10.  Let's go to 10.  10 is a Bank of
10   America account ending in 8171, correct?
11   A.  Yes, I guess.
12   Q.  And so the next page on Exhibit 10?
13           MR. ESPARZA:  It's a disk.
14   A.  You want to know the name on the account?
15   Q.  Yes.
16   A.  Universal K-9.
17   Q.  Do you know where the bank was located?
18   A.  Well, there's branches all over.  It wouldn't surprise --
19   factually I can't tell you.  Probably Virginia, but I don't
20   know for sure.
21   Q.  It is your belief and your understanding that the account
22   was opened in Virginia?
23   A.  I believe so.
24   Q.  And it was opened by a Richard Cook?
25   A.  Correct.
```

1          MR. ESPARZA:  We'll stipulate that the bank account

2   was in Virginia and opened with -- the government will

3   stipulate that the bank account was opened in Virginia by a

4   Richard Cook.

5          THE COURT:  Yes.  The Court will accept that

6   stipulation.

7   BY MR. MCHUGH:

8   Q.  In regard to this account, the government has stipulated

9   that it was opened by a Richard Cook, that's account 8171,

10  somewhere in Virginia.

11         Have you met Richard Cook?

12  A.  I have not.

13  Q.  You have never interviewed Richard Cook?

14  A.  Correct.

15  Q.  Have you read the memorandums of interview of Richard Cook?

16  A.  I think that I have read some version, maybe in draft form,

17  I don't recall if I actually read a final interview.

18  Q.  Fair enough.  And in regard to this particular account, is

19  this the account that you have identified that initially

20  received the money from the V.A.?

21  A.  Correct.

22  Q.  And you said it would receive those monies and other

23  monies, correct?

24  A.  Yes.

25  Q.  And the other monies you said -- I believe it was your

1  testimony were from charitable sources?

2  A.  Correct.

3  Q.  Have you done an analysis, since this account receives

4  money from those two sources, any other sources?

5  A.  Well, yes, because if those two sources account for

6  97 percent of the deposits, the other three deposits is just a

7  variety of things.  I would have examined those and spread

8  those out on the spreadsheet, so they're there, but I couldn't

9  tell you right now what they are.

10  Q.  And it's 97 percent in numbers of transactions or in dollar

11  amount?

12  A.  In dollar amount.

13  Q.  In dollar amount.  And what is the dollar amount -- what is

14  the life of this account because this account, did it change to

15  another account?

16  A.  Yes, it was closed and then went to the Wells Fargo

17  account.

18  Q.  And then it became the Wells Fargo account?

19  A.  Yes.

20  Q.  Do you know during what time period this account was opened

21  and Mr. Cook had it opened?

22  A.  I'm not sure, but if you looked at that opening document,

23  that would show, but my analysis for most of this is from

24  January 1st of 2016 until I believe April 30th of 2018.

25  Q.  And roughly approximately when was the first V.A. check

1  wire deposited into this account?

2  A.  I think it's around September of 2016.

3  Q.  And so you went back to the beginning, the actionable

4  information or relevant information really starts later in

5  2016?

6  A.  On the V.A. part of it, yes.

7  Q.  On the V.A. part of it.  And in charitable sources, this

8  account, the life of this account is how long?

9  A.  Well, since my analysis began January, I'm thinking that

10  the account was open before January 2016, but probably not much

11  before.  Probably when Mr. Croft was initially trying to get

12  this going off the ground, so it would have been sometime

13  before that until at least April 30, 2018.

14  Q.  April 30, 2018.

15  A.  Well, it was open up until the Search Warrant.

16  Q.  That's right.  But the deposits from the V.A. were then

17  directed to another account?

18  A.  Right.  After the Bank of America account was closed and

19  switched to Wells Fargo, then the deposits started going to the

20  Wells Fargo account.

21  Q.  And the gross deposits going into the Bank of America

22  account ending in 8171, how much V.A. money went into that

23  account?

24  A.  I'd have to refresh my memory by looking at something.

25  Could I take a minute?

Joe Vigil - Examination                              63

1    Q.  Please.

2        *(Pause.)*

3    A.  What was the question again?  On which account?

4    Q.  The 8171 account, the initial V.A. account?

5    A.  $972,919.56.

6    Q.  And from charitable sources, how much money?

7    A.  To that account, $256,847.89.

8    Q.  Is that from one charitable source or many charitable

9    sources?

10   A.  From many -- well, I don't know about many, probably just a

11   few, but more than one.

12   Q.  And you did the numbers on the monies flowing through these

13   accounts for the forfeiture, did you not?

14   A.  Yes.

15   Q.  And so do you distinguish in your forfeiture the charitable

16   money from the V.A. money?

17   A.  No.

18   Q.  Do you have any information that the charitable money

19   was -- since you're adding it together with the V.A. money,

20   what your theory is on forfeiture of those funds?

21   A.  I think the theory is that all of it is illegal proceeds,

22   both the V.A. and the donations.

23   Q.  Well, you put it together, but you haven't interviewed

24   anybody, correct?

25   A.  Correct.

1   Q.  Now, in regard to the signature card, as your testimony has

2   been, is Richard Cook and Richard Cook alone, is that correct?

3   A.  Yes.

4   Q.  And it's your understanding that a Richard Cook is the

5   person who opened that account?

6   A.  Correct.

7   Q.  And it's your understanding that the Richard Cook lives in

8   the State of Virginia?

9   A.  Yes.

10  Q.  And it's your information that Richard Cook had a

11  relationship with Universal K-9 and Bradley Croft?

12  A.  Yes.

13  Q.  Do you know whether or not Richard Cook had a title on any

14  paperwork that you have reviewed as it relates to Universal

15  K-9?

16  A.  I'm sure he did and I think maybe he had maybe more than,

17  you know, conflicting documents might have one title in one and

18  different on the other, but I don't recall which those are.

19  Q.  And do you know that Richard Cook's name was on the

20  application, the final application that was approved with the

21  V.A.?

22  A.  I didn't really get very much into that part of it.

23  Q.  You didn't get into that part?

24  A.  No.

25  Q.  And in regard to Bank of America account 3782, opened by

1  Richard Cook, you offered testimony on that, did you not?
2  A.  Yes.
3  Q.  And what is your understanding is the purpose of the role
4  of the Bank of America account 3782 opened by Richard Cook?
5  A.  I'm sure initially it was just -- I'm trying to recall
6  whether or not this account was opened during this time frame.
7  If it was opened before, then naturally it would have been just
8  a regular checking account and then it served the purpose of
9  laundering the money eventually for the --
10  Q.  That's a conclusion on your part.  It served a role of
11  what?
12      Money that goes into account number 8171 is then withdrawn
13  by Richard Cook, that is your testimony, and is deposited into
14  Richard Cook account Bank of America 3782, correct?
15  A.  Yes.
16  Q.  And what is a currency transaction report?
17  A.  Currency transaction report is a report filed by a
18  financial institution to report when a cash transaction of over
19  $10,000 occurs in an account whether it's a withdrawal or
20  deposit.
21  Q.  What is a suspicious activity report?
22  A.  Suspicious activity report would be a report filed by the
23  bank to report what they consider suspicious activity by a
24  customer.
25  Q.  In your research, did you inquire, did you investigate

1    whether or not there were currency transaction reports filed in

2    regard to these transactions?

3    A.   Yes.

4    Q.   And what is the answer?

5    A.   That if there were CTRs?  There were CRTs filed.  You mean

6    on behalf of some of these transactions?

7    Q.   Yes.

8    A.   Yes.

9    Q.   Were there CTRs filed on behalf of all these transactions?

10   A.   No.  There were for the ones that were over $10,000 which

11   is when they had to file them.

12   Q.   We have Government Exhibit Number 19 and I'll just go

13   through a couple of these and you offered testimony regarding

14   the initial withdrawals on May 8th of 2017 in increment amounts

15   of $9,000.  Do you see that?

16   A.   This is the May 24th --

17   Q.   No, no, this is on page nine.  On page nine of Exhibit 19.

18   A.   Yes.

19   Q.   And so there are three withdrawals at $9,000 from a Bank of

20   America account by a Richard Cook, is this correct?

21   A.   I'm sorry.  What date?

22   Q.   May 8, 2017.

23   A.   Yes, and there's three withdrawals, but the withdrawals are

24   from the Universal K-9 account.  Is that your question?

25   Q.   Yes.

1  A.  Yes.

2  Q.  So this is either charitable money coming out or

3  Universal -- or V.A. money coming out, correct?

4  A.  Well, I don't really differentiate.  It's just money from

5  that account.

6  Q.  But the source of the money into that account is from V.A.

7  money, charitable sources and another 3 percent?

8  A.  Yes.

9  Q.  And in regard to this transaction, these transactions on

10  May 8, 2017, are you able to say whether or not those

11  withdrawals were made on the same visit on that day or did

12  Mr. Cook leave the bank, return to the bank and do it again?

13  Did your investigation take you there?

14  A.  If you just give me a minute to look at something?

15  Q.  I'll give you two.

16  A.  Two minutes.

17     (Pause.)

18     On those particular ones, I don't know.

19  Q.  Is that relevant to you?

20  A.  No, not particularly.

21  Q.  Would it be relevant to a bank?

22  A.  If a bank, well, they're supposed to have systems set up to

23  capture whether or not somebody is withdrawing $9,000 here,

24  here on the same day and then accumulated is over $10,000,

25  they're supposed to have a system to be able to report those

1    transactions as one transaction.

2    Q.  And this is withdrawals from a bank in Virginia, correct?

3    A.  Correct.

4    Q.  As part of your investigation, did you determine whether or

5    not there was a currency transaction filed on these

6    transactions on or about May 8th of 2017?

7    A.  I do not recall that there was one filed for that.  Like I

8    said, my recollection is that there were CTRs for the ones that

9    we have over $10,000 and not a CTR filed where it shows like

10   under 9,000 like this.

11   Q.  And in regard to that transaction, because on the same day

12   you see deposits going into the Richard Cook BOA account 3782,

