```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA        :
                                     :
 4   vs.                             : No. SA:18-CR-00603
                                     : San Antonio, Texas
 5   BRADLEY LANE CROFT(1),          : October 16, 2019
     Defendant.                      :
 6   ********************************************************

 7        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS (Volume 6)
                  BEFORE THE HONORABLE DAVID A. EZRA
 8              SENIOR UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:
     FOR THE GOVERNMENT:
10     Gregory J. Surovic, Esquire
       Fidel Esparza, III, Esquire
11     United States Attorney's Office
       601 N.W. Loop 410, Suite 600
12     San Antonio, Texas  78216
       (210)384-7020; greg.surovic@usdoj.gov
13

14   FOR THE DEFENDANT:
       Thomas Joseph McHugh, Esquire
15     William A. Brooks, Esquire
       Law Offices of Thomas J. McHugh
16     130 E. Travis Street, Suite 425
       San Antonio, Texas  78205
17     (210)227-4662; thomasjmchughlaw@gmail.com

18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

**I N D E X**

| | |
|---|---|
| **GOVERNMENT WITNESSES:** | **PAGE** |
| **DAWN GOLDBERG** | |
| By Mr. Esparza | 11 |
| By Mr. McHugh | 19 |
| | |
| | |
| **DEFENSE WITNESSES:** | |
| **STEVEN BENITEZ** | |
| By Mr. Brooks | 48 |
| | |
| | |
| **BEBE GLASGOW** | |
| By Mr. McHugh | 57, 78 |
| By Mr. Surovic | 72 |
| | |
| | |
| **JONATHAN LAWRENZ** | |
| By Mr. Brooks | 81 |
| | |
| | |
| **ANGIE GILSTRAP** | |
| By Mr. McHugh | 93 |

 1    *(Wednesday, October 16, 2019, 9:13 a.m.)*

 2                              *   *   *

 3           COURT SECURITY OFFICER:  All rise.

 4           COURTROOM DEPUTY CLERK:  SA:18-CR-00603, United States

 5    of America versus Bradley Lane Croft.

 6           MR. SUROVIC:  Greg Surovic and Fidel Esparza for the

 7    United States, Your Honor, present and ready.

 8           THE COURT:  All right.

 9           MR. MCHUGH:  Good morning, Your Honor.  Tom McHugh and

10    Mr. William Brooks representing the defendant.  He is present,

11    we are ready to proceed.  I would like to make a record at this

12    point, if I may.

13           THE COURT:  Of something or other, right?

14           MR. MCHUGH:  Sorry?

15           THE COURT:  Of something, yes.

16           MR. MCHUGH:  Okay.  Yesterday there was a -- the

17    government referred to a defense exhibit as Defense Exhibit 45.

18    It was an e-mail as it related to Sue Jevning.  It turns out we

19    double marked 45.  So 45 we would now re-offer as Defendant's

20    Exhibit 63.

21           THE COURT:  Sixty-three.

22           MR. MCHUGH:  Yes.

23           THE COURT:  Okay.

24           MR. SUROVIC:  Your Honor, we had no objection to the

25    exhibit as 45, we have no objection to the exhibit as 63,

1   that's fine with us.  I understand this is the way that

2   Ms. Springs wants to do it.

3          THE COURT:  That's great.  I'm going to have to step

4   out for a second.  Something I intended to bring in I am

5   missing.  I'll be right back.

6          COURT SECURITY OFFICER:  All rise.

7          *(9:14 a.m.)*

8                          *   *   *

9          *(9:17 a.m.)*

10         THE COURT:  The first thing I want to do this morning

11  is apologize for the fact we're starting a bit late.  The

12  problem was kind of twofold.  It's kind of the -- what do they

13  call that, the perfect storm?  We had the perfect storm out

14  where I live toward Boerne yesterday and it blew out all the

15  electricity and blew out my cable, my WiFi, everything went

16  good-bye.  And then I had to go pick my daughter up at midnight

17  from a delayed flight from Houston because of the storm.  She

18  was in D.C. and got home to all that mess and of course the

19  traffic lights out there weren't working which meant the

20  traffic was backed up, took me an hour.  Usually takes me about

21  20 minutes to get in, 22 minutes from out there.  Took me an

22  hour and 15 minutes.  And then when I got in, they're working

23  on the computers because they did a huge reboot on all the

24  computers and migrated them over to a different system, so they

25  were waiting for me to start, to a degree on my computer, and

1   then I got in there and I had to stay there to log in.  That's

2   it.  So I apologize, but I can assure you that it had

3   absolutely nothing to do with intentional dilatory behavior

4   here.  What a hassle.

5           MR. MCHUGH:  Your Honor, may I complete my record?

6           THE COURT:  Yes.  I thought you were complete.  You

7   weren't?

8           MR. MCHUGH:  No.

9           THE COURT:  Okay.

10          MR. MCHUGH:  I failed, Your Honor.

11          THE COURT:  You didn't fail.

12          MR. MCHUGH:  The defendant referred to a Search

13  Warrant Affidavit yesterday and it was identified as Defendant

14  Exhibit Number 62 and --

15          MR. SUROVIC:  61.

16          MR. MCHUGH:  61?

17          MR. SUROVIC:  61.

18          THE COURT:  Don't worry about it.

19          MR. MCHUGH:  Referred to as Defense Exhibit 61.  And I

20  believe that we have an agreement or not objection to a

21  stipulation to admitting it into evidence.

22          MR. SUROVIC:  We have no objection to 61 being

23  admitted, Your Honor.

24          THE COURT:  All right.

25          MR. MCHUGH:  In addition to that, Your Honor,

1   yesterday during the trial or earlier in the trial there was a

2   stipulation that the government and the defendant entered into

3   on a Dominick Alongi.

4           THE COURT:  I remember, he's been sitting here on and

5   off.

6           MR. MCHUGH:  And he's been sitting here on and off.

7   And he is not present outside this morning, but the defendant

8   would like to call him and I believe the government has a

9   position on that.

10          THE COURT:  I'm sure they do.

11          MR. SUROVIC:  Your Honor, we would object.  He's

12  violated the witness rule, he's been able to listen to a number

13  of witnesses that the government has called and that would be

14  inappropriate.

15          THE COURT:  I have to agree.  There's no good excuse

16  for him -- it's not as if nobody knew what he knew or what he

17  was going to testify to.  He's not like a surprise witness.

18          MR. MCHUGH:  I'm just making a record, Your Honor.

19          THE COURT:  I understand.  I'm usually pretty good

20  about those things, but there comes a point where I can't

21  ignore the rules.

22          MR. MCHUGH:  I understand, Your Honor.  In addition to

23  that, Your Honor, just as a matter of record and procedure for

24  today, Mr. Surovic and Fidel Esparza and I have visited.  And

25  without a promise, I think we can make a representation to the

BENCH TRIAL PROCEEDINGS                7

1   Court that both sides may rest and close today, but I'll let

2   the government.

3           THE COURT:  What is it that Mr. Alongi would be

4   testifying to?

5           MR. MCHUGH:  Your Honor, he would testify to the

6   following, there was testimony offered at the trial regarding a

7   Richard Cook when he testified.  And Richard Cook offered

8   testimony in regard to the large motor home or the bus.

9           THE COURT:  Right.

10          MR. MCHUGH:  And his testimony is that it related to

11  the business of Universal K-9.  When Special Agent Sean Scott

12  testified yesterday, Your Honor, there was an impression left

13  on the record that it was a home.  It is true they were living

14  in it at the time.

15          THE COURT:  Okay.

16          MR. MCHUGH:  But for no other -- but they bought it

17  for no other purpose.  And so that contradicts or somewhat

18  conflicts with Cook who has already been a witness and offered

19  testimony on the record.  Mr. Alongi would say basically the

20  same thing, that he has a relationship with the defendant, they

21  know one another, he is the one, in fact, who sold to the

22  defendant the Tradesman property.  He would say that -- he

23  would offer that testimony that it was purchased for the

24  business, by the business --

25          THE COURT:  How does he know that?  Does he work in

BENCH TRIAL PROCEEDINGS                    8

1    the business?

2          MR. MCHUGH:  He knows that, Your Honor, because he has

3    been on it.  He has been in the bus, okay.

4          THE COURT:  Well, I know that, but I mean that's

5    different than knowing what the transaction was and he doesn't

6    have firsthand knowledge.  He's just in the bus and you

7    admitted that they are living in there, so no, I don't think

8    that he has that much to add.

9          MR. MCHUGH:  He would also offer testimony, Your

10   Honor, to complete the record, that he had knowledge that there

11   were plans for the business to wrap the bus and that means to

12   put logos on it, to identify that bus when it would be on the

13   road and it would go to Fort Hood or it would go to Fort Sam,

14   that it would be the business and they -- the students could

15   see the substantial nature of it.

16         THE COURT:  The best evidence of that would either be

17   testimony by Mr. Cook or testimony by the defendant.  They were

18   the ones who controlled the bus.

19         MR. MCHUGH:  That is true.  And the record does show,

20   Your Honor, that --

21         THE COURT:  But there was no such testimony from

22   Mr. Cook and it's yet to be seen whether your client is going

23   to take the stand, so I don't know.

24         MR. MCHUGH:  And the testimony regarding Cook is

25   that -- Cook being the government's witness, that it was

1   purchased for and on behalf of the business.  So that's what

2   Cook said, so the Alongi testimony isn't quite what I'm saying,

3   not quite as critical on that note, but he would offer

4   information to the Court or testimony to the Court that he,

5   one, that it was going to be wrapped which is evidence of that

6   it's Universal K-9 related.  And, two, he would offer testimony

7   that he had met Mr. Underwood and he had met Mr. Underwood

8   through the defendant, Bradley Croft.  Mr. Underwood is one of

9   the victims identified in Government Exhibit 6f and identified

10  in the indictment as victim number one.  But so far there has

11  been a derth of evidence as it relates to Mr. Underwood on the

12  record.  And so his testimony would be that he was a trainer, a

13  dog trainer.

14          THE COURT:  Whose testimony are you talking about?

15  Alongi?

16          MR. MCHUGH:  That it would be Alongi's testimony that

17  he witnessed Underwood out there in a teaching capacity.  And

18  that is my proffer, Your Honor.

19          THE COURT:  All right.  Okay.  Well, there's nothing

20  here that wasn't known and couldn't have been known and he sat

21  through a substantial part of critical testimony and I invoked

22  I rule I think at the defendant's request and --

23          MR. MCHUGH:  The defendant at least did not object.

24          THE COURT:  I don't know whose request it was, but

25  it's been very few trials that I've been in where the rule

1    hasn't been invoked and there's a reason for it.  And the

2    Court, as I said, if this had been some sort of a surprise

3    witness, nobody would have known who he was or he showed up

4    and, you know, called up and said I heard about the trial

5    somehow and I've got this critical evidence, that's another

6    story.

7              MR. MCHUGH:  In addition to that, Your Honor, the

8    defendant was aware or the defense team was aware because we

9    attempted to exclude a witness yesterday, government witness

10   after he testified.  And so the subject of the rule was

11   acknowledged by both sides.

12             THE COURT:  Yeah, but he testified, he's not coming

13   back and he's also retired.  So I think that objection would

14   have been better entertained by the Court if he was the

15   superior of the witness who was going to be testifying and

16   there was some concern that the superior might contradict his

17   testimony or put him in a bad light so that the superior

18   glaring on at him might have a deleterious effect on the

19   veracity of the testimony and because the person was

20   intimidated, but that's not the case.  This man, first of all,

21   he isn't his superior, number one.  And number two, he's

22   totally retired.  So he can have no effect on his career.  All

23   right.  Let's move on.

24             MR. ESPARZA:  At this time, the United States would

25   call Revenue Agent Dawn Goldberg.

1           COURT SECURITY OFFICER:  Raise your right hand.

2                         *   *   *

3           *(DAWN GOLDBERG, Government Witness, Sworn.)*

4                         *   *   *

5           THE WITNESS:  Yes, ma'am.

6           COURTROOM DEPUTY CLERK:  You can have a seat.  Thank

7    you.

8                   DIRECT EXAMINATION

9    BY MR. ESPARZA:

10   Q.  Good morning, Ms. Goldberg.  Could you please state your

11   name for the record?

12   A.  Good morning.  Dawn Goldberg.

13   Q.  Can you spell your last name out please?

14   A.  G-O-L-D-B-E-R-G.

15   Q.  Thank you.  Where are you currently employed?

16   A.  I'm currently employed by the Internal Revenue Service.

17   Q.  And in what division?

18   A.  I'm with the division called TEGE, Tax Exempt Government

19   Entities.

20   Q.  And briefly what specifically are your duties within TEGE?

21   A.  I'm a revenue agent forensic investigator and my duties

22   include auditing returns.  On the forensic investigator side,

23   which I've done since 2005, I actually work with CI, help them

24   develop their cases, provide technical assistance, help prepare

25   returns -- help prepare reports.

1    Q.  Is that your role that you took in this case?

2    A.  Yes, sir.

3    Q.  Did you assist Sean -- IRS CID Agent Sean Scott?

4    A.  Yes, sir.

5    Q.  Now, before we get into your revenue agent report, just

6    briefly I'd like to discuss a few things.  Regarding private

7    foundations, what is a disqualified person?

8    A.  A disqualified person -- for Internal Revenue Code 501(c)3

9    it's an organization that's organized to operate for exempt

10   purposes.  A private foundation is part of that section.  And a

11   disqualified person is anyone who is officer, director, trustee

12   or anyone who has powers or authorities similar to that.

13   Q.  Okay.  In your review of the evidence with Special Agent

14   Sean Scott, was Mr. Croft, in your opinion, found to be a

15   disqualified person?

16   A.  Yes, sir.

17   Q.  And as a disqualified person, is he able to receive any

18   personal benefit for the foundation or assets?

19   A.  No, sir.

20   Q.  Now, also what's in your review since we're mentioning the

21   words private foundation and 501(c)3, Universal K-9 is listed

22   as a 501(c)3, correct?

23   A.  Yes, sir.

24   Q.  As such, it's its own separate entity that files its own

25   returns?

1   A.   Yes, sir.

2   Q.   Are those returns known as IRS form 990s?

3   A.   They would be the 990 series, 990, 990PF, private

4   foundation, or 990N if it's online filing.

5   Q.   Did you review any 990s in this case?

6   A.   I reviewed the 990PFs for Universal K-9.

7   Q.   We can show Government's Exhibit 23.  And let's do second

8   page.  What's that before you?

9   A.   This is the 2016 form 990PF for Universal K-9.

10  Q.   And did you review this document?

11  A.   Yes, sir.

12  Q.   And just briefly what type of return is a 990?

13  A.   A 990 is -- it's not a tax return, it's information return

14  because the purpose of this return is not to pay taxes, but

15  it's to report information.

16  Q.   Let's show Government's Exhibit 24, page two also.  And

17  what is this?

18  A.   This is 2017 form 990PF return of private foundation for

19  Universal K-9.

20  Q.   And are these the two that you reviewed?

21  A.   Yes, sir.

22  Q.   Next thing that I'd like to discuss before we go again into

23  your report, are there any specific rules regarding receiving a

24  housing benefit from an employer?

25  A.   So Code Section 119 talks about providing an excluded

1   housing benefit and there's three requirements for that.  It
2   has to be on the employee's premise, it has to be provided for
3   the convenience of the employer and the example of that would
4   be like the oil rigs out in the -- I'm from the Houston office,
5   so it would be like the oil rigs out in Houston off the Gulf,
6   people live there.  That's provided by the employer and that's
7   not subject to tax.  And the other requirement is it has to be
8   part of your condition of employment.  You'd actually have an
9   agreement between employee and employer.
10  Q.  Under this sort of agreement, the employer couldn't
11  negotiate with themselves, could they?  Probably asking the
12  question incorrectly.
13      If I'm the owner/operator of the business, can I agree with
14  myself that I can live on there?
15  A.  No, sir.  Code Section 119, there's actually case law out
16  there that talks about has to be an employee/employer
17  relationship which is under Code Section 3121.  It can't be a
18  sole proprietor or partnership deciding to be their own exempt
19  income.  In fact, there's court cases that talk about farms
20  that do that where people put their farm into a corporation.
21          MR. MCHUGH:  Unresponsive, Your Honor.
22          THE COURT:  Sustained.
23  BY MR. ESPARZA:
24  Q.  Now, specifically regarding housing benefits.  Is that
25  always a taxable benefit?

1    A.  Housing benefits are always taxable unless it meets the

2    exclusion to not be taxable.

3    Q.  And given that Universal K-9 was a private foundation,

4    would that benefit have been something that Mr. Croft could

5    have received and been excluded?

6    A.  If he was an employee?  Can you clarify the question?

7    Q.  Mr. Croft, in your opinion, is a disqualified person,

8    correct?

9    A.  Correct.

