UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CAUSE NO: 18-cr-00603-DAE-1 |
| | § | |
| BRADLEY LANE CROFT | § | |

DEFENDANT'S MOTION FOR NEW TRIAL

TO THE HONORABLE JUDGE DAVID A. EZRA:

Now comes BRADLEY LANE CROFT, by and through his undersigned counsel and brings this Motion for New Trial, pursuant to Fed. R. Crim. P. 33, and in support hereof, defendant would show the Court the following:

Defendant Croft waived a jury and tried his case before this Court beginning on October 8, 2019.  The Court heard approximately 5 days of testimony from various Government and Defense witnesses.  After giving the parties the opportunity to present their closing summations in the form of written briefs, and after considering the evidence, testimony and argument of counsel, the Court ultimately rendered a guilty verdict on all counts.

Defendant moves for new trial in the interest of justice pursuant to Fed. R. Crim. P. 33, based on newly discovered evidence that raises sufficient reasonable doubt as to a material issue on each count of conviction.

I.

This Court will recall that Defendant Bradley Croft operated a business called Universal K-9 ("U-K9") that trained service dogs for drug and explosives detection and interdiction.  At some point Defendant applied for approval to train dog handlers and their service animals through the Texas Veterans Commission and the Veterans Administration GI Bill program, whereby

veterans could take the dog handler training course using the veteran's GI Bill benefits.  In 2015 and 2016, Croft submitted as part of his application the listing of four individuals who would be teaching the courses for veterans at U-K9, along with the various certifications and qualifications of these four individuals.  The individuals were Wes Keeling, Dustin Bragg, Art Underwood, and Jesse Stanley.

Defendant ultimately obtained approval for training veterans at U-K9, and over the next several years U-K9 trained many veterans under the TVC and GI Bill.  U-K9 ultimately used various instructors, including Mr. Croft, to teach the relevant training courses.  Because instructors other than the listed four were used to teach the veterans' courses, the Government alleged that Defendant Croft defrauded the VA GI Bill program.  In addition, the Government alleged that the four individuals never consented to being listed as potential instructors, and that they never consented to the use of their respective certifications and resumes, giving rise to the four counts of aggravated identity theft.  All the counts charged relate to the listing of these four individuals as potential instructors.  As the Government stated in its opening statement, "[t]hat is the heart of the scheme to defraud...[and] is the basis for the four aggravated identity theft counts."[1]

Defendant can show via newly discovered evidence that his inclusion of the four individuals in the TVC applications was not a scheme to defraud.  Bradley Croft fully intended on using these individuals to teach courses for U-K9, if business allowed, and each of those individuals were similarly interested.  The individuals also knew that Croft would be using their credentials to supplement the applications.  This is borne out by a critical analysis and review of the newly discovered evidence in relation to evidence and testimony previously provided.

Rule 33 governs motions for new trial and permits the district court to vacate a judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33.  Known as

the *Berry* rule, the following five conditions must be met when a new trial is urged based on newly discovered evidence:  (1) the evidence was newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal.  United States v. Wall, 389 F.3d 457, 467 (5th Cir. 2004).

## II. Application

1. *Wes Keeling*

This Honorable Court was falsely and dishonestly led to believe at trial that Wes Keeling never had any intention of being involved with U-K9 and its pursuit of and involvement with teaching veterans through the VTC program, and that all Keeling was interested in was teaching the interdiction classes to law enforcement officers:

[Surovic]: So it was never a plan that you would be an instructor for the school teaching K-9 handling or K-9 training?

[Keeling]:  No.

[Surovic]:  Just the interdiction?

[Keeling]:  Yes.

*Docket Entry 185, Trial transcript Volume 3, p. 118.*

[Surovic]:  Did you have any understanding with Mr. Croft that you would be willing to teach anything he offered to you?

[Keeling}:  No.

*Docket Entry 185, Trial transcript Volume 3, p. 130.*

[Surovic]:  Between 2016 and present, has Mr. Croft ever come to you and asked would you teach a handlers course for me?

[Keeling]:  No.

*Docket Entry 185, Trial transcript Volume 3, p. 131.*

Exhibit "A", attached, is a memorandum sent from Wes Keeling to Commander Cody McKinney of the Midlothian Police Department.  This memorandum was obtained pursuant to a FOIA request made subsequent to trial, and its existence was unknown to the parties at the time of trial.  This memorandum, dated February 3, 2007, clearly shows Keeling's involvement with U-K9 in coordinating "<u>K9 handler training</u>" for law enforcement "<u>and Military courses</u>" at the Midlothian Police Department.  It further notes the intention of conducting "<u>multiple upcoming courses</u>", in addition to the first course in February, 2017.

Wes Keeling ultimately taught K9 handlers courses in Midlothian, contrary to his trial testimony that he only taught interdiction courses, and that he never had any intention to teach anything else.  This is further supported by Exhibit "B", attached, showing email communication between Defendant Croft and Andrew McIntosh regarding "Subject: RE: Dog Available For <u>Handlers Course</u> Feb 27 through March 10" (emphasis added).  Andrew McIntosh was a veteran student receiving VA funds.  The email communication clearly directs McIntosh to contact Wes Keeling who will be instructing him.  McIntosh replies that he has already made contact with Keeling.

Exhibit "C", attached, is a MOI of Keeling's pretrial interview by AUSA Surovic and SA Jeffrey Breen.  This MOI is illustrative of Keeling's untruthfulness on various accounts.  First, Keeling clearly admitted that he had taught a handler's course for U-K9, contrary to his trial testimony.  Second, Keeling admitted that he had taught students who were veterans, contrary to his trial testimony.  Third, Keeling admitted to traveling to Austin with Croft for the purpose of seeking assistance from a state senator for U-K9's TVC applications.  This is contrary to Keeling's

trial testimony wherein he feigned a nonchalant, disinterested role in Croft's pursuit of the TVC

GI Bill approval:

[Keeling]:  There was a lot of conversations.  Again I thought we were friends, so I thought – he
would vent to me a lot and say that, you know, I know – when I first met Mr. Croft he told me that
the government – I didn't understand it, I don't think he used the words "G.I. Bill", but it was some
type of military contracts is the way to go to make a lot of money at K-9.

