### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **BRADLEY LANE CROFT,** | § | |
| **#91543-080,** | § | |
| | § | |
| **Movant,** | § | |
| | § | |
| | § | **SA-24-CV-1383-DAE** |
| **v.** | § | **SA-18-CR-603-DAE-1** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Respondent.** | § | |

### <u>ORDER</u>

Before the Court are Movant Bradley Lane Croft's *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (ECF No. 425); the Government's Response in opposition thereto and exhibits (ECF Nos. 427, 428, 429, 430); Croft's Reply (ECF No. 431); Croft's Amendment/Supplement to § 2255 Motion (ECF No. 503); the Government's Motion to Dismiss Portions of Defendant's Amendment or Supplement to the 2255 and to Dismiss All Other Pending Filings That Should Have Been Filed As Part of the 2255 (ECF No. 525); and Croft's Reply. (ECF No 526). For the reasons discussed in this Order, Croft's § 2255 Motion is **DENIED**. The Government's Motion to Dismiss Portions of Defendant's Amendment or Supplement to the 2255 and to Dismiss All Other Pending Filings That Should Have Been Filed As Part of the 2255 (ECF No. 525) is **GRANTED**. Croft's Amendment/Supplement to § 2255 Motion (ECF No. 503) is **DISMISSED IN PART AS TIME-BARRED AND DENIED IN PART**.

Additionally, the following Motions pending before the Court are disposed of as follows: Croft's Motion to Strike Indictment and Enjoin Enforcement Under Rule 65 for Fraud on the Court and For Immediate Release from Custody (ECF No. 481) is **DENIED**. Croft's Motion to Preserve and Individually Adjudicate Pending Rule 60(b) Filings (ECF No. 462); Motion for Leave to

Supplement Pending § 2255 Motion (ECF No. 483); Motion for Release on Bond Pending Resolution of Fraud-on-the-Court and Judicial Conflict (ECF No. 492); Renewed Motion for Release on Bond Pending § 2255 Proceedings (ECF No. 501); and "Motion to Strike Government's Non-Compliant and Conflicted Filing (DKT. 525), or in the Alternative, to Compel a Verified Rule 5(b) Response and Set Evidentiary Hearing (ECF No. 527)" are **DISMISSED AS MOOT**.

Croft's Motion to Compel Findings of Fact in Support of Writ of Prohibition (ECF No. 497); Motion to Alter or Amend Judgment Pursuant to Rule 59(e) (ECF No. 498); and Renewed Motion to Strike and Disqualify Conflicted § 2255 Response (ECF No. 499) are **STRICKEN** in accordance with ECF No. 493.

### Background

Croft operated a business called Universal K-9 that trained dogs, as well as handlers, for law-enforcement related tasks such as drug and explosives detection and interdiction. Initially, many of Croft's students came from small police departments. Croft later sought to expand his business by teaching veterans who could pay the course fee using funds through the GI Bill and paid by the Education Benefits Program of the Department of Veterans Affairs (VA).

The VA agrees to pay up to a certain amount of a student's tuition and fees directly to eligible schools that have obtained approval through an approval process. To help in the approval process, the VA relies on state-approving agencies that determine which educational institutions are eligible. In Texas, that agency was the Texas Veterans Commission (TVC). The TVC ensures that institutions and employers comply with federal guidelines and are qualified to provide the type of training offered. To be eligible to receive VA funds, Universal K-9 had to be certified by the TVC as a non-accredited, non-college-degree school.

A federal grand jury returned a fourteen-count Indictment alleging that Croft orchestrated a "scheme to defraud" by submitting fraudulent documents to obtain TVC approval for Universal K-9. (ECF No. 3). Over the course of three years, Croft submitted multiple applications to the TVC for approval. After the fourth application was approved, Universal K-9 was certified by the TVC and accepted by the VA on June 24, 2016. Croft submitted as part of his TVC application the listing of four individuals who would be teaching the courses for veterans at Universal K-9, along with the various certifications and qualifications of these four individuals. The individuals were Wes Keeling, Dustin Bragg, Art Underwood, and Jesse Stanley.

The Indictment alleged that none of the individuals who were purported to be instructors for the Universal K-9 classes for which Croft was seeking approval granted Croft permission to use their names and were not working as instructors at Universal K-9 in the classes described in the application. Art Underwood died two years prior to the submission of the application. Instead, Croft recruited individuals to act as instructors who were not certified dog handlers. The Indictment further alleged that Croft and others would recruit veterans for enrollment in the Universal K-9 courses and submit enrollment records of those individuals to the VA for payment as part of the individual's GI Bill benefits knowing that the approval of the training had been fraudulently obtained.

Following indictment, Croft retained attorney Thomas J. McHugh to represent him.[1] Thereafter, a grand jury returned a Superseding Indictment charging Croft with the following:

Counts 1 through 8: Wire Fraud, in violation of 18 U.S.C. § 1343;

Counts 9 through 12: Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1);

Counts 13 and 14: Money Laundering, in violation of 18 U.S.C. § 1956(A)(1)(A) and (B) and 2; and

---

[1] Mr. McHugh later brought in attorney Will Brooks as co-counsel.

Counts 15 and 16: Making a False Tax Return, in violation of 26 U.S.C. § 7206(1).

(ECF No. 39). The Superseding Indictment also included the Government's Notice of Demand for Forfeiture. Croft proceeded to trial on the Superseding Indictment, however, after the jury was selected, Croft requested a bench trial. The Court referred the matter to U.S. Magistrate Judge Henry J. Bemporad to advise Croft of his right to be tried by a jury and to ensure the voluntariness of Croft's jury trial waiver. (ECF No. 109). Following a colloquy before Judge Bemporad, Croft waived his right to a jury trial via written waiver, and the bench trial commenced on October 8, 2019. (ECF Nos. 112 & 182).

The trial lasted six days, with both the prosecution and defense calling numerous witnesses to testify. (ECF Nos. 183-188). Notably, the Government called Wes Keeling, Dustin Bragg, and Jesse Stanley, three of the four individuals listed on Croft's TVC application. At trial, evidence was introduced that the four individuals listed on the application had neither given Croft their permission to be listed as Universal K-9 instructors for the purposes of the TVC application nor actually served as instructors for the listed courses.

On November 6, 2019, the Court entered the verdict, finding Croft guilty of all counts, and granted forfeiture. (ECF No. 189). In announcing the verdict, the Court commended defense counsel's performance:

> I thought you did an excellent job for your client. You were vigorous in your defense, you were assertive in your defense, your legal arguments and your professionalism were outstanding here. No one could have done a better job for your client than you did. There's no question in my mind and I have tried I don't know how many trials before how many lawyers and some of the most illustrious lawyers that have ever practiced in this country have been in my court and it could not have been better tried for the defendant than you did.

(*Id.* at 9-10). Thereafter, a U.S. probation officer prepared an initial Pre-Sentence Report (PSR), to which Mr. McHugh filed written objections. (ECF Nos. 171-173). On September 29, 2020,

4

Croft filed a *pro se* Motion for Judgment of Acquittal and/or New Trial. (ECF No. 196). This was the first of several posttrial motions Croft filed based on information his daughter, Cameron Croft, obtained through a Freedom of Information Act (FOIA) request. The Court denied the Motion without prejudice because at the time of filing Croft was represented by counsel. (ECF Nos. 196 & 205).

Also on September 29, 2020, Croft filed a motion to remove Mr. McHugh as counsel. (ECF No. 197). Following a hearing, U.S. Magistrate Judge Richard B. Farrer granted the motion and appointed attorney Scott William McCrum to represent Croft. (ECF Nos. 204 & 245).