13   would this be at the same bank?

14   A.  Yes, could be a -- obviously a different branch, could be

15   different branch, but the same bank.

16   Q.  Why is it obviously a different branch?

17   A.  Well, you can see that on the deposits to the Richard Cook

18   account I noted the location of the branch where deposit was

19   made.

20   Q.  So pursuant to your investigation and your analysis of

21   these records, Richard Cook is going into one bank and

22   withdrawing money and going somewhere else in that city and

23   depositing these same funds?

24   A.  That's correct.

25   Q.  Did you check to see the deposit of those funds, did you

1    check to see whether or not there's a currency transaction

2    filed for the deposit?

3    A.   If it was over $10,000, then there was.

4    Q.   No, if it's over $10,000, it's triggered.  The question is

5    was a currency transaction report filed by Richard Cook in

6    regard to the deposit of $9,000, $8,615, $5,000, and $3,950 all

7    on the same date at Bank of America, account number 3782?

8    A.   There was not a CTR filed for those combined deposits.

9    Q.   And are CTRs -- are they triggered with a deposit or

10   withdrawal?

11   A.   Either.

12   Q.   And this transaction, you see no evidence that there's a

13   currency transaction report filed with the withdrawal nor do

14   you see one filed with the deposits?

15   A.   Correct.

16   Q.   Have you gone to check, to interview those persons within

17   the bank to see whether or not there was a suspicious activity

18   report filed in regard to this?

19   A.   I did not talk to any of the bank officials about that.

20   Q.   And that information surely hasn't come to you in your

21   investigation?

22   A.   You mean as an SAR?

23   Q.   You're not aware of any suspicious activity report?

24   A.   Yes, I am.

25   Q.   In regard to this transaction?

1   A.   I don't recall.  I don't recall if this specifically, but

2   possibly.

3   Q.   We're not here for possibly.

4   A.   I can't tell you unless I had it to look at, but I do know

5   that there were SARs filed as part of this investigation.

6   Q.   And in regard to just as you go down, the date we just

7   addressed was May 8th.  The very following day, May 9th, again

8   there are two withdrawals at $9,000 each and almost a

9   simultaneous deposit in the other Bank of America account and

10  branch on that same date.  Do you see that?

11  A.   Yes.

12  Q.   And I see there is less $200, would that be a bank charge

13  or where would that $200 -- how would that be accounted for?

14  A.   I don't know.  For whatever reason he chose to deposit

15  8,800 instead of 9,000.

16  Q.   Let us go to page ten of Exhibit 19, for example.  And if

17  you look at withdrawals made on August 8th, 11th, 14th, 15th,

18  28th and 29th totaling approximately $50,000, do you see that?

19  A.   Yes.

20  Q.   Do you see the corresponding deposit of those monies by

21  Richard Cook into the Union Bank and Trust account 8205?

22  A.   I see one corresponding deposit of 9,000 that makes sense

23  that it would have come from those funds.

24  Q.   So 50 comes out, nine you can account for.  Where did the

25  other ball park roughly $40,000 go?

1    A.  Well, let's see.  There's also a -- no, that's a cashier's

2    check.

3         If you see on some subsequent dates on September 1st, you

4    see on the other cash column, that $9,000, part of that could

5    have come from that as well as one on September 20th, but we

6    don't really know because once you pull out the cash, the

7    longer time goes by the less likely you can say that it came

8    from that or not.

9    Q.  And so when you did your analysis and because of your

10   background as a financial analyst working in assisting the FBI

11   and when you're a CID agent for IRS, what is a -- let me start

12   off with this.  What is a balance sheet?

13   A.  A balance sheet is a statement that shows the accounts, I

14   guess assets and liabilities for an individual business.

15   Q.  And a balance sheet should add up and be equal, should it

16   not?

17   A.  Yes.

18   Q.  The difference being owner's equity, I take it?

19   A.  Correct.

20   Q.  Now, in regard to your analysis here, was your assignment,

21   were you just -- was your assignment hey, tell us what you see

22   or were you given a specific assignment as to what to look at

23   and what not to look at?

24   A.  I didn't have a specific assignment.  I just know that in a

25   case like this, you look to see what happened to the money.

1   Q.  You turn over rocks, do you not?

2   A.  Correct.

3   Q.  And let's talk about the rocks.

4           THE COURT:  Let's not talk about the rocks because

5   it's lunchtime.  You can talk about the rocks after lunch.

6           MR. MCHUGH:  Is that a promise, Your Honor?

7           THE COURT:  It's a promise.  We'll stand in recess

8   until 1:30.

9           *(11:59 a.m.)*

10                              *   *   *

11          *(1:35 p.m.)*

12          COURT SECURITY OFFICER:  All rise.

13          THE COURT:  Please be seated.  The Court would note

14  the presence of counsel and the parties.  Mr. McHugh, I

15  promised you you could resume where you left off, so you should

16  do so immediately.

17          MR. MCHUGH:  Turning over a couple of rocks, thank

18  you, Your Honor.

19  BY MR. MCHUGH:

20  Q.  Mr. Vigil, did you do a tracing of all funds into the

21  Universal K-9 account and where all that money went?

22  A.  As best as I could.

23  Q.  And you were able to show a lot of the money going into

24  Cook's account, correct?

25  A.  Yes.

1   Q.  And then out of Cook's account where all that money goes,

2   you do not know?

3   A.  Not all of it.

4   Q.  Not all of it, but some of it, correct?

5   A.  Yes.

6   Q.  In regard to Government Exhibit 19, page 10, I think we're

7   cued up to the 8/8 through 8/29, these withdrawals by Cook

8   through the BOA account 8171, did you trace where these funds

9   went?

10  A.  I traced some of it based on this and once the -- once cash

11  is withdrawn, unless you have a connection about where that

12  cash is going to, it's difficult to tell.

13  Q.  Exactly, so what you know about this transaction is there's

14  one, two, three, four, five, six withdrawals over a period of

15  maybe two weeks.  What you see going into the Cook account is

16  9,000, but the rest, the 9,000, 9,000, 9,000, 5,000, 3,500 and

17  9,000, you can't say where they went, where that money went?

18  A.  That's correct.

19  Q.  You cannot say that it went to Universal K-9?

20  A.  Correct.

21  Q.  You cannot say that it did not go to Richard Cook?

22  A.  Correct.

23  Q.  In regard to all the cashier's checks and everything, were

24  all the cashier's checks purchased with cash and the remitter

25  being Richard Cook, with the exception of Anthony Ward, I

1  think?

2  A.  Well, they were purchased with cash and funds from the

3  Union account, yes.

4  Q.  And whether or not there was any leakage of money on Cook

5  withdrawals to Cook personally, you're unable to say yes or no?

6  A.  Correct.

7  Q.  And you're unable to say amounts also?

8  A.  That's correct.

9  Q.  Sir, referring you to Government Exhibit 19, page 12, and

10  you put together this spreadsheet, did you not?

11  A.  Yes.

12  Q.  And this spreadsheet you were able to put together with

13  records that you received in this case and in this

14  investigation, correct?

15  A.  Correct.

16  Q.  And those records were received through Grand Jury

17  Subpoena?

18  A.  Yes.

19  Q.  They were received through -- any of them received through

20  consent?

21  A.  Correct.

22  Q.  Which ones were received through consent?

23  A.  I think there might have been something on the jet skis,

24  one or two of the jet skis --

25  Q.  I'm referring to bank accounts.

1   A.  Bank accounts, none of them with consent I believe.  I'm

2   sure those must have been subpoenaed.  The bank records?

3   Q.  They've all been subpoenaed.  Do you know whether or not

4   when the agents went out and visited Mr. Cook in Virginia --

5   you weren't present at that time, were you?

6   A.  Correct.

7   Q.  Do you know whether or not they asked him to identify all

8   bank accounts?

9   A.  I don't know.

10  Q.  Have you read a report where he identified all bank

11  accounts?

12  A.  Like I said, I may have read a report.  I don't have any

13  specific recollection about reading that part.

14  Q.  Did you independently attempt to determine bank accounts

15  related to Bradley Croft, Universal K-9 and Richard Cook

16  individually or collectively?

17  A.  Well, it would have been through the Subpoenas, yes.

18  Q.  It would have been through the Subpoenas, but how would you

19  identify the bank accounts?  What do you do as an investigator?

20  A.  I guess if you already know of an existing account, the

21  Subpoena would basically say any and all records relating to

22  accounts in the name of -- and there would have been Universal

23  K-9 in its various forms, there would have been Brad Croft,

24  there would have been Richard Cook.  And if we had a specific

25  account already that we were aware of, that would have been

1  specifically listed on there and that would be how you find out

2  other records.

3  Q.  Did you do a search of accounts in Virginia as it relates

4  to Richard Cook or did you rely upon the procedure that he

5  provided to you?

6  A.  Well, the Subpoenas were done -- the Subpoenas were issued

7  even before he was interviewed and so like, for instance, the

8  Subpoena for Bank of America, that included anywhere there

9  would have been a Bank of America account and in this

10  particular case, one was opened in Virginia.

11  Q.  Of course, that account was identified because that is the

12  account where the V.A. money was wired transferred into,

13  correct?

14  A.  One of the them, yes.

15  Q.  One of them.  And then after that was closed, then it went

16  into a Wells Fargo account?

17  A.  Correct.

18  Q.  But in regard to -- you have that information that you

19  learned through your investigation, but what did you do

20  independently to attempt to learn what other accounts may be,

21  say, related to Richard Cook?

22  A.  I personally didn't do anything other than follow up leads

23  from the accounts.

24  Q.  So is it true that today that you can't testify that these

25  accounts that you have identified as belonging or related to

1   Richard Cook are the only accounts that relate to him, there
2   may be other accounts?
3   A.  Oh, well, the ones that are on here are not the only
4   accounts that we got records for.