10   Q.  Could he have received a housing benefit even as a

11   disqualified person?

12   A.  No.  In this case -- for private foundation under Code

13   Section 4946, he would be the definition of a disqualified

14   person.  Disqualified persons under Code Section 4941 for

15   private foundations cannot have anything go to their benefits

16   or they can't do anything for the private foundation.

17   Q.  Okay.  Now let's move on to your revenue agent report.

18           MR. ESPARZA:  Pull up Government's Exhibit 30.

19   BY MR. ESPARZA:

20   Q.  And I call this a 5278 because I come from the land of form

21   numbers, but is this the form that you created?

22   A.  Yes, sir.

23   Q.  And the information that's on this form specifically

24   regarding the adjustments to income in Section Seven, did you

25   receive that information from IRS Agent Sean Scott?

1   A.  Yes, sir.

2   Q.  And what specifically are those items listed on there?

3   A.  Well, the only thing that was picked up on the report was

4   the Dodge Ram for 2014, the Dodge Ram for 2016 and those are

5   the only two items for tax year 2016.  In 2017, we picked up a

6   2009 Yamaha jet ski trailer, the medical procedure, the 2017

7   American Eagle 45T trailer and those are the only exempt income

8   issues.

9   Q.  Why were these assets specifically selected for your

10  analysis?

11  A.  The decision was made to use a specific item method, so we

12  identified specific items which could be attributable to

13  Mr. Croft.

14  Q.  These would have been items that you believe should have

15  been listed on his income in his 1040?

16  A.  Yes, sir.

17  Q.  Let's walk down tax year 2016.  So again you said we had

18  the two Dodge Rams, correct?

19  A.  Yes, sir.

20  Q.  And what kind of -- what's the total adjustment that's

21  caused by those Dodge Rams?

22  A.  The two adjustments totaled $43,683.69.

23  Q.  As you complete your analysis with that added in as the

24  adjustment, what's his taxable income as revised?

25  A.  The taxable income was $28,142.

1  Q.  And when you did the analysis, did you still leave him as

2  head of household as he was under his 1040?

3  A.  Yes, sir.

4  Q.  Did you allow for any credits to be listed?

5  A.  Yes, sir.

6  Q.  What credits were listed?

7  A.  He had the child tax credit.

8  Q.  And were there any other taxes that were added?

9  A.  Well, we added the self-employment tax, but that was off

10  the tax return.

11  Q.  Off of his 1040?

12  A.  Yes, sir.

13  Q.  And what was the corrected tax liability for 2016?

14  A.  $2,839.

15  Q.  And the deficiency?

16  A.  $3,194.

17  Q.  So in your analysis after adding all the adjustments, had

18  the income been properly recorded on the 1040, what would have

19  been his either overpayment or any balance due?

20  A.  The balance due would have been $3,194.

21  Q.  So he wouldn't have received a refund?

22  A.  Yes, sir, that's correct.

23  Q.  Now let's go on to tax year 2017.  I believe this year you

24  had a jet ski listed, the medical procedure and the Eagle

25  trailer, correct?

1   A.   Yes, sir.

2   Q.   And why were there exemptions listed on this year?

3   A.   The code section -- when your income gets above a certain

4   level, you lose your exemptions.

5   Q.   And so what were the total adjustments after all this was

6   added up?

7   A.   Total adjustments is $498,712.81.

8   Q.   What was his taxable income as revised?

9   A.   Taxable income as revised was $483,121.

10  Q.   Again what tax rate did you use?

11  A.   We used the tax table.  Actually it was tax rate table

12  based on the income.  He did get head of household filing

13  status as claimed.

14  Q.   What was his corrected tax liability after adjustments?

15  A.   $142,224.

16  Q.   Was a self-employment tax added on?

17  A.   Yes, sir, and that was as per his return.

18  Q.   And did he receive an earned income credit?

19  A.   He had originally claimed the earned income tax credit, but

20  because the statutory reasoning, when your income goes above a

21  certain level, you don't qualify for earning tax credit.

22  Q.   And under these adjustments, would he have gone above that

23  level?

24  A.   Yes, sir.

25  Q.   And what was the deficiency listed for tax year 2017?

1    A.  $142,862.

2    Q.  What would the balance due or overpayment be?

3    A.  $142,862.

4    Q.  So again would he have received a refund in tax year 2017?

5    A.  No, sir.

6    Q.  If properly filed?

7    A.  No, sir.

8          MR. ESPARZA:  Pass the witness, Your Honor.

9                  CROSS-EXAMINATION

10   BY MR. MCHUGH:

11   Q.  Ms. Goldberg, good morning.

12   A.  Good morning.

13   Q.  My name is Tom McHugh and I represent the defendant,

14   Bradley Croft.  Have you ever met Mr. Croft?

15   A.  No, sir.

16   Q.  Have you ever interviewed Mr. Croft?

17   A.  No, sir.

18   Q.  Have you ever attempted to interview Mr. Croft?

19   A.  No, sir.

20   Q.  In reference to your background and experience, you are a

21   revenue agent?

22   A.  Yes, sir.

23   Q.  And would you describe the role and responsibilities of a

24   revenue agent, say, as opposed to a revenue officer?

25   A.  Sure.  My general classification is revenue agent and I've

Dawn Goldberg - Examination                    20

1   been doing this since 2000 with my current division.  Revenue

2   agents -- whereas revenue officers go out and collect money,

3   revenue agents, our primary duty is to examine returns and do

4   the income tax side of -- or the examination side.

5   Q.  So it would be the revenue officer who would have the more

6   direct interface with the taxpayer, is that correct?

7   A.  Depends on the case.

8   Q.  Depends upon the case.

9   A.  Correct.

10  Q.  But you, for instance, as a revenue agent, really your job

11  is in the back room doing the analysis, correct?

12  A.  Depends on the case.

13  Q.  I'm referring to this case.

14  A.  Okay.  In this particular case, in 2005 I came to a

15  specialized group, the Financial Investigations Unit.  And my

16  particular role now is I work the more complex exempt

17  organization cases, but I also support criminal investigations.

18  My support to CI would include things such as providing

19  technical assistance, I explain our law in exempt organizations

20  to them, I take whatever information they provide and analyze

21  it and pretty much provide assistance.  I do actually go out

22  and do interviews in some cases, but in this particular case I

23  was not needed for that purpose.

24  Q.  In this particular case, you worked with the CID, IRS CID

25  Agent Sean Scott?

1    A.   Yes, sir.

2    Q.   And he's in the courtroom today?

3    A.   Yes, sir.

4    Q.   Have you dealt with him on other occasions or on other

5    cases?

6    A.   He was the OJI, on-the-job instructor on another case that

7    I worked with another agent.

8    Q.   When was that, before or after this?

9    A.   Way before, some time back.

10   Q.   And it is your testimony that the defendant you had

11   determined he to be a disqualified person, is this correct?

12   A.   Correct, under Code Section 4946.

13   Q.   And under 4946, he is disqualified again, just for the

14   record, for what reason and what purpose?

15   A.   As a private foundation, it's a Code Section 4941 which

16   talks about self-dealing.  Private foundations are prohibited

17   from having any transactions with disqualified persons.  So

18   disqualified persons would be substantial contributors, if a

19   corporation gets the percentages, but the one that applies in

20   this case would be the officers, officer, director, trustees.

21   And then the regulation goes on to further define that to be

22   anyone who has the power and authority as an officer, director

23   or trustee.

24   Q.   Did you find the defendant to fit within that category?

25   A.   Yes, sir.

Dawn Goldberg - Examination                    22

1   Q.  And in regard to that, I believe it is your testimony that

2   there may be -- is it no asset or income as to those persons?

3   A.  It's any income or assets that gets diverted to an inside

4   person which is a disqualified person.

5   Q.  So it is your testimony that a disqualified person cannot,

6   may not receive a salary?

7   A.  Well, the code says, the regulation says they can receive a

8   compensation as long as it has to do directly with running the

9   foundation.

10  Q.  Exactly.  In terms of your analysis, did you ever visit or

11  attempt to visit with the defendant to personally determine

12  that?

13  A.  No, sir.

14  Q.  But you worked closely with Agent Sean Scott here, did you

15  not?

16  A.  We worked together, yes, sir.

17  Q.  And you and he would communicate with one another?

18  A.  Yes, sir.

19  Q.  As a matter of fact, did he communicate with you the

20  morning in which he met a Richard Cook?

21  A.  I believe he sent an e-mail telling me that he had gone to

22  visit Mr. Cook.

23        MR. MCHUGH:  Your Honor, for the record, the

24  government has no objection to -- I'll let them say.

25        MR. SUROVIC:  We have no objection to Defense Exhibit

1    Number 62, Your Honor, being admitted.

2              THE COURT:  It will be admitted.

3    BY MR. MCHUGH:

4    Q.  Revenue Agent Goldberg, you visited with the government

5    team, have you not, in preparation of your testimony?

6    A.  Yes, sir.

7    Q.  And you visited with them on one occasion or many

8    occasions?

9    A.  Couple occasions.

10   Q.  And so the e-mail that is there, are you able to see it?

11   Do I need to turn it for you?

12   A.  No, I can see it.  Thank you, sir.

13   Q.  So that is an e-mail from Sean Scott to yourself, Dawn

14   Goldberg, correct?

15   A.  Yes, sir.

16   Q.  And have you in preparation of your testimony today, have

17   you had the opportunity or the occasion to look at that e-mail?

18   A.  I actually did look at this this morning.

19   Q.  Okay.  And in regard to that, this e-mail was sent by

20   Mr. Scott on August 3rd of 2018.  And at that time you and he

21   were working together on this case, were you not?

22   A.  Yes, sir.

23   Q.  And you had understood at this time or on that date that he

24   would be meeting with and interviewing a person by the name of

25   Richard Cook?

1    A.   Yes, sir.

2    Q.   And did you know at the time whether or not Richard Cook

3    was to be a fact witness, a subject or target or where he fell

4    within -- how he was viewed by the government?

5    A.   At that time, the only thing I knew is that Mr. Cook was

6    listed on the application and on the return as being involved

7    with the organization.

8    Q.   Were you aware at the time that he hadn't filed any taxes

9    in many years?

10   A.   I wouldn't know that information.

11   Q.   Even today you don't know that, do you?

12   A.   Well, what I know about Mr. Cook is he's a disabled

13   veteran.  Normally disability income is not taxed, so that

14   wouldn't surprise me.

15   Q.   In regard to Mr. Cook -- that's fine.

16        Defense Exhibit 62 is in evidence.  Is there anything in

17   that e-mail that you see today or that when you read earlier

18   this morning that you do not adopt or is unclear?

19   A.   Well, I view this e-mail as he's just kind of giving me a

20   summary that he went out and talked to Mr. Cook and he was just

21   telling me a very brief synopsis of what occurred.  If you'll

22   notice, the e-mail is sent at 8:20 at night and so it would be

23   easier for him to send a quick e-mail than to call me and talk

24   about this.

25   Q.   And you and he communicated freely, did you not?

1   A.   Depends how you define frequent.  We talked every now and

2   then --

3   Q.   I'm sorry, I need to speak slower.  I meant freely, not

4   frequent.

5   A.   Oh, freely.  Yes, sir.

6   Q.   And in regard to that at the bottom, the exhibit is in and

7   will speak for itself, but you refer at the bottom, if we could

8   go down, you talk about the approach being a false statement

9   but using the expenditure method.  Do you see that?

10  A.   "CT is suggestion to go with."  Yes, sir.

11  Q.   Who is CT?

12  A.   Criminal tax.

13  Q.   Criminal tax.  So the Tax Division in Washington, D.C. has

14  been invoked or involved in this at that time, correct?

15  A.   Yes, sir.

16  Q.   And you make a reference to that approach and what is the

17  approach following specific item?

18  A.   It says, "Use the expenditure method to show his income

19  through purchases made."

20  Q.   And this is in your bailiwick, is it not, the different

21  ways of approaching?

22  A.   Yes, sir.

23  Q.   And was Agent Scott instructing you to go to use the

24  expenditure method or was that a suggestion or had you and he

25  discussed that earlier?

1   A.  Well, he is saying this is what his attorneys were telling

2   him to consider, but ultimately we actually ended up with the

3   direct method which is the specific -- you're basically as you

4   saw in the report, we identified specific expenses rather than

5   doing the whole expenditure method which means you include all

6   the income and just take off the expenditures that were for

7   business.

8   Q.  And in terms of all the income and all the spending and the

9   overhead related to Universal K-9, you were unable to offer

10  that analysis to this Court?

11  A.  That is correct.

12  Q.  And in regard to in terms of what you do as a revenue

13  agent, you never attempted to construct a, like, what a

14  Schedule C may be as it relates to Universal K-9?

15  A.  Well, this is not a Schedule C.

16  Q.  That's right.

17  A.  A 990PF, the organization applied for tax exempt status and

18  received a self-exemption, so it is its own stand-alone

19  corporation.  At one time I thought we might want to be

20  shamming the private foundation including all the income, the

21  millions onto Mr. Croft's return, but that's not the direction

22  they want to go.

23  Q.  What do you have as the, in 2016, the tax due and owing?

24  A.  You would need to flip back to the report please.

25          MR. MCHUGH:  Government 30.

BENCH TRIAL PROCEEDINGS                    27

1   A.   The taxable income as revised was -- okay, the tax due and

2   owing is going to be $3,194.

3   Q.   And the following year, 2017, that exhibit is?

4   A.   The same, yes, sir.

5          MR. MCHUGH:  May I approach, Your Honor?

6          THE COURT:  Of course.

7   BY MR. MCHUGH:

8   Q.   So the following year, the balance due was -- 2016, was

9   3,194?

10  A.   Yes, sir.

11  Q.   And that's a product of your analysis looking at the

12  credits, the balance and working down this sheet, correct?

13  A.   Yes, sir.  That's including the two trucks and then doing

14  the statutory adjustments.

15  Q.   And in regard to tax year 2017, it hopped from 3,000 to

16  142,000 and that is explained because of the investment or the

17  purchase of what?

18  A.   The biggest income adjustment was the purchase of the RV.

19  Q.   Do you recall that figure offhand?

20  A.   It's up here, it's $459,651.

21  Q.   Do you know whether or not that was purchased for the

22  personal benefit of the defendant or as it related to Universal

23  K-9 and his business?

24  A.   I know the funds came from Universal K-9.  I also was given

25  information that he was using this for personal and we talked

1   about him being a disqualified person.  That's a prohibited

2   act.  He cannot do that without it becoming a balance due to

3   him or taxable transaction to him.

4           MR. MCHUGH:  May I have one moment, Your Honor?

5           THE COURT:  Of course.

6           *(Pause.)*

7           MR. MCHUGH:  We pass the witness.

8           MR. ESPARZA:  No further questions, Your Honor.  We

9   ask that she be permanently excused.

10          THE COURT:  She may be excused.

11          MR. SUROVIC:  Your Honor, at this time, the government

12   rests.

13          *(9:55 a.m.)*

14          THE COURT:  Okay.

15          MR. MCHUGH:  Your Honor, the government having rested,

16   the defendant at this time, pursuant to Rule 29, would move

17   that the evidence presented by the government has as it relates

18   to the indictment, the superseding indictment which includes

19   wire fraud, aggravated identity theft, money laundering, and

20   tax for years 2016 and 2017, defendant maintains that the

21   evidence is insufficient to support a finding of guilty.  In

22   addition to that, the defendant would offer that the money

23   laundering is dependent upon the wire fraud.  The wire fraud is

24   dependent upon the aggravated identity theft and that the

25   aggravated identity theft there has been no showing of a

1   criminal intent on the part of the defendant.

2           The indictment specifically alleges without the

3   permission.  I think there is evidence before the Court that

4   they did share this information with the defendant.  In

5   addition to that, the defendant, Your Honor, is somewhat

6   unsophisticated in terms of this process and these

7   applications.  And because of that and he had an expanding

8   footprint, his business started out of his garage and then as

9   it grew, as it became more successful -- and this is before the

10  V.A. -- he would hold classes at a local motel here in San

11  Antonio.  And then as it became more successful, he was able to

12  and in part based upon the revenue generated through the V.A.

13  that he was able to expand his footprint and to purchase and

14  enter into a contract to purchase the property on Tradesman.

15  And he was out there and the testimony or the fact is that

16  during the execution of the Search Warrant, there was evidence

17  out there that it was a real school with real dogs, that ate

18  real dog food, that the inside of the structure out there was

19  being modified, it was under construction to create classrooms

20  and to create dormitories.  So this money that is going through

21  the V.A. is being -- a lot of it is being put back into that