     Again at the time I didn't, for lack of better words, I didn't care, but as it went on, yes, he
talked about getting the V.A. and that it was an extensive application process and that's pretty
much all I knew.  And then he would just call and, like I said, kind of vent is how I took it, that the
V.A. was not approving him because he was training shelter dogs and that was – they didn't think
shelter dogs could do it and all that.

[Surovic]:  Did you know when he actually finally did get approved, V.A. approval?

[Keeling]:  No.

*Docket Entry 185, Trial transcript Volume 3, p. 117.*

Keeling's trial testimony was clearly an attempt to distance himself from the application process,

when he knew that he traveled with Croft to Austin for the specific purpose of trying to secure the

senator's help in the application process.

     Keeling further lied at trial when he stated that he was not aware that Keeling had used his

name and credentials in the application process:

[Surovic]:  Did you give him permission in March or around March for him to use the certificate
for any application that he made to the V.A.?

[Keeling]:  No.

[Surovic]:  Did he ever tell you that he was going to do that?

[Keeling]:  Use mine?

[Surovic]: Yes.

[Keeling]:  Not that I ever recall.  I mean I wouldn't agree to – I mean I wasn't any of those things
that he listed me as, so –

[Surovic]:  When did you first become aware that your name and your certificates were used for
that purpose?

[Keeling]:  For I guess when the first meeting I had with the V.A. and FBI.

[Surovic]:  When the agents came and talked to you?

[Keeling]:  Uh-huh.

*Docket Entry 185, Trial transcript Volume 3, p. 131.*

Again, Exhibit "C" and the MOI illuminates Keeling's deception, when he discussed his ultimate "falling out" with Croft.  Keeling states that it was in 2017, and was the result of a dispute over money and property owed.  Croft sued Keeling for the property and Keeling admits that he hired a lawyer and offered to return Croft's property "but he wanted to ensure that his name was not on any VA paperwork that Croft had submitted".  This clearly shows that Keeling was aware that he was listed in the "VA paperwork", and that only when the two had fallen out did he become concerned about it.

Keeling's own statements to Surovic and Breen clearly show that Keeling was much more involved with U-K9 and the GI Bill program than was presented to this Court at trial, and that he knew his name and credentials were being used.  Armed with this new information, it becomes obvious why Keeling became uncomfortable and deceptive as he hem-hawed his way through answering the questions, above.  ([Keeling]:  "Not that I ever recall.  I mean I wouldn't agree to – I mean I wasn't any of those things that he listed me as, so –".  This should have been a pretty clear and easy, "No", answer.).

The Government will assuredly argue that the MOI is not newly discovered evidence. However, it was not utilized at trial to bring Keeling's untruthfulness to light as it should have; *in conjunction with* the newly discovered FOIA documents, it must be given proper consideration and context.

Lastly, Exhibit "D", attached, shows that Keeling was untruthful when he testified that he did not know when U-K9 received the V.A. approval.  Croft emailed Keeling on May 24, 2016, that a TVC representative acknowledged receiving the "last few forms" needed, and that they were scheduling a site visit.  Croft commented to Keeling, "O yeah!", to which Keeling replied, "Hell yea bro!!  Let's do the damn thang!!"  In addition, Keeling's best friend Dustin Bragg told investigators that it was Wes Keeling that told him when Croft "got the V.A. contract."[1]

Wes Keeling was untruthful when he testified that he did not agree to serve as an instructor for GI Bill students, and that he did not give Croft permission to use his credentials.  The evidence is clear that Keeling actively participated in trying to secure V.A. approval, that he had plans to be involved in the teaching of V.A. students, and he had knowledge that Keeling had used his credentials in the application process.  His deception and untruthfulness on the stand is alarming, especially coming from a law enforcement officer.  But perhaps it should be expected, knowing the animosity Keeling carries against Brad Croft.  Keeling made no effort to hide that the two ended on bad terms, arguing over work and money, and testified that "[Croft] got mad and cussed me out and we split ways."[2]  Keeling's trial testimony is not credible, and the new (material) evidence gives rise to much reasonable doubt.

*2. Art Underwood.*

The Government made much hay about the fact that Art Underwood was deceased when listed as a U-K9 instructor, but there is much more to Mr. Underwood's story than presented at trial.  Several witnesses have been located post-trial who had personal knowledge of Mr. Underwood's involvement with U-K9, and who provide newly discovered evidence in the form

---

[1] Exhibit "H", attached, MOI of Dustin Bragg.

[2] *Docket Entry 185, Trial transcript Volume 3, p. 120.*

of personal testimony.  This new evidence directly refutes the evidence presented at trial and raises a legitimate issue of fact contrary to the verdict.

The Government presented its case regarding Mr. Art Underwood through the testimony of Underwood's supposed best friend, Mr. Raymundo Nunez.  Nunez testified that he began working for Croft and U-K9 in 2011 and stayed through approximately 2012.[3]  Nunez testified that his job was to teach classes and train dogs.  Regarding Art Underwood, Nunez explained that Underwood was a friend of his, and that his only contact with Brad Croft and U-K9 was the "one or two times" that Underwood showed up just to visit Nunez.[4]  He further stressed that Underwood "did not get along with [Croft] the two times he met him, just didn't rub him right."[5] In response to the Government's question whether Art Underwood would have ever agreed to teach a course for U-K9, Nunez replied, "No, Sir.  From the day to the day – last day that he passed away, I was in contact with him…And there was no way that he would have ever done it."[6]

The Government utilized redirect examination to further elicit the following (shamefully dishonest) dialogue regarding Art Underwood:

[Surovic]:  Your relationship with Art Underwood earlier when I was talking to you, it sounded like you had a very close relationship, would that be fair to say?

[Nunez]:  Yes, sir.

[Surovic]:  Would you describe your relationship?

[Nunez]:  He was a father figure, he was a good friend, he was a mentor.  He was a mentor, so for him to be involved in this right now, it hurts, you know.

---

[3] *Docket Entry 185, Trial transcript Volume 3, p. 78.*

[4] *Id., at 82.*
[5] *Id., at 83.*
[6] *Id., at 87.*

[Surovic]:  I think you mentioned that you were in almost daily contact with him until the day he died?

[Nunez]:  Yes, sir.

[Surovic]:  Because of your relationship with him, would you have known if he had decided to work for Universal K-9?

[Nunez]:  Yes, sir, without a doubt.

[Surovic]:  Did he ever indicate to you that he was even thinking of working for Universal K-9?