The U.S. probation officer issued a revised PSR on April 15, 2021. (ECF No. 217). In determining the Guidelines sentence, the revised PSR grouped Counts 1 through 8 and 13 through 16 pursuant to § 3D1.2(a) because they involved the same victim and the same act or transaction. (*Id.* at ¶ 30). As to Count Group 1 (Wire Fraud), the PSR calculated a base offense level of 7, pursuant to § 2B1.1(a)(1). (*Id.* at ¶ 31). The PSR added the following upward adjustments:

**+16** pursuant to § 2B1.1(b)(1)(I) because the relevant conduct involved a total loss of $1,506,758.31. (*Id.* at ¶ 32);

**+2** pursuant to § 2B1.1(b)(2)(A) because the offense involved ten or more victims. (*Id.* at ¶ 33);

**+2** pursuant to § 2B1.1(b)(9)(A) because Croft misrepresented that he was acting on behalf of a charitable, educational, religious, or political organization, or a government agency. (*Id.* at ¶ 34);

**+2** pursuant to § 2B1.1(b)(10)(C) because Croft's conduct involved sophisticated means. (*Id.* at ¶ 35);

**+2** pursuant to § 3A1.1(b)(1) because Croft knew or should have known that the victim of the offense was a vulnerable victim. (*Id.* at ¶ 36); and,

**+4** pursuant to § 3B1.1(a) because Croft was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. (*Id.* at ¶ 37). The PSR arrived at an adjusted offense level of 35. (*Id.* at ¶ 39).

The PSR awarded no points for acceptance of responsibility pursuant to § 3E1.1, arriving at a total offense level of 35. (*Id.* at ¶ 41 & 42). As to Counts 9 through 12 (Aggravated Identity Theft), the Guidelines sentence was the minimum mandatory two-year term of imprisonment pursuant to § 2B1.6(a).

As to Counts 1 through 8, Croft faced a statutory maximum term of imprisonment of 20 years per count. As to Counts 9 through 12, he faced a minimum term of imprisonment of two years and a maximum term of two years per count, to be imposed consecutively to any other counts. As to Counts 13 and 14, Croft faced a maximum term of imprisonment of twenty years per count. As to Counts 15 and 16, Croft faced a maximum term of imprisonment of three years per count. (*Id.* at ¶ 71).

As to Counts 1 through 8 and 13 through 16, based on a total offense level of 35 and a criminal history category of I, the Guidelines imprisonment range was 168 to 210 months. (*Id.* at ¶ 73). As to Counts 9 through 12, the Guidelines sentence was the term of imprisonment required by statute—two years as to each count to run consecutively to Counts 1 through 8 and 13 through 16. (*Id.*). Pursuant to 18 U.S.C. § 3663A, the PSR calculated restitution in the total amount of $1,506,758.31 to be paid to the VA. (*Id.* at ¶ 88).

Croft waived Mr. McHugh's previously filed objections to the PSR, and Mr. McCrum filed new written objections challenging the § 2B1.1(b)(2)(A) adjustment (ten or more victims); the

§ 2B1.1(b)(9)(A) adjustment (charitable organization); the § 3A1.1(b)(1) adjustment (vulnerable victim); and the § 3B1.1(a) adjustment (leading role). (ECF No. 217-3). Mr. McCrum also filed a Sentencing Memorandum seeking a sentence of no more than sixty months based on the 18 U.S.C. § 3553(a) sentencing factors. (ECF No. 218).

Prior to sentencing, Croft filed a second Motion for New Trial, this time through counsel. (ECF No. 220). In the Motion, Croft asserted that newly discovered evidence showed that he fully intended to use the four individuals listed on the TVC application to teach courses for Universal K-9, and each of those individuals were similarly interested and knew that Croft would be using their credentials to supplement the applications.

The Motion further alleged that Keeling provided false testimony at trial by: 1) testifying that he had no plan to become involved in teaching K-9 handling or training to veterans at Universal K-9 through the TVC program, and his only involvement with Universal K-9 was to teach K-9 interdiction to law enforcement officers; 2) feigning disinterest in Croft's pursuit of TVC GI Bill approval, despite traveling to Austin for the specific purpose of securing a state senator's assistance for Universal K-9's TVC application; and 3) stating that he was not aware that Croft had used his name and credentials in the application process.

Croft offered four exhibits purporting to show Keeling's involvement in Universal K-9. One of the exhibits was a Memorandum of Interview (MOI) that Assistant United States Attorney Gregory J. Surovic drafted after he and Special Agent Jeffrey Breen of the Department of Veterans Affairs Office of Inspector General interviewed Keeling on March 28, 2019, in connection with its investigation. (ECF No. 220 at 20-21). Croft argued that the MOI was not utilized at trial to challenge Keeling's false testimony. The MOI states, in relevant part, as follows:

> In 2016, Keeling attended the Universal K-9 Trainer Course. Also in 2016, Keeling went to Austin, TX with Croft and met with a state senator in an effort to help

Universal K-9 receive approval to train veterans from the [TVC]. Keeling stated that he did not speak during the meeting but noted that Croft told the senator how often Keeling had to travel to teach classes at Universal K-9, which Keeling stated was not true. Finally, in September 2016, Keeling taught a Universal K-9 Handler Course in Midlothian, TX for law enforcement officers. Ten to twelve students attended and, per Keeling, one to two of the students were veterans. The Handler Course in Midlothian was the only non-interdiction Course that Keeling ever taught for Universal K-9.

(*Id.* at 21). The MOI further states that after a falling out between Keeling and Croft, Keeling "wanted to ensure that his name was not on any VA paperwork that Croft had submitted." (*Id.*). According to Croft, the MOI showed that, contrary to Keeling's trial testimony, Keeling admitted to teaching a handler's course for Universal K-9, that Keeling had taught students who were veterans, and that Keeling admitted to traveling to Austin with Croft for the purpose of seeking assistance from a state senator for Universal K-9's TVC applications. Croft further argued that the MOI showed that Keeling was aware that his name was listed in the VA "paperwork." In denying the Motion for New Trial, the Court determined that the exhibits Croft submitted to show the falsity of Keeling's testimony were immaterial and did not constitute newly discovered evidence. (ECF No. 222).

Thereafter, the Court held Croft's sentencing hearing. At the hearing, Mr. McCrum vigorously objected to the PSR's upward adjustments. The Court sustained counsel's objection to the four-level upward adjustment pursuant to § 3B1.1(a) (leading role) and overruled the remaining objections. (ECF No. 246). The Court sentenced Croft to 118 total months of imprisonment, three years of supervised release, and a $1,600.00 special monetary assessment. (ECF No. 228). The Court further ordered restitution in the amount of $1,506,758.31 and forfeiture of several pieces of personal and real property. (*Id.*). The forfeiture included a $1,300,000.00 money judgment representing the value of traceable proceeds.

Croft initiated his appeal to the Fifth Circuit Court of Appeals, challenging the sufficiency of the evidence supporting his convictions for wire fraud, aggravated identity theft, and money laundering, as well as the restitution and forfeiture orders. Mr. McCrum withdrew as counsel, and Judge Bemporad appointed attorney James Scott Sullivan to represent Croft on appeal. (ECF Nos. 231 & 232).

Proceeding *pro se*, Croft filed a third Motion for New Trial based on newly discovered evidence. (ECF No. 296). Croft alleged that an internal investigation by the Midlothian Police Department (PD), where Keeling was previously employed, found that Keeling had been untruthful regarding the loss of six months' worth of K-9 tracking records and was dishonest in his statements while under internal investigation, resulting in Keeling's resignation. Additionally, Midlothian PD Chief Carl Smith informed Ellis County District Attorney Patrick Wilson of the results of the investigation, which resulted in the DA's office no longer sponsoring Keeling as a witness in any of its cases, a ban that Croft refers to as "*Brady*-listed." Croft alleged that the Government suppressed the evidence of Keeling's untruthfulness and introduced false testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by using Keeling as a witness.