5   Q.  The question is what effort did you make to identify all
6   accounts as they may be related to Richard Cook?
7   A.  We issued Subpoenas and identified accounts from other
8   records that we knew of and then obtained those records through
9   Subpoena.  So for instance, with Bank of America, we do have
10  some Bank of America records that account for Richard Cook.
11  For Wells Fargo, I don't recall there is.
12  Q.  As an investigator, what do you do to -- you say through
13  Subpoenas.  Who do you Subpoena?  What is the source that you
14  Subpoena, a person's credit record, for instance?  How do you
15  identify accounts related to a person?
16  A.  It could be through credit records, it could be through
17  CTRs, it could also be from witnesses, but I don't recall that
18  we had witness testimony that identified accounts that we
19  didn't already know about.
20  Q.  So is it an accurate statement that you cannot say today as
21  you sit there testifying that you have all the records of all
22  Richard Cook accounts?
23  A.  Yes, absolutely, that's correct.
24  Q.  All the cashier's checks that you referred to in your
25  direct examination, the remitter on those were Richard Cook,

 1   were they not?

 2   A.  Yes, they were.

 3   Q.  In regard to Government Exhibit 18, I refer you to the

 4   indictment.  You may be able to, for the record, to help.  The

 5   indictment which is Government Exhibit 18, the indictment on

 6   page 10 refers to an amount of money, count number 14 of

 7   319,000 plus dollars.  Where did that figure come from?

 8       *(Pause.)*

 9   A.  I'm waiting for it to come up.  I'm not sure --

10   Q.  Well, the indictment is not going to come up.  In regard to

11   as you scroll through Exhibit 18, do you see a number, 319,000?

12   In other words, I'm asking your source in your investigation --

13   A.  Oh, yes, oh, yes.  That's the total for 15329 Tradesman

14   column.

15   Q.  And so where did the number $319,496.17 come from?

16   A.  Well, I don't know what the exhibit number is, but on that

17   summary chart, that's payments relating to 15329 Tradesman.

18   Q.  And so what figures go into that to be able to make that

19   representation?

20   A.  The $2,500, 296,996.17 and the $20,000.

21   Q.  So the settlement statement, pages 18, numbers one and two.

22   Do you see that dollar figure there?

23   A.  At the very bottom there should be 296.  Yeah, on the

24   right, I guess at the top of the second page, balance due from

25   buyer, that is the 296,996.17.  And then the $2,500 is the

1    payment made on the 22nd from that same Wells Fargo account to

2    Dominick Alongi and then the $20,000 is also a payment, a

3    cashier's check to Dominick Alongi from the Wells Fargo

4    account.

5              MR. MCHUGH:  If I may have one moment, Your Honor?

6              THE COURT:  Sure.

7              (Pause.)

8    BY MR. MCHUGH:

9    Q.  In reference to Government Exhibit 19, page 12, you have a

10   number of vehicles on the top going across, do you see that?

11   A.  Yes.

12   Q.  You have a 2018 Ford F-150, a 2017 Dodge Ram, you have an

13   Outback and you have other vehicles including jet skis and

14   property that are identified there.  Do you see that?

15   A.  Yes.

16   Q.  And how did you arrive or select this combination or this

17   assortment of assets?

18   A.  Well, just in the investigation going through the accounts

19   when they're spread you can see where the payments are going

20   and then you follow up and this is what came out.

21   Q.  Well, what about the truck that Richard Cook is driving

22   today, why isn't that on here?

23   A.  I don't recall whether it was the timeframe, if you have

24   something that has some dates for that --

25   Q.  You don't see a Richard Cook truck here, do you not?

Joe Vigil - Examination                     80

1    A.   Correct.

2    Q.   Do you know how Richard Cook was able to pay for his truck,

3    do you recall those payments and he doing cash withdrawals?

4    A.   I recall there being a couple of trucks that belonged to

5    Richard Cook.  I don't recall whether or not we had payment

6    from these accounts to Richard Cook --

7    Q.   Let's say this, let's say there are accounts, there are

8    payments from these accounts for the purchase of that

9    automobile.  What is your explanation for not including that

10   today?

11   A.   The first thing that comes to mind is that perhaps it

12   doesn't meet the threshold criteria for value when you take

13   into account what is owed.  Sometimes we don't -- an asset is

14   not seized if it doesn't meet a particular threshold as been

15   already established by the forfeiture section.

16   Q.   But if it's well within the range of the threshold of these

17   other automobiles, why is it not included on your list?

18   A.   I don't know.

19   Q.   These other automobiles, have they been seized by the

20   government?

21   A.   These automobiles?

22   Q.   Yes.

23   A.   What's happened to them?

24   Q.   Yes.

25   A.   I don't know.

1   Q.  Did your analysis show how much money went for the benefit

2   of Cook and not Universal K-9?

3   A.  I don't recall.  I'm trying to even remember if he even had

4   a salary, if he had anything.  I remember trying to look at his

5   accounts trying to see what money went in there, whether it was

6   checks from Universal K-9 or cash and there was not significant

7   cash being deposited and there was not anything significant

8   that I could tell that came from Universal K-9 other than if he

9   received a regular paycheck.  I don't even remember if he got

10  that, so I did do some tracing of that, but it was -- in the

11  end, it turned out to be not all that significant.

12  Q.  Because when money is removed from an account in cash and

13  you don't see where it's deposited, it could be in Bradley

14  Croft's pocket, could it not?  It could be in Richard Cook's

15  pocket, could it not?

16  A.  Yes.

17  Q.  And how much money in your analysis, how much money is just

18  not -- how much money is unaccounted for?

19  A.  Cash withdrawals from Universal K-9, there's probably two,

20  $300,000 that we don't know specifically where it went.

21  Q.  There is two or $300,000 which is in the wind, correct?

22  A.  Well, that we couldn't account for.

23  Q.  That you could not account for?

24  A.  Yes.

25  Q.  And when you say you could not account for it, you're

1    unable to make a representation that it did not go to Richard
2    Cook, you're not able to say that?
3    A.   Correct.
4    Q.   And who is the one person who withdrew those funds?
5    A.   Richard Cook.
6    Q.   As part of your analysis, did you do an accounting
7    regarding the records of Universal K-9?
8    A.   Just bank records.
9    Q.   Did you see how Universal K-9 was spending money on
10   Universal K-9?
11   A.   Just from the bank records.
12   Q.   And what did you learn, what did you see?
13   A.   I just saw a few items that seemed to be like the training
14   boxes, the units that Mr. Croft used to keep the dogs when
15   they're not being trained, I guess, some of that.  Other than
16   these, other than the assets here, those are the only large
17   items that I could think of or that I remember.
18   Q.   You were there on the morning of the Search Warrant, were
19   you not?
20   A.   Yes.
21   Q.   And there were dogs on the premises, were there not?
22   A.   Yes.
23   Q.   Do you recall how many dogs?
24   A.   I don't recall.
25   Q.   Would you dispute that there were 26 dogs that were seized?

1    A.   I would not.

2    Q.   Do dogs require dog food?

3    A.   Yes, absolutely.

4    Q.   Have you been able to trace the overhead expenses of

5    Universal K-9?

6    A.   No.

7    Q.   Did you ever attempt to?

8    A.   No.

9         MR. MCHUGH:  No further questions.

10        MR. ESPARZA:  Just a couple questions, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MR. ESPARZA:

13   Q.   Mr. Vigil, what's the title of that summary?

14   A.   It is Payments For Assets Benefiting Bradley Croft.

15   Q.   So this summary, you were only reviewing records regarding

16   assets that were for the benefit of Mr. Croft, correct?

17   A.   Correct.

18   Q.   You weren't reviewing anything that was going to benefit

19   Mr. Cook, correct?

20   A.   I mean I did try to do some.

21   Q.   But not for this chart?

22   A.   Right.

23        MR. ESPARZA:  And then let's go to 19, page eleven,

24   and scroll all the way to the bottom.

25   BY MR. ESPARZA:

Joe Vigil - Examination                    84

1  Q.  Now, at the bottom we have the totals.  On the far left
2  total, what's that amount?
3  A.  That is total withdrawals during this time period from the
4  Universal K-9 account.
5  Q.  And what's the amount?
6  A.  $317,200.
7  Q.  And then the amount next to it?
8  A.  That would be the total amount of deposits that went into
9  the Union Bank account for Richard Cook.
10  Q.  And what's that amount?
11  A.  $204,557.
12  Q.  And then what's the amount next to it?
13  A.  The amount is withdrawals from the Union account.
14  Q.  And what's that amount?
15  A.  $187,162.39.
16  Q.  And the last number there, the 23,000, what's that?
17  A.  And these would all be cash deposits and cash withdrawals.
18  And I'm sorry?
19  Q.  The last number on the same row.
20  A.  That is other cash that was used in addition to the money
21  withdrawn from the Union account to purchase the cashier's
22  checks that went to Alliant.
23  Q.  So out of the $204,000 that was deposited, are you saying
24  that 187,000 and some change was withdrawn?
25  A.  Correct.

1  Q.  And then additionally there's 23 almost 24,000 that was

2  straight cash not necessarily associated with the withdrawals

3  or deposits?

4  A.  That's correct.

5          MR. ESPARZA:  No further questions, Your Honor.

6                      RECROSS-EXAMINATION

7  BY MR. MCHUGH:

8  Q.  So going back to that same exhibit Number 19, page eleven

9  at the bottom, you're showing money out of BOA account 8171,

10 317,000, correct?

11 A.  Correct.

12 Q.  And who is making those withdrawals, Richard Cook is making

13 those withdrawals, correct?

14 A.  That's correct.

15 Q.  And then your investigation shows of that over $300,000,

16 $200,000 was deposited into his account, into his Union Bank

17 and Trust account?

18 A.  That's correct.

19 Q.  So there is a gap there of just there of a hundred dollars?

20 A.  Yes.

21          MR. ESPARZA:  No further questions, Your Honor, we'd

22 ask that the witness be permanently excused.

23          THE COURT:  Yes, he can be excused.

24          MR. ESPARZA:  At this time, the United States would

25 call IRS Special Agent Sean Scott.