22  business and the revenue agent and retired agent, Joe Vigil,

23  and Sean Scott offer no analysis in terms of the dollar

24  figures, you know, what it cost to run this.

25           It is true that items were purchased in the name of

1    and under the name of and through the money generated through

2    Universal K-9.  But the substantial and significant part of

3    that, Your Honor, would be vehicles which were used in the

4    business, would be the motor home which was used in the

5    business.  And the government's own witness testified as to

6    same, that is Richard Cook, that it was a business related

7    expense.  Revenue Agent Sean Scott said it was his home.  Well,

8    it was his home because he lived, his pillow was literally

9    30 feet from these dogs out there.  He lived on the back of the

10   commercial lot and he double dipped in the sense of he needed

11   this motor home to help promote and to show that his business

12   was real, substantial and growing and so what he did was he

13   moved into that.  Before that, on the same lot, and there are

14   photos in evidence, Your Honor, there are photos in evidence

15   showing that before this motor coach or home was purchased and

16   that the defendant and his daughter were living on the back --

17   not on the back, in the rear of a commercial lot.  It was

18   rocky, caliche, it wasn't a trailer park.  This thing may have

19   been, I don't know what the testimony is, 25 feet long, but the

20   two of them lived in this third-wheel type trailer.  This

21   wasn't a mobile home that you could drive it or anything like

22   that.  And the two of them lived there together because they

23   were sacrificing because they had a dream because they believed

24   in this school.  And for years they have been waiting to take

25   off.  They finally take off and the V.A. is approved and, bam,

1   the government comes in and talks about the fraudulent

2   application process.

3           I just remind the Court that the evidence clearly

4   established that this is a growing footprint, that when it was

5   a younger business, when it was in its infancy and what often

6   happens in these type businesses is it's one-step forward and

7   many steps back.  And that's exactly what happened to the

8   defendant in this case.  And this all relates to the

9   defendant's motion herein, Your Honor, and it relates to the

10  element of criminal intent.  These are all persons who were

11  qualified, they were dog trainers, they're wearing Universal

12  K-9 shirts, they would come down here.  Were they employees?

13  No.  He didn't have the income or the overhead to have

14  employees.  But he had relationships with these people and they

15  would come down and they would help him and they would help

16  promote the business.  And so when he fills out his

17  application, Your Honor, I think it's clear and the testimony

18  as from Stanley and others who is one of the instructors that

19  what he wanted was -- he says, listen, if I get this V.A., I

20  want you back.  And so it was in good faith when he puts this

21  information down because he is trying to prove an

22  infrastructure that was ready to go.  Persons who had

23  relationships with dogs, persons who were credentialed, persons

24  who had a history.  And that's what he did.  If he was able to,

25  he would have wanted to hire them.  His business got going.  If

1    the Court remembers -- this all relates to criminal intent --

2    if the Court recalls the testimony of the government's first

3    witness, Rufus Coburn, when I asked him how many instructors

4    does it take to make a school?  And he says, well, we could do

5    it with one.

6            So in regard to that, Your Honor, there were four and

7    three just under materiality -- one could be a school and it

8    could be a school that would then be accepted by the V.A. and

9    to allow the money to come in.

10           The testimony yesterday of the government witness

11   regarding the defendant and his frustration and his many

12   e-mails, he was turned down four times.  And the e-mails speak

13   for themselves, Your Honor, in terms of he wanting to make this

14   thing work.  He going to them.  Yeah, he is new to the

15   application process, but he goes to them and he says, okay, I

16   did what you told me to do.  You said that you read it

17   thoroughly, I did what you told me to do, I resubmit it and now

18   you have new hurdles in front of me.  And so he was frustrated

19   so he went from -- he went from complaining within to Bebe

20   Glasgow to Rufus Coburn to going outside to the head of TVC.

21   And so he went from being a squeaky wheel to a thorn in the

22   side of the TVC.  Bebe Glasgow leaves.  As soon as she leaves,

23   I believe it's the next application, the next application is

24   approved.  And the person, those persons, Government Exhibit 6f

25   who are identified, they're all real people.  And in regard to

1   this case, Your Honor, I keep going back to criminal intent,

2   there was no criminal intent to defraud anybody.  And if

3   somebody could show me somewhere where he when he fills out

4   that application where the application says, oh, yeah, be sure

5   you have the permission because if you don't have permission,

6   that's aggravated identity theft.

7          Well, the last time I went into Home Depot, they asked

8   for my information.  The last time I went into Michael's, they

9   asked for an e-mail address and telephone numbers.  Do you

10  think they hold on to that information?  Do you think that

11  information is proprietary?  Yeah, it's proprietary, but it has

12  value to them.  They turn around and sell that information.  Is

13  that not aggravated identity them.  It's surely more aggravated

14  identity theft than this case is right here.  He had no

15  criminal intent to commit any of the acts alleged in the

16  indictment.  Thank you, Your Honor.

17          THE COURT:  Mr. Surovic.

18          MR. SUROVIC:  Your Honor, the government believes that

19  there is sufficient evidence as to each element of every

20  offense charged to find the defendant beyond a reasonable doubt

21  guilty of each offense.  The government can go into specifics

22  as to each if the Court would like that.

23          Specifically we'll talk to the issue of the scheme to

24  defraud and the aggravated identity thefts because that seems

25  to be the thing that's of most concern to the defendant.

1    Scheme to defraud simply put was a plan on the part of the

2    defendant to use false statements in the TVC application in

3    order to gain approval.  And he was willing to do whatever he

4    needed to do in order to do that.  In particular, he used the

5    names of four individuals which he understood he had to have

6    individuals and certifications in order to get that TVC

7    approval.  He used Mr. Jesse Stanley's identification.  And one

8    of the reasons he used Mr. Jesse Stanley's identification is

9    because he had a long career in dog training, he had a

10   significant number of very impressive certificates that he

11   could use that he would have support for.  But the Court has

12   heard the testimony of Mr. Stanley.  He never agreed to allow

13   his name to be used for purposes of obtaining V.A. approval to

14   teach G.I. Bill courses.  He allowed his name and his

15   certificate, he gave his name and certificates to Mr. Croft to

16   be used for a Navy contract, Special Forces contract and for an

17   Air Force contract.  They didn't get those contracts.  He

18   subsequently broke off his relationship with Mr. Croft because

19   he didn't see it going anywhere and he took other employment.

20   By the time that his name was used in order to obtain these, he

21   had been employed by HSI, so he was not available for

22   employment.

23           Mr. Dustin Bragg and Mr. Wes Keeling, they did teach

24   courses for Mr. Croft, but only one course, only one course and

25   that was the interdiction course.  They never agreed, you heard

1   both of them testify, we never agreed to teach the dog handler

2   or the dog trainer course.  Those are the two courses that were

3   approved by the TVC based on Mr. Croft's representation to

4   them.  So they did not agree either.

5          Then we have Mr. Arthur Underwood.  Your Honor,

6   Mr. Arthur Underwood had been dead for two years before they

7   got this contract.  Significantly the first time that Mr. Art

8   Underwood's name appears on the application process -- and the

9   Court has before it the entire history, the various

10  applications and the various interim changes that the defendant

11  made concerning the application to TVC.  The first time it

12  appears, first time Mr. Underwood's name appears on that is in

13  October of 2015.  And that is Government Exhibit 6f, the e-mail

14  from Mr. Croft to the TVC.  By that time, Mr. Underwood had

15  been dead for over 18 months.  He didn't appear on any of the

16  earlier ones which undercuts the defense's argument that these

17  are the documents that were evolving.  Because if the intention

18  had been to have him on early on, he would have been early on,

19  he's not.  They had Mr. Stanley and they had a Mr. Tillman, but

20  not Mr. Underwood.  So at the time that Mr. Underwood's name

21  was added to the list, he had been dead for a year and a half.

22          Also I think, Your Honor, it's significant to note

23  that after -- let's assume that the defense's story is true

24  about this.  After they get approval from the V.A., there is no

25  attempt by Mr. Croft to contact any of these individuals and

1    say, hey, I got the contract, you're going to be teaching my

2    dog handler and dog training course.  Because he never intended

3    to have them as instructors, Your Honor.  He intended to have

4    other individuals as instructors so he wouldn't have to pay

5    these people because they had certificates.  So that is the

6    scheme to defraud, those are the false material

7    representations.

8         The third element on wire fraud is the defendant

9    caused to be transmitted by way of wire communications in

10   interstate commerce in any writing, sign, signal, picture or

11   sound for the purpose of executing such a scheme.  The

12   transmittal in this, Your Honor, was what we showed the Court

13   as far as the money coming from the government.  And I believe

14   it was from the Federal Reserve in Atlanta to the individual

15   bank accounts.  And there is a stipulation of fact concerning

16   that transmittal, it goes across State lines.

17        And finally, the defendant acted with specific intent

18   to defraud, the defendant knew that his representations to the

19   TVC were false because he never had any intention to employ

20   these individuals as instructors.  If he had, he would have

21   contacted them after he got the contract and employed them in

22   that.  He did not.  He had other plans.

23        Best example, of course, is Mr. Underwood.  He had

24   been dead for almost two years at the time of application.

25   They never contacted any of the instructors after approval to

1    get them to teach the course.  That's the wire fraud, Your
2    Honor.  That is the scheme to defraud that runs through all of
3    the other counts.
4           As far as aggravated identity theft, he knowingly used
5    means of identification of another person.  We've just
6    described that, he did without lawful authority.  Those
7    individuals never gave permission for their identity to be used
8    in that case.  And again the government always points to
9    Mr. Underwood because he's probably the most egregious of the
10   examples, but you heard the testimony of Ray Nunez also who
11   said that Mr. Underwood didn't even like Mr. Croft.  And they
12   broke off early on.  Ray Nunez had been out of the picture with
13   Mr. Croft since 2014.  And Ray Nunez was a close, personal
14   friend of Mr. Underwood, had contact with Mr. Underwood up to
15   the time of his death and there was never any agreement between
16   Mr. Underwood and Mr. Croft.
17          Defendant did so without lawful authority.  We've
18   already talked about that.  By the way, as far as the knowingly
19   used the means, the government charged a specific date,
20   October 4, 2015, and that's because that date, that's
21   Government Exhibit 6f, which is an e-mail from Mr. Croft to the
22   TVC which specifically includes that information, specifically
23   identifies these individuals as being instructors and
24   specifically amends the Exhibit J.  That's why that date was
25   chosen and it was e-mailed, so it was sent by wire.

BENCH TRIAL PROCEEDINGS                    38

1          Third, that the defendant used by means of

2    identification of another person during and in relation to wire

3    fraud described in count one through eight.  We just talked

4    about that with the wire fraud counts, Your Honor.  Fourth, the

5    defendant knew the means of identification of fact belonged to

6    another real person living or dead, all four of these

7    individuals were real persons.  He meets all the elements of

8    the aggravated identity theft count.

9          Money laundering.  These need to be broken into two

10   different categories.  There's the money laundering for the

11   motor home and there's the money laundering for the Tradesman

12   property.  As far as the motor home, Mr. Croft directed the

13   purchase of the motor home.  So the financial transaction, he's

14   attempting to conduct a financial transaction, financial

15   transaction is the purchase of the motor home.  Second element

16   is that the financial transaction involved the proceeds of

17   specified unlawful activity, namely wire fraud described in

18   counts one through eight.  All the money that was used to make

19   these purchases came from either the Bank of America or the

20   Wells Fargo.  In the second case would be the Wells Fargo

21   account.  They were based -- the money that was in those

22   accounts was all from deposits from the Veterans Administration

23   to pay for Veteran Administration G.I. Bill courses and that

24   money was all the bases of the scheme to defraud.  But for his

25   misrepresentations to the TVC, he would not have gotten a

1  dollar of that money, so it does constitute proceeds of a

2  specified unlawful activity.  Then third, the defendant knew

3  the property involved in the financial transaction represented

4  the proceeds as some form of unlawful activity.  He was the one

5  that was conducting the scheme to defraud.  He knew that it was

6  unlawful, the unlawful proceeds.  Fourth, the defendant

7  intended to promote the carrying on of specified unlawful

8  activity.  And this is something that I need to point out to

9  the Court and to the defense.  The indictment charges two

10 theories of money laundering.  One is that the money was used

11 to promote the carrying on of specified unlawful activity, the

12 second was designed in whole or in part to conceal or disguise

13 the true ownership of the property.  Defense in their argument

14 to the Court as far as Rule 29, seemed to be conceding that the

15 property was being used to promote the carrying on of specified

16 unlawful activity.  They would like the Court to believe that

17 these items were purchased in order to -- for purposes of the

18 business, that the mobile home was going to be used to watch

19 for the dogs, care for the dogs, that they were going to wrap

20 it and drive around to do promotions.  By definition that's

21 promotion of specified unlawful activity so they can recruit

22 more veterans, so they can teach more classes, so they can make

23 more money from Veterans Administration fraudulently.

24         As far as the disguising the nature, location, source

25 or ownership of the property, it was purchased using the name

1    of Mr. Richard Cook from funds in the name of Universal K-9,

2    but the benefit for that motor home went to Mr. Croft.  And the

3    defense pointed out, they had a trailer there, they had a

4    trailer in the back that Mr. Croft and his daughter were living

5    in.  They upgraded to a half million-dollar motor home for

6    Mr. Croft and his daughter's comfort.

7            So all of the elements of money laundering as to the

8    motor home were met.  Similarly to the Tradesman property, same

9    issues as far as him directing the purchase.  The transaction

10   itself is the purchase of the property.  The money came from

11   the same accounts, so it came all from V.A. proceeds.  He knew

12   it because he was the one that did the scheme.  And then really

13   for the Tradesman property, it is clearly to promote the

14   carrying on of specified unlawful activity.  They wanted -- and

15   defense admits it, they wanted to continue to run K-9 courses

16   out of that facility.  They were going to build up the facility

17   so they could do even more, so it clearly constitutes promotion

18   of a specified unlawful activity, but they also purchased it in

19   the same manner as before in order to conceal the true

20   ownership.

21           Finally, Your Honor, on the issue of the tax returns,

22   the elements are first that the defendant signed an income tax

23   return that contained a written declaration that was made under

24   penalty of perjury and we talked about the jurats on each of

25   those documents.  Secondly --

1          THE COURT:  You need to speak a little slower.

2          MR. SUROVIC:  I'm sorry.  I'm trying to run through

3    this, Your Honor.  I'll speak slower.

4          In the return, the defendant falsely stated that he

5    had only $2,000 of income during that particular tax year in

6    question.  That's evidenced by the two government exhibits,

7    exhibits number 20 and 21.  Third, the defendant knew the

8    statement was false, the defendant during those two tax years