[Nunez]:  No, sir.

[Surovic]:  In fact, it was the opposite?

[Nunez]:  Yes, sir.

*Docket Entry 185, Trial transcript Volume 3, p. 104.*

 Exhibit "E", attached, is the statement of Hannah Malone.  Ms. Malone recalls being close friends with Defendant's daughter, Cameron Croft, beginning in 2012, and that she would spend many weekends at U-K9 watching them train dogs.  Ms. Malone states that she specifically recalls seeing Art Underwood from "a few of the days Cameron and I would go watch the training or run errands for the business."[7]  It should be noted that the shirt being worn by Underwood in the photo is a U-K9 work shirt.

The statement of Ms. Taytum Goodman provides even more insight.[8]  Ms. Goodman writes how she was very close friends with Cameron and "practically ended up living with [the Crofts] through middle school and some of high school which would be between the years of 2011-2016."  Goodman recounts the many times she was around Ray Nunez and Art Underwood as they worked training dogs for U-K9.  In addition, Goodman swears that she never noted any

---

[7] Exhibit "E", sworn statement of Hannah Malone.
[8] Exhibit "F", sworn statement of Taytum Goodman.

friction between Art Underwood and Brad Croft, and that she remembers her experiences seeing Art Underwood there "vivid".  Goodman also identified Underwood from the picture of him in a U-K9 work shirt.

Most telling of all is the testimony of Ms. Julia Jaworski, attached via Scott McCrum affidavit as Exhibit "G".  Ms. Jaworski, a retired military veteran with top secret clearance, worked with U-K9 in March, 2013, to secure a lucrative Department of Defense contract to train military dogs and military personnel.  Ms. Jaworski was the contract administrator and consultant in putting together the bid.  As part of the process, Ms. Jaworski collected the resumes of the proposed U-K9 instructors, which included the lengthy resumes of Art Underwood and Jesse Stanley.  These resumes contained all of their military and civilian training regarding working dogs.  To verify the reliability of the information, Ms. Jaworski set up a conference call with Brad Croft, Art Underwood, and Jesse Stanley.  Ms. Jaworski discussed the contract with the three men, and discussed the two trainers' resumes and qualifications at length.  She recalls that she was especially impressed that the two men had received military working dog training at the 341st Training Squadron.  She swears that she has no doubt that she was speaking with Art Underwood, but for some reason she is a bit hesitant recalling that the other person was Jesse Stanley.  However, because she does recall the name "Stanley" being mentioned, and the fact that she possessed Jesse Stanley's resume as the proposed second "lead trainer", that it must have been him.

Three witnesses have come forward who swear that Art Underwood had much more of a connection with U-K9 than a mere one or two visits to see his friend Nunez.  Moreover, Ms. Jaworski would testify that as early as March, 2013, Underwood was working for U-K9 and was putting himself out as an instructor for the company; Mr. Underwood even provided his

credentials and resume.  Mr. Nunez's testimony must be seen for what it is.  Mr. Nunez had a serious falling out with Brad Croft over a substantial sum of money that Nunez felt he was cheated out of; his testimony must be measured with caution at best, as he was clearly a biased witness against Croft.  Contrary to the Nunez testimony, three witnesses have now come forward to offer testimony that corroborates Art Underwood's connection and employment with U-K9, and moreover Brad Croft's reliance on Underwood as a possible instructor.

   *3.   Jesse Stanley*

   Predictably similar to the Government's other witnesses, Jesse Stanley also claims to have given his full resume and certifications to Brad Croft, but that it was for a purpose other than U-K9's G.I. Bill applications.  Stanley's claims also fall in light of the newly obtained evidence.

   Jesse Stanley testified that his first conversations with Croft about working together was in January and February, 2013, and were focused on U-K9's pursuit of Navy Special Warfare contracts and an Air Force contract at Fort Bliss.[9]  This discussion regarding government contracts is consistent with the new evidence discovered through Ms. Julia Jaworski, Exhibit "G", and the U-K9 contract bid of March, 2013.  But Stanley curiously testified that although he gave Croft all of his resume and certifications, it wasn't for use with the V.A. applications:

   [Surovic]:      Did you ever have any conversations subsequent to [August/September, 2014] about the possibility that Mr. Croft could use your name and certifications in order to obtain V.A. certification so that he could teach G.I. Bill authorized classes?

   [Stanley]      We had discussed the V.A., the whole system and him trying to get V.A. approved.  The initial reason I gave him all of my information was for contracting purposes, right down to when I went to dog school, my certificate in 1996, all of the courses that I had gone through as far as the kennel master's course, all the training I had ever done, he had copies of all of that for contracting purposes so I could become the program manager or the lead for those contracts when they were awarded.  He had discussed the V.A. stuff but it was never said that he was going to use me as his lead guy other than just conversation, *hey, if I get the contract, I'd like you to come in and teach.*  There was nothing said that he was going to use my material that I had given him for the contracting stuff to get approved for the V.A.

---

[9] *Docket Entry 184, Trial transcript Volume 2, p. 86.*

or anything else.  That was a process that had already been started prior to me leaving there and then when I left, that was the last I heard of it until October of '16.

*Docket Entry 184, Trial transcript Volume 2, p. 103-104. (Emphasis added).*

The documents provided by Ms. Jaworski include Stanley's resume and certifications, submitted for the purpose of securing a government contract.  Ms. Jaworski stated that Mr. Stanley's role would include training dogs and teaching handler's courses to active duty military personnel.[10]  Stanley's duties would have essentially been the same as an instructor with Universal K-9.  Stanley testified as such, when he stated that Defendant Croft told him that he wanted him to come in and teach the veterans if he got the V.A. approval:

"When I returned from Afghanistan, once again I went directly back to Mr. Croft and discussed with him employment opportunities.  We also once again sat down at his home over lunch and breakfast, stuff like that and discussed training.  He stated he was still waiting for the V.A. approval before he could afford to pay me."[11]

It defies reason and logic to believe that Stanley was OK with using his information for the government contracts, but not for the V.A. work.  Stanley offered no explanation for this other than to state that Croft never specifically told him that he'd use the information for the V.A. applications.  However, further evidence of Stanley's one-time interest and commitment to working for U-K9 can be found in a KENS-5 news clip, where Stanley introduces himself by stating, "My name is Jesse Stanley, I'm a manager at Universal K-9."[12]

Stanley further testified that he and Croft discussed that Mr. Stanley and Art Underwood would be his two lead instructors for the government contracts, but that they would need to bring in "a lot more instructors."[13]   This is  consistent with the resumes provided by Ms. Jaworski, and illustrates that Croft was actively recruiting potential instructors because of the government

---

[10] Exhibit "G", attached.
[11] *Docket Entry 184, Trial transcript Volume 2, p. 92.*
[12] https://1drv.ms/v/s!ApORJ2q_VWbHgdw9EtTJKkUQMSTghA?e=Vm69bH
[13] *Docket Entry 184, Trial transcript Volume 2, p. 87.*

contracts and V.A. work he was pursuing, even though he did not need more instructors at that time.  This was no ruse to gather resumes and certifications without the intent of ever using these instructors.