While the third Motion for New Trial was pending, the Fifth Circuit issued its opinion and order affirming the judgment of this Court. (ECF No. 313). In holding that there was sufficient evidence to support a scheme to defraud, the Fifth Circuit noted that "there was sufficient evidence that Croft falsely listed four individuals on his application as instructors who did not, and would not, serve in that role. The court heard ample testimony to that effect from many of the individuals themselves." (*Id.* at 7-8). The Fifth Circuit further stated:

> [T]o the extent any of the four were previously involved with Universal K-9, taught some classes overlapping with veterans attending, or even were somewhat involved with the TVC application (as Croft argues) that does not cut against a finding of deceit. The TVC, in approving an application, expected that the listed, certified

instructors were teaching the listed classes. They were not. The TVC further expected that it and the VA would be kept abreast of any changes to the roster of instructors. They were not. And the TVC and VA expected that the veterans who were spending their G.I. Bill benefits on classes at Universal K-9 would be taught the specific classes listed on the application by the specific instructors listed on the application. They were not. That is sufficient to find deceit. Any argument that at least one qualified instructor worked for Universal K-9 after certification, and may have even taught some classes to veterans, barks up the wrong tree. The application called for a person to provide, to the best of his or her knowledge, a complete, accurate roster of certified instructors teaching specific classes before an application could be approved. Croft did not provide that, but instead provided a list rife with falsehoods. There was sufficient evidence that these falsehoods were not included by mistake, but instead were designed to deceive.

(*Id.* at 8). Croft filed a petition for a writ of certiorari in the United States Supreme Court. After the Fifth Circuit issued its Judgment, this Court denied Croft's third Motion for New Trial. (ECF No. 300). The Court found that Croft was not entitled to a new trial based on the alleged *Brady* violation because the internal affairs investigation was the type of evidence the Government did not have a duty to investigate, was evidence equally available to the defense as the Government, and that Chief Smith, District Attorney Wilson, and Keeling were not part of the prosecution team for *Brady* purposes.

The Court further stated that it was "maintain[ing] its prior holdings regarding the supposedly newly discovered evidence in the MOI of Wes Keeling," explaining that the Fifth Circuit's opinion "foreclose[d] [Croft]'s argument regarding the materiality of Wes Keeling's testimony." (*Id.* at 13). The Court further explained that "even if Keeling's testimony was false and he did work for Universal K-9 after certification or teach classes to some veterans, the impeachment evidence against Keeling was material to neither [Croft]'s guilt nor his eventual punishment because it does not cut against the finding of deceit in this case." (*Id.* at 14).

Croft appealed the denial of his third Motion for New Trial to the Fifth Circuit. (ECF No. 302). Croft then filed a Motion for Reconsideration of the order denying his third Motion for

New Trial. (ECF No. 303). In denying that Motion, this Court reiterated its prior finding that the impeachment evidence was immaterial to Keeling's guilt or punishment. (ECF No. 306). Croft filed a Second Motion for Reconsideration of this Court's Order denying Croft's *pro se* Motion for New Trial. (ECF No. 311). Croft argued that Keeling's involvement as a task-force officer with IRS Criminal Investigations (IRS-CI) rendered him part of the prosecution team, making the findings of the internal investigation discoverable as *Brady* material. The Court denied the Motion and again reiterated its findings regarding the materiality of Keeling's testimony. (ECF No. 315 at 7).

Croft filed his fourth *pro se* Motion for New Trial. (ECF No. 326), which this Court denied. (ECF No. 328). Croft filed a Notice of Appeal to the Court of Appeals for the Federal Circuit, appealing the denial of his Second Motion for Reconsideration and his fourth Motion for New Trial. (ECF No. 329). The Federal Circuit transferred the appeal to the Fifth Circuit due to limited jurisdiction, and the appeal was joined with Croft's previous appeal. (ECF No. 332).

In the meantime, the Supreme Court granted Croft's petition for a writ of certiorari. On June 20, 2023, the Supreme Court vacated the judgment affirming Croft's convictions and remanded for further consideration in light of *Dubin v. United States*, 599 U.S. 110, 131 (2023) (articulating a new standard for convictions under § 1028A). (ECF No. 353). On December 1, 2023, The Fifth Circuit affirmed Croft's convictions and sentences for the four aggravated identity theft counts in light of *Dubin*. (ECF No. 387). The Fifth Circuit further stated: "This court has also considered Croft's pro se appeal of the district court's denial of his motion for a new trial under *Brady*, 373 U.S. 83, and we hold that the district court properly denied that motion." (*Id.* at 10). Croft filed a petition for writ of certiorari to the Supreme Court, and on April 1, 2024, the Supreme Court denied the petition. (ECF No. 406).

Meanwhile, in a separate proceeding, Croft's daughter filed a grievance against Mr. McHugh with the State Bar of Texas alleging professional misconduct. (ECF No. 428). Ms. Croft levied many of the same allegations against Mr. McHugh that Croft now asserts in the pending § 2255 Motion. Through his own counsel, Mr. McHugh filed a response, in which he responded to the complaints in the grievance and detailed strategic defense considerations. (ECF No. 429). The State Bar of Texas dismissed the grievance. (ECF No. 430).

On November 26, 2024, Croft filed the pending § 2255 Motion, alleging eight claims for relief, including various claims of ineffective assistance of counsel. (ECF No. 425). Croft provided a list of exhibits along with the § 2255 Motion, however his exhibits were not docketed because he submitted them separately on a thumb drive. The Government filed a Response. (ECF No. 427). Although the Government did not submit an affidavit from either Mr. McHugh or Mr. McCrum responding to the claims of ineffective assistance of counsel, the Government filed records pertinent to the State Bar investigation into Mr. McHugh. (ECF Nos. 428-430). On February 13, 2025, Croft filed a Reply. (ECF No. 431).

Beginning in May 2025, Croft filed numerous pleadings and motions under various inapplicable Federal Rules of Civil Procedure attacking his underlying criminal judgment on the basis of trial court error, ineffective assistance of counsel, and prosecutorial misconduct associated with his criminal trial. The Court dismissed the motions and admonished Croft that he may not directly attack the criminal judgment in this case under the Federal Rules of Civil Procedure, rather § 2255 provides the primary means of collateral attack on a federal sentence. (ECF No. 460). Croft also filed numerous motions and pleadings seeking to set aside the final judgment of forfeiture, which the Court referred to United States Magistrate Judge Elizabeth S. Chestney for Report and Recommendation.

Thereafter, Croft filed *inter alia* a "Motion to Strike Indictment and Enjoin Enforcement Under Rule 65 For Fraud on the Court and For Immediate Release from Custody" and "Motion for Leave to Supplement Pending § 2255 Motion." (ECF Nos. 481 & 483). The Motions attack the criminal judgment based on the grand jury testimony of Special Agent Sean Scott and seek to supplement the pending § 2255 Motion with FOIA documents pertaining to Agent Scott's grand jury testimony. (ECF No. 483).

In light of Croft's history of filing unauthorized motions attacking his criminal conviction after the conclusion of the briefing on the § 2255 Motion and his request to supplement the pending § 2255 Motion, on September 24, 2025, the Court ordered Croft to file an Amendment/Supplement to the § 2255 Motion so that he may bring any and all challenges to the criminal judgment. (ECF No. 493). The Court further warned Croft that the order did not serve to enlarge the statute of limitations applicable to § 2255 motions, and any additional unauthorized motions seeking to collaterally attack Croft's criminal conviction would be stricken from the record. (*Id.*).

Croft timely filed an Amendment/Supplement to the § 2255 Motion, asserting five claims. (ECF No. 503). The Government filed a "Motion to Dismiss Portions of Defendant's Amendment or Supplement to the 2255 and to Dismiss all other Pending Filings That Should have Been Filed As Part of the 2255." (ECF No. 525). Croft filed a Reply. (ECF No. 526). Additionally, notwithstanding the September 24, 2025 Order, Croft has continued to file numerous *pro se* pleadings and motions seeking various forms of relief.[2]

---

[2] Croft's filings are largely duplicative, often re-asserting or re-characterizing issues that he has unsuccessfully presented to this Court. Insofar as the pending Motions allege such claims, this Order incorporates and adopts the Court's prior rulings.