```
 1          THE COURT:  All right.

 2          COURTROOM DEPUTY CLERK:  Please raise your right hand.

 3                          *   *   *

 4          (SEAN SCOTT, Government Witness, Sworn.)

 5                          *   *   *

 6          THE WITNESS:  I do.

 7          COURTROOM DEPUTY CLERK:  Thank you.  You can have a

 8  seat.

 9                      DIRECT EXAMINATION

10  BY MR. ESPARZA:

11  Q.  Good afternoon, Mr. Scott.  Could you state your name for

12  the record?

13  A.  Sean Scott.

14  Q.  Could you spell your last name for the record please?

15  A.  S-C-O-T-T.

16  Q.  Where are you currently employed?

17  A.  IRS Criminal Investigation.

18  Q.  Is that in the San Antonio Division?

19  A.  I'm actually in the Miami field office now.

20  Q.  Were you in the San Antonio Division at some point?

21  A.  Yes.

22  Q.  When were you within the San Antonio Division?

23  A.  I started with Miami October 1 of this month, so pretty

24  recent.

25  Q.  How long have you been an agent with IRS CI?
```

1    A.   Eleven years.

2    Q.   What kind of training have you had in order to be a special

3    agent with IRS?

4    A.   Just basic special agent training for about three months

5    and then we have an add-on for our agency specific, it's about

6    another three or four months.

7    Q.   And you're not an accountant, correct?

8    A.   No.

9    Q.   Now, with this case specific regarding Mr. Croft, how were

10   you brought on to the case?

11   A.   I received a call from the FBI in roughly May of 2018.

12   They said there was allegations that Mr. Croft was running a

13   dog training school for police officers and veterans and that

14   the documents, the certificate and applications that he

15   submitted with regards to that business, Universal K-9, were --

16   had been fictitiously created and he was able to qualify

17   himself to accept funding from the G.I. Bill from that.  And we

18   were asked to look at if there was any personal benefits from

19   monies that were intended for charitable purposes.

20   Q.   Okay.  And regarding those benefits, what IRS forms did you

21   review regarding Mr. Croft?

22   A.   The form 1040 individual income tax return.

23   Q.   And before we get into them in specific, what is income,

24   the definition of income?

25   A.   Income generally is all income received and that can be in

1    the form of money, property, services or goods.

2    Q.   And then next question, what is the tax year?

3    A.   Tax years that I investigated were tax years 2016 and tax

4    year 2017.

5    Q.   And any filings would be made the year after, correct?

6    A.   Yes, so you would file April 15, 2017 for the 2016 tax

7    return.

8    Q.   Now, let's discuss the tax returns.  Let's bring up

9    Government's Exhibit 20.

10            MR. MCHUGH:  Your Honor, may we approach the bench?

11            THE COURT:  Sure.

12                              *   *   *

13        (Sidebar.)

14            MR. MCHUGH:  We're trying to move things along, but

15   his witness who just finished testifying who was released by

16   Court is in the courtroom and the defendant would object to his

17   presence in the courtroom.

18            THE COURT:  Are you planning on recalling?

19            MR. SUROVIC:  He was permanently excused, so that's

20   why I told him it's okay for him to stay.

21            MR. MCHUGH:  They've got an IRS agent up there right

22   now, a lot of the testimony is going to overlap, if he's gone,

23   he's gone.

24            THE COURT:  I don't see any real reason to excuse him.

25   What is the suggestion, that this guy, this fellow that's on

1    the stand now is going to testify differently because there's

2    an IRS, a former IRS -- he's not even with the IRS anymore.

3                MR. SUROVIC:  He's retired, double retired.

4                THE COURT:  Certainly won't intimidate this fellow.

5                MR. MCHUGH:  We don't want to do that.

6                THE COURT:  Unless he's planning to be recalled, I

7    don't see any reason to excuse him.  He can stay there.

8                *(Sidebar concluded.)*

9                                *  *  *

10   BY MR. ESPARZA:

11   Q.  Let's go to page two.  I'm showing you what's been marked

12   as Exhibit 20 for the government.  Do you recognize it?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is the form 1040 individual income tax return.

16   Q.  And whose individual income tax return is it?

17   A.  Mr. Croft's.

18   Q.  How do you know that?

19   A.  From the top line, Bradley Croft.

20   Q.  Okay.  Now, going through the 1040 just briefly, that top

21   portion, what is that?

22   A.  It's basically personal identifying information, name,

23   address, Social Security number.

24   Q.  Okay.  And moving on to the filing status, what did he file

25   as?

1   A.   Head of household.

2   Q.   And did he list any exemptions?

3   A.   Two.

4   Q.   What were the exemptions?

5   A.   He took an exemption for himself and for his daughter,

6   Cameron.

7   Q.   Now, moving on to the next section, his income, what did he

8   list as his income?

9   A.   Total income he listed as $2,000.

10   Q.   Now, regarding the $2,000, based on your review of all the

11   records and the tax documents, was that a truthful statement?

12   A.   No.

13   Q.   And why isn't it a truthful statement?

14   A.   He received personal benefit in excess of that amount of

15   $2,000, it should have been recognized as income.

16   Q.   Let's go on through this 1040, let's go to page seven.

17   What is page seven?

18   A.   That is a reduction -- it's got a long title, Reduction of

19   Tax Attributes Due To Discharge of Indebtedness.

20   Q.   What is the significance of I believe it's a form 982?

21   A.   Basically you are supposed to report any benefit you

22   receive from a discharge of indebtedness and there's certain --

23   you can be excluded from that in some instances, and if so,

24   that's the form that you would file.

25   Q.   Let's go to the next page.  Now looking at this page, what

1   is a Schedule C?

2   A.   It's a profit and loss from a business, basically a sole

3   proprietorship.

4   Q.   And let's go to the second to last page.  Now, how was this

5   1040 filed?

6   A.   It's electronically filed.

7   Q.   And when it's electronically filed, how is the signature

8   done?

9   A.   You are provided a self-select pin number that is specific

10  to that taxpayer.

11  Q.   And were you able to verify the self-select pin to

12  Mr. Croft?

13  A.   Yes.

14  Q.   Now once that's filed, going back to page five, that

15  self-select pin takes place of the signature in that box,

16  correct?

17  A.   Correct.

18  Q.   And right above the box or the line where it says Your

19  Signature, is that the jurat?

20  A.   Yes.

21  Q.   And can you read that for the Court please?

22  A.   "Under penalties of perjury, I declare that I have examined

23  the return and accompanying schedules and statements and to the

24  best of my knowledge and belief, they are true, correct and

25  complete declaration of preparer under the taxpayer is based on

1  all information which preparer has any knowledge."

2  Q.  So when somebody files online, they enter their self-select

3  pin, by entering that they're agreeing to this statement,

4  correct?

5  A.  Correct.

6  Q.  And going back to the second to last page again.  Now,

7  looking at this information, what service was used to file this

8  1040?

9  A.  Tax Hawk.

10  Q.  And does this indicate that it was self-prepared?

11  A.  Yes.

12  Q.  And what e-mail address was used?

13  A.  It was the info@UniversalK-9Inc.com.

14  Q.  And what is an IP address?

15  A.  It's an Internet protocol address.  It's like a numerical

16  identifier for a device that's on a network that uses that

17  Internet protocol for communication.

18  Q.  Okay.  And just for the record what is the IP address

19  associated with this 1040?

20  A.  12.161.80.114.

21  Q.  Okay.  Finishing up with this tax return, do you know if

22  Mr. Croft received a refund based on this return?

23  A.  He did.

24  Q.  Let's go to Exhibit 39, page two.  What is that?

25  A.  That is the refund check that's issued by the United States

1    Treasury.

2    Q.  And who is it issued to?

3    A.  Bradley Croft.

4    Q.  And are you familiar with the address in question?

5    A.  Yes.

6    Q.  On the check?

7    A.  Yes.

8    Q.  What address is that?

9    A.  It's a mailbox at a UPS Store over on the address that's

10   redacted.

11   Q.  Now, going back earlier, I asked you about the $2,000

12   listed as his income and you stated that that was false.  Was

13   there purchases made during tax year 2016 that you would

14   attribute to that income?

15   A.  They were benefits that were received during that tax

16   period that should have been recognized as income.

17   Q.  I'll point you to Exhibit 19, page 12.  And again for this

18   return we're looking at tax year 2016, correct?

19   A.  Yes.

20   Q.  Now, the 2014 Dodge Ram that's listed up there, were there

21   any payments that were made during tax year 2016?

22   A.  Yes, there was the payoff for the amount of $9,703.42.

23   Q.  And let's pull up Exhibit 10h.  So Exhibit 10h is -- do you

24   recognize it?

25   A.  Yes.

1   Q.   What is it?

2   A.   It's the statement -- it's the withdrawal slip

3   acknowledging the transaction.

4   Q.   Okay.  And then let's put next to it Exhibit 16, page 331.

5   And is that the corresponding cashier's check?

6   A.   Yes.

7   Q.   Who is it made out to?

8   A.   Chrysler Capital.

9   Q.   And the remitter, what's listed?

10  A.   Universal K-9, Inc.

11  Q.   And the total amount, how much was it?

12  A.   $9,703.42.

13  Q.   Why is this considered income?

14  A.   It was a personal benefit that should have been recognized

15  on Mr. Croft's personal tax return.

16  Q.   And let's bring up Exhibit 20, page two.  And where should

17  that have been listed on his 1040, that amount we just saw?

18  A.   If he is reporting a Schedule C, any income and expenses

19  relating to a business would have been picked up on that

20  Schedule C, but if this was just a personal benefit, it would

21  have gone for line 21 on other income.

22  Q.   Going back to Exhibit 19, page 12, the 2016 Dodge Ram, were

23  there any payments that would have affected the 2016 tax year?

24  A.   There were two that were received in that year.

25  Q.   Bring up Exhibit 28, page six.  So when was the vehicle

1  purchased?

2  A.  August 1st, 2016.

3  Q.  And you said there were two payments that would have

4  affected that tax year?

5  A.  Yes.

6  Q.  Pull up Exhibit 16, page 334.  And what's listed on the

7  screen?

8  A.  It's the withdrawal slip for the $10,000, the first

9  transaction.

10  Q.  And then put that next to Exhibit 28, page 16.  Is that the

11  $10,000?

12  A.  Cashier's check, correct.

13  Q.  And same thing.  What is the remitter?

14  A.  Universal K-9, Inc.

15  Q.  And who is it paying to the order of?

16  A.  Ancira.

17  Q.  And the next payment, pull up Exhibit 10g on the left and

18  Exhibit 16, page 339 on the right.

19      This next amount, is that the next payment on the truck?

20  A.  It's the records supporting the second payment.

21  Q.  And on the right, who is the remitter on the cashier's

22  check?

23  A.  Universal K-9, Inc.

24  Q.  And in this case, who is it paid to the order of?

25  A.  Capital One Bank.

Sean Scott - Examination                    96

1   Q.  And again why should this be considered income?

2   A.  It was a personal benefit that he received during that tax

3   year.

4   Q.  And again it would have been listed in the same places as

5   you listed for the prior payment?

6   A.  Correct.

7   Q.  Let's move on to tax year 2017 and bring up Exhibit 21

8   please.  Let's go to page two.  Same thing as last time, what

9   is on the screen?

10  A.  It's his identifying information at the top of the first

11  page of the tax return.

12  Q.  And is this Mr. Croft's 1040?

13  A.  Yes.

14  Q.  Again filing status, what did he file as?

15  A.  Head of household.

16  Q.  And any exemptions?

17  A.  Two exemptions.

18  Q.  What were the two exemptions?

19  A.  For himself and his daughter again, Cameron.

20  Q.  And again under the income section, what did he list?

21  A.  2,000 that was related to the Schedule C and total income

22  of 2,000.

23  Q.  And what is this page?

24  A.  This is the Schedule C, profit or loss from business.

25  Q.  Now, how was this tax return filed?

1   A.   Electronically filed.

2   Q.   Using what service?

3   A.   Tax Hawk.

4   Q.   And again how was it signed?

5   A.   Electronically or self-select online pin.

6   Q.   Would this have been the same pin that was used on the

7   prior?

8   A.   Yes.

9   Q.   And what e-mail address was used to file this?

10  A.   Info@UniversalK-9Inc.com.

11  Q.   And what is the IP address?

12  A.   12.161.80.114.

13  Q.   Now, next to this page let's pull up -- Exhibit 21 is on

14  the left which is the 2017 tax year.  And Exhibit 20 is on the

15  right which is the 2016 tax year.  Do those IP addresses match

16  up?

17  A.   Yes.

18  Q.   Do the e-mail addresses match up?

19  A.   Yes.

20  Q.   Going back to the 1040 for 2017, does this 1040 also have

21  the same jurat as the prior 1040?

22  A.   Yes.

23  Q.   And would the entering of a self-select pin again state

24  that they'd be entering all these under the same penalties?

25  A.   Yes.

Sean Scott - Examination                    98

1    Q.   Was he issued a refund check for this tax return?

2    A.   Yes.

3    Q.   Government's Exhibit 40, page two.   What is that?

4    A.   That's the refund check that's issued by the United States

5    Treasury.

6    Q.   And who is it issued to?

7    A.   Bradley Croft.

8    Q.   And is this for the 2017 tax year?

9    A.   Yes.

10   Q.   Now, when Mr. Croft listed $2,000 as his income on the

11   prior 1040, was that materially false?

12   A.   Yes.

13   Q.   Why?

14   A.   He received personal benefit for items that were purchased

15   in tax year 2017 as well.

16   Q.   Beginning with the first purchase for that tax year, let's

17   look at Exhibit 19, page 12, and scroll down.

18       The 2009 jet ski that is listed there for $7,500, would

19   that have been a purchase made during the tack year?

20   A.   Yes.

21   Q.   Would that have been something that should have been

22   recorded as income?

23   A.   Yes.

24   Q.   Would that be considered a good, for instance?

25   A.   Yes.

Sean Scott - Examination                     99

1   Q.   Next up will be Government's Exhibit 42.   Government's

2   Exhibit 42 is on the screen, do you recognize it?

3   A.   Yes.

4   Q.   What do you recognize it to be?

5   A.   It's payment received for a medical procedure that

6   Mr. Croft received.

7   Q.   Now, this estimate, what date was the estimate made?

8   A.   October 26, 2017.

9   Q.   And would that be within the 2017 tax year?

10  A.   Yes.

11  Q.   Now, towards the bottom for the payment of the penile

12  implant, there's three separate amounts, could you list the

13  first amount for me?

14  A.   First amount is $5,629.

15  Q.   And let's put Exhibit 17g next to that please.

16       Do you see Exhibit 17g?

17  A.   Yes.

18  Q.   What amount is written on the check?

19  A.   $5,629.

20  Q.   Who is it paid to the order of?

21  A.   Paid to the order of UMSA.

22  Q.   Is that the same amount listed on the estimate on the left?

23  A.   Yes.

24  Q.   Is it also to UMSA?

25  A.   Yes.

1  Q.  And it might be a little hard to read, but on Exhibit 17 at

2  the bottom where the check was endorsed, what does that say?

3  A.  Purpose?

4  Q.  Right where it says "endorse", right above the exhibit

5  sticker on the check?

6  A.  Okay.  University of Maryland Surgical Association, P.A.

7  Q.  And move on to the next payment.  Under purpose on the

8  check, what does it say listed for the purpose?

9  A.  Purpose, B. Croft MRN:3000353194.

10 Q.  Going back to Exhibit 42 at the top, at the top where it

11 says patient name, what name is on there?

12 A.  Bradley Lane Croft, 3000353194.

13 Q.  Does that match the same number listed under Purpose on the

14 check?

15 A.  Yes.

16 Q.  Next check, let's pull up 17h.  Here is another check.

17 What's the amount?

18 A.  $16,755.

19 Q.  Who is it paid to the order of?

20 A.  UMMS.

21 Q.  And on Exhibit 42, the estimate, does that match the same?

22 A.  Yes.

23 Q.  Back to the check, what's listed under purpose?

24 A.  B. Croft, MRN:3000353194.

25 Q.  So that's the same, again, the same number as Exhibit 42?