9    spent significantly more during each of those tax years than

10   what was included in the income tax return.  He was receiving

11   at best a benefit from living in the motor home that he should

12   have included.  At worst he bought the motor home for himself

13   and he should have included that money.  There are trucks that

14   were used for him and his daughter.  His daughter is not even

15   an official employee of the business.  There are jet skis.  I

16   would love for the defendant to explain -- I'll take that

17   comment back.  How can a jet ski be used to further the dog

18   handling business?  And then the elective surgery we talked

19   about.  That was not in relation to the dog handling business.

20   All of these things were personal expenses that he gained from.

21   Fourth element is that the false statements were material.  And

22   your statement of income on your income tax return is probably

23   the most material statement that you make.  Identifying what

24   your income is is critical to determining what your proper tax

25   is.

BENCH TRIAL PROCEEDINGS                    42

 1          Finally, the defendant made the statement willfully,

 2   that is with the intent to violate the known legal duty.  He

 3   knew that he was receiving benefits in excess of $2,000, Your

 4   Honor.  He filed an income tax return, for whatever reason, who

 5   knows, but it certainly wasn't to represent what he was

 6   actually benefiting from from the business.  And Your Honor,

 7   with that, the Court has heard evidence as to each of the

 8   elements of each of these offenses, the defendant is clearly

 9   guilty.

10          THE COURT:  Very briefly.

11          MR. MCHUGH:  May I supplement, Your Honor?

12          THE COURT:  Sure, but very briefly please.

13          MR. MCHUGH:  Your Honor, I believe it may have been an

14   incorrect statement by the government, it is my understanding

15   that Mr. Underwood's name is found on both the 2013 and 2015

16   applications.  It is what it is.

17          MR. SUROVIC:  And it's not there.

18          MR. MCHUGH:  And then just as a matter of record, the

19   RV was claimed on Universal K-9's 2017 return.  And in regard

20   to this expanding footprint, receiving the V.A., there is an

21   e-mail in evidence and Mr. Keeling testified, Your Honor,

22   regarding a communication from the defendant that they were on

23   board and that -- I'm paraphrasing now -- that there may be

24   room to take him on board now that they have a revenue stream.

25          I go back to that the money laundering, Your Honor, is

1   dependent upon the wire fraud.  There's no wire fraud, it's the

2   predicate act for the money laundering and the wire fraud is

3   dependent upon the aggravated identity theft.  And there is

4   just no criminal intent, Your Honor, as it relates to the

5   aggravated identity theft.  And then with no scheme, then there

6   can be no money laundering because what the Court knows and

7   what the record shows is that in this case there were no ghost

8   or bogus debts, they were all real.  And they were real

9   veterans that were enrolled in a real school with real trainers

10  and he was just -- he was trying as maybe clumsily as he did,

11  he's trying to get this thing going.  Look where he was living,

12  look what he was doing with his money and that would show the

13  record what his intent was.  His intent wasn't to skim money

14  from the government.  His intent was to create a business.  He

15  had a dream and it was finally coming together.

16          Finally, in regard to the money laundering and the one

17  element theory on the part of the government that it was

18  designed to conceal and disguise, that's not what the evidence

19  shows, Your Honor.  The evidence doesn't show that, the nature,

20  the location, the nature of the location, they had no problem

21  whatsoever identifying him with that property and it was

22  purchased by and through the name of Universal K-9 and through

23  a Richard Cook.  On Universal K-9, the defendant's name is

24  there, it's in his backyard, it's on his property.  He was

25  merely investing the proceeds back into the business.  There is

BENCH TRIAL PROCEEDINGS                    44

1    no evidence -- and this case is not about a jet ski.  This case

2    is not about a jet ski.  There is no evidence as to personal

3    gain on the part of this defendant or criminal intent beyond --

4    there's just no evidence anywhere.  Thank you, Your Honor.

5          THE COURT:  Well, as I think counsel is well aware, at

6    this stage of the proceedings, whether it be a jury trial or a

7    nonjury trial, the Court is obligated to look at the evidence

8    in a light most favorable to the government.  I haven't even

9    heard from the defense yet and I will and I'll pay very careful

10   attention to that evidence and I'll evaluate it.  And at the

11   end of the case, I then have the obligation, the same as a jury

12   would have, if we had one, to weigh and assess the credibility

13   of the evidence, both as presented by the government and as

14   presented by the defense to determine whether the government

15   has established the defendant's guilt as to each essential

16   element beyond a reasonable doubt.

17         At this point, the Court is going to deny the

18   defendant's motion because there has been sufficient evidence

19   presented by which the defendant could be, viewing the evidence

20   in a light most favorable to the government, convicted of each

21   and every count.  I'm not going to go through a detailed

22   recitation of the evidence.  Suffice it to say that the Court

23   is well aware of the charges in this case and I have been for

24   some time.  I'm well aware of the evidence presented.  And in

25   looking at the evidence, the Court needs to remind counsel

1    that, of course, the evidence doesn't have to be direct, it can

2    be circumstantial and there is a lot of circumstantial evidence

3    here that points to the defendant having committed the acts

4    which the government alleges that he did, in fact, commit.  So

5    the Court at this point rather than simply taking it under

6    advisement which I could also do and that it would be subsumed

7    in the Court's ultimate judgment, I'm simply going to deny it

8    at this time because there is sufficient evidence by which the

9    Court could find the defendant guilty beyond a reasonable doubt

10   under the standards that I employ at this point.  I don't know

11   whether that will hold at the end of the case or not.  I'm not

12   prejudging this case at all.  I'm going to keep an absolutely

13   open mind until I hear all of the evidence and then I begin to

14   deliberate on that evidence.

15          By the way, I am going to do in this case what I

16   normally do in civil cases, but I think it would be very

17   helpful in this case, I'm going to be having closing arguments

18   submitted in writing rather than to have it submitted orally.

19   I would never do that with a jury, of course, I couldn't do it

20   with a jury, but in this case it allows the parties to go back

21   and then make their points upon reflection and point to

22   specific items of evidence that they wish to point to and give

23   the Court the full breadth of their argument.  I think it's a

24   fairer way to go, it's a better way to go.  And I do it in all

25   of my civil trials in which I try the case without the benefit

1    of a jury.  The lawyers love it because they're not required to

2    stand up there and try to remember every item of evidence and

3    pop it off the top of their head.  And that can be a very

4    stressful and a very unfulfilling experience having been a

5    trial lawyer myself and not having had the benefit of anybody

6    ever doing this for me, I can tell you there are many times I

7    would walk out of a courtroom after making a closing argument,

8    even in cases I later prevailed on, and say, geez, How did I

9    forget to make this argument?  And this is something that I

10   think is very beneficial for the parties.  So I'm going to do

11   it.  It's a little more work for you, I understand that, but

12   you've worked hard for your respective clients and it certainly

13   is more work for me because it's easier for me to just go back

14   there and sit down and think about it and just check off the

15   list and go over the evidence and then make a decision, but I'd

16   rather have the benefit of your written closing argument and

17   I'm going to limit it to 25 pages.  It shouldn't be any more

18   than that.  And I will allow counsel --

19            MR. MCHUGH:  Could it be like an eight or six font,

20   Your Honor?

21            THE COURT:  No, no.  I will allow counsel because I

22   know there is this genetic urge among lawyers to say something

23   and I am no exception to that rule for sure, I will give you

24   about a five-minute closing anyway just to kind of wrap up what

25   you believe the evidence has shown, all right, five to ten

1    minutes, but I do want to have the majority of your closing

2    argument in writing, so you're going to get essentially two

3    bites at the apple, so think about that, okay.  Let's take our

4    morning recess at this time.

5              COURT SECURITY OFFICER:  All rise.

6         (10:29 a.m.)

7                             *   *   *

8         (10:59 a.m.)

9              COURT SECURITY OFFICER:  All rise.

10             THE COURT:  Please be seated.  All right, counsel.

11   Counsel, you had reserved your opening statement.  I don't know

12   whether you feel it's necessary to make one at this point or

13   not.

14             MR. MCHUGH:  Not at this time, Your Honor, not after

15   the statement that we made for the record.

16             THE COURT:  All right.

17             MR. MCHUGH:  The opening statement was tied in with

18   the Rule 29 motion.

19             THE COURT:  Got it.

20             MR. BROOKS:  Your Honor, if I might, during that

21   argument, Mr. Surovic commented on Mr. Croft's failure to

22   testify with respect to the jet ski.  He said that he'd love to

23   have Mr. Croft explain --

24             THE COURT:  No, he actually caught himself and he

25   stepped away from that.  If we had a jury, I would have

1    admonished the jury.  I don't need to admonish myself.

2            MR. BROOKS:  Understood, Judge.  If I may, Judge, I'd

3    like to call Mr. Steven Benitez.

4            COURTROOM DEPUTY CLERK:  Please raise your right hand.

5                            *  *  *

6            *(STEVEN BENITEZ, Defense Witness, Sworn.)*

7                            *  *  *

8            THE WITNESS:  Yes, ma'am, I do.

9            COURTROOM DEPUTY CLERK:  You can have a seat.  Thank

10   you.

11                      DIRECT EXAMINATION

12   BY MR. BROOKS:

13   Q.  Hi, sir.

14   A.  Good morning.

15   Q.  Would you please introduce yourself?

16   A.  My name is Steven Benitez.

17   Q.  And Mr. Benitez, how are you employed?

18   A.  I am a K-9 handler and narcotics investigator for the City

19   of Harlingen Police Department down in Cameron County, Rio

20   Grande Valley.

21   Q.  Any sort of particular rank or is it just Officer Benitez?

22   A.  I am okay with being a K-9 handler investigator.

23   Q.  How long have you been with Harlingen?

24   A.  Just shy of five years.

25   Q.  And how long have you been a licensed peace officer?

1   A.  Almost six years.

2   Q.  Were you anywhere previous to Harlingen?

3   A.  Before getting hired with the Harlingen Police Department,

4   I was a police officer for the City of Palm Valley, which is a

5   suburb near Harlingen.  Prior to that, I was active duty

6   military.

7   Q.  Thank you for your service, sir.  How long have you been a

8   K-9 handler?

9   A.  Coming up on four years here in February.

10  Q.  Did you have any sort of certificates with respect to that?

11  A.  We are currently certified nationally through the NNDDA,

12  National Narcotics Drug Detection Association.

13  Q.  And is that a certificate specifically to you or to your

14  K-9 officer?

15  A.  As a team, correct, myself and the K-9.

16  Q.  And are you familiar with Universal K-9?

17  A.  Yes, sir, I am.

18  Q.  And how are you familiar with them?

19  A.  That was the school or the training site that I attended

20  for my certification.

21  Q.  When were you a student there?

22  A.  We attended approximately February of 2016.

23  Q.  And how did you find Universal K-9 or come to be there?

24  A.  That was accomplished or done through my department.  I

25  just applied for the position and was sent to the training

1   site.

2   Q.  And how long was your program?

3   A.  Approximately two weeks.

4   Q.  What program was that?

5   A.  That was the basic K-9 handler slash -- like a basic

6   interdiction course.

7   Q.  And who taught that class?

8   A.  I'm sorry.  Say that for me again, sir?

9   Q.  Who taught that handler course?

10  A.  The K-9 portion of it or the interdiction portion of it?

11  Q.  Both.

12  A.  Both.  The K-9 portion was done mostly through a gentleman

13  named Steve.  I don't remember his last name and some of it

14  taught by Mr. Croft as well.  And the interdiction portion was

15  taught by a police officer, gentleman's name was Wes.  I don't

16  recall his last name either.

17  Q.  And you think you'd be able to identify them if you saw

18  them?

19  A.  Yes, sir.

20          MR. BROOKS:  If I could see Defendant's Exhibit 45?

21  BY MR. BROOKS:

22  Q.  While that's being produced, when you say Steve, does Steve

23  Peek sound familiar?

24  A.  I believe that's his last name, yes, sir.

25  Q.  He taught the majority of the handler's portion?

1    A.  Yes, sir, correct.

2    Q.  As well as Brad?

3    A.  Correct.

4    Q.  And you mentioned a Wes?

5    A.  Yes, sir.

6    Q.  Would that be Wes Keeling?

7    A.  Again I believe that's his last name, I'm not a hundred

8    percent sure, but that's him.

9    Q.  He taught the interdiction course or program, correct?

10   A.  Yes, sir, correct.

11   Q.  Did you use V.A. benefits, how did you fund your education?

12   A.  No, sir, I personally did not use the V.A., it was -- the

13   K-9, the dog was purchased through a grant I believe through

14   the City.

15          MR. BROOKS:  If I could see Defense's 50.

16   BY MR. BROOKS:

17   Q.  Officer Benitez, if you would look to the monitor there,

18   are you able to identify any of those individuals in Defense

19   Exhibit 50?

20   A.  The gentleman in the white shirt with the black cowboy hat,

21   that's Mr. Steve.  And I believe the gentleman next to him in

22   the black Polo and black hat is Wes.

23   Q.  Is Wes, okay.  When you were going through this program and

24   now, do you feel like the program was a sham at all?

25   A.  I did not.  I was a new handler and I received a new dog as

1    well, so there was still a little bit of questions in training

2    that I had to do and follow up on, but I believed that I

3    received the basic information to begin K-9 handling.

4    Q.   And you say there was some follow up, were there some

5    things that you would have preferred in respect to this

6    program, is there something that you would have done

7    differently now?

8    A.   I think the only thing I would have asked was maybe if the

9    course could have been just a little bit longer.  Again coming

10   in as a new handler, I still had a thousand questions as does

11   everyone else, but that's the only thing that I wish the course

12   would have been just a little bit longer.

13   Q.   You say you were a new handler?

14   A.   Yes.

15   Q.   Did you receive a dog at that time?

16   A.   Did I receive a dog at that time?  Was that your question?

17   Q.   Yes, sir.

18   A.   I was paired with my dog I believe like the second day

19   after we got there.  But it was more like the bonding, it

20   wasn't really working the dog or conducting like narcotics

21   search, it was mostly bonding like from the second day on.

22   Q.   So when you say you wish you had more time, is it that

23   bonding, is that part of it?

24   A.   A bonding, yes, that's not going to happen with any dog in

25   two weeks ever.  Also I think just maybe a little bit more of

1  the classroom time and hands-on portion, just to be a little

2  more confident before I left.

3  Q.  But all in all you would say you were satisfied with the

4  program?

5  A.  I was, yes, sir.

6  Q.  And again you're still a licensed K-9 handler to this

7  point?

8  A.  Correct, yes, sir.

9  Q.  And tell me about do you know Brad or Bradley Croft?

10 A.  Yes, sir, I do.

11 Q.  And do you know him from that program?

12 A.  Correct, yes, sir.

13 Q.  And you met him during the course, correct?

14 A.  Yes, sir.

15 Q.  How did you find him during that time?

16 A.  I had no issues with Mr. Croft.  He was approachable from

17 day one, personally introduced himself to everyone that was

18 there.  During the course, same thing, we were able to go up to

19 him, ask questions or he would check up on us, see if we had

20 any questions.  And the same continued after the program.

21 Q.  Did you find him to be knowledgeable about dogs at that

22 point?

23 A.  I did, yes, sir, I believed he was.

24 Q.  And is that still true today?

25 A.  Yes, sir.

1   Q.   When was the last time you spoke to Brad?

2   A.   I would say that was probably like early 2018 timeframe

3   after one of the busts that we had down there, sent him some

4   pictures of the evidence that we had.

5   Q.   And your agency received some U K-9 dogs, correct?

6   A.   As of right now, my dog was the newest dog, is the newest

7   dog.

8   Q.   And what's that dog's name?

9   A.   My K-9 is K-9 Katniss.

10  Q.   And how long have you had Katniss?

11  A.   Since February of '16, so we're coming up on four years

12  here shortly.

13  Q.   And is she a Universal K-9 dog?