As with the Keeling and Nunez (Underwood) testimony, Stanley's bias against Croft must be considered.  Stanley testified that, like the others, he had a falling out with Croft that ended their relationship in a bitter manner.  Stanley's disdain for Croft showed in his snarky trial remark that Croft "…sent me a couple of [U-K9] T-shirts when we first started talking.  I never wore them.  Actually they were thrown in the trash brand new."[14]

*4. Dustin Bragg*

Dustin Bragg testified that he never gave Brad Croft his resume and certifications, and that Croft never talked to him about teaching anything other than 2-3 interdiction classes:

"Bragg never provided Croft any of his training certificates, including Bragg's TCOLE certificate contained in the VA application.  Bragg stated that he gave his TCOLE certificate to Keeling, so that he could teach the interdiction class."[15]

Bragg continued with this falsehood at trial:

[McHugh]:  In regard to your certifications, I believe it's your testimony that you lent this information to Wes Keeling, is that correct?

[Bragg]:  For what?

[McHugh]:  Your certifications that we see here?

[Bragg]:  Right.

[McHugh]:  You have acknowledged that their yours?

[Bragg]:  Correct.

[McHugh]:  And so I believe it's your testimony that you directly did not give it to Mr. Croft?

---

[14] *Docket Entry 184, Trial transcript Volume 2, p. 133.*
[15] Exhibit "H", attached, MOI of Dustin Bragg.

[Bragg]:  Correct.

[McHugh]:  That you, in fact, gave it to Mr. Keeling?

[Bragg]:  That certification could have gone to Keeling for the interdiction course, sure, it could have.

Docket Entry 185, Trial transcript Volume 3, p. 47.

Bragg's misinformation was finally called out with the introduction of Defense Exhibit 57 and 57A.  These trial exhibits consisted of an email (DE-57) from Bragg to Brad Croft stating, "Thanks Brother" with an attachment (DE-57A) consisting of Bragg's resume and complete certifications that Bragg previously stated he treated "like gold" and would not have given them to Croft.

Bragg's testimony understated his relationship with Brad croft and U-K9, but his interview with agents (Exhibit "H", MOI) reflects that Bragg took two trips with Croft, would stay overnight at Croft's house, before but the two ultimately fell out on bad terms.  Bragg described Croft as an "ass" and that he was "rude" with a "very short temper."[16]

There exists new evidence that brings to light the extreme bias in which the four material witnesses misrepresented their relationships with Brad croft and U-K9, and whether they had knowledge that he used their resumes and certifications.  The FOIA material, MOI's, emails, Jaworski material, video and witness statements show that Wes Keeling, Ray Nunez (for Art Underwood), Jesse Stanley and Dustin Bragg offered substantially biased and untruthful testimony.

Much of this evidence is newly discovered and was unknown to the Defendant at the time of trial and the failure to detect it was not due to a lack of diligence by Brad Croft.  The

---

[16] Exhibit "H", attached, MOI of Dustin Bragg.

Government will assuredly argue, as it did in its response to Defendant's *pro se* motion, that very little of the evidence is arguably *newly discovered.* However, all of the trial evidence should be reexamined in light of the newly discovered evidence, as the reliability of all of the witnesses' (biased) testimony comes to light.

This Honorable Court heard biased, false testimony from the material witnesses in this case. With this new evidence, however, and its application to the trial evidence and testimony, the Court should now agree that any reasonable jury, hearing *all* of the evidence in this case, will at a minimum find reasonable doubt on all relevant counts, and acquit the Defendant.

**WHEREFORE, PREMISES CONSIDERED,** Defendant respectfully prays that this Honorable Court will grant this Motion for New Trial.

Respectfully Submitted,

/s/ *Scott W. McCrum*
Scott McCrum
Texas State Bar No. 00795508
Attorney at Law
404 East Ramsey Rd., Suite 102
San Antonio, Texas 78216
(210) 225-4851/ (210) 225-7045 (fax)
**Attorney for Bradley Lane Croft**

Certificate of Service

I hereby certify that on April 23, 2021, a true and correct copy of the foregoing Motion for New Trial was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant:

Mr. Gregory J. Saronic
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210)384-7025
Fax:(210)384-7028

/s/ *Scott W. McCrum*
Scott McCrum

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CAUSE NO: 18-cr-00603-DAE-1 |
| | § | |
| BRADLEY LANE CROFT | § | |

ORDER

THIS MATTER having come before the Court on Defendant's Motion for New Trial, the Court finds that the Motion is well grounded in fact and law and THEREFORE,

IT IS HEREBY ORDERED that the Motion for New Trial is hereby GRANTED, and the parties will receive notice of new settings by further order.

SIGNED AND ENTERED, on this the _____ day of _____, 2021.


_____
DAVID A. EZRA
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

 **MEMORANDUM**

TO:        Commander Cody McKinney
FROM:    Corporal Wes Keeling
DATE:     February 3, 2017
SUBJECT: Canine Handlers course

---

Sir,

Let this memorandum serve as a request to begin hosting K9 handler training for both Law Enforcement and Military courses at the Midlothian Police Department. The average time for these courses are two weeks.

This will be in partnership with Universal K9 who holds all responsibility for the course.   Midlothian PD will only be a training location for multiple upcoming courses in 2017.

I have included a Memorandum of Understanding from Universal K9 to Midlothian Police Department.   The first course is scheduled for end of February 2017.