**Applicable Law**

A federal defendant may move to vacate, set aside, or correct his sentence if: (1) the imposition of the sentence was in violation of the Constitution or the laws of the United States; (2) the District Court that imposed the sentence lacked jurisdiction; (3) the sentence imposed was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996). Thus, § 2255 post-conviction relief is reserved for errors of constitutional dimension and other injuries that could not have been raised on direct appeal and, if left unaddressed, would result in a complete miscarriage of justice. *See, e.g., United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998); *United States v. Payne*, 99 F.3d 1273, 1281 (5th Cir. 1996).

The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 669 (1984). To successfully state a claim of ineffective assistance of counsel under *Strickland*, a prisoner must demonstrate counsel's performance was deficient and the deficient performance prejudiced his defense. *Id.* at 687. The failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696.

The proper standard for attorney performance is that of reasonably effective assistance. *Id.* at 688. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that, considering all the circumstances, counsel's representation fell below an objective standard of reasonableness. *Id.* A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Id.* at 687-89. To determine whether counsel's performance was

constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689. An attorney's strategic choices, usually based on information supplied by defendant and from a thorough examination of relevant facts and law, are virtually unchallengeable. *Jones v. Jones*, 163 F.3d 285, 300 (5th Cir. 1998).

To demonstrate prejudice, the prisoner must demonstrate a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is that which renders the proceeding unfair or unreliable, i.e., undermines confidence in its outcome. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

In the context of a trial "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983). We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices. *Strickland*, 466 U.S. at 689-90. A petitioner must demonstrate that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *United States v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687). "Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or reliable, is defective." *Willis*, 273 F.3d at 598 (quoting *Lockhart*, 506 U.S. at 369).

With respect to sentencing issues, the prisoner must establish a reasonable probability that, but for counsel's errors with respect to sentencing matters, he would have received less time in prison. *See United States v. Grammas*, 376 F.3d 433, 436–8 (5th Cir. 2004); *Glover v. United States*, 531 U.S. 198, 203 (2001).

## Discussion

### 1. Claims pertaining to Government witness Wes Keeling

Croft asserts three claims pertaining to Keeling's trial testimony (Claims (a), (b), and (e)). Accordingly, the Court will address these claims together.

### a. MOI

In Claim (a), Croft alleges that Mr. McHugh rendered ineffective assistance for failing to challenge Keeling's purportedly false testimony at trial regarding his involvement with Croft and Universal K-9 based on the information contained in the MOI, despite receiving a copy of the MOI prior to trial. (ECF No. 425 at 6). Croft alleges that this "was an unreasonable trial strategy" that "fatally prejudiced [him]." (*Id.*).

Mr. McHugh's response to the Texas State Bar grievance sheds light on the defense's strategy regarding witness Keeling, a strategy that was reasonable under prevailing professional norms. (ECF No. 429). The defense wanted to avoid undermining the legitimacy of Universal K-9 by "over-impeach[ing] Keeling." (*Id.* at 19) ("Croft's defense had a narrow and delicate line to walk in both impeaching Keeling as a liar and holding Keeling out as providing legitimacy to Universal K-9."). Another consideration was that because the case was tried before the Court and not a jury, the "usual strategy of objecting and impeaching for the sake of making a demonstration in front of a jury was not had here." (*Id.*). Additionally, defense counsel had distinct concerns about utilizing the MOI to impeach Keeling's testimony, including potential inaccuracies in the summarized interview because the MOI is not a document authored by the witness. (*Id.* at 13-14). The record reflects that defense counsel's decision not to impeach Keeling with the MOI was the product of a reasoned trial strategy, not deficient performance.

Moreover, and critically here, Croft cannot demonstrate *Strickland* prejudice because he cannot show a reasonable probability that the trial would have turned out differently had counsel challenged Keeling's testimony with the MOI. As previously discussed in this Order, Croft argued in a series of posttrial motions that newly discovered evidence in the MOI demonstrated that Keeling provided false testimony at trial regarding his involvement with Universal K-9. The Court repeatedly held that Keeling's testimony and the impeachment evidence were not material to a finding of guilt in this case. Therefore, counsel's failure to challenge Keeling's testimony with the MOI did not cause Croft to suffer prejudice.

Croft also appears to allege that AUSA Surovic committed prosecutorial misconduct by eliciting false testimony from Keeling at trial regarding his involvement with Universal K-9. (ECF No. 425 at 7). Croft asserts that AUSA Surovic knew Keeling's testimony was false because AUSA Surovic interviewed Keeling on March 28, 2019, and memorialized the MOI.

The Government's Response brief does not appear to address Croft's standalone claim of prosecutorial misconduct. Insofar as Croft intends to assert one, however, this claim is plainly meritless. "'[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). To establish a due process violation based on the government's use of false or misleading testimony, a movant must show that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004) (citation omitted). False

evidence is "material" only "if there is any reasonable likelihood that [it] could have affected the [] verdict." *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (citation omitted).

Keeling's testimony regarding his involvement with Universal K-9 was not material to the finding of guilt in this case. Thus, even assuming purely for the sake of argument that Croft could demonstrate that the Government knowingly solicited false testimony from Keeling, there was no reasonable likelihood that the testimony affected the Court's verdict. *See United States v. Gassaway*, 856 F. App'x 504, 507 (5th Cir. 2021) (citation omitted) ("[A]s an experienced trier of fact, the district judge is presumed to have reached a verdict based only on permissible and admissible evidence and to have disregarded any improper statements."). Accordingly, Croft's claim of prosecutorial misconduct is without merit.

### b. Subpoenas

In Claim (b), Croft further asserts that Mr. McHugh provided ineffective assistance by failing to subpoena the Midlothian PD for "personnel records, emails and internal memos" pertaining to Keeling.[3] (ECF No. 425 at 9). Croft maintains that, through a properly issued subpoena, Mr. McHugh would have discovered the documents showing that Keeling was "*Brady*-listed" by the Midlothian PD and the Ellis County District Attorney's Office following the internal investigation. According to Croft, a proper investigation would have further revealed the "extensive involvement" between the Midlothian PD and Universal K-9's TVC application for approval." (*Id.* at 10).

Croft argues that defense counsel could have used these documents to challenge "inconsistent" representations made by Keeling and the Government regarding Keeling's

---

[3] Croft also states that counsel was ineffective for failing to subpoena the Red Oak Police Department for documents pertinent to witness Dustin Bragg. However, Croft fails to allege what counsel would have uncovered or how it would have altered the outcome of the trial.

involvement with Universal K-9's TVC application. (*Id.*). Croft submitted the allegedly "exculpatory" documents that he insists counsel would have discovered through a proper subpoena—documents that Croft obtained after trial through his daughter's FOIA request.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *see also United States v. Glinsey*, 209 F.3d 386, 393 (5th Cir. 2000).

Croft fails to carry his burden of establishing ineffective assistance of counsel for failure to investigate. Croft previously submitted virtually all of the "exculpatory" documents he asserts counsel would have discovered through a properly issued subpoena in support of his second and third Motions for New Trial. The Court determined that Keeling's testimony and the impeachment evidence were not material to a finding of guilt. Accordingly, the outcome of the trial would not have been different had Mr. McHugh procured the documents through a properly issued subpoena and used them to challenge the Government's evidence at trial.

Additionally, Mr. McHugh's response to Croft's State Bar grievance demonstrates that Mr. McHugh thoroughly investigated the Government's witnesses. Mr. McHugh's performance on Croft's behalf at trial was outstanding. *See* ECF No. 189 at 9-10. Given the extent of Mr. McHugh's investigation into the Government's witnesses and the immateriality of the undiscovered Midlothian PD documents, Croft cannot show that Mr. McHugh rendered ineffective assistance under *Strickland*.