```
 1   A.   Correct.
 2   Q.   And last check, Exhibit 17f.  Do you see it before you?
 3   A.   Yes.
 4   Q.   What's the amount?
 5   A.   $1,077.
 6   Q.   Who is it paid to the order of?
 7   A.   UMAAPA.
 8   Q.   Does that match the estimate listed on Exhibit 42?
 9   A.   Yes.
10   Q.   On the check again under Purpose, what's listed?
11   A.   B. Croft, MRN, 3000353194.
12   Q.   Does that match the estimate?
13   A.   Yes.
14   Q.   Would this be considered a service or personal service or a
15   good?
16   A.   Personal benefit, yes.
17   Q.   And should this also have been listed on his 1040?
18   A.   Yes.
19   Q.   Back to Exhibit 19, page 12, the 2017 Eagle, was that
20   purchased within the 2017 tax year?
21   A.   Payments were made during that tax year, yes.
22   Q.   Now, would this be considered a good or a service or --
23   A.   Yes.
24   Q.   What would it be considered?
25   A.   Good or property.
```

1   Q.   Have you seen the RV?

2   A.   Yes.

3   Q.   When did you see it?

4   A.   During the Search Warrant that was executed on the

5   property.

6   Q.   Where was the RV located?

7   A.   Behind the Tradesman property.

8   Q.   Based on your investigation and your walk-through of the

9   RV, what was the primary purpose of the RV?

10  A.   It was a residence.

11  Q.   Did you -- during the execution of the Search Warrant, did

12  you enter the RV at all?

13  A.   I did.

14  Q.   Begin with Exhibit 33e.  What is it?

15  A.   That's I guess the bedroom or sleeping area.

16  Q.   During your walk-through, did you notice anything about the

17  bedroom that led you to believe that this was a personal

18  residence?

19  A.   Yeah, it appeared that it had been slept in the night

20  before, there was phone chargers on each side of the bed.

21  Q.   Go to 33f please.  Again where is this taken place?

22  A.   This is across from the bed, if I'm not mistaken.

23  Q.   And what about this area again that led you to believe that

24  this was a personal residence?

25  A.   Looks lived in, a lot of clothes, there was -- it just

1   looks like someone was living there.

2   Q.  Did you see a lot of clothes relating to just an adult

3   male, just male, female, do you remember?

4   A.  It appeared to be that clothes for both a guy and a girl.

5   Q.  Let's go to 33g.  Again what is this a picture of?

6   A.  That's one of the bathrooms next to the bed.

7   Q.  Did you notice anything here that again led you to believe

8   that this was a personal residence?

9   A.  Yeah.

10  Q.  What did you notice?

11  A.  A lot of personal grooming items, looks like a shower you'd

12  see in someone's home.

13  Q.  Let's go to 33h.  Are these the personal items you were

14  discussing?

15  A.  Yes.

16  Q.  Let's go to 33i.  What is this?

17  A.  It's the shower in one of the bathrooms.

18  Q.  And anything in this led you to believe that this was a

19  personal residence?

20  A.  Yeah.

21  Q.  What did you see?

22  A.  A lot of personal grooming, just like a shower you'd see in

23  somebody's house.

24  Q.  And moving on to lastly 33k.  What is this?

25  A.  One of the bathrooms.

1   Q.  Would you have considered this a guest bathroom for lack of

2   a better term?

3   A.  Second bath, yeah.

4   Q.  Did this look lived in as well?

5   A.  It did.

6   Q.  What about this led you to believe that this was a personal

7   residence, not a business?

8   A.  A lot of personal stuff in there that you'd find I guess in

9   someone's home.

10  Q.  Just one last thing regarding the RV, Exhibit 15, page

11  five.  Right under the Truth In Lending, does it list the total

12  amount that was to be financed?

13  A.  Yes.

14  Q.  And when were the monthly payments supposed to begin?

15  A.  Beginning on June 24, 2017.

16  Q.  And one last thing, Exhibit 19, page 12.  You reviewed

17  documents that were given to you by financial investigator Joe

18  Vigil, correct?

19  A.  Yes.

20  Q.  And upon review of those documents, how much of the

21  purchase of the motor home do you believe would have been or

22  should have been listed on the 1040?

23  A.  Can I review the revenue report?  It was roughly 450,000.

24          MR. ESPARZA:  Government's Exhibit 30.

25  A.  It was $459,651.81.

1   Q.  And those numbers are based on your review of the records

2   and you gave those to the revenue agent, correct?

3   A.  Correct.

4           MR. ESPARZA:  No further questions.

5                       CROSS-EXAMINATION

6   BY MR. MCHUGH:

7   Q.  Mr. Scott, good afternoon.

8   A.  Good afternoon.

9   Q.  You were asked on direct examination when you first became

10  involved in this case and in this investigation and I believe

11  your response was May of 2018?

12  A.  Correct.

13  Q.  And what happened in May of 2018?

14  A.  I received a call from Special Agent Sharleigh Drake with

15  the FBI.  She reached out to me and said that, like I said,

16  Mr. Croft was running a dog training school for police officers

17  and veterans and at the time they believed that he was using

18  monies that were intended for the charity for his own personal

19  benefit and that would be of interest to us for pursuing

20  possible tax violations.

21  Q.  And did you during the course of your investigation, you

22  interviewed Mr. Cook, did you not?

23  A.  Yes.

24  Q.  And where did that take place?

25  A.  At his residence.

1    Q.   And when did that take place?

2    A.   I believe it was October 1st of 2018.  It was right at the

3    beginning of August, maybe end of July, right around then.

4    Q.   You interviewed him before the Search Warrant, did you not?

5    A.   Correct.

6    Q.   I believe the October timeframe is maybe when you testified

7    for the superseding indictment?

8    A.   Yes.

9    Q.   And so but the original indictment was returned earlier

10   that year, correct?

11   A.   Uh-huh.

12   Q.   And you're going to have to say yes or no.

13   A.   Yes.

14   Q.   And in regard to Cook, where did you interview him, where

15   did that take place, at your offices here in town?

16   A.   Cook was at his residence.

17   Q.   At his residence in Virginia?

18   A.   In Virginia, yes, sir, Richmond.

19   Q.   What information did you have about Cook going into that

20   interview?

21   A.   Just a lot of stuff relating to documents that were filed

22   on Universal K-9, so we had Secretary of State records, tax

23   returns, form 990s, some of the stuff that were pulled from the

24   website, stuff that we would get from our internal databases at

25   IRS.

1   Q.  As an investigator, you want to know as much about the

2   subject of the interview before the interview, is that correct?

3   A.  Correct.

4   Q.  And so what did you learn about his history of paying

5   taxes?

6   A.  I believe Mr. Cook hadn't prepared a tax return in almost

7   15 years prior, since we showed up.

8   Q.  And before that interview, had you talked to a Wes Keeling?

9   A.  I wasn't on the initial interview with Wes Keeling.

10  Q.  You've read the transcript of that, have you not?

11  A.  I did not read the transcript.

12  Q.  You're a case agent in this case, are you not?

13  A.  Yes.

14  Q.  But you have read some reports, not all reports, I take it

15  then?

16  A.  I didn't read the Wes Keeling report.

17  Q.  Did you know that his interview was recorded?

18  A.  No.

19  Q.  Did you know that the agents met with him for two hours

20  before they turned on the tape recorder?

21  A.  I heard it was a long interview.

22  Q.  In regard to Mr. Cook, when you visited him in Virginia,

23  were you alone or were you with other agents?

24  A.  Two other agents.

25  Q.  Who were they?

1    A.   Special Agent Jeff Breen with V.A. OIG and Sharleigh Drake

2    with FBI.

3    Q.   And in regard to Mr. Cook, did you interview -- did you

4    record that interview?

5    A.   No.

6    Q.   Do you have a policy within your -- within the IRS when an

7    interview should be recorded and when it should not be

8    recorded?

9    A.   We do.

10   Q.   And what is that policy?

11   A.   If the subject or witness is wanting to record the

12   interview, then we have to record it as well.

13   Q.   Did the topic of a recording ever come up?

14   A.   Mr. Cook did not request that the interview be recorded.

15   Q.   Did you admonish him of his rights?

16   A.   We read him his rights.

17   Q.   And did you just show up at his door or did you let him

18   know you were coming?

19   A.   We attempted to contact him by showing up to his residence

20   that morning.  He was not there, so I called him on the phone.

21   He gave us directions -- he gave us the address to where he

22   was.  Turns out it was the wrong address, so we drove out of

23   the way and by the time we were able to get in touch with him

24   again, he said he was back at the house, so we circled back.

25   Q.   So did he give you false information?

Sean Scott - Examination                  109

```
 1   A.  He believed he gave us the right information and it could

 2   have been an error on our part.

 3   Q.  But you believe today that he misled you?

 4   A.  No, I don't think he misled us, no, no.

 5   Q.  He wasn't where he said he was going to be?

 6   A.  I believe he was earnest.

 7   Q.  In regard to -- what was his demeanor when you met with

 8   him?

 9   A.  He seemed a little nervous.

10   Q.  That's typical, is it not?

11   A.  Yes.

12   Q.  And for the record, why is it typical that a person would

13   be nervous when you come in and sit down with them and visit

14   with them?

15   A.  You see agents in this case from several different agencies

16   all producing their pictures and badges and having your rights

17   read on top of that.

18   Q.  And you were wearing a service revolver or service gun,

19   were you not?

20   A.  Yes, I had my --

21   Q.  And everyone present had a gun, did they not?

22   A.  I'm not sure what.

23   Q.  And the purpose for wearing that is routine in these type

24   interviews?