14  A.   She is, yes.

15  Q.   Is she a shelter dog, do you know?

16  A.   She was a rescue dog, shelter dog, correct.

17  Q.   Has she been a successful working dog for you?

18  A.   I would say she's been pretty successful, I've been

19  extremely happy with her, we've got several cases, like I said,

20  if you Google my agency's name, you'll see some of the cases

21  we've had down there.

22  Q.   And we've come to learn the term "pop" over the course of

23  this trial.  Does she have some good pops?

24  A.   At least one every week since I've had her.

25  Q.   And in respect to your relationship with her in your skills

1  as a handler, is that something that you have to work at?

2  A.  Absolutely.

3  Q.  How often?

4  A.  We're required to have 16 hours documented every month for

5  the training.  My agency's policy is we train a minimum of four

6  hours, once a week, to hold that certification, but it's

7  something that you have to work on almost every day, work

8  something with the dog to continue having them work.

9  Q.  And in respect to both the dog and yourself, is it the

10  piece of paper that gives you these skills or is it your

11  experience that's more important?

12  A.  I would say 99 percent of that is going to be your

13  experience, what you do after you get the dog and take the dog

14  home, keep the training going.

15  Q.  Is there any sort of substitute for that?

16  A.  I don't believe so.

17  Q.  And did Brad appear to you to have that experience that

18  we're talking about?

19  A.  Yes, sir, I believe he does.

20  Q.  So in sum, if I might, you went through the U K-9 program

21  in 2016, correct?

22  A.  Yes, sir.

23  Q.  And you received a dog and that's a working dog, Katniss?

24  A.  Correct.

25  Q.  You've been successful with Katniss.  She was a shelter

1  dog, correct?

2  A.  Yes, sir.

3  Q.  You didn't get the impression that this is a sham or a

4  farce?

5  A.  I did not, no, sir.

6  Q.  You were taught by Steve Peek who is the gentleman in the

7  cowboy hat there?

8  A.  Correct.

9  Q.  Defense 50.  And a Mr. Wes Keeling taught your interdiction

10  program, is that correct?

11  A.  Yes, sir, correct.

12  Q.  Did they seem to you to be employees or part of Universal

13  K-9?

14  A.  I don't know what their exact title was, again the time

15  while I was there, it appeared to me that they were employees

16  of the company, they were teaching.

17  Q.  Mr. Benitez, how did you come to be here today?

18  A.  How did I come to be here?

19  Q.  Yes, sir.

20  A.  I was subpoenaed and asked to be here.

21          MR. BROOKS:  Thank you.  No further questions.

22          MR. SUROVIC:  No questions from the government, Your

23  Honor.

24          THE COURT:  You can step down, sir.  Thank you.

25          MR. MCHUGH:  Bebe Glasgow.  Your Honor, is my witness

1    excused?

2            THE COURT:  Yes.

3              (Pause.)

4            COURTROOM DEPUTY CLERK:  Please raise your right hand.

5                       *   *   *

6              (BEBE GLASGOW, Defense Witness, Sworn.)

7                       *   *   *

8            THE WITNESS:  I do.

9            COURTROOM DEPUTY CLERK:  Thank you.  You can have a

10   seat.

11           MR. MCHUGH:  May I proceed, Your Honor?

12           THE COURT:  Yes.

13                      DIRECT EXAMINATION

14   BY MR. MCHUGH:

15   Q.  Will you please state your name and spell your name for the

16   record?

17   A.  Spell my name?  Bebe Glasgow, B-E-B-E, G-L-A-S-G-O-W.

18   Q.  And at one time did you work with the TVC, the Texas

19   Veterans Commission?

20   A.  I did.

21   Q.  And when did you -- when were you working there?

22   A.  From March of 2011 to May 1st, 2016.

23   Q.  And today are you employed or retired?

24   A.  I am not, I'm retired.

25   Q.  And did you have a title when you worked at TVC?

1    A.   I believe my title was program specialist.

2    Q.   Program specialist.  And what were your responsibilities as

3    a program specialist?

4    A.   I worked -- TVC is the State approving agency for the V.A.

5    and part of my job was accepting applications to approve new

6    schools that would fit under the Code of Federal Regulations

7    for veterans education so that veterans could use their G.I.

8    Bill at that school.  And then we also did compliance visits

9    during the year at schools to see that they were doing all

10   their reporting to the V.A.  Basically working with the schools

11   to file all their paperwork necessary with the V.A. so that

12   they knew what they were doing, hopefully.

13   Q.   And as a program specialist, were you alone or did you --

14   were there other program specialists?

15   A.   No, there were five in our Austin office when we were fully

16   staffed.

17   Q.   And I take it you had a variety of applications and matters

18   that flowed across your desk?

19   A.   Yes, we dealt with original applications which were schools

20   that were first applying for approval, then we had renewals,

21   usually annually.  Any time there was a change with the school

22   and their program or their faculty or their rates or anything

23   like that, they had to file -- call it an application, but it

24   was mainly to change and update things.

25   Q.   And you and I have visited before, have we not?

1    A.   Correct.

2    Q.   We visited on two occasions, have we not?

3    A.   Correct.

4    Q.   Did I make you a promise?

5    A.   Yes, you did.

6    Q.   And in regard to -- could you give an idea or for the

7    record what kind of case load you managed and the other program

8    specialists managed?

9    A.   This would be an estimate on my part because it was a

10   continual process, so sadly I didn't always pay attention, I

11   just knew they were there constantly, but I would say between

12   75 and a hundred applications of one sort of another would come

13   across my desk and the others in a month.

14   Q.   So when you say "and others", are you saying 75 to a

15   hundred split among the five of you or each, each program

16   specialist?

17   A.   If I was -- okay, for each program specialist, I would say

18   maybe let me do a little -- maybe 50 to 75 per program

19   specialist.

20   Q.   And that would be you giving particular attention every

21   month to 50 to 75 matters?

22   A.   Uh-huh, and they would be different, each month it wasn't

23   the same ones.

24   Q.   And of course, you and I have visited and much of our visit

25   related to a person by the name of Bradley Croft, is that

1  correct?

2  A.  Correct.

3  Q.  And Bradley Croft was an applicant in the program, was he

4  not?

5  A.  His school was.

6  Q.  His school was.  And his school is Universal K-9, was it

7  not?

8  A.  Correct.

9  Q.  And you received applications from him on more than one

10  occasion?

11  A.  Correct.

12  Q.  And so he would -- an application would be submitted, and

13  would you review it or would you pass it up the chain of

14  command?

15  A.  Any time an application came in, it went to our staff

16  services officer who dolled them out between the five of us.

17  Normally if it was a repeat application, they tried to give it

18  to the same specialist again because he or she was familiar

19  with that school.

20  Q.  Do you know or do you recall whether or not you ever met

21  Bradley Croft?

22  A.  There was one time that he came to the office when he was

23  bringing an application to submit.  I honestly can't remember

24  if it was the first submission or the second, but he did come

25  up to the office to drop that off.

1    Q.  And on that occasion, how did you find him?  Was he rude,

2    persistent, did he stand out in any way?

3    A.  No, he wasn't any of those things.  He just brought it.  I

4    didn't really spend very long talking to him because our

5    procedure was to just leave the application and we didn't

6    really talk to the applicant that much until we had had a

7    chance to go over the application so we kind of knew what we

8    were dealing with.

9    Q.  And do you know approximately how many individual separate

10   applications you received through or on behalf of Bradley

11   Croft?

12   A.  I dealt with three.

13   Q.  You dealt with three.

14   A.  Yeah, and when I say "dealt with", there was a lot of back

15   and forth during the processing of an application and so even

16   though there might have been a revised page or two submitted,

17   it was all part of that same application until we got to the

18   point where it was decided to either approve or decline on that

19   particular application.

20   Q.  And as you were a program specialist, were any of his

21   applications ever approved?

22   A.  Were they what?

23   Q.  Were any of Universal K-9's applications approved while you

24   were the program specialist?

25   A.  Not while I was there, no.

1  Q.  And in regard to -- what is a deficiency letter?

2  A.  Once we have a chance to go over an application and the

3  catalog, then we would send a deficiency letter to the

4  applicant letting him know things that were lacking, things

5  that were incorrect or things that needed to be changed somehow

6  in order to be in compliance with the Code of Federal

7  Regulations.  Basically a list of everything in the application

8  that needed a second look, that needed more information or a

9  revamping somehow.

10  Q.  Backing up just a bit, did you exclusively handle dog

11  school type applications?

12  A.  No.

13  Q.  For the record, what types and varieties of matters,

14  applications for schools or programs came across your desk?

15  A.  Universities, four-year universities, junior colleges,

16  non-college career schools like barber schools, beauty schools,

17  some real estate, massage therapy schools.

18  Q.  So there is a uniqueness to many of the applicants?

19  A.  Yes.

20  Q.  And I take it that would you receive any specialized

21  training, say, when you began in 2011 to help prepare you for

22  what you did?

23  A.  Yeah, we got a training course that they sent us to, but

24  most importantly it was all on-the-job training.  You worked

25  with someone for minimum six months.  There wasn't really a

1    time limit on that, it wasn't until it looked like you kind of

2    had a handle on stuff.  Then we had the Code of Federal

3    Regulations that we all knew to go by.  We had a handbook at

4    TVC for procedure purposes mainly, you know, the process of how

5    to go through and evaluate and then sending the deficiency

6    letter and being available to the schools.

7    Q.  So that handbook was a handbook for you as a program

8    specialist at the Texas Veterans Commission?

9    A.  Correct.

10   Q.  Other than the formal application itself, now I'm referring

11   to Universal K-9, would you agree that it was approximately a

12   four-page application that may include many, many attachments?

13   A.  The particular application for Universal K-9 was the

14   noncollege-degree application, so yes, it was fairly lengthy

15   because there was -- the first two or three pages was just

16   general information about the name of the school, the address,

17   things like that.  And then there was a separate what we called

18   exhibit dealing with each different kind of policy that we

19   would be looking at for the school.

20   Q.  That would be the exhibits to the attachments to the file

21   that relate to those individual questions?

22   A.  Correct.

23   Q.  In regard to Universal K-9 and its application, were you

24   working other dog school applications at the time?

25   A.  No.

1   Q.  Was there a specialty within TVC that somehow that ended on

2   your desk as opposed to one of your colleagues?

3   A.  No.

4   Q.  Is it true for me to believe that because of the uniqueness

5   and the variety of the applications that you encountered every

6   day, that you would sometimes call upon your colleagues with

7   particular questions as it relates to an application or

8   intelligibility?

9   A.  Yes, we work together a lot on them because of the --

10  Q.  Because of the uniqueness?

11  A.  Yes.  And there was such a difference between the

12  non-college career applications, the non-degree school and the

13  degree schools.

14  Q.  And you said there is a pamphlet that helps the program

15  specialist through the process, correct?

16  A.  There was a notebook if we want to call it, a policy type

17  notebook for TVC for us to use, yes.

18  Q.  And what, if anything, other than the application itself,

19  was available to the applicant to help him navigate through

20  this very meaty information type document?

21  A.  Well, I mean the applications itself was designed for

22  schools and so if you're set up like most schools, you have

23  those policies already in place, so when you see a page that

24  asks for your schedule of classes or your attendance policy,

25  most of the time that's already covered in your application, so

1  it's fairly self-explanatory.  If it's not, then that's usually

2  one of those areas that we need to work on to get up to code on

3  that.

4  Q.  I believe it is your testimony that there was a back and

5  forth between yourself as a program specialist and Universal

6  K-9 and Mr. Bradley Croft?

7  A.  That's true.  That's pretty much the way it went with every

8  school.

9  Q.  And would I be correct in saying that a lot of this is

10 written down and may be contained in e-mails?

11 A.  Correct.

12       MR. MCHUGH:  Your Honor, for the record, in evidence

13 is Defendant's Exhibits 2a through 2j, which are e-mail

14 communications between the witness, Ms. Glasgow, and the

15 defendant, Bradley Croft, just as a matter of record.

16 BY MR. MCHUGH:

17 Q.  Did you have a supervisor within your department?

18 A.  Yes, Rufus Coburn.

19 Q.  And was he the supervisor when you came in and the

20 supervisor when you left?

21 A.  When I was hired, Connie Jassuks(ph) was the head of the

22 Veterans Education Department.  He came -- I can't remember how

23 long I had been there when he took over when Ms. Jassuks(ph)

24 retired.

25 Q.  The e-mail communications, you probably haven't looked at

1  them in some time now, but can you give me the tone and flavor
2  of your communications back and forth with Mr. Croft?
3  A.  They were typical type e-mails because they were normally
4  dealing with questions, answers, information, what we needed,
5  what he had.  The way I usually did it is I would send out the
6  deficiency letter first because it would be a very detailed
7  letter.  And then after that, we used e-mails a lot back and
8  forth with questions and explanations, but yeah, they were
9  fine.
10  Q.  And in regard to the number of applications of Universal
11  K-9 as it relates to Bradley Croft that came across your desk
12  and it's your recollection that there may have been three.
13  Could there have been more than three, could there have been
14  four?
15  A.  I don't believe so.  I believe it was three, that I dealt
16  with.
17  Q.  Remember the promise?
18  A.  Correct.
19        THE COURT:  Well, I'd like to know what this promise
20  was.
21        MR. MCHUGH:  For the record, tell the Court the
22  promise.
23        THE WITNESS:  He promised me there were no "got you"
24  moments.
25        THE COURT:  Okay.

1  BY MR. MCHUGH:
2  Q.  In regard to Bradley Croft, are you even able to identify
3  him, do you even know what he looks like?
4  A.  Well, I do now.  I did remember that you were bald, but I
5  think until I saw him here today, I don't think I would have
6  recognized him on the street.
7  Q.  And but it's your testimony, your recollection is that you
8  have met him on one occasion?
9  A.  Yes.
10  Q.  In regard to you made a reference to once approved and so
11  in your relationship as a program specialist with Universal
12  K-9, you never had an approval, correct?
13  A.  That's correct.
14  Q.  And so is it correct, then, that there would be no reason
15  for you to be involved in a compliance or a site visit to
16  Universal K-9?
17  A.  Universal K-9, no.  I didn't ever make that.
18  Q.  What partly qualified you to do what you did is before you
19  worked with TVC, I believe you lived in Midland, did you not?
20  A.  Yes.
21  Q.  And you worked at a school or a junior college?
22  A.  At a junior college.
23  Q.  While you're there, part of your background is you would
24  review what?
25  A.  Well, I was the certifying official.  I worked in the

1  Registrars Office, but I was the V.A. certifying official for

2  the school which meant that I worked with the students there in

3  filing for their benefits.

4  Q.  So that gave you a feel and little bit of background when

5  you hit TVC?

6  A.  Pardon me?

7  Q.  It gave you a feel and background for the V.A. when you hit

8  the TVC in 2011?

9  A.  Correct.

10  Q.  And you remained there for approximately five years through

11  2016?

12  A.  Yes.

13  Q.  You and I visited last night and I asked you --

14          MR. MCHUGH:  And this relates, Your Honor, and for the

15  record to Defendant Exhibit Number 61.  Defendant Exhibit

16  Number 61 is an affidavit in support of an application for a

17  Search Warrant.  Your Honor, may I approach the witness?

18          THE COURT:  You may.

19  BY MR. MCHUGH:

20  Q.  Do you recall me handing you this document when we last

21  visited?

22  A.  I do.

23  Q.  In regard to that, for the record, you're not the author of

24  that document?

25  A.  That is correct, I am not.

1   Q.  But I asked you to read and to comment on those highlighted

2   first four lines of the first full paragraph of page four of

3   the affidavit and did you read it?

4   A.  I did.

5   Q.  And did I ask you to comment on what is contained there?

6   A.  You did ask me to initial that I read it.

7   Q.  That was the first time we visited, correct?

8   A.  Right.

9   Q.  But in regard to that, are you able to say whether or not

10  that is a complete and accurate statement?

11      *(Pause.)*