Thank you,
Cpl. W. Keeling #149

**EXHIBIT B**

**Robin West**

| | |
|---|---|
| **From:** | info@universalk9inc.com |
| **Sent:** | Saturday, February 25, 2017 6:52 AM |
| **To:** | Wesley Keeling |
| **Subject:** | FW: Dog Available For Handlers Course Feb 27 through March 10 |

Brad Croft
Universal K9
Visit us on the web @ www.universalk9inc.com
LinkedIn Profile: Brad Croft Operations Director

**From:** info@universalk9inc.com [mailto:info@universalk9inc.com]
**Sent:** Sunday, February 19, 2017 6:28 PM
**To:** 'Andrew McIntosh'
**Subject:** RE: Dog Available For Handlers Course Feb 27 through March 10

Awesome! Get ready to learn

Brad Croft
Universal K9
Visit us on the web @ www.universalk9inc.com
LinkedIn Profile: Brad Croft Operations Director

**From:** Andrew McIntosh [mailto: ████████████]
**Sent:** Sunday, February 19, 2017 5:46 PM
**To:** info@universalk9inc.com
**Subject:** Re: Dog Available For Handlers Course Feb 27 through March 10

I'll be at the class, I've made contact with officer keeling.
Thanks,
Drew

Sent from my iPhone

On Feb 18, 2017, at 12:37 PM, <info@universalk9inc.com> <info@universalk9inc.com> wrote:

> Hello I have 1 dog available for you for our next class at our Midlothian Texas location Feb 27 to March 11. Officer Wes Keeling will be instructing you. His number is 972-989-7762. The hotel information is as follows; Marriot Courtyard 3 community circle dr. Midlothian, texas Please call Officer Keeling and touch base about the class
>
>
> Brad Croft
> Universal K9
> Visit us on the web @ www.universalk9inc.com
> LinkedIn Profile: Brad Croft Operations Director



**Robin West**

| | |
|---|---|
| **From:** | Wesley Keeling <Wesley.Keeling@Midlothian.tx.us> |
| **Sent:** | Friday, February 24, 2017 10:39 PM |
| **To:** | info@universalk9inc.com |
| **Subject:** | RE: Feb 27 thru March 10th Class |

Western Union pd handler said he has turned down the course for thw 27th but will be in following course. Fyi

Corporal Wes Keeling #149
K9/Criminal Interdiction Unit
Midlothian Police Department

-------- Original message --------
From: info@universalk9inc.com
Date: 2/24/17 9:54 PM (GMT-06:00)
To: Wesley Keeling <Wesley.Keeling@Midlothian.tx.us>
Subject: FW: Feb 27 thru March 10th Class

1. Harris County – K9 Heat – Bite $500    832-914-3730
2. Louisiana Winn – K9 Lintz – Bite $500 318-355-3057
3. Missouri Bel Ridge – K9 China – Bite $500
4. Dallas ISD – K9 Athena – Pit Bull $1000
5. Ferris ISD - K9 Peach – Pit Bull $1000
6. Clay County NC – K9 Phantom – K9 Sarah – Pit Bull $2000 828-644-4217
7. Western Union PD – K9 Duke – Pit Bull $500  (864)784-0270
8. Clayton OCK – K9 Luke - $500 580-306-1142
9. Red Oak ISD – K9 Shoebox - $500

Total $7,000 - 12,000 – 7,000 = 5,000

Thanks it for now unless I missed something?

Brad Croft
Universal K9
Visit us on the web @ www.universalk9inc.com
Linkedin Profile: Brad Croft Operations Director



**EXHIBIT C**



### Department of Veterans Affairs
### Office of Inspector General
### Criminal Investigations Division
### San Antonio Resident Agency
### 7411 John Smith Dr., Suite 724
### San Antonio, TX 78229

## MEMORANDUM OF INTERVIEW

Salinas, Ryan (OIG)  *Digitally signed by Salinas, Ryan (OIG) Date: 2019.04.15 22:50:17 -05'00'*

Date:      04/15/2019
Appr:     RAC Ryan Salinas

Case File:                  2018-01977-ID-0285
Date of Interview:      03/28/2019
Time:                       10:00 AM
Place of Interview:     301 East 5th St., Ferris, TX
Interviewee:             Wesley Keeling
Interviewed By:         SA Jeffrey Breen, VA OIG

On 03/28/2019, Assistant United States Attorney (AUSA) Greg Surovic and I interviewed Wesley Keeling at 301 East 5th St., Ferris, TX. At the outset of the interview, I showed Keeling my law enforcement credentials, and identified myself as a Special Agent with the VA Office of Inspector General. I informed Keeling that AUSA Surovic and I were conducting a criminal investigation regarding VA education fraud. Keeling agreed to participate in the interview and to answer questions pertaining to this investigation. During the course of the interview, Keeling stated substantially as follows:

Keeling stated that he no longer works for Midlothian Police Department and now operates his own K-9 training company, Sector K-9. Keeling is currently training K-9s part-time for the Ferris Independent School District. Keeling also advised that he continues to partner with Animal Farm Foundation.

Keeling stated that he originally met Brad Croft in 2014 when Keeling's police department was looking for a new K-9 unit. Per Keeling, he heard about Universal K-9 from the chief of Red Oak Police Department. Keeling stated that he contacted Croft and scheduled a K-9 Handler Course.

Keeling stated that he first met Croft in person at the hotel in San Antonio where Keeling was staying while attending the K-9 Handler Course. Per Keeling, Croft arrived at the hotel with several dogs in cages in the back of his truck. Croft gave one of the dogs, Remy, to Keeling. Croft advised that Remy was already trained, and he just needed to train Keeling as a handler. For the remainder of the two-week course, Keeling and Croft worked on tracking exercises with Remy at multiple locations (Dotson Homes and a local auto auction). There was no formal classroom instruction and no formal bite-work.

Keeling stated that, after the class, he continued to have problems with Remy. Keeling would call Croft and ask him for advice and Croft would always blame Keeling. At least once, Keeling travelled back to San Antonio to get additional training from Croft and

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)

1 of 3

File Number:    2018-01977-ID-0285
Case Name:    Universal K-9

another trainer, Jesse Stanley. Eventually, Keeling learned on his own how to properly train dogs and began to train on his own.