### c.  E-mail metadata

In Claim (e) Croft further alleges that Mr. McHugh was ineffective for failing to discover email metadata that could have been used to impeach Keeling's testimony at trial. This claim

concerns defense Exhibits 59(A)-(D) at trial, which consisted of an email sent from Keeling to Croft and attachments to the email purporting to show Keeling's involvement as an instructor at Universal K-9 in San Antonio. (ECF No. 260). Croft places particular emphasis on Exhibit 59(B)—a letter purportedly written from Keeling to TVC Program Specialist Bebe Glasgow that was an attachment to the email. [4] (ECF No. 260-2). At trial, Mr. McHugh questioned Keeling extensively about the exhibits:

Q. And what would be Defendant Exhibit 59a?

A. Appears to be an e-mail from my work e-mail to Mr. Croft.

Q. What would be 59b?

A. It's on Midlothian's letterhead. Do you mind if I read it real quick?

Q. I do not mind if you read it. (Pause.)

A. I never wrote that.

Q. Sorry?

A. I never wrote that. That's not even my signature.

Q. Defendant Exhibit 59c. (Pause.)

A. I don't remember writing that either.

Q. Defendant Exhibit 59a, what is the subject and content of 59a?

A. It shows that there was an e-mail sent to info@UniversalK-9Inc. from Midlothian, my e-mail address on May 10, 2015 at 1:22 and to Brad Croft, Universal K-9. And then the subject is V.A. letter and certification and then some attachments.

---

[4] In the letter, Keeling states he is the "Curriculum Supervisor and an Instructor at UNIVERSAL K-9 ACADEMY in San Antonio, Texas." (ECF No. 260-2). He further states that UNIVERSAL K-9 provides [Texas Commission of Law Enforcement] approved instruction in the following courses of study: Handlers Course, Trainers Course, Behavioral Modification Course, Kennel Master SSD Course, K9 Interdiction Course. (*Id.*).

Q. And you have denied the signature is yours, but the attachments B and C, do they relate to you?

A. They have my name on them.

Q. Do they concern your certifications, your background, your history?

A. No.

THE COURT: The answer was no?

THE WITNESS: No, sir.

Q. Exhibit 59d, do you have Exhibit 59d?

A. Yes, the certification?

Q. What person or persons do they relate to?

A. Myself.

Q. Do you know these to be your certification?

A. It appears to be that, yes, sir.

Q. And how many are there?

A. I have one.

Q. You have one. And in regard to Defendant Exhibit 59a, which is the e-mail which has B, C and D as attachments, do you believe that to be an e-mail from you to Bradley Croft?

A. No, not after seeing the rest of the e-mail, absolutely not.

Q. And so you deny B, C and D or you deny B and C?

A. I'm denying B and C right now.

(ECF No. 185 at 173-74). Croft alleges that a computer expert witness named Patrick O'Leary, hired by Croft's daughter, determined that email metadata shows that the email and letter were "sent by Keeling's Police Department email address that only Keeling would have access to."

(ECF No. 425 at 25). Croft submitted Mr. O'Leary's report as an exhibit to the § 2255 Motion. Croft alleges that, had "counsel hired an expert witness and investigated further before or during [Croft]'s trial the outcome would have been different." (*Id.*)

Croft fails to demonstrate that the discovery of the metadata would have altered the outcome of the trial. Mr. McHugh produced the email and letter to impeach Keeling at trial. Keeling's testimony established what Croft alleges the metadata proves—that the email was sent from Keeling's Midlothian PD email address to Croft's email address.

Moreover, in his third Motion for New Trial, Croft argued that Keeling testified falsely regarding the email and Bebe Glasgow letter. (ECF No. 296). In denying the motion, the Court specifically concluded that "even if Keeling's testimony was false and he did work for Universal K-9 after certification or teach classes to some veterans, the impeachment evidence against Keeling was material to neither Defendant's guilt nor his eventual punishment because it does not cut against the finding of deceit in this case." (ECF No. 300 at 14). Croft again challenged Keeling's testimony based on Mr. O'Leary's metadata report in his fourth *pro se* Motion for New Trial, and the Court denied the motion. (ECF Nos. 326 & 328). Croft cannot establish that Mr. McHugh was deficient for failing to discover and utilize the email metadata to impeach Keeling at trial or that the outcome of the trial would have been different had Mr. McHugh done so. Accordingly, this claim fails under *Strickland*.

### 2. Hard drives

In Claim (c), Croft alleges that counsel rendered ineffective assistance for failing to recover hard drives that were seized pursuant to a Government search and seizure of Croft's property but never returned. (ECF No. 425 at 19). Croft alleges that counsel[5] emailed AUSA Surovic in January

---

[5] Croft does not allege which of his attorneys this claim pertains to. The Court presumes Croft is referring to Mr. McHugh, since Mr. McHugh was counsel of record in January 2019.

2019 requesting the return of the hard drives. However, when they were not returned, counsel failed to "continue to investigate and retrieve" the hard drives and/or the data the Government collected from the hard drives. (*Id.*).

Croft asserts that counsel was "on notice" that pursuing the missing hard drives "may lead to mitigating evidence such as the evidence uncovered through [Croft's] daughter's FOIA request to Midlothian PD" and would have provided a "strong predicate" upon which to challenge the testimony of Government witnesses. (*Id.*). Elsewhere in the § 2255 Motion, Croft alleges that the hard drives contained "exculpatory *Brady* material [that] the [G]overnment failed to search and or destroyed through sheer incompetence, gross negligence or on purpose." (*Id.* at 20). In its Response, the Government maintains that it responded satisfactorily when Croft requested return of the hard drives and hard-drive data in a proceeding before a Magistrate Judge. *See* ECF No. 427 at 8-9.

This claim of ineffective assistance fails to meet the *Strickland* standard. Assuming there was something more counsel could have done to effectuate the return of the hard drives or hard drive data, Croft nevertheless fails to demonstrate that counsel's failure to obtain the hard drives affected the outcome of his trial. Croft makes the vague assertion that the hard drives contained exculpatory *Brady* material, but he does not identify what material was located on the hard drives or why the material was exculpatory. Insofar as Croft asserts that the hard drives contained the documents later discovered via his daughter's FOIA request and presented to the Court via Croft's posttrial motions, Croft cannot demonstrate that the discovery of those documents would have changed the outcome of his trial. The Court has already reviewed those documents and determined that they were immaterial to a finding of guilt. Accordingly, Croft's ineffective assistance of counsel claim regarding the return of the hard drives is meritless.

### 3.  Jury trial waiver

In Claim (d), Croft alleges that Mr. McHugh was ineffective for inducing him to waive a jury trial and proceed to a bench trial, rendering the waiver of his jury trial involuntary. Croft alleges that Mr. McHugh assured him that a bench trial would be beneficial because he "knew th[e] judge", and Croft's prior criminal history "wouldn't matter." (ECF No. 425 at 22). Croft alleges that Mr. McHugh did not explain in detail what specific rights Croft would be waiving by proceeding to a bench trial, and Croft was left to rely on counsel's assurance that counsel's "relationship with [the Court] would benefit the outcome of the proceeding." (*Id.*).

Croft also alleges that Magistrate Judge Bemporad did not fully advise him of his rights attendant to waiving a jury trial at the colloquy on October 8, 2019, and this Court failed to disclose its personal "bias" in favor of military veterans until Croft's sentencing hearing. (*Id.* at 23). Croft maintains that he suffered prejudice from the failure of counsel and Judge Bemporad to explain in detail the rights he would be waiving by electing to have a bench trial and this Court's late disclosure of its personal "bias."

Insofar as Croft directly challenges the voluntariness of his jury trial waiver, the Government correctly asserts that the claim is procedurally defaulted because Croft failed to raise it on appeal and fails to demonstrate cause or prejudice. (ECF No. 427 at 10) (citing *Massaro v. United States*, 538 U.S. 500, 504 (2003) (Claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice.)). Notwithstanding the procedural bar, the record reflects that the jury trial waiver was knowingly and voluntarily made.

A defendant facing serious criminal charges has the right to a trial by jury, U.S. Const., art. III, § 2, cl. 3; id., amend. VI, but also has a right to waive a trial by jury by express and intelligent waiver. *See Patton v. United States*, 281 U.S. 276, 297–99 (1930). In addition to the constitutional

24

mandate, Fed. R. Crim. P. 23(a) has three requirements: that the Defendant waive a jury trial in writing; that the government consent; and that the court approve the agreement.