25   A.  Correct.
```

1   Q.  And going into that interview, he was a -- you believed he

2   to be an aider and abettor in the conspiracy, did you not?

3   A.  No, no.

4   Q.  In the indictment where we go into the wire fraud, let's

5   just -- for instance, count number 13, on or about May 25, 2017

6   in the Western District of Texas, Bradley Lane Croft aided and

7   abetted by others, okay.

8       Who would those "others" be?

9   A.  I don't know what it was in reference to.  The purpose of

10  that trip to speak with Mr. Cook was to determine what his

11  involvement was with Universal K-9.

12  Q.  And to see whether or not he was going to be a fact witness

13  or whether or not he was, in fact, a target of your

14  investigation?

15  A.  Correct.

16  Q.  And was he a target of the investigation?

17  A.  At the time, no.

18  Q.  Was he later a target of your investigation?

19  A.  No.

20  Q.  Was he the subject of your investigation?

21  A.  No.

22  Q.  And so you were approaching him as a fact witness?

23  A.  We weren't sure.

24  Q.  So was he a fact witness or what?

25  A.  We were not sure at that time.  Prior to the interview, we

1    were not sure.

2    Q.  And that determination is made in part as a function of

3    cooperation on the part of the subject, correct?

4    A.  Yes.

5    Q.  And on that occasion he decided to talk to you?

6    A.  Yes.

7    Q.  Whether or not he believed he had a choice or not, he

8    talked to you?

9    A.  Yes.

10   Q.  And he answered your questions?

11   A.  He did.

12   Q.  And going into the interview, did you know that he had

13   opened bank accounts in Virginia?

14   A.  We weren't sure.

15   Q.  You believe that he had opened bank accounts that related

16   to Universal K-9 in Virginia?

17   A.  We were not sure.

18   Q.  Well, you became sure later?

19   A.  Yes.

20   Q.  And you became sure during this interview?

21   A.  Yes.

22   Q.  And so did his status as a fact witness change?

23   A.  Yes.

24   Q.  And it changed to what?

25   A.  That he was going to be a witness.

1   Q.   Okay.  So he was going to be a witness, he was cooperating.

2   And did you say -- did you tell him that he would not be

3   charged?

4   A.   We didn't say -- no.

5   Q.   What did you tell him in regard to that?

6   A.   It's not up to us.

7   Q.   Did you tell him that?

8   A.   I believe we said, maybe in not as many words, we said this

9   is the investigation of the AUSA, he's the one that makes the

10  determination based off the evidence that we obtain.

11  Q.   So you didn't tell him he was off the hook?

12  A.   No.

13  Q.   And so that was kind of hanging over his head, was it not?

14         MR. ESPARZA:  Objection, Your Honor, calls for

15  speculation.

16         THE COURT:  Sustained.

17  BY MR. MCHUGH:

18  Q.   How long did this interview last?

19  A.   We were there most of the day.  We got there -- by the time

20  we met him back at his house, I think it was somewhere after

21  9:00 and we didn't leave until maybe 4:00 or 5:00 that day.

22  Q.   Before you went into this interview, what pre-work had you

23  done regarding the case as it relates to Mr. Cook?

24  A.   So I tried to pull any and all documents that are available

25  to us through either our databases or say like Secretary of

Case 5:18-cr-00603-DAE   Document 187   Filed 05/15/20   Page 113 of 143
Sean Scott - Examination                    113

1    State or whatever we can get and then I'll do maybe an
2    interview outline or something when I see what areas that we're
3    interested in addressing as far as for my purposes the tax
4    matters.
5    Q.  Okay.  And what was your arsenal of information going in?
6    What did you know was Cook's relationship to the defendant,
7    Bradley Croft, or Cook's relationship to Universal K-9?
8    A.  We saw that Cook's name was on 990s that were filed for
9    Universal K-9, we saw that he was on -- I believe he was on
10   Secretary of State records and on bank statement records that
11   had been subpoenaed for the business.
12   Q.  So you saw his name all over it?
13   A.  Yes.
14   Q.  But you had concluded going into this interview that he was
15   neither a target nor a subject?
16   A.  Yes.
17   Q.  As a matter of fact, at the conclusion of the interview,
18   you shot an e-mail back to one of your supervisors, did you
19   not?
20   A.  I don't know which one you're --
21   Q.  An e-mail where you described to I believe Ms. Gerber, Dawn
22   Gerber, am I correct with the name there?
23   A.  No.  Dawn Goldberg?
24   Q.  Yes.
25   A.  She's the revenue agent, she's on the civil side.

1    Q.   And you characterized to her your needing an interview of
2    Mr. Cook, did you not?
3    A.   That sounds correct.
4    Q.   And how did you describe him in your communication to her?
5    A.   I don't know specifically without seeing the e-mail, but we
6    just -- in conversations I've had with her, I mean several
7    different occasions it was --
8    Q.   Would you agree that you described Mr. Cook as a really
9    great guy?
10   A.   Yes, yes.
11   Q.   And the interview had gone very well?
12   A.   Yes.
13   Q.   You were very upbeat about it?
14   A.   I don't know about upbeat.
15   Q.   In regard to -- your role in part are the tax and money
16   laundering contained in the indictment, correct?
17   A.   The tax part.
18   Q.   Money laundering also?
19   A.   Well, I guess there's some spillover, yeah.
20   Q.   You helped out where you could help out?
21   A.   So -- yes.
22   Q.   And were you a co-case agent or did you act at someone
23   else's direction?
24   A.   Co-case agent under the AUSA's direction.
25   Q.   Who was the co-case agent?

1    A.   Special Agent Jeff Breen and Special Agent Sharleigh Drake.

2    Q.   So the three of you were together.  Had you met them

3    before?

4    A.   Yes.

5    Q.   You say your first participation in this case was back in

6    May of 2018, correct?

7    A.   Yes.

8    Q.   And that's on or about just before the defendant was

9    indicted in indictment number one, correct?

10   A.   Yes.

11   Q.   And in regard to that and to him, you interviewed him.  And

12   following that interview, the indictment was presented, is that

13   correct?

14   A.   I don't recall the date of the indictment, it was shortly

15   after, from what I recall.

16   Q.   And did you testify during both Grand Jury presentations?

17   A.   No.

18   Q.   You testified only in the October presentation, did you

19   not?

20   A.   Yes.

21   Q.   And in regard to Mr. Cook, when you went into this

22   interview, you saw his name on papers related to Universal K-9?

23        MR. ESPARZA:  Objection, Your Honor it's been asked

24   and answered multiple times.

25        THE COURT:  Yes, it's already been asked.  The

1    objection is sustained.

2    BY MR. MCHUGH:

3    Q.  In regard to following your interview of Mr. Cook, first of

4    all, let me ask you today, has he made it right on his back

5    taxes?

6    A.  I'm not sure if he's filed.

7    Q.  Have you had that conversation with him?

8    A.  No.

9    Q.  Has he conferred with you on that?

10   A.  No.

11   Q.  And it's your belief and understanding that he made money

12   through Universal K-9?

13   A.  Yes.

14   Q.  And that that has not been reported by him either?

15   A.  No.

16   Q.  Because he hasn't filed?

17   A.  No.

18   Q.  You think it may go back 15 years?

19   A.  It was -- to that point that we went to visit him, it had

20   been about 15 years that I recall him filing.

21   Q.  You were present during the Search Warrant, were you not?

22   A.  Yes.

23   Q.  And what time was the execution of the Search Warrant?

24   A.  Roughly 6:00 a.m.

25   Q.  And you were there at 6:00 a.m.?

1    A.   Yes.

2    Q.   And you had a pre-op meeting?

3    A.   Yes.

4    Q.   Was that the night before or morning of?

5    A.   Day before.

6    Q.   And how many agents were present during the execution of

7    the Warrant?

8    A.   Oh, I don't know.  There's a visitor's log where they kept

9    track of everybody.

10   Q.   What was your role?

11   A.   We were outside cover until FBI went in and made the scene

12   secure, safe, so we basically hung out in the perimeter until

13   it was clear.

14   Q.   So the FBI S.W.A.T. team secured the location?

15   A.   Yes.

16   Q.   And you had been -- you had done drive-bys of that location

17   before, had you not?

18   A.   Yes.

19   Q.   As a matter of fact, there was a pole camera across the

20   street monitoring the activities of who would come and go at

21   the Tradesman address?

22   A.   Yes.

23   Q.   And you were familiar with the information that was

24   contained on that address and what was not contained on that

25   video, correct, or on that camera?

1    A.   I don't understand that question.

2    Q.   It was a bad question.   Did you look at any of the photos

3    or the videos that were a product of that pole camera?

4    A.   I saw some video, saw that it was up, but it's not interest

5    to the IRS.

6    Q.   Is it typical of the IRS to use these pole cameras in their

7    investigations?

8    A.   We have, we do.

9    Q.   And what is the purpose of having the pole camera?

10   A.   To get an idea of activity, who may be coming and going,

11   just to get additional information.

12   Q.   And what you saw through that and you also did a

13   surveillance from time to time, correct?

14   A.   Correct.

15   Q.   And would you do that during the day and at night?

16   A.   Correct.

17   Q.   And so you would drive on Tradesman just to look at the

18   Universal K-9 property and see what was going on?

19   A.   The property, the Tradesman property.

20   Q.   Did you ever go onto the property?

21   A.   No.

22   Q.   In regard to when you were there during the execution of

23   the Search Warrant, there were a number of dogs on the premises

24   at the time, correct?

25   A.   Correct.

```
1    Q.   How many?

2    A.   Approximately 30.

3    Q.   And what was done with those dogs?

4    A.   Animal Control came by and took them.

5    Q.   And you said that his bus was behind the property, actually

6    what you're referring to is it was on the rear of the property,

7    right?

8    A.   Correct.

9    Q.   It wasn't behind the property, it was on the property?

10   A.   It was on the property, yes, within the -- yes.

11   Q.   And with regard to the property itself, is it in a

12   commercial or residential neighborhood?

13   A.   It's a commercial.

14   Q.   It wasn't a trailer park or anything, was it?

15   A.   No, no.

16   Q.   And what would you guesstimate the distance to be from the

17   defendant's pillow to the kennel, 30 feet?

18   A.   Maybe 50 yards.

19   Q.   50 yards?

20   A.   Yeah.

21   Q.   And in regard to the defendant, he was there when you

22   arrived on the property?