12      Would you like it again?

13  A.  No, I'm trying to -- well, yes, I would like it again.

14  Sorry.

15  Q.  Because there are no "got yous".

16      *(Pause.)*

17      I tell you what, since it is in evidence, read the

18  highlighted portion into the record and I'll ask you to comment

19  on it.

20  A.  Okay.  "This investigation was initiated based upon

21  information received from former Texas Veterans Commission

22  employee BG who advised that Universal K-9, a K-9 training

23  school located in San Antonio, Texas had received an unusually

24  large amount of V.A. education funds from 2016 to 2014 *(sic)*."

25  Q.  Would that be something that you would have knowledge of?

Bebe Glasgow - Examination                    70

1    A.  I didn't know anything about funds received.  I was retired

2    already, so I --

3    Q.  Were you a source, do you know whether or not you were a

4    source of this information?

5    A.  About the funds?

6    Q.  Yeah, about the funds.

7    A.  I don't really know.  I did talk to them about -- they

8    asked me if there was a school, another school that I had

9    reservations about.

10   Q.  Give the context of that interview.

11   A.  Pardon me?

12   Q.  Give the context of that interview.  Where did it take

13   place and what was it about?

14   A.  We were in a meeting, I was contacted by the V.A. I.G.'s

15   office in Dallas concerning another school that they were

16   reviewing and that I had experience with while I was at TVC, so

17   they were asking information about that.

18   Q.  Were you an employee of TVC at the time?

19   A.  That we were speaking?

20   Q.  Yes.

21   A.  No, I was already retired.

22   Q.  Okay.

23   A.  And at the end of that interview about the school, they

24   asked me if there was any other school that I dealt with at TVC

25   that I might have reservations about.  And I answered yes, that

1    Universal K-9.

2    Q.  Did you provide any information beyond that?

3    A.  They asked me why I thought of that and I just said that

4    during the three application processes that I dealt with, in my

5    opinion I had a feeling that the applicant was putting more

6    time and energy into getting around the Code rather than being

7    in compliance with the Code, so --

8    Q.  Did I cut you off?

9    A.  I was concerned that he would continue that mode of

10   operation after he got approved.

11   Q.  And you learned later or did you know at that time that the

12   school had been approved to receive V.A. benefits?

13   A.  No, I didn't know it had been approved by then.

14   Q.  And you knew that, how did you learn that?

15   A.  It just kind of was in conversation one day with another

16   friend of mine who used to work at TVC, we were visiting as we

17   did a lot about our families and kids.  And she mentioned, she

18   said, "Did you realize that -- did you know that Universal K-9

19   got approved?"  And I went, "Oh, no, but good."

20   Q.  Did you say "good"?

21   A.  Well, I mean I didn't really have a comment except that

22   okay.

23   Q.  I'm going back to this one more time.  "This investigation

24   was initiated upon information received from you who advised

25   that Universal K-9 had received an unusually large amount of

1   V.A. education funds from 2016 to 2018."

2        Would you have any direct knowledge of that?

3   A.  No.

4             MR. MCHUGH:  Thank you very much.  I pass the witness.

5                      CROSS-EXAMINATION

6   BY MR. SUROVIC:

7   Q.  Good morning, Ms. Glasgow.

8   A.  Good morning.

9   Q.  We have met before, haven't we?

10  A.  I think only on the phone, is that right?

11  Q.  Didn't we meet in my office in San Antonio in about May of

12  this year, me and there were some agents also available?

13  A.  I don't think so.

14  Q.  Okay.  You mentioned a Mr. Rufus Coburn.  Was he your boss

15  the entire time that you were dealing with the Universal K-9?

16  A.  Mr. Coburn?

17  Q.  Coburn, yes, ma'am.

18  A.  The entire time I dealt with Universal K-9?

19  Q.  Yes, ma'am.

20  A.  Correct.

21  Q.  In your dealings with Mr. Coburn, did you ever have any

22  issues with him concerning his unreasonableness?

23  A.  Never.

24  Q.  Would you classify him as a fair, impartial person when

25  he's reviewing these tactics?

1    A.  I would.

2    Q.  How did Mr. Coburn become involved in the processing of

3    Universal K-9, did he become involved in every application?

4    A.  He did because he was a very hands-on boss, he was always

5    available for us to ask questions if we didn't understand

6    something, so he was always aware of applications that were

7    being processed in the office.

8    Q.  You've been talked to by the agents in this case.  Do you

9    recall describing your experience with Mr. Croft as being over

10   the top?

11   A.  In reference to what?  Just his general --

12   Q.  Him personally.

13   A.  No, I don't.

14   Q.  Do you remember or indicating that he was very nice when

15   things started out, but as time went on, the relationship got

16   worse?

17   A.  Well, it would be difficult to describe it as a

18   relationship.  I mean I said I met him one time, we dealt back

19   and forth in e-mails, in letters.  With each application there

20   were more people involved usually because he brought in a

21   lawyer, couple of lawyers that I dealt with also.  So that was

22   not the norm in dealing with these applications.

23   Q.  Did you ever sense any -- was there ever any tension

24   between you and Mr. Croft concerning the applications?

25   A.  Not that I'm aware of.

1   Q.   I'm going to show you what's been marked -- what's in

2   evidence as Government Exhibit Number 6i.  You should be able

3   to see it.  There's a laptop there and it's also going to be up

4   there on the screen.

5   A.   Oh, okay.

6   Q.   Do you remember seeing this before?

7   A.   I have seen it, yes.

8   Q.   Is it something that came out of the Universal K-9 file?

9   A.   I assume so.  I don't know where this came from.

10  Q.   You've seen it, though, before?

11  A.   Uh-huh.

12  Q.   Does it fairly, accurately reflect some concerns that you

13  had concerning the first three applications of Mr. Croft and

14  Universal K-9?  You can take some time to look at it.

15      (Pause.)

16  A.   That seems accurate to me.

17  Q.   Okay.  And in the course of your working on the packet, you

18  periodically would put stickies or something like that on the

19  actual applications?

20  A.   I did, I did that on all of my applications.

21  Q.   So those would be your stickies in the exhibit?

22  A.   Most of them.  I mean I don't know what was placed in there

23  after I left, but when I worked an application I used stickies

24  a lot to help identify trouble spots.

25  Q.   Would it be fair to say that there were a number of

1   problems with Mr. Croft's application?

2   A.   There were.

3   Q.   Were you willing to work with him in order to get them

4   corrected?

5   A.   Yes, that's what we did.

6   Q.   Were you ever prejudiced against Mr. Croft specifically or

7   dog programs?

8   A.   No.

9   Q.   Was you or TVC prejudiced against the idea of using shelter

10  dogs to further the training of the students?

11  A.   In my dealings I didn't even know they were shelter dogs.

12  I mean I thought they were their dogs.

13  Q.   Do you recall if Mr. Croft ever accused you or accused the

14  TVC of being racist?

15  A.   Not that I'm aware of, but I didn't -- my only dealings

16  with him were in these deficiencies and dealing with the

17  application.

18  Q.   Was there any time while you were dealing with the

19  application that you had a discussion with Mr. Croft about the

20  need to have identify the people who are going to be the

21  trainers?

22  A.   I don't remember talking to him specifically about that.

23  It was part of the application.  There was a place where you

24  had to identify instructors and personnel, administrative

25  personnel.  That's what was required on the application, so

Bebe Glasgow - Examination                    76

1  that's what I would have been asking of him.

2  Q.  Would you have ever told him that that section isn't

3  important, that it doesn't matter, just throw in some names?

4  A.  No, I would never have said that.

5  Q.  Is that section actually important?

6  A.  It is important, yes.

7  Q.  Would a packet be approved if you never listed instructors

8  or provided their qualifications?

9  A.  If you did not provide instructors or their qualifications?

10  It should not be, no, that was one of the exhibits in the

11  application.

12  Q.  You indicated you had some reservations about the Universal

13  K-9, their activities.  Could you explain what you meant by

14  that?

15  A.  Not their activities, I had reservations about the way the

16  application process was going.  It didn't ever feel to me that

17  they were trying to be compliant with the Code, it was more

18  that they were trying to get around the Code.

19  Q.  Can you give us an example of that?

20  A.  I think it was -- I don't remember which application --

21  maybe it tells me here.  I think it was the second application

22  where they came in with these contracts that were supposed to

23  be military contracts because there was a place in the CFR that

24  talked about if you're under contract with the military, you

25  didn't have to be approved or have the two-year rule, I think

1   it was.  And so these contracts that came in all of a sudden,
2   they weren't part of the first application, but they were of
3   the second one, but it was from the State of Delaware which has
4   nothing to do with being approved in the State of Texas, so I
5   just found that odd.  Anyway that's one example.  After the --
6   Q.  Did you talk to Mr. Croft about that?
7   A.  I didn't talk to him directly.  I mean verbally I answered
8   back that this would not be acceptable because it was not a
9   State of Texas contract.
10  Q.  Okay.  Were there other instances like that?
11        MR. MCHUGH:  Objection, Your Honor, relevance.
12        THE COURT:  Overruled.
13  BY MR. SUROVIC:
14  Q.  Go ahead.
15  A.  There was one new revised catalog that came in that all of
16  a sudden was talking about Registrars Office and a Financial
17  Aid Office and talking to the counselor and making sure your
18  graped point was up and things that had never been in his
19  catalog before that all of a sudden are present and yet he
20  didn't have a registrar or financial aid guy or any of those
21  people.  They were not present at his school, but all of a
22  sudden it was in his catalog.
23  Q.  By the way, you indicated when you were talking about the
24  contracts, there is a requirement that the school operate for
25  two years before it apply to TVC in order to get veterans --

1   A.  Yeah, there is a requirement, first of all, that any

2   non-college degree school must be operating legally in the

3   State of Texas for two years prior to applying for veterans

4   approval.  And in the State of Texas, that meant that you

5   needed to either be approved or given an exemption by the Texas

6   Workforce Commission and that wasn't present either.

7            MR. SUROVIC:  No further questions, Your Honor.

8                      REDIRECT EXAMINATION

9   BY MR. MCHUGH:

10  Q.  When you were employed at the Texas Veterans Commission,

11  who was the head in the State of Texas of the Texas Veterans

12  Commission?

13  A.  Of the entire Commission?

14  Q.  Yes.

15  A.  Thomas Palladino.

16  Q.  Did you know him?

17  A.  Yes, I mean in the office.

18  Q.  Was he in your same building?

19  A.  Yes.

20  Q.  And you became aware of a communication that Bradley Croft

21  sent to Mr. Palladino, at some point you were copied on that,

22  were you not?

23  A.  I believe so.  I don't remember reading it, but you said I

24  was copied on it, so --

25  Q.  But you know of the existence of this e-mail that was out

1    there?

2    A.  I mean I remember being aware of the fact that he had gone

3    to Palladino.

4    Q.  And so do you recall meeting with Rufus Coburn regarding

5    this e-mail and that communication?

6    A.  I didn't have a meeting with him.

7    Q.  Maybe not meeting is not the right word.

8    A.  We talked about it.  I mean he told me that he knew what

9    was going on as well, was talking to me about the fact that

10   Palladino had been contacted.

11   Q.  And so you would expect your supervisor, Rufus Coburn, to

12   talk to you if one of your applicants under your responsibility

13   complains outside your immediate office, say, to Palladino.

14   And so you were aware that because of that because you had some

15   conversation at some point about this complaint?

16   A.  Our office was a very open office, so yes, he would mention

17   that, not necessarily to me in private, but to all five of us

18   as we worked.  That was the way he operated.

19   Q.  So were you involved, do you know whether or not you were

20   involved in any staffing meetings where Mr. Coburn was present

21   and Mr. Palladino was present to address the Universal K-9

22   complaint?

23   A.  No, I was not in any of those meetings.

24   Q.  And there was a question on cross about this two-year

25   requirement.  It is true that there is a period of almost two

1  years where there was no application submitted, correct?  The

2  record will speak for itself.

3  A.  I mean that could be.  I don't really know how long in

4  between.  I do know I dealt with three applications in three

5  years.

6  Q.  And you put together the timeline, did you not?

7  A.  I did put together a timeline, yes.

8  Q.  And the purpose of you putting together that timeline was

9  what?

10  A.  When Mr. Palladino was brought into it, he wanted a

11  timeline to bring him up to speed.  He was the head over all

12  five of the divisions of TVC, so he didn't have a day to day

13  knowledge of what went on in the education area.

14  Q.  So the timeline that you created and gave to Mr. Coburn,

15  who I take it gave it to Mr. Palladino, was just to give

16  historical background regarding the application process of

17  Universal K-9?

18  A.  Yes, yes, so he would know what had happened with --

19         MR. MCHUGH:  Thank you very much.

20         THE WITNESS:  Thank you.

21         MR. SUROVIC:  No further questions, Your Honor.

22         THE COURT:  Nothing more?

23         MR. MCHUGH:  She may be excused.

24         THE COURT:  All right.  You can step down.  Thank you.

25  Well, it's five minutes to noon, so I think we'll take our

 1    lunch recess.  See you at 1:30.

 2            COURT SECURITY OFFICER:  All rise.

 3            *(11:52 a.m.)*

 4                            *  *  *

 5            *(1:43 p.m.)*

 6            COURT SECURITY OFFICER:  All rise.

 7            THE COURT:  Please be seated.  The Court would note

 8    the presence of counsel as well as the parties.

 9            MR. BROOKS:  May we proceed, Your Honor?

10            THE COURT:  Yes.

11            MR. BROOKS:  At this time, the defense would call

12    Mr. Jonathan Lawrenz.

13            COURTROOM DEPUTY CLERK:  Please raise your right hand.

14                            *  *  *

15            *(JONATHAN LAWRENZ, Defense Witness, Sworn.)*

16                            *  *  *

17            THE WITNESS:  Yes, ma'am.

18            COURTROOM DEPUTY CLERK:  You can have a seat.

19                        DIRECT EXAMINATION

20    BY MR. BROOKS:

21    Q.  Mr. Lawrenz, if you could introduce yourself please?

22    A.  I'm Jonathan Lawrenz from Madisonville, Texas.

23    Q.  And Mr. Lawrenz, we spoke this morning, is that correct?

24    A.  Yes, sir.

25    Q.  How are you employed, sir?

1   A.   Full-time police officer with Madisonville Police

2   Department.

3   Q.   How long have you been doing that?

4   A.   Little over ten years.

5   Q.   How long have you been a licensed peace officer?

6   A.   Little over ten years since June of 2009.

7   Q.   And do any sort of stops before Madisonville?

8   A.   Just working as a jailer in Grimes County Jail.

9   Q.   And are you familiar with Universal K-9?

10  A.   Yes, sir.

11  Q.   How are you familiar with Universal K-9?

12  A.   I received my second K-9 from them in September of 2015.

13  Q.   And did you go through any sort of training there at

14  Universal K-9?

15  A.   Yes, sir.

16  Q.   What program did you do?

17  A.   I did the two-week dual purpose handler course.

18  Q.   At that time, who taught you?

19  A.   Brad Croft.

20  Q.   Okay.  Was there anybody else that you came in contact with

21  during that time?

22  A.   Not during the first school, no, sir.

23  Q.   You say the first school, was there a second time or second

24  program you took?

25  A.   I came back and recertified every year and then I began to

 1   do some teaching for them.

 2   Q.  Did you ever have the occasion to meet a Wes Keeling or --

 3   A.  Yes, sir.

 4   Q.  And how did you meet Mr. Keeling?

 5   A.  Him and Dustin -- I don't recall his last name -- taught a

 6   two-day interdiction course the first weekend I was at the

 7   two-week handler school.

 8   Q.  Would Dustin Bragg, does that sound familiar?

 9   A.  Yes, sir.

10        MR. BROOKS:  If I could see Defense Exhibit 50

11   whenever we have a chance?  Thank you.

12   BY MR. BROOKS:

13   Q.  And you said you took that interdiction course, correct?

14   A.  Yes, sir.

15   Q.  Sir, if you could look at the monitor there, are you able

16   to identify any of those individuals in that photo?

17   A.  Yes, sir, the gentleman next to the -- gentleman on the far

18   left in the green shirt, the one next to him, that is going to

19   be Wes.  And then on the right side next to the gentleman

20   wearing the tan pants and black shirt, that's going to be

21   Dustin.

22   Q.  Do you know anybody else in that photo?

23   A.  Brad.

24   Q.  And how do you know Brad Croft?

25   A.  Because his sandals and socks.