From 2014 to 2016, Croft and Keeling became friendly and would talk almost every day. When Keeling first met Croft in 2014, Croft did not have a physical school location for Universal K-9. In 2015, Keeling offered to teach an Interdiction Course to law enforcement officers attending Universal K-9. Keeling stated that it was a two-day course (the first day was classroom work focusing on legal issues and the second day was practical exercises) designed to bring more legitimacy to Croft's program. Keeling stated that Croft wanted non-law enforcement students to attend the class, but Keeling would not allow it. Keeling would travel to San Antonio for the weekend to teach the Interdiction Course. Initially, Keeling taught the course in a hotel conference room. Eventually, Croft moved the course to a conference room located in a pest control business owned by Croft's friend, Dominick "Dom" Alongi. Per Keeling, Croft also kept his trailer and dogs at the pest control business. In total, Keeling taught three Interdiction Courses at the pest control business and between seven and ten Interdiction Courses in total. Keeling stated that Croft charged $750.00 per course and split the money with Keeling.

In 2016, Keeling attended the Universal K-9 Trainer Course. Also in 2016, Keeling went to Austin, TX with Croft and met with a state senator in an effort to help Universal K-9 receive approval to train veterans from the Texas Veterans Commission. Keeling stated that he did not speak during the meeting but noted that Croft told the senator how often Keeling had to travel to teach classes at Universal K-9, which, Keeling stated, was not true. Finally, in September 2016, Keeling taught a Universal K-9 Handler Course in Midlothian, TX for law enforcement officers. Ten to twelve students attended and, per Keeling, one to two of the students were veterans. The Handler Course in Midlothian was the only non-Interdiction Course that Keeling ever taught for Universal K-9.

In 2017, Croft began paying Keeling to train dogs in advance of the Universal K-9 Handler Courses. Keeling stated that many of the dogs that Croft chose for training were "shitty" because they did not have the proper drive and/or they had health problems.

Per Keeling, he made approximately $9,500.00 in 2016 (through teaching Interdiction Courses) and $14,000.00 in 2017 (through a combination of Interdiction Courses and dog training). $12,000.00 of the $14,000.00 that Keeling received from Croft in 2017 was in the form of an advance payment, so that Keeling could purchase a house.

Later in 2017, Keeling and Croft had a falling out after Croft demanded (and eventually sued) that Keeling return a refrigerator and washer/dryer combo that Croft had given to him. Keeling hired a local attorney and stated that he was willing to give back the items, but he wanted to ensure that his name was not on any VA paperwork that Croft had submitted. Keeling's attorney sent a letter to Croft's attorney and never heard anything back.

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)



**EXHIBIT C**

File Number:   2018-01977-ID-0285
Case Name:    Universal K-9

Keeling described Richard "Rick" Cook as an ex-veteran and nice guy whom Keeling met while teaching the Interdiction Course. Croft told Keeling that Cook was his friend who was interested in learning about dogs. Per Keeling, Cook would attend military separation briefings and try to recruit veterans to attend Universal K-9. Cook would receive money for each veteran that he referred. Keeling did not believe that Cook had any official role in Universal K-9 and described Cook as being submissive to Croft.

Keeling described Steve Peek as a great guy and a good dog trainer. Keeling stated that Peek did not know that he had been listed as the Treasurer/Secretary for Universal K-9.

Keeling described Dustin Bragg as a friend with whom he trained dogs. Bragg helped Keeling teach one to two Interdiction Courses. Per Keeling, Bragg also received his initial training from Universal K-9. Keeling stated that Bragg and Croft did not like each other.

Keeling did not know Arthur Underwood or Chris Tillman. Keeling had heard of Ray Nunez, but never met him.

Keeling had never heard of Redonte, LLC.

Upon reviewing the application that Croft submitted to the Texas Veterans Commission in 2015, Keeling noted the following:

- The Texas Commission on Law Enforcement (TCOLE) does not certify dog trainers.
- Keeling is not, and never was (nor agreed to be), the "Curriculum Supervisor" for Universal K-9.
- The pictures of the classroom were not accurate. The actual classroom was full of boxes and had an unprofessional appearance.
- Keeling never provided his TCOLE # to Croft.
- The only course Keeling supervised was the Interdiction Course.

Finally, Keeling stated that he never gave Croft permission to use his name on any application submitted to the Texas Veterans Commission or associate his name with any of the courses listed on the application.

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)

**EXHIBIT D**

**info@universalk9inc.com**

| | |
|---|---|
| **From:** | Wesley Keeling <Wesley.Keeling@Midlothian.tx.us> |
| **Sent:** | Tuesday, May 24, 2016 7:35 PM |
| **To:** | Info@universalk9inc.com |
| **Subject:** | RE: Request site visit |

Hell yea bro!!  Let's do the damn thang!!

Corporal Wes Keeling #149
K9/Criminal Interdiction Unit
Midlothian Police Department

-------- Original message --------
From: "Info@universalk9inc.com" <info@universalk9inc.com>
Date: 5/24/2016 4:46 PM (GMT-06:00)
To: Wesley Keeling <Wesley.Keeling@Midlothian.tx.us>
Subject: Fwd: Request site visit

O yeah!

Brad Croft
Universal K9
Visit us on the web @ www.universalk9inc.com

-------- Original message --------
From: Anita Chism <anita.chism@tvc.texas.gov>
Date: 5/24/16 3:52 PM (GMT-06:00)
To: info@universalk9inc.com
Cc: Michael Butler <michael.butler@tvc.texas.gov>
Subject: Request site visit

Good afternoon Brad,

Thank you for submitting those last few forms. We have everything we need to come out and conduct a site visit at both the Tradesman and the 410 locations. Basically, the only dates that I am available in the near future are:

June 3rd

1

**EXHIBIT D**

June 9th

June 10th

June 14th

June 15th

If you could please let me know which date works best for you, I am basically available anytime – (I will be driving from Austin so, preferably after 9 AM) but otherwise, please give me a few dates that work and we will try to make our schedule work around yours.

Thank you,

Anita Chism M.A.