The Court referred the matter of Croft's jury trial waiver to Judge Bemporad specifically to ensure Croft's "knowing and voluntary waiver of the right to jury." (ECF No. 182 at 3). During the colloquy, Mr. McHugh represented to Judge Bemporad that it was Croft's desire to select a bench trial, and Mr. McHugh and Croft "thoroughly discussed" the pros and cons of doing so. (*Id.* at 2). Croft did not object. Judge Bemporad then addressed Croft directly and explained Croft's constitutional right to a jury trial. Croft represented that he had discussed his right to a jury trial with his attorneys, that he understood this right, and that he "decided to waive that right and instead go before Judge Ezra and allow him to find both the facts and the law in the case." (*Id.* at 5-6).

Mr. McHugh further represented to Judge Bemporad his belief that Croft had a rational understanding of the right to a jury trial and decided to waive that right even though a jury had already been selected. (*Id.* at 6). Based on the representations of Croft and Mr. McHugh, Judge Bemporad found that Croft knowingly and voluntarily waived his right to a jury in this case. Croft, his counsel, and the AUSA signed a written Waiver of Right to Jury Trial. (ECF No. 112).

At the start of the bench trial, this Court again inquired about Croft's desire to proceed to trial before the Court. (ECF No. 183 at 3-4). Croft affirmed Mr. McHugh's representation that Croft "wants issues of fact and law to be presented to his Court," that he is "aware of his waiver, he knows what his rights are and he's ready to proceed." (*Id.* at 4). The Court then required Croft to identify his signature on the written waiver. The Court informed Croft that he could change his mind about waiving his jury trial and proceed with the jury, but Croft declined. (*Id.* at 4-5). The Court then disclosed its status as a United States Marine Corps and United States Army veteran. Croft indicated that he had no objection. (*Id.* at 5-6).

"'Solemn declarations in open court carry a strong presumption of verity,' forming a 'formidable barrier in any subsequent collateral proceedings.'" *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (quoting *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977)). "Official records, such as [a signed waiver] are entitled to a presumption of regularity and are accorded great evidentiary weight." *Hobbs v. Blackburn*, 752 F.2d 1079, 1081–82 (5th Cir. 1985) (citations omitted). Croft's claim that neither Mr. McHugh nor Judge Bemporad advised him of the rights he was waiving is expressly controverted by the record. The record reflects that Croft was properly advised of his right to a jury trial in accordance with Fed. R. Crim. P. 23(a). Moreover, this Court disclosed its military history prior to the bench trial, and Croft had no objection. The waiver in this case was knowingly and voluntarily made.

Croft also fails to demonstrate deficient performance and prejudice regarding counsel's purported advice to proceed with a bench trial. The decision of trial counsel to recommend a bench trial to his client "is the type of act for which *Strickland* requires that judicial scrutiny be highly deferential." *Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir. 1989). Mr. McHugh's strategy for selecting a bench trial is explained in his response to Croft's State Bar grievance:

> It was the decision of the defense team, including Croft, that the trial should be had before the Court as a bench trial and that Croft should not testify. That decision was informed, in large part, by Croft's demeanor, criminal history, and the findings of the previous Federal Judge who viewed his testimony and entered findings that Croft lacked credibility. By electing a bench trial, Croft was able to avoid any possible prejudicial effects his past would have on a jury. In his deposition testimony, relied upon in his bankruptcy proceedings, Croft admitted to a large variety of past criminal conduct including violent crimes.

(ECF No. 429 at 7). By electing a bench trial, Croft avoided any possible prejudicial effects his past might have had on a jury. Croft fails to demonstrate that this strategy was unreasonable under the circumstances.

Croft's allegation that Mr. McHugh induced him into electing a bench trial because Mr. McHugh had a "relationship" with the Court is too vague to demonstrate that the jury trial waiver was involuntary. Croft does not allege, much less prove, that Mr. McHugh made a specific promise or guarantee regarding the outcome of a bench trial based on his familiarity with the Court.

Moreover, as a final matter, Croft fails to demonstrate that a jury trial would have resulted in a different outcome. There was overwhelming evidence to support Croft's convictions. Croft cannot show a reasonable likelihood that a jury would not have convicted him had he proceeded to trial by jury. Accordingly, this claim is denied.

### 4. Total loss calculation

In Claim (f), the Court understands Croft to allege that Mr. McCrum was ineffective for failing to object to the total loss amount calculated in the PSR pursuant to § 2B1.1(b)(1)(I). The PSR applied a sixteen-level upward adjustment pursuant to § 2B1.1(b)(1)(I) based on a total loss of $1,506,758.31. (ECF No. 217 at ¶¶ 15, 25, 32). Croft argues that he should have received credit against the loss amount "for legitimate services provided as well as substantial refunds for veterans who could not attend class." (ECF No. 425 at 26). According to Croft, with a proper objection, the total loss amount would have resulted in only a fourteen-level increase under § 2B1.1(b)(1)(H) and would have reduced his $1,506,758.31 restitution obligation.

In support of this claim, Croft submitted an affidavit in support of an application for a seizure warrant completed by Special Agent Sharleigh Drake on August 6, 2018. Drake was assigned as a Task Force Officer with the FBI to investigate Croft's case. In the affidavit, Drake provides a summary of activity of two of Universal K-9's bank accounts from January 1, 2016, through April 30, 2018, highlighting deposits from, and refunds to, the VA. The affidavit shows total deposits in the amount of $1,443,036.62 and refunds totaling $105,216.67. The affidavit

further states that, "Between 2016 and the present, Universal K-9 filed approximately 185 claims relating to the education of approximately 132 veterans and totaling over $1,260,00.00."

However, evidence presented later at trial established that the total amount of money the VA paid to Universal K-9 totaled $1,506,758.31. The Fifth Circuit affirmed the restitution and forfeiture orders on appeal. (ECF No. 313 at 11) ("The United States government paid Croft over $1.5 million dollars for veterans to be taught by the certified instructors approved by the TVC"). The preliminary investigative information Croft points to in Agent Drake's affidavit is insufficient to show that any monies were refunded or that the $1,506,758.31 figure adduced based on evidence presented at trial was inaccurate.

Additionally, Croft cannot show that he was entitled to a reduction of the loss amount based on the value of "legitimate services." He does not specify any legitimate services provided or the specific value of such services. Moreover, in rejecting Croft's challenge to the restitution and forfeiture orders, the Fifth Circuit stated that, "The extent of actual, beneficial training that the veterans might have received is beside the point. Universal K-9's operations and teaching of veterans was '"systematically tainted with fraud" and it was impossible to tell which services were legitimate versus illegitimate.'" (ECF No. 313 at 12).

At sentencing, Mr. McCrum vigorously objected to the PSR's offense level calculations. (ECF No. 217). As a result of Mr. McCrum's advocacy, the Court granted the objection to a four-level upward adjustment pursuant to § 3(b)1.1(a) for a leading role. Given the low likelihood of success in challenging the total loss calculation, counsel's decision to assert four other objections instead of challenging the loss calculation was not unreasonable. Accordingly, Croft fails to demonstrate that counsel was deficient for failing to challenge the total loss amount calculated in the PSR or that he would have received a lesser sentence had counsel raised the objection.

Croft further complains that Mr. McCrum failed to object to the "improperly ordered forfeiture of all the proceeds from the wire fraud." (ECF No. 425 at 26). This claim is not cognizable in the pending § 2255 Motion. The type of claims cognizable under § 2255 are limited to claims relating to unlawful custody. *See United States v. Segler*, 37 F.3d 1131, 1137 (5th Cir. 1994) ("Because Congress limited relief under § 2255 to persons in federal custody, we hold that Congress also meant to limit the types of claims cognizable under § 2255 to claims relating to unlawful custody."). Accordingly, because this ineffective assistance claim does not seek relief from a custodial sentence, it is not cognizable in the pending § 2255 Motion.