23   A.   On the Search Warrant?

24   Q.   On the Search Warrant.

25   A.   Yes.
```

1   Q.  And he was there with his daughter?

2   A.  Yes.

3   Q.  And he was there with the dogs?

4   A.  They were separate.

5   Q.  Right.  But he was living on property with those

6   approximately 30 dogs?

7   A.  Correct.

8   Q.  And you remained off premises while the S.W.A T. team

9   secured the premises?

10  A.  Correct.

11  Q.  And then you were involved in the search?

12  A.  Yes.

13  Q.  And you were familiar with the Search Warrant Affidavit,

14  were you not?

15  A.  Yes.

16  Q.  You had read the Search Warrant Affidavit, had you not?

17  A.  Yes.

18  Q.  And you had seen that one of the sources of information in

19  the Search Warrant Affidavit was a Bebe Glasgow, correct?

20  A.  I don't recall that specifically.

21          MR. MCHUGH:  May I approach the witness, Your Honor?

22          THE COURT:  Sure.

23  BY MR. MCHUGH:

24  Q.  Sir, I have handed you, it's not marked as an exhibit, the

25  Search Warrant Affidavit that you had read and that you were

1    familiar with and I asked you a specific question in regard to
2    Bebe Glasgow.  Do you see in what I handed you and what is
3    highlighted the initials BG?
4    A.  I do.
5    Q.  Do you believe that to be the initials of Bebe Glasgow?
6    A.  Yes.
7    Q.  I would ask you to read that and see if you can refresh
8    your memory?
9    A.  "This investigation was initiated based upon information
10   received from former Texas Veterans --"
11   Q.  I'm not asking you to read it out loud.
12   A.  Okay.  Yeah.
13   Q.  With regard to the --
14          MR. MCHUGH:  For the record, Your Honor, we would mark
15   the Affidavit as Defendant Exhibit Number 61 just for the
16   record.
17          THE COURT:  It will be done.
18   BY MR. MCHUGH:
19   Q.  Having looked at that section of 61, does it refresh your
20   memory as to one source of that investigation?
21   A.  Not specifically.  It was more general for us, so Special
22   Agent Breen would discuss how the information was presented to
23   him or how he received it on his end and he was saying we got
24   this information from TVC.  I've heard Bebe Glasgow's name come
25   up several times, but I don't recall it specifically with

 1   regards to the Affidavit.  In general, yes.

 2   Q.  So is it your testimony today that that Bebe Glasgow was

 3   not a source to this Search Warrant?

 4   A.  No, I'm saying I don't recall this specifically as it's

 5   mentioned in the Affidavit.

 6   Q.  Okay.  In regard to -- have you met Bebe Glasgow?

 7   A.  Yes.

 8   Q.  And on how many occasions have you visited with Bebe

 9   Glasgow?

10   A.  One.

11   Q.  And your purpose in meeting Ms. Glasgow is she was the TVC

12   representative who interfaced with the defendant, Bradley

13   Croft, during his application process?

14   A.  Yes.

15   Q.  Is that correct?

16   A.  Correct.

17   Q.  And so you met with her as part of this case, did you not?

18   A.  Yes.

19   Q.  In regard to Agent Breen and Agent Drake, you had worked

20   with them before, had you not?

21   A.  I had worked with Agent Drake in the past.

22   Q.  And did that relate to this case at all?

23   A.  Yes.

24   Q.  So the question is it was your testimony -- not a "got

25   you" -- but it was your testimony that your first involvement

1  was in May of 2018, was it actually before May of 2018?

2  A.  No.

3  Q.  No?

4  A.  No.

5  Q.  Before May of 2018, had you ever seen the defendant,

6  Bradley Croft, before?

7  A.  Yes.

8  Q.  And where had you seen him?

9  A.  Bankruptcy hearing.  In person?

10 Q.  Yes, in person.

11 A.  Bankruptcy hearing.

12 Q.  And when was the bankruptcy hearing?

13 A.  Roughly 2013.

14 Q.  And whose bankruptcy hearing was it?

15 A.  It was related to Mr. Croft.

16 Q.  So your involvement in this case your testimony is began in

17 May of 2018, yet you were familiar with Mr. Croft five years

18 earlier?

19 A.  Correct.

20 Q.  And what was your purpose of being present at this

21 bankruptcy proceeding?

22 A.  He was being looked at for another investigation.

23 Q.  Being looked at for another investigation?

24 A.  Yes.

25 Q.  And were you with Agent Drake at the time?

1   A.   I started off with a different FBI agent and Agent Drake

2   replaced her at some point.

3   Q.   The source -- where did the initial referral on this

4   present case come from and when?

5   A.   For this case we're discussing now?

6   Q.   Yes.

7   A.   It was in May 2018, Special Agent Drake gave me a phone

8   call and says, We're looking at Bradley Croft, he's running

9   Universal K-9.

10  Q.   I understand, but in terms of do you know with Drake where

11  the referral came from and when she received it?

12  A.   I believe earlier in that year Special Agent Breen reached

13  out to her.

14  Q.   Okay.  And so Breen who is present here today, is he not?

15  A.   Yes.

16  Q.   And his position and title is what?

17  A.   Special agent with Veterans Affairs, Office of Inspector

18  General.

19  Q.   And so there was activity related to the defendant here in

20  the courtroom shortly before you became involved in the case?

21  A.   Yes.

22  Q.   And do you know in regard to Agent Breen how long he had

23  been working on this particular case?

24  A.   No.

25  Q.   Do you know how soon after he became involved in it you

1    became involved in it?

2    A.  My understanding, I believe they were discussing this case

3    in early 2018 and they had contacted me in May.  I don't think

4    they had been investigating him for that long is my recall.

5    Q.  Your recall.

6    A.  Yeah.

7    Q.  What method of proof did you use in your case on the 2016

8    and 2017 returns to determine taxpayer liability?

9    A.  The specific item.

10   Q.  So there are different approaches that one can make,

11   correct?

12   A.  Correct.

13   Q.  So there's a specific item.  Is there a net worth approach?

14   A.  Net worth.

15   Q.  Is there an expenditure approach?

16   A.  Yes.

17   Q.  Are there other approaches?

18   A.  There is.

19   Q.  And what are they?

20   A.  Bank deposit method.

21   Q.  On this particular case, what method did you use?

22   A.  The specific item.

23   Q.  What is a specific item approach to a tax investigation?

24   A.  It's a direct method of proof, it's basic kind of what it

25   says, specific item.  You identify specific items that are

1  recognized as, say, personal benefits in this case and

2  determine through applicable to be recognized as income for his

3  tax return.

4  Q.  And in regard to the tax returns themselves, the bottom

5  line figure is the net income, is it not?

6  A.  No.

7  Q.  How do you get from the gross income to the net income?

8  A.  You've got credits and deductions that come into place,

9  whether they're refundable or nonrefundable to reach either

10  your tax due or your amount refunded to you, so maybe that

11  would be the bottom line whether you pay or get money back.

12  Q.  And what is a Schedule C?

13  A.  Schedule C is the schedule that's filed by taxpayers, it's

14  a profit or loss from business, sole proprietors.  If they

15  recognize if you're in an activity where you're trying to

16  produce income, income producing venture, then you're going to

17  be filing Schedule C if you're a sole proprietor.

18  Q.  Income you refer to the word of art as personal benefit,

19  correct?

20  A.  No, income is all -- anything received, money, goods,

21  property, service, that's defined as by the IRS.

22  Q.  And what is personal benefit?

23  A.  So the properties, the assets, the medical procedures that

24  Mr. Croft received that were monies that were intended for

25  charitable purposes.

1   Q.  And what are allowances for offsets to, say, gross income?

2   A.  Like earned income tax credit is a refundable credit that

3   you can get.  Like your exemptions, your standard deductions

4   that will reduce your taxable income.  There's different for

5   specific to the sole proprietorship there's self-employment

6   tax.  You get a deduction on one side and tax on the other,

7   so --

8   Q.  There are a lot of factors that come into play?

9   A.  Correct.

10  Q.  In terms of expenses for a sole proprietorship or expenses

11  for that matter for Universal K-9, what are expense items that

12  you would expect to see in that?

13  A.  In general for a Schedule C?

14  Q.  Yes.

15  A.  You'd see like cost of goods sold, advertisement,

16  insurance, costs associated with keeping up, maintaining

17  assets, vehicles, stuff like that.

18  Q.  And did you do such an analysis on the returns in 2016 and

19  2017 that you referred to?

20  A.  Yes.

21  Q.  And so what did you determine to be expenses related to

22  that business?

23  A.  So we didn't look at the expenses related to the business.

24  Our focus was on false statements made to the -- material

25  statements made from the income that was reported.  So this

1  wasn't an invasion case, this was a false statement case.
2  Q.  I well understand that.  But the indictment charges income
3  well in excess of $2,000?
4  A.  Yes.
5  Q.  And so a determination was made by yourself as the case
6  agent that income was made in excess of $2,000?
7  A.  Correct.
8  Q.  And to determine that income, are expenses relevant?
9  A.  No.
10 Q.  Because -- okay.  I got you.  In regard to these tax
11 returns which you're not able to say because it's not an
12 invasion case is what he took away or did not take away from
13 the business?
14 A.  I don't understand that.
15 Q.  Because you never did that analysis.
16 A.  Correct.
17 Q.  You never attempted to offset his expenses against his
18 known income?
19 A.  Correct.
20 Q.  And the known income was money that you learned came to
21 him, one, through the V.A., correct?
22 A.  Correct.
23 Q.  Two, through maybe charitable sources, correct?
24 A.  Correct.
25 Q.  And maybe a small pittance from some other source?

1   A.   Correct.

2   Q.   And in terms of the defendant and just talking about his

3   tax liability, you have not done that analysis and you're not

4   prepared today to offer an opinion on that, correct?

5   A.   I don't understand that question.

6   Q.   How much --

7   A.   We do have a tax due and owing calculation based on the

8   charge.

9   Q.   The tax due and owing, have you done that analysis?

10   A.   It was done by Revenue Agent Dawn Goldberg.

11   Q.   Have you reviewed that?

12   A.   Yes.

13   Q.   What factors go into calculating that figure?

14   A.   The income that's recognized above the $2,000 amount -- the

15   2,000-dollar amount that was reported for those years.  So it's

16   a tax assessed with that, the amount that's over that.

17   Q.   And so do you know whether or not in her analysis or your

18   analysis you attempted to identify and quantify all expenses

19   related to Universal K-9?

20   A.   Yes.

21   Q.   Examples of expenses identify that relate to Universal K-9

22   would be what?  Would it be cost of instructors?

23   A.   No.

24   Q.   No?

25   A.   What we did was ask for items that he was using for his

1    personal benefit and that was provided by the FBI.

2    Q.  No, I understand that.

3    A.  Okay.

4    Q.  But did you ever look and attempt to determine, say, for

5    instance, what the overhead was of the operation to conduct --

6    for Universal K-9 to conduct its business?

7    A.  No.

8    Q.  Never even went there?

9    A.  No.

10   Q.  In reference to defendant's second amended exhibit list, in

11   reference to -- let me direct your attention if we could bring

12   up 3a.

13       Do you recognize 3a?

14   A.  Yes.

15   Q.  What is 3a?

16   A.  That's the property at Tradesman.

17   Q.  And in regard to 3a, where would the pole camera have been

18   mounted?

19            MR. ESPARZA:  Objection, Your Honor, to relevance.

20            THE COURT:  Yeah, what is the relevance here?

21            MR. MCHUGH:  Well, the relevance is, Your Honor, that

22   through surveillance and through the pole camera, they can show

23   that this is an ongoing business, that there was a real school

24   there with real dogs there and this is all information that

25   comes in --

1        THE COURT:  I don't think there's any dispute in this
2   case that they had a school with dogs.
3        MR. ESPARZA:  That's correct, Your Honor.  And the
4   location of the said camera isn't relevant to that analysis
5   whatsoever.  He's already testified there was a camera.
6        THE COURT:  The concern that I have, the greater
7   concern I have is that there's no dispute that there was at
8   least the semblance of a school with dogs.  I mean we've had
9   plenty of testimony about that, the government's own witnesses,
10  so I'm going to sustain the objection.
11  BY MR. MCHUGH:
12  Q.  In reference to the property here in Exhibit 3a, that is a
13  front view of Universal K-9, is it not?
14  A.  Yes.
15  Q.  And during the execution of the Search Warrant, you had the
16  occasion and the opportunity actually to go inside that
17  structure, did you not?
18  A.  Yes.
19  Q.  What you saw when you went in there and we can bring up the
20  photos there, they're pre-admitted, you saw evidence of
21  construction, did you not?
22  A.  Yes.
23  Q.  What did you see, what was the evidence?
24  A.  It looked like a lot of stuff was cleared out.  Looked like
25  there was some construction going on.  We saw looked like maybe

1   an office was set up there and maybe, maybe a boardroom kind of

2   space.

3   Q.  A classroom?

4   A.  Could be, yeah.

5   Q.  Did you say you saw what you believed to be evidence that

6   this would in part be a classroom building for Universal K-9?

7   A.  Yes.

8   Q.  And that Universal K-9 in terms of its footprint in

9   infrastructure was growing at the time, was it not, it was

10  under construction?

11  A.  It was under construction?

12  Q.  Inside.

13  A.  Yes.

14  Q.  And in regard to, do you know how long -- well, first,

15  Universal K-9 purchased this property from a, and was paying on

16  this property from a Dominick Alongi, is that correct?

17  A.  Yes.

18  Q.  And you have interviewed him, have you not?  You have met

19  with him, have you not?

20  A.  Met with him, yes.

21  Q.  And in regard to that, you learned on or about when the

22  property was sold from Dominic Alongi to the defendant here,

23  correct?

24  A.  Correct.

25  Q.  And so the defendant had not been on this property that