```
 1   Q.  Interesting look, isn't it?  And what was your impression
 2   of Mr. Croft during that time when you were being taught?
 3   A.  During my two-week school?
 4   Q.  Yes, sir.
 5   A.  I was pretty impressed.
 6   Q.  Have you had much contact with him after that school, after
 7   that time?
 8   A.  Yes, sir, we stayed in contact.
 9   Q.  When was your last contact with him?  Months?  Years?
10   A.  Months.
11   Q.  Tell me a little bit about -- you said you're on your
12   second dog, is that correct, from U K-9?
13   A.  Yes.
14   Q.  What's that dog's name?
15   A.  Jocco.
16   Q.  Jocco.  Male or female?
17   A.  Male.
18   Q.  And is Jocco currently a K-9 officer?
19   A.  Yes, sir, he is.
20   Q.  Is Jocco a shelter dog, if you know?
21   A.  No, sir.
22   Q.  Okay.  What kind of dog is Jocco?
23   A.  He is a full blood Belgian Malinois that came from Lackland
24   Air Force Base.
25   Q.  How long have you been working with Jocco?
```

1   A.   Since September of 2015.

2   Q.   Has it been a continuous work process between the two of

3   you?

4   A.   Yes, sir, every week, every day.

5   Q.   How would you describe the scale of dog training or dog

6   handling?

7   A.   Can you rephrase that?

8   Q.   How would you describe that?  So you're a K-9 officer,

9   correct?

10  A.   Yes, sir.

11  Q.   And is that a skill you acquire and how is it acquired?

12  A.   The skill is acquired by going to trainings and

13  continuously training, working with your dog.  You get a new

14  dog, you continue working with the new dog, learning the new

15  dog's distinct behavior changes that you learn through training

16  with the dog.  It's a perishable skill.  If you don't use it,

17  you're going to lose it.  If you don't continue to train, you

18  will -- the skill will perish between you and the dog.

19  Q.   And has Jocco been successful, in your opinion, as a K-9

20  officer with you?

21  A.   Yes, sir, if you look me up on Google, it's the first thing

22  that pops up.

23  Q.   And you had done some training prior to the U K-9 course,

24  correct?

25  A.   Yes, sir.

1  Q.  What program was that?

2  A.  I went through 120-hour basic handler school at Harris

3  County Sheriff's Office in Houston, Texas.

4  Q.  How long was that program?

5  A.  Three weeks.

6  Q.  And you said the U K-9 program was two weeks?

7  A.  Yes, sir.

8  Q.  So a shorter program.  Was there an hour's difference as

9  between the two?

10  A.  The class in Harris County was kind of we worked with the

11  instructor's or trainer's work schedule because I was kind of a

12  guest allowed to come down there.  But Universal K-9 is a set

13  schedule, we work our hours every day.

14  Q.  As between the two, do you feel like you -- do you feel

15  like the programs were comparable in your mind?

16  A.  I do.

17  Q.  Have you been contacted by law enforcement in respect to

18  this case?

19  A.  I have.

20  Q.  And tell me a little bit about that contact, if you can?

21  A.  I was -- first contact was a -- I can't recall his name,

22  gentleman who said he was investigator with the IRS, was asking

23  me questions.  I believe this was shortly after the initial

24  arrest and raid of the Universal K-9, had advised me that there

25  was letters sent out to everyone that received dogs.  I advised

1    him I never received a letter, confirmed my work address.

2    Q.   Did you ever get that letter?

3    A.   No, sir.

4    Q.   Did they ask you for any sort of other feedback on

5    Universal K-9 at that point?

6    A.   That was a pretty long phone call.  They asked me all kinds

7    of questions.

8    Q.   Okay.  Was that the only time you had contact with law

9    enforcement regarding this case?

10   A.   No, sir.

11   Q.   What was the next contact you had?

12   A.   The next one was I believe July of this year, end of July.

13   It was two individuals on the phone, a female, I believe she

14   was a DPS officer assigned to FBI Task Force, and IRS

15   investigator.

16   Q.   And what sort of things were you discussing at that point?

17   A.   They just asked me questions about Universal K-9, the

18   training I went through, how it was comparable to Harris County

19   Sheriff's Office, if I received any other additional training,

20   had the dog trained anywhere else after receiving him.  Just

21   kind of got a little background of me and Jocco.

22   Q.   Was your discussion essentially the same as your testimony

23   has been today?

24   A.   Yes.

25   Q.   Did you, in fact, teach any courses at U K-9?

1   A.  I did.

2   Q.  When was that?

3   A.  I taught three, February of 2018, March of '18 and June of

4   '18.

5   Q.  And were you compensated for those courses or those

6   teachings?

7   A.  Just one of them, I believe.  The first two I taught for

8   free, was kind of like a -- I wanted to see if it was something

9   I wanted to do.  I've never taught a K-9 school before.  I

10  really enjoyed it.  Mr. Croft thought I was more knowledgeable

11  than I think I am, so I wanted to try it out, taught for free

12  and I did get compensated for one of the classes I taught.

13  Q.  During those teachings, did you receive feedback from some

14  of the students?

15  A.  I did.

16  Q.  Would you characterize that feedback as positive or good?

17  A.  Yes, sir, at the end of every class I passed out critique

18  forms.  All the students would fill them out, turn them back

19  in.  It's a TCOLE requirement also and none of them had

20  anything bad to say.

21  Q.  And when you were contacted by law enforcement, I think you

22  said first by was it tax or was it -- who contacted you first?

23  A.  I believe it was the IRS investigator, I don't recall his

24  name.  It was the entity that was in '18.

25  Q.  Were they interested in that positive information?

1  A.  I did advise them of the critique forms and advised them

2  that I could send them to them a digital copy, mail them to

3  them, never heard anything that they wanted the forms.

4  Q.  And I think the second time was DPS, correct?

5  A.  Yes.

6  Q.  DPS contacted you or a Task Force officer?

7  A.  Yes.

8  Q.  Did you tell them about the positive feedback and

9  information?

10  A.  I did.

11  Q.  And was that person interested in that information?

12  A.  They never asked for them.

13  Q.  To the best of your knowledge.  Tell me a little bit, if

14  you can, about the dog handling industry or the dog industry.

15  How would you describe it in your experience?

16  A.  A lot of people call it doggy-dog.  You have so many

17  companies out there and with all your private industry things,

18  people are going to be bashing each other, they want the

19  business, so they're going to bash other businesses to try to

20  get business to them by saying they put out bad dogs or the

21  dogs that they're putting out are too young, undertrained.

22  I've seen dogs that come from kennels that cost $40,000 that

23  had to be sent back because they didn't perform.

24  Q.  Is there a lot of attacking of other businesses in your

25  experience in the dog industry?

1  A.  Yes, sir.

2  Q.  And why is that, in your opinion?

3  A.  Because they want the business.

4  Q.  Everybody is going for the same piece of the pie

5  essentially, correct?

6      Tell me a little bit about regulation, if you know, how is

7  the industry, the dog industry in Texas, for example,

8  regulated?  Is there a standard body?

9  A.  I don't know of any State or Federal regulations that you

10  have to hold any certain trainer license or certificate to

11  train a drug dog for law enforcement.  I know people

12  individually who have personally trained their own drug dog,

13  had it certified through a national agency like NNDDA or NAPWDA

14  and now they are currently working the streets with this dog

15  that they trained on their own and they are not a certified

16  trainer or anything.  They started as a bird dog trainer,

17  trained their own drug dog, the drug dog passed the NNDDA

18  certifications, they're working the streets.

19  Q.  So back to my earlier question, is this a skill that's

20  acquired through experience, in your opinion?

21  A.  It is and not everyone is cut out to do it.

22  Q.  Does a certificate hold as much weight as, say, the

23  experience does itself?

24  A.  It doesn't.

25  Q.  In your opinion, did Brad have the necessary skill set to

1    be in the industry or train dogs?

2    A.   Absolutely.

3    Q.   So if I might go back around just briefly, you're certified

4    to handle dogs, is that correct?

5    A.   Yes, sir.

6    Q.   And what certifications do you possess?

7    A.   I've certified through Universal and NNDDA, I've been

8    through the 120-hour basic handler school through Harris County

9    Sheriff's Office, but my certifications with Jocco come through

10   Universal K-9 and the National Narcotic Detector Dog

11   Association which I certified with in 2015 directly after

12   leaving Universal K-9 and again in 2018 after Universal K-9 was

13   raided just to keep court stuff down, I had to go to court.

14   Q.   You want to ensure the dog is still able to work?

15   A.   Yes, because I did go to court after the fact and my

16   records were subpoenaed and they did bring up the Universal K-9

17   court issue and tried to attack the certification.

18   Q.   Fair enough.  You did go through the Universal K-9 program?

19   A.   I did.

20   Q.   In your opinion it was comparable to the Harris County

21   program?

22   A.   Yes, sir.

23   Q.   And during your time at Universal K-9, you were taught

24   by -- in the interdiction course by Mr. Bragg and Mr. Keeling,

25   correct?

1   A.   Yes, sir.

2   Q.   And what year was that?

3   A.   2015.

4   Q.   Was there a falling out between Mr. Croft and any of the

5   individuals we just discussed, if you know?

6   A.   I know through my personal communications with Brad after

7   getting --

8            MR. SUROVIC:  Object, Your Honor, hearsay.

9            MR. BROOKS:  I'll move on, Your Honor.

10           THE COURT:  Sustained.

11  BY MR. BROOKS:

12  Q.   You believed in the program, you came back and taught some

13  courses yourself, correct?

14  A.   Yes, sir.

15           MR. BROOKS:  Thank you very much, Mr. Lawrenz, Officer

16  Lawrenz.  I pass the witness, Judge.

17           MR. SUROVIC:  No questions, Your Honor.

18           THE COURT:  You can step down.

19           MR. MCHUGH:  Angie Gilstrap.

20           *(Pause.)*

21           COURTROOM DEPUTY CLERK:  Please raise your right hand.

22                          *   *   *

23           *(ANGIE GILSTRAP, Defense Witness, Sworn.)*

24                          *   *   *

25           THE WITNESS:  Yes.