Program Specialist

Texas Veterans Commission

P.O. Box 12277

Austin, Texas  78711-2277

Phone: (512) 463-3517

Fax: (512) 463-3932

Email: anita.chism@tvc.texas.gov

Website: www.tvc.texas.gov

*"To care for him who shall have borne the battle and for his widow, and his orphan…"*

*Abraham Lincoln*

02/06/2021

Hi, my name is Hannah Malone. I am from San Antonio, Texas. Cameron Croft and I met in 2012, when we were in sixth grade. During our friendship, Cameron and I always loved going to watch her dad (Brad Croft) train the dogs on the weekends. He was always thrilled when Cameron and I would join. Cameron reached out to me asking if I remembered two of her dad's employees and provided photos. In the photo below, I was able to identify Art Underwood. I recognized him from a few of the days Cameron and I would go to watch the training or run errands for the business.



Hannah Malone

3-5-2021



State of Texas   County of BRAZOS

Sworn to and subscribed before me this 5
day of MARCH, 20 21

Notary Public

RICK POWELL
Notary Public, State of Texas
Comm. Expires 02-05-2025
Notary ID 138329-2

NOTARY WITHOUT BOND



**Taytum Goodman**

**February 26, 2021 12:57 PM**

To whom it may concern:

My name is Taytum, I am 20 years old, currently a sophomore full time student at the University of Mississippi. I have known Cameron and her dad, Bradley Croft, since I first moved to San Antonio starting off second grade at Wilderness Oak Elementary in the years 2007-2008. My parents were going through a divorce and it was a new school, new city, big change. At such a young age you would think it would be so simple to just be thrown into a new crowd, but for me I struggled and was terrified of being alone. That's when I met Cameron, she became not only my best friend but my sister. I struggled a lot through my years, living in a house with 6 other children it became a lot. Due to me having a big family and becoming like a second daughter to Bradley, Cameron would let me stay over and I practically ended up living with them through middle school and some of highschool which would be between the years of 2011-2016. During this period of time I was basically living with them, I was aware Ray Nunez and Art Underwood were working for Bradley with the K9's in the years Cameron and I were attending Lopez middle school, between 2011-2015. I was sleeping in the guest room with Cam every night during middle school because we both were involved in sports and her dad made it apparent we train and get healthy breakfast before a morning of practice. I mention this due to the fact we would also train with Ray's little boys, who played basketball, Shoebop (a.k.a Ray Nunez), Seth Nunez and Logan Nunez. I used to help a lot with training the K9's with Bradley, Cam, and his employees Ray Nunez & Art Underwood when we had summer/winter breaks from school or on the weekends. Also, I have hours docked/ logged from community service through the school. At this time there was one old church school we used to go play at with a basketball court outside with Ray's 3 younger boys while Ray and Art both along with Bradley would train all of the K-9s there. Many days and weeks we would go, I remember so vividly and never during these times did I note that there was any friction or bad feelings between Art and Brad. Cameron recently reached out to me to ask if I remembered Art Underwood and Ray Nunez working for Bradley at Universal K9, she provided me with videos and photos of the two individuals that were related to

p1 of 2 je TBG

**EXHIBIT F**

Universal K9. She asked me if I could write her a truthful, to the best of my knowledge, statement about Underwood and Nunez to be provided to the court as new evidence for Art Underwood. Below are the pictures Cameron provided when she contacted me about writing this statement regarding Art Underwood and Ray Nunez.





Sincerely,

Taytum Goodman

Sworn to and subscribed in my presence this ___ day of March, 2021
by Taytum Goodman.

STATE OF MISSISSIPPI
NOTARY PUBLIC
JoANNE M. COSTA
Commission Expires
Nov. 21, 2024
LAFAYETTE COUNTY

p 2 of 2
TB6

THE STATE OF TEXAS      § 

                       §       AFFIDAVIT

COUNTY OF BEXAR      §

BEFORE ME, the undersigned official, on this day appeared Scott McCrum, who is personally known to me, and first being duly sworn according to law upon his oath and said:

"My name is Scott McCrum, I am over 18 years of age, am fully competent to make this affidavit.  I have personal knowledge of the facts stated herein, and they are all true and correct.

"On this date I spoke with Ms. Julia Jaworski regarding her experiences with Bradley Croft and Universal K-9 ("U-K9").  Ms. Jaworski had previously shared with me documents relating to a (March, 2013) Department of Defense ("DOD") contract, whereby U-K9 had submitted a bid for securing a military contract for the training of bomb detection dogs and other working dogs for use by the DOD, as well as providing training to active duty U.S. servicepersons. Ms. Jaworski, a retired military veteran with top secret clearance, was acting as contract administrator and consultant at the time, working in conjunction with U-K9 to submit a bid for the contract valued at over $1,000,000.00, and encompassing potential work in the Eastern and Western United States, as well as overseas."

"Part of the packet of information included with the bid for contract were the resumes of various proposed U-K9 personnel (trainers).  It included the resume of Arthur Underwood and Jesse Stanley.  Ms. Jaworski stated that she was in good standing with the military, and was not going to jeopardize her standing unless she was confident that U-K9 was qualified and capable of fulfilling the contract terms.  Accordingly, she requested a conference call with Bradley Croft and his lead trainers to discuss their qualifications. Ms. Jaworski specifically recalls conversing with Art Underwood on this phone call, as he discussed his experience and qualifications, as listed on his resume.  The resume included all of Art Underwood's dog handling/training experience.  Ms. Jaworski is confident that it was Jesse Stanley who she spoke with as well on that conference call, as he was listed as the second lead trainer, but she is not quite as certain as she is about Art Underwood.  She does recall, however, commenting to that individual that she would not have any trouble remembering his name because she has a close family member named Stanley, and that it most probably was him because he is listed as the second "lead trainer", and also because he had also submitted a lengthy resume"

"Ms. Jaworski recalls specifically discussing with Brad Croft, Art Underwood, and (most probably) Jesse Stanley that the contract would require that they all obtain secret clearance by the military, and that they all had to be available for overseas travel.  The contract period was for one year, renewable yearly.  She recalls that she was most comfortable with Underwood and Stanley because they expressed that they both had received working dog training at the 341st Training Squadron, a preeminent military dog training installation."

"Ultimately, U-K9 was not awarded the contract.  However, Ms. Jaworski is certain that she spoke with Art Underwood, who provided all of his credentials for submission, and that he was very interested in securing the contract with U-K9.  She is equally certain that the third

**EXHIBIT G**

individual she spoke with on the conference call was equally interested in working for U-K9 on this military contract, and also provided his credentials.  She cannot see how it was anyone other than Jesse Stanley, but for some reason cannot swear to that fact."