### 5. "Money or property" under 18 U.S.C. § 1343

In Claim (g), the Court understands Croft to allege that counsel was ineffective for failing to challenge the wire fraud charges on the grounds that Croft did not seek "money or property" from the TVC, as required by the wire fraud statute. Croft argues that the misrepresentations he made to the TVC did not amount to a "scheme to defraud" under § 1343 because the wire fraud statute bars fraudulent schemes "for obtaining money or property,"[6] and Croft sought "approval" from the TVC for Universal K-9 to receive tuition payments through GI-Bill funding, not money or property from the state regulatory agency.

Croft relies on Supreme Court and Fifth Circuit decisions holding that a "scheme to defraud" under the mail fraud statute does not encompass fraud in obtaining government licenses because "such a license is not 'property' in the government regulator's hands," *Cleveland v. United States*, 531 U.S. 12, 20 (2000), nor does the statute reach fraud in obtaining the allocation of

---

[6] 18 U.S.C. § 1343 provides, in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." (emphasis supplied).

unissued tax credits. *United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003). Croft likens the "approval" sought in his TVC application to a license or permit. Croft further maintains that the misrepresentations he made in his TVC applications were immaterial.

Croft cannot demonstrate counsel was ineffective for failing to challenge the wire fraud charges on this basis because this argument has no merit and would not have changed the outcome of his criminal proceeding. Croft's misrepresentations to the VA induced the agency to pay $1.5 million in benefits to Universal K-9. The cases Croft relies on are readily distinguishable, and the Fifth Circuit rejected an argument similar to the one Croft makes here in *United States v. Davis*, 53 F.4th 833, 843 (2022). Moreover, this Court and the Fifth Circuit have rejected Croft's argument that the misrepresentations he made on the TVC application were immaterial. Accordingly, Croft cannot establish ineffective assistance of counsel under *Strickland*.

### 6. *Dubin*

In his final ground for relief, (Claim (h)), Croft asserts that the Fifth Circuit erred in affirming his aggravated identity theft convictions on remand from the Supreme Court following *Dubin*. In *Dubin*, the Supreme Court held that under § 1028A(1)(a) "[a] defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Dubin*, 599 U.S. at 131. On remand, a three-judge panel of the Fifth Circuit applying *Dubin* affirmed Croft's aggravated identity theft convictions, holding that, "Croft's misrepresentations about 'who' was teaching courses at Universal K-9 were the basis— and 'heart of'—his wire fraud convictions." (ECF No. 387 at 9) (citations omitted). Thus, "[a]s is required by *Dubin*, the use of the four men's names and information was 'at the crux of what made the underlying [conduct] fraudulent.'" *Id.* at 10 (citation omitted).[7]

---

[7] In a *dubitante* Circuit Judge James C. Ho wrote that he respected the decision of the majority of the panel that decided to affirm "even if I am personally not so sure that affirmance can be reconciled with *Dubin*." (ECF No. 387 at 16).

Croft argues that the panel misapplied *Dubin* because "[a]ll of the testimony before this court makes it clear it was the QUALIFICATIONS of those who would teach the veterans and not their names, which was the "CRUX" of the TVC application." (ECF No. 425 at 35). Following remand, Croft argued through counsel that the use of the four individuals' names was not the crux of this case but were ancillary to the predicate offense. The panel majority rejected this argument, holding that, "At its core, Croft's application to the TVC was fraudulent because of his misappropriation of the victim trainers' means of identification." (ECF No. 387 at 10). The Supreme Court denied Croft's petition for a writ of certiorari. This claim has already been resolved against Croft on appeal, and he provides no basis for relief in the § 2255 Motion. Accordingly, this claim is denied.

### 7. Amendment/Supplement to § 2255 Motion

Croft's Amendment/Supplement to the § 2255 Motion asserts five claims. Claim One involves the grand jury testimony of Sean Scott, a special agent with IRS-CI who testified before the grand jury regarding Counts Fifteen and Sixteen (making a false tax return). Croft alleges that he conducted a diligent public records search for any public record reflecting that Agent Scott is or was a special agent of IRS-CI, however Croft's search did not uncover any records. Additionally, the IRS denied Croft's FOIA request for "[a]ny pseudonyms, aliases, badge numbers, or alternate identifiers used by Sean Scott in the course of duty" with the following explanation:

> We're withholding the requested information pertaining to Sean Scott under FOIA exemption (b)(6). Your request is being denied because the scope of your request extends to records, to the extent that any exist, contain information of an individual that would be included in a protected group of employees, such as individuals in a protected series and those who have a cyber security designation, alternate work location, or a pseudonym.

(ECF No. 503 at 33-36). Croft concludes that Agent Scott was a "fictitious agent" that the Government presented to the grand jury without disclosing this "pseudonym," rendering Counts Fifteen and Sixteen constitutionally invalid.

Claim Two involves Fred Olivares, a former FBI criminal investigator who worked with Mr. McHugh in aid of Croft's defense to the criminal charges. Croft alleges that Mr. Olivares investigated Croft's case when he worked for the FBI, then later assisted Mr. McHugh with Croft's defense, resulting in a conflict of interest. Croft asserts that the U.S. Attorney's Office, through AUSA Surovic, sent a written letter to Mr. McHugh on November 19, 2018, informing Mr. McHugh of the potential conflict of interest involving Olivares. Croft further asserts that Mr. McHugh later submitted a false affidavit in 2022 denying knowledge of any such conflict. Croft asserts that the Court "permitted [Mr.] Olivares to sit at counsel table without waiver, colloquy, or inquiry into his conflicted role" and "further accepted [Mr.] McHugh's false affidavit at face value" resulting in "fraud on the court" and a "structural conflict." (ECF No. 503 at 2).

Claim Three alleges that AUSA Surovic elicited false testimony from witness Wes Keeling at trial, contradicting representations Keeling made in the MOI. Croft further asserts that the Government suppressed the impeachment evidence that Keeling was "*Brady*-listed." Croft asserts that "[t]he Government's subsequent denials, and [the Court]'s acceptance of those denials, constituted ratification of falsehoods and judicial entanglement in fraud on the Court." (*Id.* at 3). Croft submits several exhibits purportedly demonstrating the falsity of Keeling's testimony and Government suppression of the impeachment evidence.

Claim Four alleges that the Government's Response to the § 2255 Motion—filed by AUSA Surovic—presents a conflict of interest because Croft's § 2255 Motion alleges claims of prosecutorial misconduct and ineffective assistance of counsel based on AUSA Surovic's

involvement in Croft's criminal case. Croft previously filed a motion to strike the Government's Response to the § 2255 Motion based on this purported conflict on September 15, 2025. (ECF Nos. 478 & 480). The Court denied the motion on September 24, 2025. (ECF No. 493). Croft alleges that by denying the motion, the Court "ratified an advocate-witness conflict" and became a "participant in perpetuating fraud on the court" warranting disqualification under 28 U.S.C. § 455. (ECF No. 503 at 3).

In Claim Five, Croft alleges that the Government's wire fraud theory rested on the allegation that Croft emailed applications to the TVC, but the TVC did not accept emailed applications and instead required three hard copies submitted by mail. According to Croft, because the only alleged wire transmission was not material or central to the scheme, the wire fraud counts under 18 U.S.C. § 1343 fail as a matter of law under Supreme Court precedent that forecloses using regulatory approvals or intangible interests as "property." (ECF No. 526) (citing *Cleveland*, 531 U.S. 12; *Dubin*, 599 U.S. 110).

It is well settled that Rule 15 of the Federal Rules of Civil Procedure, which governs Amended and Supplemental Pleadings, applies to federal habeas proceedings. *See United States v. Saenz,* 282 F.3d 354, 355-56 (5th Cir. 2002) (Habeas applications "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"). Rule 15(a) requires that leave to amend be granted freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a district court may deny leave to amend a section 2255 motion when the amendment would be futile. *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009). An amendment is futile if it is time-barred. *Id.*

Section 2255 contains a one-year limitations period for the filing of a motion to vacate, set aside, or correct a federal sentence. *See* 28 U.S.C. § 2255(f). This limitations period runs from the

latest of: (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence. *Id.* A judgment of conviction becomes final when the conviction is affirmed on direct review or when the time for perfecting an appeal expires. *Clay v. United States*, 537 U.S. 522, 527 (2003).