```
1   long, had he?
2   A.   I'm not sure.
3   Q.   Had he been on the property more than a year?
4   A.   I don't know.
5   Q.   But you know that going back and you know through your
6   investigation that when he started this dog school that he was
7   actually working out of his garage?
8   A.   Yes.
9   Q.   And then --
10  A.   At his house.
11  Q.   At his house?
12  A.   Right.
13  Q.   And then he would have students come into town and you'd
14  learn that he then would go to a local hotel and host his
15  school, did you not?
16  A.   Yes.
17  Q.   You were aware of that.  And then later he moved into this
18  property on Tradesman, correct?
19  A.   Yes.
20  Q.   And you went in the property on Tradesman and you saw these
21  classrooms under construction?
22  A.   I saw the building under construction.
23  Q.   The inside, not the outside, correct?
24  A.   Inside was empty.  I'm not sure what was --
25  Q.   There was sheetrock work going on, was there not?
```

1    A.  It appeared, yes.

2    Q.  Did you also know that as part of this expanding footprint,

3    that there were going to be dormitories in there?

4    A.  I don't know what the plan was.

5    Q.  Because you never -- prior to that day, you never attempted

6    to visit with or talk with the defendant?

7    A.  Prior to the Search Warrant?

8    Q.  Prior to the Search Warrant.

9    A.  Correct.

10   Q.  And to your knowledge, Breen, Detective Breen here, he had

11   never approached the defendant?

12   A.  Not to my knowledge.

13   Q.  And it's your understanding that Agent Drake never

14   approached the defendant?

15   A.  Yeah, not to my knowledge.

16   Q.  Are you aware the history of the acquisition of different

17   vehicles as it relates to Universal K-9?

18   A.  As far as --

19   Q.  Universal K-9 purchased in its name or other's names trucks

20   for Universal K-9 and for Richard Cook?

21   A.  I'm not following you.

22   Q.  Did Universal K-9, money received from the V.A., did it go

23   to pay for a truck that was in the name of Richard Cook and is

24   now in Virginia?

25   A.  Yes -- no.

1   Q.  That is under the government's theory, those are corrupt

2   funds, are they not?

3   A.  Yes.

4   Q.  Under the government's theory, the government has yet to

5   move to take possession of that truck from Mr. Cook, has it?

6   A.  You're referring to the truck that was purchased for

7   Mr. Cook?

8   Q.  Yes.

9   A.  No.

10          MR. MCHUGH:  Your Honor, if the Court would want to do

11  an afternoon, I think I could either use court time now or --

12          THE COURT:  I was going to leave it to you.  I mean I

13  didn't want to interrupt.

14          MR. MCHUGH:  I have a few questions left, but I don't

15  want to go fishing.

16          THE COURT:  I didn't want to interrupt your

17  presentation, that's all.  We can take our recess then.  It

18  appears you want to do that, so we'll take our recess at this

19  time.

20          COURT SECURITY OFFICER:  All rise.

21          (3:19 p.m.)

22                              *   *   *

23          (3:41 p.m.)

24          COURT SECURITY OFFICER:  All rise.

25          THE COURT:  Please be seated.  The Court would note

1    the presence of counsel as well as the parties.

2            MR. MCHUGH:  May I proceed, Your Honor?

3            THE COURT:  You may.

4    BY MR. MCHUGH:

5    Q.  Sir, you have before you Defendant's Exhibit Number 62.  It

6    purports to be an e-mail from yourself, Sean Scott, to a Dawn

7    Goldberg, dated August 3rd, 2018.  Do you see that?

8    A.  Yes.

9    Q.  I had ask you to read it, have you read it?

10   A.  I have.

11   Q.  Are you familiar with it?

12   A.  I am.

13   Q.  If that refreshes your memory, I will ask you the following

14   questions.  One is how did you describe then and how do you

15   describe now Richard Cook?

16   A.  Same as in this e-mail.  I was -- so Dawn is that

17   cooperating revenue agent that we work with and I was just

18   giving her a summary of our meeting with Mr. Cook that day.  I

19   think this is the day after we returned.

20   Q.  So if you go to line three, how do you describe him?

21   A.  "Richard is a great guy, big heart, was taken advantage of,

22   Richard was present in name only."

23   Q.  And you knew this information going out.  You knew that he

24   was President in name only going in?

25   A.  No.

```
 1   Q.  You knew that through your interview of Mr. Cook?
 2   A.  We were not sure until we met.
 3   Q.  And you accepted what he told you as being true?
 4   A.  Yes.
 5   Q.  One final question.  As an investigator, as you investigate
 6   your cases, do you continue to investigate all sources of
 7   information?
 8   A.  We try to.
 9   Q.  And why do you do that?
10   A.  To be as thorough as possible.
11   Q.  Sometimes you're misled, are you not?  We've all been
12   fooled.
13   A.  Sure.
14   Q.  Sometimes you're misled, are you not?
15   A.  Sure, yes.
16         MR. MCHUGH:  Pass the witness, Your Honor.
17         MR. ESPARZA:  Just a few questions, Your Honor.
18                     REDIRECT EXAMINATION
19   BY MR. ESPARZA:
20   Q.  First off, again you were at the Search Warrant, correct?
21   A.  Yes.
22   Q.  Were there any debit cards found at the Search Warrant?
23   A.  Yes.
24   Q.  And the Search Warrant took place here in San Antonio,
25   correct?
```

1    A.  Correct.

2            MR. ESPARZA:  Exhibit 33p.

3            MR. MCHUGH:  Your Honor, respectfully, I believe this

4    is beyond the scope of direct.

5            THE COURT:  I believe it is.

6            MR. ESPARZA:  He did discuss the Search Warrant over

7    and over again.

8            THE COURT:  Well, I know, but you're going into

9    something beyond that.

10           MR. ESPARZA:  Okay.  That's fine, Your Honor.  Moving

11   on then to -- let's put Exhibit 20 and Exhibit 21 side by side,

12   page seven on each.

13   BY MR. ESPARZA:

14   Q.  Looking at Exhibit 20 and 21 side by side, what pages are

15   those?

16   A.  Those are from the Schedule C profit or loss from business.

17   Q.  And I know opposing counsel went over revenue and things

18   that should have been listed, did Mr. Croft list anything on

19   this Schedule C in terms of car expenses, commissions, fees,

20   contract labor, anything on either Schedule C?

21   A.  No.

22   Q.  So they're blank in terms of any expense, correct?

23   A.  Correct.

24   Q.  And on cross, the defense brought up your discussion with

25   Mr. Cook regarding 990s and the private foundation, correct?

1    A.   Correct.

2    Q.   The business itself is its own separate taxable entity,

3    correct?

4    A.   Tax exempt.

5    Q.   It has its own returns that they file, correct?

6    A.   Correct.

7    Q.   And those would be the forms 990s that Mr. McHugh was

8    referencing, correct?

9    A.   Correct.

10   Q.   Now, the Exhibit 44, second to last page, now that document

11   that you see there, that's the filing information for a 990,

12   correct?

13   A.   Correct.

14   Q.   Now, the 990s that he mentioned, you discussed with

15   Mr. Richard Cook, where does Mr. Richard Cook live?

16   A.   Richmond, Virginia.

17   Q.   Now, let's go down to the bottom for the IP address for the

18   990.  Does that match the IP addresses that we discussed with

19   the 1040s?

20   A.   For the 2016 and 2017 tax return for the 1040s, yes.

21   Q.   And last question.  The benefits again that we discussed,

22   the trucks and the jet ski and the penile implant, those are

23   benefits to Mr. Croft and would not be associated on the 990s,

24   correct?

25   A.   Correct.

1            MR. ESPARZA:  No further questions.

2            MR. MCHUGH:  No questions.

3            THE COURT:  Sir, you can step down.

4            MR. ESPARZA:  Your Honor, we would ask that he be

5    permanently excused.

6            THE COURT:  Yes, he can be excused.

7            MR. ESPARZA:  At this time, the government will call

8    IRS Revenue Agent Dawn Goldberg.

9            MR. SUROVIC:  Your Honor, for the Court's information,

10   this is our last witness.

11           THE COURT:  How long is Mr. Goldberg going to go?

12           MR. ESPARZA:  I anticipate her being quicker than my

13   direct with Mr. Scott, so hopefully 30 minutes, maybe less.

14           THE COURT:  We're not going to get very far.

15           MR. SUROVIC:  It's your call, Your Honor.  I believe

16   we spent about 20 minutes on direct examination with Mr. Scott,

17   so it would be less than that.

18           MR. ESPARZA:  I don't plan on keeping her up very

19   long.

20           THE COURT:  But then there's cross, so the cross is

21   going to have to wait until tomorrow.

22           MR. SUROVIC:  Cross may go on, that's up to defense

23   counsel.

24           THE COURT:  I don't think he's not going to cross the

25   witness.  So whatever cross -- sometimes lawyers don't like to

1   put somebody on and then have the whole day waiting for

2   somebody to do cross.  I mean that's up to you.  I'm giving you

3   the option here and nobody is taking it.

4           MR. SUROVIC:  I understand, Your Honor.  It's

5   Mr. Esparza's witness, so I'll leave it to him.  My position is

6   we're trying to move this case as quickly as possible.

7   Anything we can do today will mean we'll have less --

8           THE COURT:  All right.  Let's put her up.  We'll do

9   direct and then cross starting tomorrow.

10          COURTROOM DEPUTY CLERK:  Please raise your right hand.

11                        *   *   *

12          *(DAWN GOLDBERG, Government Witness, Sworn.)*

13                        *   *   *

14          THE WITNESS:  Yes, ma'am.

15          COURTROOM DEPUTY CLERK:  You can have a seat.

16                      DIRECT EXAMINATION

17  BY MR. ESPARZA:

18  Q.  Good afternoon, Ms. Goldberg.

19  A.  Good afternoon.

20          THE COURT:  I'm going to have to step out for a

21  minute.  We're going to have to do this tomorrow.  I'm going to

22  have to take the call from D.C.  It has to do with some stuff

23  that we're working on here that's going to be for all the

24  lawyers' benefits actually.  I'm sorry.  We'll have to have you

25  here tomorrow 9:00.

1        THE WITNESS:  Yes, sir.

2        COURT SECURITY OFFICER:  All rise.

3        *(3:50 p.m.)*

4                        *   *   *

1                           *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  October 27, 2019

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25