```
 1          COURTROOM DEPUTY CLERK:  Thank you.  You can have a

 2   seat.

 3          MR. MCHUGH:  May I proceed, Your Honor?

 4          THE COURT:  You may.

 5                     DIRECT EXAMINATION

 6   BY MR. MCHUGH:

 7   Q.  Will you please state your name?

 8   A.  Angie Gilstrap.

 9   Q.  And where are you employed?

10   A.  I have a medical spa called Millennia Mini Spa in New

11   Braunfels.

12   Q.  How long have you had that spa?

13   A.  Since 2005.

14   Q.  Are you the owner of that spa?

15   A.  That's correct.

16   Q.  You have employees?

17   A.  Yes.

18   Q.  How many employees do you have?

19   A.  Ten.

20   Q.  And are you familiar with a Canyon Lake Animal Shelter?

21   A.  That's correct.  I am the President of the Board of

22   Directors for CLAS, also known as Canyon Lake Animal Shelter.

23   Q.  What is Canyon Lake Animal Shelter?

24   A.  Canyon Lake Animal Shelter is a 501(c)3, no-kill animal

25   shelter.  A lot of animal shelters can call themselves no-kill,
```

1  but we are truly no-kill.  We will keep an animal as long as

2  necessary until it finds its forever home.  We do occasionally

3  euthanize for medical issues that are not treatable, but other

4  than that, these animals stay as long as they need to, unlike

5  other shelters.

6  Q.  How are you funded?  How is the animal shelter -- where

7  does it receive its funds?

8  A.  We're privately funded by donors that support our cause.

9  We do receive a few grants.  They're not large grants, but it

10 helps keep us afloat.  We run on a very small shoestring

11 budget.

12 Q.  And do you take any money out of the animal shelter?

13 A.  No.  I actually donate a lot of my own personal funds to

14 keep the shelter afloat and I also probably put in about 20 to

15 30 hours a week of my personal time that's uncompensated.

16 Q.  And what is the population at the shelter?

17 A.  We currently have 37 dogs and about 115 cats.

18 Q.  And the defendant in the courtroom, Bradley Croft, do you

19 know a Bradley Croft?

20 A.  I do know Brad.

21 Q.  And how do you know him?

22 A.  I met Brad in February of 2014, I had a dog that was

23 brought into my facility that was located in San Antonio,

24 Texas.  A bus driver had been dropping off children and he

25 dropped off the last child and then a Pit Bull ran onto the bus

1   and he took the dog home with him, contacted several shelters

2   who basically told him it's a Pit Bull, we're going to

3   euthanize him.  He contacted me, I had some room at my shelter

4   at the time and I took the dog in.  Once the dog got to my

5   facility, we scanned the dog for a microchip and the microchip

6   was registered to Brad Croft, so I reached out to him.  And it

7   was a dog that he had in his program that did not make the cut

8   and had been re-homed and had gotten loose from its owner, but

9   the microchip was still registered to him.

10  Q.  So he came out to retrieve the dog?

11  A.  He did, he came out, picked up the dog.  The dog's name was

12  Rex.  And while he was there, he asked if I had any dogs that I

13  thought might be good for his program.  And at that point, I

14  had never heard of his program before.  The one thing that we

15  do at my shelter is any time an animal comes in, we evaluate

16  that animal and try to see is this going to be a family pet or

17  does this dog have qualities that it could be a service dog or

18  maybe go into other line of work.  And so when I met Brad I was

19  really excited about the program that he offered because

20  there's no one else out there saving these dogs with this high

21  ball drive.  High ball drive is these dogs that all they want

22  is the ball, so they come in, a lot of people are looking for a

23  family dog that wants to lay on the couch, watch TV with them.

24  These high ball drive dogs, they really don't make good family

25  pets and because of that, they can become destructive.

1   Q.   Why does a high ball drive not make a good family pet in

2   your opinion?

3   A.   In my opinion, like I said, people want a dog that lays on

4   the couch and watch TV with them.  And these dogs, they want

5   that ball or that toy or whatever their drive is, so much so

6   that they really don't care about human interaction as much as

7   they care about that toy.

8   Q.   And so after this initial meeting with Mr. Croft, would he

9   ever reach out to your facility?

10  A.   He did.  He would occasionally reach out to me if he had

11  space in his program, but I think I actually called him more

12  than he called me.

13  Q.   And explain that?

14  A.   Well, I get about 30 tags a day on Facebook, people asking

15  me to help save animals that are in need.

16  Q.   I take it you're a dog person?

17  A.   I'm a dog person, but I'm really the crazy cat lady, but

18  yeah, I like dogs too.  But it's these dogs, there's so many

19  out there, especially here in Texas, we have a problem with

20  over population and people not caring for their animals.

21  There's a lot of animals that wind up in facilities that aren't

22  really adoptable, they get put on death row.  My shelter will

23  actually go into these high-kill facilities and pull dogs off

24  death row.  A lot of them have medical conditions --

25  Q.   Slow down.  Say that one more time?

1   A.  I will save dogs from area shelters and that are on death

2   row, meaning they have usually less than ten hours to live

3   before they're euthanized to make space for more dogs coming

4   into the facility.  And I will save these dogs, pull them into

5   my shelter, rehabilitate them and put them up for adoption.

6   Q.  In regard to -- how many has Mr. Croft -- how many dogs has

7   he received through your facility, Canyon Lake Animal Shelter?

8   A.  From my shelter personally, eight dogs, but I have helped

9   other facilities get their dogs into his program as well.

10  Q.  And you are familiar with the -- through your conversations

11  with him, the type dogs that he would be interested in?

12  A.  Absolutely.  And he worked with me one on one.  He came to

13  my shelter and showed me some tests that I could run on these

14  dogs.  One of those tests, for example, is taking like a Home

15  Depot bucket and dropping a ball down in the bucket.  If that

16  dog is willing to put his head down in the bucket, that means

17  that dog has no problem putting his head in confined spaces, so

18  that would make a great drug dog because he's going to be able

19  to put his head up in a wheel well or wherever he needs to put

20  it.

21  Q.  Over what period of time have you provided him from your

22  facility with those eight dogs?

23  A.  From 2014, February of 2014 to July of 2018.

24  Q.  And you're familiar what happened with the seizure of dogs

25  at Universal K-9?

1   A.  From what I've heard on the news and social media, that's
2   about all I know.
3   Q.  After dogs were seized at his property, did you talk to him
4   on or about that time?
5   A.  I did.  I immediately called him when I heard what had
6   happened and I asked him what happened to the three dogs that
7   were at my program.  He said that they had been taken by Animal
8   Control.  And I was able to reach out to Animal Control within
9   a few days of going back and forth with them.  I did get three
10  dogs back, but I will say of the three dogs, one of them had
11  already been assigned to a veteran in his program and she had
12  been working with this dog.  And in speaking with Brad, we
13  decided that, you know, she needed this dog, deserved this dog.
14  She came to my shelter and I donated the dog to her, did not
15  charge an adoption fee, I let her have the dog.  But the other
16  two dogs that were in that program was a German Shepherd and a
17  Pit Bull, so I got them back in August, I think it was
18  August 9th or 10th of last year.
19  Q.  2018?
20  A.  Uh-huh, and those two dogs are still in my facility right
21  now.
22  Q.  Why are they still in your facility?
23  A.  Because they are too high drive to be a great family pet
24  and so until I can find another project for these dogs, they'll
25  probably end up spending the rest of their lives at my shelter.

1   Q.  The three dogs that you received back, what shape or

2   condition were they in?

3   A.  They were fine, they were happy.  I didn't see that they

4   were depressed, they didn't -- they hadn't lost any weight.

5   They actually maybe looked a little chunkier than when they

6   left.

7   Q.  Would you communicate with Mr. Croft regarding an exchange

8   of videos and if you could explain that?

9   A.  Absolutely.  One of the easiest ways for Brad to see some

10  of the dogs that I thought might be good for his program would

11  be sending videos back and forth, so I would take videos at my

12  facility, I would also have these other facilities that were

13  reaching out to me and saying, hey, I know you have a

14  relationship with Universal K-9, can you help maybe get some of

15  my dogs into that program as well, which I did do.

16          MR. MCHUGH:  Your Honor, may I approach the witness?

17          THE COURT:  Yes.

18  BY MR. MCHUGH:

19  Q.  I hand you what has been marked for identification purposes

20  as Defendant Exhibit number what?

21  A.  64.

22  Q.  64.  And what is 64?  Have you seen that before?

23  A.  I have.  I'm in the picture.

24  Q.  Do you recognize yourself?

25  A.  I do.

1   Q.  And where and when was that picture taken, if you recall?

2   A.  I don't know the exact date that that picture was taken,

3   but it is taken in front of my shelter and what had happened

4   was this is K-9 Remmie, she was the first dog that left my

5   facility and went into the Universal K-9 program.  She's a rock

6   star.  And they came by one day so that I could meet her

7   handler.  And so it was her handler and Jesse, one of Brad's

8   employees came out that day and they ran a few little scenarios

9   out front where they pulled someone over, searched the car.

10  And then afterwards I got to take this photo-op., which I

11  posted on our Facebook page.

12  Q.  Who took the photo?

13  A.  I think Brad took it.

14  Q.  In regard to when you refer to Jesse, referring to Jesse

15  Stanley?

16  A.  Correct.

17  Q.  When you refer to a Wes, you refer to Wes Keeling?

18  A.  Correct.

19  Q.  And they were with Mr. Croft when they came out to your

20  no-kill animal shelter?

21  A.  That is correct.  I want to say that Jesse and Brad rode in

22  the same car together that day, if I can remember, it was a

23  long time ago.

24  Q.  And just to go back just -- you made a reference to a

25  kill/no-kill shelter?

1   A.   Uh-huh.

2   Q.   And what are you suggesting or what are you saying?

3   A.   Well, a shelter can call itself a no-kill shelter if it

4   kills less than ten percent of the animals that it has in its

5   possession, so if they can keep their kill numbers down below

6   ten percent, they can say that they're no-kill even though

7   they're still killing to make space.  Whereas at my shelter if

8   we're full, we're full, I don't accept any new intakes.  It's

9   basically one dog out, one dog in.  That's how it has to work

10  at my facility, so we don't euthanize to make room for new dogs

11  coming in.

12  Q.   You say Remmie was a rock star?

13  A.   She was a rock star.

14  Q.   What do you mean by that?

15  A.   Well, Remmie always had a ball, a tennis ball in her mouth

16  and it was really fun because people would come by to look at

17  the animals for adoption and their favorite thing to do was

18  just pick up a ball and get Remmie to play with them.  But then

19  after they played with her for a while they thought, oh, that's

20  way too much energy for my home.

21       So I actually turned down a few adoptions for Remmie based

22  on the home environment.  I didn't think it was going to work

23  for her specifically.  And so when Brad came along and fell in

24  love with her, I thought this is an amazing situation because

25  that's exactly what she needed was a job.  And there's a lot of

1   dogs that need jobs.  And that's one thing that I do in my

2   facility is we evaluate these animals.  I work with a company

3   that trains these dogs to be diabetic alert dogs.  Some people

4   have never even heard of that before.  Basically the dogs can

5   smell if the insulin levels are too high or too low and alert

6   their handlers.  I've also worked with organizations that train

7   the dogs to be service dogs for PTSD.  So it was really nice

8   having a couple of different or actually three different

9   options, police dogs, service dogs and diabetic alert dogs.

10      And you know, I will say Brad was the only one that was

11  taking Pit Bulls.  And I know there's a lot of stigma about Pit

12  Bulls, I personally love them and I think that they get a bad

13  rap and nobody wants to save them, but you have this

14  organization that not only was saving them, but giving them a

15  purpose and a job and I think it's sad that, you know, right

16  now we don't have that ability to do anything with these Pits

17  because nobody else wants to save them.  They want the German

18  Shepherds and that type of working breed.

19  Q.  Thank you very much.

20              MR. MCHUGH:  I pass the witness.

21              MR. SUROVIC:  No questions, Your Honor.

22              THE COURT:  Ma'am, you may step down.

23              MR. MCHUGH:  May we approach the bench, Your Honor?

24              THE COURT:  The bench?  Sure.

25                            *   *   *

1          *(Sidebar.)*

2          MR. MCHUGH:  I think, Your Honor, that's it as far as

3    witnesses and so I rest.  Before I rest --

4          THE COURT:  Is your client going to take the stand?

5          MR. MCHUGH:  He is not going to take the stand and I

6    would like the Court to admonish him.

7          THE COURT:  Yes, I will.

8          MR. MCHUGH:  And we need to clear up, we have a couple

9    of stipulations that we'll do as a matter of record and it's

10   mostly the admonishment.

11         THE COURT:  I'll take care of that right now.  Thank

12   you.

13         *(Sidebar concluded.)*

14                              *  *  *

15         MR. MCHUGH:  Your Honor, at this time, the defendant

16   has no additional witnesses to present.

17         THE COURT:  All right.  Mr. Croft, your counsel has

18   indicated that there are no further witnesses to be presented

19   by the defense which means, of course, that you haven't been

20   listed as a witness.  The indication the Court has is that you

21   will not be testifying, is that correct?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  Now, you understand that you have a right,

24   an absolute right under the United States Constitution to

25   either testify in your own defense or make a reasoned decision

1    not to testify in your own defense in which case no mention of

2    the fact that you have chosen not to testify nor inference

3    thereon may be taken by the Court or anyone else.  And I can

4    assure you this is a non-jury trial and I take no inference

5    whatsoever on a defendant's decision not to testify, but I have

6    to assure myself that this is your decision.  Now, that does

7    not mean that you don't have the right, maybe even the

8    responsibility if you have good sense to speak with your

9    lawyers, but in the end, the lawyer is the lawyer and you are

10   the client and you're the one that's on trial here.  So the

11   decision to testify or not testify is, of course, your

12   decision.  You understand that?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  Now, have you made a conscious, reasoned

15   decision not to testify?

16            THE DEFENDANT:  Yes, sir, I discussed it with my

17   attorney.

18            THE COURT:  Has anybody pressured you, coerced you,

19   intimidated you in any way in making that decision not to

20   testify?

21            THE DEFENDANT:  No, sir.

22            THE COURT:  All right.  Do you feel that this is your

23   own decision not to testify and in your best interest?

24            THE DEFENDANT:  I discussed it with my attorney and

25   him and I both believe it's in my best interest just to let the

1   evidence stand where it is.

2           THE COURT:  All right.  Well, that doesn't exactly

3   answer my question.  Is this your decision not to testify?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  It is, all right.  Very good.  You may be

6   seated.  Thank you.

7           MR. MCHUGH:  Your Honor.

8           THE COURT:  Yes, go ahead, Mr. McHugh.

9           MR. MCHUGH:  We have a couple of stipulations or a

10  stipulation.  We have -- I believe there's no objection to the

11  defense offers Defense Exhibit Number 64 into evidence.

12          MR. SUROVIC:  We have no objection, Your Honor.  It's

13  a photograph that the witness just testified.

14          THE COURT:  It will be received.

15          MR. MCHUGH:  In addition to that, Your Honor, defense

16  counsel has had the opportunity to review --

17          (Pause.)

18          Your Honor, at this time after conferring with

19  government counsel, the government would offer into evidence --

20          THE COURT:  The government?

21          MR. MCHUGH:  The Court knows.

22          THE COURT:  I thought maybe you had an arrangement

23  that you were speaking on his behalf.

24          MR. MCHUGH:  No.  Government's Exhibits (sic) 66 and

25  67, which are e-mails involving a Wesley Keeling and the

1    defendant, Brad Croft, and it relates to the exhibits will

2    speak for themselves, but it is a communication which is

3    forwarded by defendant Croft, a communication that he's

4    received from Chisholm, that it looked like the approval was

5    going forward and what Brad Croft did in this e-mail is he

6    forwarded that to Wes Keeling.  And so the point is there that

7    he's keeping Wes Keeling in the loop when he believes he's

8    going to be approved by the V.A.  In addition to that, Your

9    Honor --

10             THE COURT:  What are those numbers again please?

11             MR. MCHUGH:  66 and 67.  They're both the same string

12   in an e-mail.

13             THE COURT:  Okay.

14             MR. MCHUGH:  The date is May -- so the defendant

15   offers Defendant's Exhibits 65, 66 and 67.  67, Your Honor --

16   actually 65 being an e-mail communication between Jesse Stanley

17   and Brad Croft just -- I'll read it.

18             THE COURT:  Okay.

19             MR. MCHUGH:  For Brad Croft.  "How are things going

20   and to see if it's going in the right direction.  It's possible

21   they are going to ask me to stay until August, so we just

22   wondering what the job situation looks like."  That's from a

23   Jesse Stanley.

24             A Brad Croft response to the Brad Croft initial e-mail

25   which that was a response to, he said, "What have you been up

1   to?  Are you working?  I've been making some headway with the

2   V.A. through U.S. Senator's help and could be looking at

3   approval soon.  Let me know your status please."  So that is

4   Bradley Croft to Jesse Stanley.  Stanley's reply is, "How are

5   things going and see if it's going in the right direction."

6          MR. SUROVIC:  What's the date?

7          MR. MCHUGH:  The date on the -- 12/27.

8          In addition to that, Your Honor, I have visited with

9   the defendant on this issue as well, we have considered calling

10  an additional witness.  And the additional witness would relate

11  to -- and I have shared this with the government, would be

12  testimony of a person who today is in Mississippi and her

13  testimony would be that she knows Bradley Croft, she knows Art

14  Underwood.  She knows that Art Underwood was a dog trainer and

15  Art Underwood had a relationship to Bradley Croft.  And so if

16  this witness came in from Mississippi, that is what the witness

17  would testify to.  May also testify as to particular trip they

18  all made together, but in regard to -- I have shared this with

19  the government.  And the government, they can speak for

20  themselves, appear to have no objection because believes the

21  same and similar evidence is already before the Court through a

22  witness Nunez.

23         MR. SUROVIC:  We have no problem with the stipulation,

24  stipulation of fact that Mr. Underwood was a dog trainer and

25  that --

1          THE COURT:  He knew Mr. Croft.

2          MR. SUROVIC:  -- Mr. Croft knew Mr. Underwood.

3    There's already been testimony.

4          THE COURT:  I believe there has been testimony.

5          MR. SUROVIC:  I think there's even a photo in

6    evidence.

7          THE COURT:  I believe that's right.

8          MR. MCHUGH:  And as it relates to that relationship,

9    Your Honor, the defendant at this time, Your Honor, would offer

10   Defendant Exhibit Number 48 which is a photograph of Nunez, a

11   government witness, and Art Underwood.

12         THE COURT:  It will be received.

13         MR. MCHUGH:  May I have a moment, Your Honor?

14         THE COURT:  Sure.

15         *(Pause.)*

16         MR. MCHUGH:  Your Honor, at this time after -- the

17   defendant would offer into evidence Defendant's Exhibits 65, 66

18   and 67.

19         MR. SUROVIC:  We have no objection, Your Honor.

20         THE COURT:  They'll be received.

21         MR. MCHUGH:  And the defendant at this time, Your

22   Honor, would rest.

23         THE COURT:  All right.  Do you have a rebuttal case at

24   all?

25         MR. SUROVIC:  No, Your Honor, we close.

1      THE COURT:  Okay.  All right.  So here is what I want

2  to do, I want to give you some time to get your little short

3  closing argument that you'd like to make.  And when I say ten

4  minutes, I mean ten minutes, okay.  The ten minutes doesn't

5  mean a 40-minute closing argument because we are going to have

6  written closing arguments.  This is really not so much a

7  closing argument as it is a what I would call a recap of what

8  you believe the evidence has shown, which of course, is a

9  closing argument, but that's all right.  And I'd like that

10 first thing tomorrow morning.  And then I'm going to have to

11 move some sentencings.

12     MR. SUROVIC:  Your Honor, we may be able to save the

13 Court some time.  There's been a discussion already at the

14 beginning of this trial that the Court would not be hearing

15 this case on Thursday and Friday.

16     THE COURT:  Right.

17     MR. SUROVIC:  So I certainly don't want to cut into

18 that.  I can tell the Court that my closing argument --

19     THE COURT:  That's right, Mr. McHugh, you have a

20 situation.

21     MR. SUROVIC:  I can tell the Court, Your Honor, that

22 my closing argument is basically going to be we're going to

23 refer back to our Rule 29, rely on our Rule 29 argument.  I

24 don't think there's anything to add.

25     MR. MCHUGH:  I have discussed that with the government

1    and we would just ask the Court to adopt and recall our words.

2           THE COURT:  I'll have a transcript.  I will have a

3    transcript.  I will recall it, but if I have any problems, I

4    can read it.  All right, so that will be it.  There won't be

5    any further closing argument except for the written closing

6    argument.  And how long do you believe you would like to get

7    that prepared?

8           MR. SUROVIC:  Your Honor, I can provide a copy to you

9    tomorrow at the close of business tomorrow.

10          THE COURT:  It is entirely up to you, but you don't

11   have to give it to me tomorrow.  You can give it to me on

12   Monday.

13          MR. SUROVIC:  I understand, Your Honor, we're just

14   anxious to get a verdict in the case.  And I assume that

15   Mr. McHugh is going to need some time to review my argument so

16   that he can prepare his.  Normally before the Court the

17   government argues and then the defense argues.

18          THE COURT:  I usually do them simultaneously when we

19   have written closing argument because the bottom line is both

20   counsel know precisely what the other counsel are arguing.

21          MR. SUROVIC:  I would think at this point, Your Honor.

22          THE COURT:  I don't think there's any surprises here.

23   I don't think that Mr. McHugh, being the experienced prosecutor

24   and defense lawyer that he is, is shocked by anything that has

25   been presented here.  So I want them simultaneous.  So I would

1   ask that we do --

2          MR. SUROVIC:  We'll defer to Mr. McHugh as far as his

3   timeline.

4          THE COURT:  What would you like, Mr. McHugh?  I know

5   you're going to be out Thursday and Friday, so I'm not going to

6   ask for Monday.

7          MR. MCHUGH:  Your Honor, I believe one week would be

8   reasonable.

9          THE COURT:  How about next week Monday.  I don't mean

10  this coming Monday, but the following.  This coming Monday is

11  the 21st, so I would say the 28th.

12         MR. SUROVIC:  We can certainly comply with that.

13         THE COURT:  28th is okay?

14         MR. MCHUGH:  And the Court said 40 pages, no more,

15  correct?

16         THE COURT:  Well, Mr. McHugh, you and I might be

17  having another conversation of a different order if you turn in

18  40 pages or we might just do the old way like Judge Lewis

19  Bunton just when people turned something in that was longer

20  than they should, he'd just tear off the last pages and read

21  right up to the point where they were allowed to write.

22         MR. MCHUGH:  Your Honor, a story which at the time I

23  did not think that funny.  Oftentimes with Judge Bunton, if you

24  say I just have two more questions, it is just two more

25  questions.

1            THE COURT:  You're right.  And I'm much too soft to

2   that regard, I know, I've been told that many times, but that

3   comes from my being a trial lawyer in my own regard.  So all

4   right, counsel, thank you very much for your courtesies during

5   the trial.  I'll do the very best I can to get this out as

6   promptly as I can.  I'm going to allow the defendant to remain

7   out on bond on the same terms and conditions as previously

8   imposed.  I don't see any -- nothing has come up during the

9   trial that would indicate to me that there should be any

10  changes.  Frequently, as you know, at the close of a criminal

11  trial, the Court will order somebody into custody, but I'm not

12  going to do so in this case.

13            THE DEFENDANT:  Thank you.

14            MR. MCHUGH:  May I visit with the client briefly?

15            THE COURT:  Sure.

16            *(Pause.)*

17            MR. MCHUGH:  Nothing further, Your Honor.

18            THE COURT:  Thank you very much.  Court stands in

19  recess.

20            COURT SECURITY OFFICER:  All rise.

21            *(2:30 p.m.)*

22                        *   *   *

23

24

25

BENCH TRIAL PROCEEDINGS                      113

1                          *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  October 30, 2019

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25