"I further swear that the resumes of Art Underwood and Jesse Stanley are inclusive of their vast military training, including specific periods of service at the various military bases and installations.

Scott McCrum

SUBSCRIBED AND SWORN TO BEFORE ME on this 12th day of April, 2021, to certify which witness my hand and official seal.

SAMANTHA ALYSSYA NEUMANN
Notary Public, State of Texas
Comm. Expires 09-24-2024
Notary ID 132695421

Notary Public in and for
Bexar County, Texas





**Department of Veterans Affairs**
**Office of Inspector General**
**Criminal Investigations Division**
**San Antonio Resident Agency**
**7411 John Smith Dr., Suite 724**
**San Antonio, TX 78229**

## MEMORANDUM OF INTERVIEW

Date:
Appr:    RAC James Ross

Case File:          2018-01977-DD-0187
Date of Interview:  05/24/2018
Time:               10:40 AM
Place of Interview: 101 Live Oak St., Red Oak, TX
Interviewee:        Dustin Bragg
Interviewed By:     SA Jeffrey Breen

On 05/24/2018, I interviewed Dustin Bragg at 101 Live Oak St., Red Oak, TX. SA Sharleigh Drake, TX Department of Public Safety (DPS), and SA Joseph Miller, VA-OIG, were also present.  At the outset of the interview, I showed Bragg my law enforcement credentials, and identified myself as a Special Agent with the VA Office of Inspector General.  I informed Bragg that I was conducting a criminal investigation regarding VA education fraud.  Bragg agreed to participate in the interview and to answer questions pertaining to this investigation.  During the course of the interview, Bragg stated substantially as follows:

Bragg's phone number is ███████████.  He has worked as a police officer with Red Oak Police Department since 2006.  He's currently certified by the American Working Dog Association and trains dog-handling skills weekly with other local law enforcement. Prior to working for Red Oak PD, Bragg was a funeral director.

In 2013, Bragg's chief, Garland Wolf███████████, went to Universal K-9 and purchased a dog named Rambo for Bragg.  Brad Croft told Wolf that Rambo was a 4 year old, owner-surrendered dog at the time of purchase and that he was imprinted with marijuana, methamphetamine, cocaine, heroin, and MDMA (using ScentLogix).  Bragg stated that Rambo died in early 2018, and the veterinarian told him that Rambo was much older than Croft had told Garland (around 14 years old).  Despite the large age-difference, Bragg stated that Croft claims all of his dogs are properly vetted.

Shortly after Garland purchased Rambo, Bragg attended the 2-week K-9 Handler's Course provided by Universal K-9.  Red Oak PD paid $2,500 for Bragg to attend the course.  Bragg stated that Croft was the only instructor at the course.  Bragg described Croft as an "ass" noting that Croft was rude and had a very short temper.  Bragg stated that most of the training occurred at his hotel, an automobile auction and a mobile home park, but he did go to Croft's house where he saw 8-12 dogs in Croft's garage.

**FOR OFFICIAL USE ONLY**
**(Public Availability to be Determined Under 5 USC 552 and 552a)**



VA OIG CI Form FD207-9
11/11


**EXHIBIT H**

**File Number:** 2018-01977-DD-0187
**Case Name:** Universal K-9

Bragg stated that, after he attended the 2-week K-9 Handler's Course, he and Wes Keeling, Bragg's friend and a K-9 officer with Midlothian PD, taught a 2-day Interdiction Course for students attending the 2-week K-9 Handler's Course. The course was Texas Commission on Law Enforcement (TCOLE) certified and created by Keeling. Bragg stated that he taught 2-3 Interdiction Courses through Universal K-9 and received approximately $150 per course from Keeling. While teaching the Interdiction Courses, Bragg would stay with Croft at his house where he met Croft's daughter, Cameron, whom Bragg described as "nice."

Bragg stated that the only other work he performed for Universal K-9 was in 2015 when he agreed to imprint a dog for $500. Per Bragg, Croft did not want to pay because he felt that Bragg had not properly trained the dog (even though Bragg trained the dog using the same methods he had learned from Croft during the 2-week K-9 Handler's Course). Croft eventually gave Keeling around $150 to pay to Bragg for the work. Bragg stated that Keeling often acted as the "middleman" between him and Croft and that Croft was trying to get Keeling more involved with Universal K-9.

Bragg stated that he attended a K-9 conference in Las Vegas in 2015 where he worked at the Animal Farm Foundation booth with Keeling and Croft. The only other interactions that Bragg had with Croft after the conference were when he and Croft attended the same National Narcotic Detection Dog Association certification in 2015 and when Garland purchased Bragg's current dog, Lentz, from Croft in June 2017. Lentz is a dual-purpose trained Belgian Malinois (narcotics and bite work) which Croft allegedly purchased from a vendor in Mexico.

Bragg stated that his partner, Johnny Determan's, K-9, a dual-purpose trained Belgian Malinois named Rexa, was also purchased from Universal K-9. Determan's first K-9, a pit-bull named Wilson, was a rescue dog from the Animal Farm Foundation trained by Universal K-9. Determan attended a 2-week K-9 Handler's Course which was taught by Keeling.

When shown Universal K-9's application to the Texas Veterans Commission to receive approval to train veterans, Bragg stated the following:

- Croft had told Bragg that he was trying to get VA approval.
- Croft told Bragg that he owned Universal K-9.
- Bragg heard from Keeling that Croft "got the VA contract."
- Bragg and Croft never discussed Bragg providing any training to veterans.
- Bragg never provided Croft any of his training certificates, including Bragg's TCOLE certificate contained in the VA application. Bragg stated that he gave his TCOLE certificate to Keeling, so that he could teach the Interdiction Course.
- Bragg never gave Croft permission to list his name as a trainer in the VA application.
- Bragg never taught any Universal K-9 courses to veterans who were using the GI Bill, including those courses listed in the VA application.

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)

**EXHIBIT H**

**File Number:**   **2018-01977-DD-0187**
**Case Name:**   **Universal K-9**

- Other than Croft and Keeling, the only name on the VA application that Bragg recognized was Steve Peek whom Bragg had met at the Las Vegas K-9 conference and an Interdiction Course.

Finally, I showed Bragg the forged training certificates that Croft had provided to DPS. Bragg stated that he did not recognize the certificates and that he and Croft never discussed Croft's K-9 training credentials.

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)