The judgment of conviction became final under § 2255(f)(1) on April 1, 2024, when the Supreme Court denied Croft's petition for writ of certiorari. Croft had until April 1, 2025, to timely assert any § 2255 claims. There is no dispute that the original § 2255 Motion was timely filed on November 26, 2024.

Under Fed. R. Civ. P. 15, an untimely claim is not time-barred if it relates back to the original, timely filed § 2255 motion. Fed. R. Civ. P. 15(c)(1)(B). "An amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. *Saenz*, 282 F.3d at 356 (quoting Fed. R. Civ. P. 15(c)(2)). However, new claims do not automatically relate back because they arose out of the same trial and conviction or because they rest on violations of the same constitutional provision. *Mayle v. Felix*, 545 U.S. 644 (2005); *Gonzalez*, 592 F.3d at 680 (New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision).)). The court "must look to whether [the movant's] new claim

asserts 'a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Gonzalez*, 592 F.3d at 680 (quoting *Mayle*, 545 U.S. at 650).

The Government asserts that Claims Three and Five of the Amendment/Supplement to the § 2255 Motion relate back to the original § 2255 Motion and are therefore not time-barred. However, the Government asserts that the claims, as amended, are without merit. As to the remaining claims, the Government asserts that the claims are time-barred, they do not relate back to the claims raised in the original § 2255 Motion, and Croft fails to demonstrate equitable tolling.

The Government's position is well-taken. Claim Three, which reasserts the claim that AUSA Surovic committed prosecutorial misconduct by eliciting false testimony from Keeling at trial regarding his involvement with Universal K-9, relates back to the original § 2255 Motion. In the Amendment/Supplement to the § 2255 Motion, Croft provides additional evidence in support of this claim and further alleges that "[t]he Government's subsequent denials, and [the Court]'s acceptance of those denials, constituted ratification of falsehoods and judicial entanglement in fraud on the Court." The Court has considered the additional argument and evidence and nevertheless finds that the claim is meritless because the Court has repeatedly held that Keeling's testimony and the impeachment evidence were not material to a finding of guilt in this case.

Liberally construed, the Court understands Claim Five to supplement Croft's challenge to the wire fraud convictions based on *Cleveland* and *Dubin* asserted in the original § 2255 Motion. Accordingly, this claim relates back to the original § 2255 Motion. However, the supplemental argument that no fraudulent act was committed by wire does not change the Court's analysis that Croft's challenge to the wire fraud conviction is meritless.

Claims One, Two, and Four of the Amendment/Supplement to the § 2255 Motion were not timely filed and do not relate back to the original, timely filed § 2255 motion. Claim One, which

35

asserts that the Government presented the grand jury testimony of Agent Scott without disclosing the "pseudonym," is different in time and type from any of the prosecutorial misconduct claims asserted in the original § 2255 Motion. Claim Two also does not relate back because there is no allegation of prosecutorial misconduct, ineffective assistance of counsel, or trial court error regarding the purported conflict of interest involving Mr. Olivares in the original § 2255 Motion. Claim Four, wherein Croft asserts that the Government's Response to the § 2255 Motion presents a conflict of interest because it was filed by AUSA Surovic, does not relate back to any claim in the original § 2255 Motion.

To demonstrate "timeliness and equitable tolling" Croft asserts that: (1) he has been diligent in pursuing his claims; (2) "Government concealment and suppression of key facts prevented earlier discovery;" (3) new facts discovered between 2023-2025 warrant the application of a later limitations period pursuant to § 2255(f)(4); (4) all new claims arise from the same core misconduct and prosecutorial fraud alleged in original § 2255 Motion; and (5) Rule 60(d)(3) preserves authority to vacate judgments obtained through fraud. (ECF No. 503 at 4-5).

Croft does not satisfy his burden of establishing any grounds to warrant statutory or equitable tolling of the untimely claims. His vague references to Government suppression and "new facts" discovered between 2023-2025 do not establish that the facts giving rise to Claims One (Agent Scott "pseudonym"), Two (Mr. Olivares "conflict"), and Four (§ 2255 Response) could not have been discovered through the exercise of due diligence until a later date pursuant to § 2255(f)(4). Croft also does not meet the standard for equitable tolling of the statute of limitations because he does not establish that "'(1) [] he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

In summary, Claims Three and Five of the Amendment/Supplement to the § 2255 Motion are denied on the merits. Claims One, Two, and Four are dismissed with prejudice as time-barred. Accordingly, Croft's Motion to Strike Indictment and Enjoin Enforcement Under Rule 65 for Fraud on the Court and For Immediate Release from Custody (ECF No. 481) is denied. Croft's Motion for Leave to Supplement Pending § 2255 Motion with the evidence of the IRS FOIA response (ECF No. 483) is dismissed as moot. The Government's "Motion to Dismiss Portions of Defendant's Amendment or Supplement to the 2255 and to Dismiss all other Pending Filings That Should have Been Filed As Part of the 2255" (ECF No. 525) is granted, and the Amendment/Supplement to the § 2255 Motion is dismissed in part with prejudice as time-barred and denied in part.

## **Evidentiary Hearing**

An evidentiary hearing on a § 2255 motion is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). A district court's decision not to hold an evidentiary hearing is reviewed for abuse of discretion. *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998)). Because the issues presented in this case can be resolved on the basis of the record, the Court finds an evidentiary hearing is not required.

## **Conclusion**

The claims Croft presents in the § 2255 Motion are without merit. Accordingly, the § 2255 Motion is denied. The Amendment/Supplement to the § 2255 Motion is dismissed in part with prejudice as time-barred and denied in part.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a proceeding under § 2255 "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejects a movant's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a [certificate of appealability] should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Croft's § 2255 motion on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See id*. Thus, a certificate of appealability shall not be issued.

Accordingly,

It is **ORDERED** that Movant Bradley Lane Croft's Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 (ECF No. 425) and Motion to Strike Indictment and Enjoin Enforcement Under Rule 65 for Fraud on the Court and For Immediate Release from Custody (ECF No. 481) are **DENIED**.

It is further **ORDERED** that the Government's Motion to Dismiss Portions of Defendant's Amendment or Supplement to the 2255 and to Dismiss All Other Pending Filings That Should Have Been Filed As Part of the 2255 (ECF No. 525) is **GRANTED**. Croft's Amendment/Supplement to § 2255 Motion (ECF No. 503) is **DISMISSED IN PART AS TIME-BARRED AND DENIED IN PART** as set forth in this Order.

It is further **ORDERED** that Croft's Motion to Preserve and Individually Adjudicate Pending Rule 60(b) Filings (ECF No. 462); Motion for Leave to Supplement Pending § 2255 Motion (ECF No. 483); Motion for Release on Bond Pending Resolution of Fraud-on-the-Court and Judicial Conflict (ECF No. 492); Renewed Motion for Release on Bond Pending § 2255 Proceedings (ECF No. 501); and "Motion to Strike Government's Non-Compliant and Conflicted Filing (DKT. 525), or in the Alternative, to Compel a Verified Rule 5(b) Response and Set Evidentiary Hearing" (ECF No. 527) are **DISMISSED AS MOOT**.

It is further **ORDERED** that Croft's Motion to Compel Findings of Fact in Support of Writ of Prohibition (ECF No. 497); Motion to Alter or Amend Judgment Pursuant to Rule 59(e) (ECF No. 498); and Renewed Motion to Strike and Disqualify Conflicted § 2255 Response (ECF No. 499) are **STRICKEN** in accordance with ECF No. 493.

It is further **ORDERED** that this case is now **CLOSED**.

**FINALLY**, **IT IS ORDERED** that a certificate of appealability is **DENIED**.

**SIGNED** the 29th day of October 2025.

_____
DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE